UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-

C.D., by and through her PARENTS AND
NEXT FRIENDS, M.D. and P.D.
and
M.D. and P.D., for themselves,

            Plaintiffs

v.

NATICK PUBLIC SCHOOL DISTRICT,
and
BUREAU OF SPECIAL EDUCATION
APPEALS
           Defendants

COMPLAINT

## PRELIMINARY STATEMENT

1.     This action arises under the Individuals with Disabilities Education Act ("IDEA"),

20 U.S.C. §1400, *et. seq.*  It is also a complaint for judicial review of a final administrative

Decision of the Defendant, Bureau of Special Education Appeals ("BSEA") of the

Division of Administrative Law Appeals, pursuant to 20 U.S.C. §1415(i)(2).

2.     The Plaintiffs, C.D., and her parents, M.D. and P.D. ("Parents") bring this action,

on behalf of their daughter and themselves, due to the failure of the Defendant, Natick

Public School District ("Natick") to comply with the requirements of federal and state

special education law.

3.      C.D. is currently enrolled at Learning Preparatory School ("Learning Prep"), a state-approved special education school in Newton, Massachusetts, where the Parents privately placed her in September 2012, following their rejection of Natick's proposed placement for 9th grade.   C.D. successfully completed 9th, 10th and 11th grade at Learning Prep and is currently attending 12th grade.

4.      The issues exhausted at the BSEA hearing were:

a.      Whether the Individualized Educational Programs ("IEP's") proposed by Natick for the periods from 2012-2013, 2013-2014, and 2014-2015 were reasonably calculated to provide C.D. with a free appropriate public education ("FAPE") in the least restrictive environment.

b.       Whether there were any procedural violations committed by Natick that resulted in a denial of FAPE to C.D.

c.      Whether Natick complied with C.D's IEP in providing summer services during the summer of 2012.

d.       Whether Natick engaged in any discrimination or retaliation in violation of 42 U.S.C. § 1983 and Section 504 of the Rehabilitation Act of 1973 (to preserve the Parents' right to file a claim for damages at a later date).

5.      On July 24, 2015, the Hearing Officer issued a final Decision, which she reissued on July 28, 2015 with a cover Memorandum indicating that there were three (3) paragraphs of the final Decision that were inadvertently omitted from the version of the

Decision sent to the parties on July 24, 2015.  (The reissued final Decision is attached hereto as Exhibit A.).

6.      The Parents bring this action timely, requesting review and reversal of the Hearing Officer's decision with respect to whether Natick failed to provide C.D. with a FAPE in the least restrictive environment for the periods from 2012-2013, 2013-2014, and 2014-2015, and whether there were any procedural violations committed by Natick that resulted in a denial of FAPE to C.D.

7.      The Parents are seeking reimbursement for their unilateral placement of C.D. at Learning Preparatory School ("Learning Prep") in Newton, Massachusetts, as well as reasonable attorney's fees and costs under the IDEA.

8.      The Parents are aggrieved by the final Decision of the Hearing Officer in that it is based upon mistakes of fact and errors of law, made upon unlawful procedures, not supported by a preponderance of the evidence, unwarranted by the facts on the record, biased, arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over the matter pursuant 20 U.S.C. §1415(i) of the IDEA, and 28 U.S.C. §1331.

10.     Venue is appropriate in this District pursuant to 28 U.S.C. §1391.

## THE PARTIES

11.    The Plaintiff, C.D., is the subject of this action.  She is a student with a disability who is entitled to all the rights, entitlements, and procedural safeguards mandated by applicable law and statutes, including, but not limited to, the IDEA, and M.G.L. c.71B. C.D. is and was at all times relevant to this action, a resident of Natick, Middlesex County, Massachusetts.

12.    The Plaintiffs, M.D. and P.D. are C.D.'s father and mother respectfully, who bring this action on behalf of C.D. and themselves.  M.D. and C.D. are and were at all times relevant to this action, residents of Natick, Middlesex County, Massachusetts.

13.    The Defendant, Natick, is a public corporation with the capacity to be sued under the laws of the Commonwealth of Massachusetts, with a usual place of business located at 13 E. Central Street, Natick, Middlesex County, Massachusetts.

14.    Natick receives federal funds from the United States Department of Education pursuant to the IDEA, and is required to provide special education services to all eligible students who reside within the school district.

15.    The Defendant, BSEA, is an independent subdivision of the Division of Administrative Law Appeals, an independent state agency within the Commonwealth of Massachusetts, with a usual place of business at One Congress Street, Boston, Suffolk County, Massachusetts.

16.    The BSEA is responsible for adjudicating disputes between parents and school districts regarding special education services pursuant to 20 U.S. §1415(g) and M.G.L. c. 71B, §2A.

## FACTUAL ALLEGATIONS

17.     C.D. is an eighteen (18) year old student with a disability who is eligible for special education and related services under federal and state law.  Upon reaching the age of majority, C.D. delegated her continued decision-making rights regarding her special education services to her parents pursuant to 603 CMR 28.07(5)(c).

18.     C.D. has been diagnosed with a borderline intellectual disability, along with deficits in receptive and expressive language.

19.     C.D. has many strengths, including, but not limited to, a very strong work ethic and excellent executive functioning skills; she is organized, cooperative, has good social skills, and has never exhibited any behavior problems.

20.     C.D. attended public school in Natick through the end of 5th grade pursuant to IEP's proposed by Natick and accepted by the Parents.

21.     At the end of 5th grade, Natick determined that C.D. should be placed in the substantially separate "ACCESS" program at Wilson Middle School for all of her academic classes during the 2009-2010 school year.

22.     The ACCESS program at Wilson Middle School is a self-contained substantially separate "life-skills" program that uses "entry points" to access the general education curriculum, emphasizing functional academics and community living skills.

23.     The Parents rejected the IEP and enrolled C.D. in the Christa McAuliffe Regional Charter Public Middle School ("McAuliffe"), in Framingham, Massachusetts.

24.     C.D. attended all of her classes at McAuliffe integrated with general education students in the general education inclusion setting with appropriate supports and services

for 6th grade through 8th grade (with the exception of Math in 8th grade only, for which she attended a small group class).

25.     C.D.'s progress reports showed that her placement at McAuliffe was appropriate and she received clear academic and social benefits.

26.     On November 17, 2010, when C.D. was in 7th grade, the Parents filed a request for hearing with the BSEA, alleging that the IEP devised by Natick at the end of 5th grade did not propose a FAPE in the least restrictive environment pursuant to the requirements under the IDEA.

27.     On February 15 and 16, 2011, a hearing was held before Hearing Officer Crane who found that the IEP developed by Natick *in 2009* proposing the ACCESS program for 6th grade was appropriate at that time *based upon the information Natick had available (or could have had available) at the time it was proposed in 2007*.

28.     On or about May 2, 2012, the Parents contacted Natick to request an IEP Team Meeting to discuss C.D's potential reenrollment at Natick for 9th grade following her graduation from McAuliffe and enrollment in extended year services ("ESY") at Natick during the summer of 2012.

29.     On May 24, 2012, Natick held an *"Informational"* IEP Team Meeting.

30.     The Parents provided Natick with information prior to the meeting, including C.D.'s most recent Speech and Language Assessment, most recent Educational Assessment, and her records from McAuliffe.

31.    In addition, the Parents brought several persons to the Team Meeting who had worked directly with C.D. during the previous three (3) years, to provide information to Natick about C.D.'s unique individual needs and success at McAuliffe in the general education setting.

32.    Ms. Coellner and Ms. Soden, two retired special educational teachers/administrators with over thirty (30) years' experience each, had provided C.D. with occasional supplementary support in the academic classroom at McAuliffe on a rotating schedule every day for the past three (3) years.

33.    Ms. Flax, a speech/language pathologist with over thirty (30) years' experience, had provided private speech therapy for C.D. on a weekly basis since 2007.

34.    Dr. Imber, a special education consultant, independent educational evaluator, and professor of special education, with over forty (40) years' experience, had served as an educational consultant and independent evaluator for C.D. since 2009.

35.    There was no one present from Natick at the meeting on May 24, 2012 who had observed C.D. at McAuliffe or who had worked directly with her.

36.    Ms. Coellner and Ms. Soden informed Natick that C.D. was able to access the general education curriculum at McAuliffe and make meaningful progress with appropriate supplementary aids and services.

37.    Natick provided the Parents with general information about the two predominant programs at the high school: (1) general education inclusion classes; and (2) small group ("Small Group/Replacement") classes where all students are on an IEP, the curriculum is

the same as in the general education classes, but taught with modifications by special education teachers.

38.     Natick also explained that there is the self-contained substantially separate "ACCESS" program at Natick High School that uses "entry points" to access the general education curriculum, emphasizing functional academics and community living skills.

39.     Students in the ACCESS program do not take the standard Massachusetts Comprehensive Assessment System ("MCAS") exam and do not receive a high school diploma.

40.     In contrast to the ACCESS program, all students at Learning Prep take the standard MCAS with appropriate accommodations.  The rate of passing is approximately 88% to 92% and all students at Learning Prep who pass the MCAS receive their high school diplomas.

41.     At the conclusion of the meeting, Natick indicated that the ACCESS program would *likely* be the appropriate program for C.D., *based upon Dr. Imber's recent test scores and the prior BSEA ruling in 2011*, but that its Special Education Director, Ms. Gina Dalan would be observing C.D. at McAuliffe and speaking with her teachers.

42.      On May 29, 2012, the Parents requested permission to observe the programs, pursuant to their rights under federal and state law, but Natick did not provide them with the opportunity to do so before the end of the school year.

43.     On May 31, 2012, Ms. Dalan, observed C.D. at McAuliffe.

44.     On June 5, 2012, Ms. Dalan sent a letter to C.D.'s parents, indicating that she believed the self-contained ACCESS program at Natick High School would be the

appropriate placement, but Natick would be proposing all Small Group/Replacement classes to provide a "comparable program" *pending the development of a new IEP in the fall* [as required by law for transfer students pursuant to 603 C.M.R. 28.03(1)(c)].

45.     On June 13, 2012, the Parents requested an IEP meeting during the summer so that Natick could develop a new IEP *before the fall*, rather than propose a comparable IEP solely to comply with the regulations regarding transfer students.  Natick scheduled an IEP Team Meeting for July 27, 2012 *to develop a new IEP for C.D.*

46.     Prior to the meeting, C.D. attended the extended year program ("ESY") at Natick, which began on or about July 9, 2012.

47.     Prior to the meeting on July 12, 2012, Ms. Dalan sent an email to the Parents indicating that *Natick's recommendation of the ACCESS program was based on the discussion at the meeting on May 24, 2012.*

48.     The Parents brought several persons to the IEP Team Meeting on July 27, 2012, including Ms. Coellner, Ms. Soden and Dr. Imber, to provide Natick with information about C.D.'s unique individual needs and success at McAuliffe in the general education classroom.

49.     There was no one present from Natick at the meeting who knew C.D. directly or indirectly, even though Natick could have invited the academic teacher and the speech and language teacher from the ESY program who had both worked with C.D. just a few weeks prior to the meeting.

50.     Ms. Dalan, the only person from Natick who had observed C.D. at McAuliffe, was no longer employed by the district and therefore did not attend the meeting.

51.     Ms. Coellner and Ms. Soden provided detailed information to Natick regarding C.D.'s progress and success at McAuliffe.

52.     In 8th grade, C.D. took the standard ELA MCAS with appropriate accommodations, and passed.

53.     Despite the information provided by the Parents at the Team Meeting on July 27, 2012, Natick *would not even discuss* why it could not provide an appropriate education in the general education or Replacement/Small Group classes for C.D., even with the use of supplementary aids and services, contrary to the requirements of the IDEA.

54.     Natick insisted that based upon C.D.'s test scores and the prior BSEA ruling in 2011, the ACCESS program was the only appropriate placement for the 2012-2013 school year.

55.     The Parents had many questions about the ACCESS program, which could not be answered at the meeting because there were no teachers from the ACCESS program in attendance.

56.     Natick could have invited Mr. Francoise, who was the lead teacher of the ACCESS program at the time, or another teacher from the ACCESS program, but Natick chose not to do so despite it's intention to propose the ACCESS program to the Parents at the meeting.

57.     The Parents requested syllabuses and reading materials from the ACCESS program, but Natick did not provide them.

58.     The Parents asked about the population of students, but Natick was only able to provide limited information, including that approximately nine (9) students were enrolled in the 2012-2013 class, and there were no students with autism or "significant" behavioral disabilities (a representation that would later prove to have been disingenuous).

59.     On August 1, 2012, Natick provided the Parents with the proposed IEP for the 2012-2013 school year, recommending the ACCESS program for all of C.D.'s academic classes.  The proposed IEP did not include a transition plan, as required for all students over age fourteen (14) under the law in Massachusetts.

60.     On August 14, 2012, the Parents rejected the IEP.

61.     The Parents provided Natick with the required ten (10) day notice, indicating that C.D. would be attending Learning Prep for the 2012-2013 school year, and they would be seeking reimbursement from Natick.

62.     Natick chose not to schedule another IEP Meeting or otherwise attempt to address the Parents' concerns.

63.     C.D. attended Learning Prep for the 2012-2013 school year, achieving meaningful progress, and benefiting both academically and socially.

64.     On May 22, 2013, Natick held an IEP Team Meeting for the purpose of C.D.'s Annual Review under the IDEA.

65.     Although Natick could have obtained information regarding C.D.'s progress at Learning Prep during the 2013-2014 school year, Natick did not invite anyone from Learning Prep to attend the meeting and did not otherwise attempt to update its

information regarding C.D.'s current performance.

66.     On June 1, 2013, Natick proposed an IEP for the 2013-2014 school year, which was practically identical to the IEP proposed for the 2012-2013 year, failing to take into account C.D.'s progress during the period of time between the date of its last proposed IEP and the current date.

67.     The Parents rejected the IEP proposed for the 2013-2014 school year and provided Natick with the ten (10) day notice, indicating that C.D. would be attending Learning Prep for the 2013-2014 school year.

68.     C.D. attended Learning Prep for the 2013-2014 school year, achieving meaningful progress, and benefiting both academically and socially.

69.     In 10th grade C.D. took the standard MCAS with appropriate accommodations and passed the MCAS in ELA.  C.D. almost passed the MCAS in Math and Science/Technology, missing by only a few points.

70.     On March 12, 2014, Natick requested that the Parents provide consent to evaluate C.D. as part of her three (3) year evaluation under the IDEA.

71.     The Parents requested clarification regarding the nature of the evaluations before providing their consent.

72.     On April 15, 2014, Natick held an IEP Team Meeting for the purpose of C.D.'s Annual Review and to answer the Parents' questions regarding the nature of the evaluations proposed.

73.     Natick *did not invite any teacher from the ACCESS program* to attend the meeting*, and there was no speech and language teacher at the meeting* although

speech and language was a central goal on C.D.'s IEP.

74.     Although Natick could have obtained information regarding C.D.'s progress at Learning Prep during the 2013-2014 school year, Natick did not invite anyone from Learning Prep to attend the meeting and did not otherwise attempt to update its information regarding C.D.'s current performance.

75.     Natick informed the Parents that it would be conducting a Psychological Evaluation, a Speech and Language Assessment, and Academic Achievement Testing.

76.     Although Natick could have proposed a Transition Assessment, Natick chose not to do so, even though *C.D. was now seventeen (17) years old* and a transition assessment had not been done, contrary to Massachusetts's law.

77.     Following the meeting, Natick proposed its first of three IEP's for the 2014-2015 school year.  The proposed IEP dated April 15, 2014 – April 15, 2015 continued to recommend placement in the ACCESS program, and was practically identical to the IEP proposed for the 2013-2014 school year.

78.     On May 23, 2014, the Parents filed a Request for Hearing with the BSEA that led to the Hearing Decision from which the Parents now appeal.

79.     The Parents alleged *inter alia* that Natick violated C.D's due process rights under the IDEA by: (1) failing to propose IEP's for the period from 2012-2013, 2013-2014, and 2014-2015 school years that provided C.D. with a FAPE in the least restrictive environment; and (2) committing multiple procedural violations that resulted in the denial of a FAPE.

80.     In its response, Natick denied the Parent's allegations and asserted *inter alia* that

"[a]bsent a significant change in [C.D.'s] cognitive profile, a possibility that seems highly unlikely…there is no evidence to support that the ACCESS program would not have been or does not continue to be appropriate."

81.    The Parents were surprised to learn that Natick had placed C.D. in the ACCESS program *based on her cognitive profile and not her unique individual needs*.

82.    On May 27, 2014, the Parents rejected the IEP dated April 15, 2014 – April 15, 2014, and informed Natick that they would be placing C.D. at Learning Prep for the 2014-2015 school year.

83.    On June 10, 2014, *Natick finally provided the opportunity for Dr. Imber and Ms. Flax to observe the ACCESS program and speak with the teachers* so they could assess whether it would be appropriate for C.D.

84.    Dr. Imber and Ms. Flax observed seven (7) children in the class and three (3) aids; the students were mostly sitting by themselves at different tables, and there was very little social interaction between them.

85.    One of the students was very disruptive, stimming and humming.

86.    Mr. Francoise informed them that most of the students were intellectually challenged and one of the students was nonverbal.

87.    Dr. Imber and Ms. Flax did not believe that the students they observed in the ACCESS classroom would be an appropriate peer group for C.D.

88.    On June 13, 2014, an IEP Team Meeting was held to review Natick's evaluations.

89.    Natick finally proposed conducting a Transition Assessment in the fall,

including an evaluation of C.D.'s "daily living skills," a necessary component in determining the presence of an intellectual disability.

90.     Natick reviewed the evaluations and then suddenly informed the Parents, *without prior notice*, that it would be *changing C.D.'s disability category from "Intellectual" to "Communication."*

91.     The Parents were shocked by this information, not only because it was apparently determined outside the IEP Team Meeting process, but also because it was premature and improper given that an evaluation of C.D's daily living skills had not yet been done, and for most of her life she had been diagnosed with an intellectual disability.

92.     For the first time since July 2012 when Natick proposed its initial IEP, *Natick now proposed a "blended" program* for C.D.

93.     The second IEP for the 2014-2015 school year, which was dated June 13, 2014 – June 13, 2015, was very different from the IEP's *proposed prior to the evaluations and C.D.'s request for hearing*.

94.     Natick now proposed placement in the general education classroom for History, Small Group/Replacement classes for English and Science, and Math and Reading (as opposed to English) in the ACCESS program.

95.     Although Natick finally proposed some classes in the general education classroom and some Small Group/Replacement classes following the Parents' Request for Hearing, they were still proposing the ACCESS program for Math, which would not have prepared C.D. for the Math MCAS and receipt of a high school diploma; a Transition Assessment had still not been completed, and given that Natick had not yet

evaluated C.D.'s daily living skills, the change in C.D.'s disability category remained premature and improper.

96.    The Parents rejected the IEP dated June 13, 2014 – June 13, 2015, and informed Natick that they would be paying for independent educational evaluations.

97.    The Parents retained Dr. Imber to conduct an Educational Evaluation, Ms. Flax to conduct a Speech and Language Assessment, Dr. Erin Gibbons to conduct a Neuropsychological Evaluation, and Dr. Arlyn Roffman to assess C.D.'s transition needs and critique the transition programs offered by Natick and Learning Prep.

98.    On September 14, 2014, the Parents requested the opportunity for themselves and their independent evaluators and educational consultants, to observe the new proposed program and speak with the service providers. Observations were scheduled for October and November 2014.

99.    Between the date of their request and the dates of the scheduled observations, Natick informed the Parents that conditions would be placed on their evaluators, including, but not limited to, that they would only be permitted to observe; *the evaluators would not be permitted to speak with the staff or ask any questions*.

100.    Natick did not provide the Parents with any reason for the conditions and restrictions.

101.    On October 24, 2014, Dr. Imber observed the general education History class and the Small Group/Replacement Science classes, and Ms. Flax observed the Small Group/Replacement English class.

102.    Although Dr. Imber and Ms. Flax were able to observe the classes, they were not provided with any worksheets or syllabuses and they were not permitted to ask any questions.

103.    As a result, they could not obtain information about the curriculum or how it was modified or might be modified, and they were not able to determine what the students were doing or what the teacher's objectives were, contrary to the IDEA.

104.    On October 24, 2014 and October 27, 2014, Ms. Coellner observed the ACCESS English and ACCESS Math classes, respectively.

105.    Ms. Coellner observed that ACCESS was a functional classroom, with a washer, dryer, and stove.

106.    The students in the ACCESS classroom were disruptive and walking around.

107.    One boy was slapping his face throughout the film that was being shown.  117.

      There was one student who had a 1:1 paraprofessional aid who yelled out repeatedly during the class.

108.    Compared to Ms. Coellner's observations at Learning Prep, the ACCESS class was at a much lower level.

109.    At Learning Prep, C.D. was accessing the curriculum; she raised her hand, read aloud, and went up to the board.

110.    At Learning Prep, there were no students with disruptive emotional or behavioral problems according to the Principal of Learning Prep, Cynthia Manning, who testified at the hearing.

111.    Based upon her extensive knowledge about C.D.'s strengths, both socially and academically, Ms. Coellner did not believe that the students she observed in the ACCESS classroom would be an appropriate peer group for C.D.

112.    The Parents and Dr. Roffman observed a transition class on October 27, 2014, where students participate in a 12-week rotation through culinary, library and fitness placements.

113.    Dr. Roffman observed students bagging cookies, shelving books in the library, and wiping down fitness equipment in the gym.

114.    According to Natick's own assessment of C.D., these areas would not be a challenge or of interest to C.D., and were clearly meant for lower functioning students.

115.    The class appeared similar to a sheltered workshop that would not lead to competitive employment, and there did not appear to be any evidence of differentiation among the students; however, Dr. Roffman could not obtain definitive information and fully assess the transition class due to Natick's restriction on her ability to ask questions.

116.    On October 29, 2014, the Parents informed Natick that their independent evaluators could not complete their evaluations due to their outstanding questions, and again requested an opportunity for them to speak with the service providers so that they could have their questions answered.

117.    On October 30, 2014, Natick denied the Parents' request and informed them that the reason that their evaluators were not permitted to have conversations with the

staff was because when their evaluators had observed the ACCESS program in June 2014, *Natick staff felt as though they were being "interrogated" by Dr. Imber and Ms. Flax, which made them extremely uncomfortable.*

118.    This was the first time Natick had informed the Parents of these allegations, which were entirely false and defamatory (and which would ultimately be proven false by the testimony of Mr. Francoise at the BSEA hearing).

119.    On November 12, 2014, the Parents filed a motion with the BSEA, asking for it to compel Natick to permit their evaluators to speak with the teachers so they could have their questions answered and fully assess whether the proposed program would be appropriate for C.D., in accordance with the IDEA.

120.    The Parents' motion was supported by verified affidavits from Dr. Imber and Ms. Flax, denying that any inappropriate behavior had occurred during their observations on June 10, 2014, and asserting that it is their usual and necessary professional business practice to speak with the service providers to fully assess a proposed program and complete their reports.

121.    Natick opposed the Parents' motion, but *did not provide any evidence to support their false allegations or to controvert the assertions made by Dr. Imber and Ms. Flax in their respective affidavits.*

122.    Throughout the prehearing process, Natick continued to make false allegations against the Parents' evaluators and consultants, particularly Dr. Imber and Ms. Flax, which included asserting that they were not acting independently (allegations that would later be proven false by Dr. Imber's testimony at the hearing).

123.    On November 14, 2014, Natick held an IEP Team meeting to review the

Transition Evaluation, which was finally conducted in September 2014, when C.D.

was over seventeen (17) years old, in violation of state and federal law.

124.    The Parents provided Natick with the Neuropsychology Evaluation conducted

by Dr. Gibbons, as well as a *partial* Educational Evaluation provided by Dr. Imber

and a *partial* Speech and Language Assessment provided by Ms. Flax, pending the

ruling on the Parents' motion.

125.    Natick *did not invite the speech and language teacher to the meeting*, even

though Speech and Language was a central goal on C.D.'s IEP, and Natick knew that

the Team *would be reviewing the Speech and Language Assessment* submitted by Ms.

Flax.

126.    C.D. attended Learning Prep for the 2014-2015 school year, achieving meaningful

progress, and benefiting both academically and socially.

127.    On April 1, 2015, the BSEA, through its Hearing Officer, finally ruled on the

Parents' motion to compel Natick to allow their evaluators and consultants to speak with

the teachers, which they had filed on November 12, 2014, almost five (5) months prior to

the ruling.

128.    The Hearing Officer's ruling granted the Parents' motion to the limited extent that

it allowed them to submit questions in writing to be answered by Natick in writing.  The

Parents' evaluators and consultants submitted questions seeking clarification of what they

had observed.

129.    Natick objected to the form and content of the questions, and following a conference call on May 1, 2015, the Hearing Officer issued a ruling eliminating and reformatting many of the Parents' questions, and requiring Natick to provide only "Yes" or "No" written responses to many of the questions that remained.

130.    On May 5, 2015, the Parents submitted their exhibits for hearing five (5) business days prior to the hearing in accordance with Rule IX of the BSEA rules, which included the most recent reports from Dr. Imber, Ms. Flax, and Dr. Roffman, who had completed their reports to the extent possible so that the Parents could submit them as exhibits for the hearing pursuant to federal law (45 CFR §300.502).

131.    On April 1, 2015, the Parents filed an Amended Request for Hearing, asserting that in addition to the claims brought in their initial request, Natick had violated C.D's due process rights under the IDEA, by engaging in discrimination and retaliation, as evidenced by Natick's acts following the Parents' Initial Request for Hearing, including, but not limited to, Natick's unsubstantiated and uncontroverted false allegations against Dr. Imber and Ms. Flax, which not only served to prevent the Parents from obtaining complete information about the proposed program, but also served to bias the Parents' right to a fair and impartial due process hearing.

132.    The Hearing was held on May 12, 13, 27 and 28, 2015.

133.    On July 24, 2015, the Hearing Officer issued a final Decision, holding *inter alia* that: (1) the IEP's proposed by Natick for the 2012-2013, 2013-2014, and 2014-2015 school years were reasonably calculated to provide C.D. with a FAPE in the least

restrictive environment; and (2) Natick did not commit any procedural violations that resulted in the denial of FAPE.

134.    Because the Hearing Officer found that the IEP's proposed by Natick did not deny C.D. a FAPE, she made no determination regarding whether the Parents' placement at Learning Prep was an appropriate placement in the least restrictive environment, pursuant to the applicable standard for Parents who unilaterally place their child in private school.

135.    Based on her Decision, the Hearing Officer denied all of the Parents' requests for relief.

136.    On July 28, 2015, the Hearing Officer *reissued the final Decision* with a Cover Memorandum indicating that there were three (3) paragraphs of the final Decision that were inadvertently omitted from the version of the Decision sent to the parties on July 24, 2015.

137.    The omitted paragraphs, which appear as the last three (3) paragraphs in the reissued Decision, indicated that the Hearing Officer *did not rely on the testimony of Dr. Imber or Ms. Flax, and did not rely on the most recent evaluation reports submitted by Dr. Imber, Ms. Flax, and Dr. Roffman*.

138.    *The Hearing Officer made multiple inaccurate findings of fact and ignored substantial evidence* on the record in addressing C.D.'s success at McAuliffe.  For example, Ms. Coellner provided uncontroverted testimony that there were *18-20 students* in the class, and that she and Ms. Soden provided *occasional support if needed in academic classes only:*

"…the teacher would be giving a lesson, we would stand near her, if she needed to be cued as to what page they were on.  I would check in with her and say, "Have you started this?  Do you know what to do?"  (Transcript, V.I. p. 122).

139.    Despite Ms. Coellner's testimony, the Hearing Officer found that:

"Student attended general education classes with approximately *12-13 students* in each class and *with the constant support* of either Nan Coellner or Marcia Soden…" (Decision, p. 3).

140.    The Hearing Officer *relied on her inaccurate findings of fact* in her ruling on the

appropriateness of the IEP for the 2012-2013 school year, by concluding:

"[The ACCESS program] was less restrictive than Student's McAuliffe placement because it did not provide for the assistance of a *one-to-one aide* throughout the day." (Decision p. 15).

141.    Further, in finding that one-to-one (1:1) support in the public school general

education setting at McAuliffe is necessarily more restrictive than a self-contained

substantially separate classroom in the public school setting at Natick High School, the

Hearing Officer's finding *was based on an error of law*.

142.    In addition, the Hearing Officer took *inappropriate judicial notice* that McAuliffe

was more restrictive than the ACCESS program, given that there was *no testimony or*

*evidence* on the record from either party that addressed the restrictiveness of McAuliffe,

and she *did not provide any notice to the parties* that she intended to take judicial notice

regarding the restrictiveness of McAuliffe, thereby violating the rights of the parties to

*provide rebuttal testimony or evidence*.

143.    The Hearing Officer erroneously concluded that there were no instances in the record where the Parents claimed Natick committed any procedural violations, completely *ignoring/dismissing, without explanation, substantial evidence and testimony provided* by the Parents relative to the procedural violations committed by Natick, including, but not limited to, Natick's failure to update C.D.'s present levels of performance in her proposed IEP's for 2012-2013, 2013-2014, and 2014-2015 (through April 15, 2014); Natick's improper determination outside the IEP Team Meeting process that C.D.'s disability category should be changed, and Natick's failure to conduct any formal or informal transition assessments prior to the September 2014.

144.    The Hearing Officer *ignored/dismissed all of the evidence and testimony* from the Parents witnesses (and Natick's witnesses) that ACCESS students are not prepared for the MCAS, and as long as C.D. was in the ACCESS program, she would not be prepared for the MCAS.

145.    Despite evidence to the contrary, the Hearing Officer discredited the Father's testimony that C.D. would not be prepared for the Math MCAS in the ACCESS program, finding that:

> "…This was an assumption made by Parents and their evaluators
> that was not supported by the evidence."  (Decision, p. 20)

146.    The Hearing Officer erroneously found that C.D. had the option of enrolling in all Small Group/Replacement classes at Natick High School in 2012, discounting all of the undisputed evidence and testimony provided by both Parents' and Natick's witnesses that

the meeting in May 2012 was an "informational" meeting, during which the determination

of a proposed program had not yet been made.

147.     On cross-examination, Dr. Imber testified with regard to whether Natick offered

the Small Group/Replacement classes in 2012:

> Q:  "Are you saying there was no discussion of the
> *possibility* of Replacement classes in May or July of
> 2012"?
>
> A:  "I think it came up in May. In July, the only
> program—I believe it's quite clear that it was stated that –
> 'There is only one program.  We know C.D. We know her.
> The program that she's best likely to succeed is in the
> ACCESS program, and that's where we think she needs to
> be.' That was it.  That was the only option offered."
> (Transcript V.II., p. 225)

148.     The Hearing Officer *misrepresented Dr. Imber's testimony* to support her finding

that C.D. had the option of enrolling in all Small Group/Replacement classes at Natick

High School in 2012, by asserting that:

> "Dr. Imber affirmed that this offer had been made to Parents
> during a May 2012 meeting." (Decision, p. 16)

149.     In addition, the Hearing Officer's ruling that Ms. Dalan could have properly

proposed the Small Group/Replacement classes outside the IEP Team Meeting Process

was based upon a *mistake of law*.

150.     Further, the Hearing Officer's ruling on the appropriateness of the IEP proposed

for the 2012-2013 school year was based *on a misrepresentation of the findings* in the

prior BSEA decision before Hearing Officer Crane, which *she adopted without question*

based upon the misrepresentation of the findings provided by Natick.

151.     The Hearing Officer erred by taking *judicial notice of the prior BSEA decision based on her misrepresentation of the findings and failed to inform the Parents of the facts* upon which she intended to rely so that they could dispute them.

152.     In addition, the Hearing Officer's ruling on the relevance of the prior decision was based on a *mistake of law* regarding the information upon which a proposed IEP should be based.

153.     In ruling that the IEP's for the 2012-2013, 2013-2014, and 2014-2015 school years were reasonably calculated to provide FAPE in the least restrictive environment, the Hearing Officer*, credited the testimony of Natick's witnesses*, *without explanation,* who had never worked with C.D. directly or indirectly, had never observed C.D. at McAuliffe or Learning Prep, and had not reviewed her IEP's or recent progress reports, over the testimony of the Parents' witnesses who had worked with C.D. directly for many years, observed her at McAuliffe and Learning Prep and reviewed all of her IEP's and progress reports.

154.     The Hearing Officer, *without explanation, credited the testimony of Natick's School Psychologist, Donna Cymrot*, who determined that C.D.'s disability category should be changed, and discounted the testimony of Dr. Imber, Ms. Flax and Dr. Gibbons, all of whom had previously evaluated C.D. on multiple occasions, and testified that C.D.'s disability category should not be changed, completely *ignoring Ms. Cymrot's testimony on cross-examination* where she admitted that the change in

C.D.'s disability category was improper, premature, and based on an incomplete review of C.D.'s  records.

155.    On cross-examination, Ms. Cymrot testified:

> Q:  "Wasn't it true you made the category change without having one of the domains tested at the time you did that?"
>
> A:  "Yes."
>
> Q:  "Are you aware Natick listed C.D.'s disability as Intellectual on all IEP's since 2008."
>
> A:  "No, I would not have seen nor had access to her prior IEP."
>
> Q:  "Would you confirm that you did not review her entire record?"
>
> A:  "Yes." (Transcript, V. II, p.292-293, 300).

156.    The Hearing Officer demonstrated bias throughout the hearing by objecting on Natick's behalf in the absence of any objection by Natick's attorney and sustaining objections by Natick's attorney before hearing the questions.

157.    The Hearing Officer *did not consider any of the substantial evidence and testimony* showing that Natick misrepresented the profile of students in the ACCESS program, and did not consider Mr. Francoise's testimony *to the extent that it supported the Parents' claim* that Natick fabricated its allegations against Dr. Imber and Ms. Flax.

158.    On direct examination, Mr. Francoise testified:

> Q:  "Do you recall whether Dr. Imber or Ms. Flax acted in any way inappropriately during that meeting?"
>
> A:  "No, they were fine."  (Transcript, V. IV. p. 41)

159.    The Hearing Officer *ignored/dismissed Dr. Imber's uncontroverted testimony* that the evaluators and consultants acted independently and in good faith which refuted Natick's false and unfounded allegations to the contrary.

160.    The Hearing Officer *failed to consider any of the testimony* of the Parents' three (3) witnesses from Learning Prep, who had worked directly with C.D. during the previous three (3) years, and who provided credible testimony regarding C.D.'s unique individual needs and academic potential relevant to determining whether the IEP's proposed by Natick provided C.D. with a FAPE.

161.    The Hearing Officer's decision to discount all of the testimony of Dr. Imber and Ms. Flax should not be given any deference because by her own admission she indicated that *she did not consider it, rather than considering it and rejecting it*.

162.    The Hearing Officer *demonstrated bias* against the Parents by adopting the proposed finding in Natick's opening statement, despite the complete lack of evidence to support it; Natick's attorney stated:

> "It is clear that these experts have simply changed the recommendations based on what the Parents are seeking at any given time." (Transcript V.I., p. 35)

163.    In her re-issued Decision, the Hearing Officer adopted Natick's allegations without sufficient evidence to support her finding:

> "It appears that Dr. Imber has changed his recommendations to align with whichever placement she was in at the time he was asked to state his opinion." (Decision V.I., p. 20-21)

164.    The Hearing Officer demonstrated bias by indicating that she did not credit the

testimony of Dr. Imber or Ms. Flax because they changed their positions regarding the

appropriate program for C.D., while at the same time crediting the testimony of Natick's

witnesses who found the ACCESS program to be appropriate in 2012 and the blended

program to be appropriate in 2014.

165.    The Hearing Officer mischaracterized the testimony of Dr. Imber and Ms. Flax

with regard to their current recommendations for C.D., and *relied on the*

*mischaracterized testimony to make an adverse credibility finding*.

166.    Both Dr. Imber and Ms. Flax credibly testified that they were not changing

their prior recommendations for C.D.; however, since C.D. was succeeding at her

current placement at Learning Prep, it would not be in her best interests to change her

program now, in accordance with the essence of the IDEA's "stay-put" provision.

167.    Ms. Flax testified that she would not recommend changing C.D.'s placement at

this time:

> "[b]ecause she is in an environment where she is developing and
> growing and flourishing.." (Transcript V.II. p.17)

168.    Dr. Imber testified:

> "I'm not going to say there would be no benefit to her being in an
> inclusive environment.  That's not my testimony.  But I am saying,
> under the circumstances of what was proposed in '12, '13 and in
> '14 … she's been in a situation at Learning Prep where she's done a
> really nice job and she evidenced success.  So at this point, given
> that she's accessing the general ed.  curriculum and she's got – has
> friends at school…my opinion is that it would be disruptive to now

suddenly move her in her senior year of high school.  That, I don't
see a benefit of that." (Transcript V.II., p.241)

169.     Over the Parents' objections, the Hearing Officer *improperly refused to hear any*

*testimony* regarding the false and defamatory allegations against Dr. Imber and Ms. Flax,

or the Parents' lack of meaningful participation in the IEP process that resulted from the

restrictions placed on the observations of the Parents' evaluators, but *found that the*

*Parents did not present sufficient evidence* to show discrimination or retaliation, or lack

of parental participation.

170.     During direct examination, Mr. Francoise testified:

> Q:  "[w]ere you aware that the school district had accused them
> of interrogating you and making you feel…"

> Hearing Officer:  "This is not relevant, and this is not an issue
> before me…I've already resolved the issue of evaluations and
> access to evaluations."

> Parents' Attorney:  "This goes to administrative exhaustion and I
> need to have it on the record."

> Hearing Officer:  "You can get the question on the record, but its
> not relevant to this proceeding. So I'm not going to have the
> witness answer it." (Transcript, V. IV, p. 42)

171.     The Hearing Officer *ignored/dismissed without explanation uncontroverted*

*testimony* by the Parents, Ms. Flax, Dr. Imber, and Dr. Roffman regarding the specific

questions that they could not ask and the specific information that they were not able to

obtain, by ruling that:

> "[t]he credible evidence before me does not support any claim that
> the Parents' may be alleging that they were unable to receive

information…Parents did not any evidence of an instance in which they were…unable to get answers to their questions." (Decision, p. 20)

172.   C.D.'s father provided testimony with regard to his unanswered questions at the IEP Team Meeting on January 7, 2015:

Q:  "Did you ask about the ACHIEVE program?"

A:  "Yes."

Q:  "What was the response?"

A:  "We weren't going to talk about it at this time."

Q:  "Is it fair to say when you asked about it you weren't given an answer?"

A:  "Correct." (Transcript, V.I, p.112)

173.   Dr. Roffman provided testimony regarding her unanswered questions following her observation of the transition class:

"I think it was meant to be divided into two 40-minute sections; it was unclear.  We were not allowed to ask questions… I wasn't sure how this 80 minutes fit together, and if what benefit it was, and where it stood in terms of being steps towards curricular goals.  I wasn't allowed to ask questions, so I wasn't able to discern that." (Transcript, V.I., p. 190)

174.   Ms. Flax provided testimony regarding her unanswered questions following her observation of the Small Group/English Replacement class:

"I didn't have the chance to speak to Nick Coleman when I observed the replacement class… part of being a good placement is also the profile of children within the class, and since those

questions weren't answered, I had no way to complete my report."
(Transcript, V.II., p. 6-7)

175.    With regard to his observations of the proposed program, Dr. Imber testified:

> "I was not permitted to ask any questions whatsoever, so I was
> not able to really find out anything about the curriculum.  I didn't
> see a syllabus...I didn't get to see worksheets… I wasn't really
> able to determine anything about the kids in the program or what
> the teacher's objectives were."  (Transcript, V.II., p. 191)

176.    The Hearing Officer *improperly refused to consider the most recent report*s timely

provided by Dr. Imber, Ms. Flax and Dr. Roffman as exhibits for the hearing, based upon

Natick's inability to convene a Team Meeting prior to the hearing to discuss them, despite

the Parents' compliance with the requirement for providing exhibits before the

commencement of the hearing.

177.    The Hearing Officer's decision to exclude the reports of Dr. Imber, Ms. Flax and

Dr. Roffman, which were timely submitted for the hearing by the Parents, was based upon

*an error of law* regarding the use of privately paid independent educational evaluations.

178.    By excluding the reports, the Hearing Officer *erroneously made C.D.'s right to a

FAPE of lesser importance* than the Hearing Officer's mistaken view of Natick's

procedural rights.

179.    The Parents are aggrieved by the final Decision of the Hearing Officer in that it is

based upon mistakes of fact and errors of law, made upon unlawful procedures, not

supported by a preponderance of the evidence, unwarranted by the facts on the record,

biased, arbitrary and capricious, an abuse of discretion and otherwise not in accordance

with law.

**PRAYERS FOR RELIEF**

WHEREFORE, the Plaintiffs pray that this Honorable Court:

180.    Assume jurisdiction over this matter.

181.    REVERSE the Hearing Officer's final Decision and Order dated July 24, 2015, with respect to whether Natick failed to provide C.D. with a FAPE in the least restrictive environment for the periods from 2012-2013, 2013-2014, and 2014-2015, and whether there were any procedural violations committed by Natick that resulted in a denial of FAPE to C.D.

182.    DECLARE that the Parents met their burden of showing that the IEP's proposed by Natick for the periods from 2012-2013, 2013-2014 and 2014-2015 were not reasonably calculated to provide C.D. with a free appropriate public education in the least restrictive environment, in violation of the IDEA.

183.    DECLARE that the Parents met their burden of showing that Natick committed procedural violations, in violation of the IDEA, resulting in a denial of a free appropriate public education for C.D.

184.    DECLARE that the Parents met their burden of showing that placement at Learning Prep provided C.D. with an appropriate education in the least restrictive environment.

185.    DECLARE that the BSEA, through its hearing officer, violated C.D.'s rights under state and federal special education law by issuing a final Decision based upon mistakes of fact and errors of law, made upon unlawful procedures, not supported by a preponderance

of the evidence, unwarranted by the facts on the record, biased, arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law.

186.    FIND that the Parents are the prevailing parties in this matter.

187.    AWARD the Parents the tuition, related fees and transportation costs associated with their unilateral placement of C.D. at Learning Prep School since September 2012, including her attendance during the summers for ESY services.

188.    AWARD the Parents their reasonable attorney's fees and costs.

189.    AWARD such other relief as the Court deems just and proper

Dated:  October 21, 2015                          Respectfully submitted,

                                                  C.D., M.D., and P.D.,
                                                  By their attorney,

                                                  /s/ Laurie R. Martucci

                                                  Laurie R. Martucci, Esq.
                                                  Wagner Law Associates, LLC
                                                  4 West Street
                                                  Franklin, MA 02038
                                                  BBO# 561946
                                                  Telephone: 508-528-4007
                                                  Telefax:  508-528-4008
                                                  Email: lrm@wagnerlegal.com