**Exhibit A**

July 24, 2015

# COMMONWEALTH OF MASSACHUSETTS

*Division of Administrative Law Appeals*

**Bureau of Special Education Appeals**

---

## DECISION

## BSEA # 1408860

---

**BEFORE**

**CATHERINE PUTNEY-YACESHYN**
**HEARING OFFICER**

**LAURIE R. MARTUCCI, ATTORNEY FOR STUDENT**

**ALISIA ST. FLORIAN, ATTORNEY FOR NATICK PUBLIC SCHOOLS**

MEMORANDUM

To:        Parties in the matter of Student v. Natick Public Schools, BSEA # 1408860

From:      The Bureau of Special Education Appeals

Date:      July 28, 2015

Re:        Decision


There were three paragraphs of the final decision of this matter which were inadvertently omitted from the version of the decision which was sent to the Parties on July 24, 2015.  Enclosed is the complete decision including the three paragraphs which were omitted and appear at pages 20-21. The BSEA regrets any inconvenience this may have caused.

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF ADMINISTRATIVE LAW APPEALS
SPECIAL EDUCATION APPEALS

**Student v. Natick Public Schools**                    BSEA #1408860

## DECISION

This decision is issued pursuant to M.G.L. c. 71B and 30A, 20 U.S.C. § 1401 et seq., 29 U.S.C. § 794, and the regulations promulgated under said statutes.

## PROCEDURAL HISTORY

Parent requested a hearing on May 26, 2014 which was scheduled for June 27, 2014.  Natick Public Schools (hereinafter, Natick) requested a postponement of the initial hearing date on June 2, 2014, which request was allowed.  There was a pre-hearing conference on July 14, 2014 and the hearing was rescheduled to proceed on November 18, 19, and 20, 2014.  On September 30, 2014, Natick requested a postponement of the hearing which was allowed.  The hearing was rescheduled for January 5, 6, and 7, 2015.  On January 7, 2015, the matter was reassigned to Hearing Officer Catherine Putney-Yaceshyn.  There were telephone conference calls on January 28 and March 3, 2015.  The hearing was rescheduled to proceed on May 12, 13, and 27, 2015.  The hearing was held on May 12, 13, 27, and 28, 2015.  The Parties requested a postponement of the closing of the record to submit closing arguments.  The hearing officer allowed their request and set a deadline of June 12, 2015 for the submission of closing arguments.  Natick submitted its closing argument on June 12.  Parents submitted their closing argument on June 15, 2015 and the record closed[1] on that date.

Those present for all or part of the hearing were:

Mother
Father
Nan Coellner                   Parents' special education teacher/consultant
Arlyn Roffman                  Parents' transition consultant
Suzanne Flax                   Parents' speech language pathologist
Steve Imber                    Parents' educational consultant
Erin Gibbons                   Parents' Neuropsychologist
Carole Tsang                   Transition Coordinator, Learning Prep School
Nancy D'Hemecourt             Teacher, Learning Prep School
Cynthia Manning                High School Principal, Learning Prep School
Laurie Martucci                Attorney for the Parents
Lindsay McGovern               Assistant Direct of Student Services, Natick Public Schools
Timothy Luff                   Director of Student Services, Natick Public Schools

---

[1] Natick did not object to Parents' late filing of its closing argument.

| | |
|---|---|
| Donna Cymrot | School psychologist, Natick Public Schools |
| Karen Liptak | Special education teacher, Natick Public Schools |
| Christine Michelson | Special education teacher, Natick Public Schools |
| Sarah Karian | Speech language pathologist, Natick Public Schools |
| Katheryn Brown | Transition coordinator, Natick Public Schools |
| James Franciose | Special education teacher, Natick Public Schools |
| Anne Bohan | Court Reporter |
| Carol Kusinitz | Court Reporter |
| Alisia St. Florian | Attorney, Natick Public Schools |
| Catherine Putney-Yaceshyn | Hearing Officer |

The official record of this hearing consists of Parent's exhibits marked P-1 through P-90, and Natick Public Schools' exhibits marked S-1 through S-53 and approximately six hours of recorded oral testimony.

## ISSUES

1. Whether Natick complied with the Student's IEP in providing summer services during the summer of 2012 and if not whether Student is owed any compensatory educational services.

2. Whether the IEP proposed by Natick for the period from 2012-2013 was reasonably calculated to provide the student with a free appropriate public education in the least restrictive environment.

3. Whether the IEP proposed by Natick for the period from 2013 -2014 was reasonably calculated to provide the student with a free appropriate public education in the least restrictive environment.

4. Whether the three IEPs proposed during the period from 2014-2015 were reasonably calculated to provide the student with a free appropriate public education in the least restrictive environment.

5. Whether there were any procedural violations committed by Natick that resulted in the denial of FAPE to the Student.

6. Whether or not Natick engaged in any discrimination or retaliation in violation of Section 1983 and Section 504.

7. If Natick's IEPs are found to have been deficient, whether Parents are entitled to reimbursement for their unilateral placement of Student at the Learning Prep School.

## SUMMARY OF THE EVIDENCE

1.  The student (hereinafter, "Student") is eighteen years old[2] and resides in Natick, within the Natick Public Schools, (hereinafter, "Natick".) She has been diagnosed with Borderline Intellectual Functioning[3] and has been noted to have weakness in language functioning. (P-62) Her most recent neuropsychological evaluation indicates that Student has a Mild Intellectual Disability along with ongoing weaknesses in receptive and expressive language. (P-63) Student is organized, hard-working, cooperative and able to follow classroom routine and class expectations. She is a conscientious student who wants to do well. (P-44) Student appears to have good self-esteem and social skills. (S-2, P-15)

2.  Student was parentally placed at the Christa McAuliffe Charter Public School, (hereinafter, "McAuliffe") for the sixth through the eighth grades. (Father, S-6) Student attended general education classes with approximately 12-13 students in each class and with the constant support of either Nan Coellner or Marcia Soden at McAuliffe. (S-30, pg. 17), retired, experienced special education teachers who provided both in-class 1:1 support and out of class teaching and tutoring services as well as modification to assignments and tests. Parents privately paid for the services of Ms. Coellner[4] and Ms. Soden. (Coellner)

3.  Ms. Coellner noted that Student did not have any self-confidence in her academic abilities when she met her in sixth grade. She saw her self-confidence improve during her three years at McAuliffe. When Ms. Coellner first met her, Student was able to fill in blank in a sentence. By the end of eighth grade Student was able to write a composition. She passed the eighth grade English MCAS. Ms. Coellner did not conduct formal assessments of Student, but measured her progress by observing her and reviewing work Student had produced. Ms. Coellner concluded that inclusion with supports was very good for Student and she was able to access grade level curriculum with modifications. (Coellner)

4.  Gina Dalan, Natick's then-Director of Special Education, sent Parents' a letter dated June 5, 2012. The letter indicated that she had observed Student at McAuliffe and referenced a previous Team meeting[5]. Ms. Dalin stated that although she believed the Access program (a substantially separate program with opportunities for inclusion for students with intellectual disabilities and communication difficulties ((Michelson, Franciose)), described more fully below) at the high school to be appropriate, as discussed at the meeting, the Team would be proposing all replacement classes "in the spirit of cooperation and our attempt to provide a comparable IEP for [Student]." She indicated that although there was not an opportunity for Father or Parents' private service providers to observe the proposed program, Natick would plan to meet within the first couple of weeks of the next school year for Natick to write a new IEP for student. She informed Father that he and his providers could observe the program prior to the meeting if they desired. She informed

---

[2] Student has allegated continued decision making authority to her Parents regarding her special education services. (S-47)
[3] Dr. Gibbons modified her initial diagnosis of Student in accordance with the DSM-5. Her current diagnosis is Mild Intellectual Disability. (P-63, Gibbons)
[4] Each night Ms. Coellner would e-mail Father to let him know how Student did. (Coellner)
[5] The record does not contain a record of a previous Team meeting, but Father's testimony references a May 2012 Team meeting.

Father that she would be available to answer any of his questions until June 22, her last day in the employ of the district[6]. (S-29)

5.  Student attended Natick's program for extended year services in July 2012. On the first day when Student arrived, staff was not expecting her. Student was upset by the situation and cried. (S-53) The issue was corrected after the first day and Student attended the remainder of the extended year program. (Father, S-52)

6.  Parents' attorney sent a letter to Natick's attorney dated July 13, 2012 referencing a letter she had written, dated June 13, 2012. In her letter she acknowledged Natick's offer to place Student in all replacement classes, but requested a Team meeting during the summer so that Natick would not feel compelled to offer a program it did not deem appropriate. (S-53)

7.  The Team met to discuss Student's transition to Natick High School on July 27, 2012. (P-43, S-6, P-20)  The Team agreed to continue to implement the goals, objectives, accommodations and modifications from Student's then-current IEP developed by McAuliffe and dated 4/4/12 – 4/4/13. (S-7, S-6, P-20) The option of providing Student with "replacement" classes[7] was discussed and rejected by Natick, as it believed that the least restrictive environment in which Student would receive FAPE was the Access program. (S-6, P-20, S-28) At the conclusion of the meeting, Natick proposed the Access program for Student. The Access program, as described in the IEP, would provide Student with direct special education services in small group English, history, science, math, and vocational classes; direct special education services in electives in the general education setting; and indirect consultation services. Dr. Imber recalled that Natick proposed the Access program based upon some low test scores achieved by Student in testing he had administered to her. He informed the Team that her test scores were not indicative of what she could do in the classroom as demonstrated at McAuliffe. Natick proposed starting Student in the Access program and reconvening to assess her progress and the appropriateness of the program in October. Father suggested starting Student in the general education setting with supports and services and assessing her progress in that setting. Natick was not open to that. Dr. Imber recalled that Parents asked whether there were students with autism or behavior disabilities in the Access Program and were told the program was not designed for students with behavior disorders or emotional disturbance. Natick informed Parents that the program would have students very similar to Student, largely with intellectual disabilities. Dr. Imber[8] recalled that during a May 2012 meeting Natick staff mentioned that the Access program allows opportunities for inclusion to the extent that each individual student can manage it. He agreed that he and Parents were informed that Student could participate in general education electives, but that specific options were not addressed at that time. He recalled Natick staff stating that the guidance

---

[6] Ms. Dalin also informed Parents that the new Director of Special Education would begin working on July 2, 2012 and stated that she would leave all of Student's information with him. (S-29)

[7] Replacement classes are designed for students who have communication disabilities, language-based learning disabilities, specific learning disabilities, and reading difficulties. They provide access to the regular curriculum, but material is presented at a slower pace. The classes follow the Massachusetts curricular standards. (Liptak, Vol 3, pg. 143)

[8] Steve C. Imber, Ph.D., is an educational consultant hired by the Parents. (Imber)

counselors could best answer specific questions and would be available around August 20. (Imber)

8. The proposed IEP indicated that Student was attending the Natick Extended School Year program and that she was making slow progress while working on her IEP goals and objectives. The Narrative Description of School District Proposal indicated that the services would be delivered through the Access program. The IEP contained goals in the following areas: communication, mathematics, socialization/peer interaction, reading comprehension, writing composition, content vocabulary and study skills. The service delivery grid contained consultation services in the area of speech language 1x 15 minutes per cycle and consultation between the staff and learning center teacher 1x 15 minutes per cycle. The B grid contained academic/electives with a "student support facilitator" (SSF) 9 x 80 minutes per cycle. The C grid contained speech language services with the speech language pathologist 2 x 30 minutes per cycle; mathematics with the learning center teacher and SSF 3 x 80 minutes per cycle; science with the learning center teacher and SSF 3 x 80 minutes per cycle; vocational services with the learning center teacher/SSF 3 x 80 minutes per cycle; social studies with learning center teacher and SSF 3 x 80 minutes per cycle, English/Language Arts with the learning center teacher and SSF 3 x 80 minutes per cycle, and extended school year services. (P-20, S-6)

9. The Nonparticipation Justification section of the IEP stated that Student requires specially designed instruction in small group classes outside of the general education setting for all core academic content areas and for vocational/post-secondary skill development using modified curriculum and approaches in order to make progress. (P-20, S-6)

10. Parents rejected the IEP and placement in full on or around August 9, 2012. Father attached a document indicating his reasons for the rejection. It stated that because Student had been in a general education classroom for most of her academics for the past three years, he believed that placing her in a self- contained classroom would hinder her growth. He also rejected a number of goals because they were the same goals contained in the McAuliffe IEP in the inclusion setting, and he thought the goals should change if the setting was changing. (S-6, Father) Father also believed that the hours of service were decreasing from those provided in the prior IEP. (S-6) Dr. Imber did not believe the IEP was appropriate for Student. His biggest concern was that it proposed going from a primarily inclusive environment [McAuliffe] to the most restrictive environment Natick had. He did not believe that she would have access to the general education curriculum and thus would not be able to pass MCAS. (Imber)

11. Parents' attorney sent a letter to Natick's attorney dated August 14, 2012. The letter reiterates Parents' rejection of Natick's proposed IEP and placement and indicates that Parents would be withdrawing Student from Natick, placing her at Learning Prep, and seeking reimbursement from Natick. (P-40)

12. Natick's attorney responded to Parents' attorney in a letter dated August 15, 2012. The letter indicated that Natick declined to fund the unilateral placement and stated that the

placement at Learning Prep was a more restrictive placement than the in-district program Natick had proposed for Student. The letter also referenced a decision in BSEA # 11-3131 in which the hearing officer had affirmed the appropriateness of Natick's Access program for Student. (P-39)

13. Lindsey McGovern, Natick's Assistant Director of Student Services, testified that she was surprised that Parents and their experts found Natick's proposal of the Access program to be too restrictive for Student and that they then placed her in Learning Prep, an out-of-district placement. She noted that the recommendations of Parents' consultants (Ms. Flax and Dr. Imber) had significantly changed over time. She also noted that Student's profile had not changed significantly and in fact she had made gains in expressive language, which in Ms. McGovern's view would warrant a less restrictive, not more restrictive setting. (McGovern)

14. Student attended Learning Prep for the 2012-2013 school year. (P-56, P-55, P-54, P-53)

15. Natick convened the Team on May 22, 2013 and Father participated in the meeting via conference call. The Access teacher was at the meeting, but Father did not have any questions for the teacher. The proposed IEP provided for support in the general education setting for electives and the Team discussed a range of options for electives. The Narrative Description of School District Proposal indicated that the services were to be delivered within the Access Program. The goals and service delivery grid were very similar to those previously proposed by Natick. Father rejected the IEP and the placement on or around June 10, 2013. He sent a letter to Natick dated June 17, 2013 indicating that he would be enrolling Student at Learning Prep for extended school year services in 2013 and for the 2013-2014 school year. He stated that his decision was based on the same concerns he had raised with respect to Student's IEP for the 2012-2013 school year. This IEP contained a transition action plan which provided for Student to meet with her guidance counselor to explore post-secondary learning opportunities and with the career specialist to explore employment and internship possibilities. It also stated Student should explore non-degree post-secondary programs. The plan indicated Student would benefit from exploring vocational opportunities and receiving vocational training. It stated Student would learn to access community services and transportation in the community, manage money and increase her social thinking strategies. (P-38, S-5)

16. Student attended Learning Prep for the 2013-2014 school year. (P-52, P-51, P-50)

17. Natick sent Parents an Evaluation Consent Form to perform her three-year evaluation on or around March 12, 2014. Father rejected the proposed evaluation in full indicating that before he consented he wanted a description of the tests that would be conducted and the location. (S-24) Father later provided consent for the proposed evaluations on April 15, 2014 and they were completed in May and June of 2014. (Father, S-24)

18. Student's Team convened on April 15, 2014 and proposed an IEP for the period from April 15, 2014 through April 15, 2015. The IEP was substantially similar to the IEPs proposed by Natick for the two prior school years. The IEP contained a transition

planning Action Plan which listed a number of items for Student to work on in the transition realm. (S-4, P-18)

19. Father sent a letter to Natick, dated May 27, 2014, in which he rejected the proposed IEP and placement. He further stated his intent to place Student at Learning Prep for extended year services and for the 2014-2015 school year. (P-37)

20. Donna Cymrot, School Psychologist, Natick Public Schools, conducted a psychological evaluation of Student on May 23, 2014. She concluded that Student continued to show competencies in social/emotional and behavioral domains with fairly even cognitive functioning in the Extremely Low/Borderline range. She noted that cognitive development was keeping pace with her age as indicated by her stable scores. She noted that Student continued to require special education supports to access her education due to her cognitive and language limitations. (S-9) Ms. Cymrot testified that Student had nicely developed motor skills and age-appropriate social skills and behavior. She noted that the area of long-standing deficit had been in the area of language (language understanding, language expression, reading comprehension, and written language). Additionally, Student has strong executive function skill, is very motivated and her behavior is age appropriate. Based upon those factors, Ms. Cymrot believed that a language disability or communication disability more accurately describes Student. Ms. Cymrot stated that Student's disability category would not have any impact on her service delivery. (Cymrot)

21. Mark D'Angelo, special education teacher, Natick, completed an "achievement evaluation" on June 6, 2014. He administered the Wechsler Individual Achievement Test, Third Edition. He noted that Student's composite score in reading fell at the thirteenth percentile, her written expression score was at the seventh percentile, and her reading comprehension and fluency scores fell below the average range. Both her mathematics and mathematics fluency scores fell in the low range. He recommended some accommodations. (S-10)

22. Sarah Karian, MS, CCC-SLP, Natick, conducted a speech and language re-evaluation on May 27, 2014. Ms. Karian noted that Student demonstrated strengths in pragmatic language, word memory, and comprehension of spoken paragraphs. She demonstrated less developed skills in the areas of memory, sentence formulation, and understanding vocabulary and semantic relationships. She reported that Student's results revealed significantly below average skills in the areas of receptive and expressive language, language content and memory. She noted that Student's impairments in most areas of language impact her ability to learn through traditional measures and access regular education curriculum. (S-11)

23. The Team reconvened on June 13, 2014 to review the results of Student's three year reevaluation. The Team meeting summary indicates that the Team discussed Student participating in an internship in an area of interest as well as in extracurricular activities such as the fashion club. Student had stated that she is interested in cooking and fashion and might be interested in going to school to study one of those areas. The Team discussed proposing a transition assessment of Student and a 688 referral was

recommended. The Team proposed some modifications to the previously proposed service delivery grid. It continued to propose consultation in the areas of speech language and academics for fifteen minutes per cycle. It added consultation between the speech language pathologist and Student's outside speech language therapist for six hours per year. The B grid included general education social studies with a paraprofessional 2 x 80 minutes per cycle and health and electives with general education staff and a paraprofessional 2 x 80 minutes per cycle. The C grid included speech/language services with the speech language pathologist 2 x 45 minutes per cycle (1 individual and 1 group session), English Language Arts (Writing, Literature) with a special education teacher 2 x 80 minutes per week (small group); Reading Comprehension with a special education teacher 2 x 80 minutes per cycle in the Access class; mathematics with a special education teacher 2 x 80 minutes per cycle in the Access class; Academic Support/Transition with a special education teacher 4 x 80 minutes per cycle; science with a special education teacher 2 x 80 minutes per week. The C grid also contained extended year services in the areas of speech language therapy and academic support. (S-20, S-4, P-17)

24. Father rejected the IEP and placement on or around July 7, 2014. (P-36) He sent a letter to Natick dated July 7, 2014 stating he was rejecting the IEP because a transitional assessment had not been done and he thought such assessment would change all of the benchmarks and objectives and because he believed the total hours in the service delivery grid exceeded the hours available in the school's 4 day cycle, leaving no time for speech language services. In the same letter he informed Natick that Student would be attending Learning Prep for the 2014-2015 school year and Parents would seek reimbursement for Student's placement. (P-36) Father testified that he also rejected the IEP because it contained placement in Access classes and indicated that Student would take the MCAS alternate assessment in math. (Father)

25. Student attended Learning Prep for the 2014-2015 school year. (Father, (P-47, P-48)

26. Katheryn Brown, Natick's Transition and Vocational Coordinator, conducted a transition evaluation of Student on October 22, 2014[9]. (S-8, P-67) Ms. Brown concluded that Student had clear interests in fashion, cooking, and baking, and most of all, hairstyling and make-up application. She noted that Student would require further development to build her knowledge of requirements and skills for specific jobs, as she seemed completely unaware of what training and skills will be necessary for her to become a hairstylist or make-up artist. She recommended Student participate in transitional activities such as job shadowing and internships in her two main areas of interest. Ms. Brown made a number of specific recommendations for IEP goals which are described in her report. (S-8, P-67)

27. The Team reconvened on November 14, 2014 to review the transitional assessment and revised Student's Transition Planning Form. (S-2, P-15) The IEP, for the period from November 14, 2014 through June 13, 2015, proposed Student having an extended day in

---

[9] Ms. Brown used the Transition Planning Inventory, Employability Skills Inventory, Vineland II, AIR Self-Determination Scale, Career Clusters Interest Survey, Test of Interpersonal Competence for Employment, Things That Are Difficult for Me Questionnaire, Personal Strengths Checklist, Skills Checklist, Student Interview, and Situational Work Assessment. (S-8, P-67, Brown)

order to receive the recommended transition services. It provided that extended school day services be provided by the transition coordinator to address Student's goals in career awareness and readiness and independent living skills.

28. The service delivery grid provided for consultation services with the speech language pathologist and between the general education teacher and paraprofessionals. The B grid provides for student's participation in academic/electives with a general education teacher and paraprofessional 2 x 80 minutes per cycle and social studies with a general education teacher and paraprofessional 2 x 80 minutes per cycle. The C grid contains speech language with the speech language pathologist 2 x 45 minutes per cycle (1 small group and 1 individual session); science with a special education teacher 2 x 80 minutes per cycle; mathematics with a special education teacher 2 x 80 minutes per cycle; academic support with a special education teacher 4 x 80 minutes per cycle; reading comprehension with a special education teacher 2 x 80 minutes per cycle; English/language arts with a special education teacher 2 x 80 minutes per cycle; and Transition with a special education teacher/transition specialist/job coach/paraprofessional 2 x 80 minutes per cycle. (S-2, P-15)

29. Katheryn Brown taught the vocational class for the Access program during the 2014-2015 school year. She worked with students and their families on their future vision to determine what can be done in Access to prepare them for their vision. She begins meeting with eighth grade students transitioning to the high school and then begins working on the first day of their freshman year. If Student had attended Natick High School, there would have been potential opportunities for her to participate in job shadowing in her career areas of interest. Ms. Brown has students who job shadow in their junior and senior years with the hope that it will lead to an internship in their area of interest.

Ms. Brown described the in-school vocational program provided to students at Natick High School. She stated that there are many opportunities throughout the school for students to practice and explore vocational skills. There are jobs in the cafeteria including cookie packaging, refilling the coolers, refilling the snack and chip displays, helping to run the breakfast snack cart, preparing the ingredients for a smoothie bar. There are students who work in the library at tasks such as setting up displays of books or setting up wall displays, and IT tasks such as setting up PowerPoint presentations which are shown on televisions throughout the building. Ms. Brown could work on finding a job for Student that would be specific to her interests, such as cooking and baking.

Student would not be required to receive her vocational class after school in an extended day program. The extended day option was one of several that were presented to Parents by Lindsey McGovern. (Brown)

30. Father rejected the IEP in full because it contained an Access class for reading comprehension which a Natick teacher told father had never been proposed for a student before. Father assumed since it was never done before it was a "program that was just being developed" and was thus inappropriate for Student. Additionally, Father stated that

with disabilities including autism, intellectual disability and traumatic brain injury. All the students had some kind of communication deficit as well. None of the students in the program was non-verbal. There were four paraprofessionals in the program. She consults with Ms. Brown, the transitional coordinator, daily. She described the Access program and explained that typically all academic classes are provided within the Access classroom, but students have the opportunity to be placed in replacement classes and small group general education classes with paraprofessional support. Students have the ability to be transferred from the Access classroom to a replacement or general education class at any time in the school year. The decision to move a student to a different classroom is very individualized. Students are taught a modified curriculum according to their abilities. The curriculum is gleaned from the Massachusetts Curriculum Frameworks and grade-level Common Core. None of the students misses time from academic classes to attend speech language therapy.

35. Based upon her review of Student's records, Ms. Michelson believes that the IEP proposed by the Natick Public School for the 2014-2015 school year was appropriate for Student and that she would have appropriate peers within the Access program. She believes that her students benefit from the inclusion opportunities provided because she has seen them make friends with students from other settings. Ms. Michelson believes that the behaviors that her students exhibit in class are the same behaviors that are typical in all high school classrooms. She stated that some of her students can be disruptive, but that is true in any class. She specified that one or two students in her class may "call out an answer", but they are easily redirected. Ms. Michelson believes that a blended program that includes some Access classes, some replacement classes and some general education classes with support would be appropriate for Student.

36. Karen Liptak, special education teacher, Natick, is a learning center teacher and teaches small-group English classes, referred to as replacement classes. She described replacement classes as being designed for students with communication disabilities, language-based learning disabilities and reading difficulties. The students can access the regular curriculum, but they need material to be presented at a slower pace. The classes follow the Massachusetts curricular standards. Replacement class sizes vary from five to ten students. During the 2014-2015 school year she had one paraprofessional in her English replacement class. She has seen students moved from the Access program into replacement classes. Ms. Liptak met Student and provided services to her during the summer of 2012. She did not recall anything unusual about Student's attendance or participation in the summer program. She noted that Student was very amiable. Ms. Liptak believes that the Access program would be an appropriate placement for Student and that a blended program providing for some replacement classes with support would be appropriate. She thinks the proposed transition program would meet Student's needs. From her experience teaching replacement classes, she does not believe other students' behavior will interfere with Student's learning. (Liptak)

37. Ms. McGovern, Assistant Director of Student Services, testified that the Team reconvened in January 2015 to review the rejected IEP. Ms. McGovern was concerned that Father had indicated he had not previously had a chance to ask all of his questions. That was not her

impression of previous meetings, but she wanted to make sure she was mindful of asking if Father had any remaining questions. She prepared a projection explaining four proposed schedules that Student could have at Natick High School. She later prepared written copies of the sample schedules and sent them to Parents. In order to accommodate Father's concern that Student be able to participate in electives, she proposed providing Student's vocational class after school as part of an extended school day. She was trying to balance the Parents' concern that Student spend some time in the general education setting with the proposed service delivery grid, which contained a number of services, including double English classes.[10]

38. Arlyn Roffman, Ph.D.[11], has worked at Lesley University for 37 years where she founded the Threshold Program, a transition program for young adults with disabilities, in 1981. She reviewed Student's relevant IEPs[12], met Student in late 2012, and observed her at Learning Prep twice. Dr. Roffman was critical of Natick's Action Plan in the IEP for the period from May 2013-May 2014 (S-5) because it did not contain goals and was not measurable. Additionally, she opined that the transition plan contained in S-4 was not properly filled out. She stated that it was not clear what the services would be from the IEP. Dr. Roffman observed a career class at Natick High School in October 2014 and noted some "very good teaching." She observed what was described to her as students learning prevocational skills of following directions and routine and following through. She observed students getting cookies and putting them into waxed paper bags to be sold at lunch. She noted very good prompting and no behavioral issues. She also observed students wiping down fitness equipment in the gym and shelving books at the library. She noted that the cookie task would not be a challenge or of interest to Student and she did not think it would lead to any sort of competitive employment. She did not find the length of the eighty minute blocks at Natick to be problematic for student and noted that students could be helped to work on memory. She did not think it would be appropriate for Student to receive her transitional services in a 1:1 setting, because she though Student would benefit more from learning from peers and benefitting from their lessons as well. She noted that Natick's 2014 assessment of Student's transitional needs was adequate. Dr. Roffman concluded that Natick did not provide appropriate transitional planning or propose appropriate transitional services for any of the IEP periods at issue.

39. Dr. Roffman wrote a report dated May 4, 2015[13]. In it, she noted that an appropriate transition program for Student should include employment training that would prepare her for competitive employment or for entry into competitive employment. It should also

---

[10] Ms. McGovern explained that Natick proposed that Student participate in two English classes (one replacement English class and one Access reading comprehension class) because she enjoys writing and has some relative strength in that area, but needs rigorous instruction in reading comprehension. She would then be averaging one 80 minute English class per day. (McGovern)

[11] Dr. Roffman has a Ph.D. in developmental psychology, a Master's degree in learning disabilities, and is a licensed special education teacher. (Rothman)

[12] Dr. Roffman's testimony indicates that the IEPs she reviewed prior to the hearing may not have been complete copies of the IEPs. (See testimony of Arlyn Roffman, Transcript, Vol. 1, pgs. 199-200)

[13] She had not recently observed Student or evaluated her. She knew that the report had to be available for the hearing in this matter. She never attended a Team meeting and Natick had never seen her report prior to the hearing. (Roffman)

contain community living skills which would give her hands-on experience in areas of need, and contain postsecondary planning activities that would give Student a chance to see what is out there and assistance with making application to programs. She did not think Student's services should be provided 1:1, but that Student should be integrated as much as possible. Dr. Roffman believes Student's educational program should be provided with students of differing disabilities and the opportunity for some inclusion. (Roffman)

40. Dr. Gibbons, a neuropsychologist who evaluated Student in 2012 and 2014, testified that her recommendations for Student have been consistent since 2012. She found that Student needs language-based instruction[14] based on her significant language impairments and requires small classes of six to eight students. She requires multimodal instruction, such as use of thinking maps and other graphic organizers. She stated that Student requires substantially separate special education classes for her academics. Dr. Gibbons found Natick's four day block scheduling concerning because she thinks Student requires daily repetition of each class, especially classes like reading comprehension, which is an area in which Student requires additional support.    She did not think it would have been appropriate for Student to be in mainstream classes at Natick Public Schools after attending the McAuliffe School. (Gibbons)

41. Suzanne Flax has an M.S. in speech/language pathology and has provided Student private weekly speech language services since 2007. When Ms. Flax began working with her, Student did not use a lot of verbal language and was not initiating language. In June 2014 she observed at Natick High School for approximately two hours[15].

42. Ms. Flax stated that students' behaviors at Learning Prep are less disruptive than the students' behavior in the Access program based upon spending one hour in an Access classroom in Natick. She further stated that there are no peers in the Access program with whom Student would have been able to make a social connection. She testified that she was absolutely positive that Student would not have made any friends in the Access program given the level of disability that she observed and the lack of interaction of the students with one another. Ms. Flax noted that since Student has been attending Learning Prep she has been using significantly more verbal language and initiating more language. She believes this is because she is interacting with other children who have verbal language at or above her level. She believes Student requires a consistent schedule from day to day due to her language processing issues and short and long term memory deficits. (Flax) Dr. Imber also noted concern about Natick's block schedule. He thought that fact that the schedule rotates would be challenging for Student. (Imber)

43. Although in 2012 Ms. Flax recommended a general education placement for Student, in 2014 she recommended a small substantially separate, language-based, program for her. She stated that her reason for changing her recommendation is because Student has made language gains. She no longer believes that a general education program would be

---

[14] She defined language based instruction entailing material being presented at a slower pace, language is simplified, there is a lot of repetition, additional clarification if needed, and previewing and reviewing. (Gibbons)
[15] Ms. Flax also "interviewed" Lindsey McGovern and Jim Francoise. (Flax)

While an IEP must conform to the procedural and substantive requirements of the IDEA, "the obligation to devise a custom tailored IEP does not imply that a disabled child is entitled to the maximum education benefit possible." *Lessard, v. Wilton-Lyndenborough Cooperative School District et.al.*, 518 F.3d 18 at 23.

There are two parts to the legal analysis of a school district's compliance with the IDEA. First, the hearing officer must determine whether the district has complied with the procedures set forth in the IDEA. *(Rowley, supra,* 458 U.S. at pp. 206-207.) Second, the hearing officer must decide whether the IEP developed through those procedures was designed to meet the child's unique needs, and was reasonably calculated to enable the child to receive educational benefit. *(Ibid.)*

An IEP is not judged in hindsight; its reasonableness is evaluated in light of the information available at the time it was promulgated. *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 992 (1st Cir. 1990)

The burden of persuasion in an administrative hearing challenging an IEP is placed upon the party seeking relief. *Schaffer v. Weast, 546* U.S. 49, 126 S. Ct. 528, 534, 537 (2005) In this case, Parents are the party seeking relief, and thus have the burden of persuading the hearing officer of their position.

With the foregoing legal framework in mind, I turn to the issues before me. First, whether Natick complied with Student's IEP regarding Student's extended year services for the summer of 2012. Natick does not dispute Parents' claims that its staff was not aware that Student would be attending its program on the first day. Parents do not dispute the testimony of Natick's staff that Student attended the remainder of the summer program, participated appropriately, and completed work. The purpose of extended year services is to prevent substantial regression. 603 CMR 28.05(4)(d). Parents did not provide any testimony to suggest that Student regressed in her skills as a result of not receiving services for one day of her summer program. Although Father testified that Student cried and was emotionally upset about not receiving services on the first day, he did not provide any credible evidence that Student was denied a free appropriate public education. Thus, there is no basis for awarding compensatory services to Student.

I turn now to the appropriateness of the IEP for the period from 2012-2013. At the time Natick proposed the IEP Student had just completed three years at McAuliffe where she had been placed by her parents. While at McAuliffe, although Student received academic services in a general education setting, she did so with the assistance of a full time one-to-one assistant who also acted as a one-to-one tutor as needed. (Coellner) Although none of the witnesses testified about the level of restrictiveness of such a placement, the hearing officer took note of it. Parents and their witnesses argued that Natick's proposed IEP placing Student in the Access program was overly restrictive because it did not provide for Student's education within the general education setting. However, it was less restrictive than Student's McAuliffe placement because it did not provide for the assistance of a one to one aide throughout the day. It provided Student the opportunity to independently access academic services in a program specifically designed for students with profiles similar to Student's. If Parents were truly seeking a less restrictive setting

in Natick, they could have accepted Natick's offer to place Student in all replacement classes as relayed to them by Gina Dalan's letter dated June 5, 2012.

The evidence shows that Natick reviewed all information available to them at the time of the May and July 2012 Team meetings, including results of Student's then-most recent testing, the verbal reports of service providers from McAuliffe, Parents' suggestions and concerns, and the previous BSEA decision which had upheld the appropriateness of an Access program for Student. (McGovern, S-30)

One of Parents' stated reasons for rejecting the IEP was that the goals in the proposed IEP were the same goals contained in the McAuliffe IEP in the inclusion setting, and Father thought the goals should change if the setting was changing. (S-6, Father) As Father testified that he does not have any credentials in education, this reason is not considered valid by the hearing officer. Further, Parents could have limited their rejection to the goals of the IEP without rejecting it in its entirety. Father also believed that the hours of service in the proposed IEP were decreasing from those provided in the prior IEP. (S-6) He did not present any credible evidence to support that presumption. Dr. Imber was primarily concerned that the proposed IEP placed Student in Natick's most restrictive environment after she had participated in a primarily inclusive environment [McAuliffe]. As stated above, based on the evidence presented Natick's proposal for Student emerges as less restrictive than Student's placement at McAuliffe. Additionally, as noted above, Student had the option of enrolling in all replacement classes at Natick High School. Dr. Imber affirmed that this offer had been made to Parents during a May 2012 meeting. (Imber)

Finally, the Parents indicated that Natick's proposal for Student's placement in the Access class would be inappropriate because it would not provide Student with access to the general curriculum and she would thus be unable to pass MCAS. Again, this was an assumption made by Parents and their evaluators that was not supported by the evidence before me.

Mr. Franciose, the lead teacher of the Access program for most of the time period relevant to this hearing, testified that students in the Access program are routinely placed in replacement classes when their abilities and classroom performance indicate it is appropriate. Although Parents did not have the opportunity to speak to Mr. Franciose at the time that the IEP was proposed, they were able to ask questions to other Natick Team members. Ms. Dalin, Natick's then-Special Education Director sent Parents a letter dated June 6, 2012, which among other things, informed them that she was available to answer questions at any time until June 22, 2012. Parents could have raised questions to Ms. Dalin or other Natick Team members regarding the ability of Student to access the general curriculum within the Access program.

Parents also point to the fact that they were not able to observe the Access program prior to the beginning of the 2012-2013 school year. Natick did not dispute the fact that Parents had not observed the program prior to the commencement of the school year. However, in addition to Team meetings in May and July where the program was described and Parents were provided

opportunities to ask questions about the program[18], Natick provided Parents opportunities to address any and all questions to Ms. Dalin or Mr. Luff. Dr. Imber was not able to specify what questions Parents still had after the July meeting other than not knowing which specific electives would be available for Student. Dr. Imber stated that Natick informed Parents that the guidance counselors could provide specific information about elective classes when staff returned to school in late August. Further, Ms. Dalin suggested that Parents and their consultants visit the program early in the fall and offered to convene the Team within the first couple of weeks of school to adjust the IEP as necessary.

Father's testimony that Parents had to make a decision about whether to place Student in Natick prior to the return of the guidance counselors from summer break was unpersuasive. The evidence suggests Parents may have made a decision to place Student at Learning Prep as early as June 2012. Ms. Dalin sent an e-mail to Katie Clark of McAuliffe on June 5, 2012 requesting copies of Student's "transition paperwork." Ms. Clark responded to Ms. Dalin in an e-mail dated June 6, 2012 in which she noted, "the transition plan was written with the anticipation that she [Student] was attending Learning Prep High School." (P-75, pg. 10)

Based upon the foregoing, I find that Natick's proposed IEP for the period from 7/27/2012 – 4/4/2013 was reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment.

Natick proposed an IEP for the period from 2013-2014 that was substantially similar to the IEP it proposed the prior year. Student had attended Learning Prep pursuant to a unilateral parental placement during the prior school year and there was not any new information about Student for the Team to consider. Father's rejection letter stated that he was rejecting the IEP for the same reasons that he had rejected the prior IEP. For the reasons that I found that the 2012-2013 IEP was reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment, I also find that the IEP proposed for the period from 2013-2014 was reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment.

Next I turn to the appropriateness of the IEPs proposed for Student during the period from 2014-2015. The first IEP proposed by Natick during this time period was the IEP for the period from April 15, 2014 through April 15, 2015. At that point in time, Natick had sent Parents a request for consent to complete Student's three-year evaluation. Parents had not yet provided consent due to questions regarding the assessments. The Team convened without having updated information to prevent expiration of the IEP. It was proposed with the understanding that the Team would reconvene to review the results of the three-year evaluation and changes could be made to the IEP at that time. (McGovern)

The next IEP proposed for that time period was the IEP for the period from June 13, 2014-June 13, 2015. This IEP contained a number of changes from the previous IEPs, including a proposal for Student to participate in a general education class and some replacement classes. Ms.

---

[18] The Team attendance sheet from the July 27, 2012 shows that Tim Luff, Lindsey McGovern, Paul Tagliapietra (Asstistant Director of Student Services), Susan Balboni (Assistant Director of Student Services), and Rose Bertucci (Principal of Natick High School) were all present at the meeting.

McGovern credibly testified that the changes to the IEP were made based upon the review of Student's evaluations and some helpful information provided by Learning Prep, including Educational Assessment Forms A and B.  Father rejected the IEP in part because a transition assessment had not been done and he believed such assessment would result in changes to the benchmarks and objectives of the IEP.  Additionally, he believed that the proposed services could not be provided within the four day cycle used at Natick High School and thus, Student would not receive her speech language services.   He further rejected the IEP because it continued the proposal that Student attend some Access classes and proposed that Student take the MCAS-alt in math.

I find that despite Father's objections, the IEP was reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment.  The record contains no support for Father's conclusion that Student's services could not be provided as written and  that she would not receive her speech language support.  While it is true that Natick had not yet conducted a transitional evaluation and might have adjusted objectives and benchmarks after conducting it, that has no bearing on the appropriateness of what was proposed by Natick.  In fact, the record shows that Natick did later conduct a transitional evaluation and propose and update IEP.  Although Father continued to reject Student's placement in any Access classes, the credible evidence shows that placement in Access math and reading comprehension classes was appropriate for Student.  Ms. McGovern credibly testified that Student was placed in the Access math class to address an area which has always been an area of significant need for Student.  The Team proposed providing Student with two different English classes.  To address an area of significant need reading comprehension would be provided within the Access setting, where she would receive additional support.  And, recognizing that Student has an interest and relative strength in writing, participation in a replacement English class.  This proposal would also address a concern raised by Father, Ms. Flax, and Dr. Imber regarding the rotating block scheduling at Natick High School[19], as Student would receive some instruction in English/language arts for eighty minutes every cycle.  Both Ms. Liptak and Ms. Cymrot credibly testified that this "blended program" that Natick was proposing, whereby Student would receive some services in the more restrictive substantially separate Access program, some services in the replacement classes, and some services in the general educational with paraprofessional support, would be appropriate for Student.  Ms. Liptak noted that Student would benefit from the opportunity to interact with different peers in the different classes.  She also noted that Student would benefit from working with peers with writing, social and reading strengths within the different settings.  (Liptak)  Ms. Cymrot believed the blended program was appropriate for Student because it would allow her areas of weakness to be addressed intensely (within the Access program) while allowing her to receive content instruction in the less restrictive replacement classes.  (Cymrot)

With respect to the issue of the MCAS-alt being proposed for Student, Ms. McGovern and Mr. Franciose credibly testified that students within the Access program often take the regular MCAS exam.  They both noted that students are routinely moved from Access classes to replacement classes where they can receive instruction geared toward passing the MCAS.

---

[19] Although Dr. Imber and Ms. Flax testified regarding their concerns about the appropriateness of the rotating block schedule due to Student's memory issues, this issue was not formally raised to the Team until Father's rejection of the IEP in November 2014.  Thus, it could not have formed the basis of Parents' rejection of prior IEPs. (P-26)

Based upon the foregoing, I find that the IEP proposed by Natick for the period from June 13, 2014-June 13, 2015 was reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment.

Next, I turn to the appropriateness of the IEP proposed for the period from November 14, 2014 through June 13, 2015. I find that this IEP continued to offer appropriate services to address all of Student's areas of needs. The IEP contained many of the same services as the prior IEP, but contained additional transitional services. Father, Ms. Flax, and Ms. Coellner criticized the program because it proposed that Student receive her transition class in a 1:1 setting after school. However, Ms. McGovern testified that she presented several different scheduling options to Parents to accommodate the number of services proposed for Student. The option of providing an extended school day was presented as a way to allow Student to continue to receive non-academic general education electives during the school day while still providing her with all the services contained in her service delivery grid. I find that it was appropriate for Natick to propose extended day services as one option for Parents to choose from to enable to Student to receive more inclusion opportunities during the school day, while still receiving all of the transition services she requires. Parents could have chosen one of the other scheduling options offered for Student to receive her necessary IEP services.

Parents relied primarily on Dr. Roffman for their conclusion that the transition services proposed for Student were not appropriate. Most of Dr. Roffman's criticisms of the transition services Natick proposed related to her opinion that forms were not filled out correctly. However, she found that the transition assessment done by Natick was adequate. Most of her criticism of Natick's vocational services centered around her belief that it was inappropriate for Student to receive her vocational services as part of an extended day in a 1:1 setting. As described above, the proposal for Student to receive after school services was just one of many options presented to Parents and thus, is not a basis for finding vocational services to be inappropriate. Dr. Roffman's other substantive criticism of Natick's proposed vocational services was that Student would not receive services tied to her interests. Ms. Brown addressed this concern when she described how Natick individualizes students' programs to align with their interests. She stated that if she were to begin working with Student she would first seek to find her a task relating to her noted interests in cooking and baking. (Brown)

Parents also point to Natick's decision to change Student's disability category from intellectual to communication. Although they clearly disagree with this decision, they have not pointed to any impact that this decision has or will have on Student's service delivery. Natick staff credibly testified that the change of disability category will not change the way in which services are delivered to Student and Parents did not provide any evidence to the contrary. (Cymrot, Karian)

Based upon the foregoing, Parents have not met their burden of showing that the IEP proposed for Student for the period from November 14, 2014 – June 13, 2015 was not reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment.

I now turn to the Parents' claims of procedural violations. The record is unclear as to what procedural violations Parents believe Natick committed. There were many references throughout

the Parents' case to Parents and/or their experts being unable to obtain answers to their questions. The credible evidence before me does not support any claim that Parents may be alleging that they were unable to receive information and thus participate in the Team's decision making. The record shows that Natick convened many Team meetings during the course of the period of time at issue during which Parents and their consultants had opportunities to ask questions. Additionally, in 2012, Ms. Dalin provided Parents with contact information to enable them to ask her or her predecessor questions regarding the proposed placement. Ms. McGovern and Mr. Franciose made themselves available on one occasion to specifically address Parents (and their consultant's) questions about the program. Parents did not present any evidence of an instance in which they were not able to participate in the Team process or were unable to get answers to their questions. Although Dr. Imber made several references to not being able to get his questions answered, he was unable to point to a specific example of this. I find that Parents were provided with opportunities to participate in the Team process. I am not aware of any other instances in the record in which Parents claim Natick committed any procedural violations. Parents have not met their burden of showing that Natick has committed any procedural violations.

I now address Parents' claims of Natick's engaging in discrimination or retaliation in violation of Section 1983 and Section 504. Again, the record is unclear as to the basis of Parents' allegations in this regard. Thus, Parents have not met their burden of showing that Natick engaged in discrimination. Additionally, the BSEA does not have jurisdiction over claims of discrimination under Section 1983.

Finally, Parents seek reimbursement for their unilateral placement of Student at Learning Prep for the 2012-2013, 2013-2014, and 2014-2015 school years. As I have found the IEPs proposed by Natick to be reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment, it is not necessary to address the appropriateness of Learning Prep.

In reaching the above decision I did not rely on the testimony of Ms. Flax, as I did not find her to be a credible witness. Although she had appropriate credentials and experience as a speech and language pathologist, the statements she made during her testimony caused her to lose credibility. For example, she steadfastly stated that Student would not benefit at all from any inclusion. This statement was not supported by any other witness for either party, nor did it comport with Ms. Flax's own prior recommendations for Student's programming. Additionally, she stated that she was absolutely certain that Student would not have made any friends in the Access program, had she attended. This is a statement is so speculative as to carry no evidentiary value.

I also did not rely upon Dr. Imber's testimony. A careful review of his testimony shows that his current recommendations were primarily based upon Student's performance at Learning Prep. Although he did not share Ms. Flax's belief that Student would not receive any benefit from inclusion, he did previously support an inclusive placement for Student yet currently stated that he no longer believed that inclusion was as important for Student based upon her performance at Learning Prep. Based upon that opinion, it appears that Dr. Imber has changed his

recommendations to align with which ever placement she was in at the time he was asked to state his opinion.

I did not rely upon the most recent reports submitted by Ms. Flax or Dr. Imber, as they were first presented to Natick as exhibits in the hearing and the Team did not have the opportunity to review them prior to the hearing.  Likewise, I did not rely upon the written report of Dr. Roffman as it was not received by Natick prior to the hearing.

## ORDER

Based upon the foregoing, I find that Natick complied with Student's IEP during the summer of 2012 and find no basis for awarding compensatory services to Student.

I find that the IEPs proposed by the Natick Public Schools covering the 2012-2013, 2013-2014 and 2014-2015 school years were reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment.

I have found no evidence of procedural violations that resulted in a denial of a free appropriate public education to Student.

I have found no evidence that Natick discriminated against Student/Parents under sections 1983 or 504.

By the Hearing Officer,

Catherine M. Putney-Yaceshyn
Dated:  July 24, 2015

COMMONWEALTH OF MASSACHUSETTS
BUREAU OF SPECIAL EDUCATION APPEALS

## EFFECT OF BUREAU DECISION AND RIGHTS OF APPEAL

### Effect of the Decision

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must obtain such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

### Compliance

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau of Special Education Appeals contending that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to the facts on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

**Rights of Appeal**

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in the state superior court of competent jurisdiction or in the District Court of the United States for Massachusetts, for review of the Bureau decision. 20 U.S.C. s. 1415(i)(2).

An appeal of a Bureau decision to state superior court or to federal district court must be filed within ninety (90) days from the date of the decision. 20 U.S.C. s. 1415(i)(2)(B).

**Confidentiality**

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court. See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990). If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

**Record of the Hearing**

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request. Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.