## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

<table>
<tr><td>—————————————————————</td><td>)</td><td>Civil Action No. 15-cv-13617-FDS</td></tr>
<tr><td>C.D., by and through her PARENTS AND NEXT FRIENDS, M.D. and P.D.</td><td>)<br>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Plaintiffs,</td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>NATICK PUBLIC SCHOOL DISTRICT and<br>BUREAU OF SPECIAL EDUCATION APPEALS,</td><td>)<br>)<br>)<br>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td>—————————————————————</td><td>)</td><td></td></tr>
</table>

## PLAINTIFFS' AMENDED MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### (LEAVE TO FILE GRANTED ON 07/05/16)

## I.    INTRODUCTION

Pursuant to Fed. R. Civ. P.56 and Local Rule 56.1, the Plaintiffs, C.D., and her parents, M.D. and P.D. ("Parents"), on behalf of their daughter and themselves, respectfully submit this Amended Memorandum of Law in Support of their Motion for Summary Judgment filed on June 27, 2016, seeking reversal of a decision by the Bureau of Special Education Appeals ("BSEA") of the Division of Administrative Law Appeals, pursuant to 20 U.S.C. §1415(i)(2) of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400, *et. seq.*

In its decision, the BSEA found: (1) the individualized education program ("IEPs") proposed by the Natick Public School District ("Natick") for the 2012-2013, 2013-2014 and 2014-2015 school years were reasonably calculated to provide C.D. with a free appropriate education ("FAPE) in the least restrictive environment ("LRE"); (2) there was no evidence of

procedural violations that resulted in a denial of FAPE; and (3) no evidence that Natick discriminated against C.D. or her Parents under 42 U.S.C. § 1983 or Section 504 of the Rehabilitation Act of 1973.[1]  (A.R. 1549).

The Parents are entitled to summary judgment in their favor because there are no genuine issues of any material fact, and the administrative record and applicable law show that the hearing officer abused her discretion, failed to examine all of the evidence in the entire record, and made biased, erroneous findings and conclusions unsupported by substantial evidence, resulting in a final Decision that is not entitled to deference and should be reversed.

## II.   STATUTORY FRAMEWORK

The IDEA provides that as a condition of receiving federal funding, States must provide a free appropriate education to or special education and related services to all children with disabilities.  20 U.S.C.A. § 1412(a)(1)(A); *Pihl v. Massachusetts Dept. of Ed.*, 9 F.3d 184, 187 (1st Cir. 1993).[2]

A principal purpose of the IDEA is: "to … prepare [students] for further education, employment, and independent living;" 20 USC § 1414 (d)(1)(A)(i).  The IDEA "imposes extensive procedural requirements on participating state and local agencies to safeguard a disabled student's right to a free appropriate public education."  *Pihl v. Massachusetts Dept. of Ed*, 9 F.3d at 187.

---

[1] Citations to the Administrative Record are denoted as "A.R." followed by the page number found at the bottom of each record page (e.g., A.R. 1549).

[2] In Massachusetts, the provision of special education is governed by Mass. G.L c. 71B, which also requires that a child be provided with a "free and appropriate education." M.G. L. c. 71B, § 3; *see also Roland M. v. Concord School Comm.*, 910 F.2d 983, 987 (1st Cir. 1990); *Lenn v. Portland School Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993). While the IDEA emphasizes an appropriate rather than an "ideal" or an "optimal" education, it requires that the state provide services in a way "reasonably calculated to confer a meaningful educational benefit."  *D.B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012).

A.      **INDIVIDUALIZED EDUCATION PROGRAM**

The "primary safeguard" is the mandatory development of an IEP by the local school

district responsible for educating a disabled student. *Pihl v. Massachusetts Dept. of Ed*, *Ed*, 9

F.3d at 187; 20 U.S.C.A. §§ 1414(d), 1415; G.L. c. 71B, § 3.  The IEP, which is developed by

the local school district with the parents' participation, is a written document detailing the

student's current educational performance, the short-term and long-term goals of the plan, the

specific educational services to be provided, and objective criteria to evaluate the student's

progress.  *See* 20 U.S.C. §§ 1401(14), 1414(d); *Lenn v. Portland School Comm.*, 998 F.2d at

1086; G.L. c. 71B, § 3; 603 C.M.R. §§ 28.02, 28.05.

Under the IDEA, a child receives FAPE "if the program: (1) addresses the child's

unique needs; (2) provides adequate support services so the child can take advantage of the

educational opportunities; and (3) is in accord with the [IEP]." *Capistrano Unified Sch. Dist. V.*

*Wartenberg ex rel. Wartenberg,* 59 F.3d 884, 893 (9th Cir. 1995) (citing *Bd. Of Educ. v.*

*Rowley*, 458 U.S. 176, 188-89 (1982)).

B.      **LEAST RESTRICTIVE ENVIRONMENT**

In addition to requiring the provision of a FAPE, the IDEA declares that children with

disabilities shall be educated in the LRE.  School districts may not unnecessarily restrict a child

if that child's IEP can be implemented using supplementary aids and services in a regular

education classroom.  *See Oberti v. Board of Educ.*, 995 F.2d 1204 (3rd Cir. 1993); *Daniel R.R.*

*v. State Bd. of Educ.*, 874f.2d 1036 (5th Cir. 1989); *Sacramento City School Dist. V. Rachel H.*,

14 F.3d 1398 (9th Cir. 1994).

In adopting the IDEA, Congress created a strong preference for educating students with disabilities in regular education classrooms, and requires States accepting IDEA funds to educate children in the LRE to the *maximum extent appropriate* (which in this context means the least restrictive setting available that will provide the student with a FAPE).

### 1.   Supplementary Aids and Services

School districts must, as a preliminary matter in every case, determine whether the child can be provided with an appropriate education in the regular education classroom with supplementary aids and services. *See Department of Educ. v. Katherine D*., 727 F.2d 809, 815 (9th Cir. 1983), *cert denied*, 471 U.S. 1117 (1985).

As part of this discussion, the school district must consider the whole range of supplementary aids and services, including resource rooms and itinerant instruction, for which it is obligated to provide under the IDEA. Only when the disabled child's education may not be achieved satisfactorily, even with one or more of these supplementary aids and services, may the school board consider placing the child outside of the regular classroom. *Greer v. Rome City School District,* 956 F.2d 1025 (1992).

### 2.   Individual Potential/Educational Models and Unique Needs

For students with disabilities, progress and educational benefit must be gauged and measured in relation to a student's own intellectual and functional capabilities and not judged in comparison to the abilities of other students -- in particular, the abilities of their nondisabled classmates. *Daniel R. R. v. State Bd. of Educ.,* 441 IDELR 433 (5th Cir. 1989); *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H.,* 20 IDELR 812 (9th Cir. 1994), *cert. denied,* 109 LRP 34833, 512 U.S. 1207 (1994); and *Katherine* G. *v. Kentfield Sch. Dist.,* 39 IDELR 63 (N.D. Cal. 2003), *aff'd,* 42 IDELR 29 (9th Cir. 2004).

A district may consider the availability of special education services when making a placement determination; however, it cannot allow those factors to dictate the child's placement on the LRE continuum. *Letter to Trigg,* 50 IDELR 48 (OSEP 2007). The school district is required to base its placement decision on the child's IEP, rather than on the mere fact of a pre-existing program. 34 C.F.R. § 300.552. A placement decision may only be considered to have been based on the child's IEP when the child's individual characteristics, including demonstrated response to particular types of educational programs, are taken into account. *See Polk* v. *Cent. Susquehanna Intermediate Unit 16,* 853 F.2d 171, 177.

### 3.     Variety of Sources/Current Unique Needs

Districts must consider a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior, when interpreting evaluation data and making placement decisions. 34 CFR 104.35(c)(l). Categorical decisions clearly violate IDEA's requirement for individualized educational planning. *Letter to VanWart,* 20 IDELR 1217 (OSEP 1993).

The team must consider the child's unique needs and individual potential at the time the IEP's were promulgated.  The appropriateness of an IEP must not be "judged exclusively in hindsight. An IEP is a snapshot, not a retrospective." Thus, the "IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." *Roland M. v. Concord School Comm*., 910 F.2d 983, 987 (1st Cir. 1990);

### 4.     Potential Harm to Child/Positive Reaction to Nondisabled Peers

In selecting the LRE, consideration must be given to any potential harmful effect on the child. 20 U.S.C. 1412(a)(5); 34 CFR 300.116; 603 CMR 28.06 (b) and (c).  In addition,

5

if a student shows awareness and some positive reaction to being with nondisabled peers, then such interaction weighs in favor of inclusion (assuming the student can receive a meaningful educational benefit and is not unduly disruptive). *See Daniel R. R. v. State Bd. of Educ., supra*; *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H supra*; and *Katherine* G. *v. Kentfield Sch. Dist., supra.*

C. **PRESENT LEVELS OF PERFORMANCE**

The student's present levels of performance are the foundation of the IEP and must include functional and academic performance. 20 U.S.C. §1414 (d) (1) (A) (i).  The student's present levels of performance must always be accurate and up-to-date.  When the IEP fails to include accurate and up-to-date information about the child's present levels, the IEP is defective.

School districts are required to review IEPs and the progress of each eligible student at least annually; additionally, a reevaluation must occur at least once every three years, unless the parent and the public agency agree that a reevaluation is unnecessary. 34 CFR §300.303(b)(2).

D. **PARENTAL PARTICIPATION**

Parental Participation is central to the IDEA's goal of protecting disabled students' rights and providing each disabled student with a FAPE.  20 U.S.C. § 1400(d); *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205–06 (1982). Parental participation in the IEP and educational placement process is critical to the organization of the IDEA. *See* 20 U.S.C. § 1414(d)(1)(B)(i) (requiring the inclusion of parents on the IEP team); 34 C.F.R. § 300.321(a)(1)(same); 20 U.S.C. § 1415(b)(1). For this reason, written notice must be given to the parents of a child with a disability a reasonable time before the public agency proposes to initiate or change the identification, evaluation, or educational placement of the child.  *See* 34. C.F.R. § 300.503.

###### 1.    __Knowledgeable Team__

In determining the educational placement of a child with a disability, districts must ensure that the placement decision—"[i]s made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 20 U.S.C. 1412(a)(5); 34 CFR 300.116; 603 CMR 28.06 (b) and (c).

###### 2.    __Right to Independent Evaluations and Access to Information__

School districts have a "natural advantage" in information and expertise, but Congress addressed this when it obliged schools to safeguard the procedural rights of parents and to share information with them ... Parents also have the right to an "independent educational evaluation of the[ir] child." *Ibid.* The regulations clarify this entitlement by providing that a "parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." ... IDEA thus ensures parent's access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion. *Schaffer v. Weast,* 546 US (2005) (Decision pages 10-11).

To insure that parents can participate fully and effectively with school personnel in the consideration and development of appropriate educational programs for their child, a school committee shall, upon request by a parent, provide timely access to parents and parent-designated independent evaluators and educational consultants for observations of a child's current program and of any program proposed for the child, including both academic and non-academic components of any such program. G.L. c. 71B s. 3.

This requirement not only safeguards the parents right to participate in the decision-making process with respect to the identification, evaluation, and educational placement of their child, but also safeguards the parents' right to due process, by ensuring that the Parents' experts

7

"are not left to challenge the government without a realistic opportunity to access the necessary evidence, or without an expert with the firepower to match the opposition. *Schaffer v. Weast,* 546 US (2005) (Decision pages 10-11). *See also Sebastian M. v. King Philip Regional School Dist.,* 685 F.3d 79 (1ˢᵗ Cir. 2012) (noting the critical importance of persuading a BSEA hearing officer that your experts are both credible and persuasive).

### 3.    Predetermination

"[P]redetermination occurs when an educational agency has made its determination prior to the IEP meeting, including when it presents one placement option at the meeting and is unwilling to consider other alternatives. In such case, regardless of the discussions that may occur at the meeting, the School District's actions would violate the IDEA's procedural requirement that parents have the opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of the child." *H B. ex rel P.B.* v. *Las Virgenes Unified School Dist.,* 239 Fed. App. 342, 344-346, 2007 WL 1989594, 2 (C.A.9 (9ᵗʰ Cir. 2007).

The school district must come to IEP meetings with an open mind, willing to discuss and consider several options before a final recommendation is made. See, *Hanson ex rel. Hanson* v. *Smith,* 212 F. Supp. 2d 474, 486 (D. Md. 2002). While school officials are permitted to form opinions and compile reports prior to IEP meetings, such conduct is only harmless as long as school officials are "willing to listen to the parents." *Ms. C. ex rel. N.L. v. Knox County Sch.,* 315 F.3d 688 (6th Cir. 2003) at 694-995 (noting that school system representatives should "come to the meeting with suggestions and open minds, not a required course of action".)

The Parents' mere presence and opportunity to speak at the various meetings does not necessarily mean they were afforded a meaningful opportunity to participate. See *Deal v.*

*Hamilton County Bd. of Educ.,* 392 F.3d 840, 858 (6th Cir. 2004) at 858. When it is apparent that nothing a parent says could have changed the school system's determination of appropriate services, their participation is no more than after the fact involvement. *See Spielberg,* 853 F.2d at 259.

**E.    TRANSITION SERVICES AND ASSESSMENTS**

The IDEA provides that a principal purpose of FAPE is to "prepare [students] for further education, employment, and independent living."[3] The IDEA requires transition services, which are developed through transition planning by the IEP Team.  Pursuant to the IDEA:

> The term "transition services" means a coordinated set of activities for a child with a disability that—
>
> (A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
>
> (B) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and
>
> (C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.[4]

The IDEA requires that a school district conduct "age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living

---

[3] 20 USC 1400(d)(1)(A). *See also Mr. I. v. Maine School Administrative District No. 55*, 480 F.3d 1, 12 (1st Cir. 2007) ("Maine's broad definition of 'educational performance' squares with the broad purpose behind the IDEA: 'to ensure that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'").
[4] 20 USC 1401(34).

skills…."[5] Beginning not later than the first IEP to be in effect when the child is 16, and

updated annually thereafter, the IEP Team must include the following within each IEP:

> (aa) appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills;

> (bb) the transition services (including courses of study) needed to assist the child in reaching those goals…[6]

By statute, Massachusetts lowered the age to 14 for beginning transition services.[7]

Transition services are part of, and not separate from, a school district's responsibility

to provide FAPE. Whether a student's transition planning and services are appropriate must

therefore be considered within the context of the purposes of FAPE, as well as within the

court decisions interpreting the FAPE standard.[8]

## F.    INTRASTATE TRANFERS

When "a child with a disability (who had an IEP that was in effect in a previous [school

district] in the same State) transfers to a new [school district] in the same State, and enrolls in a

new school within the same school year, the new [district] (in consultation with the parents) must

provide a [free, appropriate public education (FAPE)] to the child (including services

comparable to those described in the child's IEP from the previous school district), until the new

[district] either:

---

[5] 20 USC § 1414 (d)(1)(A)(i)(VIII)(aa) (emphasis added).  See also 34 CFR §300.320(b).

[6] 20 USC § 1414 (d)(1)(A)(i)(VIII).  See also 34 CFR §300.320(b).

[7] Section 2 of chapter 71B of the Massachusetts General Laws was amended by Chapter 285 of the Acts of 2008 to require that beginning at age 14, or sooner if determined appropriate by the IEP Team, school age children with disabilities are entitled to transition services and measurable postsecondary goals, as provided under the IDEA.

[8] *Lessard v. Wilton Lyndeborough Cooperative School Dist.*, 518 F.3d 18, 28-30 (1st Cir. 2008) (applying FAPE standards to determine whether transition services were appropriate).

- Adopts the child's IEP from the previous district; or

- Develops, adopts, and implements a new IEP that meets the IDEA requirements."

20 USC 1414(d)(2)(C)(i)(2); 34 CFR 300.323(e); Ed 1109.03 (requiring compliance with 34 CFR 300.323).

The Office of Special Education Programs ("OSEP") has also opined that in transfer situations described in 34 CFR §300.323(e), the child's newly-designated IEP Team in the new public agency, which includes the child 's parents, determines the services that are comparable to the services that were described in the child's IEP from the previous public agency. 71 Federal Register 46540, 46681 (Aug. 14, 2006).

Consistent with this interpretation, if the new public agency convenes a meeting of the IEP Team for this purpose, the required participants listed in 34 CFR §300.321(a) must be included.  In the alternative, a parent and a public agency may agree not to conduct an IEP Team meeting and adopt temporary IEP goals consistent with the requirements of 34 CFR §300.324(a)(4). Under that provision, the parent and the public agency may agree to make changes after the annual IEP Team meeting, and may develop a written document to amend or modify the child's current IEP to address the temporary IEP goals for comparable services…until the new public agency either adopts the child's IEP from the previous public agency  or develops, adopts, and implements a new IEP for the child that meets the applicable requirements in 34 CFR §§300.320 through 300.324.  34 CFR §300.323(e)(l)-(2). *Letter to Finch,* 56 IDELR 174 (OSEP 1993).

## G.    UNILATERAL PLACEMENTS

If a school system is unable to furnish a disabled child with FAPE through public school placement, it may be obliged to subsidize the child in a private program.  *C.G. and B.S. v. Five Town Cmty. Sch.*, 513 F3d. 279, 284 (1st Cir. 2008).  However, parents who

unilaterally change their child's placement during the pendency of review proceedings, without the consent of school officials, do so at their own financial risk.  *School Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985); *see also* 20 U.S.C. § 1412(a)(10)(C)(i) ("this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school . . . if that agency made a free appropriate education available to the child and the parents elected to place the child in such private school").[9]

## H.   DUE PROCESS HEARING

Parents or students may challenge an IEP by seeking a due process hearing before the state special education agency.  20 U.S.C. § 1415(f); G.L. c. 71B, § 3; *Lenn v. Portland School Comm.*, 998 F.2d at 1086.[10] Parents or students may seek judicial review of a BSEA decision by filing an action in state or federal court, asserting a claim for review under the IDEA. *See* 20 U.S.C. § 1415(i)(2); 603 C.M.R. § 28.08(6).

The Supreme Court established a two-part legal analysis for determining a school district's compliance with the IDEA. *See Bd. of Educ. v. Rowley,* 458 U.S. at 206-207 (1982).  This analysis requires that: (1) the hearing officer must first determine whether the school district has complied with the procedures set forth in the IDEA; and (2) the hearing officer must then decide whether the IEP developed through those procedures was

---

[9] *See Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).

[10] In Massachusetts, the BSEA conducts the due process hearing. G.L. c. 71B, § 3; 603 C.M.R. § 28.08(3), (5). Proceedings before the BSEA are conducted pursuant to the procedures set forth in federal regulations, 34 C.F.R. § 300.506-.513, and in the state Administrative Procedure Act, M.G.L. c. 30A, and state regulations.  *See* 603 C.M.R. § 28.08(5).

designed to meet the child's unique needs, and was reasonably calculated to enable the child to receive educational benefits. *Ibid.*

Procedural violations alone amount to a denial of FAPE if the procedural inadequacies: (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the child; or (3) caused a deprivation of educational benefit. 34 CFR 300.513(a)(2))(20 U.S.C. 1415(f)(3)(E)(ii).

## III.   STANDARD OF REVIEW

While Parents have moved for summary judgment on their administrative appeal of the BSEA's decision, "[i]n a case like this, summary judgment is merely the device for deciding the issue, because the procedure is in substance an appeal from an administrative determination, not a summary judgment." *North Reading School Committee v. Bureau of Special Education Appeals*, 480 F. Supp. 2d 479, 481 n.1 (2007) (citations and internal quotation marks omitted). The burden of proof rests on the party challenging the BSEA hearing officer's decision.  *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992).

Essentially, "judicial review [of administrative decisions on claims brought under the IDEA] falls somewhere between the highly deferential clear-error standard and the non-deferential *de novo* standard." *Lessard*, 518 F.3d at 24 (citing *Roland M. v. Concord School Comm.*, 910 F.2d at 989). The IDEA provides that courts reviewing agency decisions "(i) shall receive the records of the administrative proceeding; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

A reviewing court must ensure that the school district and state-education agency adhere scrupulously to the procedural requirements of the statute and relevant regulations and rules. *See Bd. of Educ. v. Rowley*, 458 U.S. at 205-06 (noting that the Act "demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP").

However, in reviewing an agency's substantive decisions on FAPEs and IEPs, a reviewing court's "principal function is one of involved oversight." *Roland M. v. Concord School Comm.*, 910 F.2d at 989. "[C]ourts should be [loath] to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs." *Id.* at 992. Nonetheless, it is the reviewing court's role to render "an independent ruling as to the IEP's adequacy based on a preponderance of all the evidence, including the hearing officer's duly weighted findings." *Lenn v. Portland Sch. Comm*, 998 F.2d at 1089.

In short, on matters that implicate educational expertise, heightened deference is due to an agency's administrative findings. *Mr. I v. Maine Sch. Admin. Dist. No. 55*, 416 F. Supp. 2d 147, 156 (D. Me. 2006). However, "when the issue is more a matter of law, the educational expertise of the agency is not implicated, and less deference is required." *Id.* at 157.

The amount of deference owed to the administrative decision varies depending on the decision's "persuasiveness." *M.H.,* 685 F.3d at 244 (quoting *Lenn v. Portland Sch. Comm.,* 998 F.2d 1083, 1086-87 (1st Cir. 1993)). "Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not." *Id.* (citing *Walczak v. Fla. Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir. 1998)).

The fact-finder must fairly examine all evidence in the entire record, taking into full account whatever evidence weakens or undermines reasonable reliance on the proof underlying a factual conclusion. If the evidence sought to be relied upon to support a finding still remains reasonably credible and believable after the weighing process, it may then form the basis of a proper finding.[11]

Findings that are arbitrary and unsupported by substantial evidence, even those regarding the credibility of witnesses, may be set aside by a reviewing court. *Bettencourt v. Bd. of Registration in Med.*, 408 Mass. 221, 227 (1990). The agency in *Bettencourt* ignored a physician's testimony and was found to have acted in an arbitrary manner.  *Id*.

Hearing officers are, in fact, required to confront problems in a witness's testimony and to provide "an explicit analysis of credibility and the evidence bearing on it." *Herridge v. Bd. of Registration in Med., 420 Mass. 154, 165 (1995), citing Morris v. Bd. of Registration in Med.,* 405 Mass. 103, 107, cert. denied, 493 U.S. 977 (1989).  The wholesale adoption of the recommendations of one party is a red flag that the hearing officer was biased or inattentive.  *See Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985).

## IV.   STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1

The facts upon which the Plaintiffs rely are set forth in their Amended Statement of Undisputed Facts pursuant to Local Rule 56.1, filed concurrently with this Amended Memorandum of Law.

---

[11] The Supreme Judicial Court, in *Cohen v. Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966), and its progeny, has repeatedly warned administrative adjudicators against merely seizing upon any available piece of evidence to support a finding; rather, all favorable evidence must first be subjected to critical scrutiny in the light of any other record evidence that tends to detract from its credibility and believability.

V.    **ARGUMENT**

      **A.**      **The hearing officer's determination that the IEPs proposed by Natick for the 2012-2013, 2013-2014 and 2014-2015 school years were reasonably calculated to provide C.D. with a free appropriate education in the least restrictive environment is not entitled to deference and should be reversed because the hearing officer failed to examine all of the information in the entire record, made biased, erroneous findings unsupported by the evidence, and disregarded the fundamental legal principles under the IDEA in reaching her conclusions.**

      In determining a school district's compliance with the IDEA; (1) a hearing officer must first determine whether the school district has complied with the procedures set forth in the IDEA; and (2) a hearing officer must then decide whether the IEP developed through those procedures was designed to meet the child's unique needs, and was reasonably calculated to enable the child to receive educational benefits.[12]

      In reaching her conclusions that the IEPs for the 2012-2013, 2013-2014, and 2014-2015 school years all provided C.D. with a FAPE in the LRE, the hearing officer failed to address substantial evidence showing that Natick failed to comply with the procedures set forth in the IDEA, made biased, erroneous findings unsupported by the evidence, and disregarded the fundamental legal principles under the IDEA in reaching her conclusions.

           **1.**      **The hearing officer disregarded substantial evidence on the record showing that Natick failed to discuss whether C.D. could succeed in general education or Replacement classes with supplementary aids and services.**

      In adopting the IDEA, Congress created a strong preference for educating students with disabilities in regular education classrooms; accordingly, school districts may not unnecessarily restrict a child if that child's IEP can be implemented using supplementary aids and services in a

---

[12] *See Bd. of Educ. v. Rowley, supra.*

regular education classroom.[13] Thus, as a preliminary matter in every case, school districts must determine whether the child can be provided with an appropriate education in the regular education classroom with supplementary aids and services.[14]

The hearing officer ignored and omitted substantial evidence showing that Natick failed to consider whether C.D. could succeed with supplementary aids and services in the least restrictive general education setting (or the less restrictive Replacement classes), before proposing placement in the most restrictive self-contained ACCESS program.

For example, at the team meeting on July 27, 2012, the Parents repeatedly asked Natick to consider placing C.D. in the general education setting or the Replacement program with supplementary aids and services or to explain why it concluded C.D. could only be educated in the ACCESS program. (A.R. 413-414).

The only justification for removal offered by Natick was that based upon a handful of C.D.'s test scores that Natick selectively chose from Dr. Imber's report, and the information provided at the BSEA hearing in 2010, ACCESS was the only appropriate program. (*See e.g.* A.R. 402, 413-414).

> **2.      The hearing officer disregarded substantial evidence on the record showing that Natick failed to measure C.D.'s progress in relation to her own individual potential, disregarded C.D.'s positive response to the educational model at McAuliffe, and based its placement decision solely on the programs available at Natick High School.**

A student's progress and educational benefit must be measured in relation to the student's own capabilities and not judged in comparison to the abilities of other students, in

---

[13] *See Oberti v. Board of Educ.*; *Daniel R.R. v. State Bd. of Educ.*, *Sacramento City School Dist. V. Rachel H.*, *Katherine* G. *v. Kentfield Sch. Dist.,supra.*

[14] *See Department of Educ. v. Katherine D.*, supra.

particular, the abilities of their nondisabled classmates.[15]  In addition*, a placement decision may only be considered to have been based on the child's IEP when the child's individual characteristics, including demonstrated response to particular types of educational programs are taken into account.[16]

The hearing officer disregarded substantial evidence showing that Natick failed to measure C.D.'s progress in relation to her own potential, ignored her individual needs, and dismissed outright her positive response to the educational model at McAuliffe.

For example, at the meeting on July 27, 2012, when the Parents described the educational model at McAuliffe and C.D.'s success with supplementary supports and services in the general education classroom, Natick responded, "That could not happen here...because it doesn't happen, because public schools have their own staff and their own experts, and they don't allow outside people to come in and teach their students in their classroom. No public school would allow that." (A.R. 317).

At the same meeting, the Parents expressed concern that the block schedule in all three of the Natick High School programs would fail to address C.D.'s individual needs because she requires continuity due to her memory deficits."[17] (A.R. 408). Natick responded that ACCESS is the appropriate program because as a self-contained program, subjects can be infused together (*See generally* A.R. 270).

---

[15] *See Daniel R. R. v. State Bd. of Educ., supra*; *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H, supra*; and *Katherine* G. *v. Kentfield Sch. Dist., supra.*

[16] *See Polk* v. *Cent. Susquehanna Intermediate Unit 16,* 853 F.2d 171, 177.

[17] The hearing officer did not consider the Parents' concern regarding the Block Schedule prior to 2014 based on her finding that it was not raised before then, completely ignoring the evidence on the record showing that Parents raised this concern as early as July 2012.

In doing so, Natick forced C.D. to fit into an inappropriate program with a modified curriculum that did not provide her with educational benefits rather than creating or locating a program to meet her unique needs so she could derive educational benefits and meaningful access to the curriculum.

**3.    The hearing officer disregarded substantial evidence on the record showing that Natick failed to consider the potential negative effects of placement in the ACCESS program and C.D.'s positive reaction to being with nondisabled peers as factors weighing in favor of inclusion.**

Districts must consider factors such as the potential negative effects of the proposed placement[18] and the child's positive response to being with nondisabled peers as factors weighing in favor of inclusion.[19]

The hearing officer disregarded substantial evidence on the record showing that Natick failed to consider the potential negative effects of placement in the ACCESS program and C.D.'s positive reaction to being with nondisabled peers.

For example, at the meeting on July 27, 2012, Ms. Coellner expressed concern that C.D. would be isolated in ACCESS, "Because she is a very normal, regular teenager like all normal, regular teenagers, who has the same interests in fashion and music and television and all that." (A.R. 420), and might lose the skills in ACCESS that she worked very hard to gain at McAuliffe. (A.R. 410-411).  Natick admitted that C.D. made positive gains by interacting with nondisabled peers, stating, "it seems like that's really an area where she flourishes, ...we want her contained as little as possible." (A.R. 421). Natick,

---

[18] 20 U.S.C. 1412(a)(5); 34 CFR 300.116; 603 CMR 28.06 (b) and (c).

[19] *See Daniel R. R. v. State Bd. of Educ., supra*; *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H supra*; and *Katherine G. v. Kentfield Sch. Dist., supra*.

however, did not consider these factors weighing in favor of inclusion. (A.R. 421).

4. **The hearing officer disregarded substantial evidence on the record showing that Natick failed to base its placement decision on a variety of sources and current information available.**

Districts must consider a variety of sources when interpreting evaluation data and making placement decisions[20] in light of the child's unique needs and individual potential at the time the IEPs were promulgated.[21]

In her Findings and Conclusions, the hearing officer asserted that, "[t]he evidence shows that Natick reviewed all of the information available to them at the time of the May and July 2012 Team meetings...," ignoring substantial evidence on the record showing that Natick failed to base its placement decisions on a variety of sources and current information regarding C.D.'s progress and individual needs.[22]  (A.R. 1566).

For example, despite the availability of overwhelming uncontested testimony and evidence from multiple sources of information, Natick disregarded the positive gains C.D. made in the inclusive environment at McAuliffe and ignored her numerous unique qualities, including her strong work ethic, desire to succeed, executive functioning skills, desire to interact with nondisabled peers, willingness to follow teacher direction, and willingness to accept teacher support, as factors weighing in favor of inclusion.  (See generally A.R. 732-944).

Contrary to the requirements of the IDEA, the only factors Natick considered in

---

[20] 34 CFR §104.35(c)(l).

[21] *Roland M. v. Concord School Comm., supra.*

[22] The hearing officer omitted almost all evidence regarding the meeting in May, inexplicably noting that the record does not contain a record of a previous team meeting although father's testimony referenced a May meeting (See A.R. 1553, fn.5).

determining C.D.'s placement were a handful of Dr. Imber's test scores and the BSEA

decision in 2011[23], stating,  "what is a little bit difficult in hearing you describe her

performance is that her scores are so low, that what you're describing is so inconsistent

with the scores... we've been to the BSEA even had a hearing… she hasn't been in Natick but

as far as a student who hasn't been in Natick, I feel that the team knows her, because we have

had the experience of going through the BSEA hearings…" (A.R. 397-398, A.R 402).

> **5.**  **The hearing officer excused Natick's failure to update the IEPs
> with C.D.'s present levels of performance, and in doing so,
> disregarded the fundamental purpose of an IEP as determined
> by Congress in adopting the IDEA.**

School districts must review the progress of the student at least annually, and must

conduct a reevaluation at least once every three years to ensure that the IEP includes accurate

and up-to-date information about the child's present levels of performance.[24]

The hearing officer disregarded these requirements and simply excused Natick's failure

to include accurate and up-to-date information about C.D.'s present levels of performance based

upon current information from Learning Prep when it proposed substantially similar IEPs for

2013-2014 and for April 15, 2014-April 15, 2015 (A.R. 1565).

In her decision, the hearing officer found that, "Natick proposed an IEP for the

period from 2013-2014 that was substantially similar to the IEP proposed the prior year

[because]…there was not any new information about Student for the team to consider."

(A.R. 1568).

---

[23] *See Student v. Natick Public Schools* BSEA 11-3131 (Hearing Officer Crane ruled that the IEP developed
by Natick for 2009 proposing the ACCESS program for 6th grade, was appropriate for C.D.  based on the
information Natick had available or could have had available at the time it was proposed. Officer Crane did
not consider C.D.'s progress at McAuliffe in his ruling because it occurred subsequent to the proposed IEP).

[24] 34 CFR §300.303(b)(2).

6. **The hearing officer disregarded substantial evidence on the record showing that Natick failed to comply with the requirements under IDEA related to transition services.**

Pursuant to the IDEA, school districts in Massachusetts are required to provide transition services, developed through transition planning by the IEP Team, based upon "age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills…." Beginning…"when the child is 14 years old, and updated annually thereafter."[25]

Because Natick failed to conduct appropriate transition assessments, it was not possible for Natick to understand the nature and scope of C.D.'s deficits as those deficits pertained to her transition from High School to postsecondary education, employment, and independent living, which directly led to Natick's failure to propose appropriate transition plans and services.

The hearing officer disregarded the requirements of the IDEA and simply excused Natick's failure to conduct age appropriate transition assessments until C.D. was 17½ years old.

For example, with regard to the IEP for the period from June 13, 2014 – June 13, 2015, the hearing officer's concluded, "[w]hile it is true that Natick had not yet conducted a transition evaluation and might have adjusted objectives and benchmarks after conducting it, that has no bearing on the appropriateness of what was proposed by Natick" (A.R. 1562).

7. **The hearing officer disregarded substantial evidence on the record showing that Natick failed to ensure that the team included persons knowledgeable about C.D. and the placement options.**

---

[25] 20 USC §1414 (d)(1)(A)(i)(VIII).  See also 34 CFR §300.320(b); G.L. c. 71B §3.

In determining the educational placement of a child with a disability, districts must ensure that the placement decision—"[i]s made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options."[26]

The hearing officer ignored substantial evidence showing that Natick failed to ensure that team members included persons knowledgeable about C.D., her evaluations, and the placement options.

For example, at the IEP meeting held on July 27, 2012, the only persons in attendance who had worked with C.D. indirectly or directly were C.D.'s parents, Ms. Coellner, Ms. Soden, and Dr. Imber.  There was no one in attendance from Natick who had any direct knowledge about C.D., through observations or teacher consultations at McAuliffe. (A.R. 2770).  Although C.D. had attended ESY services in July 2012, the staff who had worked directly with C.D. did not attend the meeting; while the team had recommended the ACCESS program at the meeting in May, there was no teacher from the ACCESS program at the meeting in July; and although electives might be C.D.'s only opportunity to be included with non-disabled peers, there were no guidance counselors at the meeting. (A.R. 2770). Ms. Dalan, the only person to observe C.D. at McAuliffe, was no longer employed by Natick and did not attend the meeting. (A.R. 2770).

There was substantial evidence on the record, which the hearing officer conveniently ignored, showing that, as a result of the lack of knowledgeable staff at the team meeting, the

---

[26] *Id.*

Parents were unable to get their questions answered, significantly impeding their right to participate in the team process. (*See e.g.*, A.R. 453).

For example, the hearing officer found that although the Parents did not have the opportunity to speak to Mr. Franciose at the time that the IEP was proposed, they were able to ask questions to other Natick Team members (A.R. 1569).  This finding was unsupported by the evidence showing that in response to the Father's request for additional information regarding the ACCESS program to assist him in making a decision regarding the IEP that would be proposed for C.D. (A.R. 451), Natick responded that a proposed IEP had been mailed and that "regarding your request for information about the ACCESS program, you raise good questions...I suggest that you, [C.D.'s mother] and I meet with Jim Francoise, the lead teacher of the program, at the beginning of the school year..." (A.R. 453).

> **8.    The hearing officer disregarded substantial evidence showing that Natick predetermined C.D.'s proposed placement in the ACCESS program.**

When a school district makes its placement decision prior to the IEP meeting and is unwilling to consider alternatives regardless of the discussion at the meeting, the school district's actions constitute "predetermination" and violate the IDEA's procedural requirement that parents have the opportunity to participate in meetings with respect to the identification, evaluation, and educational placement of the child." [27]

The hearing officer ignored substantial evidence showing that Natick predetermined C.D.'s proposed placements and thereby violated the Parents' right to participate in meetings with respect to C.D.'s educational placement.

---

[27] *H B. ex rel P.B.* v. *Las Virgenes Unified School Dist., supra.*

For example, following her observation of C.D. on June 5, 2012, Ms. Dalan informed the Parents that after observing C.D. in her inclusion classes at McAuliffe, speaking with some of her teachers, and reviewing some of her work samples, the self-contained ACCESS class at Natick would be appropriate. (A.R. 2771). Referring to the informational meeting on May 24, 2012. Ms. Dalan asserted, "[O]ur recommendation of the ACCESS class for C.D. came from our discussion at the meeting and Dr. Imber's Report." (A.R. 377). At the IEP meeting on July 27, 2012, Natick informed the parents that based upon "...what Gina [Ms. Dalan] told me after that observation, and I know what she and the rest of the Natick team felt when we met in May is that she needs to be in the ACCESS program; that is the program that is appropriate for C.D. in order to meet her needs." (A.R. 402-403).

There was substantial evidence on the record, which the hearing officer ignored, showing that Natick did not come to the meeting on July 27, 2012 with an open mind, including that Natick refused to even consider placing C.D. in the general education classroom with supplementary aids and services, despite evidence of her successful inclusion at McAuliffe presented repeatedly by the Parents, Ms. Coellner, and Ms. Soden (*see* generally, A.R. 383-484); when the Parents asked whether C.D. could succeed in the Replacement classes, Natick replied, "based on what we're seeing on paper, the team is saying the ACCESS program." (A.R. 414); when the Parents attempted to have the team consider using a similar model to the model at McAuliffe; Natick responded, "That could not happen here..." (A.R. 317)

The Parents emphasized repeatedly the importance of inclusion for C.D. (*see e.g.* A.R. 413, 431); however, Natick never even considered inclusion as a viable option.

Therefore, although one or both of the Parents attended the various IEP meetings and spoke, they were not afforded an adequate opportunity to participate; the Parents'

participation was not meaningful participation and was no more than after the fact involvement.

The substantial evidence clearly showed that regardless of the information presented by the Parents, Ms. Coellner, Ms. Soden, and Dr. Imber, Natick still would have proposed the ACCESS program for C.D.  This is predetermination.

### 9. The hearing officer disregarded substantial evidence showing that Natick limited and restricted the Parents' access to information.

School districts have a "natural advantage" in information and expertise, but Congress addressed this when it obliged schools to safeguard the procedural rights of parents and to share information with them ... parents have the right to review all records that the school possesses in relation to their child ... they also have the right to an independent evaluation of their child, which includes access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion.[28] In addition, upon request of the parents, schools must provide timely access to parents and parent-designated independent evaluators and educational consultants for observations of… any program proposed for the child, including both academic and non-academic components of any such program. [29]

In her Findings and Conclusions, the hearing officer asserted, "[P]arents did not present any evidence of an instance in which they were not able to participate in the Team process or were unable to get answers to their questions." (A.R. 1570), thereby disregarding and dismissing overwhelming evidence showing that Natick restricted the Parents' access to information regarding the proposed programs for C.D.

---

[28] *See Schaffer v. Weast, supra.*
[29] G.L. c. 71B s. 3.

For example, the Parents repeatedly requested the opportunity to observe the programs at Natick, but were repeatedly denied the opportunity to do so. (A.R. 410-411, A.R. 2771).   Once observations were finally scheduled, Natick placed unreasonable restrictions on the rights of the Parents' and their evaluators to speak with the staff and obtain information about the classes they observed, requiring the Parents to file a motion to compel Natick to allow the Parents access to the information to which they were entitled.

The hearing officer completely omitted any reference to the Parents' Motion to Compel, its accompanying Memorandum of Law (A.R. 1138), which included sixteen exhibits and verified affidavits in support of the motion by Ms. Flax (A.R. 1168) and Dr. Imber (A.R. 1173); Natick's Opposition (A.R. 1279); the Parents' Response to Natick's Opposition (A.R. 1287), which included additional verified affidavits in support of the response by Ms. Flax (A.R. 1293) and Dr. Imber (A.R. 1296); and the hearing officer's Ruling Regarding Access of Independent Evaluators/Consultants (A.R. 815).[30]

The hearing officer repeatedly insisted that the issues in the Parents' Motion to Compel were resolved by her ruling on the motion and objected to any attempts by the Parents to address these issues at the hearing.   (*See e.g*., A.R. 2471). While the hearing officer ruled on the specific relief requested with regard to unanswered questions from the observations in October and November 2014, she did not rule on the issues raised in the supporting memoranda and affidavits relevant to the merits of the Parents' underlying case, including Natick's pattern of withholding information from the Parents, and their use of false allegations against their experts to justify their actions.

---

[30] In addition, the hearing officer's ruling on the relief requested by the Parents' Motion to Compel, was contrary to the principles and directives of both the Supreme Court and the First Circuit (*See Schaffer v. Weast*, *supra*, (requiring parental access to information); and *Sebastian v. King Philip*, *supra*, (noting the critical importance of experts who are both credible and persuasive)).

27

By prohibiting the Parents from providing testimony related to the issues surrounding their observations, the hearing officer minimized the importance Congress attached to parental participation under the IDEA, and violated the Parents' right to due process. (A.R. 2471).

Even if the hearing officer was correct that her ruling resolved the issue, this would not justify her decision to omit any reference to the motion (or to the supporting documentation) in the procedural history section of her Decision, effectively treating it as if it never existed. (A.R. 1551).

          **10.**      **The hearing officer disregarded substantial evidence on the record showing that Natick predetermined the change in C.D.'s disability category based upon an inadequate evaluation, and further, failed to provide the Parents' with prior written notice.**

Parents have the right to meaningful participation in decisions relative to the identification, evaluation and placement of their child.[31]  Further, written notice must be given to the parents of a child with a disability a reasonable time before the public agency proposes to initiate or change the identification, evaluation, or educational placement of the child.[32]

The hearing officer disregarded substantial evidence on the record showing that Natick predetermined the change in C.D.'s disability category from Intellectual to Communication based upon Ms. Cymrot's inadequate psychological evaluation, and further, failed to provide the Parents with prior written notice before proposing the change.

At the team meeting on June 13, 2014, following a review of her evaluation, Ms. Cymrot informed the Parents that although C.D.'s test scores continued to meet the

---

[31] *See* 20 U.S.C. § 1414(d)(1)(B)(i) (requiring the inclusion of parents on the IEP team); 34 C.F.R. § 300.321(a)(1) (same); 20 U.S.C. § 1415(b)(1).

[32] *See* 34. C.F.R. § 300.503.

criteria for Intellectual Disability, her disability category should be changed to Communication.  (A.R. 406, A.R. 1657, A.R. 1006-1011).

The Parents were shocked by this information, not only because (1) it was apparently determined outside the team meeting process and they were not given prior written notice, and (2) C.D. was 17 ½ years old at the time and for most of her life she had been diagnosed with an intellectual disability; but also because (3) it was premature and improper given that an evaluation of C.D.'s daily living skills had not yet been done. (A.R. 3424).

Although the Parents disagreed with the change in C.D.'s disability category and attempted to discuss their concerns with Natick at the meeting in June 2014 and at subsequent team meetings in November 2014 and January 2015, Natick steadfastly refused to even discuss, let alone reconsider, the change in C.D.'s disability category, ignoring that C.D. was approaching her 18th birthday and had been eligible under the category of Intellectual for most of her life, and insisting that Ms. Cymrot's evaluation supported their position. (A.R. 3394, A.R. 2503).

> **11.** **The hearing officer's determination that the IEP proposed by Natick for the 2012-2013 school year was reasonably calculated to provide C.D. with a FAPE in the LRE is not entitled to deference because her findings and conclusions were based upon factual and legal errors.**

The hearing officer made multiple findings based upon errors of fact and law.  A striking example of this is her determination that the IEP proposed for 2012-2013 provided FAPE in the LRE because the proposed placement in ACCESS was less restrictive that C.D.'s program at McAuliffe.  The hearing officer stated, "[A]lthough none of the witnesses testified about the level of restrictiveness of [McAuliffe], the hearing officer took note of it…[The ACCESS program] was less restrictive than [C.D's] McAuliffe placement because it did not provide for the assistance of a one to one aide throughout the day.  It provided [C.D.] the

opportunity to independently access academic services in a program specifically designed for students with profiles similar to [C.D's]. (A.R. 1565).

This finding was not only irrelevant to the determine of whether the ACCESS program provided FAPE, but it was also factually incorrect.  In making this finding, the hearing officer disregarded substantial evidence on the record showing that C.D. succeeded with considerable independence at McAuliffe, and that the support C.D. received in the general education classroom at McAuliffe served to maximize her learning and participation with nondisabled peers, rather than impede it (see e.g., A.R. 4028); that she received occasional (not constant) support (A.R. 1696); in academic classes only (not throughout the day) (A.R. 1696); worked really well on group projects (A.R. 1697); often acted as the scribe, writing on the board on behalf of the group (A.R. 1697); attended electives, including a keyboarding computer class, art, physical education and lunch on her own, without any support (A.R. 1720).

Further, in reaching her conclusion that C.D. received constant support, the hearing officer not only ignored evidence presented by the Parents, but also evidence presented by Natick, including Ms. Dalan's statement in her email to the Parents dated June 19, 2012, in which she observed that C.D.: "was sitting quietly, sometimes taking notes, and other times working to complete given assignments…I did not see her private tutor working with her." (A.R. 377). There is no indication that the hearing officer considered any of this substantial evidence in reaching her conclusion.

Finally, the hearing officer's finding is based on errors of law to the extent that she is implying a one-to-one aide necessarily makes a program more restrictive, and that it is appropriate to place a student in a program based upon her profile.

      **B.**      **The hearing officer's determination that the IEPs proposed by Natick for the 2012-2013, 2013-2014 and 2014-2015 school years were reasonably**

**calculated to provide C.D. with a free appropriate education in the least restrictive environment is not entitled to deference because the hearing officer's determination relative to the credibility of witnesses, was biased and unsupported by the evidence.**

The hearing officer discredited nearly all of the Parents' witnesses, who had worked directly with C.D. for years, had observed her at McAuliffe and Learning Prep, had observed the proposed program at Natick (to the extent they were permitted), and were familiar with all of her IEPs and evaluations, and at the same time she credited all of Natick's witnesses, who had never worked with C.D., and were not familiar with her IEPs or evaluations.[33]

### 1.    Testimony of Father

The Father testified that one of his reasons for rejecting the 2012-2013 IEP was because the goals in the proposed IEP were the same goals contained in the McAuliffe IEP which were implemented in the inclusion setting, and Natick's decision to change C.D.'s placement to the ACCESS program would warrant a change in the goals. (A.R. 3428). The hearing officer noted that "[as] Father testified that he does not have any credentials in education, this reason is not considered valid by the hearing officer."  (A.R. 1566).

Regardless of whether the Father's concern was factually correct, he is not an expert witness and should not be subject to a credibility determination based upon his lack of credentials in education; he is a Parent, and in summarily dismissing his concern as invalid based solely on his status as a Parent, the hearing officer completely disregarded the fundamental

---

[33] The hearing officer's assessment of the witnesses' credibility was not only contrary to the First Circuit's decision in *Sebastian v. King Philip*, *supra*, but also contradicted the hearing officer's own decision in November 2014, where she arrived at the opposite conclusion in another matter, finding that the parents did not meet their burden of proof because they "did not present any expert testimony with respect to the inappropriateness of the IEP."  (*See Student v. Concord Carlisle Regional School District*, BSEA #1407063,20 MSER at 210).

importance Congress placed on parental participation in the educational decision-making process under the IDEA.

The hearing officer dismissed the Father's concern that the hours of service in the proposed IEP were less than those provided in the prior IEP, because "he did not present any credible evidence to support that presumption." (A.R. 1566). The evidence on the record includes a chart provided to Natick by the Father illustrating the decrease in hours. (A.R. 3432). The hearing officer did not reference this evidence at all, so it is not clear whether she reviewed it and rejected it, or did not review it at all.

The hearing officer noted the Parents' concern that placement in the ACCESS program would be inappropriate because it would not prepare [C.D.] for the MCAS, and indicated that "this was an assumption made by Parents and their evaluators that was not supported by the evidence before me." (A.R.1566). In making this conclusory finding, the hearing officer failed to show any evidence contrary to the Parents' "assumption", and specifically omitted substantial evidence showing that students in the ACCESS program are not prepared for the MCAS. (A.R. 295, 2433-2483).

The hearing officer noted that throughout his testimony, "Father referenced conclusions he had drawn regarding the ACCESS program…he did not believe students in the program would not be taking the MCAS. He believed the ACCESS program was a "life-skills" program and would not prepare students to receive a diploma. He believed that the ACCESS peers would not have been appropriate peers for Student due to their behavioral issues [A.R. 1560]." By systematically listing the reasons for Father's rejection of the IEPs one after another, and then summarily rejecting them based upon an incomplete and inaccurate review of the record, the hearing officer painted a picture of the Father that completely distorted his motives and understanding of the issues in this matter.

32

The hearing officer omitted substantial evidence on the record that showed most, if not all, of Father's conclusions were completely accurate, including evidence that verified the Parents' belief that ACCESS is a life skills program (A.R. 295); uses "entry points" to access the curriculum (A.R 406); that students are not on the diploma track (A.R. 295); do not take the MCAS (A.R. 295); and that opportunities for inclusion in general education were only available to students who were transferred out of ACCESS (A.R. 420).

## 2.    **Testimony of Nan Coellner**

Although the hearing officer was quick to discredit the Father's testimony because he did not have a degree in education, she simply ignored Nan Coellner's testimony despite her extensive experience in education spanning over 30 years.[34]  In addition to her qualifications, Ms. Coellner had worked with C.D. at McAuliffe from September 2009 through May 2012, for at least two days per week for three years, providing assistance in her general education academic classrooms, by giving her cues at the point of instruction. (A.R. 397-398). Ms. Coellner had observed C.D. and spoken with her teachers both at McAuliffe and Learning Prep. She observed the proposed program at Natick.  She testified reviewed the IEPs proposed by Natick for C.D.'s 2012-2013, 2013-2014, and 2014-2015 school years and attended team meetings for C.D. on May 24, 2012, July 27, 2012, and November 11, 2014.  (A.R. 1691-1745). Her testimony

---

[34] Ms. Coellner has a Master's degree in special education, Orton-Gillingham training from Mass General, multiple certifications in Special Education, and was employed by the Boston Public Schools for over 30 years. Her career with the Boston Public Schools, which began in 1972, includes working as a special education teacher teaching multi- handicapped students, serving as an Evaluation Team Leader, working as the assistant to the project manager for inclusion, being in charge of the special education programs in all schools in the Allston-Brighton area, and serving as the Special Education Program Director for Dorchester High School, where she was in charge of all services for approximately 350 students in various special education programs, until her temporary retirement in 2005.  (A.R. 3189).

was highly relevant to the issues presented at the hearing, yet the hearing officer completely omitted all of Ms. Coellner's testimony from her decision. (A.R. 1691-1745).

### 3.   Testimony of Suzanne Flax

Ms. Flax is a highly qualified speech and language pathologist, who has been providing C.D. with private speech and language therapy weekly since 2007.[35] Ms. Flax conducted speech and language evaluations of C.D. in 2010, 2012 and 2014 (A.R. 3802); she had observed C.D. and spoken with her teachers at McAuliffe and Learning Prep, and she had observed the proposed program at Natick. (A.R. 3802).

Ms. Flax testified that she reviewed all of the IEP's proposed by Natick for 2012-2013, 2013-2014, and 2014-2015, attended team meetings at Natick on May 24, 2012, and November 11, 2014. (A.R. 1847-1855). Her testimony was highly relevant to the issues at the hearing.

By way of the corrected decision issued on July 28, 2014, the hearing officer indicated that she did not rely on Ms. Flax's testimony at all.  (A.R. 1570-1571). While the hearing officer has the discretion to determine the weight to be given to witnesses before her, her decision to throw out Ms. Flax's entire testimony was based solely upon her testimony regarding whether she currently supported inclusion for C.D. and her opinion that C.D. would not have friends in the ACCESS program.  (A.R. 1570).  Even if it was

---

[35] Suzanne Flax received a Master's degree in Speech/Language Pathology from Columbia University, and has over 30 years' experience working as a speech therapist. Her career includes employment by the Boston Public Schools through Easter Seals beginning in 1988, working with preschool children through grade 9, working as part of a developmental diagnostic clinic, involving diagnosis and placement of children in Massachusetts, Vermont and New Hampshire, working at Braintree Hospital from 1997-2001, where she functioned as a school speech therapist at the Melrose Public Schools. Ms. Flax has been in private practice since 2001, working with children through adults with a variety of different disabilities, and has provided speech therapy to thousands of children and adolescents. (A.R. 3217).

reasonable for the hearing officer to give little or no weight to these two statements, disregarding her entire testimony was extremely prejudicial to the Parents' case.

### 4.   Testimony of Steve Imber, Ph.D.

Dr. Imber is a highly qualified expert, with over 40 years' experience in the field of special education.[36] He was hired by the Parents in 2009 to conduct an independent evaluation of C.D.; he conducted evaluations in 2009, 2010, 2012, and 2014, which included observations of C.D., reviews of previous evaluations, and standardized academic testing. (A.R. 2015-2132). In addition to conducting evaluations of C.D., he has served as an educational consultant to the Parents, observing C.D.'s programs, speaking with her teachers, and providing feedback to the Parents; Dr. Imber had observed C.D. and spoken with her teachers at McAuliffe and Learning Prep, and had observed the proposed program for C.D. at Natick. (A.R. 2015-2132). Dr. Imber testified that he reviewed all of the IEP's proposed by Natick for C.D. 's 2012-2013, 2013-2014, and 2014-2015 school years, and attended team meetings at Natick on May 24, 2012, July 27, 2012, June 13, 2014, November 11, 2014, and January 7, 2014. (A.R. 3662, A.R 3756).  Dr. Imber's testimony was highly relevant to the issues at the hearing.

By way of the corrected decision issued on July 28, 2014, the hearing officer indicated that she did not rely on Dr. Imber's testimony at all.  (A.R. 1570). In support of her decision to disregard Dr. Imber's testimony, the hearing officer indicated "a careful

---

[36]Dr. Imber received a Doctoral degree in Special Education from UConn; he has published numerous articles in education journals, and has been a Professor of Special Education at Rhode Island College for over 40 years, teaching at both the undergraduate and graduate levels and supervising the clinical programs for student teachers, 90% of which has been in public school settings.  During the course of his career, Dr. Imber has also consulted in a variety of different settings, including working with the Rhode Island Department of Education, and working with multiple public school systems, which included serving as a special education consultant and school psychologist for the Lincoln Public Schools from 1996 to 2002, and working as an independent evaluator from 1976 to the present, during which time he has evaluated over 1000 children and adolescents.  (A.R. 3190).

review of his testimony shows that his current recommendations were primarily based upon Student's performance at Learning Prep…he did previously support an inclusive placement for Student yet currently stated that he no longer believed that inclusion was as important for Student based upon her performance at Learning Prep. Based upon that opinion, it appears that Dr. Imber has changed his recommendations to align with which ever placement she was in at the time he was asked to state his opinion." (A.R. 1570-1571). There is no evidence in the record to support this finding.

A careful review of the record, however, shows that the hearing officer supported her decision to discredit Dr. Imber by simply adopting the proposed finding in Natick's opening statement, despite the complete lack of evidence to support it.  In her opening statement, Natick's attorney stated:

> "It is clear that these experts have simply changed the recommendations based on what the Parents are seeking at any given time." (A.R. 1609)

In her corrected Decision, the Hearing Officer adopted Natick's allegations without any substantial evidence to support her finding:

> "It appears that Dr. Imber has changed his recommendations to align with whichever placement she was in at the time he was asked to state his opinion."  (A.R. 1570)

The hearing officer's wholesale adoption of Natick's proposed finding in the absence of any substantial evidence to support it demonstrates bias against the Parents and was highly prejudicial to the Parents' case.

### 5.    Testimony of Arlyn Roffman, Ph.D.

Dr. Roffman is a renowned expert in the field of transition.[37] Dr. Roffman met C.D.
in December 2012 when the Parents contacted her to provide consultation and feedback
regarding the transition plans proposed by Learning Prep and Natick. Dr. Roffman provided
a written report of her findings and recommendations, about which she testified at the
hearing.  (A.R. 3651). Dr. Roffman testified that she had reviewed all of the IEP's proposed
by Natick for C.D's 2012-2013, 2013-2014, and 2014-2015 school years, had observed C.D.
at Learning Prep School, and had observed  the proposed  program  for C.D. at Natick.
(A.R. 171).  She provided detailed and sophisticated testimony regarding the transition
program proposed by Natick for C.D., which the hearing officer without explanation
summarized as, "she opined that the transition plan contained in S-4 was not properly filled
out." (A.R.1562).

### 6.    Testimony of Donna Cymrot

Ms. Cymrot is a school psychologist, who began working at the Natick Public
Schools in 1988 (at the High School level since 2000). Ms. Cymrot first met C.D. in May of
2014 as a result of Natick's request that she conduct a psychological evaluation of C.D. as
part of her three-year reevaluation.  (A.R. 293-310)

In her decision, the hearing officer credited Ms. Cymrot's testimony that the "blended
program" that Natick was proposing would be appropriate for C.D. (A.R. 1557).

---

[37] Dr. Roffman obtained a Ph.D. in Developmental Psychology from Lesley University, is a licensed psychologist
and Special Education teacher. After obtaining her Ph.D., Dr. Roffman spent the next thirty-seven years doing
teacher preparation and founding the Threshold Program at Lesley University in 1981, a transition program for
young adults with disabilities, designed to assist students with disabilities to develop the social, vocational and
community living skills needed for adult living. Students have attended the Threshold Program from all over the
world. Prior to retiring from her position at Lesley in July 2014, Dr. Roffman developed a Transition Specialist
Endorsement program for individuals seeking transition certification under Massachusetts' law.  (A.R. 3220).

The hearing officer completely disregarded clear and substantial evidence on the record showing that the evaluations Ms. Cymrot performed, and upon which the IEP dated June 13, 2014 through June 13, 2015 was based, were incomplete and inadequate, calling into question not only whether the change in C.D.'s disability was appropriate, but also, significantly diminishing Ms. Cymrot's credibility as a witness. (A.R. 293-310).

Ms. Cymrot admitted on cross-examination that:

a.   She did not review any of the IEPs proposed for C.D. for the 2012-2013, 2013-2014, or 2014-2015 school years, and did not review all of the previous psychological reports, including those conducted by Natick in 2012;

b.   She made the determination that C.D.'s disability category should be changed prior to the assessment of C.D.'s skills in the practical domain, which she knew would be assessed in the fall of 2014;

c.   She did not recall whether the eligibility flowchart required by DESE was used at the meeting on June 13, 2014 prior to the change in C.D.'s disability category;

d.   She referenced a prior assessment from 2003 where C.D. was not diagnosed with an Intellectual Disability, but ignored the assessments from 2007 and 2008 diagnosing C.D. with an Intellectual Disability;

e.   She was not aware that all of Natick 's proposed IEPs since 2008 indicated that C.D. had an Intellectual Disability because, "I would not have seen or had access to the prior IEPs;"

f.   She wrote an email to Ms. Molinari-Bates on May 15, 2014 stating that she did not need [C.D.'s] file, thereby confirming that she did not review C.D.'s entire record, and;

g.   If she had known there were more recent assessments, she might have referenced them in her report;

h.   She wrote an email to Ms. McGovern, Barbara Molinari-Bates, Mark D'Angelo and Ms. Karian asking the recipients to "edit the report as needed;"

i.   Although she had attended the team meeting in May 2012 she "had not reviewed any records at all, other than listening to the report that Dr. Imber presented at that meeting," and actually did not review Dr. Imber's

38

report until the day of the hearing;  and

j.    She did not know whether the change in C.D.'s disability category would affect her eligibility for services. (A.R. 293-310, A.R. 2661).

**7.    Testimony of Karen Liptak**

Ms. Liptak is a special education teacher who began working at Natick in 2004, first at the Wilson Middle School and then at the High School, where her responsibilities include acting as a learning center teacher and teaching the Replacement English classes. (A.R. 2321-2328).

Ms. Liptak had never observed C.D. at Learning Prep, she testified that she did not review the IEPs proposed by Natick for C.D.'s 2012-2013 and 2013-2014 school years. Ms. Liptak worked with C.D. in the summer of 2012, providing the academic component of her ESY program.  (A.R. 2321-2328). Ms. Liptak testified that she did not attend the team meeting in July 2012 because she had very limited knowledge of C.D. compared to the knowledge of the persons that worked with C.D. at McAuliffe. (A.R. 2321-2328).

Without explanation, the hearing officer credited Ms. Liptak's testimony over the testimony of the Parents' and all of the Parents' witnesses to support her conclusion that the transition program proposed by Natick in 2014 would meet C.D.'s needs, and that the placements proposed by Natick would be appropriate placements for [C.D.].  "Ms. Liptak believes that the [ACCESS] program would be an appropriate placement for [C.D.] and that a blended program providing for some replacement classes with support would be appropriate. She thinks the proposed transition program would meet [C.D's] needs. From her experience teaching [R]eplacement classes, she does not believe other students' behavior will interfere with [C.D.'s] learning." (A.R. 2321-2328).

**8.    Testimony of Christine Michelson**

Ms. Michelson obtained her current position at Natick in August 2014, first as an ACCESS teacher, and then in October 2014, as the lead teacher for the ACCESS program, replacing Mr. Francoise, who was reassigned. Ms. Michelson had never met C.D., did not observe C.D. at Learning Prep, testified that she did not review the IEPs proposed by Natick prior to the IEP currently proposed for the 2014-2015 school year, and did not review all of the evaluation reports, including the report provided by Dr. Gibbons. (A.R. 2282-2320).

Inexplicably, the hearing officer credited Ms. Michelson's testimony over the Parents and all of their witnesses, who had worked directly with C.D. for years. The hearing officer stated, "[b]ased upon her review of [C.D.'s] records, Ms. Michelson believes that the IEP proposed by [Natick] for the 2014-2015 school year was appropriate for [C.D.] and that she would have appropriate peers within the ACCESS program…Ms. Michelson believes that a blended program that includes some ACCESS classes, some Replacement classes, and some general education classes with support, would be appropriate for [C.D.]." (A.R. 1561).

**9.    The hearing officer's decision to completely disregard the reports provided by Dr. Imber, Ms. Flax, and Dr. Roffman is not entitled to deference because her rationale was inconsistent with applicable law, and substantially prejudiced the Parents' case.**

The hearing officer notified the parties by way of the corrected decision that she did not rely upon the most recent reports submitted by Ms. Flax and Dr. Imber…"because they were first presented to Natick as exhibits in the hearing and the team did not have the opportunity to review them prior to the hearing. (A.R. 1571). Likewise, I did not rely upon the written report

of Dr. Roffman as it was not received by Natick prior to the hearing." (A.R. 1571).

The hearing officer indicated that the reason she did not rely on the reports was because the Parents did not provide them to Natick in time for Natick to convene a team meeting prior to the hearing.  (A.R. 1571). However, this rationale is inconsistent with applicable law regarding the use of expert reports at due process hearings.

The Parents timely submitted the reports (including Dr. Roffman's report) as exhibits five (5) business days prior to the hearing in accordance with Rule IX of the BSEA rules and 45 CFR §300.502.  By excluding the reports, the hearing officer erroneously made C.D.'s right to a FAPE of lesser importance than her mistaken view of Natick's procedural rights.

**10.   The hearing officer's determination that there was no evidence of procedural violations that resulted in a denial of FAPE is not entitled to deference and should be reversed because it was wholly unsupported by the evidence on the record.**

The hearing officer addressed this claim in her Decision solely by making the conclusory remarks, "[I] am not aware of any…instances in the record in which Parents claim Natick committed any procedural violations…[T]he record is unclear as to what procedural violations Parents believe Natick committed."  (A.R. 1548). Based upon the foregoing discussion, this conclusion evidences a blatant disregard for the record before her.

**11.   The hearing officer's determination that there was no evidence that Natick discriminated against C.D. or her Parents under Section 1983 or Section 504, is not entitled to deference and should be reversed because it was not supported by the evidence on the record.**

The hearing officer would not allow the Parents to obtain any testimony on the record with regard to their claims under §1983 or §504; however, the record itself is replete with evidence , including the Parents' Motion to Compel and its accompanying Memorandum of

Law (A.R. 1138), which included sixteen exhibits and two verified affidavits by Ms. Flax (A.R.

1168) and Dr. Imber (A.R. 1173) each in support of the motion; documenting evidence of false

allegations made against the Parents' evaluators and educational consultants in order to restrict

their access to information.  (A.R. 3106-3162).

## VI.    <u>CONCLUSION</u>

For all the foregoing reasons, Parents are entitled to judgment in their favor as a matter of

law and respectfully request that this Honorable Court grant their Motion for Summary Judgment.

DATED this 7th day of July 2016.

<div style="margin-left:40%">

Respectfully submitted,

C.D., by and through her PARENTS AND
NEXT FRIENDS, M.D. and P.D.

By their attorney,

/s/ Laurie R. Martucci
Laurie R. Martucci, Esq.
BBO # 561946
Wagner Law Associates, LLC
4 West Street
Franklin, MA 02038
(508) 528-4007
lrm@wagnerlegal.com

</div>

## CERTIFICATE OF SERVICE

I hereby certify that the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF"), and paper copies will be sent to those indicated as non-registered participants on July 7, 2016.

/s/  Laurie R. Martucci
Laurie R. Martucci