**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | Civil Action No. 15-cv-13617-FDS |
| C.D., by and through her PARENTS AND ) | |
| NEXT FRIENDS, M.D. and P.D. ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| NATICK PUBLIC SCHOOL DISTRICT ) | |
| and ) | |
| BUREAU OF SPECIAL EDUCATION ) | |
| APPEALS, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**PLAINTIFFS' AMENDED STATEMENT OF MATERIAL FACTS**
**(LEAVE TO FILE GRANTED ON 07/05/16)**

In compliance with Local Rule 56.1 of the Massachusetts Federal Rules of Court, the

Plaintiffs, C.D., and her parents, M.D. and P.D. ("Parents"), on behalf of their daughter and

themselves, respectfully submit this Amended Statement of Material Facts in support of their

Motion for Summary Judgment filed on June 27, 2016.

**THE PARTIES**

1.      The Plaintiffs, M.D. and P.D. are C.D.'s father and mother respectfully, who

bring this action on behalf of C.D. and themselves.  (A.R.  818).[1]

2.      The Plaintiff, C.D is a student with a disability who is entitled to all the

rights, entitlements, and procedural safeguards mandated by applicable law and statutes,

---

[1] Citations are to the Administrative Record from which each of the facts are derived and are denoted as "A.R." followed by the page number found at the bottom of each record page (e.g., A.R. 2).

including, but not limited to, the IDEA, and M.G.L. c.71B. (A.R.  818).

3.      C.D. is and was at all times relevant to this action, a resident of Natick, Middlesex County, Massachusetts. (A.R.  818).

4.      C.D. attended public school in Natick through the end of 5th grade pursuant to IEPs proposed by the Natick Public School District ("Natick") and accepted by the Parents.[2] (A.R. 818).

5.      The Parents enrolled C.D. in the Christa McAuliffe Regional Charter School ("McAuliffe"), in Framingham, Massachusetts, which she attended, in the general education inclusion classroom for 6th, 7th and 8th grades. (A.R. 818).

6.      C.D. is currently enrolled at Learning Preparatory School ("Learning Prep"), a state-approved special education school in Newton, Massachusetts, where the Parents privately placed her in September 2012, following their rejection of Natick's proposed placement for 9th grade. (A.R.  818).

7.      C.D. was attending 12th grade at the time of the hearing.   (A.R.  818).

8.      M.D. and C.D. are and were at all times relevant to this action, residents of Natick, Middlesex County, Massachusetts. (A.R.  818).

9.      The Defendant, Natick, is a public corporation with the capacity to be sued under the laws of the Commonwealth of Massachusetts, with a usual place of business located at 13 E. Central Street, Natick, Middlesex County, Massachusetts. (A.R.  818).

10.      Natick receives federal funds from the United States Department of Education pursuant to the IDEA, and is required to provide special education services to all

---

[2] C.D. also attended the extended year program ("ESY") at Natick in 8th grade.

eligible students who reside within the school district. (A.R. 818).

11.    The Defendant, Bureau of Special Education Appeals "BSEA", is an independent subdivision of the Division of Administrative Law Appeals, an independent state agency within the Commonwealth of Massachusetts, with a usual place of business at One Congress Street, Boston, Suffolk County, Massachusetts. (A.R. 818).

12.    The BSEA is responsible for adjudicating disputes between parents and school districts regarding special education services pursuant to 20 U.S. §1415(g) and M.G.L. c. 71B, §2A. (A.R. 818).

## PROCEDURAL HISTORY BEFORE THE BSEA

13.    The Parents filed their initial request for hearing on May 23, 2014, which they amended on April 1, 2015 based upon events that transcribed subsequent to the initial filing date. (A.R. 818).[3]

14.    Natick filed its response to the Parents initial request for hearing on June 2, 2014. (A.R. 3093).

15.    The hearing was held on May 12, 2015, May 13, 2015, May 27, 2015, and May 28, 2015. (A.R. 1559).

### The Parents' Witnesses

16.    The Parents' witnesses who provided testimony at the hearing with regard to the appropriateness of the proposed programs for C.D. included: (1) Ms. Nan Coellner; (2) Ms.

---

[3] In their Amended Complaint, the Parents asserted that Natick engaged in discrimination and retaliation in violation of 42 U.S.C. § 1983, and Section 504 of the Rehabilitation Act of 1973 by repeatedly providing the BSEA with false and defamatory allegations against the Parents and their educational evaluators and consultants as justification for restricting their access to information; by changing C.D.'s disability category without just cause; and by wrongfully denying C.D. o opportunity to participate in the standard Math MCAS.

Suzanne Flax; (3) Dr. Steve Imber; and (4) Dr. Arlyn Roffman. (A.R. 1549).

17.    Nan Coellner, a retired special education teacher, with over thirty years' experience in the Boston Public Schools (A.R. 3189), worked with C.D. in the general education classroom at McAuliffe for at least two days per week from September 2009 through May 2012. (A.R. 1696).

18.    Ms. Coellner observed C.D. and spoke with her teachers at McAuliffe and Learning Prep, and observed the proposed program for C.D. at Natick. (*See* A.R. 1691-1745).

19.    Ms. Coellner testified that she reviewed the IEPs proposed by Natick for C.D.'s 2012-2013, 2013-2014, and 2014-2015 school years and attended team meetings for C.D. on May 24, 2012, July 27, 2012, and November 11, 2014. (*See* A.R. 1691-1745).

20.    Suzanne Flax, a speech therapist with over thirty years' experience (A.R. 3217), has been working with C.D. one day per week since 2007, when the Parents hired her to provide private speech therapy for C.D. (*See* A.R. 1840-1914).

21.    Ms. Flax observed C.D. and spoke with her teachers at McAuliffe and Learning Prep, and observed the proposed program at Natick; Ms. Flax testified that she reviewed all of the IEPs proposed by Natick for 2012-2013, 2013-2014, and 2014-2015, and attended team meetings at Natick on May 24, 2012 and November 11, 2014. (*See* A.R. 1840-1914).

22.    Dr. Imber, an educational evaluator/consultant, and Professor of Special Education at Rhode Island College with over forty years' experience (A.R. 3190), was hired by the Parents in 2009 to conduct an independent evaluation of C.D.; he conducted evaluations in 2009, 2010, 2012, and 2014, which included observations of C.D., reviews of previous evaluations, and standardized academic testing. In addition to conducting

evaluations, Dr. Imber has served as an educational consultant to the Parents, observing C.D.'s programs, speaking with her teachers, and providing feedback to the Parents. (*See* A.R. 2015-2131).

23.     Dr. Imber observed C.D. and spoke with her teachers at McAuliffe and Learning Prep, and has observed the proposed program at Natick. (*See* A.R. 2015-2131).

24.     Dr. Imber testified that he reviewed all of the IEPs proposed for the 2012-2013, 2013-2014, and 2014-2015 school years, and attended team meetings at Natick on May 24, 2012, July 27, 2012, June 13, 2014, November 11, 2014, and January 7, 2014. (*See* A.R. 2015-2131).

**Natick's Witnesses**

25.     Natick's witnesses who provided testimony at the hearing with regard to the appropriateness of the proposed programs for C.D. included: (1) Karen Liptak; (2) Sarah Karian; (3) Donna Cymrot; and (4) Christine Michelson.

26.     Karen Liptak, a special education teacher at Natick High School, worked with C.D. in the summer of 2012, providing the academic component of her ESY program.  (*See* A.R. 2320-2345).

27.     Ms. Liptak has never observed C.D. at Learning Prep; Ms. Liptak attended team meetings for C.D. on May 24, 2012, November 11, 2014, and January 7, 2015. (*See* A.R. 2320-2345).

28.     Ms. Liptak did not attend the IEP team meeting on July 27, 2012 (even though she had provided services to C.D. during the ESY program earlier that month).

29.     Ms. Liptak testified that she did not review the IEPs proposed by Natick for C.D.'s 2012-2013, 2013-2014 school years.  (*See* A.R. 2320-2345).

30.     Sarah Karian, Speech Language Pathologist at Natick High School, first met C.D. on May 27, 2014, per Natick's request that she conduct a speech and language evaluation for C.D.'s three-year reevaluation. (*See* A.R. 2183-2215).

31.     Ms. Karian conducted her evaluation at Learning Prep but did not observe C.D. in any of her classes or speak with any of her teachers, indicating in her testimony that she doesn't think it was important for her to observe C.D. as part of her evaluation. (*See* A.R. 2183-2215).

32.     Ms. Karian attended team meetings on June 13, 2014 and January 7, 2015; Ms. Karian did not attend the team meeting on November 11, 2014, at which the team reviewed Ms. Flax's most recent Speech and Language Evaluation.
(*See* A.R. 2183-2215).

33.     Ms. Karian did not testify with regard to whether she reviewed the IEPs proposed for the 2012-2013, 2013-2014, and 2014-2015 school years. (*See* A.R. 2183-2215).

34.     Donna Cymrot, a school psychologist at Natick High School, first met C.D. in May of 2014 as a result of Natick's request that she conduct a psychological evaluation as part of her three-year reevaluation. Ms. Cymrot observed C.D. at Learning Prep when she conducted her evaluation but did not speak with any of her teachers. Ms. Cymrot attended team meetings on May 24, 2012, June 13, 2014, and November 11, 2014. (See A.R. 2132-2175).

35.     Ms. Cymrot testified that she did not review any of the IEPs proposed for C.D. for the 2012-2013, 2013-2014, or 2014-2015 school years, and did not review all of the previous psychological reports, including those conducted by Natick in 2012, which contradicted her findings, and the Neuropsychological Evaluation provided by Dr. Gibbons and about which Dr. Gibbons testified at the hearing. (*See* A.R. 2183-2215).

36.     Christine Michelson, the Lead ACCESS teacher since October 2014, had never met C.D. (*See* A.R. 2382-2319).

37.     Ms. Michelson had never observed C.D. at McAuliffe or Learning Prep or consulted with any of her teachers. (*See* A.R. 2382-2319).

38.     Ms. Michelson testified that she did not review the IEPs proposed by Natick prior to the IEP currently proposed for the 2014-2015 school year, and did not review all of the evaluation reports, including the Neuropsychological Evaluation provided by Dr. Gibbons and about which Dr. Gibbons testified at the hearing. (*See* A.R. 2382-2319).

39.     Ms. Michelson attended team meetings on November 11, 2014 and January 7, 2015. (*See* A.R. 2382-2319).

**The Issues Exhausted**

40.     The following issues were exhausted at the BSEA hearing: (a) Whether the IEPs proposed by Natick for the periods from 2012-2013 (A.R. 2603), 2013-2014 (A.R. 2628), and 2014-2015 (A.R. 2551, A.R. 2529, A.R. 2503) were reasonably calculated to provide C.D. with a FAPE in the LRE; (b) Whether there were any procedural violations committed by Natick that resulted in a denial of a FAPE to C.D.; (c) Whether Natick engaged in any discrimination or retaliation in violation of 42 U.S.C. § 1983 and Section 504 of the Rehabilitation Act of 1973 (to preserve the Parents' right to file a claim for damages at a later date). (A.R. 1549-1574).

**Discovery**

41.     On December 5, 2014, pursuant to the Parents' discovery request, Natick provided the Parents with redacted IEPs for students in the ACCESS program between September 2012 and the current date, which revealed the profile of students who would

have been C.D.'s peers. (A.R. 4182).

42.    The IEPs revealed that there were students with autism; there were students who were nonverbal, and students with emotional and behavioral challenges.  (A.R. 4182).

**The Motion to Compel**

43.    On November 12, 2014, the Parents filed a Motion to Compel Independent Evaluators and Educational Consultants Access to School Staff ("Motion to Compel"), a supporting Memorandum of Law, which included two verified affidavits and sixteen exhibits. (A.R. 732-944).

44.    The Motion to Compel was a result of conditions placed upon the Parents' and their experts with regard to their observations of the proposed program during October and November 2014; and which prevented them from obtaining the information that they needed and were entitled to receive.  (A.R. 732-944)

45.    Natick justified restricting the observations based upon allegations against Dr. Imber and Ms. Flax, accusing them of interrogating Natick staff and making them feel uncomfortable during their observation in June 2014. (A.R. 732-944).

46.    In their affidavits, Dr. Imber and Ms. Flax fervently denied the allegations against them. (A.R. 732-944).

47.    By their motion, the Parents sought to compel Natick to provide the Parents and their designated evaluators/consultants the opportunity to communicate directly, in person, and without the imposition of impermissible conditions, with the school staff in the classes they had observed in October and November 2014 (as well as in the future). (A.R. 732-944).

48.    Natick filed an Opposition to the Parents' Motion to Compel on November 20, 2014; however, Natick did not provide any evidence to support their allegations. (A.R. 1279).

49.     On November 28, 2014, the Parents filed a response to Natick's Opposition, which included two additional affidavits from Dr. Imber and Ms. Flax. (A.R. 1287).

50.     On April 1, 2015, five months after the motion was filed, the hearing officer issued a ruling, which ordered that the Parents could submit clarifying questions in writing to be answered by Natick in writing regarding the observations that occurred five months prior to the ruling. (A.R. 815).

51.     The Parents submitted questions in writing on April 21, 2015. (A.R. 1351).

52.     Natick objected to the form and content of the questions submitted, and following a conference call on May 1, 2015, the hearing officer issued an amended ruling providing that Natick would submit written responses by May 7, 2015, to the questions deemed appropriate by the hearing officer. (A.R. 768).

### The Exhibits

53.     On May 5, 2015, the Parents submitted their exhibits for hearing five business days prior to the hearing in accordance with Rule IX of the BSEA rules, which included the most recent reports from Dr. Imber (A.R. 3662), Ms. Flax (A.R. 3802), and Dr. Roffman (A.R. 3651), who had completed their reports to the extent possible (given the restrictions imposed by Natick) so that the Parents could at least submit them as exhibits for the hearing pursuant to federal law[4] (A.R. 1409).

### The Decision

54.     The BSEA issued a final Decision on July 24, 2015 (A.R. 1528-1549), which was corrected on July 28, 2015 to include three paragraphs which had been inadvertently omitted. (A.R. 1549-1574).

---

[4] 45 CFR §300.502.

55. The omitted paragraphs indicated that the hearing officer: (1) did not rely on the testimony of Ms. Flax; (2) did not rely upon the testimony of Dr. Imber; and (3) did not rely on the most recent reports submitted by Ms. Flax, Dr. Imber, or Dr. Roffman. (A.R. 1549-1574).

56. Following a four-day hearing on May 12, 2015, May 13, 2015, May 27, 2015, and May 28, 2015, the hearing officer found that: (1) the IEPs proposed by Natick for the 2012-2013, 2013-2014, and 2014-2015 school years were reasonably calculated to provide C.D. with a FAPE in the LRE; (2) there was no evidence of procedural violations that resulted in a denial of FAPE to C.D.; and (3) there was no evidence that Natick discriminated against Student/Parents under 42 U.S.C. § 1983 or Section 504 of the Rehabilitation Act of 1973. (A.R. 1549-1574).

57. Because the hearing officer found that the IEPs proposed by Natick did not deny C.D. a FAPE, she made no determination regarding whether the Parents' placement at Learning Prep was an appropriate placement in the LRE, pursuant to the standards applicable when parents unilaterally place their child in a private school. (A.R. 1549-1574).

**THE MATERIAL FACTS**

58. C.D. has been diagnosed with Borderline Intellectual Functioning and has been noted to have weakness in language functioning. (A.R. 3876).

59. Her most recent neuropsychological evaluation indicates that C.D. has a Mild Intellectual Disability along with ongoing weaknesses in receptive and expressive language. (A.R. 3876).

60. C.D. is an organized, hard-working, conscientious, cooperative student who wants to do well, is able to follow classroom routine and class expectations (A.R. 3435), and appears to have good self-esteem and social skills. (A.R. 2505, A.R. 3231).

61.     C.D. attended all of her classes at McAuliffe in the general education inclusion setting (with the exception of Math for 8th grade only). (A.R. 3375).

62.     C.D. received supplementary support in the general education classroom at McAuliffe from Ms. Coellner and Ms. Soden, two retired special educational teachers/administrators, hired by the Parents.  (A.R. 1691).

63.     Ms. Coellner testified that she and Ms. Soden had worked with C.D. on a rotating schedule every day for 6th, 7th and 8th grade (A.R. 1691); that they provided occasional support in the academic classroom (A.R. 1696); and did not accompany C.D. to electives or lunch.  (A.R. 1696).

64.     Ms. Coellner testified that C.D. was able to access the general education curriculum at McAuliffe (A.R. 1697); has excellent executive functioning skills, is very organized, works really well in groups; has beautiful handwriting and would often be the scribe during group projects. (A.R. 1697).

65.     Ms. Coellner testified that at the end of 6th grade, C.D. had no confidence in her own academic ability; however, at McAuliffe, her self-confidence dramatically improved…when she began at McAuliffe, C.D. could fill in a blank in a sentence and at the end of three years, she could write a composition; in 8th grade, C.D. passed the standard MCAS in English. (A.R. 1699).

66.     Ms. Coellner testified that C.D. felt like part of the group at McAuliffe, she didn't feel special; she was one of the kids, laughing and joking in the hallway, and spending time with friends socially after school.  (A.R. 1700).

67.     Ms. Flax testified that in 2007, C.D. presented with a severe language-based learning disability due to her overall cognitive profile; she didn't initiate verbal language,

and was basically answering questions in one to three words. (A.R. 1848).

68.     Ms. Flax testified that at McAuliffe, C.D. was in an environment where the
bar was set high, she had models she could emulate, and she was growing because of
this…she was in an environment where she felt more socially engaged and was more
motivated to use her language, and as a result, her attitude changed dramatically; she started
talking and wanting to come to sessions…"I know for sure that her language was beginning to
progress and she was eager to develop more language." (A.R. 1848).

69.     The Parents filed a request for hearing with the BSEA on November 17, 2010,
when C.D. was in 7th grade.  (A.R. 4116).

70.     A hearing was held at the BSEA on February 15 and 16, 2011, and a decision
was issued on March 24, 2011. (A.R. 4116).

71.     On May 2, 2012, the Parents contacted Natick to request a meeting because
C.D. would be graduating from McAuliffe in June 2012 and returning to Natick for extended
year services (ESY) and High School.  (A.R. 161).

72.     In anticipation of the meeting, the Parents forwarded C.D.'s 8th Grade IEP
from McAuliffe (A.R. 163), her most recent Psychoeducational Evaluation (A.R. 177),
and Neuropsychological Evaluation (A.R. 238), and Speech and Language Evaluation (A.R.
222), and a copy of the Natick High School 9th Grade Course Selection List which C.D.
and her McAuliffe guidance counselor, Sara Shapiro, had completed, circling and
initialing all college prep level courses for C.D. per the recommendations of C.D.'s
teachers. (A.R. 2750).

73.     Ms. Gina Dalan, Natick's former Director of Special Education, informed
the Parents that if they decided to complete the registration paperwork, she would "send

someone over to the charter school to complete an observation and speak with C.D.'s teachers, both of which will help us develop an effective plan to insure (sic) that C.D. has a successful transition." (A.R. 268).

74.     Ms. Dalan coordinated and scheduled an "informational" meeting for May 24, 2012. (A.R. 268).

**The May 24, 2012 Team Meeting**

75.     The Parents brought Ms. Coellner, Ms. Soden, Ms. Flax, and Dr. Imber to the meeting on May 24, 2012. (A.R. 270).

76.     The Parents indicated that their goal for C.D. in Natick High School was a continuation of the inclusion program C.D. completed at McAuliffe and from which she obtained both academic and social benefits. (A.R. 273).

77.     The Parents informed Natick of the other options that they were considering for high school, including technical high schools (which only offered life skills programs, and therefore would be inappropriate for C.D., and Charter Schools, which unfortunately had extremely long waiting lists). (A.R. 315).

78.     Natick described the three available models at Natick High School: (1) Inclusion; (2) Replacement classes, where all students are on an IEP, small classes are taught by a special education teacher, the curriculums are the same but taught with modifications; and (3) the ACCESS program, which is a substantially separate life skills program with a further modified curriculum. (A.R. 294).

79.     Natick indicated that ACCESS students do not take the MCAS or receive a high school diploma (A.R. 295); that students in Replacement classes are on the diploma track and that students in the ACCESS program are not. (A.R. 295).

80.     Natick explained that pursuant to the law for transfer students, they were required to provide services that were comparable to the current IEP; however, "we could agree to start C.D. in the ACCESS program based upon the information we have currently." (A.R. 314).

81.     The Parents reiterated that their goal was for C.D. to obtain a high school diploma. (A.R. 319-320).

82.     Natick referenced Dr. Imber 's report and determined that inclusion would not be successful…"I'll be very upfront here: I can't imagine looking at this report offered by another family, and saying to that family 'Let's consider full inclusion.' So knowing the expectation for inclusion classes, I would have significant concerns about her success..." (A.R. 317).

83.     The Parents described the educational model at McAuliffe and C.D.'s success with supplementary supports and services in the general education classroom. (A.R. 317).

84.     Natick responded, "That could not happen here...because it doesn't happen, because public schools have their own staff and their own experts, and they don't allow outside people to come in and teach their students in their classroom. No public school would allow that." (A.R. 317).

85.     When the Parents noted, "McAuliffe is a public school," Natick responded, "Well, O.K. Then I guess I'll just say Natick.  But in my experience, I've never heard of that ..."(A.R. 317).

86.     Natick stated, "I'm not criticizing what happened [at McAuliffe], but I'm just trying to explain what would happen here, and I think that I'm hearing from Gina and

from everybody, and I know I feel the same way…is...the replacement classes would be much more comparable to what she's getting at McAuliffe than the general ed. setting." (A.R. 318).

87.     The Parent's requested information about transition services. (A.R. 327).

88.     Natick mentioned the ACHIEVE Program, which is a public community day program for ACCESS students aged 18-22 years old in a community-based location; there was no mention of earlier transition programs or services. (A.R. 327).

89.     The Parents provided their completed registration paperwork to Natick on May 29, 2012, requesting an opportunity to observe the recommended program(s) at Natick as soon as possible. (A.R. 360-372).

90.     On May 31, 2012, Ms. Dalan observed C.D. at McAuliffe.  (A.R. 2771).

91.     On June 5, 2012, Ms. Dalan informed the Parents that after observing C.D. in her inclusion classes at McAuliffe, speaking with some of her teachers, and reviewing some of her work samples, the self-contained ACCESS class at Natick would be appropriate; however, "in the spirit of cooperation and our attempt to provide a comparable IEP for C.D., we would be proposing all [Replacement] classes."  (A.R. 2771).

92.     Ms. Dalan also indicated that "due to scheduling complications" ...there were no available opportunities for the Parents to observe the programs at Natick prior to the fall. (A.R. 2771).

93.     On June 13, 2012, the Parents' attorney contacted Natick to express their concern that it is not in C.D.'s best interest for Natick to be "placing C.D. in a program that they clearly believe is inappropriate and then within the first couple of weeks of school

'after C.D. has had some time to adjust,' propose moving her to a different program," solely to comply with the regulations [for intrastate transfer students]; the Parents requested a team meeting during the summer so that Natick could develop a new IEP [in accordance with the more extensive procedures required for the development of a new IEP]. (A.R. 374).

94.     On June 19, 2012, Ms. Dalan sent an email to the Parents, indicating that when she observed C.D. at McAuliffe, she "was sitting quietly, sometimes taking notes, and other times working to complete given assignments…I did not see her private tutor working with her." (A.R. 377).

95.     On July 12, 2012, Ms. Dalan sent an email to the Parents indicating that Natick's recommendation of the ACCESS program was based on the discussion at the meeting on May 24, 2012. (A.R. 4050).

96.     On July 18, 2012, the Parents' attorney contacted Natick to follow up on their request for a team meeting during the summer. (A.R. 380).

97.     In anticipation of a team meeting in the summer, the Parents requested copies of Ms. Dalan's notes or her report from her observation of C.D. at McAuliffe.

98.     In response, the Parents were informed that Ms. Dalan did not take notes, that a report was not required, and that Mr. Tim Luff would be replacing her as Director of Special Education as of July 2, 2012; Ms. Dalan had indicated that her "observation was really not intended to change what we talked about at the meeting ...our recommendation of the ACCESS class for C.D. came from our discussion at the meeting and Dr. Imber's Report." (A.R. 377).

99.     Natick scheduled a meeting for July 27, 2012 to develop a new IEP for C.D.

(A.R. 2770).

### The July 27, 2012 Team Meeting

100. Ms. Coellner, Ms. Soden and Dr. Imber attended the meeting on July 27, 2012 with the Parents to present information about C.D.'s strengths, needs and progress at McAuliffe. (*See* A.R. 270-382).

101. There was no one present from Natick at the meeting who knew C.D. directly or indirectly, even though the academic teacher and the speech and language teacher from the ESY program had both worked with C.D. just a few weeks prior to the meeting. (A.R. 2770).

102. Ms. Dalan, the only person from Natick who had observed C.D. at McAuliffe, was no longer employed by the district and therefore did not attend the meeting. (A.R. 2770).

103. There was no teacher from the ACCESS program in attendance. (A.R. 2770).

104. There were no guidance counselors in attendance. (A.R. 2770).

105. Natick noted that the purpose of the meeting was twofold: to discuss C.D.'s transition to high school, and to develop a new IEP to meet her needs at high school rather than waiting until the fall. (A.R. 385).

106. Natick indicated that it would accept Dr. Imber's test scores for the purpose of the "current evaluation results" section on the IEP. (A.R. 396).

107. Dr. Imber cautioned that while his test results are certainly helpful, it was important to consider the direct experience of Ms. Coellner and Ms. Soden and not just the test scores alone. (A.R. 396).

108. The Parents expressed their concerns, including whether C.D. would be with peers who had emotional/behavioral challenges, and how C.D. would access the general education curriculum; they were particularly concerned about the reduction in ELA services from five 45-minute sessions to two or three 80-minute sessions as a result of the block schedule. (A.R. 386).

109. Nan Coellner asked whether there are students with autism in the ACCESS program. (A.R. 416).

110. Natick responded, "No." (A.R. 417).

111. The Parents asked whether there are students with emotional or behavioral issues in the ACCESS program. (A.R. 418).

112. Natick responded, "Some of the kids have – It's not behavioral *disabilities* [emphasis added]. Some have…multiple challenges…" (A.R. 418).

113. Ms. Coellner observed the ACCESS program in November 2014; she testified:

    a. "[S]tudents in the class were somewhat disruptive…walked around..ate.

    b. There was a film showed…and one boy was slapping his face throughout the film. There was one student who had a 1:1 para who yelled out during the class, would scream out things."

    (A.R.1703-1704, *see generally* A.R. 1691-1745).

114. Ms. Flax observed the ACCESS program in June 2014; she testified:

    a. One of the students was very disruptive; he was stimming and humming; there was very little social interaction between the students.

    b. At least one, possibly two, were nonverbal.

(A.R. 1850-1851, *see generally* A.R. 1840-1915).

115.  Dr. Imber observed the ACCESS program in June 2014; he testified:

    a.    [T]here was one student that was kind of making a lot of loud vocalizations.

    b.    Another student "got out of his seat to sharpen his pencil, and it seemed pretty normal, except that once he started, he wouldn't stop.  And he was asked to stop several times, and he just kept sharpening the pencil.

    (A.R. 2051, see generally A.R. 2015-2132).

116.  Ms. Michelson testified with regard to the ACCESS program:

    a.    There are currently 11 students and 4 paraprofessionals in the program; 5 students in the 11th and 12th grade (four boys and one girl).

    b.    The students have a range in disabilities from being diagnosed with autism, having intellectual disability, traumatic brain injury…

    c.    Some students [only] have functional speech and language, there are no students that are nonverbal.

    d.    When asked to define "nonverbal," Ms. Michelson responded, "I would say a student that is nonverbal has no verbal communication whatsoever."

    e.    One student "has limited functional language…he is able to make basic requests. However, his conversational speech is one that [he is] currently still working on.

    (A.R. 2282-2320)

117.  Mr. Francoise, the lead ACCESS teacher until October 2014 testified:

    a.    In 2012-2013, there were eight (8) students – two (2) girls and six (6) boys, one of whom had a one-on-one aide.  Most of them used conversation…*;*

    b.    Students in 10th grade ACCESS do not take the standard MCAS and would need to be transferred to Replacement classes to do so; and

    c.      It would be very unusual for a student like C.D. transferring into 9th grade from a general education program in another district, to be placed in ACCESS for all of his or her academic classes.

(A.R. 2433-2483).

118.    Mr. Francoise initially testified that there were no students with behavioral or emotional issues in the 2012-2013 and 2013-2014 ACCESS classes, but then recalled that:

    a.      There was a student who would have outbursts that would be disruptive to the class;

    b.      There was a student with "chewing behavior," but "no classroom is perfect;"

    c.      There was a student with Selective Mutism, who communicated nonverbally through his laptop;

    d.      There was a student who often spoke in a rude tone to teachers and put his head down on the desk and refused to answer questions even when he knew the answers, who was very much lacking in social skills when he entered the ACCESS class as a freshman and did in fact interrupt the class; and

    e.      There was a student who transferred to ACCESS from the Northstar Program for students with serious emotional/behavioral disabilities.

(A.R. 2433-2483).

119.    The Parents asked about transition services prior to age 18, and Natick indicated that transition planning, which starts at age 14, would be discussed in October and the IEP would be revised based on C.D.'s performance at that point. (A.R. 392-393).

120.    Referring to C.D.'s IEP that was written in April, Natick noted that while C.D. "seems to have made progress...C.D. does seem to continue to require a significant level of support in order to produce work." (A.R. 397).

121.    Ms. Coellner and Ms. Soden clarified that C.D. had been in the regular education setting, kept up with the class, read the same books, and had been part of the

regular classroom, that "significant support" was not accurate, and that she only needed occasional support, was making progress and doing well; Ms. Coellner and Ms. Soden emphasized the significance of observing C.D. to confirm their statements. (A.R. 397-398).

122. Ms. Coellner and Ms. Soden emphasized that C.D. was able to access the general curriculum at McAuliffe and worked really hard because she wanted to do well; because she wanted to be in a regular class. (A.R. 398).

123. The Parents expressed concern that the block schedule in all three of the Natick High School programs would fail to address C.D.'s individual needs because she requires continuity due to her memory deficits." (A.R. 408).

124. Natick responded that because ACCESS is a self-contained program, subjects can be infused together. (A.R. 408).

125. Ms. Coellner noted her concern that C.D. would be isolated in ACCESS, "Because she is a very normal, regular teenager like all normal, regular teenagers, who has the same interests in fashion and music and television and all that." (A.R. 421).

126. Natick reiterated that C.D.'s current performance level is low, and "what is a little bit difficult in hearing you describe her performance is that her scores are so low, that what you're describing is so inconsistent with the scores – "I mean…what I'm hearing; that there is a huge discrepancy...we've been to the BSEA even had a hearing, so we've had a lot of experts come in...we know this case, we know C.D. I mean, you know, she hasn't been in Natick but as far as a student who hasn't been in Natick, I feel that the team knows her, because we have had the experience of going through the BSEA hearings, that I'm hearing a huge discrepancy." (A.R. 402).

127.     The Parents asked about Ms. Dalan's report from her observation of C.D. at McAuliffe; Natick responded that "She did not generate a report because what Tim said, it was really just sort of a much more informal way of looking at C.D. at McAuliffe, and the impression that I got from Gina, in speaking with her, echoed what I think we talked about at the [May] meeting, which essentially was we were looking at what is a comparable IEP and we decided that if we're looking straight at the IEP, 'comparable' is probably the replacement classes ... what Natick actually think[s] is appropriate to meet her needs ...what Gina told me after that observation, and I know what she and the rest of the Natick team felt when we met in May is that she needs to be in the [ACCESS] program; ...which is what we felt she needed when we had a hearing at the [BSEA]." (A.R. 402-403).

128.     Ms. Coellner expressed concern that they were not given the opportunity to observe the ACCESS program in June; she expressed concern regarding C.D.'s access to regular education books because they worked very hard for C.D. to write three and four-page compositions and read and take notes and highlight, and she might lose those skills in ACCESS.  (A.R. 410-411).

129.     Natick responded that "the ACCESS program serves kids that do have cognitive, communication, social/pragmatic deficits or disabilities in those areas. C.D. would, on paper, fit into that category; she has an intellectual disability and also issues with communication and social/pragmatic." (A.R. 406).

130.     The Parents reiterated that C.D. read the books on the Natick 9th grade syllabus in 8th grade and asked why inclusion with supports and services would not be possible in the general education class, especially since she already read the books. (A.R. 413).

131.     Natick responded that, "Well, given C.D.'s level of need, and given some of

the other activities that go along with those -- It's not just decoding the text; it's also inferencing, it's instructing meaning from the text, and it's working on a textual analysis at a high-school level, and I think we believe that the most appropriate place for her to truly access the curriculum would be in the ACCESS program." (A.R. 413).

132.    The Parents asked, "Instead of doing that, why don't we go the other way? Put her in the general education with support, and see what she can do. And if she doesn't work, well then we move her down." (A.R. 413).

133.    Natick responded, "Personally, I would not recommend that based on the IEP that I see in front of me, and in consultation with my team." (A.R. 413-414).

134.    The Parents asked whether C.D. could succeed in the Replacement classes [with supplementary supports and services]? (A.R. 414).

135.    Natick replied, "based on what we're seeing on paper, the team is saying the ACCESS program." (A.R. 414).

136.    On July 30, 2012, the Father requested additional information regarding the ACCESS program, and copies of C.D.'s work from ESY to assist them in making a decision regarding the IEP that would be proposed for C.D. (A.R. 451).

137.    On July 31, 2012, Natick responded that a proposed IEP had been mailed and that "regarding your request for information about the ACCESS program, you raise good questions...I suggest that you, [C.D.'s mother] and I meet with Jim Francoise, the lead teacher of the program, at the beginning of the school year..." (A.R. 453).

**The Proposed IEP for 2012-2013 (dated July 27, 2012-April 4, 2013)**

138.    On August 1, 2012, Natick provided the Parents with the proposed IEP for the 2012-2013 school year, recommending the ACCESS program for all of C.D.'s academic

classes. (A.R. 2628).

139. The proposed IEP did not include a transition plan. (A.R. 2628).

140. On August 14, 2012, the Parents rejected the IEP for multiple reasons, including the lack of a transition plan, and placement in the ACCESS program for all of her academic classes. (A.R. 3427).

141. The Parents provided Natick with notice on August 14, 2012, that they would be unilaterally placing C.D. at Learning Prep for the 2012-2013 school year and seeking reimbursement from Natick. (A.R. 3427).

**The May 22, 2013 Team Meeting**

142. Natick scheduled a meeting for May 22, 2013 for C.D.'s annual review (A.R. 3413).

143. There was no one from Learning Prep in attendance at the meeting. (A.R. 3306).

**The Proposed IEP for 2013-2014 (dated May 22, 2013-May 22, 2014)**

144. Following the meeting, Natick proposed an IEP for the 2013-2014 school year, which was practically identical to the IEP proposed for the 2012-2013 year, indicating that due to a lack of information, it was unable to update C.D.'s current levels of performance. (A.R. 2628).

145. Ms. McGovern, Natick's Director of Student Services, testified that the IEP proposed for the 2013-2014 school year had few if any changes from the IEP proposed for the 2012-2013 school year based on the lack of information given to the chairperson, Ms. Molinari-Bates, prior to the meeting; she admitted that the Evaluation Team Leader usually makes attempts to obtain information, but since she was not chairing the meeting, she did not know whether Ms. Molinari-Bates had invited Learning Prep School staff or requested

information. She testified that the 2013-2014 proposed IEP was appropriate "based upon information Natick had at the time." (A.R. 2360; *see generally* A.R. 2343-2347).

146.    Ms. McGovern testified that the more we know the student, the more we can perfect the transition plan, but admitted that no transition assessment was conducted between 2012 and 2014, and that, in fact, there were no assessments at all conducted between 2012 and 2014. (A.R. 2360; *see generally* A.R. 2343-2347).

147.    The Parents rejected the IEP proposed for the 2013-2014 school year for the same reasons they rejected the IEPs for the 2012-2013 school year, including, but not limited to, that the IEP continued to propose placement in the most restrictive program for all of C.D.'s academic classes, which would have not prepared C.D. for the MCAS and would not have led to a high school diploma, the block schedule, and the lack of an appropriate transition plan. (A.R. 3424).

### The 10th Grade MCAS

148.    C.D. passed the ELA MCAS in 10th grade and almost passed the MCAS in Math and Science/Technology, missing by only a few points. (A.R. 3901).

### The April 15, 2014 Team Meeting

149.    On April 15, 2014, Natick held a team meeting for C.D.'s Annual Review. (A.R. 3282).

150.    Natick informed the Parents that it would be conducting a psychological evaluation, a speech and language assessment, and academic achievement testing as part of C.D.'s 3-year reevaluation.  (A.R. 3282).

151.    Natick did not propose a transition assessment.   (A.R. 3282).

**The First Proposed IEP for 2014-2015 (dated April 15, 2014–April 15, 2014)**

152.    Following the meeting, Natick proposed an IEP that was substantially similar to the prior IEPs, which the Parents rejected for multiple reasons, including, but not limited to, that the IEP continued to propose placement in the most restrictive program for all of C.D.'s academic classes, which would have not prepared C.D. for the MCAS and would not have led to a high school diploma, the block schedule, and the lack of an appropriate transition plan. (*See* A.R. 3282).

**The June 13, 2014 Team Meeting**

153.    A Team meeting was scheduled for June 13, 2014 to review Ms. Cymrot's Psychological Evaluation, Ms. Karian 's Speech and Language Assessment, and Mr. D'Angelo's Academic Achievement Testing.  (A.R. 1657).

154.    Natick proposed conducting a Transition Assessment in the upcoming fall when C.D. would be in her junior year.  (A.R. 3263).

155.    The Father testified that Natick reviewed the evaluations and suddenly informed the Parents that C.D.'s disability category should be "Communication" instead of "Intellectual". (A.R. 1657).

156.    Ms. Cymrot stated [with regard to C.D.'s psychological evaluation] "the results are really very similar to what had been obtained previously ...In terms of cognitive functioning, C.D.'s scores were in the extremely low to borderline range." (A.R. 991).

157.    With regard to C.D.'s disability category, Ms. Cymrot stated, "...basically, I just wanted to state that up until now...the disability category that has been noted in the IEP is "Intellectual." Based on all the data here, that disability category is not really supported ...so, we are looking at noting her disability category as communication." (A.R.

1006-1011).

158.    In response to the change in C.D.'s disability category, the Father stated, "This is the first time I heard it ...it is upsetting, it has been intellectual disability for years, and so to hear the change..." (A.R. 1006-1011).

159.    With regard to the proposed placement, Natick stated, "...based on all the information it probably would seem -be most logical, for C.D.to be in our small group English." (A.R. 1011).

### The 2nd Proposed IEP for 2014-2015 (dated June 13, 2014-June 13-2015)

160.    For the first time since July 2012 when Natick proposed its initial IEP, Natick now proposed a "blended" program for C.D. (A.R. 2529).

161.    Natick now proposed placement in the general education classroom for History, Replacement classes for English and Science, and Math and Reading (as opposed to English) in the ACCESS program. (A.R. 2529).

162.    Although Natick proposed some classes in the general education classroom and some Replacement classes, they were still proposing the ACCESS program for Math, which would not have prepared C.D. for the Math MCAS and receipt of a high school diploma; in addition, a transition assessment had still not been completed. (A.R. 2529).

163.    On July 7, 2014, the Parents rejected the IEP and proposed placement for multiple reasons, including that a transition assessment had not yet been conducted, the total hours in the service delivery grid exceeded the hours available in the school's 4-day cycle so there appeared to be no time available for speech/language, the Math goal focused solely on multiplication, and placement in the ACCESS program for Math would only expose C.D. to functional math and would not prepare her for the MCAS. (A.R.

3428).

164.    As a result, the Parents informed Natick that they had decided to exercise their right to obtain independent educational evaluations at their own expense, including, but not limited to, an assessment of C.D.'s activities of daily living (ADLs). (A.R. 3427).

165.    The Father testified that one of the main issues at the team meeting in June 2014 was Natick's change in disability category for C.D. from Intellectual to Communication, which was suddenly announced by Natick without notice and which appeared to have clearly been determined prior to the meeting. (*See* A.R. 1610-1690).

166.    The Father testified that while it is reasonable for teachers to discuss students amongst themselves regarding lesson plans etc., it is not appropriate to change the disability category – "that's a serious thing." (*See* A.R. 1610-1690).

167.    Ms. Cymrot testified on direct exam with regard to the change in category: C.D. received a full scale IQ score between 66 and 74, which placed her in the extremely low range and borderline range for cognitive abilities and met the criteria for an intellectual disability based on her cognitive ability, but concluded that C.D.'s disability category should be communication instead of intellectual, because according to the DESE criteria, the social and practical domains must also be considered.  (A.R. 2139-2140).

168.    During cross-examination, Ms. Cymrot:

   a.    Admitted that she made the determination that C.D.'s disability category should be changed prior to the assessment of C.D.'s skills in the practical domain, which she knew would be assessed in the fall of 2014;

   b.    Conceded that she did not recall whether the team [including the Parents] used the eligibility flowchart required by DESE at the meeting on June 13, 2014 prior to the change in disability category;

c.   Admitted that she referenced a prior assessment from 2003 where C.D. was not diagnosed with an Intellectual Disability, but ignored the assessments from 2007 and 2008 diagnosing C.D. with an Intellectual Disability;

d.   Indicated that she was not aware that all of Natick 's proposed IEPs since 2008 indicated that C.D. had an Intellectual Disability because "I would not have seen or had access to the prior IEPs."

e.   Admitted writing an email to Ms. Molinari-Bates on May 15, 2014 stating that she did not need [C.D.'s] file, thereby confirming that she did not review C.D.'s entire record, and conceded that if she had known there were more recent assessments, she might have referenced them in her report;

f.   Admitted writing an email to Ms. McGovern, Barbara Molinari-Bates, Mark D'Angelo and Ms. Karian asking the recipients to "edit the report as needed;"

g.   Had attended the team meeting on May 24, 2012 but "had not reviewed any records at all, other than listening to the report that Dr. Imber presented at that meeting," and actually did not review Dr. Imber's report until the day of the hearing; and

h.   She did not know whether the change in C.D.'s disability category would affect her eligibility for services after graduation.

(A.R. 293-310).

**The Observations and the Motion to Compel**

169.   On May 29, 2014, the Parents requested the opportunity for themselves and Dr. Imber and Ms. Flax, to observe the proposed program for C.D. at Natick High School, including both academic and non-academic components of the program. (A.R. 3126).

170.   The Parents specifically requested "observations that are of sufficient duration and extent for the parents and their designees to observe the ACCESS program _and_ meet with Mr. Francoise and the speech-language pathologist. (A.R. 3126).

29

171.    Observations were scheduled for Dr. Imber and Ms. Flax to observe the ACCESS program and general education gym class on June 10, 2014, and confirmed by email on June 9, 2014, in which Natick stated, "While we will permit the observers to ask Mr. Francoise brief factual questions related to their observation, the SLP will not be available." (*See* A.R. 3126-3143).

172.    The Parents' attorney forwarded the email from Natick to the Parents, Dr. Imber and Ms. Flax to inform them of the schedule, the unavailability of the SLP, and the conditions placed on their observations with regard to their conversations with Mr. Francoise. (*See* A.R. 3126-3143).

173.    On June 10, 2014, Dr. Imber and Ms. Flax were accompanied by Ms. McGovern to observe the ACCESS program and general education gym class; although Dr. Imber and Ms. Flax did not agree with the conditions placed on their conversations with Mr. Francoise, they complied with them fully. (See A.R. 3144-3154).

174.    On September 14, 2014, as part of their independent educational evaluations, the Parents requested the opportunity for themselves and their evaluators/consultants, Ms. Coellner, Dr. Imber, Ms. Flax, and Dr. Roffman to observe the proposed program for C.D. at Natick, including both academic classes and lunch period. (A.R. 3130).

175.    Between September 15, 2014, and October 24, 2015, Natick's attorney sent multiple emails to the Parents' attorney specifying the conditions that would be placed on the observations; (for example, on October 23, 2014, Natick informed the Parents through their attorney, "these are observations, we are not setting aside a time for your experts to speak with Natick staff. Each visitor will have an escort who will be available to answer basic factual questions about what is being observed…we are not going to allow your experts to speak with

Natick staff at any time prior to the IEP team meeting except for basic questions that might come up during the observation which relate to clarifying what is being observed.)"  (A.R. 3131).

176.    On October 24, 2014, at 1:00 PM (during the ongoing observations that day), Natick's attorney contacted the Parents' attorney and indicated that she was just informed that, "both Dr. Imber and Ms. Flax asked for time to talk with staff during their observations today. I do not think I could have been more clear with you about the fact that we were not going to allow this. Why were your people under the impression that they would be allowed to have these conversations? This is extremely concerning to me. They seem to think that they will be allowed to return and again we will not allow this. Please explain to me why both Dr. Imber and Ms. Flax made these requests today after I had been explicit with you about the district's position?" (A.R. 3140).

177.    The Parents' attorney contacted the Parents' evaluators, including Dr. Imber and Ms. Flax regarding their observations and was informed that they not only completely abided by the conditions placed upon them by Natick, but also, they were denied the opportunity to obtain even basic information. (*See* A.R. 3144-3154, A.R. 1168, A.R. 1173).

178.    Despite Natick's representation that the Parents' "experts had full access to observe and ask clarifying questions during the observations," the Parents' independent evaluators and consultants did not have full access to observe and were not even permitted to ask basic questions during the observations. (*See* A.R. 3144-3154).

179.    On October 30, 2014, Natick's Attorney informed the Parents' attorney that, "…*The reason that the evaluators were not permitted to have substantive conversations with staff during their observation is that Natick had allowed this with your experts in the past and*

31

*felt as though the conversations turned into interrogations." (emphasis added).* (*See generally*, A.R. 732-944).

180. The Parents' Attorney contacted the Parents' evaluators, including Dr. Imber and Ms. Flax regarding their observations and was informed that they behaved completely appropriately and had no idea what Natick was referring to. (*See generally*, A.R. 732-944).

181. The Parents' filed their Motion to Compel as a result of these incidents. (*See* A.R. 3112).

182. Dr. Roffman provided testimony regarding her unanswered questions following her observation of the transition class:

> "I think it was meant to be divided into two 40-minute sections; it was unclear. We were not allowed to ask questions… I wasn't sure how this 80 minutes fit together, and if what benefit it was, and where it stood in terms of being steps towards curricular goals. I wasn't allowed to ask questions, so I wasn't able to discern that." (*See* A.R. 1764).

183. Ms. Flax provided testimony regarding her unanswered questions following her observation of the English Replacement class:

> "I didn't have the chance to speak to Nick Coleman when I observed the [R]eplacement class… part of being a good placement is also the profile of children within the class, and since those questions weren't answered, I had no way to complete my report." (R.A. 1860-1861).

184. With regard to his observations of the proposed program, Dr. Imber testified:

> "I was not permitted to ask any questions whatsoever, so I was not able to really find out anything about the curriculum. I didn't see a syllabus...I didn't get to see worksheets… I wasn't really able to determine anything about the kids in the program or what the teacher's objectives were." (A.R. 2057).

185.    Mr. Francoise testified that when Ms. Flax and Dr. Imber observed the ACCESS

program in June 2014, *they did not act in any way inappropriately. [emphasis added].* (A.R.

2470).

186.    The hearing officer refused to allow Mr. Francoise to testify about the allegations

made by Natick against Dr. Imber and Ms. Flax with regard to their observation of his class:

> Parents' Attorney: "[w]ere you aware that the school district had
> accused them of interrogating you and making you feel…"
>
> Hearing Officer: "This is not relevant, and this is not an issue
> before me…I've already resolved the issue of evaluations and
> access to evaluations."
>
> Parents' Attorney: "This goes to administrative exhaustion and I need
> to have it on the record."
>
> Hearing Officer: "You can get the question on the record, but it's not
> relevant to this proceeding. So I'm not going to have the witness
> answer it." (A.R. 2471)

## The November 14, 2014 Team Meeting

187.    Natick scheduled a team meeting for November 14, 2014 to review the

Transition Evaluation which was finally conducted in October 2014. (A.R. 3404).

188.    On November 13, 2014, the Parents sent evaluations conducted by their

Educational Evaluators to Natick in preparation for the team meeting on November 14,

2014. (*See* A.R. 3662, A.R. 3802, A.R. 3876).

189.    Given that the Parents' Motion to Compel was pending at the time of the team

meeting, Dr. Imber's report and Ms. Flax's report were submitted to the extent that they

could be completed pending the ruling on the Parents' outstanding motion. (*See* A.R. 3662,

A.R. 3802, A.R. 3876).

190.    Ms. Karian did not attend the meeting. (A.R. 3401).

191.    Ms. Karian testified that she was unable to attend the meeting in November 2014 when Ms. Flax presented her report because she was attending a conference, did not know whether the Parents were previously informed that she would not be attending, and admitted that she would have attended the meeting if she had not been at a conference. (*See* A.R. 2183-2215).

192.    Ms. Brown testified with regard to the vocational class observed by the Parents and Dr. Roffman; Ms. Brown explained that the students don't stay at the same job; at the end of the year, they choose which job in the rotation they like best, cookie packaging, wiping fitness equipment or setting up library books. (*See* A.R. 2215- 2282).

193.    When asked whether Natick could provide C.D. with vocational opportunities in her areas of interest, Ms. Brown testified that they could find something in the cafeteria she was interested in since she was interested in cooking and baking.  (*See* A.R. 2215- 2282).

194.    Dr. Roffman testified that the after-school program proposed by Natick for the 2014-2015 school year was not reflected in the IEP itself and it was not clear how the objectives described on the Transition Planning Form could possibly be addressed in two 80-minute periods after school, and that, regardless, it was not appropriate for a student working on communication skills to be isolated in a 1:1 program.  (*See* A.R. 1745-1805).

195.    On cross-examination, Ms. Brown admitted that:

     a.     As of now, C.D. would be the only student in the proposed after-school transition program and conceded that it had never been implemented before;

     b.     She was not qualified to testify with regard to the appropriateness of the change in C.D.'s disability category;

     c.     She did not know whether C.D. had passed MCAS or where she stood with regard to the requirements for

graduation; and

    d.    She did not recall whether there was a transition plan in the IEP's proposed by Natick prior to her employment in August 2014.

(A.R. 2215- 2282).

### The 3rd Proposed IEP for 2014-2015 (dated November 14, 2014-June 13, 2015)

196.    The Parents had questions after the team meeting on November 11, 2014, and requested an additional meeting to address them; however, Natick responded that another meeting was not necessary, forcing the Parents to reject the IEP and thereby require a meeting to have their questions answered; a meeting was then scheduled for January 7, 2015.  (A.R. 3400).

197.    Ms. McGovern admitted in her testimony that she recalled that the Parents were not able to ask their questions in November because they ran out of time.  (A.R. 2345-2425).

198.    The Parents rejected the IEP on December 20, 2014, with a lengthy detailed attachment outlining their reasons for rejection, which included: the proposed extended day schedule for C.D. to participate in a "one-to-one" transition program, which has never before been implemented and which would not provide any peer  interaction; the continued proposed placement in ACCESS Math, which would not prepare C.D. for the Math MCAS despite her receipt of an almost passing score at Learning Prep, and Natick's continued insistence on changing C.D.'s disability category. (A.R. 3398).

### The January 30, 2015 Team Meeting:

199.    A team meeting was held on January 30, 2015. (*See* A.R. 3394 -A.R. 3398).

200.    Natick noted that it had incorrectly indicated that C.D. would be taking

the Math MCAS (with accommodations) on the "State or District-Wide Assessment"

page of the proposed IEP, and that the form should have indicated that Natick had

determined C.D. would participate in the alternative assessment in Math. (*See* A.R.

3394 -A.R. 3398).

201.    On January 30, 2015, the Parents received notice from Natick indicating

its refusal to make the changes requested by the Parents, except for correcting the error

on the "State or District-Wide Assessment" page. (*See* A.R. 3394 -A.R. 3398).

202.    On January 30, 2015, the Parents received the corrected, "State or District-

Wide Assessment" page, which indicated that C.D. would participate in the alternate

assessment for Math (instead of the Math MCAS). (*See* A.R. 3394 -A.R. 3398).


DATED this 7th day of July 2016.


Respectfully submitted,

C.D., by and through her PARENTS AND
NEXT FRIENDS, M.D. and P.D.

By their attorney,

/s/ Laurie R. Martucci
Laurie R. Martucci, Esq.
BBO # 561946
Wagner Law Associates, LLC
4 West Street
Franklin, MA 02038
(508) 528-4007
lrm@wagnerlegal.com

## CERTIFICATE OF SERVICE

I hereby certify that the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF"), and paper copies will be sent to those indicated as non-registered participants on July 7, 2016.

/s/  Laurie R. Martucci
Laurie R. Martucci