## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
)
C.D., by and through her PARENTS AND   )
NEXT FRIENDS, M.D. and P.D.          )
                             )
           Plaintiffs,       )
v.                            )
                             )
NATICK PUBLIC SCHOOL DISTRICT   )
and                          )
BUREAU OF SPECIAL EDUCATION    )
APPEALS,                  )
           Defendants.    )
_____)

Civil Action No. 15-cv-13617-FDS

## NATICK PUBLIC SCHOOLS'  OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## LEAVE TO FILE GRANTED 8-19-2016

## I.    INTRODUCTION

Plaintiffs, C.D. (Student), a minor, by and through her Parents and Next Friends, M.D. and P.D. (Parents), (collectively, plaintiffs) have appealed from the July 28, 2015, Board of Special Education Appeals (BSEA) decision, which found that IEPs proposed for Student from July, 2012 to the present were and are reasonably calculated to provide her with a free appropriate public education (FAPE) in the least restrictive environment and that the Natick Public School District (Natick) committed no procedural violations amounting to any kind of substantive harm.  The evidence at the hearing was comprehensive and provided more than a sufficient basis to support the BSEA's decision.

The due process hearing conducted by the BSEA in this case took place over four (4) days.  The administrative record (cited to hereinafter as R.) includes four (4) volumes of hearing transcripts, Parents' ninety (90) exhibits, Natick's fifty two (52) exhibits, and the BSEA's sixty-

seven (67) exhibits, and comprises 4,789 pages. R.1528-1529.

The issues at hearing, as articulated by the Hearing Officer in her written decision (R.1529-30), were:

(1)    Whether Natick complied with Student's IEP in providing summer services during the summer of 2012 and if not whether Student is owed compensatory educational services.

(2)    Whether the IEP proposed by Natick for the period from 2012-2013 was reasonably calculated to provide the student with a free appropriate public education in the least restrictive environment.

(3)    Whether the IEP proposed by Natick for the period from 2013-2014 was reasonably calculated to provide the student with a free appropriate public education in the least restrictive environment.

(4)    Whether the IEP proposed by Natick for the period from 2014-2015 was reasonably calculated to provide the student with a free appropriate public education in the least restrictive environment.

(5)    Whether there were any procedural violations committed by Natick that resulted in the denial of FAPE to Student.

(6)    Whether or not Natick engaged in any discrimination or retaliation in violation of Section 1983 and Section 504.

(7)    If Natick's IEPs are found to have been deficient, whether Parents are entitled to reimbursement for their unilateral placement of Student at the Learning Prep School.

Plaintiffs' Complaint does not challenge the hearing officer's conclusion on issue 1, but seeks review and reversal of the hearing officer's decision on issues 2, 3, 5, and 6 (Complaint ¶ 6). Plaintiffs also seek to be reimbursed for the costs associated with Parents' unilaterally placing Student at Learning Prep School (Learning Prep) (issue 7). In addition, the Complaint mentions the Section 1983 and Section 504 claims (issue 6), but only to assert that plaintiffs exhausted their administrative remedies to preserve their right to pursue a claim for damages in the future.

Plaintiffs failed to meet their burden of proof at hearing. The preponderance of the evidence in the record demonstrates that Natick's proposed IEPs were and are reasonably calculated to provide Student with FAPE and that Natick committed no procedural violations amounting to any substantive harm. Natick has been at all times responsive to Parents and their experts and has provided them ample information and opportunity for observations. Since Parents failed to meet their burden of proof on any of the issues before the BSEA, the decision must be upheld, plaintiffs' motion for summary judgment must be denied, and summary judgment must enter in favor of Natick and the BSEA.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Natick relies upon the facts set out in this opposition and in Natick Public Schools' Response to Plaintiffs' Amended Statement of Material Facts and Natick Public Schools' Additional Statement of Undisputed Material Facts which is being filed with this opposition.

## III.   STANDARD OF REVIEW

In reviewing the decision of an administrative hearing officer in an Individuals with Disabilities Act (IDEA) case, the district court:

> (i) shall receive the records of the administrative proceedings;
> (ii) shall hear additional evidence at the request of a party; and
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 USC § 1415(i)(2)(c). "When the parties choose not to submit additional evidence [as in this case] 'the motion for summary judgment is a procedural device through which the court decides the case on the basis of the administrative record.'" Linda E. v. Bristol Warren Reg'l Sch. Dist., 758 F. Supp. 2d 75, 87 (D.R.I. 2010) (citations omitted).

This court applies an "intermediate standard of review characterized by independence of judgment," a standard which "requires a more critical appraisal of the agency determination than

clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review. Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990). *See also* Lessard v. Wilton Lyndeborough Coor. School District (Lessard I)*,* 518 F.3d 18, 24 (1st Cir. 2008). The administrative proceedings must be accorded "due weight" (Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206 (1982), and the review must "be thorough yet deferential, recognizing 'the expertise of the administrative agency.'" Roland M., 910 F.2d at 989 (citations omitted). Because "[j]urists are not trained, practicing educators…the statutory scheme binds trial courts to give 'due weight' to the state agency's decision in order to prevent judges from 'imposing their view of preferable educational methods upon the States.'' Id., *citing* Rowley*,* 458 U.S. at 207. The court "is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir.1993) (*citing* Town of Burlington v. Dep't of Educ. for Com. of Mass., 736 F.2d 773 (1st Cir. 1984), *aff'd sub nom.* Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 105 S. Ct. 1996 (1985).

While a hearing officer's "[l]egal rulings are subject to nondeferential (or *de novo*) review (Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 112 (D. Mass. 1999), *aff'd.*, 229 F.3d 1133 (1st Cir. 2000)), a hearing officer's findings of fact are entitled to deference unless impaired by an error of law or the Court "determines that [they] are unreliable or incorrect in light of the totality of the record." Id. at 112. The "party challenging the outcome of the administrative decision 'bears the burden of proof.'" Id. at 112. Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 111 (D. Mass. 1999), *aff'd,* 229 F.3d 1133 (1st Cir. 2000).

## IV.  **LEGAL OVERVIEW**

Where required, Natick will address plaintiffs' recitation of "the statutory framework" in

its arguments on the issues raised. Generally, Natick takes issue with the mischaracterizations of cases cited and the incomplete and/or inaccurate citations appearing in plaintiffs' statement at pages 2 through 14 of their memorandum in support of their motion for summary judgment (hereinafter Plaintiffs' Memorandum). Natick agrees, however, that a state must offer all children with disabilities a free appropriate public education (FAPE) to qualify for federal funding under the Individual Disabilities Education Act (IDEA). 20 U.S.C. §§1400(c), 1412(a)(1). A free "appropriate" public education requires an "instructional plan [which is] custom tailored to address the handicapped child's 'unique needs' (20 U.S.C. §1400(c)) in a way 'reasonably calculated to enable the child to receive educational benefits.'" Lenn, 998 F.2d at 1086, *citing* Rowley, 458 U.S. at 207. The IDEA also articulates a preference for educating special education students in the "least restrictive environment" (LRE). 20 U.S.C. §1412(a)(5).

The Individual Education Program (IEP) "comprises the centerpiece of a state's IDEA-compelled response to a particular child's handicap" (Lenn, 998 F.2d at 1086), and "must include a statement of the child's present level of educational performance, and lay out short and long term educational goals, specific services to be offered, and objective criteria for measuring progress." Id.; 20 U.S.C. §1414(d). The IDEA also contains procedural safeguards that school districts must follow in formulating an IEP, including requiring that the IEP be developed at a meeting of the student's Team, that is, his or her parents, teachers, administrators, and where, appropriate, the child (20 U.S.C. §1414(d)(1)(B)), and permitting parents to inspect relevant records and obtain an independent evaluation of the child. 20 U.S.C. §1415(b)(1). As the First Circuit has pointed out, however,

> [t]he IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate,

- 5 -

> rather than an optimal, IEP. Appropriateness and adequacy are
> terms of moderation. It follows that, although an IEP must afford
> some educational benefit to the handicapped child, the benefit
> conferred need not reach the highest attainable level or even the
> level needed to maximize the child's potential.

Lenn, 998 F.2d at 1086. "The IEP does not have to be the choice of selected experts, the parents'

first choice, or even the best choice, but it must provide the child with a free appropriate public

education." Gonzalez v. Puerto Rico Department of Education, 969 F.Supp. 801, 807

(D.P.R.1997), *citing* Amann v. Stow School System, 982 F.2d 644, 651 (1st. Cir. 1992). The

IDEA entitles parents to have their complaints resolved at an impartial due process hearing (20

U.S.C. §1415(f)), and to request further review in state or federal court (20 U.S.C. §1415(i)(2))

as the plaintiffs have done in this case.

As the parties challenging Natick's IEPs and proposed placement, plaintiffs bore the

burden of proof at hearing. Schaeffer v. Weast, 126 S. Ct. 528 (2005) ("The burden of proof in

an administrative hearing challenging an IEP is properly placed upon the party seeking relief").

Parents did not meet their burden at the BSEA. The overwhelming evidence presented at the

hearing was more than sufficient to support the hearing officer's conclusions and decision, and

the preponderance of the evidence before this Court supports affirming the BSEA in this case.

## V.    ARGUMENT

### A.    Arguments Not Fully-Developed Should Be Deemed Waived.

Plaintiffs' arguments are conclusory and unsupported by legal authority. Even to the

extent any of the facts argued can be found in the record, the facts cited are often incomplete

statements of the testimony or statements taken out of context as demonstrated in Natick's

responses to plaintiffs' statement of material facts. The arguments do not apply facts to the law

to reach a conclusion.

Plaintiffs' undeveloped arguments should be deemed waived. <u>Delaney v. Massachusetts Bay Transp. Auth.</u>, 24 F. Supp. 3d 121, 125 (D. Mass. 2014) ("Because she has not developed her equal protection argument, I deem it waived."); <u>United States v. $572,204 in U.S. Currency, More or Less</u>, 606 F. Supp. 2d 153, 155 (D. Mass. 2009) ("These claims are undeveloped within claimant's memorandum…and argument. As such, this court will not address them here").

Plaintiffs' arguments 10 and 11 (Plaintiffs' Memorandum, pp.41-42), for example, are cursory, paragraph-long statements that fail to specify the alleged procedural violations the hearing officer disregarded by reference to law and/or facts (argument 17) and fail to explain with citation to any authority how allegedly false allegations against parents' evaluators discriminated against Student under either "section 1983 or 504" (argument 18). Accordingly, they are undeveloped or insufficiently developed in plaintiffs' argument and memorandum and should be deemed waived.

### B. The IEPs Natick Proposed for the 2012-2013 and 2013-2014 School Years Were Reasonably Calculated to Provide Student FAPE in the LRE.

"The primary vehicle for delivery of a FAPE is an IEP. . . . An IEP must be custom-tailored to suit a particular child." <u>Sebastian M. v. King Philip Reg'l Sch. Dist.</u>, 685 F.3d 79, 84 (1st Cir. 2012) (quotation and citation omitted). "However, an IEP need not be designed to furnish a disabled child with the maximum educational benefit possible. . . .To comply with the IDEA, an IEP need only be "reasonably calculated to confer a meaningful educational benefit." <u>Id.</u> (citation omitted). Ample evidence in the record, cited, *infra,* supports the BSEA's conclusion that Natick's proposed IEPs were reasonably calculated to provide Student with FAPE in the least restrictive environment (LRE). R.1575.

Plaintiffs complain (Plaintiffs' Memorandum, p.20) that Natick disregarded new information. The 2012-2013 and 2013-2014 IEPs were substantially similar because Natick did

not have any new information to consider when it developed the IEP for 2013-2014.  R.1680; *ll*.9-17; R.2422, *ll.*17-21.  The 2013-2014 IEP expressly states that Learning Prep failed to provide sufficient data to permit Natick to update the goals.  R.2584-90.

Natick reviewed the information available to it during the May and July, 2012 meetings and subsequent meetings, including the results of Student's most recent testing and verbal reports from her service providers.  R.2325, *ll.*7-9; R.2348-2351.  The transcript of the July, 2012 meeting (R.383-433) documents that Natick relied on various sources of information when proposing the IEP, including Student's progress in the summer program, informal testing, questions during the Team meeting, and a staff member's visit.  R.385,*ll.*14-20; R.387,*ll.*3-13; R.397,*ll.*22-24; R.399,*ll.*2-4; R.403-12-25.

The 2012-2013 and 2013-2014 IEPs proposed an appropriate program for Student.  The Access program was for students who, like Student, have cognitive, communication, and social pragmatic deficits (R.406) where English and Math are infused throughout and integrated into content areas.  R.408, *l.*12 – R.409, *l.*13.  Natick also demonstrated that the block scheduling (longer periods three times per week as opposed to shorter periods every day) it offered was appropriate for Student because it permitted more opportunities for her to hear the same information, permitting information to be presented in a variety of ways in a longer class rather than having the information presented the same one way every day.  R.2212, *l.*17 – R.2214, *l.*12.  Parents presented no evidence at the hearing that the IEP was inappropriate other than Student's father's opinions of the goals and allegedly decreasing services, but his testimony was not persuasive since he has no education credentials.  R.1638, *ll.*10-24; R.1639, *ll.*1-4; R.1659, *ll.*17-24; R.1660, *ll.*1-6.

Under the circumstances of this case, the hearing officer correctly concluded that

Natick's proposed Access program, with the option to participate in replacement classes was less restrictive than the general education setting at the Christa McAuliffe Charter Public School (McAuliffe) where Student was assisted throughout the day by one-to-one aides who acted as tutors. Nevertheless, Parents rejected Natick's proposals in favor of placing Student in a private special education school, Learning Prep, where all the students are disabled and where Student lacks access to *any* typical peers. On the continuum of settings, Learning Prep is far more restrictive the program Natick proposed. R.2353, *ll*.13-17. Natick's program would have allowed Student to have elective classes with typical peers (R.411, *ll*.16-23), and would have permitted her the option of replacement classes as well. R.403, *ll*.17-20; R.405, *ll*.20-23; R.410, *l*.24 – R.411, *l*.11.

When comparing the Access program to a general education setting with supplementary aids and services at the level she had at McAuliffe, substantial evidence supports the hearing officer's conclusion that Natick's proposed IEPs were less restrictive. At McAuliffe, Student's prior placement, she received services in a general education setting with the assistance of one-to-one aides hired by her parents to be with her as one-to-one tutors to make sure she was on task, cue her as necessary, and go over vocabulary or practice flash cards of science words to prepare for a test during a study or free period. R.1695, *l*.9 – R.1696, *l*.24; R.1701, *ll*.1-8 7. Student required frequent modifications. R.409, *ll*.17-21. In contrast, the proposed Access placement would have permitted Student to independently access academic services in a setting designed for students with a profile similar to hers. T.W. v. Unified Sch. Dist. No. 259, Wichita, Kan., 136 F. App'x 122, 131 (10th Cir. 2005)(explaining that regular education setting was not least restrictive environment if progress was solely the result of one-to-one instruction). Natick also provided Parents the option of having Student placed in all replacement classes. R.2191,

*ll.*2-8; R.2298, *ll.*20-23; R.2322, *ll.*5-13; R.2396, *ll.*3-15; R.2439, *ll.*11-21; R.2440, *ll.*13-23. Either the Access program or replacement classes would have been a less restrictive environment than Learning Prep, given Student's needs.

The least restrictive environment cases plaintiffs cite actually support the conclusion that the Access program is the most appropriate and least restrictive placement for Student. In <u>Daniel R.R.v. State Bd. of Educ.</u>, 874 F.2d 1036, 1050 (5th Cir. 1989), the court concluded that the district's decision to remove the student "from regular education does not run afoul of the EHA's preference for mainstreaming" as Student could not be educated in the mainstream classes. It noted that the District had "taken creative steps to provide Daniel as much access to nonhandicapped students as it can, while providing him an education that is tailored to his unique needs." <u>Id.</u> Similarly, in <u>Katherine G. v. Kentfield Sch. Dist.</u>, 112 F. App'x. 586, 587 (9th Cir. 2004), the court found that a placement was consistent with mainstreaming requirements because it "included a morning special day class and an afternoon inclusion experience in a regular-education kindergarten classroom." *Cf.* <u>Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. By & Through Holland</u>, 14 F.3d 1398, 1401 (9th Cir. 1994) (finding that student could be educated in mainstream classroom, but only after crediting the parents' experts over the school district's). As in those cases, mainstream classes were not appropriate for Student for all classes. Student needed separate classes for academics and elective classes with typical peers. R.2581-2627.

Natick's IEP offered Student a program that provided her as much access to typical peers as possible, while offering her an education tailored and appropriate to her needs. Substantial evidence supports the conclusion that, taking Student's needs into account, the Access program was the least restrictive environment. Plaintiffs' claim that Student required a full inclusion

program, but Natick should reimburse them for placing her in the far more restrictive setting of a private special education program with no typical, non-disabled peers, is logically inconsistent.

### C. The Hearing Officer properly concluded that the IEPs Natick proposed for the 2014-2015 school year were also appropriate.

Ample evidence supports the hearing officer's conclusion that the three IEPs Natick proposed for the 2014-2015 school year were reasonably calculated to provide Student with a free appropriate public education in the least restrictive environment. The first was similar to the 2012-2013 and 2013-2014 IEPs because Student's three-year reevaluation had not been completed, but the second and third proposed a number of changes from the prior IEPs, including one which would have had Student participate in a general education class and some replacement classes. R.2309, *ll.*22-24; R.2362, *ll.*14-16; R.2364, *ll.*13-19. The changes were made following a review of Student's evaluations and information from Learning Prep. R.2412, *ll.*22-24; R.2413, *ll.*1; R.2414, *ll.*17-24.

Natick proposed keeping Student in the Access class for mathematics because math was a significant need for her. R.244, *ll.*14-22. It also proposed placing her in two different English classes, one for reading comprehension in the Access setting to address her significant need, and the other a replacement English class given her relative strength and interest in writing. R.2373, *l.*15 - R.2374, *l.*14. The two English classes would have ensured that Student would have received some instruction in English Language Arts for eighty minutes every cycle (id.) and was appropriate because it would have allowed Natick to address intensely her area of weakness, while allowing her to receive content instruction in the less restrictive replacement class. Id. Accordingly, the IEP would have allowed Student to interact and work with peers on writing, social, and reading strengths in different settings. R.2333, *l.*19 - R.2334, *l.*9.

Plaintiffs' contention that the IEPs were not appropriate because Natick had not yet conducted a transition assessment and there were no transition goals when Student turned fourteen (Complaint, ¶76), ignores the evidence and the law. The IDEA requires that every IEP created for a child aged sixteen or older include appropriate, measurable post-secondary goals based on age-appropriate transition assessments related to training, education, employment, and independent living skills, as well as corresponding transition services. 20 U.S.C. § 1414(d)(1)(A)(VIII). Under Massachusetts law, schools are required to provide transition services starting at age fourteen. M.G.L. c. 71B, § 2. A transition plan is a "set of activities" based on the student's needs and is created to help the disabled student move from school to post-school activities. 20 U.S.C. § 1401(34)(B); 34 C.F.R.§ 300.43. Massachusetts has clarified that transition assessments are "[a]ny assessment that is conducted when a student on an IEP is aged 14-22 . . .in that it affords information which can be used to discern the student's vision; understand the student's needs, strengths, preference, and interests; and measure progress towards the acquisition of skills." Massachusetts Department of Elementary and Secondary Education, Transitional Assessment in the Secondary Transition Planning Process, Technical Advisory SPED 2014-4 (April 9, 2014) (emphasis added). It could also be "be garnered through routine whole-school programming such as social-emotional learning curricula, work-and-learning experiences, guidance department courses and opportunities, or the standard academic course of study." Id.

In Sebastian M., 774 F. Supp. 2d 3at 406-07, the plaintiffs argued that because the proposed IEPs did not contain a transition plan for the student, the IEPs were not reasonably calculated to provide FAPE. The District Court rejected that argument, explaining that "the administrative record makes clear that transition planning was discussed at all of Sebastian's

team meetings. And although an IEP must contain statements of transition services, 'the IDEA does not require a stand-alone transition plan as part of an IEP.'" Id. at 407. "Because transition services were mentioned in the IEPs and because transition services were actually provided to Sebastian, there is no error here based on transition planning." Id.

Similarly, in Rodrigues v. Fort Lee Bd. of Educ., 458 F. App'x. 124, 128 (3d Cir. 2011), the parents contended that the IEPs did not contain an adequate description of the transition services the student would be offered to bridge the gap between high school and her post-school activities. The court noted that

> [i]t is not clear whether the IEPs' statements of transition services were actually deficient. Both IEPs correctly noted that [the student] wished to attend college and set forth the academic requirements for that path, and the senior-year IEP included a detailed checklist designed to assist her transition out of school. Moreover, the Board provided the Rodrigueses with extensive information about agencies that could further assist with [the student's] transition."

Id. Given those facts, the court concluded there was no error.

In this case, plaintiffs and their witnesses acknowledged that the Team had conducted transition planning for Student. *See e.g.* R.1639, *l*.24 – R.1640, *l*.1 (referring to transition goals); R.1644, *ll*.17-18; R.1736, *ll.4-6*; R.1741, *ll*.14-16; R.1753, *ll.*9-15. The IEPs for the time period reflect transition services, such as vocational services from the Learning Center Teacher/Student Support Facilitator in the 2012-2013 IEP (R.2617) to the Transition Plan for the 2013-2014 (R.2594-2595) and 2014-2015 (R.2572-2573) IEPs with vocational services. R.2559; R.2591. Moreover, Natick initially had enough information from other evaluations that it did not require formal assessments under Massachusetts guidance. *See e.g.* SPED 2014-4, *supra.* Nevertheless, it conducted a more formal transitional evaluation later, and updated the IEP. R.2229. Although Parents criticized the IEP because it proposed that Student receive her transition services in a

one-to-one setting after school, Natick offered several schedules; the after-school transition services was but one of those options.  R.1677, *l*.7 – R.1678, *l*.1.  Creating an extended school day would have allowed Student to continue to receive non-academic general education electives during the day, as well as all the services on the service delivery grid.  Id.  Parents' expert, Dr. Roffman, argued that the services were inappropriate because they were not tied to Student's interests, but Natick described how it aligned its transition program to her interests.  R.1771, *ll*.14-23; R.2228, *l*.6 – R.2233, *l*.11.  In contrast to Natick's transition planning and offered services, Learning Prep does not start transition services until the student is in the eleventh grade. R.2235, *ll*.21-24.

Plaintiffs also challenge the IEP because it reflected a change in Student's disability category from intellectual to communication, a change they claim was made outside the Team process and without notice to them.  Complaint ¶¶90, 143; Plaintiffs' Memorandum, pp.28-29. The change in disability category was based upon an evaluation by Natick's school psychologist, Ms. Cymrot, in May, 2014 (R.2134, *l*.18-24; R.2142, *l*.14 – R.2144, *l*.21), and the recommendation to change the category was discussed at two Team meetings.  R.2143, *l*.22 – R.2144, *l*.14.  Ms. Cymrot testified that Student had longstanding deficits in language, language understanding, reading comprehension, and written language, and that the deficits affected cognitive growth and development.  R.2142, *ll*.14-22.  Her recommendation to change the category was discussed at both the June, 2014 and November, 2014 meetings (R.2143, *l*.22 – R.2143, *l*. 2145, *ll*.14) and there is no evidence that any decision to change the disability category was made apart from the discussions of Ms. Cymrot's findings at the Team meetings. Moreover, Natick provided the Parents prior notice of the change in disability category pursuant

to 34 C.F.R. § 503(a) through the N1 and proposed IEPs from the June and November, 2014 meetings. R.2527-2528; 2499-2501.

Importantly, as the hearing officer pointed out, Parents were unable to point to any impact from the decision to change the disability category on Student's service delivery. What is important are the services provided and whether they meet a student's needs, not the label given to the disability. In this case, service providers testified at hearing that a communication disability describes Student well because she needs significant support around language, including pairing instruction with visuals, repetition, and previewing and reviewing material. R.2194, *ll.*13-20. They also testified that regardless of the disability category, the services would not change because they recommended services based on areas of deficit and day-to-day functioning, not the named disability category. R.2143, *ll.*10-21; R.2199, *ll.*7-17. The change in category had no impact on the services recommended or proposed, did not subvert any due process, and did not violate Student's right to FAPE.

**D. Natick did not commit procedural violations.**

The hearing officer concluded that the credible evidence at hearing demonstrated that Parents participated in Team decision-making and there were no procedural violations.

**1. Parents and their experts had an adequate and meaningful opportunity to participate in the process.**

The IDEA requires that school districts provide "an opportunity for the parents of a child with a disability . . . to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child . . ." 20 U.S.C. § 1415(b)(1). There is no procedural violation unless a school district's actions significantly impede the parents' opportunity to participate in the decision-making process or result in depriving the student of educational benefits. <u>Alloway Twp. Bd. of</u>

Educ. v. C.Q., No. CIV.12-6812 RMB/AMD, 2014 WL 1050754, at *9 (D.N.J. Mar. 14, 2014) (finding parent not deprived of meaningful opportunity to participate when not prevented from asking questions at Team meeting and when parent did not ask general questions). "A school district cannot be faulted for drafting an IEP that does not answer all the parents' after-the-fact questions when the parents were given an opportunity to participate in the IEP and out-of-district placement process, but declined to actively engage in that process." Id.

In Hanson ex rel. Hanson v. Smith, 212 F. Supp. 2d 474, 486-87 (D. Md. 2002), the parents argued that the school committed a procedural violation by denying them the opportunity to fully participate because they were not allowed to observe the proposed program. The Federal district court upheld the hearing officer's decision that there was no procedural violation because the parents were present at all of the meetings and were, therefore, given a full opportunity to participate in formulating the IEP. Id. at 487. The court explained that "[t]here is no language in the IDEA requiring a school board to allow parents to visit the school of the proposed placement. Rather, the statute requires merely that the parents be active partners in the process." Id. "Plaintiffs have cited no case holding that under the IDEA parents must be permitted to observe the proposed placement prior to an IEP decision in order to be able to fully participate in the process." Id. The parents fully participated because "[t]he Learning Academy was fully described to the parents, and representatives of the Summit School, who testified at the hearing on behalf of the parents and who participated in the process, had observed the Learning Academy." Id.; see also T.M. v. D.C., 75 F. Supp. 3d 233, 243 (D.D.C. 2014) ("IDEA does not guarantee parents the right to observe on request" so a school district's "decision not to allow T.M.'s parents and attorney to observe when requested was *not* a denial of FAPE")(emphasis the court's); P.C. ex rel. J.C. v. Harding Twp. Bd. of Educ., No. CIV.2,*ll.*11-06443 WJM, 2013 WL

3938969, at *9 (D.N.J. July 31, 2013) (finding no procedural violation because "[t]here is no suggestion that [the school district] was unwilling to consider any suggestions Plaintiffs wanted to offer regarding the 2010 IEP").

L.M. v. Capistrano Unified Sch. Dist., 556 F.3d 900, 910-11 (9th Cir. 2009), upheld a hearing officer's determination that the parents had a meaningful opportunity to participate, noting that "[p]arents fail to present any evidence that undermines the ALJ's credibility findings, or proffer any evidence that they could have found had they received more classroom observation time. [Their expert] could have gone back on other occasions for more twenty-minute visits." Id. The court went on:

> [Parents' expert] also conceded that she was able to provide Parents with an informed and independent opinion, and Parents presented [her] opinion…during the due process hearing. Having heard all of the testimony, the ALJ determined that there was likely nothing [the expert] could have discovered during an additional seventy minutes of observation time that would have changed the ALJ's ultimate opinion that placement in [the public elementary school] was appropriate for L.M.

Id.; see also K.A. ex rel. F.A. v. Fulton Cty. Sch. Dist., 741 F.3d 1195, 1205 (11th Cir. 2013) (finding no procedural violation where "[t]he parents have not identified anything they would have done differently, any evidence they would have introduced, or any contribution they might have made, had all the required records and notice been provided to them a reasonable time before any of the team meetings").

In this case, the alleged procedural violations are unclear. To the extent they are based upon claims that parents were denied access to information about proposed programs and denied the right to observe Natick's programs and/or their observations were restricted (see e.g. Plaintiffs' Memorandum, pp.26-28; Complaint ¶¶ 83, 99-103), there is substantial evidence in the record that there were no violations which impeded parents' opportunity to participate in the

process or which deprived Student of educational benefit. Parents were able to ask whatever questions they had during Team meetings and they could ask the special education teacher, Director of Special Education, and other staff any follow-up questions. R.2195, *ll.*20-24; R.2264, *ll.*5-11; R.2279, *ll.*10-18; R.2280, *ll.*2-6; R.2292, *ll.*11-14; R.2371, *ll.*1-19; R.2394, *l.*23 - 2395, *l.*8. Natick answered several questions and told Parents how to contact staff for further information. R.453. Although there is no entitlement to observe a program before an IEP is created to permit parents to meaningfully participate in the decision-making, the Parents and experts in this case had multiple opportunities to observe the Access program (R.2246, *ll.*3-7; R.2256, *ll.*12-17; R.2295, *ll.*9; R.2304, *ll.*22-24; R.2368, *ll.*11-13; R.2369, *ll.*18-21), and providing them adequate information. Parents did not explain to the hearing officer what other information they could have discovered through additional observations or questions, what they would have done differently with more information, or how any additional information would have changed the hearing officer's ultimate opinion that Natick's placement was appropriate, either in connection with their motion to compel or at hearing. General accusations of being denied access are insufficient to demonstrate that Parents were deprived of a full opportunity to participate in the Team process.

## 2. Natick did not predetermine the outcome of the July, 2012 meeting.

In G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 947-48 (1st Cir. 1991), the First Circuit Court of Appeals concluded there was no predetermination even though the school district came to a meeting with a draft IEP because the final IEP was not approved until the Team meeting. Hazen v. S. Kingstown Sch. Dep't, No. CA 09-313 ML, 2010 WL 5558912, at *11 (D.R.I. Nov. 22, 2010), *report and recommendation adopted sub nom.,* Hazen ex rel. R.H. v. S. Kingstown Sch. Dep't, No. CA 09-313 ML, 2011 WL 63499 (D.R.I. Jan. 7, 2011), also

concluded there was no predetermination, in part because there had been significant discussions about the services provided to the student with input from parents and their experts. The court pointed out that "[t]here is no evidence in the administrative record that [the student's parents] were told that they could not ask questions during the IEP meeting." Id. *See also* K.D. ex rel. C.L. v. Dep't of Educ., Hawaii, 665 F.3d 1110, 1123 (9th Cir. 2011) ("fact that the DOE scouted out Pearl Harbor Kai in March of 2007 as a place of potential placement for the 2007 IEP is not conclusive evidence that the DOE had decided to place K.D. there"); Fort Osage R-1 Sch. Dist. v. Sims ex rel. B.S., 641 F.3d 996, 1005 (8th Cir. 2011) (no predetermination when "the district court made an express finding that the School District was willing to listen to the Sims's evidence and concerns and work with them when drafting all of B.S.'s IEPs, including the June 13, 2006 IEP").

The transcript from the July, 2012 meeting shows that Natick asked questions and considered the information presented to determine the best options for Student. R.385,*ll.*14-20; R.387,*ll.*3-13; R.397,*ll.*22-24; R.399,*ll.*2-4; R.403-12-25. As the hearing officer correctly pointed out, although there was no evidence Natick predetermined Student's program and placement, the evidence actually suggested that the Parents had already decided on Learning Prep before the July, 2012 meeting. In an e-mail dated June 6, 2012, McAuliffe reported to Natick that the transition plan was written assuming that Student would attend Learning Prep. R.4054

### 3.   Natick did not fail to consider any updated information or levels of performance.

Even if Natick failed to consider current information or failed to update performance levels (Plaintiffs' Memorandum, pp.20-21), which Natick denies, plaintiffs fail to explain how this omission resulted in a denial of FAPE in this case. T.F. v. The New York City Dep't of

Educ., No. 14CV3401, 2015 WL 5610769, at *4 (S.D.N.Y. Sept. 23, 2015), *appeal withdrawn* (Jan. 12, 2016) ("failure to conduct a vocational assessment, in and of itself, does not rise to the level of a FAPE deprivation where the CSE had sufficient information about the student to determine the student's educational needs."); Watson v. Kingston City Sch. Dist., 142 F. App'x 9, 11 (2d Cir. 2005) (failure to update goals and objectives listed in 2001–2002 IEP from that of previous year did not render IEP defective).  Natick had sufficient information to determine Student's needs and the IEP was appropriate based upon the information it had.

### 4.     **Student's Teams were properly composed.**

The IDEA provides that a student's Team must include: (1) the parents; (2) a regular education teacher if the child would be participating in regular education, (3) a special education teacher or special education provider; and (4) a representative of the local educational agency. 20 U.S.C. § 1414(d)(1)(B).  It does not require any other particular staff to attend.  Accordingly, Natick did not commit a procedural error by failing to have extended school year staff, Access staff, Learning Prep staff, or a speech and language pathologist at the July, 2012 meeting.

Although it was difficult for Natick to put together a Team in July, 2012 because it was summer and much of its staff was unavailable (R.2389, *ll.*23-211,*ll.*2; R.2394, *ll.*13-18), all the individuals statutorily-required for the Team meeting were in attendance.  According to the attendance sheet, both parents, Natick's Director of Student Services, two Assistant Directors of Student Services, including the Team Chair, Lindsey McGovern, who is also a special education teacher, another special education teacher, a general education teacher, the principal of Natick High School, parents' independent evaluator and consultant, and Student's two one-on-one aides ("tutors") attended the meeting, along with the parties' counsel.  R.478, 2770.

Natick had the Student's IEP from McAuliffe developed in April, 2012, and considered

input from that IEP. R.2350, *ll.*2-10. Natick explained that no one from the summer program attended because the program was only five weeks' long and they would have had little to contribute. R.2326, *ll.*13-18. Since Student was transitioning from one school to another, Natick also recommended reconvening the Team in October after Natick could monitor her progress, obtain more information from working with her, and see if any changes to the IEP were needed. R.2352, *ll.*5-24. The Team Chair solicited feedback from Learning Prep for the May, 2013 meeting, but did not receive meaningful information. R.2360, *l.*7 0- R.2361, *ll.*11. In 2014, there was no need for the Access program teacher to be present at all meetings since he attended the June, 2014 meeting, had not done any direct work with Student because she was unilaterally placed at Learning Prep, and there was always adequate representation from Natick at the meetings. R.2445, *ll.*3-11.

A "[s]tudent is denied a FAPE only when the procedural violation results in the loss of educational opportunity or seriously infringes the parents' opportunity to participate in the IEP formation process." J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist., 611 F. Supp. 2d 1097, 1126 (E.D. Cal. 2009), *aff'd,* 626 F.3d 431 (9th Cir. 2010) (quotation omitted). "Not all procedural violations deny the child a FAPE . . . Where a school district improperly constitutes an IEP team, IDEA procedural error may be held harmless." Id. (quotation and citation omitted). In J.W., 611 F. Supp. 2d at 1127, the failure to include a general education teacher was considered harmless error because the teacher had attended prior meetings and answered questions. "Thus, the importance of a general education teacher perspective in developing an IEP for Student lessened." Id.; L.R.v. Manheim Twp. Sch. Dist., 540 F. Supp. 2d 603, 616 (E.D. Pa. 2008) (finding no substantive error by not having regular education teacher because the "value of the regular education teacher's contribution is especially uncertain because L.R.had not been

enrolled in the School District since August 2001, over a year before the November 2002 IEP meeting. In fact, Plaintiff has not been able to name a regular education teacher who actually taught her, let alone demonstrate that such teacher was still employed in the School District and available in November 2002").

In R.B., ex rel. F.B.v. Napa Valley Unified Sch. Dist., 496 F.3d 932, 938 (9th Cir. 2007), the Ninth Circuit Court of Appeals disagreed with the parents' argument that the school committed a procedural error because the teacher who taught the student in kindergarten six years before attended the meeting rather than the current teacher. The court explained that "the IDEA no longer requires the presence of the child's current regular education teacher on the IEP team." Id. at 939.

There was also no harm in the failure to have a speech and language pathologist at the April, 2014 and November, 2014 meetings (R.2405, *ll*.5-16) and there was never a request to reconvene to discuss speech and language goals. Id. Although a speech and language pathologist is not a statutorily-required member of a team, one attended both the June, 2014 and January, 2015 meetings to discuss the findings of her evaluations and what services would be like, and to give the parents an opportunity to ask questions. R.2194, *l*.21 – R.2195, *l*.24; R.2193, *ll*.1-9.

In this case, since the Team was at all times properly constituted, there was no procedural violation. There was no need for summer providers, the Access program teacher, the speech and language pathologist, or anyone from Learning Prep to be present at all meetings. Even if plaintiffs were correct that any of these should have attended, they have failed to identify or point to any evidence of any resulting harm or loss of educational opportunity.

E.     **The Hearing Officer's credibility determinations are entitled to deference.**

1.      **Expert Testimony.**

"The valuation of expert testimony is precisely the sort of first-instance administrative determination that is entitled to judicial deference by the district court." Sebastian M., 685 F.3d at 86; Andover Sch. Comm. v. Bureau of Special Educ. Appeals of Div. of Admin. Law Appeals, No. CIV.A. 12-12288-DPW, 2013 WL 6147139, at *14 (D. Mass. Nov. 21, 2013) ("Credibility determinations…are the province of the factfinder, which in this case is the Hearing Officer. . . . In the absence of some compelling evidence as to why the testimony of certain of Andover's witnesses should be disregarded, I have no reason to recalibrate the assessment of the credibility of those witnesses or disagree with the Hearing Officer's credibility determinations.").

The hearing officer found Ms. Flax not credible because she steadfastly maintained that Student would not benefit from inclusion (R.1882, *ll*.7-22), a statement not supported by any other witness for either party, and one which was contrary to her prior recommendations for Student's programming and because she speculated with the sweeping generalization that Student would have absolutely no friends in the Access program.  R.1913, *ll*.2-11.

The hearing officer chose not to rely on Dr. Imber because he appeared to change his opinion based upon the parents' choice of placement at the time he is ask to give an opinion. R.1676, *ll*.2-6; R.2086, *l*.8 - R.2091, *l*.4.  In 2011, Dr. Imber advocated for inclusion at an earlier BSEA hearing.  R.2082, *ll*.8–11.  In a 2012 report, he recommended that Student "continue to attend high school in an inclusive environment" and that "[t]he recommendation is consistent with current best practice in education, consistent with the IDEA's emphasis on least restrictive environment."  R.2077, *l*.8 – R.2078, *l*.4. In the May and July, 2012 meetings, Dr. Imber also felt that inclusion opportunities were important for Student.  R.2082, *ll*.12-24.
Despite advocating for inclusion in 2011 and 2012, however, he endorsed Learning Prep, where

the Student had no opportunity to be with general education students, at the hearing,. R.2071, l. 4-2072, l.8; R.2086, l. 8 –R.2091, l. 4.

Under the circumstances, it was entirely reasonable and proper for the hearing officer to discount the testimony of both Ms. Flax and Dr. Imber.

## 2. Non-expert Testimony.

Credibility determinations are also the province of the factfinder when non-expert testimony is at issue. *See, e.g.,* Wytrwal v. Saco Sch. Bd., 70 F.3d 165, 171 (1st Cir.1995) (stating, in case not involving IDEA, "choice" to credit testimony "is within the discretion of the factfinder"). A parents' testimony may also be discredited. J.E. v. Boyertown Area Sch. Dist., 834 F. Supp. 2d 240, 253–54 (E.D. Pa.), *aff'd sub nom.* J.E. ex rel. J.E. v. Boyertown Area Sch. Dist., 452 F. App'x, 172 (3d Cir. 2011), upheld a determination that a parent was not credible because she "repeatedly referred to her fear of the public high school environment during her testimony." According to the court:

> the overall tenor of the parents' testimony about Hill Top strongly implies that they would not accept an appropriate placement at BAHS—rather, both Parents would always be dissatisfied with the District's offers . . .This evidence is sufficient to support [the hearing officer's] credibility finding that he did not find the mother to be credible as to facts because of her fear of the public school environment.

Id. at 254 (quotation, brackets and citation omitted).

The hearing officer in this case properly discounted Student's father's testimony about whether Natick's proposed programs would provide Student a free appropriate public education because he admitted he did not have degrees or licenses in either general or special education, never taught in a public school or private school setting, and did not have any degrees in speech and language pathology. R.1659, *l.*17 – R.1660, *l.*6. The hearing officer also properly

discounted his testimony about a decrease in hours when he acknowledged that the Access program was different from the program in Student's prior placement (R.1665, *l.*10 –R. 1666, *l.*13), making it inappropriate to compare one service delivery grid to the other.

In addition, the hearing officer properly discredited Student's father's statements about whether Access students could or would pass MCAS and receive a diploma. Student's father appeared to rely upon a single classroom observation to conclude that Access students did not prepare for MCAS. R.1644, *ll.*19-23. In fact, Natick presented evidence that students in the Access program were routinely placed in replacement classes when their abilities and classroom performance indicated that such a move was appropriate and that the replacement classes allowed them to access the general curriculum so they could, conceivably, take MCAS and receive diplomas. R.2191, *ll.*2-8; R.2298, *ll.*20-23; R.2322, *ll.*5-13; R.2396, *ll.*3-15; R.2439, *ll.*11-21; R.2440, *ll.*13-23. Under the circumstances, Student's father was neither credible, nor qualified to testify about whether Natick's proposed program would meet Student's needs.

Contrary to plaintiffs' contention, the hearing officer did not completely omit Ms. Coellner's testimony or Dr. Roffman's. The hearing officer need not make a specific written finding about each witnesses' credibility," particularly where the written decision reflects that the ALJ considered the testimony." Adams v. Chater, 93 F.3d 712, 715 (10th Cir. 1996) ("it is clear that the ALJ considered the testimony of claimant's wife in making his decision because he specifically referred to it in his written opinion."); Smith v. Barnhart, No. 04-2197-GTV, 2005 WL 589758, at *8 (D. Kan. Mar. 11, 2005) ("the fact that the ALJ did not specifically discuss findings regarding the credibility of Plaintiff's mother's testimony does not warrant remand. Failure to discuss the testimony of other witnesses may not be grounds for remand when the testimony is largely cumulative of that of the claimant, as it was here"). The hearing officer

cited Ms. Coellner's testimony (R.1553) and discussed Dr. Roffman's testimony in detail. R.1562-68. She unquestionably considered their testimony, but found there testimony was not enough to persuade her that Parents had met their burden.[1]

Finally, the hearing officer properly credited the testimony of Ms. Cymrot and Ms. Liptak. Just as a factfinder's credibility determinations may lead to giving a witness' testimony little or no weight, they also lead to crediting the testimony of other witnesses. Plaintiffs cite to no evidence that Ms. Cymrot's testing results were inaccurate or that Ms. Liptak was not credible. Ms. Cymrot is a licensed school psychologist who had worked in Natick for over twenty years. R.2132, *l*.10 – R.2133, *l*.2. She observed and evaluated Student. R.2135, *ll*.17-23. Although one of the testing domains for an intellectual disability was going to be tested later, it had been tested previously. R.2159, *ll*.12-20. Ms. Cymrot explained that she cited relevant tests, but would not reference every report done. R.2164, *ll*.14-15.

Ms. Liptak had seventeen years of experience as a special education teacher. R.2321, *ll*.6-7. She taught Student in Natick's ESY program (R.2325, *ll*.8-9) and was familiar with the Access program. She testified that the Access program was appropriate for Student based upon what she knew about Student's profile and her knowledge of the Access program. R.2327, *ll*.4-13. The Hearing Officer properly credited the testimony of these witnesses.

---

[1] Even if the hearing officer had not considered Ms. Coellner's or Dr. Roffman's testimony at all, she would have had valid reasons to reject their testimony. Ms. Coellner did not conduct any formal evaluations of Student, had not worked with Student for over three years, and although she has special education credentials, she worked with Student as a paraprofessional. R.1715, *l*.19 –R.1717, *l*.2. Most of Dr. Roffman's criticisms related to her opinion that it was inappropriate for Student to receive vocational services as part of an extended day, even though that was but one of a number of options presented to the parents. R.1764, *ll*.12-16; R.1765, *ll*.1-6; R.2278, *ll*.14-24. In addition, Dr. Roffman's statement that the services would not be tied to Student's interests (R.1771, *ll*.14-23) was also refuted. R.2063, *ll*.21-24; R.2228, *l*.6 – R.2233, *l*.11; R.2277, *l*.21 –R.2278 ,*l*.2;

**F.** **The hearing officer was not required to rely upon private evaluations submitted in accordance with the Five-Day Rule, and properly refused to consider them in this case because Natick and Student's Team could not have considered them before the hearing.**

That reports were timely submitted pursuant to the Five-Day Rule does not make them relevant, nor compel the hearing officer to consider them. "An IEP is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated." Roland M. v. Concord Sch. Comm., 910 F.2d 983, 992 (1st Cir. 1990). In a recent decision, this Court rejected a plaintiff's argument that a report submitted in compliance with the Five Day Rule (20 U.S.C. §1415(f)(2)(A) and BSEA Rule IX(A)) must be considered by the hearing officer in determining whether the IEPs at issue were/are reasonably calculated to provide FAPE. Jacob Doe v. Richmond Consolidated School District, U.S.D.C. Civil Action No. 15-30027, *11 (May 31, 2016). As Judge Mastroianni explained, "[t]he adequacy of the IEP must be examines based on what was known to the school district when the IEP was promulgated." If the school district does not have the reports, it cannot consider them within the Team process (id., *12) and by the time the Five-Day Rule comes into play, the district is prevented from amending the IEP to reflect the new information.

Natick had no opportunity to consider the transition report, psychoeducational evaluation, and speech and language evaluations dated approximately two weeks before the hearing. R.1584, *l.*23 – R.1585*, l.*6. They were performed after the IEPs at issue were developed. Since the Team did not consider them, they are not relevant to determine whether the IEPs were appropriate when developed, and the hearing officer properly declined to consider them.

## VI.  CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment should be denied and

summary judgment should enter instead for Natick and the BSEA, affirming the BSEA's

DATED at Quincy, Massachusetts, this 19th day of August, 2016.

Counsel for Natick Public Schools,

/s/ Doris R. MacKenzie Ehrens
BBO # 544252
Felicia Vasudevan
BBO #687463
MURPHY, HESSE, TOOMEY & LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, MA 02269-9126
(617) 479-5000

## CERTIFICATE OF SERVICE

I, Doris R. MacKenzie Ehrens, hereby certify that this document filed through the
CM/ECF system will be sent electronically to counsel of record for the plaintiff and to counsel of
record for Reece Erlichman, Director, Bureau of Special Education Appeals, on this 19th day of
August, 2016.

/s/ Doris R. MacKenzie Ehrens
Doris R. MacKenzie Ehrens

943746v1