_____
           )  Civil Action No. 15-cv-13617-FDS
C.D., by and through her PARENTS AND )
NEXT FRIENDS, M.D. and P.D.   )
           )
      Plaintiffs,  )
v.            )
           )
NATICK PUBLIC SCHOOL DISTRICT )
and           )
BUREAU OF SPECIAL EDUCATION  )
APPEALS,        )
      Defendants.  )
_____)

### NATICK PUBLIC SCHOOLS' RESPONSE TO PLAINTIFFS' AMENDED STATEMENT OF MATERIAL FACTS AND NATICK PUBLIC SCHOOLS' ADDITIONAL STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  The Plaintiffs, M.D. and P.D. are C.D.'s father and mother respectfully, who bring this action on behalf of C.D. and themselves.

**Response:** Admitted.

2.  The Plaintiff, C.D is a student with a disability who is entitled to all the rights, entitlements, and procedural safeguards mandated by applicable law and statutes, including, but not limited to, the IDEA, and M.G.L. c.71B.

**Response:** Natick states that this paragraph is a legal conclusion, which does not require a response.

3.  C.D. is and was at all times relevant to this action, a resident of Natick, Middlesex County, Massachusetts.

**Response:** Admitted.

4.     C.D. attended public school in Natick through the end of 5th grade pursuant to IEPs proposed by the Natick Public School District ("Natick") and accepted by the Parents.

**Response**:  Admitted.

5.     The Parents enrolled C.D. in the Christa McAuliffe Regional Charter School ("McAuliffe"), in Framingham, Massachusetts, which she attended, in the general education inclusion classroom for 6th , 7th and 8th grades.

**Response**:  Admitted.  Natick adds that the McAuliffe Regional Charter School (McAuliffe) is a local education agency ("LEA"), and that once parents enrolled C.D. there, Natick had no further obligation to provide her with a free appropriate public education and/or any educational services.  C.D. attended McAuliffe with the full time assistance of personal one-to-one aides provided by her parents.  R.1718, *ll*.8-24.

6.     C.D. is currently enrolled at Learning Preparatory School ("Learning Prep"),a state-approved special education school in Newton, Massachusetts, where the Parents privately placed her in September 2012, following their rejection of Natick's proposed placement for 9th grade.

**Response**:  Natick admits that C.D. is currently enrolled at Learning Prep School ("Learning Prep"), a state-approved special education school in Newton, Massachusetts. Although Parents privately placed her there in September, 2012, after they rejected Natick's proposed placement for 9th grade, the evidence suggests that the Parents intended to privately place C.D. at Learning Prep as early as June, 2012.  R.4054.

7.     C.D. was attending 12th grade at the time of the hearing.

**Response**:  Admitted.

8.      M.D. and C.D. are and were at all times relevant to this action, residents of Natick, Middlesex County, Massachusetts.

**Response:**  Admitted.

9.      The Defendant, Natick, is a public corporation with the capacity to be sued under the laws of the Commonwealth of Massachusetts, with a usual place of business located at 13 E. Central Street, Natick, Middlesex County, Massachusetts.

**Response:**  Admitted.

10.     Natick receives federal funds from the United States Department of Education pursuant to the IDEA, and is required to provide special education services to all eligible students who reside within the school district.

**Response**:  Admitted.

11.     The Defendant, Bureau of Special Education Appeals "BSEA", is an independent subdivision of the Division of Administrative Law Appeals, an independent state agency within the Commonwealth of Massachusetts, with a usual place of business at One Congress Street, Boston, Suffolk County, Massachusetts.

**Response:**  Admitted.

12.     The BSEA is responsible for adjudicating disputes between parents and school districts regarding special education services pursuant to 20 U.S. §1415(g) and M.G.L. c.71B, §2A. (A.R.818).

**Response:**  Natick states that this paragraph is a legal conclusion, which does not require a response.

## PROCEDURAL HISTORY BEFORE THE BSEA

13.     The Parents filed their initial request for hearing on May 23, 2014, which they amended on April 1, 2015 based upon events that transcribed [sic] subsequent to the initial filing date.

**Response**:  Natick admits that Parents filed these documents and that the documents speak for themselves.

14.     Natick filed its response to the Parents initial request for hearing on June 2, 2014.

**Response**:  Admitted.

15.     The hearing was held on May 12, 2015, May 13, 2015, May 27, 2015, and May 28, 2015.

**Response**:  Admitted.

### The Parents' Witnesses

16.     The Parents' witnesses who provided testimony at the hearing with regard to the appropriateness of the proposed programs for C.D. included: (1) Ms. Nan Coellner; (2) Ms. Suzanne Flax; (3) Dr. Steve Imber; and (4) Dr. Arlyn Roffman.

**Response**:  Admitted.

17.     Nan Coellner, a retired special education teacher, with over thirty years' experience in the Boston Public Schools (A.R.3189), worked with C.D. in the general education classroom at McAuliffe for at least two days per week from September 2009 through May 2012. (A.R.1696).

**Response**: Admitted. Natick adds that Ms. Coellner was employed by C.D.'s father, not by McAuliffe. R.1716, *ll.*8-13.[1] She learned of the job through a posting on Craigslist. R.1694, *ll.*11-21.

18.     Ms. Coellner observed C.D. and spoke with her teachers at McAuliffe and Learning Prep, and observed the proposed program for C.D. at Natick.

**Response**: Denied. Ms. Coellner never observed the replacement classes in Natick. R.1713, *ll.*8-12. Moreover, she did not observe the Natick program in 2012 or 2013, only in 2014. R.1714, *ll.*4-16. Ms. Coellner admitted in her testimony that she did not talk to teachers at Learning Prep. R.1724, *ll.*18-21.

19.     Ms. Coellner testified that she reviewed the IEPs proposed by Natick for C.D.'s 2012-2013, 2013-2014, and 2014-2015 school years and attended team meetings for C.D. on May 24, 2012, July 27, 2012, and November 11, 2014. (*See* A.R.1691-1745).

**Response**: Admitted.

20.     Suzanne Flax, a speech therapist with over thirty years' experience (A.R.3217), has been working with C.D. one day per week since 2007, when the Parents hired her to provide C.D. private speech therapy. (*See* A.R.1840-1914).

**Response**: Admitted that Ms. Flax is a speech/language pathologist who has provided C.D. with speech and language services since she was in the fourth grade. Natick denies that she has over thirty years of experience as a speech therapist because her first job as a speech-language pathologist was in 1987, twenty-eight years before the hearing in 2015. R.3220.

---

[1] Consistent with the format in Natick's Opposition, Natick cites to the Administrative Record with "R." The transcript is included in the record and citations to the transcript are to the pages of the record rather than the pages of the transcript volumes. Line numbers are designated *ll.*x-x.

21.     Ms. Flax observed C.D. and spoke with her teachers at McAuliffe and Learning Prep, and observed the proposed program at Natick; Ms. Flax testified that she reviewed all of the IEPs proposed by Natick for 2012-2013, 2013-2014, and 2014-2015, and attended team meetings at Natick on May 24, 2012 and November 11, 2014. (*See* A.R.1840-1914).

**Response**: Admitted that she attended Team meetings in May, 2012 and November, 2014. Ms. Flax did not observe the Natick program in 2012 or 2013, only in 2014. R.1848, *ll.*13-17. Ms. Flax did not testify that she spoke to the teachers at McAuliffe. R.1840-1864, 1870-1915.

22.     Dr. Imber, an educational evaluator/consultant, and Professor of Special Education at Rhode Island College with over forty years' experience (A.R.3190), was hired by the Parents in 2009 to conduct an independent evaluation of C.D.; he conducted evaluations in 2009, 2010, 2012, and 2014, which included observations of C.D., reviews of previous evaluations, and standardized academic testing. In addition to conducting evaluations, Dr. Imber has served as an educational consultant to the Parents, observing C.D.'s programs, speaking with her teachers, and providing feedback to the Parents. (*See* A.R.2015-2131).

**Response**: Admitted.

23.     Dr. Imber observed C.D. and spoke with her teachers at McAuliffe and Learning Prep, and has observed the proposed program at Natick.

**Response**: Admitted that Dr. Imber observed C.D. and spoke with her teachers at McAuliffe and Learning Prep. Dr. Imber did not observe the Natick program in 2012 or 2013, only in 2014. R.2047, *ll.*22-24.

24.     Dr. Imber testified that he reviewed all of the IEPs proposed for the 2012-2013, 2013-2014, and 2014-2015 school years, and attended team meetings at Natick on May

24, 2012, July 27, 2012, June 13, 2014, November 11, 2014, and January 7, 2014. (*See* A.R.2015-2131).

    **Response**:  Admitted.

    25.    Natick's witnesses who provided testimony at the hearing with regard to the appropriateness of the proposed programs for C.D. included: (1) Karen Liptak; (2) Sarah Karian; (3) Donna Cymrot; and (4) Christine Michelson.

    **Response**:  Admitted.  Natick adds that Lindsey McGovern and Kathryn Brown also testified to the appropriateness of Natick's programs.

    26.    Karen Liptak, a special education teacher at Natick High School, worked with C.D. in the summer of 2012, providing the academic component of her ESY program. (*See* A.R.2320-2345).

    **Response:**  Admitted.  Natick adds that she taught both the academic component and phonology.  R.2325, *ll.*13-14.

    27.    Ms. Liptak has never observed C.D. at Learning Prep; Ms. Liptak attended team meetings for C.D. on May 24, 2012, November 11, 2014, and January 7, 2015. (*See* A.R.2320-2345).

    **Response**:  Admitted.

    28.    Ms. Liptak did not attend the IEP team meeting on July 27, 2012 (even though she had provided services to C.D. during the ESY program earlier that month).

    **Response:**  Admitted.  Natick adds that Ms. Liptak explained why she did not attend the meeting.  She testified that "[t]he summer program is only five weeks in duration.  I really think the charter school personnel would have been probably more important at that time than the

summer school people.  They had a longer relationship with her.  We would have had a snapshot of information to really contribute."  R.2326, *ll.*13-18.

29.     Ms. Liptak testified that she did not review the IEPs proposed by Natick for C.D.'s 2012-2013, 2013-2014 school years. (*See* A.R.2320-2345).

**Response:**  Denied.  Ms. Liptak never testified that she did not review the IEPs that Natick proposed.  Instead, she acknowledged that she read some of the Student's records. R.2334, *ll.*16.

30.     Sarah Karian, Speech Language Pathologist at Natick High School, first met C.D. on May 27, 2014, per Natick's request that she conduct a speech and language evaluation for C.D.'s three-year reevaluation. (*See* A.R.2183-2215).

**Response:** Admitted.

31.     Ms. Karian conducted her evaluation at Learning Prep but did not observe C.D. in any of her classes or speak with any of her teachers, indicating in her testimony that she doesn't think it was important for her to observe C.D. as part of her evaluation. (*See* A.R.2183-2215).

**Response**:  Admitted.  Ms. Karian explained that, when doing a communication evaluation, it is not necessary to do an observation.  R.2201, *ll.*17-23.

32.     Ms. Karian attended team meetings on June 13, 2014 and January 7, 2015; Ms. Karian did not attend the team meeting on November 11, 2014, at which the team reviewed Ms. Flax's most recent Speech and Language Evaluation. (*See* A.R.2183-2215).

**Response**:  Admitted.

33.     Ms. Karian did not testify with regard to whether she reviewed the IEPs proposed for the 2012-2013, 2013-2014, and 2014-2015 school years. (*See* A.R.2183-2215).

**Response**:  Ms. Karian testified that she reviewed C.D.'s IEPs.  R.2201, *l.*24 – R.2202, *l.*2.

34.     Donna Cymrot, a school psychologist at Natick High School, first met C.D. in May of 2014 as a result of Natick's request that she conduct a psychological evaluation as part of her three-year reevaluation.  Ms. Cymrot observed C.D. at Learning Prep when she conducted her evaluation but did not speak with any of her teachers.  Ms. Cymrot attended team meetings on May 24, 2012, June 13, 2014, and November 11, 2014. (See A.R.2132-2175).

**Response**:  Admitted, except that Ms. Cymrot did not testify that she did not speak with any of C.D.'s teachers. R.2132 -2177.

35.     Ms. Cymrot testified that she did not review any of the IEPs proposed for C.D. for the 2012-2013, 2013-2014, or 2014-2015 school years, and did not review all of the previous psychological reports, including those conducted by Natick in 2012, which contradicted her findings, and the Neuropsychological Evaluation provided by Dr. Gibbons and about which Dr. Gibbons testified at the hearing. (*See* A.R.2183-2215).

**Response:**  Admitted that Ms. Cymrot did not review the report Dr. Gibbons testified about or the 2012-2013 or 2013-2014 IEPs.  Natick denies that Ms. Cymrot did not review the 2014-2015 IEPs because she testified she helped  create them.  R.2160, *ll.*14-18.  Natick denies that the 2012 report contradicted Ms. Cymrot's findings.  R.945-954; R.2825-2833.  Natick also denies that Ms. Cymrot did not review Natick's

evaluations. R.2141, *l*.24 – R.2142, *l*.1. Natick adds that Ms. Cymrot did not review Dr.

Gibbons' 2012 report because Natick did not have the report. R.2141, *ll*.11-12. Ms.

Cymrot did not include every evaluation that was ever done. She reviewed previous

Natick Public Schools' evaluations and the Massachusetts General report. R.2141, *l*.24 –

R.2142, *l*.5; R.2164, *ll*.14-15.

36.     Christine Michelson, the Lead ACCESS teacher since October 2014, had

never met C.D. (*See* A.R.2382-2319).

**Response**:  Admitted.

37.     Ms. Michelson had never observed C.D. at McAuliffe or Learning Prep or

consulted with any of her teachers. (*See* A.R.2382-2319).

**Response**:  Admitted, except Natick denies that Ms. Michelson never consulted with

any of C.D.'s teachers because there was no testimony to this effect.  R.2282-2343.

38.     Ms. Michelson testified that she did not review the IEPs proposed by Natick

prior to the IEP currently proposed for the 2014-2015 school year, and did not review all of

the evaluation reports, including the Neuropsychological Evaluation provided by Dr.

Gibbons and about which Dr. Gibbons testified at the hearing. (*See* A.R.2382-2319).

**Response**:  Admitted, except that Ms. Michelson testified that she reviewed

evaluation reports for C.D.  R.2287, *ll*.10-12 .

39.     Ms. Michelson attended team meetings on November 11, 2014 and January

7, 2015. (*See* A.R.2382-2319).

**Response:** Admitted.

**The Issues Exhausted**

40.     The following issues were exhausted at the BSEA hearing: (a) Whether the IEPs proposed by Natick for the periods from 2012-2013 (A.R.2603), 2013-2014 (A.R.2628), and 2014-2015 (A.R.2551, A.R.2529, A.R.2503) were reasonably calculated to provide C.D. with a FAPE in the LRE; (b) Whether there were any procedural violations committed by Natick that resulted in a denial of a FAPE to C.D.; (c) Whether Natick engaged in any discrimination or retaliation in violation of 42 U.S.C. § 1983 and Section 504 of the Rehabilitation Act of 1973 (to preserve the Parents' right to file a claim for damages at a later date). (A.R.1549-1574).

   **Response:**  Admitted, except that Natick does not know the reason Parents' filed the 42 U.S.C. § 1983 and Section 504 of the Rehabilitation Act of 1973 claims.

41.     On December 5, 2014, pursuant to the Parents' discovery request, Natick provided the Parents with redacted IEPs for students in the ACCESS program between September 2012 and the current date, which revealed the profile of students who would have been C.D.'s peers. (A.R.4182).

   **Response**:  Admitted.

42.     The IEPs revealed that there were students with autism; there were students who were nonverbal, and students with emotional and behavioral challenges. (A.R.4182

   **Response**:  Natick states that the IEPs speak for themselves.

**The Motion to Compel**

44.     On November 12, 2014, the Parents filed a Motion to Compel Independent Evaluators and Educational Consultants Access to School Staff ("Motion to Compel"), a

supporting Memorandum of Law, which included two verified affidavits and sixteen exhibits. (A.R.732-944).

**Response**:  Admitted.

44.     The Motion to Compel was a result of conditions placed upon the Parents' and their experts with regard to their observations of the proposed program during October and November 2014; and which prevented them from obtaining the information that they needed and were entitled to receive. (A.R.732-944).

**Response**:  The Parents' Motion to Compel speaks for itself.

45.     Natick justified restricting the observations based upon allegations against Dr. Imber and Ms. Flax, accusing them of interrogating Natick staff and making them feel uncomfortable during their observation in June 2014. (A.R.732-944).

**Response**:  Natick admits that it restricted the observations in part because Dr. Imber and Ms. Flax had previously interrogated Natick staff and made them uncomfortable.  R.775.  Natick denies the characterization of Natick's reasoning as an "accusation."  Id.  Moreover, Natick had other arguments for limiting access under the circumstances.  R.770-776.

46.     In their affidavits, Dr. Imber and Ms. Flax fervently denied the allegations against them. (A.R.732-944).

**Response**:  The documents speak for themselves.

47.     By their motion, the Parents sought to compel Natick to provide the Parents and their designated evaluators/consultants the opportunity to communicate directly, in person, and without the imposition of impermissible conditions, with the

school staff in the classes they had observed in October and November 2014 (as well as in the future). (A.R.732-944).

**Response**:  The document speaks for itself.

48.     Natick filed an Opposition to the Parents' Motion to Compel on November 20, 2014; however, Natick did not provide any evidence to support their allegations. (A.R.1279).

**Response**:  Natick denies the Parents' characterizations.  Moreover, Natick was not required to submit evidence to support its opposition to the motion to compel.

49.     On November 28, 2014, the Parents filed a response to Natick's Opposition, which included two additional affidavits from Dr. Imber and Ms. Flax. (A.R.1287).

**Response**:  Admitted.

50.     On April 1, 2015, five months after the motion was filed, the hearing officer issued a ruling, which ordered that the Parents could submit clarifying questions in writing to be answered by Natick in writing regarding the observations that occurred five months prior to the ruling. (A.R.815).

**Response**:  Admitted that the hearing officer ruled on the motions on April 1, 2015.  The decision speaks for itself.

51.     The Parents submitted questions in writing on April 21, 2015. (A.R.1351).

**Response**:  Admitted.

52.     Natick objected to the form and content of the questions submitted, and following a conference call on May 1, 2015, the hearing officer issued an amended ruling

providing that Natick would submit written responses by May 7, 2015, to the questions deemed appropriate by the hearing officer. (A.R.768).

**Response**: Admitted that Natick objected to the questions submitted because they were not clarifying, but were excessively lengthy and unduly burdensome. R.1367. Natick denied that the conference call was on May 1, 2015; it took place on April 30, 2015. R.1399-1400. The hearing officer's decision speaks for itself. Id.

**The Exhibits**

53.     On May 5, 2015, the Parents submitted their exhibits for hearing five business days prior to the hearing in accordance with Rule IX of the BSEA rules, which included the most recent reports from Dr. Imber (A.R.3662), Ms. Flax (A.R.3802), and Dr. Roffman (A.R.3651), who had completed their reports to the extent possible (given the restrictions imposed by Natick) so that the Parents could at least submit them as exhibits for the hearing pursuant to federal law[4] (A.R.1409).

**Response**: Admitted that the Parents submitted their exhibits for hearing five business days prior to the hearing as required by Rule IX of the BSEA rules, and that the exhibits included the most recent reports from Dr. Imber, Ms. Flax, and Dr. Roffman. Natick denies that they had completed their reports "to the extent possible" before the hearing and plaintiffs do not cite any evidence to support that statement.

**The Decision**

54.     The BSEA issued a final Decision on July 24, 2015 (A.R.1528-1549), which was corrected on July 28, 2015 to include three paragraphs which had been inadvertently omitted. (A.R.1549-1574).

**Response:**  Admitted.

55.    The omitted paragraphs indicated that the hearing officer: (1) did not rely on the testimony of Ms. Flax; (2) did not rely upon the testimony of Dr. Imber; and (3) did not rely on the most recent reports submitted by Ms. Flax, Dr. Imber, or Dr. Roffman. (A.R.1549-1574).

**Response:**  Admitted.

56.    Following a four-day hearing on May 12, 2015, May 13, 2015, May 27, 2015, and May 28, 2015, the hearing officer found that: (1) the IEPs proposed by Natick for the 20122013, 2013-2014, and 2014-2015 school years were reasonably calculated to provide C.D. with a FAPE in the LRE; (2) there was no evidence of procedural violations that resulted in a denial of FAPE to C.D.; and (3) there was no evidence that Natick discriminated against Student/Parents under 42 U.S.C. § 1983 or Section 504 of the Rehabilitation Act of 1973. (A.R.1549-1574).

**Response**: Admitted that there was a four-day hearing on May 12, 2015, May 13, 2015, May 27, 2015, and May 28, 2015.  Otherwise, the hearing officer's decision speaks for itself.

57.    Because the hearing officer found that the IEPs proposed by Natick did not deny C.D. a FAPE, she made no determination regarding whether the Parents' placement at Learning Prep was an appropriate placement in the LRE, pursuant to the standards applicable when parents unilaterally place their child in a private school. (A.R.1549-1574).

**Response**: The hearing officer's decision speaks for itself.

**The Material Facts**

58.     C.D. has been diagnosed with Borderline Intellectual Functioning and has been noted to have weakness in language functioning. (A.R.3876).

**Response**:  Admitted.

59.     Her most recent neuropsychological evaluation indicates that C.D. has a Mild Intellectual Disability along with ongoing weaknesses in receptive and expressive language. (A.R.3876).

**Response**:  Admitted.

60.     C.D. is an organized, hard-working, conscientious, cooperative student who wants to do well, is able to follow classroom routine and class expectations (A.R.3435), and appears to have good self-esteem and social skills. (A.R.2505, A.R.3231).

**Response**:  Natick admits that reports and assessments have indicated that C.D. has exhibited the strengths alleged in this paragraph.

61.     C.D. attended all of her classes at McAuliffe in the general education inclusion setting (with the exception of Math for 8th grade only). (A.R.3375).

**Response**:  Admitted, except that Natick also notes that C.D. received academic support in a separate setting three times a week.  R.3388.

62.     C.D. received supplementary support in the general education classroom at McAuliffe from Ms. Coellner and Ms. Soden, two retired special educational teachers/administrators, hired by the Parents. (A.R.1691).

**Response**:  Admitted.

63.     Ms. Coellner testified that she and Ms. Soden had worked with C.D. on a rotating schedule every day for 6th, 7th and 8th grade (A.R.1691); that they provided

occasional support in the academic classroom (A.R.1696); and did not accompany C.D. to electives or lunch. (A.R.1696).

    **Response**:  Natick admits that Ms. Coellner and Ms. Soden worked with C.D. on a rotating schedule.  Natick denies that they provided occasional support in the academic classroom.  In sixth grade, they also pulled her out for math.  R.1696, *l*.5.  They went to small group math with her in the eighth grade.  R.1696, *ll*.7-8.  They would stand near her in the class and cue her as needed and remind her about what she had to do.  Id., *ll*.12-19.  They would go over vocabulary and practice flash cards.  R.1701, *ll*.4-8.

    64.    Ms. Coellner testified that C.D. was able to access the general education curriculum at McAuliffe (A.R.1697); has excellent executive functioning skills, is very organized, works really well in groups; has beautiful handwriting and would often be the scribe during group projects. (A.R.1697).

    **Response**:  Admitted that Ms. Coellner so testified.

    65.    Ms. Coellner testified that at the end of 6th grade, C.D. had no confidence in her own academic ability; however, at McAuliffe, her self-confidence dramatically improved...when she began at McAuliffe, C.D. could fill in a blank in a sentence and at the end of three years, she could write a composition; in 8th grade, C.D. passed the standard MCAS in English. (A.R.1699).

    **Response:**  Denied that Ms. Coellner testified that C.D. had no confidence in her own academic ability at the end of 6th grade but that her self-confidence dramatically improved at McAuliffe.  Natick does not see this statement in Ms. Coellner's testimony, either specifically on the page that Plaintiffs cite or anywhere else in her testimony. Natick admits that Ms. Coellner testified to the rest as her opinion of C.D.'s progress, but

notes that Ms. Coellner admitted that she did not conduct any formal evaluations and did not formally measure any progress. R.1715, *ll*.19-22; R.1717, *ll*.11-19.

66.    Ms. Coellner testified that C.D. felt like part of the group at McAuliffe, she didn't feel special; she was one of the kids, laughing and joking in the hallway, and spending time with friends socially after school. (A.R.1700).

**Response**:  Natick admits that Ms. Coellner testified that she thought C.D. felt as if she were part of the group, was "one of the kids," and was joking in the hallway and spending time with friends after school, but denies that she testified that C.D. didn't feel special because that statement is nowhere in Ms. Coellner's testimony.  Furthermore, Ms. Coellner drew these conclusion from her observations.  She acknowledged that she did not have conversations with C.D. about her feelings.  R.1700, *ll*.11-24.

67.    Ms. Flax testified that in 2007, C.D. presented with a severe language-based learning disability due to her overall cognitive profile; she didn't initiate verbal language, and was basically answering questions in one to three words. (A.R.1848).

**Response**:  Natick admits that is what Ms. Flax testified.

69.    Ms. Flax testified that at McAuliffe, C.D. was in an environment where the bar was set high, she had models she could emulate, and she was growing because of this...she was in an environment where she felt more socially engaged and was more motivated to use her language, and as a result, her attitude changed dramatically; she started talking and wanting to come to sessions..."I know for sure that her language was beginning to progress and she was eager to develop more language." (A.R.1848).

**Response**: Natick denies that Ms. Flax testified that C.D. had models she could emulate at McAuliffe because there is no testimony at R.1848 to that effect. Natick admits that Ms. Flax testified that the rest of the quoted language was her opinion.

69.     The Parents filed a request for hearing with the BSEA on November 17, 2010, when C.D. was in 7th grade. (A.R.4116).

**Response**: Admitted.

70.     A hearing was held at the BSEA on February 15 and 16, 2011, and a decision was issued on March 24, 2011. (A.R.4116).

**Response**: Admitted.

71.     On May 2, 2012, the Parents contacted Natick to request a meeting because C.D. would be graduating from McAuliffe in June 2012 and returning to Natick for extended year services (ESY) and High School. (A.R.161).

**Response**: Natick admits that the Parents contacted Natick on or about May 2, 2012, to request a Team meeting to discuss C.D.'s potential enrollment in Natick for the 9th grade and for extended year services. Natick denies that the Parents intended to return C.D. to Natick because there was evidence that as of June, 2012 they intended to place C.D. at Learning Prep. *See* R.4054.

72.     In anticipation of the meeting, the Parents forwarded C.D.'s 8th Grade IEP from McAuliffe (A.R.163), her most recent Psychoeducational Evaluation (A.R.177), and Neuropsychological Evaluation (A.R.238), and Speech and Language Evaluation (A.R.222), and a copy of the Natick High School 9th Grade Course Selection List which C.D. and her McAuliffe guidance counselor, Sara Shapiro, had completed, circling and initialing all college prep level courses for C.D. per the recommendations of C.D.'s teachers. (A.R.2750).

**Response**: Natick admits that the Parents provided information. Natick denies the statement about the course selection. There is no evidence in the record that C.D.'s guidance counselor helped C.D. complete and circle the course selection list and that the teachers recommended the courses selected. The form is unsigned. R.2750-2753.

73.     Ms. Gina Dalan, Natick's former Director of Special Education, informed the Parents that if they decided to complete the registration paperwork, she would "send someone over to the charter school to complete an observation and speak with C.D.'s teachers, both of which will help us develop an effective plan to insure (sic) that C.D. has a successful transition." (A.R.268).

**Response**: Admitted.

74.     Ms. Dalan coordinated and scheduled an "informational" meeting for May 24, 2012. (A.R.268).

**Response**: Natick admits that it held a meeting on or about May 24, 2012.

**The May 24, 2012 Team Meeting**

75.     The Parents brought Ms. Coellner, Ms. Soden, Ms. Flax, and Dr. Imber to the meeting on May 24, 2012. (A.R.270).

**Response**: Admitted.

76.     The Parents indicated that their goal for C.D. in Natick High School was a continuation of the inclusion program C.D. completed at McAuliffe and from which she obtained both academic and social benefits. (A.R.273).

**Response**: Natick admits that C.D.'s father stated that was his goal and that he claimed she had benefitted academically and socially from inclusion.

77.     The Parents informed Natick of the other options that they were considering for high school, including technical high schools (which only offered life skills programs, and therefore would be inappropriate for C.D., and Charter Schools, which unfortunately had extremely long waiting lists). (A.R.315).

**Response**:  Natick admits that the Parents informed it that they were considering vocational schools and charter schools.  Natick adds that the Parents did not inform Natick that they were considering Learning Prep.  R.4054.

78.     Natick described the three available models at Natick High School: (1) Inclusion; (2) Replacement classes, where all students are on an IEP, small classes are taught by a special education teacher, the curriculums are the same but taught with modifications; and (3) the ACCESS program, which is a substantially separate life skills program with a further modified curriculum. (A.R.294).

**Response**:  Natick admits those are the three programs offered at Natick High School but denies that the Access program is, or was described as, a life skills program.  R.294.

79.     Natick indicated that ACCESS students do not take the MCAS or receive a high school diploma (A.R.295); that students in Replacement classes are on the diploma track and that students in the ACCESS program are not. (A.R.295).

**Response**:  Denied.  Natick staff testified that the program is very individualized and some students take the MCAS Alternative, while others take the MCAS.  R.2396, *ll.*7-15.

80.     Natick explained that pursuant to the law for transfer students, they were required to provide services that were comparable to the current IEP; however, "we could agree to start C.D. in the ACCESS program based upon the information we have currently." (A.R.314).

**Response**:  Admitted that Natick made that statement.  Natick adds that it explained at the meeting that replacement classes would be the most comparable setting to C.D.'s placement and services at McAuliffe given class sizes.  R.282, *ll.* 22-24; R.317, *ll.*1-4; R.319, *ll.*9-16.

81.     The Parents reiterated that their goal was for C.D. to obtain a high school diploma. (A.R.319-320).

**Response**:  Admitted.

82.     Natick referenced Dr. Imber's report and determined that inclusion would not be successful..."I'll be very upfront here: I can't imagine looking at this report offered by another family, and saying to that family 'Let's consider full inclusion.' So knowing the expectation for inclusion classes, I would have significant concerns about her success..." (A.R.317).

**Response**:  Admitted.

83.     Parents described the educational model at McAuliffe and C.D.'s success with supplementary supports and services in the general education classroom. (A.R.317).

**Response**:  Denied.  R.317 is not support for Plaintiffs' claim that Parents described the educational model at McAuliffe or C.D.'s success in the general education classroom.

84.     Natick responded, "That could not happen here...because it doesn't happen, because public schools have their own staff and their own experts, and they don't allow outside people to come in and teach their students in their classroom. No public school would allow that." (A.R.317).

**Response**:  Admitted.  Natick adds that its explanation relates to allowing individuals like Ms. Coellner and Ms. Soden to come into the classroom as paraprofessionals employed by parents and at parents' expense.

85.     When the Parents noted, "McAuliffe is a public school," Natick responded, "Well, O.K. Then I guess I'll just say Natick. But in my experience, I've never heard of that ..."  (A.R.317).

**Response**:  Admitted.

86.     Natick stated, "I'm not criticizing what happened [at McAuliffe], but I'm just trying to explain what would happen here, and I think that I'm hearing from Gina and from everybody, and I know I feel the same way...is...the replacement classes would be much more comparable to what she's getting at McAuliffe than the general ed. setting." (A.R.318).

**Response**:  Admitted.

87.     The Parent's requested information about transition services. (A.R.327).

**Response**:  Denied.  The Parents did not ask for information about transition services at this meeting.  R.270-329.

88.     Natick mentioned the ACHIEVE Program, which is a public community day program for ACCESS students aged 18-22 years old in a community-based location; there was no mention of earlier transition programs or services. (A.R.327).

**Response:**  Denied.  The ACHIEVE Program is for any Natick student, aged 18-22, not just those in the Access program.  Some participants have met high school diploma requirements.  R.327, *l.*21 – R.328, *l.*12; R.2231, *l.*4 – R.2232, *l.*21.  The goal is to ensure that the students have the transition services necessary to succeed.  R.2231, *l.*4 – R.2232, *l.*21.

89.     The Parents provided their completed registration paperwork to Natick on May 29, 2012, requesting an opportunity to observe the recommended program(s) at Natick as soon as possible. (A.R.360-372).

**Response**:  Natick admits that the Parents asked to observe, but denies that they asked to do so "as soon as possible."   Parents said in a letter:  "Given the limited time left before the end of this school year, please let me know, at your earliest possible convenience, which programs will be available for observation." R.360.  Due to scheduling complications, including MCAS, Special Olympics, and the start of final exams, there were no opportunities available to observe.  R.370.

90.     On May 31, 2012, Ms. Dalan observed C.D. at McAuliffe. (A.R.2771).

**Response**:  Admitted.

91.     On June 5, 2012, Ms. Dalan informed the Parents that after observing C.D. in her inclusion classes at McAuliffe, speaking with some of her teachers, and reviewing some of her work samples, the self-contained ACCESS class at Natick would be appropriate; however, "in the spirit of cooperation and our attempt to provide a comparable IEP for C.D., we would be proposing all [Replacement] classes." (A.R.2771).

**Response**:  Natick admits that Ms. Dalan sent a letter and that letter speaks for itself.

92.     Ms. Dalan also indicated that "due to scheduling complications" ...there were no available opportunities for the Parents to observe the programs at Natick prior to the fall. (A.R.2771).

**Response**:  Natick admits that Ms. Dalan sent a letter and that letter speaks for itself. *See also* the response to item 89, *supra*.

93.     On June 13, 2012, the Parents' attorney contacted Natick to express their concern that it is not in C.D.'s best interest for Natick to be "placing C.D. in a program that they clearly believe is inappropriate and then within the first couple of weeks of school 'after C.D. has had some time to adjust,' propose moving her to a difference program solely to comply with the regulations [for intrastate transfer students]; the Parents requested a team meeting during the summer so that Natick could develop a new IEP [in accordance with the more extensive procedures required for the development of a new IEP]. (A.R.374).

**Response**:  Natick admits that it received a letter from the Parents' attorney on June 13, 2012.  The letter speaks for itself.  R.374-75.

94.     On June 19, 2012, Ms. Dalan sent an email to the Parents, indicating that when she observed C.D. at McAuliffe, she "was sitting quietly, sometimes taking notes, and other times working to complete given assignments...I did not see her private tutor working with her." (A.R.377).

**Response:**  Natick admits that Ms. Dalan sent an email on June 19, 2012, and the email speaks for itself.  Natick adds that the Parents did not quote the entire paragraph.  Ms. Dalan said that C.D. was "sitting quietly, sometimes taking notes, and other times working to complete given assignments. *I saw her special education teacher work with her in her history/social studies class, she appeared to be clarifying directions*.  I did not see her private tutor working with her."  The bolded, italicized language is the language plaintiffs left out of their "quote" in paragraph 94.

95.     On July 12, 2012, Ms. Dalan sent an email to the Parents indicating that Natick's recommendation of the ACCESS program was based on the discussion at the meeting on May 24, 2012. (A.R.4050).

**Response**:  Denied.  Ms. Dalan sent an email on June 19, 2012, not July 12, 2012.  This email speaks for itself.  R.4050.

96.      On July 18, 2012, the Parents' attorney contacted Natick to follow up on their request for a team meeting during the summer. (A.R.380).

**Response**:  Denied.   The Parents attorney sent a letter on July 13, 2012.  R.380.  The letter speaks for itself.

97.      In anticipation of a team meeting in the summer, the Parents requested copies of Ms. Dalan's notes or her report from her observation of C.D. at McAuliffe.

**Response**:  Natick admits that the Parents requested copies of notes from Ms. Dalan's observation.  Natick has no knowledge of whether parents requested the copies in "anticipation of a team meeting in the summer" and Plaintiffs cite no evidence to support that contention. R.377-78.

98.      In response, the Parents were informed that Ms. Dalan did not take notes, that a report was not required, and that Mr. Tim Luff would be replacing her as Director of Special Education as of July 2, 2012; Ms. Dalan had indicated that her "observation was really not intended to change what we talked about at the meeting ...our recommendation of the ACCESS class for C.D. came from our discussion at the meeting and Dr. Imber's Report." (A.R.377).

**Response**:  Natick admits that Ms. Dalan emailed the Parents on June 19, 2012.  The email speaks for itself.  R.377-78.

99.      Natick scheduled a meeting for July 27, 2012 to develop a new IEP for C.D. (A.R.2770).

**Response**:  Admitted.

**The July 27, 2012 Team Meeting**

100.     Ms. Coellner, Ms. Soden and Dr. Imber attended the meeting on July 27, 2012 with the Parents to present information about C.D.'s strengths, needs and progress at McAuliffe. (*See* A.R.270-382).

**Response**:  Admitted.

101.     There was no one present from Natick at the meeting who knew C.D. directly or indirectly, even though the academic teacher and the speech and language teacher from the ESY program had both worked with C.D. just a few weeks prior to the meeting. (A.R.2770).

**Response**:  Denied to the extent that the Parents suggest that Natick had an obligation or reason to require anyone from the ESY program to attend the Team meeting.  The extended school year staff had worked with C.D. for only five weeks, and were unlikely to provide significant, meaningful information.  R.2325, *ll.*13-18.

102.     Ms. Dalan, the only person from Natick who had observed C.D. at McAuliffe, was no longer employed by the district and therefore did not attend the meeting. (A.R.2770).

**Response:**  Natick admits that Ms. Dalan observed C.D. at McAuliffe and that she did not attend the meeting because she was no longer employed by Natick.

103.     There was no teacher from the ACCESS program in attendance. (A.R.2770).

**Response:**  Denied.  A high school special education teacher, Ms. Bresnick was present at the meeting.  R.384, *ll.*22-23; R.478, 2770.

104.     There were no guidance counselors in attendance. (A.R.2770).

**Response**:  Admitted, but states that Natick had no legal obligation or other reason to have a guidance counselor at the meeting.

105.     Natick noted that the purpose of the meeting was twofold: to discuss C.D.'s transition to high school, and to develop a new IEP to meet her needs at high school rather than waiting until the fall. (A.R.385).

**Response**:  Admitted.

106.     Natick indicated that it would accept Dr. Imber's test scores for the purpose of the "current evaluation results" section on the IEP. (A.R.396).

**Response**:  Admitted.

107.     Dr. Imber cautioned that while his test results are certainly helpful, it was important to consider the direct experience of Ms. Coellner and Ms. Soden and not just the test scores alone. (A.R.396).

**Response**:  Natick admits that Dr. Imber made this statement.

108.     The Parents expressed their concerns, including whether C.D. would be with peers who had emotional/behavioral challenges, and how C.D. would access the general education curriculum; they were particularly concerned about the reduction in ELA services from five 45-minute sessions to two or three 80-minute sessions as a result of the block schedule. (A.R.386).

**Response**:  Denied.  In the page that the Parents cite, Mrs. McGovern summarized parental concerns.  The Parents did not express the concern stated in paragraph 108.  R.386. C.D.'s father did not state that he was "concerned" about the scheduling of English Language Arts, but asked how scheduling works for someone like C.D. with memory deficits.  Id.

109.     Nan Coellner asked whether there are students with autism in the ACCESS program. (A.R.416).

**Response**:  Admitted.

110.     Natick responded, "No." (A.R.417).

**Response**:  Admitted.

111.     The Parents asked whether there are students with emotional or behavioral issues in the ACCESS program. (A.R.418).

**Response**:  Admitted.

112.     Natick responded, "Some of the kids have – It's not behavioral *disabilities* [emphasis added]. Some have...multiple challenges..." (A.R.418).

**Response**:  Denied.  The language quoted is from the transcript of the July 27, 2012, Team Meeting and does not accurately reflect the nature of the disabilities of the students in the program.  The second sentence and those that follow it are as follows:

> Some of the students have multiple challenges, so they may have
> disabilities in the area of communication and also in reading, or
> they might have -- There's one person in the program who has a
> health disability as well as a disability in the area of
> communication.  But it's not a behavioral program it's not a
> social/emotional program.  It's typically the social/pragmatics,
> communication, and the -- sort of the intellectual sort of global
> academic and cognitive needs that are in the program.

R.418.

113.     Ms. Coellner observed the ACCESS program in November 2014; she testified:

a.     "[S]tudents in the class were somewhat disruptive...walked around..ate.

b.     There was a film showed...and one boy was slapping his face throughout the film. There was one student who had a 1:1 para who yelled out during the class, would scream out things."

(A.R.1703-1704, *see generally* A.R.1691-1745).

**Response**:  Natick admits that Ms. Coellner alleged that she observed those incidents.  Natick denies that those incidents occurred.  During her testimony, Ms. Michelson

demonstrated the actions that a student displayed. R.2305, *ll.*9-15. She testified that it was not disruptive. Id.

      114.    Ms. Flax observed the ACCESS program in June 2014; she testified:

        a.    One of the students was very disruptive; he was stimming and humming; there was very little social interaction between the students.

        b.    At least one, possibly two, were nonverbal.

**Response**: Natick admits that Ms. Flax testified as such, but she acknowledged that she did not actually know if any student was nonverbal (R.1886, *ll.*9-11), testifying: "I don't know, because no one would give me the profile of the children. But what I do know is the children were not talking to each other or the teacher. So my sense is, even if there were no nonverbal children in that class, there were children who either didn't have the language or weren't using it." R.1886, *ll.*11-17.

      115.    Dr. Imber observed the ACCESS program in June 2014; he testified:

        a.    [T]here was one student that was kind of making a lot of loud vocalizations.

        b.    Another student "got out of his seat to sharpen his pencil, and it seemed pretty normal, except that once he started, he wouldn't stop. And he was asked to stop several times, and he just kept sharpening the pencil.

**Response**: Admitted that Dr. Imber testified that he observed these incidents. Dr. Imber added, however, "But I didn't see, in the classroom when I observed, I didn't see anybody throwing anything or I didn't see anybody screaming or yelling, but that student was making very loud vocalizations was certainly — you know, caught my attention." A.R.2051, *ll.*17-21. Further, when the Access teacher was questioned about whether there were disruptive students, he said: "No, I mean, students in my class are no different than typical kids. I mean no classroom is perfect. That's all I have to say." R.2458, *l.*22 – R.2459*, l.*4.

116.    Ms. Michelson testified with regard to the ACCESS program:

(A.R.2051, see generally A.R.2015-2132).

a.    There are currently 11 students and 4 paraprofessionals in the program; 5 students in the 11th and 12th grade (four boys and one girl).

b.    The students have a range in disabilities from being diagnosed with autism, having intellectual disability, traumatic brain injury...

c.    Some students [only] have functional speech and language, there are no students that are nonverbal.

d.    When asked to define "nonverbal," Ms. Michelson responded, "I would say a student that is nonverbal has no verbal communication whatsoever."

e.    One student "has limited functional language...he is able to make basic requests. However, his conversational speech is one that [he is] currently still working on.

(A.R.2282-2320)

**Response:**  Admitted, except for (e).  Ms. Michelson said that one student "might have limited functional language; however, academically he does participate fully in the class. And all the students in the class participate in general ed electives and have the opportunity for inclusive general ed classes."  R.2311, Tr.Vol. III, p.132, *ll*.14-18.  She added, "I would just say that the student is able to answer questions when asked upon."  R.2316, *ll*.6-7.

117.    Mr. Francoise, the lead ACCESS teacher until October 2014 testified:

a.    In 2012-2013, there were eight (8) students - two (2) girls and six (6) boys, one of whom had a one-on-one aide. Most of them used conversation...*;*

b.    Students in 10th grade ACCESS do not take the standard MCAS and would need to be transferred to Replacement classes to do so; and

c.    It would be very unusual for a student like C.D. transferring into 9th grade from a general education program in another district, to be placed in ACCESS for all of his or her academic classes.

(A.R.2433-2483)

**Response:**  Admitted as to paragraph (a) and the composition of the classroom in the 2012-

2013 school year.  Denied as to the rest.  In terms of conversation, Mr. Francoise testified that "[m]ost

kids use conversation.  There are some students that need initiation for them to converse, but that's far

and few between.  We try to make situations in the classroom that engage all the students, and we put

them in situations where it promotes that interaction."  R.2444, *ll.*3-8.  In relation to the MCAS, Mr.

Francoise testified:  "As a matter of fact, students come to me in the ACCESS Program and, based

upon their performance and how we interpret things, if a student -- if I feel a student is kind of

borderline prior to the sophomore year, we put them into replacement classes.  So at various

times, we've had students that were brought into my program and who showed a lot of promise

and were placed in replacement classes.  And now, since that has happened, we've had

approximately six or seven kids able to pass the regular MCAS and who will now receive a

diploma."  R.2439*, ll.*11-21.  When asked about students transferring from a general education

program to Access, Mr. Francoise testified, "It's not typical."  R.2442, *l.*22.  He continued:  "I

don't know how to answer it, to be honest with you."  R.2442, *l.*24 – R.2443*, l.*1.

    118.  Mr. Francoise initially testified that there were no students with behavioral or

emotional issues in the 2012-2013 and 2013-2014 ACCESS classes, but then recalled that:

        a.    There was a student who would have outbursts that would be
            disruptive to the class;

        b.    There was a student with "chewing behavior," but "no
            classroom is perfect;"

        c.    There was a student with Selective Mutism, who
            communicated nonverbally through his laptop;

        d.    There was a student who often spoke in a rude tone to
            teachers and put his head down on the desk and refused to
            answer questions even when he knew the answers, who was
            very much lacking in social skills when he entered the

ACCESS class as a freshman and did in fact interrupt the class; and

e.      There was a student who transferred to ACCESS from the Northstar Program for students with serious emotional/behavioral disabilities.

(A.R.2433-2483).

**Response**:  Denied.  The Parents read isolated statements from IEPs and Mr. Francoise's testimony describes the students differently.  With respect to one student, he testified  "I think that refers to a student that would occasionally have an outburst of some sort…It could be at some point in time, yes. Those were far and few between."  R.2454, *ll*.16-17, 21-22.  He testified that the student with the chewing, "had that behavior that was extinguished quite quickly.  And this particular student happens to be a student that started in my class, is no longer in my class, and will obtain a diploma from Natick High School next year."  R.2458, *ll*.15-20.  He testified about the student who was allegedly mute as follows :

> He's a selective mute. But if you know this individual and become connected to this individual, he communicates nonverbally and via his laptop quite well.
>
> This particular student is another student that came to my program as a 9th grader, was in an ACCESS situation his whole life. And after seeing this student and realizing that this student didn't belong in my program, he was put into a replacement situation. And this particular student -- I know he has that challenge as a selective mute; however, this particular student is obtaining a diploma next month. So that's another success story for Natick.

R.2460, *ll*.1-13.

About the student in paragraph (d), Mr. Francoise testified:

> I believe I recall that student. When he entered the ACCESS Program as a freshman, he was very much lacking in social skills, and he was very immature.  However, this particular guy has come a long way. He took the MCAS Alt, because cognitively he's still significantly below grade level; however, this young man has done

- 33 -

some remarkable things. He obtained a driver's license, and he is
also completing his school time at Natick and moving on to the
Achieve Program. But he also has a full-time job, and he works for
Enterprise now.

So this guy here -- you know, typically, when kids come to the
high school, typical kids or ACCESS kids or whatever, there are --
I wouldn't consider them behaviors, but there are situations where
kids are immature and they have to conform to being young adults.

And it's a whole process when they're young. So when they come
to the high school, you know, it's not so much a behavioral thing as
much as them learning what's correct and learning how to conform
and act like young adults.

R.2461, *l.*12 – R.2462,*ll.*10.

119.    The Parents asked about transition services prior to age 18, and Natick indicated
that transition planning, which starts at age 14, would be discussed in October and the IEP would
be revised based on C.D.'s performance at that point. (A.R.392-393).

**Response**: Denied. Natick said that "we can talk about this a little bit later but I think
the team, the Natick Team, would reconvene in early October, early to mid-October to see where
C.D. is at that point, and talk about any revisions that may need to be made." R.393-93.

120.    Referring to C.D.'s IEP that was written in April, Natick noted that while C.D.
"seems to have made progress...C.D. does seem to continue to require a significant level of
support in order to produce work." (R.397).

**Response**: Denied. The quote is taken out of context. Natick said: "The IEP that was
written in April, and I know there's probably been some progress since then, but it looks like
C.D. does still continue to require a significant level of support in order to produce work. She
does seem to have made progress in the socialization and peer interaction realm." R.396, *l.*25-
R.397, *l.*4.

121.    Ms. Coellner and Ms. Soden clarified that C.D. had been in the regular education setting, kept up with the class, read the same books, and had been part of the regular classroom, that "significant support" was not accurate, and that she only needed occasional support, was making progress and doing well; Ms. Coellner and Ms. Soden emphasized the significance of observing C.D. to confirm their statements. (A.R.397-398).

**Response**:  Denied.  Ms. Coellner testified that "I know that she would need you to break things down, she would need graphic organizers, she would need to take the test modified."  R.398, *ll*.7-9.  She added:  "[C.D.] has trouble with inference and those things but she can get the basic, objective meaning from text:  'What's the boy's name? What was the color of the dog? Where did they go?' She can give you factual information.  She does need help with inference and more abstract parts from reading."  R.399, *ll*.17-22.

122.    Ms. Coellner and Ms. Soden emphasized that C.D. was able to access the general curriculum at McAuliffe and worked really hard because she wanted to do well; because she wanted to be in a regular class. (A.R.398)

**Response**:  Admitted that Ms. Coellner and Ms. Soden so testified.  Their testimony was not based upon or tied to any concrete measurements. R.397-398.

123.    The Parents expressed concern that the block schedule in all three of the Natick High School programs would fail to address C.D.'s individual needs because she requires continuity due to her memory deficits." (A.R.408).

**Response**:  Admitted that the Parents expressed that concern.

124.    Natick responded that because ACCESS is a self-contained program, subjects can be infused together. (A.R.408).

**Response**:  Admitted.  According to Natick at the July 27, 2012, Team meeting

there are cases of this program that are infused throughout –
Because it's a program, the teacher and the staff of the program do
infuse instruction in ELA and Math; they try to integrate that into
the other content areas as well – They teach many of the classes.
The teacher would not – It's not like he would be using reading
and writing strategies, for instance, in the Current Events and
History class, reinforcing what the students are also learning in the
reading class. So it helps students – There is reading and writing
across the curriculum because she's – It's a self-contained
program, to an extent; students are included in electives, which I'll
talk about in a minute.

R.408, *l.*20 – R.409, *l.*7.

125.    Ms. Coellner noted her concern that C.D. would be isolated in ACCESS,
"Because she is a very normal, regular teenager like all normal, regular teenagers, who has the
same interests in fashion and music and television and all that." (A.R.421).

**Response**:  Natick denies that Ms. Coellner noted a concern about isolation, but admits
the quote.  Natick explained that "[C.D.] would be with these students during some of the core
academic classes that she's in because those are the special education services and classes, where
they do take the modified curriculum.  But in the electives, she would be with – My
understanding is she's with general ed. students . . ."  R.420, *ll.*13-17.

126.    Natick reiterated that C.D.'s current performance level is low, and "what is a little
bit difficult in hearing you describe her performance is that her scores are so low, that what
you're describing is so inconsistent with the scores – "I mean...what I'm hearing; that there is a
huge discrepancy...we've been to the BSEA even had a hearing, so we've had a lot of experts
come in...we know this case, we know C.D.  I mean, you know, she hasn't been in Natick but as
far as a student who hasn't been in Natick, I feel that the team knows her, because we have had
the experience of going through the BSEA hearings, that I'm hearing a huge discrepancy."
(A.R.402).

**Response**:  Denied.  This is a quote from Natick's counsel.  To the extent Plaintiffs' statement of facts is intended to be presented in chronological order, this quote should be before the one in Paragraph 125.

127.    The Parents asked about Ms. Dalan's report from her observation of C.D. at McAuliffe; Natick responded that "She did not generate a report because what Tim said, it was really just sort of a much more informal way of looking at C.D. at McAuliffe, and the impression that I got from Gina, in speaking with her, echoed what I think we talked about at the [May] meeting, which essentially was we were looking at what is a comparable IEP and we decided that if we're looking straight at the IEP, 'comparable' is probably the replacement classes ... what Natick actually think[s] is appropriate to meet her needs ...what Gina told me after that observation, and I know what she and the rest of the Natick team felt when we met in May is that she needs to be in the [ACCESS] program; ...which is what we felt she needed when we had a hearing at the [BSEA]." (R.402-403).

**Response**:  Admitted.  Natick adds that Ms. McGovern further stated that "I don't think the team's impressions have changed, because I don't think that C.D.'s presentation has changed very –" R.404, *ll.*1-10.

128.    Ms. Coellner expressed concern that they were not given the opportunity to observe the ACCESS program in June; she expressed concern regarding C.D.'s access to regular education books because they worked very hard for C.D. to write three and four-page compositions and read and take notes and highlight, and she might lose those skills in ACCESS. (A.R.410-411).

**Response**:  Denied.  Ms. Coellner did not express concern about not being able to observe.  She said:  "I think it makes sense.  Marcia and I had wanted to come visit the program

in June so we could help you modify a schedule for her, but we weren't able to do that." R.411, *ll.*12-14. Natick admits that Ms. Coellner referred to C.D.'s writing three and four page compositions. Natick adds that Mr. Tagliapietra responded: "Well, we would take where she is now and push forward." R.410, *ll.*12-13.

129. Natick responded that "the ACCESS program serves kids that do have cognitive, communication, social/pragmatic deficits or disabilities in those areas. C.D. would, on paper, fit into that category; she has an intellectual disability and also issues with communication and social/pragmatic." (A.R.406).

**Response**: Denied. This statement was not in response to the concerns expressed in Paragraph 128 as it occurred chronologically before Paragraph 128. Admitted as to the quote.

130. The Parents reiterated that C.D. read the books on the Natick 9th grade syllabus in 8th grade and asked why inclusion with supports and services would not be possible in the general education class, especially since she already read the books. (A.R.413).

**Response**: Denied. This statement was not a response to Paragraph 129. R.406. Additionally, this was not a "reiteration" because the Parents had not mentioned it previously at the meeting. R.413.

131. Natick responded that, "Well, given C.D.'s level of need, and given some of the other activities that go along with those -- It's not just decoding the text; it's also inferencing, it's instructing meaning from the text, and it's working on a textual analysis at a high-school level, and I think we believe that the most appropriate place for her to truly access the curriculum would be in the ACCESS program." (A.R.413).

**Response:** Admitted.

132.    The Parents asked, "Instead of doing that, why don't we go the other way? Put her in the general education with support, and see what she can do. And if she doesn't work, well then we move her down." (A.R.413).

**Response:**  Admitted.

133.    Natick responded, "Personally, I would not recommend that based on the IEP that I see in front of me, and in consultation with my team." (A.R.413-414).

**Response:**  Admitted.

134.    The Parents asked whether C.D. could succeed in the Replacement classes [with supplementary supports and services]? (A.R.414).

**Response**:  Denied.  Natick does not see any such question on R.414.

135.    Natick replied, "based on what we're seeing on paper, the team is saying the ACCESS program."  (A.R.414).

**Response**:  Admitted.  Natick  continued:  "But I think you've heard a lot of flexibility within that program, and there's no desire to keep a student in that program who doesn't need to be in that program.  It's actually quite the opposite, so there's a lot of encouragement and opportunity to move forward."  R.413*, ll.*9-14.

136.    On July 30, 2012, the Father requested additional information regarding the ACCESS program, and copies of C.D.'s work from ESY to assist them in making a decision regarding the IEP that would be proposed for C.D. (A.R.451).

**Response**:  Admitted that C.D.'s father requested additional information.  Denied on the reasons for the request as there is no evidence of the reason on that page.  R.451.

137.    On July 31, 2012, Natick responded that a proposed IEP had been mailed and that "regarding your request for information about the ACCESS program, you raise good questions...I

suggest that you, [C.D.'s mother] and I meet with Jim Francoise, the lead teacher of the program,

at the beginning of the school year..." (A.R.453).

**Response**:  Admitted.

## The Proposed IEP for 2012-2013 (dated July 27, 2012-April 4, 2013)

138.    On August 1, 2012, Natick provided the Parents with the proposed IEP for the

2012-2013 school year, recommending the ACCESS program for all of C.D.'s academic classes.

(A.R.2628).

**Response**:  Admitted, except as to the date.  The IEP was issued on July 30, 2012.

R.2619.

139.    The proposed IEP did not include a transition plan. (A.R.2628).

**Response**: Admitted.  There was no transition plan, but Natick did not have sufficient

information at the July, 2012 meeting to develop a transition plan. The additional information

section states:  "The Team will reconvene in October 2012 to discuss C.D.'s progress and

ongoing transition to Natick High School and to make revisions to the IEP as necessary.  At this

time, the Team will also develop a transition plan for C.D."  R.2619.  Moreover, Natick notes

that the IEP contained transitional services, such as a vocational services.  R.2617.

140.    On August 14, 2012, the Parents rejected the IEP for multiple reasons, including

the lack of a transition plan, and placement in the ACCESS program for all of her academic

classes. (A.R.3427).

**Response**:  Denied.  The IEP speaks for itself.  R.2602-2621.  The Parents' rejection

speaks for itself.  R.2623-24.  Parents' rejection is dated August 9, 2012.  Id.  It includes no

mention of the transition plan.  Id.  It is the letter from the Parents' attorney, notifying Natick of

the Parents' intent to unilaterally place, dated August 14, 2012.  R.3427.  The August 14, 2012

letter does not mention a transition plan either.  R. 3427.

141.    The Parents provided Natick with notice on August 14, 2012, that they would be unilaterally placing C.D. at Learning Prep for the 2012-2013 school year and seeking reimbursement from Natick. (A.R.3427).

**Response:** Admitted.

## The May 22, 2013 Team Meeting

142.    Natick scheduled a meeting for May 22, 2013 for C.D.'s annual review (A.R.3413).

**Response**:  Admitted.

143.    There was no one from Learning Prep in attendance at the meeting. (A.R.3306).

**Response**:  Natick admits that no one from Learning Prep was at the meeting.  Natick adds that it had reports from Learning Prep teachers in the areas of history, biology, and language arts/literature, and that it reviewed the information provided.  R.566-68; R.571.

## The Proposed IEP for 2013-2014 (dated May 22, 2013-May 22, 2014)

144.    Following the meeting, Natick proposed an IEP for the 2013-2014 school year, which was practically identical to the IEP proposed for the 2012-2013 year, indicating that due to a lack of information, it was unable to update C.D.'s current levels of performance. (A.R.2628).

**Response**:  Natick admits that it proposed an IEP for the 2013-2014 school year.  The IEP for the 2013-2014 and 2012-2013 school years speak for themselves.  R.572-591; R.2581-2602.

145.     Ms. McGovern, Natick's Director of Student Services, testified that the IEP proposed for the 2013-2014 school year had few if any changes from the IEP proposed for the 2012-2013 school year based on the lack of information given to the chairperson, Ms. Molinari-Bates, prior to the meeting; she admitted that the Evaluation Team Leader usually makes attempts to obtain information, but since she was not chairing the meeting, she did not know whether Ms. Molinari-Bates had invited Learning Prep School staff or requested information. She testified that the 2013-2014 proposed IEP was appropriate "based upon information Natick had at the time." (A.R.2360; *see generally* A.R.2343-2347).

     **Response**:  Admitted that Ms. McGovern said that "[t]here were very few, if any, changes made to that IEP, based on Ms. Molinari-Bates' lack of sort of meaningful information from providers at Learning Prep at that point" and that the IEP was appropriate. R.2360, *ll.*12-15.  Natick denies the statement related to requesting information.  The question was:  "I'm sorry, did you say you invited Learning Prep to attend that meeting."  Ms. McGovern responded:  "I don't recall.  That would be something that Barbara Molinari-Bates – at this point I wasn't chairing – I had chaired one meeting, but I was leaving the chairing of these other meetings to her."  R.2360, *ll.*16-22.  She then added "I believe that she had received some feedback from Learning Prep teachers the following year, but I would have to check in the exhibit book."  R.2360, 181, *l.*24 - R.2361, *l.*2.

146.     Ms. McGovern testified that the more we know the student, the more we can perfect the transition plan, but admitted that no transition assessment was conducted between 2012 and 2014, and that, in fact, there were no assessments at all conducted between 2012 and 2014. (R.2360; *see generally* R.2343-2347).

**Response**: Denied. Ms. McGovern said that: "We did not conduct a ***formal*** transition assessment between 2012 and 2014." R.2392, *ll.*18-22 (emphasis added).

147.    The Parents rejected the IEP proposed for the 2013-2014 school year for the same reasons they rejected the IEPs for the 2012-2013 school year, including, but not limited to, that the IEP continued to propose placement in the most restrictive program for all of C.D.'s academic classes, which would have not prepared C.D. for the MCAS and would not have led to a high school diploma, the block schedule, and the lack of an appropriate transition plan. (A.R.3424).

**Response**: Denied. The Parents' letter speaks for itself. R.3424. Natick notes that the letter does not reference any of the reasoning set out in Paragraph 147. Id.

## The 10th Grade MCAS

148.    C.D. passed the ELA MCAS in 10th grade and almost passed the MCAS in Math and Science/Technology, missing by only a few points. (A.R.3901).

**Response**: Natick admits that C.D. passed the MCAS in ELA in 10th grade, but did not pass MCAS in Math and Science/Technology.

## The April 15, 2014 Team Meeting

149.    On April 15, 2014, Natick held a team meeting for C.D.'s Annual Review. (A.R.3282).

**Response**: Admitted.

150.    Natick informed the Parents that it would be conducting a psychological evaluation, a speech and language assessment, and academic achievement testing as part of C.D.'s 3-year reevaluation. (A.R.3282).

**Response**:  Natick admits that it proposed a psychological evaluation, a speech and language assessment, and academic achievement testing as part of C.D.'s 3-year reevaluation. Natick states further that it first proposed this testing on March 12, 2014.  R.597.

151.    Natick did not propose a transition assessment. (A.R.3282).

**Response**:  Natick admits that it did not propose a formal stand-alone transition assessment as part of the three year reevaluation.

**The First Proposed IEP for 2014-2015 (dated April 15, 2014-April 15, 2014)**

152.    Following the meeting, Natick proposed an IEP that was substantially similar to the prior IEPs, which the Parents rejected for multiple reasons, including, but not limited to, that the IEP continued to propose placement in the most restrictive program for all of C.D.'s academic classes, which would have not prepared C.D. for the MCAS and would not have led to a high school diploma, the block schedule, and the lack of an appropriate transition plan. (*See* A.R.3282).

**Response**:  Natick admits that it proposed an IEP for the 2014-2015 school year.  The IEPs for the 2013-2014 and 2014-2015 school year speak for themselves.  R.572-591; R.2551-2580.  The Parents cite no evidence in the record documenting their basis for rejecting the IEP.

**The June 13, 2014 Team Meeting**

153.    A Team meeting was scheduled for June 13, 2014 to review Ms. Cymrot's Psychological Evaluation, Ms. Karian 's Speech and Language Assessment, and Mr. D'Angelo's Academic Achievement Testing. (A.R.1657).

**Response**:  Natick admits that it held a Team meeting on June 13, 2014, and that the meeting was held to develop an IEP and determine and determine placement as a result of C.D.'s three-year reevaluation.

154.    Natick proposed conducting a Transition Assessment in the upcoming fall when C.D. would be in her junior year. (A.R.3263).

**Response**:  Admitted.

155.    The Father testified that Natick reviewed the evaluations and suddenly informed the Parents that C.D.'s disability category should be "Communication" instead of "Intellectual".  (A.R.1657).

**Response**:  Natick denies the categorization of "suddenly."  Ms. Cymrot and the other evaluators discussed the results of the evaluation at a Team meeting June 13, 2014, in sixteen pages of transcript.  R.991-1007.  The Team then moved on to the eligibility flow chart as the process requires.  R.1006.  Ms. Cymrot explained why she believed that the proper category was "communication disability."  R.1007-1008.

156.    Ms. Cymrot stated [with regard to C.D.'s psychological evaluation] "the results are really very similar to what had been obtained previously ...In terms of cognitive functioning, C.D.'s scores were in the extremely low to borderline range. (A.R.991).

**Response**:  Denied.  This quotation is taken out of context.  Ms. Cymrot stated on R.991:  "The results are really very similar to what had been obtained previously.  The social, emotional and behavior domains appear to be her strengths as you might read in the report."  Then, two pages later in the transcript, on R.993, Ms. Cymrot states:  "So anyway, in terms of cognitive functioning, C.D.'s scores were in the extremely low to boarder line range.  Her non-verbal reasoning is very consistent with her verbal knowledge and reasoning.  And, it is quite similar to the findings for the testing that was done at the – in 2011."

157.    With regard to C.D.'s disability category, Ms. Cymrot stated, "...basically, I just wanted to state that up until now...the disability category that has been noted in the IEP is "Intellectual." Based on all the data here, that disability category is not really supported ...so, we are looking at noting her disability category as communication." (A.R.1006-1011).

**Response**:  Denied.  This quote is not from Ms. Cymrot.  It is from a "female speaker."  R.1006-1007.  The quote references Ms. Cymrot in third person, so it cannot be Ms. Cymrot speaking.  Id.  The quote in paragraph 157 is also not accurate.  The speaker said:  "And, basically, I just wanted to state that up until now, the last IEP that was developed was sort of carrying in from the school where it was developed was when she was at Christa McCalla [sic]. And, at that time, the disability category that has been noted in the IEP is 'intellectual.' Based on all the data here, that disability category is not really supported and I will let Ms. Cymrot speak to that."  R.1006-1007.

158.    In response to the change in C.D.'s disability category, the Father stated, "This is the first time I heard it ...it is upsetting, it has been intellectual disability for years, and so to hear the change..." (A.R.1006-1011).

**Response**:  Natick admits that C.D.'s father made these comments, although it notes again that the quotes are separated by a page in the transcript.  R.1008-1009.  Natick adds that after the quoted sentence, C.D.'s father added:  "But she has also had substantial language processing both receptive and expression over a long period of time."  Id.

159.    With regard to the proposed placement, Natick stated, "...based on all the information it probably would seem -be most logical, for C.D.to be in our small group English." (A.R.1011).

**Response**:  Natick admits that a female speaker made this statement.

## The 2nd Proposed IEP for 2014-2015 (dated June 13, 2014-June 13-2015)

160.    For the first time since July 2012 when Natick proposed its initial IEP, Natick now proposed a "blended" program for C.D. (A.R.2529).

**Response**:  Denied.  Natick proposed replacement classes in June, 2012.  R.370.

161.    Natick now proposed placement in the general education classroom for History, Replacement classes for English and Science, and Math and Reading (as opposed to English) in the ACCESS program. (A.R.2529).

**Response**:  The June 13, 2014, to June 13, 2015 IEP speaks for itself.  R.2529-2550.

162.    Although Natick proposed some classes in the general education classroom and some Replacement classes, they were still proposing the ACCESS program for Math, which would not have prepared C.D. for the Math MCAS and receipt of a high school diploma; in addition, a transition assessment had still not been completed. (A.R.2529).

**Response**:  Natick admits that it proposed social studies in the general education classroom.  It proposed math and reading comprehension through the Access program.  R.2528.  Natick proposed a transition assessment for C.D.  R.2528.  Natick denies that it would not have prepared C.D. for the Math MCAS or a high school diploma.  Natick demonstrated that students in the Access program were routinely placed in replacement

classes when their abilities and classroom performance indicated that it was appropriate, and that the replacement classes allowed students to access the general curriculum. R.2191, *ll.*2-8; R.2298, *ll.*20-23; R.2322, *ll.*5-13; R.2396, *ll.* 3-15; R.2439, *ll.*11-21; R.2440, *ll.*13-23.

163. On July 7, 2014, the Parents rejected the IEP and proposed placement for multiple reasons, including that a transition assessment had not yet been conducted, the total hours in the service delivery grid exceeded the hours available in the school's 4-day cycle so there appeared to be no time available for speech/language, the Math goal focused solely on multiplication, and placement in the ACCESS program for Math would only expose C.D. to functional math and would not prepare her for the MCAS. (A.R.3428).

**Response**: The Parents' rejection stands for itself. R.3420.

164. As a result, the Parents informed Natick that they had decided to exercise their right to obtain independent educational evaluations at their own expense, including, but not limited to, an assessment of C.D.'s activities of daily living (ADLs). (A.R.3427).

**Response**: Denied. R.3427 contains no notice of obtaining an independent evaluation.

165. The Father testified that one of the main issues at the team meeting in June 2014 was Natick's change in disability category for C.D. from Intellectual to Communication, which was suddenly announced by Natick without notice and which appeared to have clearly been determined prior to the meeting. (*See* A.R.1610-1690).

**Response:** Denied. The Father did not testify that "one of the main" issues was the disability category. He testified that "One of the things that bothered me was the change in disability category from intellectual to communication. That's another

surprising thing that happened in the June of 2014 meeting. I went to the meeting and it was sprung on me that her disability category was changed. I didn't know about it before I went to the meeting." R.1657, *ll.*8-14.

166.    The Father testified that while it is reasonable for teachers to discuss students amongst themselves regarding lesson plans etc., it is not appropriate to change the disability category – "that's a serious thing." (*See* A.R.1610-1690).

**Response**: Admitted that C.D.'s father so testified.

167.    Ms. Cymrot testified on direct exam with regard to the change in category: C.D. received a full scale IQ score between 66 and 74, which placed her in the extremely low range and borderline range for cognitive abilities and met the criteria for an intellectual disability based on her cognitive ability, but concluded that C.D.'s disability category should be communication instead of intellectual, because according to the DESE criteria, the social and practical domains must also be considered. (A.R.2139-2140).

**Response**: Denied. Ms. Cymrot provided the testimony referenced in relation to a question on observations. She said: "The 95 percent confidence interval places her score in the extremely low range, with a score between 66 and 74. So that 95 percent of the times that this test is administered, she would score somewhere within that range. So it really flanks the extremely low and borderline range." R.2139, *l.*19 – R.2140*, l.*1. She then continued in response to whether she met the criteria of intellectual ability: "In terms of cognitive ability, she would have, yes. But the criteria for intellectual impairment, according to DESE, is more than just cognitive ability. One has to look at practical domain and overall adjustment – overall

adjustment. And so part of this – yes, the social domain as well as the practical

domain." R.2140, *ll.*7-13.

168.    During cross-examination, Ms. Cymrot:

   a.    Admitted that she made the determination that C.D.'s
         disability category should be changed prior to the assessment of
         C.D.'s skills in the practical domain, which she knew would be
         assessed in the fall of 2014;

**Response:**  Denied.  Ms. Cymrot said that she could make the conclusion

because the practical domain had been assessed previously.  R 2159, *l.*20.

   b.    Conceded that she did not recall whether the team [including the
         Parents] used the eligibility flowchart required by DESE at the
         meeting on June 13, 2014 prior to the change in disability
         category;

**Response**:  Denied.  She testified:  "I would think so, but I don't recall."

R.2162, *l.*11.  She continued that "I mean, that's a normal part of a team meeting."

R.2162, *ll.*13-14.

   c.    Admitted that she referenced a prior assessment from 2003
         where C.D. was not diagnosed with an Intellectual Disability,
         but ignored the assessments from 2007 and 2008 diagnosing
         C.D. with an Intellectual Disability;

**Response**:  Denied.  Ms. Cymrot testified that she did not see a diagnosis of an

intellectual disability or mention of an intellectual impairment in the 2008 report.

R.2165, *ll.*22-24.

   d.    Indicated that she was not aware that all of Natick's proposed
         IEPs since 2008 indicated that C.D. had an Intellectual
         Disability because "I would not have seen or had access to the
         prior IEPs."

**Response**:  Admitted.

e.     Admitted writing an email to Ms. Molinari-Bates on May 15, 2014 stating that she did not need [C.D.'s] file, thereby confirming that she did not review C.D.'s entire record, and conceded that if she had known there were more recent assessments, she might have referenced them in her report;

**Response**: Denied. The email said that she no longer needed the file because she found all the records that she needed from two years ago. R.2167, *l.*17 – R.2168, *l.*2. She added that "I might have [used] if I had known. But I had seen the three-year repeated reevaluations that Natick had done, and then I was able to, as I said earlier, reference the 4/11 evaluation that was done, and that would have been in the prior three years. So I would have had no reason to think that there were other evaluations. 4/11 was three years prior to 4/14." R.2170, *l.*22 – R.2171, *l.*5.

f.     Admitted writing an email to Ms. McGovern, Barbara Molinari-Bates, Mark D'Angelo and Ms. Karian asking the recipients to "edit the report as needed;"

**Response**: Denied. She testified that "I would not have expected her to edit it. She would have told me what she disagreed with or thought needed further clarification. And I don't think that the edit would have referred to content, but to any grammatical mistakes or historical inaccuracies, but not the content of what I was saying." R.2172, *ll.*6-12.

g.     Had attended the team meeting on May 24, 2012 but "had not reviewed any records at all, other than listening to the report that Dr. Imber presented at that meeting," and actually did not review Dr. Imber's report until the day of the hearing; and

**Response**: Denied. Natick does not see any such statements in the cross examination of Ms. Cymrot.

h.     She did not know whether the change in C.D.'s disability category would affect her eligibility for services after graduation.

(A.R.293-310).

**Response**:  Admitted.

**The Observations and the Motion to Compel**

169.    On May 29, 2014, the Parents requested the opportunity for themselves and Dr. Imber and Ms. Flax, to observe the proposed program for C.D. at Natick High School, including both academic and non-academic components of the program. (A.R.3126).

**Response**:  Admitted that the Parents made the request.

170.    The Parents specifically requested "observations that are of sufficient duration and extent for the parents and their designees to observe the ACCESS program <u>and</u> meet with Mr. Francoise and the speech-language pathologist. (A.R.3126).

**Response**:  Admitted that the Parents made such a request.

171.    Observations were scheduled for Dr. Imber and Ms. Flax to observe the ACCESS program and general education gym class on June 10, 2014, and confirmed by email on June 9, 2014, in which Natick stated, "While we will permit the observers to ask Mr. Francoise brief factual questions related to their observation, the SLP will not be available." (*See* A.R.31263143).

**Response:** Admitted.

172.    The Parents' attorney forwarded the email from Natick to the Parents, Dr. Imber and Ms. Flax to inform them of the schedule, the unavailability of the SLP, and the conditions placed on their observations with regard to their conversations with Mr. Francoise. (*See* A.R.3126-3143).

**Response**:  Denied.  There is no evidence in the record that Parents' attorney forwarded the email.

173.     On June 10, 2014, Dr. Imber and Ms. Flax were accompanied by Ms. McGovern to observe the ACCESS program and general education gym class; although Dr. Imber and Ms. Flax did not agree with the conditions placed on their conversations with Mr. Francoise, they complied with them fully. (See A.R.3144-3154).

**Response**:  Denied.  Ms. McGovern was not present during the observation.  R.1795, *ll.*6-8.  Natick also denies the characterization that Dr. Imber and Ms. Flax complied fully with Natick's observation requirements.  R.1284.

174.     On September 14, 2014, as part of their independent educational evaluations, the Parents requested the opportunity for themselves and their evaluators/consultants, Ms. Coellner, Dr. Imber, Ms. Flax, and Dr. Roffman to observe the proposed program for C.D. at Natick, including both academic classes and lunch period. (R.3130).

**Response**:  Natick admits that the Parents requested the opportunity to observe the proposed program and have their evaluators observe the program.  Natick adds that observations were scheduled and that the arrangements for asking questions of teachers and service providers were addressed by the BSEA and were the subject of a BSEA order.  R.1399.

175.     Between September 15, 2014, and October 24, 2015, Natick's attorney sent multiple emails to the Parents' attorney specifying the conditions that would be placed on the observations; (for example, on October 23, 2014, Natick informed the Parents through their attorney, "these are observations, we are not setting aside a time for your experts to speak with Natick staff. Each visitor will have an escort who will be available to answer basic factual questions about what is being observed...we are not going to allow your experts to speak with Natick staff at any time prior to the IEP team meeting except for basic questions that might come up during the observation which relate to clarifying what is being observed.)" (A.R.3131).

**Response**:  Natick admits that it agreed to permit the Parents and their evaluators and consultants to observe the program, but that speaking with staff and asking questions was addressed by, and was the subject of, a BSEA order which permitted written questions.  R.1399.

176.     On October 24, 2014, at 1:00 PM (during the ongoing observations that day), Natick's attorney contacted the Parents' attorney and indicated that she was just informed that, "both Dr. Imber and Ms. Flax asked for time to talk with staff during their observations today. I do not think I could have been more clear with you about the fact that we were not going to allow this. Why were your people under the impression that they would be allowed to have these conversations? This is extremely concerning to me. They seem to think that they will be allowed to return and again we will not allow this.  Please explain to me why both Dr. Imber and Ms. Flax made these requests today after I had been explicit with you about the district's position?" (A.R.3140).

**Response**:  Admitted.

177.     The Parents' attorney contacted the Parents' evaluators, including Dr. Imber and Ms. Flax regarding their observations and was informed that they not only completely abided by the conditions placed upon them by Natick, but also, they were denied the opportunity to obtain even basic information. (*See* A.R.3144-3154, A.R.1168, A.R.1173).

**Response**:  Denied.  There is no evidence on the pages in the record Plaintiffs cite supporting paragraph 177.  In fact, Ms. Flax stated in her affidavit in support of Parents' motion to compel that during the October 24, 2014 observation, she asked questions of the teacher, Mr. Coleman.  R.3147, ¶27.

178.     Despite Natick's representation that the Parents' "experts had full access to observe and ask clarifying questions during the observations," the Parents' independent

evaluators and consultants did not have full access to observe and were not even permitted to ask basic questions during the observations. (*See* A.R.3144-3154).

**Response**: Denied. Ms. Flax swore in her affidavit that she received information from Natick and asked questions. R.3146-3147. Dr. Imber also swore in his affidavit that he was able to ask questions and received information from Natick. R.3151-3152.

179. On October 30, 2014, Natick's Attorney informed the Parents' attorney that, "...*The reason that the evaluators were not permitted to have substantive conversations with staff during their observation is that Natick had allowed this with your experts in the past and felt as though the conversations turned into interrogations.*" *(emphasis added)*. (*See generally*, A.R.732-944).

**Response**: Admitted.

180. The Parents' Attorney contacted the Parents' evaluators, including Dr. Imber and Ms. Flax regarding their observations and was informed that they behaved completely appropriately and had no idea what Natick was referring to. (*See generally*, A.R.732-944).

**Response**: Denied. Plaintiffs have not cited anything in the record to support paragraph 180.

181. The Parents' filed their Motion to Compel as a result of these incidents. (*See* A.R.3112).

**Response**: Natick admits that the Parents filed a Motion to Compel.

182. Dr. Roffman provided testimony regarding her unanswered questions following her observation of the transition class:

> "I think it was meant to be divided into two 40-minute sections; it was unclear. We were not allowed to ask questions... I wasn't sure how this 80 minutes fit together, and if what benefit it was, and

where it stood in terms of being steps towards curricular goals. I wasn't allowed to ask questions, so I wasn't able to discern that." (*See* A.R.1764).

**Response**: Denied. The quote is not accurate. Dr. Roffman did not testify to the first part of the quote. She testified: "And the period ended without a recap. There was no discussion about what had happened at the actual hands-on placements that I had observed earlier. So I wasn't sure how this 80 minutes fit together, and of what benefit it was, and where it stood in terms of being steps toward curricular goals. I was't allowed to ask questions, so I wasn't able to discern that." R.1764, *ll.*2-9.

183. Ms. Flax provided testimony regarding her unanswered questions following her observation of the English Replacement class:

> "I didn't have the chance to speak to Nick Coleman when I observed the [R]eplacement class... part of being a good placement is also the profile of children within the class, and since those questions weren't answered, I had no way to complete my report." (R.A. 1860-1861).

**Response**: Denied. There is no such quote in the record at R.1860-1861.

184. With regard to his observations of the proposed program, Dr. Imber testified:

> "I was not permitted to ask any questions whatsoever, so I was not able to really find out anything about the curriculum. I didn't see a syllabus...I didn't get to see worksheets... I wasn't really able to determine anything about the kids in the program or what the teacher's objectives were." (A.R.2057).

**Response**: Admitted that Dr. Imber so testified.

185. Mr. Francoise testified that when Ms. Flax and Dr. Imber observed the ACCESS program in June 2014, *they did not act in any way inappropriately*. *[emphasis added]*. (A.R.2470).

**Response**: Denied. The quote from Mr. Francoise is "No. They were fine."

R.2470, *l.*18.

186.    The hearing officer refused to allow Mr. Francoise to testify about the

allegations made by Natick against Dr. Imber and Ms. Flax with regard to their

observation of his class

> Parents' Attorney: "[w]ere you aware that the school district had accused them of interrogating you and making you feel..."
>
> Hearing Officer: "This is not relevant, and this is not an issue before me...I've already resolved the issue of evaluations and access to evaluations."
>
> Parents' Attorney: "This goes to administrative exhaustion and I need to have it on the record."
>
> Hearing Officer: "You can get the question on the record, but it's not relevant to this proceeding. So I'm not going to have the witness answer it." (A.R.2471).

**Response**:  Admitted that the hearing officer ruled that the question was not relevant.

Natick adds that the Parents are not citing the full transcript.  Please see R.2470-71 for the full

quotes.


**The November 14, 2014 Team Meeting**

187.    Natick scheduled a team meeting for November 14, 2014 to review the

Transition Evaluation which was finally conducted in October 2014. (A.R.3404).

**Response**:  Natick admits that it conducted a Team meeting to review the

transition evaluation.

188.    On November 13, 2014, the Parents sent evaluations conducted by their

Educational Evaluators to Natick in preparation for the team meeting on November 14,

2014. (*See* A.R.3662, A.R.3802, A.R.3876).

**Response**:  Natick admits that the Parents provided a neuropsychological evaluation and two incomplete evaluations.

189.    Given that the Parents' Motion to Compel was pending at the time of the team meeting, Dr. Imber's report and Ms. Flax's report were submitted to the extent that they could be completed pending the ruling on the Parents' outstanding motion. (*See* A.R.3662, A.R.3802, A.R.3876).

**Response**:  Denied.  There is no evidence on the pages cited for the reasons the reports were incomplete.

190.    Ms. Karian did not attend the meeting. (A.R.3401).

**Response**:  Admitted.

191.    Ms. Karian testified that she was unable to attend the meeting in November 2014 when Ms. Flax presented her report because she was attending a conference, did not know whether the Parents were previously informed that she would not be attending, and admitted that she would have attended the meeting if she had not been at a conference. (*See* A.R.2183-2215).

**Response**:  Admitted.

192.    Ms. Brown testified with regard to the vocational class observed by the Parents and Dr. Roffman; Ms. Brown explained that the students don't stay at the same job; at the end of the year, they choose which job in the rotation they like best, cookie packaging, wiping fitness equipment or setting up library books. (*See* A.R.2215- 2282).

**Response**:  Admitted that the students rotate through jobs.  Denied in terms of tasks.  Ms. Brown testified:

So we have students -- again, the rotation is, I mean, I think you saw some students prefer to do the cookie packaging, because they like the roteness and routine of it. And I have other students who refill all of the coolers. And obviously Natick High School is a huge school, so that's actually three students working together to do that, to refill all the drinks in the coolers.

We have three students working together as a team refilling all of the chips and snack displays. We have other students who help with the -- they have a breakfast snack cart in the morning. So there's an employee working there, and they assist with that, with taking payment, replenishing it, things like that.
We have another student who does preparation – he'll begin, actually this week, preparing for -- they have a new smoothy bar, so his job is to prepare the ingredients for the smoothy bar. So in the cafeteria itself there are a lot of positions.
. . .
And then we have students working in the fitness center, and then we have students working in the library. Some students, their jobs is to set up the displays of books. Some other students, their job is to set up the wall displays. They have a theme of the month, and they have to come up with the theme and then find all of the material.

Another student sets up all the PowerPoint presentations, which are slides that are presented on the flat screen TVs throughout the building. And thats his --

R.2276, *l.*8 – R.2277, *l.*20.

193.    When asked whether Natick could provide C.D. with vocational opportunities in her areas of interest, Ms. Brown testified that they could find something in the cafeteria she was interested in since she was interested in cooking and baking. (*See* A.R.2215- 2282).

**Response:**  Admitted.  Ms. Brown said specifically, **"**I mean, I think in the cafeteria certainly we could find something that -- she was interested in cooking and baking. We could find something more specific for her, yes." R.2277, *l.*23 – R.2278, *l.*2.

194.    Dr. Roffman testified that the after-school program proposed by Natick for the 2014-2015 school year was not reflected in the IEP itself and it was not clear how the objectives described on the Transition Planning Form could possibly be addressed in two 80-minute periods after school, and that, regardless, it was not appropriate for a student working on communication skills to be isolated in a 1:1 program. (*See* A.R.1745-1805).

**Response**:  Admitted that Dr. Roffman testified that that was her opinion.

195.    On cross-examination, Ms. Brown admitted that:

      a.      As of now, C.D. would be the only student in the proposed after-school transition program and conceded that it had never been implemented before;

**Response**:  Admitted that the after-school program had not been implemented before.  Denied as to the rest.  Ms. Brown said that "If that were to happen, then C.D. would probably be in the community, working on those skills with generalized peers."  R.2261, *ll.*10-12.

      b.      She was not qualified to testify with regard to the appropriateness of the change in C.D.'s disability category;

**Response**:  Denied.  She testified that she was not qualified to testify as to whether "adaptive daily living skills apply to making a determination of a student's disability category with regard to whether it's intellectual or communication." R.2259, *l.*18 – R.2260, *l.*2.

      c.      She did not know whether C.D. had passed MCAS or where she stood with regard to the requirements for graduation; and

**Response**:  Admitted.

      d.      She did not recall whether there was a transition plan in

the IEPs proposed by Natick prior to her employment in
August 2014.

**Response**:  Admitted.   R.2215- 2282.

## The 3rd Proposed IEP for 2014-2015 (dated November 14, 2014-June 13, 2015)

196.     The Parents had questions after the team meeting on November 11,

2014, and requested an additional meeting to address them; however, Natick responded

that another meeting was not necessary, forcing the Parents to reject the IEP and thereby

require a meeting to have their questions answered; a meeting was then scheduled for

January 7, 2015. (A.R.3400).

**Response**:  Natick admits that the Parents requested a second Team meeting and

that Natick did not believe another Team meeting was necessary.  There is no evidence

on the cited page concerning the reason the Parents requested the meeting or why they

rejected the IEP.  R.3400.

197.     Ms. McGovern admitted in her testimony that she recalled that the

Parents were not able to ask their questions in November because they ran out of time.

(A.R.2345-2425).

**Response**:  Denied.  Ms. McGovern testified that she felt the Parents always had

an opportunity to ask any questions during the meeting. R.2371, *ll.*5-9.  She said: "And

then in a rejection letter that I received for the IEP we proposed in November, it was

alleged that I hadn't given them ample opportunity to answer questions, and I was

truthfully very surprised.  I do understand that the meetings have to move along at a pace,

but we had usually met for an hour and a half to two hours**.** So I understand there might

have been things that they thought afterwards  But I was surprised that was brought up."
Id.

198.     The Parents rejected the IEP on December 20, 2014, with a lengthy
detailed attachment outlining their reasons for rejection, which included: the proposed
extended day schedule for C.D. to participate in a "one-to-one"transition program,
which has never before been implemented and which would not provide any peer
interaction; the continued proposed placement in ACCESS Math, which would not
prepare C.D. for the Math MCAS despite her receipt of an almost passing score at
Learning Prep, and Natick's continued insistence on changing C.D.'s disability
category. (A.R.3398).

**Response**:  Natick admits that the Parents rejected the IEP on December 20,
2014.  The rejection speaks for itself.  R.3398.

**The January 30, 2015 Team Meeting**:

199.     A team meeting was held on January 30, 2015. (*See* A.R.3394 -
A.R.3398).

**Response**:  Admitted.

200.     Natick noted that it had incorrectly indicated that C.D. would be taking
the Math MCAS (with accommodations) on the "State or District-Wide Assessment"
page of the proposed IEP, and that the form should have indicated that Natick had
determined C.D. would participate in the alternative assessment in Math. (*See*
A.R.3394 -A.R.3398).

**Response**:  Admitted.

201.    On January 30, 2015, the Parents received notice from Natick indicating its refusal to make the changes requested by the Parents, except for correcting the error on the "State or District-Wide Assessment" page. (*See* A.R.3394 -A.R.3398).

**Response**:  The N1 speaks for itself.  R.2295-3397.

203.    On January 30, 2015, the Parents received the corrected,"State or District-Wide Assessment" page, which indicated that C.D. would participate in the alternate assessment for Math (instead of the Math MCAS). (*See* A.R.3394 -A.R.3398).

**Response**:  Admitted.

**NATICK'S STATEMENT OF**
**ADDITIONAL UNDISPUTED MATERIAL FACTS**

Natick incorporates herein by reference its denials and the additional information contained in its responses to Plaintiffs' facts in paragraphs 6, 17-18, 21, 23, 25-26, 28, 29, 31, 33, 34, 35, 37-38, 45, 52, 53, 63, 65, 66, 71-72, 77-80, 84, 87-89, 94, 95-96, 101, 103-104, 108, 112-122, 124-130, 134-35, 138-40, 143, 145-47, 150, 155-58, 162, 164-65, 167, 168, 172-75, 177-78, 182-83, 185-86, 189, 192-93, 195-97, *supra*.  Natick adds the following undisputed material facts which are not otherwise contained in its responses above:

**Prior Placement**

204.    Student was placed by her parents at the Christa McAuliffe Charter Public School ("McAuliffe") for the sixth through eighth grades.  R.1612, Tr.V.I, p.38*, ll.*11-13.

205.    In C.D.'s placement at McAuliffe, she received services in a general education setting, but with the assistance of a one-to-one aide, who acted as a one-to-one tutor.  R.1696, *ll.*12-19l ; R.1716, *ll.*14-22.

206. She attended classes with approximately 16 students in each class and had the constant support of either Nan Coellner or Marcia Soden. R.282, *l*.18; R.1695-1696.

207. She also required significant and frequent modifications. R.409, *ll*.16-22**.**

## 2012-2013

208. To provide a comparable IEP to McAuliffe, Natick offered to place C.D. in all replacement classes. R.2191, *ll*.2-8; R.2298, *ll*.20-23; R.2322, *ll*.5-13; R.2396, *ll* 3-15; R.2439, *ll*.11-21; R.2440, *ll*.13-23; R.2771.

209. Natick convened two meetings and reviewed all the information available to it during the May and July, 2012 meetings, including the results of C.D.'s most recent testing and verbal reports from C.D.'s service providers. R.2325, *ll*. 7-9; R.2348-2351.

210. It was difficult to hold the July, 2012 meeting because it was during the summer when staff are not available. R.2389, *l*.23 – R.2390, *l*.2; R.2394, *ll*.13-18.

211. Although it was difficult for Natick to put together a Team in July, 2012 because it was summer and much of its staff was unavailable (R.2389, *ll*.23-211,*ll*.2; R.2394, *ll*.13-18), all the individuals statutorily-required for the Team meeting were in attendance. R.478, 2770.

212. The attendance sheet for the July 27, 2012, meeting, shows that both parents, Natick's Director of Student Services, two Assistant Directors of Student Services, including the Team Chair, Lindsey McGovern, who is also a special education teacher, another special education teacher, a general education teacher, the principal of Natick High School, parents' independent evaluator and consultant, and Student's two one-on-one aides ("tutors") attended the meeting, along with the parties' counsel. R.478, 2770.

213. No one from the summer program attended because the summer program is only five weeks long. R.2326, *ll*.13-18.

214.    The transcript from the July, 2012 meeting shows that Natick relied on various sources of information in developing the IEP, including C.D.'s progress in the summer program, informal testing, questions during the Team meeting and a staff member's visit. R.385, *ll.*14-20; R.387, *ll.*3-13; R.397, *ll.*22-24; R.399, *ll.*2-4; R.403-12-25.

215.    Lindsey McGovern, the Team Chair who attended the meeting, is also a special education teacher,. R.2347, *ll.*19-23; R.2344, *ll.*6-10; R.2345, *ll.*2-3.

216.    In the July, 2014, IEP, the Team adopted the goals, objectives, accommodations and modifications from the IEP developed by McAuliffe dated April 4, 2013, to April 4, 2013. R.2600-2622.

217.    The Team discussed the option of replacement classes, but believed that the Access program was the most appropriate for C.D.'s needs. R.403, *l.*21 - 404, *l.*2; R.2600-2622.

218.    The Access program was for students like C.D. with cognitive, communication and social pragmatic deficits. R.406.

219.    The Access program would have enabled C.D. to have appropriate supports in place. R.413, *ll.*14-20.

230.    The Access program would have provided C.D. with direct special education services in small group English, history, science, math and vocational classes. It would have provided direct special education services in electives in the general education setting and indirect consultation services. R.2600-2622.

231.    The block scheduling allowed reading and writing to be integrated across the curriculum. R.409, *ll.*4-13. Block scheduling would have prevented discrete, isolated instruction in reading and writing and allow information to be presented in a variety of ways. Id.; R.2212, *l.*20; R.2213, *l.*22 – R.2214, *l.*12.

232.	Students in the Access program were routinely placed in replacement classes when their abilities and classroom performance indicated that it was appropriate and the replacement classes allowed students to access the general curriculum.  R.2191, *ll.*2-8; R.2298, *ll.*20-23; R.2322, *ll.*5-13; R.2396, *ll.* 3-15; R.2439, *ll.*11-21; R.2440, *ll.*13-23.

233.	Given that C.D. was transitioning from one school to another, Natick held the meeting, but recommended that teachers and staff work with C.D. and then reconvene in October after they had more first-had information about her.  R.2352, *ll.*5-24.

## 2013-2014

234.	A Team meeting was held on May 22, 2013.  R.2674-2597.

235.	The Access teacher was at the meeting, but C.D.'s father did not have any questions for the teacher.  R.2575.

236.	The Team Chair had solicited feedback from Learning Prep, but Learning Prep did not provide meaningful information.

237.	Learning Prep failed to provide sufficient data to update the goals for the 2013-2014 IEP.  R.2584-90; R.2360, *l.*12 – R.2361, *l.*2.

238.	The Team reviewed C.D.'s current performance as reported by Learning Prep teachers in the areas of history, biology and language arts/literature.

239.	The Team continued to believe that Access was appropriate.  R.2674-2597.

240.	The IEP contained a transition action plan which provided for C.D. to meet with her guidance counselor to explore post-secondary learning opportunities and with the career specialist to explore employment and internship possibilities. R.2595.

241.	The transition action plan provided that C.D. should explore non-degree post-secondary programs and stated that she would benefit from exploring vocational opportunities

and receiving vocational training. It also provided that C.D. would learn to access community services and transportation in the community, managing money and increasing social thinking strategies. R.2595.

**2014-2015 IEPs**

242. Natick sent Parents an evaluation consent form to perform C.D.'s three year evaluation on March 12, 2014. R.2754-57.

243. C.D.'s father rejected the proposed evaluation in full, indicating that before he consented he wanted a description of the tests to be conducted and the location where they would be given. R.2756.

244. C.D.'s father did not consent until April 15, 2014. R.2757.

245. The Team met on April 15, 2014, and proposed an IEP. The IEP contained a Transition Planning Action form. R.2551-2581.

246. The Team reconvened on June 13, 2014 to review the results of C.D.'s three year reevaluation. R.2529-2550.

247. The Team proposed a number of changes from the prior IEPs, including a proposal that C.D. participate in a general education class and some replacement classes. R.2309, *ll.* 22-24; R.2362, *ll.*14-16; R.2364, *ll.*13-19; R.2529-2550.

248. The 2014 changes were made based on review of C.D.'s evaluations and information from Learning Prep. R.2412, *ll.*22-24; R.2413, *l.*1; R.2414, *ll.*17-24  249.  The speech and language pathologist attended both the June, 2014 and January, 2015 meetings, and discussed the findings from her evaluations and what services would be like. Parents had an opportunity to ask questions. R.2194, *ll.*21 – R.2195, *l.*24; R.2193, *ll.*1-9.

250. The IEP kept C.D. in the Access class for mathematics because that was a

significant area of need for her.  R.244, *ll*.14-22.

251.    The IEP proposed placing C.D. in two different English classes to address her significant need in the area of reading comprehension in the Access setting, while permitting her to participate in a replacement English class to accommodate her relative strength in writing and interest in writing.  R.2373, *l*.15 - R.2374, *l*.12.  The dual English classes ensured C.D. some instruction in English Language Arts for eighty minutes every cycle.  Id.

252.    The IEP would have permitted Natick to address C.D. area of weakness intensely, while allowing her to receive content instruction in the less restrictive replacement classes. R.2373, *l*.20 - R.2374, *l*.12.

253.    The IEP would have allowed her to interact with peers in different classes and work in different settings with peers who have reading, writing, and social strengths.  R.2333, *l*. 19 - R.2334, *l*.9.

**Transition Services**

254.    The 2012-2013 IEP proposed vocational services from the Learning Center Teacher/Student Support Facilitator.  R.2628-2645.

255.    There was a Transition Plan for the 2013-2014 and 2014-2015 IEPs with vocational services.  R.2503-2645.

256.    Ms. Brown conducted a transition assessment of C.D. on October 22, 2014. R.2646-2660.

257.    She explained that C.D. had an interest in fashion, cooking, baking, and most of all hairstyling and make-up.  R.2646-2660.

258.    She noted that C.D. required further development to build her knowledge of the requirements and skills for specific jobs and recommended job shadowing and internships.  She

made a number of other recommendations as well.  R.2646-2660.

259.    The Team convened on November 14, 2014 to review the transition assessment and revise the Transition Planning Form.  R.2503-2528.

260.    Dr. Roffman testified that Natick's transition assessment was adequate.  R.1775, *ll*. 4-8.

261.    There were numerous schedules offered for the transition services, one of which was a one-to-one setting after school.  R.1677, *l*.7 – R.1678, *l*.1.

262.    The IEP proposed an extended day for C.D.  R.2503-2528.

263.    An extended school day would have allowed C.D. to continue to receive non-academic general education electives during the day as well as all her services on the service delivery grid.  R.1677, *l*.7 – R.1678, *l*.1.

**Disability Category**

264.    The change in the disability category was based upon an evaluation by Natick's school psychologist, Ms. Cymrot, in May of 2014.  R.2132, *l*.12.

265.    Ms. Cymrot is a licensed school psychologist who had worked in Natick for over twenty years.  R.2132, *l*.10 – R.2133, *l*.2.

266.    Ms. Cymrot noted that C.D. had longstanding deficits in language, language understanding, reading comprehension, and written language, and that the deficits affected cognitive growth and development.  R.2134, *ll*.14-22.

267.    Ms. Cymrot discussed her opinion that C.D.'s disability should be communication as opposed to intellectual at both the June, 2014 and November, 2014 meetings.  R.2143, *l*.22 – R.2145, *l*.4.

268. Natick provided Parents with notice of the change in disability category through the N1s and proposed IEPs developed at the June and November, 2014 meetings. R.2527-2548; 2499-2526.

269. Service providers testified that a communication disability describes C.D. well and that she needs significant support around language and requires pairing instruction with visuals, repetition, and previewing and reviewing of material. R.2194, *ll.*13-20.

270. The service providers further testified that regardless of the disability category, the services for C.D. would not have changed because the recommended services are based upon all areas of deficit and day-to-day functioning, and not upon the named disability category. R.2143, *ll.*10-21; R.2199, *ll.*3-17.

**Learning Prep**

271. At Learning Prep, C.D. has/had no access to ***any*** typical peers because Learning Prep is a special education school for students with disabilities. R.2353, *ll.*13-17.

272. Learning Prep does not start transition services until the student is in the eleventh grade. R.2235, *ll.*21-24.

**Parents' Participation**

273. The Parents were able to ask whatever questions they had about the program(s) proposed during Team meetings and after Team meetings, they could ask whatever questions they had of the special education teacher, the Director of Special Education, and other staff. R.2195, *ll.*20-24; R.2264, *ll.*5-11; R.2279, *ll.*10-18; R.2280, *ll.*2-6; R.2292, *ll.*11-14; R.2371, , *ll.*1-19; R.2394, *l.*23 – R.2395, *l.*8.

274. The Parents and their experts had multiple opportunities to observe Natick's

proposed programs.  R.2246, *ll*.3-7; R.2256, *ll*.12-17; R.2295, *l*.9; R.2304, *ll*.22-24; R.2368, ,
p.189, *ll*.11-13; R.2369, *ll*.18-21.

**Testimony/Hearing**

275.    Dr. Imber changed his opinion of what C.D. required over time.   R.1676, *ll*.2-6;
R.2086, *l*.8 – R.2091, l.4.

276.    In 2011, Dr. Imber advocated for inclusion at the BSEA hearing.  R.2082, *ll*.8–11.

277.    In his 2012 report, Dr. Imber recommended that C.D. "continue to attend high
school in an inclusive environment."  He said that "[t]he recommendation is consistent with
current best practice in education, consistent with the IDEA's emphasis on least restrictive
environment." R.2077, *l*.8 – R.2078, *l*.4.

278.    At the May and July, 2012 meetings, Dr. Imber stated that inclusion opportunities
were important for C.D.  R.2082, *ll*. 12-24.

279.    At the BSEA hearing, Dr. Imber advocated for C.D.'s attending Learning Prep
where she had no opportunity to be with general education students.  R.2071, *l*.4 – R.2072, *l*.8;
R.2086, *l*. 8 – R.2091, *l*. 4.

280.    C.D.'s father does not have any degrees or licenses in either general or special
education, never taught in a public school or private school setting, and did not have any degrees
in speech and language pathology.  R.1659, *l*.17 – R.1660, *l*.6.

281.    Ms. Flax testified that C.D. would have absolutely no friends in the Access
program.  R.1913, *ll*.1-16.

282.    Ms. Flax testified that C.D. would not benefit from inclusion.  R.1882, *ll*.6-10.

283.    Ms. Coellner admitted that she did not conduct any formal evaluations of C.D.,
had not worked with C.D. for over three years, and was a paraprofessional, not C.D.'s special

education teacher.   R.1715, *l.*19 – R.1717, *l.*2.

284.     Ms. McGovern testified that she was surprised that Parents and their experts found Natick's proposed Access program too restrictive for C.D., but then placed her at Learning Prep, a private special education, out-of-district placement.  R.2353, *ll.*1-17.

285.     She noted that the recommendations of Ms. Flax and Dr. Imber had "really" changed over time.  R.2353, *ll.*13-17.

286.     Ms. McGovern testified that C.D.'s profile had not changed significantly and, in fact, C.D. had made gains in expressive language, warranting a less restrictive setting rather than a more restrictive one.  R.2353, *l.*22 – R.2354, *l.*1.

287.     Approximately two weeks before the hearing, on or about May 4, 2015, Parents attempted to submit a transition report, a psychoeducational evaluation, and a speech and language evaluation.  R.1584, *l.*23 – R.1585, *l.*6.

DATED at Quincy, Massachusetts, this 19th day of August, 2016.

Counsel for Natick Public Schools,

/s/ Doris R. MacKenzie Ehrens
BBO # 544252
Felicia Vasudevan
BBO #687463
MURPHY, HESSE, TOOMEY & LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, MA 02269-9126
(617) 479-5000

## CERTIFICATE OF SERVICE

I, Doris R. MacKenzie Ehrens, hereby certify that this document filed through the CM/ECF system will be sent electronically to counsel of record for the plaintiff and to counsel of record for Reece Erlichman, Director, Bureau of Special Education Appeals, on this 19th day of August, 2016.

/s/ Doris R. MacKenzie Ehrens
Doris R. MacKenzie Ehrens