**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ) | Civil Action No.  15-cv-13617-FDS |
| ) |  |
| C.D., by and through her PARENTS AND  ) | |
| NEXT FRIENDS, M.D. and P.D.        ) | |
| ) | |
| Plaintiffs,     ) | |
| v.                  ) | |
| ) | |
| NATICK PUBLIC SCHOOL DISTRICT  ) | |
| and                ) | |
| BUREAU OF SPECIAL EDUCATION  ) | |
| APPEALS,          ) | |
| ) | |
| Defendants.     ) | |

## PLAINTIFF'S REPLY TO NATICK PUBLIC SCHOOLS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, C.D. and her Parents, M.D. and P.D. ("Parents"), on behalf of their daughter and themselves, hereby submit this Reply to Natick Public Schools' Opposition to Plaintiff's Motion for Summary Judgment.  The facts upon which Plaintiff's rely are set forth in Plaintiffs' Reply to Natick Public Schools' Response to Plaintiffs' Amended Statement of Material Facts and Response to Natick Public Schools' Additional Statement of Undisputed Material Facts, filed concurrently with this reply.  Parents incorporate herewith their Motion for Summary Judgment, and Amended Memorandum of Law in Support of Motion for Summary Judgment filed with this Court on July 2, 2016.

I.    **ARGUMENT**

A.    **LEAST RESTRICTIVE ENVIRONMENT**

1.    **Substantial evidence supports the Parents argument that the IEPs**

**proposed by Natick for the 2012-2013, 2013-2014, and 2014-2015 school years were not reasonably calculated to provide C.D. with FAPE in the LRE.**

Substantial evidence supports the Parents' argument that Natick violated the procedural requirements under the IDEA for determining the least restrictive environment for C.D., by (1) failing to discuss whether she could be provided with an appropriate education in the least restrictive general education classroom (or the less restrictive Replacement classes), with supplementary supports and services prior to proposing placement in the most restrictive self-contained ACCESS program for all of her core academic curriculum classes (English, Math, Science and History) in the IEP proposed for the 2012-2013 school year, the IEP proposed for the 2013-2014 school year, and the first IEP proposed for the 2014-2015 school year; (2) failing to base its placement decision on a variety of sources and current information available regarding C.D.'s individual potential, unique needs and unique assets, her progress and positive reaction to being in the general education classroom with nondisabled peers for the previous three (3) years immediately preceding the IEP meeting on July 27, 2012, and the potential negative effects of placement in the self-contained ACCESS program for the 2012-2013 school year, the IEP proposed for the 2013-2014 school year, and the first IEP proposed for the 2014-2015 school year.[1]

Substantial evidence also supports the Parents' argument that Natick: (1) should have invited Ms. Liptak to the meeting on July 27, 2012, because she was the only special education teacher at Natick who had worked directly with C.D. and could provide first-hand information for the team to consider; (2) disregarded the information provided by Ms.

---

[1] *See e.g.*, A.R. 163; A.R. 177; A.R. 222; A.R. 238; A.R. 296, *ll.* 21; A.R. 297, *ll.* 3; A.R. 317; A.R. 318; A.R. 386, *ll.*17-22; A.R.397, *ll.* 9; A.R.398, *ll.* 7; A.R. 402-403; A.R.404, ll. 1-10; A.R. 406, *ll.* 13-15; A.R. 406, *ll.* 16-20; A.R. 410-411; A.R. 413- A.R. 414; A.R. 414, *l.* 8; A.R. 414, *ll.* 18-20; A.R. 1691; A.R.1696; A.R. 1697, *ll.* 7-11; A.R. 1699; A.R. 1700, *ll.* 11-24; A.R. 1848, *ll.* 3-9; A.R. 2505; A.R. 2750 – 2753; A.R. 3231; A. R. 3435.

2

Coellner and Ms. Soden, two special education teachers/administrators with decades of experience, including experience in the Boston Public Schools, hired by the Parents who provided C.D. with supplementary supports and services in the general education classroom at McAuliffe on a rotating basis for the previous three (3) years, and; (3) contrary to the requirements of the IDEA, based its placement decision solely on C.D.'s disability profile, as evidenced by her evaluations, reports, a handful of Dr. Imber's test scores, and the BSEA decision in 2011.[2]

> **2.      Natick does not dispute the Parents' argument that it failed to discuss whether C.D. could succeed in the general education classroom or the Replacement classes with supplementary supports and services prior to proposing placement in the self-contained ACCESS Program for the 2012-2013 school year.**

Natick does not provide any evidence to dispute the Parents' claim that Natick failed to discuss whether C.D. could succeed in the general education class or Replacement classes with supplementary supports and services.  However, in a misguided attempt to show that ACCESS was appropriate for C.D., Natick provides evidence that actually supports the Parents' claim.  (Opp. 408).[3]  Natick cites A.R.408, *l*.12 – R.409, *l*.13 (which references Ms. McGovern's response to the father's question regarding the block schedule at Natick High School, and how Natick would address the individual needs of a student who has memory deficits like C.D.); Ms. McGovern *haltingly* testified:

> "Right; I mean, the class itself, in this program, that there are cases of this program that are infused throughout -- Because it's a program, the teacher and the staff of the program do infuse instruction in ELA and Math; they try to integrate that into the other content areas as they – They teach many of the classes. The teacher would not -- It's not like he would be using reading and writing strategies, for instance, in the Current Events and History class, reinforcing what the students are also learning in the reading

---

[2] *Id.*
[3] Citations to Natick Public Schools' Opposition to Plaintiffs' Motion for Summary Judgment are denoted as "Opp." followed by the page number at the bottom of each page (*e.g.*, Opp.8).

class. So it helps students -- There is reading and writing across the curriculum because she's -- It's a self-contained program…"

Contrary to supporting Natick's argument that ACCESS was an appropriate placement for C.D., the evidence Natick cites supports the Parents' argument that Natick did not discuss the supports and services needed for C.D. to succeed in the general education classes or Replacement classes, and instead addressed her disability simply by placing her in the only program available at Natick High School where the issues inherent in the block schedule are less of a concern, thereby forcing her to fit into an inappropriate program, rather than an appropriate program based upon her individual needs.  (*See, Letter to Trigg,* 50 IDELR 48 (OSEP 2007)).  Despite its own reference showing that Ms. McGovern justified placement in the ACCESS program to address the effect of the block schedule on someone with memory deficits, such as C.D., Natick inexplicably further argued that "Natick also demonstrated that the block scheduling (longer periods three times per week as opposed to shorter periods every day) it offered was appropriate for Student because it permitted more opportunities for her to hear the same information, permitting information to be presented in a variety of ways in a longer class rather than having the information presented the same one way every day." (Opp. 8).  In support of its argument, Natick cites A.R.2212, *l.*17 – R.2214, *l.*12[4], (which references Ms. Karian's testimony regarding the block schedule in general education and Replacement classes proposed in the IEP dated June 13, 2014 - June 13, 2015, which is completely irrelevant to Natick's statement regarding the ACCESS program proposed in the IEP's proposed previously, and is contradictory and misleading to the court.

Natick attempts to divert the court's attention from this inquiry by failing to address

---

[4] Consistent with the format in Plaintiffs' Amended Memorandum of Law in Support of Motion for Summary Judgment, the Parents cite to the Administrative Record with "A.R." The transcript is included in the record and citations to the transcript are to the pages of the record rather than the pages of the transcript volumes.  (Line numbers are designated "*ll.*x-x", e.g. *ll.*2-3)

the critical importance Congress placed on educating students with disabilities in regular education classrooms to the maximum extent appropriate,[5] and instead focusing on the level of supplementary supports and services C.D. received at McAuliffe *solely* for the purpose of determining whether the IEP proposed was appropriate.  While this information may be relevant to the consideration of C.D.'s unique needs and abilities, it does not excuse Natick from failing to discuss whether C.D. could succeed in the general education classroom or the Replacement classes with these or other supplementary supports and services in the context of the current IEP proposed for the 2012-2013, 2013-2014 and 2014-2015 school years.

Natick attempts to excuse its failure to follow the procedural requirements for determining LRE, by arguing that regardless, the *level* of support C.D. received at McAuliffe supports their position that the ACCESS program was appropriate.  In doing so, Natick not only asks the court to apply an inappropriate legal standard created by the Hearing Officer and adopted by Natick, but also misrepresents the level of support C.D. received.  (A.R.296, *l.* 21 – 297, *l.* 3; A.R.397, *l.* 9 – A.R.398, *l.7*; A.R.401, *ll.* 12-13; A.R.413; A.R. 420, *ll.*13-17; A.R.421; A.R.1542; A.R.1691; A.R.1696; A.R.1697; A.R. 1699; A.R.1700; A.R.1848).

> **3.**     **Natick cites irrelevant evidence to support its assertion that it relied on the information available to it during the May and July 2012 meetings when proposing the IEP.**

Natick asserts that it relied on the information available to it during the May and July 2012 meetings when proposing the IEP.   (Opp. 8).  Natick cites multiple pages in the record, giving the impression that there is substantial evidence to support its claim; however, the references cited not only fail to support Natick's claim, but also support the Parents' claim. Natick cites A.R. 2325, ll. 7-9 (which references Ms. Liptak's testimony that she was present at

---

[5] 20 U.S.C. § 1412(a)(5)(A).

the meeting in May and worked with C.D. during the summer of 2012):

> Q:     Was that the May 2012 meeting?
>
> A:     Yes.  And then I also worked with [C.D.] in the summer
>        program, the Natick ESY program.

While Ms. Liptak's testimony does not refer to any information reviewed or available at the meeting in July 2012; it shows that Ms. Liptak had worked with C.D. just weeks prior to the meeting in July 2012, and had current information that she could have shared at the meeting in July for the team to consider, if she had attended that meeting.  (A.R.2326, *ll*.13-18).

Natick also cites A.R. 2348-2351 (which references Ms. McGovern's statement at the meeting in July 2012, that Natick reviewed Dr. Imber's test scores, the last McAuliffe IEP (written in April 2012 by knowledgeable staff at McAuliffe who recommended that C.D. *continue* in a general education inclusion setting), the programming available at Natick, the BSEA decision from 2011, and having no indication that C.D.'s disability had changed since then, recommended the ACCESS program for all of C.D.'s core curriculum classes.

In relevant part, Ms. McGovern testified:

> We reviewed Dr. Imber's report. We reviewed the McAuliffe -- the data that we had from McAuliffe, which, at the time, as is in the exhibits, is an IEP that was developed based, I believe, on testing from earlier that year. I believe it was 2011. It might have been 2012.
>
> We looked at the McAuliffe IEP. We looked at the goals and objectives from McAuliffe. We looked at Carolyn's scores. But we also looked at input from the IEP that was developed in McAuliffe, which was developed in April 2012…and our programming that we had at the time, which we felt was the most appropriate.
>
> And based on all of those things, we recommended ACCESS for the academic classes…"

(A.R. 2350, *ll*.2-12).

With regard to the BSEA decision in 2011 and C.D.'s disability category, Ms. McGovern testified that the proposed IEP was consistent with that decision, and although she had not read it, she knew other Natick staff took it into consideration:

> Q.    Did the team take into account the fact that there had been a recent BSEA decision that had found that the ACCESS Program was appropriate for Carolyn at the middle school level?
>
> A.    I believe so. I had heard that that had taken place, but in all honesty, I had not yet read that decision at the time. But I know that others were aware of it and had taken it into consideration.
>
> Q.    Was there any discussion about any changes to Carolyn's disability between the time of that BSEA decision and basically a year later when she presented back in Natick and you met as a team?
>
> A.    In 2012?
>
> Q.    Yes.
>
> A.    Not to my knowledge, no.

(A.R. 2351, *ll.*7-22)

Although Natick's cites Ms. McGovern's testimony to support its argument, she does not refer to any of the *current* information available to the team at the IEP meeting in July 2012, including the information provided by Ms. Coellner and Ms. Soden, that C.D. passed the ELA MCAS, and the course selection list prepared by C.D.'s guidance counselor. Therefore, the evidence cited by Natick to support its argument that Natick reviewed all information available to it during the May and July 2012 meetings, not only fails to do so, but on the contrary supports the Parents' argument that the IEP was not based upon current information available.

Natick further argues that the transcript from the July 2012 meeting also shows that Natick relied on various sources of information when proposing the IEP, including C.D.'s progress in the summer program, informal testing, and questions during the team meeting, again citing multiple references to support their claim.  (Opp. 8).   Natick's purported evidence, however, again fails to support their claim, and again serves to support the Parents' argument.  Specifically, Natick cites A.R. 385, ll. 14-20 (which references Ms. McGovern's statement at the meeting on July 27, 2012, that information regarding C.D.'s attendance in the summer program *would be* brought to the table), A.R. 387, *ll*. 3-13, (which references Mr. Tagliapietra's statement providing the "information" from the summer program, which was solely that C.D.'s performance matched her test scores); A.R. 397, ll., 22-24; A.R. 399, *ll*., 2-4 (which references Ms. Coellner's statement that C.D. made progress and succeeded at McAuliffe and was working close to grade level).

Again the evidence cited by Natick fails to support their argument that Natick relied on various sources of information when proposing the IEP, and on the contrary, supports the Parents' argument that the proposed placement was not based upon current information available.

It is particularly perplexing that Natick would reference Ms. Coellner's statements that C.D. succeeded and progressed in the general education classroom at McAuliffe and was working close to grade level as support for their argument that the IEP proposing placement in the self-contained ACCESS program was based upon the information cited.

    **4.**    **The level of restrictiveness of C.D.'s placement at McAuliffe is not relevant to the determination of whether the IEPs proposed for the 2012-2013, 2013-2014 and 2014-2015 school years provided C.D. with FAPE in the LRE.**

Natick attempts to argue that C.D.'s program at McAuliffe was more restrictive than the proposed program in ACCESS, in support of its determination that the IEP proposed for the 2012-2013, 2013-2014 and 2014-2015 school years provided C.D. with FAPE in the LRE, Natick contends that "When comparing the Access program to a general education setting with supplementary aids and services at the level she had at McAuliffe, substantial evidence supports the hearing officer's conclusion that Natick's proposed IEPs were less restrictive." (Opp. 9). This "straw man" argument created by the Hearing Officer and adopted by Natick, is irrelevant to the determination of whether the IEP proposed by Natick for the 2012-2013 school year was appropriate and merely serves to distract the court from the underlying issue. Neither the Hearing Officer nor Natick cite any legal authority to show that the level of restrictiveness of C.D.'s program at McAuliffe is relevant to the issue before the Court.

> **5.     Natick's argument, however irrelevant, is based on false premises, as there is absolutely no evidence on the record to support Natick's assertion that C.D. received constant one-to-one support at McAuliffe.**

The uncontroverted evidence on the record, which Natick fails to dispute, is that C.D. did <u>not</u> receive constant one-to-one support at McAuliffe. Natick refers to A.R.1695, *l.*9 – A.R.1696, *l.*24; A.R.1701, *ll.*1-8  7, (which references Ms. Coellner's testimony) to support their contention that "at McAuliffe, Student's prior placement, she received services in a general education setting with the assistance of one-to-one aides hired by her parents to be with her as one-to-one tutors to make sure she was on task, cue her as necessary, and go over vocabulary or practice flash cards of science words to prepare for a test during a study or free period. While Natick paraphrases Ms. Coellner's testimony accurately, her testimony does not support its claim that she received constant support, and on the contrary shows that C.D. received appropriate supports and services as mandated by Congress.  20 U.S.C. § 1412(a)(5)(A).

To further support their false premise, Natick argues that, in contrast to C.D.'s program at McAuliffe, "the proposed Access placement would have permitted Student to independently access academic services in a setting designed for students with a profile similar to hers." Natick cites, <u>T.W. v. Unified Sch. Dist. No. 259, Wichita, Kan.</u>, 136 F. App'x 122, 131 (10th Cir. 2005) (explaining that regular education setting was not least restrictive environment if progress was solely the result of one-to-one instruction). Natick, however, does not cite to any evidence on the record in support of this claim. (Opp. 9). In contrast to *T.W. v. Unified Sch. Dist. No. 259*, (*supra*), there is no evidence on the record indicating whether C.D. would have received supports and services in ACCESS or that her success was the result of one-to-one instruction at McAuliffe. There is, however, substantial evidence showing that her academic and social success was <u>not</u> solely the result of one-to-one support. (A.R. 397, *l*.9 – A.R.398, *l*.7; A.R.420, *ll*.13-17; A.R.1696; A.R.1697; A.R.1699; A.R.1700; A.R.1848).

> 6. The level of restrictiveness of C.D.'s placement at learning prep is not relevant to the determination of whether the IEP proposed for the 2012-2013, 2013-2014 and 2014-2015 school years provided C.D. with FAPE in the LRE.

Natick similarly adopts the Hearing Officer's argument that C.D.'s placement at Learning Prep is more restrictive than ACCESS, in support of its claim that the IEP proposed for the 2012-2013, 2013-2014 and 2014-2015 school years provided C.D. with FAPE in the LRE, Natick cites A.R.2353, *ll*.13-17 (which simply references Ms. McGovern's testimony that "LPS is more restrictive than anything on Natick's continuum of services.")

This is clearly another "straw man" argument created by the Hearing Officer and adopted by Natick, which is irrelevant to the determination of whether the IEP proposed by Natick for the 2012-2013 school year was appropriate and merely serves to distract the court from the underlying issue. (See, *Burlington School Committee v. Massachusetts Department*

*of Education*, 471 U.S. 359 (1985))

Regardless of Natick's fallacious argument, the population at LPS, unlike the population in ACCESS, includes students with multiple mild disabilities and provides a meaningful high school education geared towards passing the MCAS and obtaining a high school diploma. A.R.295; A.R. 4182 – A.R. 4789).  When faced with the choice of MCAS and a high school diploma at Learning Prep versus no preparation for MCAS and no diploma in the ACCESS program, the lack of nondisabled peers is no longer an issue.

It is also worth noting that if C.D. would have been able to access "academic services" independently in the ACCESS program, she would have been accessing "entry points" as opposed to the Massachusetts core curriculum and would not have been prepared for MCAS, which begs the question: if C.D. could access entry points independently in ACCESS, couldn't she access the Massachusetts core curriculum and prepare for MCAS with appropriate supports and services in the Replacement (or general education) classes? (A.R. 4148 - A.R.4151). Natick's logic is directly opposed to Congressional mandate that supplementary supports and services should be used to enable students to be included with nondisabled peers to the maximum extent appropriate.  20 U.S.C. § 1412(a)(5)(A).  Natick appears to have turned Congressional mandate on its head, arguing instead that students should be placed in the environment in which they can best succeed *without* supplementary supports and services, even if that is the most restrictive placement on the continuum without nondisabled peers.

Natick's argument, therefore, which it adopted from the Hearing Officer, essentially indicating that having one-to-one supplementary supports and services necessarily makes the program at McAuliffe more restrictive, is based on legal error and flies in the face of the principle purpose of the IDEA, to ensure that children with disabilities are prepared for further

11

education, employment, and independent living. (*See e.g.,* 20 USC § 1414 (d)(1)(A)(i) (requiring transition planning and services beginning at age sixteen)).

In order for these core educational principles to be realized, decisions regarding special education and related services must be made in a way that allows the *unique learning needs* of each student to be met and that, at the same time, allows each student to become as independent as possible, particularly in preparation for the end of secondary education. (*Id.*)

For some students, a classroom aide may be necessary to receive FAPE, and particularly to maximize learning and participation with non-disabled peers.[6] While in some cases, inappropriate use of a classroom aide can have detrimental consequences on a student's independence, such as  "interference with peer interactions, insular relationships, stigmatization, provocation of behavior problems, or diminished student-teacher interactions,"[7] the evidence in this case overwhelmingly showed that C.D. succeeded with considerable independence at McAuliffe.  (A.R. 397, *l.*9 – A.R.398, *l.*7; A.R.420, *ll.*13-17; A.R.1696; A.R.1697; A.R.1699; A.R.1700; A.R.1848).

**7.    Substantial evidence supports the Parents' argument that Natick's decision to place C.D. in the ACCESS program was based upon C.D.'s disability profile.**

Natick argues that the IEP for the 2012-2013 school year proposed an appropriate program for C.D. because the ACCESS program is for students like C.D. who have cognitive, communication, and social pragmatic deficits (Opp. 8), where English and Math are infused throughout and integrated into content areas.

---

[6] *See,* Massachusetts Department of Elementary and Secondary Education, Special Education, Technical Assistance Advisory SPED 2014-3 (revised): Identifying the Need for Paraprofessional Support, footnote 3, which states that these services may be needed "for a disabled student to learn … with non-disabled students to the maximum extent appropriate …, to allow the student to participate in extracurricular and other nonacademic activities, or to address a wide variety of other educational needs identified on a student's individualized education program (IEP).

[7] Id.

In support of this argument, Natick cites to the July 2012 meeting transcript where Ms. McGovern states:

> The ACCESS program serves kids that do have cognitive, communication, social/pragmatic deficits or disabilities in those areas.  [C.D.] would *on paper*, fit into that category; she has an intellectual disability and also issues with communication and social pragmatic [emphasis added].

(A.R.406, ll., 16-20).

This evidence not only fails to support Natick's claim that the ACCESS program was appropriate for C.D., but on the contrary supports the Parents' claim that Natick's determination was based upon her disability profile, which was contrary to the law and failed to consider C.D.'s unique needs.

**8.      Students in the ACCESS Program for all of their core academic curriculum are <u>not</u> on the high school diploma track and do not ever take the standard MCAS.**

Natick supports the Hearing Officer's decision to discredit C.D.'s father's statements about whether Access students could or would pass MCAS and receive a diploma, arguing that "Student's father appeared to rely upon a single classroom observation to conclude that Access students did not prepare for MCAS." (Opp. 25).  In support of this assertion, Natick cites A.R. 1644, *ll*. 19-23 (which misrepresents the father's testimony that student's in ACCESS do not take the MCAS, and ignores substantial evidence on the record in support of this assertion).

Natick itself presented evidence that students in the ACCESS program were placed in Replacement classes when their abilities and classroom performance indicated that such a move was appropriate and that the Replacement classes allowed them to access the general curriculum so they could, conceivably, take MCAS and receive diplomas, confirming the

father's assertion that students in ACCESS take the MCAS-ALT.  (A.R.295; A.R.319, *l*.25 –

A.R.320, *l*. 2*;* A.R.2191, *ll*.2-8; A.R.2298, *ll*.20-23; A.R.2322, *ll*.5-13; A.R.2396, *ll*.3-15;

A.R.2439, *ll*.11-21; A.R.2440, *ll*.13-23).

 9. **The Replacement classes were <u>not</u> presented as an option in any of the IEPs
 proposed before June 2014.**

 Natick claims that the hearing officer correctly concluded that Natick's proposed

ACCESS program, *with the option to participate in replacement classes* was less restrictive

than the general education setting at McAuliffe where C.D. was assisted throughout the day by

one-to-one aides who acted as tutors.  (Opp. 9).  The record is absolutely clear that Natick never

proposed the Replacement classes in any IEP prior to the IEP proposed on June 14, 2014.

(A.R.3328-3282).

 Natick cites multiple pages in the record, giving the misleading impression that there is

substantial evidence on the record in support of their claim that the Parents had the option of

enrolling C.D. in Replacement classes for the 2012-2013 school year.  (Opp. 9).  However,

while there are multiple pages cited, *none* of the references support Natick's claim, and some of

the references actually support the Parents' claim.

 In support of its position, Natick cites: A.R. 2191, *ll*. 2-8 (which references Ms. Karian's

testimony describing the Replacement classes in general); A.R. 403, *ll*. 17-20 (which references

Ms. McGovern's statement at the meeting on July 27, 2012, alluding to the May 24, 2012

meeting, when Natick indicated that the Replacement classes were most comparable to C.D.'s

program at McAuliffe); A.R. 405 *ll*. 20-23 (which references Ms. McGovern's rhetorical

statement simply indicating that the team needs to determine whether the goals in C.D.'s IEP

can be accomplished in Replacement classes or need to be done through the ACCESS

program); A.R. 2298, *ll*.20-23 (which references Ms. Michelson's testimony that there are other

students going into more Replacement classes "with the needed supports so that they can access

more of the general ed curriculum;" A.R.2322, *ll*.5-13 (which references Ms. Liptak's

testimony that students in Replacement classes follow the MCAS and Massachusetts curriculum

standards); A.R.2396, *ll*.3-15 (which references Ms. McGovern's testimony that some students

are in a hybrid program and those students may take the standard MCAS or the MCAS-Alt);

A.R.2439, *ll*.11-21 and A.R.2440, *ll*.13-23 (which references Mr. Francoise's testimony

indicating that some students were moved from the ACCESS program to Replacement classes).

Inexplicably, as if its failure to cite evidence to support its position was not harmful

enough, Natick cites A.R. 410, *l*.24 – A.R. 411, *l*.11 (which references Ms. McGovern's

statement at the IEP meeting in July 2012, confirming the Parents' assertion that the

Replacement classes were <u>*not*</u> presented as an *option* in 2012, but merely a *potential possibility*

during the following years:

> "We have some students who are in a couple of ACCESS classes
> but are now in replacement classes as well.  The goal is, of course,
> to fully include the student as much as possible.  She could start in
> the ACCESS program and have made such gains that she is slowly
> included in more and more classes throughout her high school
> career."

**10.     Despite Natick's argument the contrary, the LRE cases cited by the
Parents support their conclusion that the ACCESS program was not
reasonably calculated to provide C.D. with FAPE in the LRE.**

Natick's asserts that the least restrictive environment cases Parents cite actually support

the conclusion that the ACCESS program is the most appropriate and least restrictive

placement for C.D.  (Opp. 10). This assertion is puzzling at best. The Parents' cited these

seminal cases as support for the legal principles they represent, *i.e.*, that (1) in adopting the

IDEA, Congress created a strong preference for educating students with disabilities in regular

education classrooms, and that accordingly, school districts may not unnecessarily restrict a

child if that child's IEP can be implemented using supplementary aids and services in a regular education classroom (*See Oberti v. Board of Educ.,* 995 F.2d 1204 (3rd Cir. 1993); *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036 (5th Cir. 1989)*; Sacramento City School Dist. v. Rachel H.,* 14 F.3d 1398 (9th Cir. 1994); *Katherine G. v. Kentfield Sch. Dist.,* 112 F. App'x. 586 9th Cir. 2004); (2) as a preliminary matter in every case, school districts must determine whether the child can be provided with an appropriate education in the regular education classroom with supplementary aids and services *(See Department of Educ. v. Katherine D*., 727 F.2d 809, 815 (9 [th] Cir. 1983), *cert denied*, 471 U.S. 1117 (1985)); and (3) a student's progress and educational benefit must be measured in relation to the student's own capabilities and not judged in comparison to the abilities of other students, in particular, the abilities of their nondisabled classmates.  (*See Daniel R.R. v. State Bd. of Educ., supra).* The Parents referenced these cases to support their argument that Natick failed to follow the procedural requirements under the IDEA.  In the cases cited, these procedures *were* followed by the school districts.  (*See Oberti v. Board of Educ.*; *Sacramento City School Dist. v. Rachel H.*; *Katherine G. v. Kentfield Sch. Dist.;* and *Daniel R.R. v. State Bd. of Educ., supra*).

While it is true that in the cases cited, it was determined that the inclusion classes were not appropriate for those particular students, this in no way supports Natick's argument that ACCESS was appropriate for C.D. – unless Natick is implying that following the procedures mandated by Congress will always result in removal from the general education classroom – a conclusion which is clearly not Congress' intent.

### B.   PARENTAL PARTICIPATION

**1.   Natick does not provide any evidence to dispute the Parents' argument that it predetermined C.D.'s placement in the ACCESS program for the 2012-2013 school year.**

Natick does not present any evidence to dispute the Parent's claim that Natick predetermined C.D.'s placement in the ACCESS program for the 2012-2013 school year. Natick argues that the 2012 transcript supports its argument, citing the same references it cited to support its argument *supra* that Natick relied on various sources of information when proposing the IEP, which fail to support their claim, and actually supports the Parents' argument.  (Opp. 8, citing A.R. 385, ll. 14-20, A.R. 387, *ll*. 3-13, A.R. 397, ll., 22-24; A.R. 399, *ll*., 2-4).

In addition, Natick cites A.R. 403, *ll*. 12-25, (which references Ms. McGovern's statement that the impression she got from Ms. Dalan following her observation of C.D. at McAuliffe): "…And what Gina told me after that observation, and I know what she and the rest of the Natick team felt when we met in May, is that she needs to be in." (A.R. 403, ll. 23-25).  Natick specifically ends its reference mid-sentence at line 25.  If Natick had referenced A.R. 403, *11*. 1-2, thereby completing the sentence, it would have shown that the remainder of the sentence was "in the ACCESS program; that is the program that is appropriate to meet her needs."  Despite Natick's apparent attempt to avoid referencing the end of the sentence, it is clear that this reference supports the Parents' claim that Natick predetermined C.D.'s placement in the ACCESS program prior to the meeting in July 2012.

In addition, the cases Natick cites in support of this argument are irrelevant to this matter.  For example, Natick cites *G.D. v. Westmoreland Sch. Dist*., 930 F.2d 942, 947-48 (1st Cir. 1991), in which the First Circuit Court of Appeals concluded there was no predetermination even though the school district came to the meeting with a draft IEP because the final IEP was not approved until the Team meeting.  Natick does not indicate how this case lends support to its argument; however, given that Natick did not come to the meeting with a

draft IEP, it does not appear to support the argument Natick makes.

**2.    Natick's adoption of the Hearing Officer's argument that the evidence suggests that the father had already determined C.D.'s placement prior to the meeting in July 2012 is irrelevant to the question of whether Natick predetermined C.D.'s placement.**

The Hearing Officer's conclusion, which Natick adopts, that the father had determined C.D.'s placement prior to the meeting on July 27, 2012, is a red herring, which is not only irrelevant to the underlying issue, but also references an unauthenticated email expressing an opinion from a non-witness to another non-witness, which neither party raised at the hearing, rendering its probative value extremely suspect. (A.R. 1544; A.R. 4050)

**3.    Substantial evidence supports the Parents' argument that Natick predetermined the change in C.D.'s disability category prior to the meeting on June 13, 2014.**

The transcript from the June 13, 2014 IEP meeting clearly shows that Natick determined C.D.'s change in disability category outside the team process. (A.R.1697; A.R.1006, *l.* 25 – A.R. 1007, *l.*7; A.R. 1006 – A.R. 1011).

Pursuant to federal regulations, prior notice is required when the school district "Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child. 34 C.F.R. § 300.503(a)(1).

By indicating that "Natick provided the Parents prior notice of the change in disability category pursuant to 34 C.F.R. s. 503(a) through the N1 and proposed IEPs from the June and November 2014 meetings" (Opp. 16), Natick admits that Natick changed the category *outside* the IEP meeting, triggering the requirement that would be inapplicable if the change had been properly proposed as part of the reevaluation process *during* the IEP meeting.

**4.    Substantial evidence shows that Natick significantly impeded the Parents' opportunity**

**to participate in the decision-making process.**

Natick's argument that it did not significantly impede the Parents' opportunity to participate in the decision-making process (Opp. 17) is contradicted by substantial evidence on the record, which includes the impermissible restrictions it placed on the observations of the proposed program by their experts, and their inability to obtain answers to their questions, both with regard to the observations and well as with respect to issues raised during IEP meetings. (A.R.3402 – A.R.3403; A.R.768; A.R. 360-A.R.372; A.R.451; A.R.453; A.R.738; A.R.768; A.R.1168; A.R.1173; A.R.1764; A.R.1872, l.23 – A.R.1873, l.7; A.R.2057; A.R.2406; A.R.3036; A.R.3112- A.R.3173; A.R.3147; A.R.  3126 – A.R. 3143; A.R.3144 – A.R.3154; A.R. 3151-3153; A.R.3167 – A.R.3173).

While Natick's denial that it deprived the Parents' of a meaningful opportunity to participate evidences their apparent failure to carefully review the record, Natick's assertion that that law does not require a school district to allow parents to visit and observe the proposed program evidences a shocking, blatant disregard of Massachusetts law.  G.L. Ch. 71B, §3; 603 CMR 28.07(1)(a)(3).  To support their argument, Natick cites the IDEA and cases in D.C. and New Jersey, while inexplicably and inexcusably ignoring Massachusetts law, which accords parents, and by extension, their evaluators and consultants, a reasonable opportunity to observe their child's proposed program. *Id*. The rationale for the law, as delineated in the first sentence of the statute is: "To insure that parents can participate fully and effectively with school personnel in the consideration and development of appropriate educational programs for their child, a school committee shall, upon request by a parent, provide timely access to parents and parent-designated independent evaluators and educational consultants for observations of a child's

19

current program and of any program proposed for the child, including both academic and non-academic components of any such program." *Id.*

In addition, BSEA case law has established that conditions imposed beyond those authorized by Massachusetts law are not permissible. See *e.g.*, *Mansfield Public Schools*, BSEA #1307030, 19 MSER 100 (2013), (hearing officer rejected the school districts rationale for restricting the parents' observations specifically because their rationale did not fall under the three recognized bases for restricting access of the parents' observer under Massachusetts law). BSEA case law has also established that observers must be accorded the opportunity to speak with teachers and other staff about the program. See *e.g., Northbridge Public Schools*, BSEA #09-2533, 14 MSER 348 (2008) (hearing officer castigated the school district for instructing staff not to speak about the student or his program with the parents' independent evaluators and consultants).

Natick's claim that the Parents did not explain to the hearing officer what other information they could have discovered through additional observations or questions, ignores not only the Parents' Memorandum of Law in Support of their Motion to Compel and the affidavits prepared by Dr. Imber and Ms. Flax, but also the specific questions submitted by the Parents and their experts in response to the hearing officer's order, and the testimony of their witnesses at the hearing.  (A.R.768; A.R.1399-1400; A.R.3402 – A.R.3403).

As a result of the restrictions on the Parents' right to observe the programs and a five-month delay in ruling on the Parents' Motion to Compel, Natick not only impeded the Parents' right to meaningfully participate in the decision-making process, but also damaged their credibility as witnesses, thereby violating the Parents' 14th Amendment rights to due process. (*See Schaffer v. Weast,* 546 US (2005) (Decision pages 10-11)); (*See also Sebastian M. v. King*

*Philip Regional School Dist*., 685 F.3d 79 (1st Cir. 2012) (noting the critical importance of persuading a BSEA hearing officer that your experts are both credible and persuasive)).

The evidence Natick cites to show that the Parents were able to ask questions (and presumably have their questions answered), does little to support their argument.  Natick cites A.R. 2195, *ll*. 20-24 (which references Ms. Karian's testimony that the Parents were able to ask some questions); A.R. 2264, *ll*. 5-11 (which references Ms. McGovern's testimony that she did not recall whether the Parents were able to ask questions); A.R. 2279, 10-18, and A.R. 2280 (which references Ms. Brown's testimony that she did not recall whether Natick refused to answer questions, and that in her opinion the Parents were able to ask questions); A.R. 2292 *ll*.11-14 (which references Ms. Michelson irrelevant testimony about the ACCESS program); A.R. 2371, *ll*. 1-19, A.R. 2394, l.23-A.R. 2395, l.8; A.R. 453 (which simply references various times that Ms. McGovern stated that the Parents could ask questions).

In support of Natick's assertion that the Parents were able to observe the programs, Natick simply presents a string of cites, showing that the limited observations that occurred, actually occurred. (Opp. 18, citing A.R. 2246, *ll*. 3-7; A.R. 2256, *ll*. 12-17; A.R.2295, *ll*.9; A.R. 2304, *ll*. 22-24; A.R. 2368, *ll*. 11-13; A.R. 2369, *ll*. 18-21).

Further, Natick's failure to include guidance counselors and Mr. Francoise at the team meeting in July 2012 precluded the Parents from having their specific questions answered with regard to the ACCESS program and the electives that would be available to C.D. (which would have been C.D.'s only opportunity to be included with nondisabled peers in an academic setting).   In addition, Natick's failure to invite Ms. Liptak not only limited the Parents' access to information regarding C.D.'s progress in the summer program, but also precluded Natick from disregarding the information presented by the Parents and their experts, who were the only

persons at the meeting with current knowledge about C.D.  *See* 45 C.F.R § 300.116(a)(1)

(requiring the placement decision to be made by persons knowledgeable about the child).

### C.   PRESENT LEVELS OF PERFORMANCE

####   1.   Natick's attempt to excuse its failure to update the 2013-2014 IEPs and the first two IEPs for 2014-2015 by blaming Learning Prep for not providing updated information is contrary to the IDEA.

Natick admits that it failed to update C.D.'s presents levels of performance in the 2012-

2013 and 2013-2014 proposed IEPs indicating "the 2012-2013 and 2013-2014 IEPs were

substantially similar because Natick did not have any new information to consider."  (Opp. 8).

In support of this argument, Natick cites A.R. 1680, *ll*. 9-17 (which references Dr. Imber's

testimony regarding the transition program proposed by Natick in 2014) and A.R. 2422, *ll*. 17-

21 (which references Ms. McGovern's equivocal testimony that: "In 2013-2014, because we

had limited new information, and because it wasn't a reevaluation year, we proposed – and

because we hadn't – we had believed that our proposal was appropriate the year previously, we

didn't propose anything new.")

Dr. Imber's testimony regarding the proposed transition program not only fails to

support Natick's argument, but is completely irrelevant to it.  On the other hand, while not

irrelevant to its argument, Ms. McGovern's testimony evidences Natick's complete disregard of

the law requiring *annual* reviews and supports the Parents' argument that Natick failed to

update information annually as required by law.

It is not acceptable for a school district to abdicate its responsibility for obtaining

information necessary to conduct annual reviews by simply indicating under every goal in the

IEP that, "The District is unable to update the Current Performance Level due to insufficient

data from Learning Prep School regarding [C.D.'s] performance," as Natick did and which

Natick cites in support of its excuse for failing to update C.D.'s IEP as required. (A.R. 2584-A.R.2590).

> **2.      Natick's failure to update the IEP proposed for the
> 2013-2014 school year and the first two IEPs for the
> 2014-2015 school year, dated April 15, 2014 – April 15,
> 2015 and June 13, 2014 – June 13, 2015 constitutes a
> denial of FAPE.**

Despite its earlier admission that it failed to update current performance levels in the

IEP for the 2013-2014 school year and the first two IEPs for the 2014-2015 school year (Opp.

8), Natick later denies that it failed to do so (Opp. 19), but states that even if it did, it is not

necessarily a denial of FAPE, indicating that Parents failed to explain how the omission resulted

in a denial of FAPE in this case, citing *T.F v. The New York City Dep't of Educ.* No.14CV3401,

2015 WL 5610769, at *4 (S.D.N.Y. Sept. 23, 2015), *appeal withdrawn* (Jan. 12, 2016), as

support for the proposition that "failure to conduct a vocational assessment, in and of itself,

does not rise to the level of a FAPE deprivation where the CSE had sufficient information about

the student to determine the student's educational needs").  (Opp. 20) Comparing this case to

the present case, Natick makes the conclusory statement that Natick had sufficient information

to determine C.D.'s needs and the IEP was appropriate based upon the information it had. (*Id.*)

Notwithstanding the contradiction between this statement and Natick's previous statement

conceding that "the 2012-2013 and 2013-2014 IEPs were substantially similar because Natick

did not have any new information to consider" (Opp. 8), substantial evidence shows that unlike

the School District in *T.F v. The New York City Dep't of Educ.(supra),* Natick clearly did not

have sufficient information about C.D. to determine her educational needs.  Given the

substantial changes Natick made to the third IEP for the 2014-2015 school year following

Natick's assessments and receipt of information from Learning Prep, it is also clear that

Natick's failure to update current performance levels in the prior IEPs precluded C.D. from being offered more appropriate services earlier than June 13, 2014.

### D.   TRANSITION

**1.   Natick's contention that the IEPs for the 2012-2013, 2013-2014 and the first IEP for the 2014-2015 school years were appropriate despite Natick's failure conduct transition assessments ignores the evidence and the law.**

Natick's attempt to justify its failure to conduct a transition assessment until C.D. was 17.5 years old, by arguing that formal assessments are not required, makes a mockery of the intent and purpose of the Massachusetts Technical Advisory that it cites in support of its argument.  (Opp. 13). In addition, the cases Natick cites do not lend support to its position, given that actual transition services were provided to the students in those cases.  (Id.)  The evidence in this matter is clear and uncontroverted: Natick not only failed to conduct *formal* transition assessments, it failed to conduct *any* transition assessments.  (Opp. 13). In response to Ms. McGovern's statement that: "We did not conduct a formal transition assessment between 2012 and 2014." (A.R.2392, *ll.*18-22), the Parents' attorney asked, "Did you conduct any assessments?" to which Ms. McGovern testified, "No."  (A.R.2392, *ll.*20-22)

**2.   Natick's assertion that Parents and their witnesses acknowledged transition planning does not excuse its failure to conduct a transition assessment, which provides the information upon which transition planning must be based.**

Natick's assertion that Parents and their witnesses acknowledged transition planning for C.D. (Opp. 13), does not excuse its failure to conduct a transition assessment, which provides the information upon which transition planning must be based.  In support of their argument Natick cites: A.R. 1639, *l.*24-A.R. 1640 *l.*1, A.R. 1644, *ll.* 17-18 (which references the father's

testimony that the transition goals were very vague, the transition plan was "terrible" and that

Natick did <u>not</u> do a transition assessment); A.R. 1736, *ll*. 4-6 (which references Ms. Coellner's

testimony indicating that she could not recall the transition program proposed in November

2014); A.R. 1741, *ll*. 14-16 (which references Ms. Coellner's testimony that the Transition

Planning Form included a vague goal entitled "Independent Living Skills"); A.R. 1753, *ll*. 9-15

(which simply references Ms. Roffman's testimony that a Transition Planning Form was

attached to the IEP).

> **3.     The third IEP proposed by Natick for the 2014-2015 school year,
> dated November 14, 2014 – November 14, 2015, while more
> appropriate than the prior IEPs, was still not reasonably calculated
> to provide C.D. with FAPE in the LRE.**

While the third IEP proposed for the 2014-2015 school year finally proposed placement

in some Replacement classes and general education History, and was based upon the transition

assessment, which was finally conducted in November 2014, the IEP continued to place C.D. in

the ACCESS program for Math, which would have precluded her from preparing for and taking

the MCAS.  (A.R.2954-A.R. 2957.  As support for its determination that C.D. remain in the

ACCESS program for Math, Natick cited A.R. 244, *ll*. 14-22 (which referenced a single page

from C.D.'s neuropsychological evaluation in 2012), and which was therefore unrelated to the

argument it was purported to support.

The IEP also included a change in C.D.'s disability category from Intellectual to

Communication based upon an incomplete evaluation by Natick's school psychologist, Donna

Cymrot.  (A.R. 1610; A.R.1657, *ll*. 8-14; A.R. 2139-2140; A.R. 2162, *l*. 11 – A.R. 2159, *l*. 20;

A.R.2152, *ll*. 8-11).   Although Parents do not dispute that Natick correctly pointed out that

under the law the change in disability category should not affect the services proposed for C.D.,

the evidence on the record shows that Natick acted otherwise.  (A.R.406, *ll*.16-20).

### E.      WITNESS CREDIBILITY

#### 1.      The Hearing Officer improperly discredited the father's testimony.

Natick's contention that "Parents presented no evidence at the hearing that the IEP was inappropriate other than Student's father's opinions of the goals and allegedly decreasing services, but his testimony was not persuasive since he has no education credentials," (Opp. 8) does not specify to which IEP it is referring; but regardless it completely ignores the substantial evidence on the record provided by the Parents in support of their claims about all of the IEPs at issue in this matter, including within the father's testimony cited by Natick in support of this contention.  (Opp. 25; A.R. 1665, *l*.10-A.R.1666, *l*. 13).

In addition, the father's testimony, which the Hearing Officer discounted due his lack of education credentials, was based upon the 10-day notice to which he referred and which was written based upon the opinions of the experts he hired who had substantial education credentials of their own (A.R. 1639, *ll*. 5-7, A.R. 1660, *ll*.1-6); A.R.1659, *ll*.17- 24; A.R.1660, *ll*.1-6).

The Hearing Officer's rationale for discrediting the father's testimony, therefore, is an *ad hominem* fallacy, and is not entitled to deference, as the father's education credentials or lack thereof have no bearing on the truth of his statements, which were supported by substantial evidence on the record. (Id.)

#### 2.      The Hearing Officer misrepresented the testimony of
#### Ms. Flax and Dr. Imber.

The Hearing Officer misrepresented the testimony of Ms. Flax and Dr. Imber which Natick simply repeated in its response despite evidence on the record to the contrary.  Dr. Imber supported C.D.'s continued placement at Learning Prep *at the time of the hearing* based

upon the benefits she experienced between 2012 and 2014, and he initially supported the

Parents' placement at Learning Prep only because Natick offered no other options than the

self-contained ACCESS program for all of C.D.'s core academic classes in 2012, despite her

success for the past three years in the general education classroom at McAuliffe.  (A.R.2071,

*ll*.7-9; A.R.2072, *l*.4 – R.2072, *l*.8; A.R.2087, l.7-A.R.2088, *l*.5; A.R.2089, *ll*.3-11; A.R.2090,

*l*.21-A.R.2091, *l*.4).

Ms. Flax's testimony was that C.D. would not benefit from inclusion to the extent that it

required her to leave Learning Prep and return to Natick for the following school year, given the

benefits she experienced at Learning Prep between 2012 and 2014.  Specifically, Ms. Flax

testified, "I feel, during the school day, given the type of environment she is in, she should not be

integrated with typically developing peers at this time." (A.R.1882, *ll*.14-17; A.R.1883, *ll*.1-12).

> **3.     Natick's claim that the Hearing Officer "considered"
> the testimony of Ms. Coellner and Dr. Roffman is not
> supported by the record.**

Natick's assertion that the Hearing Officer "considered" the testimony of Ms. Coellner

and Dr. Roffman (Opp. 25), because she simply cites some of the facts to which they testified in

the "Summary of the Evidence," section of her decision does not support its argument.

(A.R.1691- A.R.1745; A.R.1745-A.R.1805).

> **4.     Natick's claim that the Parents cite to no evidence that
> Ms. Cymrot's testing results were incomplete is not
> supported by the record.**

Natick's assertion that the Parents failed to cite evidence that supported their claim

that Ms. Cymrot's testing results were incomplete (Opp. 26) is not supported by the

record.  (A.R. 1610; A.R.1657, *ll*. 8-14; A.R. 2139-2140; A.R. 2162, *l*. 11 – A.R. 2159, *l*.

20; A.R.2152, *ll*. 8-11).   If Natick is implying that the Hearing Officer's proper

credibility determinations should be dependent on whether the Parents' cite to the record, rather than her own review of the testimony and evidence, then that argument must fail.

> **5.**      **Natick's rationale for supporting the Hearing Officer's decision to credit Ms. Liptak's testimony, is curiously similar to its rationale for supporting the Hearing Officer's decision to discredit Ms. Coellner testimony.**

Natick's argument that the Hearing Officer properly credited the testimony of Ms. Liptak because she worked with C.D. (for five (5) weeks) during the summer program in 2012, (and did not conduct any formal evaluations) (Opp.26) clearly contradicts its argument that the Hearing Officer properly discredited Ms. Coellner because she had not worked with C.D. since 2012 (two-three (2-3) days per week for three (3) years) and did not conduct any formal evaluations.  This obvious contradiction diminishes both the Hearing Officer's credibility determination with regard to these two witnesses, as well as Natick's argument supporting it.

> **6.**      **The Hearing Officer's refusal to consider the reports submitted by Dr. Imber, Ms. Flax, and Dr. Roffman for reasons other than consideration of the appropriateness of the third IEP for the 2014-2015 school year was improper.**

The Parents do not contest the Hearing Officer's refusal to consider the reports submitted by Dr. Imber, Ms. Flax and Dr. Roffman for the purpose of determining whether the third IEP for the 2014-2015 school year provided C.D. with FAPE in the LRE, consistent with the decision in *Jacob Doe v. Richmond Consolidated School District*, U.S.D.C. Civil Action No. 15-30027, *11 (May 31, 2016); however, the Parents did not intend for the Hearing Officer to consider them solely for this limited purpose.

The reports in this matter were submitted timely pursuant to Rule IX of the BSEA rules for consideration with regard to multiple other issues, including, but not limited to, documentary support for the experts' testimony, evaluation of their credibility based upon their

experience and knowledge of the facts in this matter, including their review of other reports and contacts with service providers in all relevant settings (McAuliffe, Natick and Learning Prep), their assessment of the prior IEPs for which their reports would not have been considered regardless of the date of submission, and as evidence with respect to the restrictions imposed by Natick on their abilities to obtain information, which led to their inabilities to complete their reports in time for consideration by Natick in the first place.  (A.R.3107-A.R.3162)

## I.  **CONCLUSION**

For all the foregoing reasons, Parents are entitled to judgment in their favor as a matter of law and respectfully request that this Honorable Court grant their Motion for Summary Judgment.  DATED this 26th day of September 2016.

Respectfully submitted,

C.D., by and through her PARENTS
AND NEXT FRIENDS, M.D. and P.D.

By their attorney,

/s/ Laurie R. Martucci
Laurie R. Martucci, Esq.
BBO # 561946
Wagner Law Associates,
LLC 4 West Street
Franklin, MA 02038
(508) 528-4007
lrm@wagnerlegal.com

## **CERTIFICATE OF SERVICE**

I hereby certify that the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF"), and paper copies will be sent to those indicated as non-registered participants on September 26, 2016.

/s/ Laurie R. Martucci
Laurie R. Martucci