**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| ) | Civil Action No.  15-cv-13617-FDS |
| ) |  |
| C.D., by and through her PARENTS AND ) |  |
| NEXT FRIENDS, M.D. and P.D. ) |  |
| ) |  |
| Plaintiffs, ) |  |
| v. ) |  |
| ) |  |
| NATICK PUBLIC SCHOOL DISTRICT ) |  |
| and ) |  |
| BUREAU OF SPECIAL EDUCATION ) |  |
| APPEALS, ) |  |
| ) |  |
| Defendants. ) |  |
| ) |  |

**PLAINTIFFS' REPLY TO NATICK PUBLIC SCHOOLS' RESPONSE TO PLAINTIFFS'
AMENDED STATEMENT OF MATERIAL FACTS AND NATICK PUBLIC SCHOOLS'
ADDITIONAL STATEMENT OF UNDISPUTED MATERIAL FACTS**

The Plaintiffs, C.D., and her Parents, M.D. and P.D. ("Parents"), on behalf of their

daughter and themselves, respectfully submit this Reply to Natick Public Schools' Response to

Plaintiffs' Amended Statement of Material Facts and Additional Statement of Undisputed Material

Facts.

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

**The Parties**

1.        The Plaintiffs, M.D. and P.D. are C.D.'s father and mother respectfully, who

bring this action on behalf of C.D. and  themselves.

**Natick's Response:** Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

1

does not require a reply.

2.      The Plaintiff, C.D is a student with a disability who is entitled to all the rights, entitlements, and procedural safeguards mandated by applicable law and statutes, including, but not limited to, the IDEA, and M.G.L. c.71B.

**Natick's Response:** Natick states that this paragraph is a legal conclusion, which does not require a response.

**Parents' Reply:** The Parents state that this paragraph is a legal conclusion and does not require a reply.

3.      C.D. is and was at all times relevant to this action, a resident of Natick, Middlesex County, Massachusetts.

**Natick's Response:** Admitted.

**Parents' Reply:** The Parents state that this paragraph was admitted by Natick and does not require a reply.

4.      C.D. attended public school in Natick through the end of 5th grade pursuant to IEPs proposed by the Natick Public School District ("Natick") and accepted by the Parents.

**Natick's Response:** Admitted.

**Parents' Reply:** The Parents state that this paragraph was admitted by Natick and does not require a reply.

5.      The Parents enrolled C.D. in the Christa McAuliffe Regional Charter School ("McAuliffe"), in Framingham, Massachusetts, which she attended, in the general education inclusion classroom for 6th, 7th and 8th grades.

**Natick's Response:** Admitted. Natick adds that the McAuliffe Regional Charter

School (McAuliffe) is a local education agency ("LEA"), and that once parents enrolled C.D. there, Natick had no further obligation to provide her with a free appropriate public education and/or any educational services. C.D. attended McAuliffe with the full time assistance of personal one-to-one aides provided by her parents.  R.1718, *ll.*8-24.

**Parents' Reply:**  The Parents admit that Ms. Coellner and Ms. Soden shared a full-time job and provided C.D. with assistance.  The page cited by Natick does not support Paragraph 5.

6.        C.D. is currently enrolled at Learning Preparatory School ("Learning Prep"), a state-approved special education school in Newton, Massachusetts, where the Parents privately placed her in September 2012, following their rejection of Natick's proposed placement for 9th grade.

**Natick's Response:**  Natick admits that C.D. is currently enrolled at Learning Prep School ("Learning Prep"), a state-approved special education school in Newton, Massachusetts. Although Parents privately placed her there in September, 2012, after they rejected Natick's proposed placement for 9th grade, the evidence suggests that the Parents intended to privately place C.D. at Learning Prep as early as June, 2012.   R.4054.

**Parents' Reply:** The Parents deny that there is any evidence that the Parents intended to privately place C.D. at Learning Prep as early as June, 2012, either in the document cited by Natick or anywhere else in the record.  The Parents add that a variety of possible conclusions are "suggested" by the document Natick cited, that the document presents an opinion from a non-witness, and that there was no testimony with regard to the document presented by either party at the hearing.

7.        C.D. was attending 12th grade at the time of the hearing.

**Natick's Response:**  Admitted.[1]

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

8.      M.D. and C.D. are and were at all times relevant to this action, residents of Natick, Middlesex County,  Massachusetts.

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

9.      The Defendant, Natick, is a public corporation with the capacity to be sued under the laws of the Commonwealth of Massachusetts, with a usual place of business located at 13 E. Central Street, Natick, Middlesex County,  Massachusetts.

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

10.      Natick receives federal funds from the United States Department of Education pursuant to the IDEA, and is required to provide special education services to all eligible students who reside within the school  district.

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

11.      The Defendant, Bureau of Special Education Appeals "BSEA", is an

---

[1] Please note the following correction to Paragraph 7:  C.D. was attending 11th grade not 12th grade at the time of the hearing.

independent subdivision of the Division of Administrative Law Appeals, an independent state agency within the Commonwealth of Massachusetts, with a usual place of business at One Congress Street, Boston, Suffolk County, Massachusetts.

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

12.      The BSEA is responsible for adjudicating disputes between parents and school districts regarding special education services pursuant to 20 U.S. §1415(g) and M.G.L.  c.71B §2A. (A.R.818).

**Natick's Response:**  Natick states that this paragraph is a legal conclusion, which does not require a response.

**Parents' Reply:**  The Parents state that this paragraph is a legal conclusion and does not require a reply.

## PROCEDURAL HISTORY BEFORE THE BSEA

13.      The Parents filed their initial request for hearing on May 23, 2014, which they amended on April 1, 2015 based upon events that transcribed [sic] subsequent to the initial filing date.

**Natick's Response:**  Natick admits that Parents filed these documents and that documents speak for themselves.

**Parents' Reply:**  Admitted.

14.      Natick filed its response to the Parents initial request for hearing on June 2, 2014.

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

15.     The hearing was held on May 12, 2015, May 13, 2015, May 27, 2015, and May 28, 2015.

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

**The Parents' Witnesses**

16.     The Parents' witnesses who provided testimony at the hearing with regard to the appropriateness of the proposed programs for C.D. included: (1) Ms. Nan Coellner; (2) Ms. Suzanne Flax; (3) Dr. Steve Imber; and (4) Dr. Arlyn Roffman.

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

17.     Nan Coellner, a retired special education teacher, with over thirty years' experience in the Boston Public Schools (A.R.3189), worked with C.D. in the general education classroom at McAuliffe for at least two days per week from September 2009 through May 2012. (A.R.1697).

**Natick's Response**:  Admitted. Natick adds that Ms. Coellner was employed by C.D.'s father, not by McAuliffe. R.1716, *ll.*8-13.  She learned of the job through a posting on Craigslist. R.1694, *ll.*11-21.

**Parents' Reply**:  Admitted.

18.     Ms. Coellner observed C.D. and spoke with her teachers at McAuliffe and Learning Prep, and observed the proposed program for C.D. at Natick.

**Natick's Response:**   Denied.   Ms. Coellner never observed the replacement classes in Natick. R.1713, *ll.*8-12. Moreover, she did not observe the Natick program in 2012 or 2013, only in 2014.  R.1714, *ll.*4-16.  Ms. Coellner admitted in her testimony that she did not talk to teachers at Learning Prep.  R.1724, *ll.*18-21.

**Parents' Reply:**  Admitted that Ms. Coellner did not observe the replacement classes in Natick.  Admitted that Ms. Coellner did not observe the Natick program in 2012 or 2013, only in 2014.  The Parents add that Ms. Coellner did not observe the Natick program prior to 2014 because Natick denied the Parents' request for her to do so.  (A.R. 1714, *ll.* 14-18; A.R. 360, A.R. 370; *see generally* A.R.3112-3173).[2]  Admitted that Ms. Coellner admitted in her testimony that she did not talk to teachers at Learning Prep.

19.     Ms. Coellner testified that she reviewed the IEPs proposed by Natick for C.D.'s 2012-2013, 2013-2014, and 2014-2015 school years and attended team meetings for C.D. on May 24, 2012, July 27, 2012, and November 11, 2014. (*See* A.R.1691-1745).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

20.     Suzanne Flax, a speech therapist with over thirty years' experience (A.R.3217), has been working with C.D. one day per week since 2007, when the Parents hired her to provide C.D. private speech therapy. (*See* A.R.1840-1914).

**Natick's Response**:  Admitted that Ms. Flax is a speech/language pathologist who has

---

[2] Consistent with the format in Plaintiffs' Amended Memorandum of Law in Support of Motion for Summary Judgment, the Parents cite to the Administrative Record with "A.R." The transcript is included in the record and citations to the transcript are to the pages of the record rather than the pages of the transcript volumes.  (Line numbers are designated "*ll.*x-x", e.g. *ll.*2-3).

provided C.D. with speech and language services since she was in the fourth grade. Natick

denies that she has over thirty years of experience as a speech therapist because her first job as

a speech- language pathologist was in 1987, twenty-eight years before the hearing in 2015.

(A.R.3220).

**Parents' Reply:**  The Parents state that Ms. Flax worked as a Speech-Language Clinical

Fellow in 1985, thirty years before the hearing in 2015. (A.R. 3220).

21.    Ms. Flax observed C.D. and spoke with her teachers at McAuliffe and Learning

Prep, and observed the proposed program at Natick; Ms. Flax testified that she reviewed all of

the IEPs proposed by Natick for 2012-2013, 2013-2014, and 2014-2015, and attended team

meetings at Natick on May 24, 2012 and November 11, 2014. (*See* A.R.1840-1914).

**Natick's Response:**  Admitted that she attended Team meetings in May, 2012 and

November, 2014. Ms. Flax did not observe the Natick program in 2012 or 2013, only in 2014.

R.1848, *ll.*13-17. Ms. Flax did not testify that she spoke to the teachers at McAuliffe. R.1840-

1864, 1870-1915.

**Parents' Reply:**  Admitted that Ms. Flax did not observe the Natick program in 2012

or 2013, only in 2014. The Parents add that Ms. Flax did not observe the Natick program prior

to 2014 because Natick denied the Parents' request for her to do so.  (A.R. 360, A.R. 370).

Admitted that Ms. Flax did not testify with regard to whether she spoke to the teachers at

McAuliffe.

22.    Dr. Imber, an educational evaluator/consultant, and Professor of Special

Education at Rhode Island College with over forty years' experience (A.R.3190), was hired by

the Parents in 2009 to conduct an independent evaluation of C.D.; he conducted evaluations in

2009, 2010, 2012, and 2014, which included observations of C.D., reviews of previous

evaluations, and standardized academic testing. In addition to conducting evaluations, Dr.

Imber has served as an educational consultant to the Parents, observing C.D.'s programs,

speaking with her teachers, and providing feedback to the Parents. (*See* A.R. 2015-2131).

 **Natick's Response**:  Admitted.

 **Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

 23. Dr. Imber observed C.D. and spoke with her teachers at McAuliffe and

Learning Prep, and has observed the proposed program at Natick.

 **Natick's Response**:  Admitted that Dr. Imber observed C.D. and spoke with her teachers

at McAuliffe and Learning Prep. Dr. Imber did not observe the Natick program in 2012 or 2013,

only in 2014.   R.2047, *ll.*22-24.

 **Parents' Reply**:  Admitted that Dr. Imber did not observe the Natick program in

2012pr 2013.  The Parents add that Dr. Imber did not observe the Natick program prior to

2014 because Natick denied the Parents' request for him to do so.  (A.R. 360, A.R. 370).

 24. Dr. Imber testified that he reviewed all of the IEPs proposed for the 2012-

2013, 2013-2014, and 2014-2015 school years, and attended team meetings at Natick on May

24, 2012, July 27, 2012, June 13, 2014, November 11, 2014, and January 7, 2014. (*See*

A.R.2015-2131).

 **Natick's Response**:  Admitted.

 **Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

 25. Natick's witnesses who provided testimony at the hearing with regard to

the appropriateness of the proposed programs for C.D. included: (1) Karen Liptak; (2)

Sarah Karian; (3) Donna Cymrot; and (4) Christine Michelson.

**Natick's Response:**  Admitted.  Natick adds that Lindsey McGovern and Kathryn

Brown also testified to the appropriateness of Natick's programs.

**Parents' Reply:**  Admitted.  The Parents add that the father, Dr. Erin Gibbons,

Cynthia Manning, Carol Tsang, Nancy d'Hemecourt, and James Francoise, were also

witnesses called by the Parents to provide testimony at the hearing.

26.     Karen Liptak, a special education teacher at Natick High School, worked with

C.D. in the summer of 2012, providing the academic component of her ESY program.

(*See* A.R.2320-2345).

**Natick's Response:**  Admitted.  Natick adds that she taught both the academic

component and phonology.  R.2325, *ll.*13-14.

**Parents' Reply:** Admitted.

27.     Ms. Liptak has never observed C.D. at Learning Prep; Ms. Liptak attended team

meetings for C.D. on May 24, 2012, November 11, 2014, and January 7, 2015. (*See* A.R.2320-

2345).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

28.     Ms. Liptak did not attend the IEP team meeting on July 27, 2012 (even though

she had provided services to C.D. during the ESY program earlier that month).

**Natick's Response:**  Admitted.  Natick adds that Ms. Liptak explained why she did not

attend the meeting. She testified that "[t]he summer program is only five weeks in duration. I

really think the charter school personnel would have been probably more important at that time

than the summer school people. They had a longer relationship with her. We would have had a snapshot of information to really contribute." R.2326, *ll.*13-18.

**Parents' Reply:**  Admitted that Ms. Liptak so testified.  The Parents add that at the meeting on May 24, 2012, Ms. Dalan specifically indicated that C.D.'s participation in the summer program would enable Natick to get to know C.D., "…we can offer a similar level of summer services, which, should you choose to access that, would be probably helpful for us to get to know her…"  (A.R.307, *ll.*23-25).

29.     Ms. Liptak testified that she did not review the IEPs proposed by Natick for C.D.'s 2012-2013, 2013-2014 school years. (*See* A.R.2320-2345).

**Natick's Response:** Denied.  Ms. Liptak never testified that she did not review the IEPs that Natick proposed. Instead, she acknowledged that she read some of the Student's records. R.2334, *ll.*16.

**Parents' Reply:** Admitted that Ms. Liptak did not testify with regard to whether she reviewed the IEPs.  Denied that she acknowledged that she read some of the Student's records.  The Parents do not see this statement in Ms. Liptak's testimony, either specifically on the page that Natick cites or anywhere else in her testimony.

30.     Sarah Karian, Speech Language Pathologist at Natick High School, first met C.D. on May 27, 2014, per Natick's request that she conduct a speech and language evaluation for C.D.'s three-year reevaluation. (*See* A.R.2183-2215).

**Natick's Response:** Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

31.     Ms. Karian conducted her evaluation at Learning Prep but did not observe

C.D. in any of her classes or speak with any of her teachers, indicating in her testimony that she doesn't think it was important for her to observe C.D. as part of her evaluation. (*See* A.R.2183-2215).

**Natick's Response**:  Admitted.  Ms. Karian explained that, when doing a communication evaluation, it is not necessary to do an observation.  R.2201, *ll.*17-23.

**Parents' Reply**: Admitted that Ms. Karian so testified.

32.     Ms. Karian attended team meetings on June 13, 2014 and January 7, 2015; Ms. Karian did not attend the team meeting on November 11, 2014, at which the team reviewed Ms. Flax's most recent Speech and Language Evaluation. (*See* A.R.2183-2215).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

33.     Ms. Karian did not testify with regard to whether she reviewed the IEPs proposed for the 2012-2013, 2013-2014, and 2014-2015 school years. (*See* A.R.2183-2215).

**Natick's Response**:  Ms. Karian testified that she reviewed C.D.'s IEPs.  R.2201, *l.*24 – R.2202, *l.*2.

**Parents' Reply**:  The Parents admit that Ms. Karian so testified.

34.     Donna Cymrot, a school psychologist at Natick High School, first met C.D. in May of 2014 as a result of Natick's request that she conduct a psychological evaluation as part of her three-year reevaluation. Ms. Cymrot observed C.D. at Learning Prep when she

conducted her evaluation but did not speak with any of her teachers. Ms. Cymrot attended

team meetings on May 24, 2012, June 13, 2014, and November 11, 2014. (See A.R.2132-

2175).

**Natick's Response:**  Admitted, except that Ms. Cymrot did not testify that she did not

speak with any of C.D.'s teachers. R.2132 -2177.

**Parents' Reply:**  Admitted that Ms. Cymrot did not testify with regard to whether she

spoke with any of C.D.'s teachers.

35.     Ms. Cymrot testified that she did not review any of the IEPs proposed for

C.D. for the 2012-2013, 2013-2014, or 2014-2015 school years, and did not review all of the

previous psychological reports, including those conducted by Natick in 2012, which

contradicted her findings, and the Neuropsychological Evaluation provided by Dr. Gibbons

and about which Dr. Gibbons testified at the hearing. (*See*  A.R.2183-2215).

**Natick's Response:** Admitted that Ms. Cymrot did not review the report Dr.  Gibbons

testified about or the 2012-2013 or 2013-2014 IEPs. Natick denies that Ms. Cymrot did not

review the 2014-2015 IEPs because she testified she helped create them. R.2160, *ll.*14-18.

Natick denies that the 2012 report contradicted Ms. Cymrot's findings. R.945- 954; R.2825-

2833.  Natick also denies that Ms. Cymrot did not review Natick's evaluations. R.2141, *l.*24 –

R.2142, *l.*1. Natick adds that Ms. Cymrot did not review Dr. Gibbons' 2012 report because

Natick did not have the report.  R.2141*, ll.*11-12.   Ms. Cymrot did not include every evaluation

that was ever done. She reviewed previous Natick Public Schools' evaluations and the

Massachusetts General report. R.2141, *l.*24 – R.2142*, l.*5; R.2164*,  ll.*14-15.

**Parents' Reply:** Admitted that Ms. Cymrot testified that she participated in writing the

2014-2015 IEP at the meeting on June 13, 2014. (A.R.2160, *ll.*14-18). The Parents add that Ms.

Cymrot did not testify with regard to whether she reviewed the final proposed IEP dated 6/13/2014-6/13/2015.  (A.R.2131-2176).

The Parents deny that Ms. Cymrot testified that she helped create the first two IEPs proposed for 2014-2015 dated 4/15/2014-4/15/2015 and 11/14/2014-6/13/2015.  The Parents add that Ms. Cymrot did not testify with regard to whether she reviewed the IEPs dated 4/15/2014-4/15/2015 and 11/14/2014-6/13/2015.

The Parents admit that Ms. Cymrot testified that the 2012 report did not contradict her findings. (A.R.2152, *ll*.14-16).  The Parents add that Ms. Cymrot testified that she did not review any of the test results from 2012 until the date she testified at the hearing (A.R.2152, *l*.10).

The Parents admit that Ms. Cymrot testified that she reviewed reports that were done by Natick previously (A.R.2141, *l*.24-A.R.2142, *l*.1).

The Parents admit that Ms. Cymrot testified that she did not review Dr. Gibbons' 2012 report because Natick did not have the report; however, the Parents deny that Natick did not have the report. (*See* Paragraph 72 *infra*).

The Parents admit that Ms. Cymrot testified that she did not include every evaluation that was ever done.

The Parents also admit that Ms. Cymrot testified that she reviewed previous Natick Public Schools' evaluations and the Massachusetts General report. (A.R.2141, *l*.24 – A.R.2142, *l*.5; A.R.2164, *ll*.14-15).  The Parents add that the Massachusetts General report was completed in 2003 when C.D. was in kindergarten (A.R.2142, *ll*.1-5).  The Parents also add that Ms. Cymrot testified that she had no idea there were more recent evaluations conducted (A.R. 2170, *l*.14-15).

14

36.     Christine Michelson, the Lead ACCESS teacher since October 2014, had never met C.D. (*See* A.R.2382-2319).

**Natick's Response:** Admitted.

**Parents' Reply:** The Parents state that this paragraph was admitted by Natick and does not require a reply.

37.     Ms. Michelson had never observed C.D. at McAuliffe or Learning Prep or consulted with any of her teachers. (*See* A.R.2382-2319).

**Natick's Response:** Admitted, except Natick denies that Ms. Michelson never consulted with any of C.D.'s teachers because there was no testimony to this effect.   R.2282-2343.

**Parents' Reply:** Admitted that Ms. Michelson did not testify with regard to whether she ever consulted with any of C.D.'s teachers.

38.     Ms. Michelson testified that she did not review the IEPs proposed by Natick prior to the IEP currently proposed for the 2014-2015 school year, and did not review all of the evaluation reports, including the Neuropsychological Evaluation provided by Dr. Gibbons and about which Dr. Gibbons testified at the hearing. (*See* A.R.2382-2319).

**Natick's Response:** Admitted, except that Ms. Michelson testified that she reviewed evaluation reports for C.D.  R.2287*, ll.*10-12.

**Parents' Reply:** Admitted, except that Ms. Michelson testified that she did not review the Neuropsychological Evaluation provided by Dr. Gibbons and about which Dr. Gibbons testified at the hearing. (A.R.2287, *l.*15).

39.     Ms. Michelson attended team meetings on November 11, 2014 and January 7, 2015. (*See* A.R.2382-2319).

**Natick's Response:** Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

**The Issues Exhausted**

40.    The following issues were exhausted at the BSEA hearing: (a) Whether the IEPs proposed by Natick for the periods from 2012-2013 (A.R.2603), 2013-2014 (A.R.2628), and 2014-2015 (A.R.2551, A.R.2529, A.R.2503) were reasonably calculated to provide C.D. with a FAPE in the LRE; (b) Whether there were any procedural violations committed by Natick that resulted in a denial of a FAPE to C.D.; (c) Whether Natick engaged in any discrimination or retaliation in violation of 42 U.S.C. § 1983 and Section  504 of the Rehabilitation Act of 1973 (to preserve the Parents' right to file a claim for damages at a later date).  (A.R.1549-1574).

**Natick's Response:**  Admitted, except that Natick does not know the reason Parents' filed the 42 U.S.C. § 1983 and Section 504 of the Rehabilitation Act of 1973 claims.

**Parents' Reply:** The Parents state that the reason Parents filed the 42 U.S.C. § 1983 and Section 504 of the Rehabilitation Act of 1973 claims was clearly set forth in Claim VII of their Amended Complaint filed on April 1, 2015.  (A.R. 3086).

41.    On December 5, 2014, pursuant to the Parents' discovery request, Natick provided the Parents with redacted IEPs for students in the ACCESS program between September 2012 and the current date, which revealed the profile of students who would have been C.D.'s peers. (A.R.4182).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

42.     The IEPs revealed that there were students with autism; there were students who were nonverbal, and students with emotional and behavioral challenges.  (A.R.4182)

**Natick's Response:** Natick states that the IEPs speak for themselves.

**Parents' Reply:**  Admitted.

**The Motion to Compel**

43.     On November 12, 2014, the Parents filed a Motion to Compel Independent Evaluators and Educational Consultants Access to School Staff ("Motion to Compel"), a supporting Memorandum of Law, which included two verified affidavits and sixteen exhibits. (A.R.732-944; A.R.3112-3173).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

44.     The Motion to Compel was a result of conditions placed upon the Parents' and their experts with regard to their observations of the proposed program during October and November 2014; and which prevented them from obtaining the information that they needed and were entitled to receive.  (A.R.732-944; A.R.3112-3173).

**Natick's Response:** The Parents' Motion to Compel speaks for itself.

**Parents' Reply:**  Admitted.

45.     Natick justified restricting the observations based upon allegations against Dr. Imber and Ms. Flax, accusing them of interrogating Natick staff and making them feel uncomfortable during their observation in June 2014.  (A.R.732-944).

**Natick's Response:**  Natick admits that it restricted the observations in part because Dr. Imber and Ms. Flax had previously interrogated Natick staff and made them uncomfortable. R.775. Natick denies the characterization of Natick's reasoning as an "accusation." <u>Id</u>.  Moreover, Natick had other arguments for limiting access under the circumstances.  R.770-776.

**Parents' Reply:** Admitted to the extent that Natick alleged Dr. Imber and Ms. Flax had previously interrogated Natick staff and made them uncomfortable. (A.R.775).  The Parents object to the characterization of their conversations as "interrogations." Admitted that Natick had other arguments for limiting access.  (A.R.770-776).

46.     In their affidavits, Dr. Imber and Ms. Flax fervently denied the allegations against them.  (A.R.732-944).

**Natick's Response:** The documents speak for themselves.

**Parents' Reply:** Admitted.

47.     By their motion, the Parents sought to compel Natick to provide the Parents and their designated evaluators/consultants the opportunity to communicate directly, in person, and without the imposition of impermissible conditions, with the school staff in the classes they had observed in October and November 2014 (as well as in the future). (A.R.732-944).

**Natick's Response:**  The document speaks for itself.

**Parents' Reply:**  Admitted.

48.     Natick filed an Opposition to the Parents' Motion to Compel on November 20, 2014; however, Natick did not provide any evidence to support their allegations. (A.R.1279).

**Natick's Response:**  Natick denies the Parents' characterizations. Moreover, Natick was

18

not required to submit evidence to support its opposition to the motion to compel.

**Parents' Reply:** Admitted that Natick was not required to submit evidence to support its opposition to the motion to compel. The Parents state that they do not know what characterizations Natick is denying.

49.     On November 28, 2014, the Parents filed a response to Natick's Opposition, which included two additional affidavits from Dr. Imber and Ms. Flax. (A.R.1287).

**Natick's Response:** Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

50.      On April 1, 2015, five months after the motion was filed, the hearing officer issued a ruling, which ordered that the Parents could submit clarifying questions in writing to be answered by Natick in writing regarding the observations that occurred five months prior to the ruling.  (A.R.815).

**Natick's Response:** Admitted that the hearing officer ruled on the motions on April 1, 2015.  The decision speaks for itself.

**Parents' Reply:** Admitted.

51.     The Parents submitted questions in writing on April 21, 2015.  (A.R.1351).

**Natick's Response:** Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

52.     Natick objected to the form and content of the questions submitted, and following a conference call on May 1, 2015, the hearing officer issued an amended ruling

providing that Natick would submit written responses by May 7, 2015, to the questions deemed appropriate by the hearing officer. (A.R.768).

**Natick's Response**: Admitted that Natick objected to the questions submitted because they were not clarifying, but were excessively lengthy and unduly burdensome. R.1367. Natick denied that the conference call was on May 1, 2015; it took place on April 30, 2015. R.1399-1400. The hearing officer's decision speaks for itself. Id.

**Parents' Reply:** Admitted that Natick objected to the questions submitted. The Parents add that Natick indicated the reasons for its objection by correspondence dated April 21, 2015 and that the correspondence speaks for itself. (A.R.1367). Admitted that the conference call took place on April 30, 2015 and that the hearing officer's decision speaks for itself. (A.R.1399-1400).

## The Exhibits

53.     On May 5, 2015, the Parents submitted their exhibits for hearing five business days prior to the hearing in accordance with Rule IX of the BSEA rules, which included the most recent reports from Dr. Imber (A.R.3662), Ms. Flax (A.R.3802), and Dr. Roffman (A.R.3651), who had completed their reports to the extent possible (given the restrictions imposed by Natick) so that the Parents could at least submit them as exhibits for the hearing pursuant to federal law. (A.R.1409).

**Natick's Response:** Admitted that the Parents submitted their exhibits for hearing five business days prior to the hearing as required by Rule IX of the BSEA rules, and that the exhibits included the most recent reports from Dr. Imber, Ms. Flax, and Dr. Roffman. Natick denies that they had completed their reports "to the extent possible" before the hearing and plaintiffs do not cite any evidence to support that statement.

**Parents' Reply:**  Admitted.  The Parents add that they advised Natick by email that "since the district has restricted all of the parents' independent evaluators from consulting with service providers/teachers on the day of their observations…the parents' independent evaluators will not be able to complete their evaluation reports prior to the Team Meeting…" (A.R.3141).

**The Decision**

54.     The BSEA issued a final Decision on July 24, 2015 (A.R.1528-1549), which was corrected on July 28, 2015 to include three paragraphs which had been inadvertently omitted.  (A.R.1549-1574).

**Natick's Response:** Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

55.     The omitted paragraphs indicated that the hearing officer: (1) did not rely on the testimony of Ms. Flax; (2) did not rely upon the testimony of Dr. Imber; and (3) did not rely on the most recent reports submitted by Ms. Flax, Dr. Imber, or Dr. Roffman. (A.R.1549-1574).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

56.     Following a four-day hearing on May 12, 2015, May 13, 2015, May 27, 2015, and May 28, 2015, the hearing officer found that: (1) the IEPs proposed by Natick for the 20122013, 2013-2014, and 2014-2015 school years were reasonably calculated to provide C.D. with a FAPE in the LRE; (2) there was no evidence of procedural violations

that resulted in a denial of FAPE to C.D.; and (3) there was no evidence that Natick

discriminated against Student/Parents under 42 U.S.C. § 1983 or Section 504 of the

Rehabilitation Act of 1973.  (A.R.1549-1574).

**Natick's Response:**  Admitted that there was a four-day hearing on May 12, 2015,

May 13, 2015, May 27, 2015, and May 28, 2015. Otherwise, the hearing officer's decision

speaks for itself.

**Parents' Reply:**  Admitted.

57.     Because the hearing officer found that the IEPs proposed by Natick did

not deny C.D. a FAPE, she made no determination regarding whether the Parents'

placement at Learning Prep was an appropriate placement in the LRE, pursuant to the

standards applicable when parents unilaterally place their child in a private school.

(A.R.1549-1574).

**Natick's Response:**  The hearing officer's decision speaks for  itself.

**Parents' Reply:**  Admitted.

## The Material Facts

58.     C.D. has been diagnosed with Borderline Intellectual Functioning and has

been noted to have weakness in language functioning.  (A.R.3876).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

59.     Her most recent neuropsychological evaluation indicates that C.D. has a

Mild Intellectual Disability along with ongoing weaknesses in receptive and expressive

language.  (A.R.3876).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

60.    C.D. is an organized, hard-working, conscientious, cooperative student who wants to do well, is able to follow classroom routine and class expectations (A.R.3435), and appears to have good self-esteem and social skills. (A.R.2505, A.R.3231).

**Natick's Response**:  Natick admits that reports and assessments have indicated that C.D.  has exhibited the strengths alleged in this  paragraph.

**Parents' Reply**: Admitted.

61.    C.D. attended all of her classes at McAuliffe in the general education inclusion setting (with the exception of Math for 8th grade only).  (A.R.3375).

**Natick's Response:**  Admitted, except that Natick also notes that C.D. received academic support in a separate setting three times a week.   R.3388.

**Parents' Reply:**  Admitted to the extent that C.D. received academic support in a separate setting three times a week in 8th grade.  (A.R.3388).

62.    C.D. received supplementary support in the general education classroom at McAuliffe from Ms. Coellner and Ms. Soden, two retired special educational teachers/ administrators, hired by the Parents.  (A.R.1691).

**Natick's Response:**  Admitted.

**Parents' Reply:** The Parents state that this paragraph was admitted by Natick and does not require a reply.

63.     Ms. Coellner testified that she and Ms. Soden had worked with C.D. on a rotating schedule every day for 6th, 7th and 8th grade (A.R.1691); that they provided occasional support in the academic classroom (A.R.1696); and did not accompany C.D. to electives or lunch. (A.R.1696).

**Natick's Response:**  Natick admits that Ms. Coellner and Ms. Soden worked with C.D.  on a rotating schedule. Natick denies that they provided occasional support in the academic classroom. In sixth grade, they also pulled her out for math. R.1696, *l*.5. They went to small group math with her in the eighth grade. R.1696, *ll*.7-8. They would stand near her in the class and cue her as needed and remind her about what she had to do.  Id., *ll*.12-19. They would go over vocabulary and practice flash cards.  R.1701, *ll*.4-8.

**Parents' Reply:**  Admitted to the extent that Ms. Coellner and Ms. Soden provided the supplementary supports and services referenced by Natick.  Denied that these supplementary supports and services provided more than occasional support. The Parents add that C.D. was in inclusion Math in 7th grade. (A.R. 1696, *l*.6).

64.     Ms. Coellner testified that C.D. was able to access the general education curriculum at McAuliffe (A.R.1697); has excellent executive functioning skills, is very organized, works really well in groups; has beautiful handwriting and would often be the scribe during group projects.  (A.R.1697).

**Natick's Response:**  Admitted that Ms. Coellner so testified.

**Parents' Reply:**   Admitted.

65.     Ms. Coellner testified that at the end of 6th grade, C.D. had no confidence in her own academic ability; however, at McAuliffe, her self-confidence dramatically improved...when she began at McAuliffe, C.D. could fill in a blank in a sentence and at the

end of three years, she could write a composition; in 8th grade, C.D. passed the standard MCAS in English.  (A.R.1699).

**Natick's Response:**  Denied that Ms. Coellner testified that C.D. had no confidence in her own academic ability at the end of 6th grade but that her self-confidence dramatically improved at McAuliffe.  Natick does not see this statement in Ms. Coellner's testimony, either specifically on the page that Plaintiffs cite or anywhere else in her testimony. Natick admits that Ms. Coellner testified to the rest as her opinion of C.D.'s progress, but notes that Ms. Coellner admitted that she did not conduct any formal evaluations and did not formally measure any progress.  R.1715, *ll*.19-22; R.1717, *ll*.11-19.

**Parents' Reply:**  Admitted that the page cited does not include Ms. Coellner's testimony with respect to C.D.'s self-confidence, but denied that this statement does not appear in her testimony.  The Parents add that Ms. Coellner testified that, "When I met Carolyn in the sixth grade, she had no self-confidence about academics.  She was very shy, she didn't think she could do anything, and I saw her self-confidence improve."  (A.R.1697, *ll*. 7-11).

The Parents admit that Ms. Coellner testified that she did not conduct formal evaluations. The Parents deny that Ms. Coellner admitted she did not formally measure any progress on the page cited or anywhere else in her testimony.  The Parents add that Ms. Coellner testified that while she did not measure her progress in a quantitative way, she conducted qualitative analysis at least 2 days per week for 3 years, which she measured through her experience, her eye, and her expertise as a highly trained, experienced special educator and by observing the improvements in C.D.'s work product and classroom performance between 6th and 8th grade. (A.R. 1717, *l*.14-A.R. 1718, *l*.17).

66.    Ms. Coellner testified that C.D. felt like part of the group at McAuliffe,

she didn't feel special; she was one of the kids, laughing and joking in the hallway, and spending time with friends socially after school.  (A.R.1700).

**Natick's Response:**  Natick admits that Ms. Coellner testified that she thought C.D. felt as if she were part of the group, was "one of the kids," and was joking in the hallway and spending time with friends after school, but denies that she testified that C.D. didn't feel special because that statement is nowhere in Ms. Coellner's testimony.  Furthermore, Ms. Coellner drew these conclusions from her observations.  She acknowledged that she did not have conversations with C.D. about her feelings.  R.1700, *ll*.11-24.

**Parents' Reply:**  Admitted that Ms. Coellner did not specifically state that C.D. "didn't feel special," and that Ms. Coellner drew her conclusions from her observations.  The Parents deny that Ms. Coellner acknowledged she did not have conversations with C.D. about her feelings.  The Parents add that Ms. Coellner testified that she did not normally have those kind of conversations, she observed C.D. over the course of three years, observed her laughing and joking with other kids in the hallways, observed her when she was coming back from lunch or going to gym; she knew kids would call her up, and they would meet or go to parties or go bowling, etc.  (A.R.1700, *ll*.11-24).

67.     Ms. Flax testified that in 2007, C.D. presented with a severe language-based learning disability due to her overall cognitive profile; she didn't initiate verbal language, and was basically answering questions in one to three words. (A.R.1848).

**Natick's Response:**  Natick admits that is what Ms. Flax testified.

**Parents' Reply:**   Admitted.

68.     Ms. Flax testified that at McAuliffe, C.D. was in an environment where the bar was set high, she had models she could emulate, and she was growing because of

this...she was in an environment where she felt more socially engaged and was more motivated to use her language, and as a result, her attitude changed dramatically; she started talking and wanting to come to sessions..."I know for sure that her language was beginning to progress and she was eager to develop more language."  (A.R.1848).

**Natick's Response:**  Natick denies that Ms. Flax testified that C.D. had models she could emulate at McAuliffe because there is no testimony at R.1848 to that effect. Natick admits that Ms. Flax testified that the rest of the quoted language was her opinion.

**Parents' Reply:**  Admitted that Ms. Flax did not specifically state that "C.D. had models she could emulate at McAuliffe;" however, this was the clear intent of her testimony, describing why C.D. benefited by inclusion in the general education classroom at McAuliffe, "I think with any child who presents with special needs, you want to hold the bar high.  So you want them to have models that they can try to emulate.  The thing – the beauty of McAuliffe was, she was in the regular education classroom…and the bar was held high, and she was growing because of this."  (A.R.1848, *ll*.3-9).

69.     The Parents filed a request for hearing with the BSEA on November 17, 2010, when C.D. was in 7th grade.  (A.R.4116).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

70.     A hearing was held at the BSEA on February 15 and 16, 2011, and a decision was issued on March 24, 2011.  (A.R.4116).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

71.     On May 2, 2012, the Parents contacted Natick to request a meeting because C.D. would be graduating from McAuliffe in June 2012 and returning to Natick for extended year services (ESY) and High School. (A.R.161).

**Natick's Response:**  Natick admits that the Parents contacted Natick on or about May 2, 2012, to request a Team meeting to discuss C.D.'s potential enrollment in Natick for the 9th grade and for extended year services. Natick denies that the Parents intended to return C.D. to Natick because there was evidence that as of June, 2012 they intended to place C.D. at Learning Prep.  *See* R.4054.

 **Parents' Reply:**   The Parents deny that there was evidence that as of June, 2012 the Parents intended to place C.D. at Learning Prep either on the document cited by Natick or anywhere else in the record.  The Parents add that there is substantial uncontroverted evidence on the record that the Parents considered multiple options.  The father testified, "before I enrolled her at Learning Prep, I was looking at other options.  I was trying to get her in the charter school in Foxborough, but Natick isn't in the sending district.  So I got put on a wait list and I was like 122 out of 123.  So I tried to continue the model, but Natick said they couldn't be any help to me in getting her in a program like that."  (A.R.1675, *ll.* 3-10).

72.     In anticipation of the meeting, the Parents forwarded C.D.'s 8th Grade IEP from McAuliffe (A.R.163), her most recent Psychoeducational Evaluation (A.R.177), and Neuropsychological Evaluation (A.R.238), and Speech and Language Evaluation (A.R.222), and a copy of the Natick High School 9th Grade Course Selection List which C.D. and her McAuliffe guidance counselor, Sara Shapiro, had completed, circling and initialing all college prep level courses for C.D. per the recommendations of C.D.'s teachers. (A.R.2750).

**Natick's Response:**  Natick admits that the Parents provided information.  Natick denies the statement about the course selection.  There is no evidence in the record that C.D.'s guidance counselor helped C.D. complete and circle the course selection list and that the teachers recommended the courses selected.  The form is unsigned.  R.2750-2753.

**Parents' Reply:**   Denied that there is no evidence in the record that C.D.'s guidance counselor helped C.D. complete and circle the course selection list and that the teachers recommended the courses selected.  The signature lines on the form are designated for the Student and the Parents to accept the recommendations, not for the staff who make the recommendations. The Parents add that C.D.'s guidance counselor, Sara Shapiro verified that she completed the form by inserting her initials ("SS") next to the circled recommendations. (A.R.2750-2753).

73.     Ms. Gina Dalan, Natick's former Director of Special Education, informed the Parents that if they decided to complete the registration paperwork, she would "send someone over to the charter school to complete an observation and speak with C.D.'s teachers, both of which will help us develop an effective plan to insure (sic) that C.D. has a successful transition."  (A.R.268).

**Natick's Response:**  Admitted.

**Parents' Reply:**   The Parents state that this paragraph was admitted by Natick and does not require a reply.

74.     Ms. Dalan coordinated and scheduled an "informational" meeting for May 24, 2012. (A.R.268).

**Natick's Response:**  Natick admits that it held a meeting on or about May 24, 2012.

**Parents' Reply:**  The Parents state that the document cited in support of this

paragraph is an email from Gina Dalan dated May 22, 2012 referencing the meeting for

May 24, 2012, in which she stated, "this is how we would plan to proceed on Thursday.

With that said it would be more of an information sharing meeting than an IEP meeting."

(A.R.268).

**The May 24, 2012 Team Meeting**

75.     The Parents brought Ms. Coellner, Ms. Soden, Ms. Flax, and Dr. Imber to the

meeting on May 24, 2012.  (A.R.270).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

76.     The Parents indicated that their goal for C.D. in Natick High School was a

continuation of the inclusion program C.D. completed at McAuliffe and from which she

obtained both academic and social benefits.  (A.R.273).

**Natick's Response:**  Natick admits that C.D.'s father stated that was his goal and that

he claimed she had benefitted academically and socially from inclusion.

**Parents' Reply:**  Admitted.  The Parents add that the father's "claim" that C.D.

benefitted academically and socially from inclusion at McAuliffe is supported by substantial

uncontroverted evidence on the record, including, but not limited to, the information provided by

Ms. Coellner and Ms. Soden at the IEP meetings in May and July 2012, which included that

C.D. passed the ELA MCAS; the testimony of the father, Ms. Coellner, Ms. Flax and Dr. Imber

at the hearing; and the Natick High School 9th Grade Course Selection List recommending all

college prep level courses for C.D.  (A.R.3901-3904, A.R.270-282, A.R.383-449, A.R.1610-

1691, A.R.1691-1745, A.R.1840-1915, A.R.2015-2131, A.R.2750).

77.   The Parents informed Natick of the other options that they were considering for high school, including technical high schools (which only offered life skills programs, and therefore would be inappropriate for C.D., and Charter Schools, which unfortunately had extremely long waiting lists).  (A.R.315).

**Natick's Response:**  Natick admits that the Parents informed it that they were considering vocational schools and charter schools. Natick adds that the Parents did not inform Natick that they were considering Learning Prep. R.4054.

**Parents' Reply:**  Admitted.  The Parents add that they were not required to inform Natick of all the options they were considering.

78.   Natick described the three available models at Natick High School: (1) Inclusion; (2) Replacement classes, where all students are on an IEP, small classes are taught by a special education teacher, the curriculums are the same but taught with modifications;  and (3) the ACCESS program, which is a substantially separate life skills program with a further modified curriculum. (A.R.294).

**Natick's Response:**  Natick admits those are the three programs offered at Natick High School but denies that the Access program is, or was described as, a life skills program.   R.294.

**Parents' Reply:**  Admitted that the ACCESS program was not specifically described as a "life skills" program.  The Parents add that at the meeting on July 27, 2012, the Parents' attorney asked about the ACCESS curriculum and Ms. McGovern responded, "They use entry points to access the general ed. curriculum.  The emphasis is on more functional academics but they are teaching the Mass.  They're using the Mass. curriculum frameworks; they're using entry points into the Mass. curriculum."  (A.R. 406, *l*.24-A.R.407, *l*.3).  The Parents also state that Natick described the educational model for the

students in the ACCESS program on its website, which indicated that, "these students receive a vocational and *life centered* educational approach using the MA Curriculum Frameworks *entry point levels* for high school [emphasis added]."  (A.R. 4148-A.R. 4151).

79.     Natick indicated that ACCESS students do not take the MCAS or receive a high school diploma (A.R.295); that students in Replacement classes are on the diploma track and that students in the ACCESS program are not. (A.R.295).

**Natick's Response**:  Denied.  Natick staff testified that the program is very individualized and some students take the MCAS Alternative, while others take the MCAS. R.2396, *ll.*7-15.

**Parents' Reply:** Admitted that Natick staff testified that the program is very individualized.  Denied that any students in the ACCESS program for all of their core academic classes take the MCAS.  The Parents state that while Natick staff testified that some students who are in a hybrid program, where they take the vocational class in ACCESS and some classes in small group/replacement classes, may take the MCAS (R.2396, *ll.*7-15), there is clear and substantial evidence on the record that students who are in the ACCESS program for all of their core academic classes take the MCAS-Alt exclusively and are not on the high school diploma track. (A.R.319, *l.*25-A.R. 320, *l.*2).

80.     Natick explained that pursuant to the law for transfer students, they were required to provide services that were comparable to the current IEP; however, "we could agree to start C.D. in the ACCESS program based upon the information we have currently." (A.R.314).

**Natick's Response:**  Admitted that Natick made that statement.  Natick adds that it explained at the meeting that replacement classes would be the most comparable setting to

C.D.'s placement and services at McAuliffe given class sizes. R.282, *ll.* 22-24; R.317, *ll.*1-4; R.319, *ll.*9-16.

**Parents' Reply:**  Admitted that at the May 24, 2012 meeting Natick indicated that replacement classes would be the most comparable setting to C.D.'s placement at McAuliffe given class sizes.   (A.R.282, *ll.* 22-24; A.R.317, *ll.*1-4; A.R.319, *ll.*9-16).

81.     The Parents reiterated that their goal was for C.D. to obtain a high school diploma. (A.R.319-320).

**Natick's Response:**  Admitted.

**Parents' Reply:** The Parents state that this paragraph was admitted by Natick and does not require a reply.

82.     Natick referenced Dr. Imber's report and determined that inclusion would not be successful... "I'll be very upfront here: I can't imagine looking at this report offered by another family, and saying to that family 'Let's consider full inclusion.' So knowing the expectation for inclusion classes, I would have significant concerns about her success..." (A.R.317).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

83.     Parents described the educational model at McAuliffe and C.D.'s success with supplementary supports and services in the general education classroom.  (A.R.317).

**Natick's Response:**  Denied.  R.317 is not support for Plaintiffs' claim that Parents described the educational model at McAuliffe or C.D.'s success in the general education classroom.

**Parents' Reply**:  Admitted that A.R.317 does not support Paragraph 83.  (*See* Paragraph 76).

84.     Natick responded, "That could not happen here...because it doesn't happen, because public schools have their own staff and their own experts, and they don't allow outside people to come in and teach their students in their classroom. No public school would allow that." (A.R.317).

**Natick's Response**:  Admitted.  Natick adds that its explanation relates to allowing individuals like Ms. Coellner and Ms. Soden to come into the classroom as paraprofessionals employed by parents and at parents' expense.

**Parents' Reply**:  Admitted.

85.     When the Parents noted, "McAuliffe is a public school," Natick responded, "Well, O.K. Then I guess I'll just say Natick. But in my experience, I've never heard of that ..."  (A.R.317).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

86.     Natick stated, "I'm not criticizing what happened [at McAuliffe], but I'm just trying to explain what would happen here, and I think that I'm hearing from Gina and from everybody, and I know I feel the same way...is...the replacement classes would be much more comparable to what she's getting at McAuliffe than the general ed. setting."  (A.R.318).

**Natick's Response**:  Admitted.

**Parents' Reply**: The Parents state that this paragraph was admitted by Natick and does not require a reply.

87.   The Parent's requested information about transition services.  (A.R.327).

**Natick's Response:**  Denied.  The Parents did not ask for information about transition services at this meeting.  R.270-329.

**Parents' Reply:**  Denied.  The Parents asked for information about opportunities available after C.D. turned 18 and Natick provided information about ACHIEVE, the post-high school transition program at Natick.  (A.R. 327, *ll*.6-25).

88.   Natick mentioned the ACHIEVE Program, which is a public community day program for ACCESS students aged 18-22 years old in a community-based location; there was no mention of earlier transition programs or services.  (A.R.327)

**Natick's Response:**  Denied.  The ACHIEVE Program is for any Natick student, aged 18-22, not just those in the Access program. Some participants have met high school diploma requirements. R.327, *l*.21 – R.328, *l*.12; R.2231, *l*.4 – R.2232*, l*.21. The goal is to ensure that the students have the transition services necessary to succeed.  R.2231, *l*.4 – R.2232*, l*.21.

**Parents' Reply:** Admitted that some participants in the ACHIEVE program have met high school diploma requirements and that the ACHIEVE Program is for any Natick student, aged 18-22, not just those in the ACCESS program. (*See* Paragraph 79 *infra*). The Parents add that over 90 percent of students in the ACCESS program enter the ACHIEVE program.  (A.R.2283, *ll*. 17-19), and students in the ACHIEVE program work on daily living skills, including travel training and meal planning.  (A.R.2231, *ll*.18-A.R.2232, *ll*. 21).

89.   The Parents provided their completed registration paperwork to Natick on May 29, 2012, requesting an opportunity to observe the recommended program(s) at Natick as soon

Case 1:15-cv-13617-FDS   Document 53   Filed 09/26/16   Page 36 of 112

as possible.  (A.R.360-372).

**Natick's Response:**  Natick admits that the Parents asked to observe, but denies that they asked to do so "as soon as possible." Parents said in a letter: "Given the limited time left before the end of this school year, please let me know, at your earliest possible convenience, which programs will be available for observation." R.360.  Due to scheduling complications, including MCAS, Special Olympics, and the start of final exams, there were no opportunities available to observe.  R.370.

**Parents' Reply:**  Admitted to the extent that "as soon as possible" is not a direct quotation from the Parents' letter.

90.     On May 31, 2012, Ms. Dalan observed C.D. at McAuliffe.  (A.R.2771).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

91.     On June 5, 2012, Ms. Dalan informed the Parents that after observing C.D. in her inclusion classes at McAuliffe, speaking with some of her teachers, and reviewing some of her work samples, the self-contained ACCESS class at Natick would be appropriate; however, "in the spirit of cooperation and our attempt to provide a comparable IEP for C.D., we would be proposing all [Replacement] classes."  (A.R.2771).

**Natick's Response**:  Natick admits that Ms. Dalan sent a letter and that letter speaks for itself.

**Parents' Reply:**  Admitted.

92.     Ms. Dalan also indicated that "due to scheduling complications" ...there were no available opportunities for the Parents to observe the programs at Natick prior to the fall.

(A.R.2771).

**Natick's Response**:  Natick admits that Ms. Dalan sent a letter and that letter speaks for itself.  *See also* Natick's Response to item 89, *supra*.

**Parents' Reply**:  Admitted.

93.     On June 13, 2012, the Parents' attorney contacted Natick to express their concern that it is not in C.D.'s best interest for Natick to be "placing C.D. in a program that they clearly believe is inappropriate and then within the first couple of weeks of school 'after C.D. has had some time to adjust,' propose moving her to a difference program solely to comply with the regulations [for intrastate transfer students]; the Parents requested a team meeting during the summer so that Natick could develop a new IEP [in accordance with the more extensive procedures required for the development of a new IEP].    (A.R.374).

**Natick's Response**:  Natick admits that it received a letter from the Parents' attorney on June 13, 2012.  The letter speaks for itself.   R.374-75.

**Parents' Reply**:  Admitted.

94.     On June 19, 2012, Ms. Dalan sent an email to the Parents, indicating that when she observed C.D. at McAuliffe, she "was sitting quietly, sometimes taking notes, and other times working to complete given assignments...I did not see her private tutor working with her." (A.R.377).

**Natick's Response**:  Natick admits that Ms. Dalan sent an email on June 19, 2012, and the email speaks for itself. Natick adds that the Parents did not quote the entire paragraph. Ms. Dalan said that C.D. was "sitting quietly, sometimes taking notes, and other times working to complete given assignments. *I saw her special education teacher work with her in her history/social studies class, she appeared to be clarifying directions*. I did not see her private

tutor working with her." The bolded, italicized language is the language plaintiffs left out of their "quote" in paragraph 94.

**Parents' Reply:**  Admitted.

95.    On July 12, 2012, Ms. Dalan sent an email to the Parents indicating that Natick's recommendation of the ACCESS program was based on the discussion at the meeting on May 24, 2012.  (A.R.4050).

**Natick's Response:**  Denied.  Ms. Dalan sent an email on June 19, 2012, not July 12, 2012.  This email speaks for itself.  R.4050.

**Parents' Reply:**  Admitted.

96.    On July 18, 2012, the Parents' attorney contacted Natick to follow up on their request for a team meeting during the summer.  (A.R.380).

**Natick's Response:**  Denied.   The Parents attorney sent a letter on July 13, 2012.  R.380. The letter speaks for itself.

**Parents' Reply:**   Admitted.

97.    In anticipation of a team meeting in the summer, the Parents requested copies of Ms. Dalan's notes or her report from her observation of C.D. at  McAuliffe.

**Natick's Response:**  Natick admits that the Parents requested copies of notes from Ms. Dalan's observation. Natick has no knowledge of whether parents requested the copies in "anticipation of a team meeting in the summer" and Plaintiffs cite no evidence to support that contention.  R.377-78.

**Parents' Reply:**  Admitted to the extent that the phrase in "anticipation of a team meeting in the summer" is not a direct quotation.  The Parents add that the father sent multiple emails to Ms. Dalan requesting copies of her notes in June 2012 prior to the meeting scheduled

for July 27, 2012.   (A.R. 377-378).  On June 12, 2012, he wrote, "I am concerned that at [C.D's] next IEP meeting, your replacement will not be able to represent you in your absence without some written information regard your observation." (A.R.378).

98.     In Natick's Response, the Parents were informed that Ms. Dalan did not take notes, that a report was not required, and that Mr. Tim Luff would be replacing her as Director of Special Education as of July 2, 2012; Ms. Dalan had indicated that her "observation was really not intended to change what we talked about at the meeting ...our recommendation of the ACCESS class for C.D. came from our discussion at the meeting and Dr. Imber's Report."  (A.R.377).

**Natick's Response:**  Natick admits that Ms. Dalan emailed the Parents on June 19, 2012. The email speaks for itself.   R.377-78.

**Parents' Reply:**  Admitted.

99.     Natick scheduled a meeting for July 27, 2012 to develop a new IEP for C.D. (A.R.2770).

**Natick's Response:**  Admitted.

**Parents' Reply:** The Parents state that this paragraph was admitted by Natick and does not require a reply.

**The July 27, 2012 Team Meeting**

100.     Ms. Coellner, Ms. Soden and Dr. Imber attended the meeting on July 27, 2012 with the Parents to present information about C.D.'s strengths, needs and progress at McAuliffe. (*See* A.R.270-382).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

101.    There was no one present from Natick at the meeting who knew C.D. directly or indirectly, even though the academic teacher and the speech and language teacher from the ESY program had both worked with C.D. just a few weeks prior to the meeting.  (A.R.2770).

**Natick's Response**:  Denied to the extent that the Parents suggest that Natick had an obligation or reason to require anyone from the ESY program to attend the Team meeting. The extended school year staff had worked with C.D. for only five weeks, and were unlikely to provide significant, meaningful information.  R.2325,  *ll.*13-18.

**Parents' Reply:**  Denied to the extent that Natick had no obligation or reason to invite staff from the ESY program who had worked with C.D.  Admitted that the extended school year staff, including Ms. Liptak, worked with C.D. for five weeks. (A.R.2325,  *ll.*13-18).

102.    Ms. Dalan, the only person from Natick who had observed C.D. at McAuliffe, was no longer employed by the district and therefore did not attend the meeting.  (A.R.2770).

**Natick's Response:**  Natick admits that Ms. Dalan observed C.D. at McAuliffe and that she did not attend the meeting because she was no longer employed by Natick.

**Parents' Reply:**  Admitted.

103.    There was no teacher from the ACCESS program in attendance.  (A.R.2770).

**Natick's Response:**  Denied.  A high school special education teacher, Ms. Bresnick was present at the meeting.  R.384, *ll.*22-23; R.478, 2770.

**Parents' Reply:**  Admitted to the extent that Ms. Bresnick was present at the meeting.

104.    There were no guidance counselors in attendance.  (A.R.2770).

**Natick's Response:**  Admitted, but states that Natick had no legal obligation or other reason to have a guidance counselor at the meeting.

**Parents' Reply:**  Denied to the extent that Natick had no reason or obligation to have a guidance counselor at the meeting.

105.    Natick noted that the purpose of the meeting was twofold: to discuss C.D.'s transition to high school, and to develop a new IEP to meet her needs at high school rather than waiting until the fall.  (A.R.385).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

106.    Natick indicated that it would accept Dr. Imber's test scores for the purpose of the "current evaluation results" section on the IEP.  (A.R.396).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

107.    Dr. Imber cautioned that while his test results are certainly helpful, it was important to consider the direct experience of Ms. Coellner and Ms. Soden and not just the test scores alone.  (A.R.396).

**Natick's Response:**  Natick admits that Dr. Imber made this statement.

**Parents' Reply:**  Admitted.

108.    The Parents expressed their concerns, including whether C.D. would be with peers who had emotional/behavioral challenges, and how C.D. would access the general education curriculum; they were particularly concerned about the reduction in ELA services from five 45-minute sessions to two or three 80-minute sessions as a result of the block schedule.  (A.R.386).

**Natick's Response:**  Denied.  In the page that the Parents cite, Mrs. McGovern summarized parental concerns. The Parents did not express the concern stated in paragraph 108. R.386. C.D.'s father did not state that he was "concerned" about the scheduling of English Language Arts, but asked how scheduling works for someone like C.D. with memory deficits. Id.

**Parents' Reply:**  Admitted only to the extent that father did not specifically use the word "concerned."  The Parents add that Ms. McGovern specifically used the word "concerns" in her summary of the Parents' concerns, which was followed immediately by the father's question, "And another thing, too, is when we were here in May, I guess the way the Natick program is structured, that they won't have ELA every day; they'll have it two or three days a week for 80 minutes, as opposed to five times, 45 minutes. And with a person like Carolyn, who has memory deficits, I'm wondering how that works."  (A.R.386, *ll.*17-22*).*

109.    Nan Coellner asked whether there are students with autism in the ACCESS program. (A.R.416).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

110.    Natick responded, "No."  (A.R.417).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

111.    The Parents asked whether there are students with emotional or behavioral

issues in the ACCESS program.  (A.R.418).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

112.    Natick responded, "Some of the kids have – It's not behavioral *disabilities*

[emphasis added]. Some have...multiple challenges..."  (A.R.418).

**Natick's Response:**  Denied.  The language quoted is from the transcript of the July 27,

2012, Team Meeting and does not accurately reflect the nature of the disabilities of the students

in the program.  The second sentence and those that follow it are as follows:

> Some of the students have multiple challenges, so they may have
> disabilities in the area of communication and also in reading, or
> they might have -- There's one person in the program who has a
> health disability as well as a disability in the area of
> communication. But it's not a behavioral program it's not a
> social/emotional program. It's typically the social/pragmatics,
> communication, and the -- sort of the intellectual sort of global
> academic and cognitive needs that are in the program.

R.418.

**Parents' Reply:**  Admitted to the extent that this is the second sentence in the language

quoted.  Denied that the language quoted accurately reflected the nature of the disabilities of the

students in the program.   The IEPs speak for themselves. (A.R.4182-A.R.4789).

113.    Ms. Coellner observed the ACCESS program in November 2014; she testified:

    a.     "[S]tudents in the class were somewhat disruptive...walked
around...ate.

    b.     There was a film showed...and one boy was slapping his face
throughout the film. There was one student who had a 1:1 para who
yelled out during the class, would scream out  things."

(A.R.1703-1704, *see generally* A.R.1691-1745).

**Natick's Response:**  Natick admits that Ms. Coellner alleged that she observed those incidents.  Natick denies that those incidents occurred.  During her testimony, Ms.  Michelson demonstrated the actions that a student displayed. R.2305, *ll.*9-15. She testified that it was not disruptive.  Id.

**Parents' Reply:**  Admitted that Ms. Michelson so testified.

114.  Ms. Flax observed the ACCESS program in June 2014; she testified:

    a.  One of the students was very disruptive; he was stimming and humming; there was very little social interaction between the students.

    b.  At least one, possibly two, were nonverbal.

**Natick's Response:**  Natick admits that Ms. Flax testified as such, but she acknowledged that she did not actually know if any student was nonverbal (R.1886, *ll.*9-11), testifying: "I don't know, because no one would give me the profile of the children. But what I do know is the children were not talking to each other or the teacher. So my sense is, even if there were no nonverbal children in that class, there were children who either didn't have the language or weren't using it."  R.1886, *ll.*11-17.

**Parents' Reply:**  Admitted Ms. Flax so testified.

115.  Dr. Imber observed the ACCESS program in June 2014; he testified:

    a.  [T]here was one student that was kind of making a lot of loud vocalizations.

    b.  Another student "got out of his seat to sharpen his pencil, and it seemed pretty normal, except that once he started, he wouldn't stop. And he was asked to stop several times, and he just kept sharpening the pencil.

**Natick's Response:**  Admitted that Dr. Imber testified that he observed these incidents. Dr.  Imber added, however, "But I didn't see, in the classroom when I observed, I didn't see anybody throwing anything or I didn't see anybody screaming or yelling, but that student was

making very loud vocalizations was certainly — you know, caught my attention." A.R.2051,

*ll.*17-21. Further, when the Access teacher was questioned about whether there were disruptive

students, he said: "No, I mean, students in my class are no different than typical kids. I mean no

classroom is perfect.  That's all I have to say."  R.2458, *l.*22 – R.2459*, l.*4.

**Parents' Reply:**  Admitted that Dr. Imber and Mr. Francoise so testified.

116.    Ms. Michelson testified with regard to the ACCESS program: (A.R.2051,

see generally  A.R.2015-2132).

> a.      There are currently 11 students and 4 paraprofessionals in the program;
> 5 students in the 11th and 12th grade (four boys and one girl).
>
> b.      The students have a range in disabilities from being diagnosed
> with autism, having intellectual disability, traumatic brain
> injury...
>
> c.      Some students [only] have functional speech and language, there are
> no students that are nonverbal.
>
> d.      When asked to define "nonverbal," Ms. Michelson responded, "I would
> say a student that is nonverbal has no verbal communication
> whatsoever."
>
> e.      One student "has limited functional language...he is able to make basic
> requests. However, his conversational speech is one that [he is]
> currently still working on.

 (A.R.2282-2320)

**Natick's Response:**  Admitted, except for (e).  Ms. Michelson said that one student

"might have limited functional language; however, academically he does participate fully in the

class. And all the students in the class participate in general ed electives and have the opportunity

for inclusive general ed classes." R.2311, Tr.Vol. III, p.132*, ll.*14-18. She added, "I would just

say that the student is able to answer questions when asked upon."  R.2316, *ll.*6-7.

**Parents' Reply:**  Admitted Ms. Michelson so testified.

117.    Mr. Francoise, the lead ACCESS teacher until October 2014 testified:

a.      In 2012-2013, there were eight (8) students - two (2) girls and six (6) boys, one of whom had a one-on-one aide. Most of them used conversation...;

b.      Students in 10th grade ACCESS do not take the standard MCAS and would need to be transferred to Replacement classes to do so; and

c.      It would be very unusual for a student like C.D. transferring into 9th grade from a general education program in another district, to be placed in ACCESS for all of his or her academic classes.

(A.R.2433-2483)

**Natick's Response:**  Admitted as to paragraph (a) and the composition of the classroom in the 2012-2013 school year. Denied as to the rest. In terms of conversation, Mr. Francoise testified that "[m]ost kids use conversation. There are some students that need initiation for them to converse, but that's far and few between. We try to make situations in the classroom that engage all the students, and we put them in situations where it promotes that interaction." R.2444, ll.3-8.  In relation to the MCAS, Mr. Francoise testified: "As a matter of fact, students come to me in the ACCESS Program and, based upon their performance and how we interpret things, if a student -- if I feel a student is kind of borderline prior to the sophomore year, we put them into replacement classes.  So at various times, we've had students that were brought into my program and who showed a lot of promise and were placed in replacement classes. And now, since that has happened, we've had approximately six or seven kids able to pass the regular MCAS and who will now receive a diploma." R.2439, *ll*.11-21. When asked about students transferring from a general education program to Access, Mr. Francoise testified, "It's not typical." R.2442, *l*.22. He continued: "I don't know how to answer it, to be honest with you." R.2442, *l*.24 – R.2443, *l*.1.

**Parents' Reply:**  Admitted that Mr. Francoise so testified.

118.    Mr. Francoise initially testified that there were no students with behavioral or

emotional issues in the 2012-2013 and 2013-2014 ACCESS classes, but then recalled that:

a.    There was a student who would have outbursts that would
be disruptive to the class;

b.    There was a student with "chewing behavior," but
"no classroom is perfect;"

c.    There was a student with Selective Mutism,
who communicated nonverbally through his
laptop;

d.    There was a student who often spoke in a rude tone to
teachers and put his head down on the desk and refused to
answer questions even when he knew the answers, who
was very much lacking in social skills when he entered
the ACCESS class as a freshman and did in fact interrupt
the class; and

e.    There was a student who transferred to ACCESS from
the Northstar Program for students with serious
emotional/behavioral disabilities.

(A.R.2433-2483).

**Natick's Response:**  Denied.  The Parents read isolated statements from IEPs and Mr.

Francoise's testimony describes the students differently. With respect to one student, he testified "I

think that refers to a student that would occasionally have an outburst of some sort…It could be at

some point in time, yes. Those were far and few between."  R.2454, *ll.*16-17, 21-22.  He testified

that the student with the chewing, "had that behavior that was extinguished quite quickly.  And this

particular student happens to be a student that started in my class, is no longer in my class, and will

obtain a diploma from Natick High School next year." R.2458, *ll.*15-20. He testified about the

student who was allegedly mute as follows:

He's a selective mute. But if you know this individual and

> become connected to this individual, he communicates
> nonverbally and via his laptop quite well.
>
> This particular student is another student that came to my program
> as a 9th grader, was in an ACCESS situation his whole life. And
> after seeing this student and realizing that this student didn't
> belong in my program, he was put into a replacement situation.
> And this particular student -- I know he has that challenge as a
> selective mute; however, this particular student is obtaining a
> diploma next month. So that's another success story for Natick.

R.2460, *ll.*1-13.

About the student in paragraph (d), Mr. Francoise testified:

> I believe I recall that student. When he entered the ACCESS
> Program as a freshman, he was very much lacking in social skills,
> and he was very immature. However, this particular guy has come
> a long way. He took the MCAS Alt, because cognitively he's still
> significantly below grade level; however, this young man has
> done some remarkable things. He obtained a driver's license, and
> he is also completing his school time at Natick and moving on to
> the Achieve Program. But he also has a full-time job, and he
> works for Enterprise now.
>
> So this guy here -- you know, typically, when kids come to the
> high school, typical kids or ACCESS kids or whatever, there are
> -- I wouldn't consider them behaviors, but there are situations
> where kids are immature and they have to conform to being
> young adults.
>
> And it's a whole process when they're young. So when they
> come to the high school, you know, it's not so much a behavioral
> thing as much as them learning what's correct and learning how
> to conform and act like young adults.

R.2461, *l.*12 – R.2462, *ll.*10.

**Parents' Reply:**  Admitted Mr. Francoise so testified.  The Parents add that the hearing officer restricted the Parents from referencing the IEPs in greater detail, and would not permit the Parents or their witnesses to testify about the redacted IEPs.  The Parents also add that the IEPs speak for themselves.  (A.R.4182-A.R.4789).

119.    The Parents asked about transition services prior to age 18, and Natick indicated

that transition planning, which starts at age 14, would be discussed in October and the IEP

would be revised based on C.D.'s performance at that point.  (A.R.392-393).

**Natick's Response:**  Denied.  Natick said that "we can talk about this a little bit later

but I think the team, the Natick Team, would reconvene in early October, early to mid-October

to see where C.D. is at that point, and talk about any revisions that may need to be made."

R.393-93.

**Parents' Reply:**  Admitted that Natick so stated.

120.    Referring to C.D.'s IEP that was written in April, Natick noted that while

C.D. "seems to have made progress...C.D. does seem to continue to require a significant

level of support in order to produce work." (R.397).

**Natick's Response:**  Denied.  The quote is taken out of context.  Natick said: "The IEP

that was written in April, and I know there's probably been some progress since then, but it

looks like C.D. does still continue to require a significant level of support in order to produce

work.  She does seem to have made progress in the socialization and peer interaction realm."

R.396, *l.*25- R.397, *l.*4.

**Parents' Reply:**  Admitted to the extent that the quotation is accurate.

121.    Ms. Coellner and Ms. Soden clarified that C.D. had been in the regular

education setting, kept up with the class, read the same books, and had been part of the regular

classroom, that "significant support" was not accurate, and that she only needed occasional

support, was making progress and doing well; Ms. Coellner and Ms. Soden emphasized the

significance of observing C.D. to confirm their statements. (A.R.397-398).

**Natick's Response:**  Denied.   Ms. Coellner testified that "I know that she would need

you to break things down, she would need graphic organizers, she would need to take the test

modified." R.398, *ll*.7-9.  She added: "[C.D.] has trouble with inference and those things but she

can get the basic, objective meaning from text: 'What's the boy's name? What was the color of

the dog? Where did they go?' She can give you factual information.  She does need  help with

inference and more abstract parts from reading."  R.399, *ll*.17-22.

    **Parents' Reply:**  Admitted to the extent that Ms. Coellner so testified.  The Parents add

that Ms. Coellner also testified that:

> Just to emphasize, again, that Carolyn has been in a regular education
> setting for the past few years.  You said significant support; I'm sort
> of sensitive to that.  Certainly, we have been there; but certainly,
> when your representative came to observe her, we are basically in the
> back of the room, she's part of the classroom. And in fact, I realized
> that she only could even recognize who Carolyn was except that she
> was pointed out.  She had an opportunity -- The representative had an
> opportunity to speak with her special education teacher, to look at her
> work, and in fact observe her in English, Language Arts, and in
> Science. And basically, she has been functioning in a regular
> education classroom with our support; we are there if she needed us.
>
> She was able to keep up with the class. She was -- She read the
> same books that the class read.  She did basically the same work.
> She does require support, but I wouldn't call it significant
> support.

(A.R.397, *l*.9-A.R.398, *l*.7).

    122.    Ms. Coellner and Ms. Soden emphasized that C.D. was able to access the

general curriculum at McAuliffe and worked really hard because she wanted to do well;

because she wanted to be in a regular class.  (A.R.398).

    **Natick's Response:**  Admitted that Ms. Coellner and Ms. Soden so testified.  Their

testimony was not based upon or tied to any concrete measurements.  R.397-398.

    **Parents' Reply:**  Admitted.

    123.    The Parents expressed concern that the block schedule in all three of the

Natick High School programs would fail to address C.D.'s individual needs because she requires continuity due to her memory deficits." (A.R.408).

**Natick's Response**:  Admitted that the Parents expressed that concern.

**Parents' Reply**:  Admitted.  (*See* Paragraph 108 *supra*).

124.    Natick responded that because ACCESS is a self-contained program, subjects can be infused together.  (A.R.408).

**Natick's Response**:  Admitted.  According to Natick at the July 27, 2012, Team meeting

> there are cases of this program that are infused throughout – Because it's a program, the teacher and the staff of the program do infuse instruction in ELA and Math; they try to integrate that into the other content areas as well – They teach many of the classes.  The teacher would not – It's not like he would be using reading and writing strategies, for instance, in the Current Events and History class, reinforcing what the students are also learning in the reading class. So it helps students – There is reading and writing across the curriculum because she's – It's a self-contained program, to an extent; students are included in electives, which I'll talk about in a minute.

R.408, *l.*20 – R.409, *l.*7.

**Parents' Reply**:  Admitted.

125.    Ms. Coellner noted her concern that C.D. would be isolated in ACCESS, "Because she is a very normal, regular teenager like all normal, regular teenagers, who has the same interests in fashion and music and television and all that." (A.R.421).

**Natick's Response**:  Natick denies that Ms. Coellner noted a concern about isolation, but admits the quote. Natick explained that "[C.D.] would be with these students during some of the core academic classes that she's in because those are the special education services and classes, where they do take the modified curriculum.  But in the electives, she would be with – My understanding is she's with general ed. students . . ."  R.420, *ll.*13-17.

**Parents' Reply:**  Admitted.  The Parents add that, while Ms. Coellner did not expressly say that she was "concerned about isolation," Ms. McGovern responded, "It seems like that's really an area where she flourishes, in her ability to make connections, and so, of course, we want to capitalize on that, and for sure we'll work in that way, and have her -- We want her contained as little as possible so –" A.R.420, *l*.23-A.R.421, *l.* 2).

126.     Natick reiterated that C.D.'s current performance level is low, and "what is a little bit difficult in hearing you describe her performance is that her scores are so low, that what you're describing is so inconsistent with the scores – "I mean...what I'm hearing; that there is a huge discrepancy...we've been to the BSEA even had a hearing, so we've had a lot of experts come in…we know this case, we know C.D. I mean, you know, she hasn't been in Natick but as far as a student who hasn't been in Natick, I feel that the team knows her, because we have had the experience of going through the BSEA hearings, that I'm hearing a huge discrepancy." (A.R.402).

**Natick's Response:**  Denied.  This is a quote from Natick's counsel.  To the extent Plaintiffs' statement of facts is intended to be presented in chronological order, this quote should be before the one in Paragraph 125.

**Parents' Reply:**  Admitted that this is a quote from Natick's counsel.

127.     The Parents asked about Ms. Dalan's report from her observation of C.D. at McAuliffe; Natick responded that "She did not generate a report because what Tim said, it was really just sort of a much more informal way of looking at C.D. at McAuliffe, and the impression that I got from Gina, in speaking with her, echoed what I think we talked about at the [May] meeting, which essentially was we were looking at what is a comparable IEP and we decided that if we're looking straight at the IEP, 'comparable' is probably the replacement

classes ... what Natick actually think[s] is appropriate to meet her needs ...what Gina told me after that observation, and I know what she and the rest of the Natick team felt when we met in May is that she needs to be in the [ACCESS] program; ...which is what we felt she needed when we had a hearing at the [BSEA]."  (R.402-403).

**Natick's Response:**  Admitted.  Natick adds that Ms. McGovern further stated that "I don't think the team's impressions have changed, because I don't think that C.D.'s presentation has changed very –" R.404, *ll.*1-10.

**Parents' Reply:**  Admitted.

128.    Ms. Coellner expressed concern that they were not given the opportunity to observe the ACCESS program in June; she expressed concern regarding C.D.'s access to regular education books because they worked very hard for C.D. to write three and four-page compositions and read and take notes and highlight, and she might lose those skills in ACCESS. (A.R.410-411).

**Natick's Response:**  Denied.  Ms. Coellner did not express concern about not being able to observe.  She said: "I think it makes sense.  Marcia and I had wanted to come visit the program June so we could help you modify a schedule for her, but we weren't able to do that." R.411, *ll.*12-14. Natick admits that Ms. Coellner referred to C.D.'s writing three and four page compositions. Natick adds that Mr. Tagliapietra responded: "Well, we would take where she is now and push forward."  R.410, *ll.*12-13.

**Parents' Reply:**  Admitted to the extent that Ms. Coellner did not specifically state that she was "concerned" about not being able to observe.  Also admitted that Mr. Tagliapietra responded as indicated.

129.    Natick responded that "the ACCESS program serves kids that do have

cognitive, communication, social/pragmatic deficits or disabilities in those areas. C.D. would,

on paper, fit into that category; she has an intellectual disability and also issues with

communication and social/pragmatic." (A.R.406).

**Natick's Response:**  Denied.  This statement was not in response to the concerns

expressed in Paragraph 128 as it occurred chronologically before Paragraph 128.  Admitted as

to the quote.

**Parents' Reply:**  Admitted that this statement was not directly in response to Ms.

Coellner's concerns expressed in Paragraph 128.  The Parents add that this statement was directly

in response to a question by the Parents' attorney, who asked, "The replacement program is for

students who have, like mild to moderate disabilities; and then the Access program is more severe

disabilities?  (A.R.406, *ll*. 13-15).

130.    The Parents reiterated that C.D. read the books on the Natick 9th grade syllabus in 8th

grade and asked why inclusion with supports and services would not be possible in the general

education class, especially since she already read the books.  (A.R.413).

**Natick's Response**:  Denied.  This statement was not a response to Paragraph 129.

R.406.  Additionally, this was not a "reiteration" because the Parents had not mentioned it

previously at the meeting.  R.413.

**Parents' Reply:**   Admitted that this statement was not directly in response to

Paragraph 129.  Denied that this was not a reiteration.  Earlier in the meeting Ms. Coellner

stated, "Well, for example, they certainly read *To Kill a Mockingbird* and they read *Lord of the

Flies*."  (A.R. 401, *ll.*, 12-13).  The Parents also add that at the previous meeting on May 24,

2012, the father stated, "I went to a meeting here in January; one night they had a, I guess like

a, for potential people going to Natick High School, and the general education books, I think,

for ninth grade at the time were *The Odyssey* and *To Kill a Mockingbird*.  Now, she's read *To Kill a Mockingbird* this fall and last year she read *The Odyssey*.  So at McAuliffe, they're doing some pretty high level reading that's comparable to the general education class here."  (A.R. 296, *l*.21-A.R. 297, *l*.3).

131.    Natick responded that, "Well, given C.D.'s level of need, and given some of the other activities that go along with those -- It's not just decoding the text; it's also inferencing, it's instructing meaning from the text, and it's working on a textual analysis at a high-school level, and I think we believe that the most appropriate place for her to truly access the curriculum would be in the ACCESS program."  (A.R.413).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

132.    The Parents asked, "Instead of doing that, why don't we go the other way? Put her in the general education with support, and see what she can do. And if she doesn't work, well then we move her down."  (A.R.413).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

133.    Natick responded, "Personally, I would not recommend that based on the IEP that I see in front of me, and in consultation with my team."  (A.R.413-414).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

134.    The Parents asked whether C.D. could succeed in the Replacement classes [with supplementary supports and services]?  (A.R.414).

**Natick's Response**:  Denied.  Natick does not see any such question on R.414.

**Parents' Reply**:  Admitted to the extent that this was not a quotation. The Parents add that the specific question asked by the Parents' attorney was, "And not even in the Replacement class?"  (A.R.414, *l*.8).  This question was directly related to Ms. McGovern's statement that, "we believe the most appropriate place for her to truly access the curriculum would be the ACCESS program" (A.R.414, *l*.18-20), to which the father had asked, "Instead of doing that, why don't we go the other way?  Put her in the general education with support, and see what she can do. And if she doesn't work, well then we move her down." (A.R.414, *ll*.21-24), and Ms. McGovern's direct response that, "Personally, I would not recommend that based on the IEP that I see in front of me, and in consultation with my team." (A.R.413, *l*.25-A.R.414, *l*.2).

135.    Natick replied, "based on what we're seeing on paper, the team is saying the ACCESS program."  (A.R.414).

**Natick's Response**:  Admitted.  Natick continued: "But I think you've heard a lot of flexibility within that program, and there's no desire to keep a student in that program who doesn't need to be in that program. It's actually quite the opposite, so there's a lot of encouragement and opportunity to move forward."  R.413, *ll*.9-14.

**Parents' Reply**:  Admitted that Natick made this statement.

136.    On July 30, 2012, the Father requested additional information regarding the ACCESS program, and copies of C.D.'s work from ESY to assist them in making a decision regarding the IEP that would be proposed for C.D.  (A.R.451).

**Natick's Response:**  Admitted that C.D.'s father requested additional information.  Denied on the reasons for the request as there is no evidence of the reason on that page.  R.451.

**Parents' Reply:**  Denied.  The father specifically stated by email to Ms. McGovern, "Thank you for meeting with us last Friday.  As a result of the meeting, I would like the following information to sort some of the uncertainties in my mind."  (A.R.451).

137.    On July 31, 2012, Natick responded that a proposed IEP had been mailed and that "regarding your request for information about the ACCESS program, you raise good questions...I suggest that you, [C.D.'s mother] and I meet with Jim Francoise, the lead teacher of the program, at the beginning of the school year..." (A.R.453).

**Natick's Response**:  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

**The Proposed IEP for 2012-2013 (dated July 27, 2012-April 4, 2013)**

138.    On August 1, 2012, Natick provided the Parents with the proposed IEP for the 2012-2013 school year, recommending the ACCESS program for all of C.D.'s academic classes. (A.R.2628).

**Natick's Response:**  Admitted, except as to the date.  The IEP was issued on July 30, 2012.  R.2619.

**Parents' Reply:**  Admitted.

139.    The proposed IEP did not include a transition plan.  (A.R.2628).

**Natick's Response:** Admitted.  There was no transition plan, but Natick did not have sufficient information at the July, 2012 meeting to develop a transition plan. The additional

information section states: "The Team will reconvene in October 2012 to discuss C.D.'s progress and ongoing transition to Natick High School and to make revisions to the IEP as necessary. At this time, the Team will also develop a transition plan for C.D."  R.2619. Moreover, Natick notes that the IEP contained transitional services, such as a vocational services.  R.2617.

**Parents' Reply:**   Admitted only to the extent that the Service Delivery Grid indicated that "Vocational" services would be included among the services provided.  The IEP speaks for itself (A.R.2617).

140.    On August 14, 2012, the Parents rejected the IEP for multiple reasons, including the lack of a transition plan, and placement in the ACCESS program for all of her academic classes. (A.R.3427).

**Natick's Response:**   Denied.  The IEP speaks for itself.  R.2602-2621.  The Parents' rejection speaks for itself.  R.2623-24.  Parents' rejection is dated August 9, 2012.  Id.  It includes no mention of the transition plan.  Id.  It is the letter from the Parents' attorney, notifying Natick of the Parents' intent to unilaterally place, dated August 14, 2012.  R.3427. The August 14, 2012 letter does not mention a transition plan either.  R.  3427.

**Parents' Reply:**   Admitted.  The Parents add that the Parents rejection included a chart not cited in Natick's Response which showed the reduction in services (A.R.2625).

141.    The Parents provided Natick with notice on August 14, 2012, that they would be unilaterally placing C.D. at Learning Prep for the 2012-2013 school year and seeking reimbursement from Natick.  (A.R.3427).

**Natick's Response:**   Admitted.

**Parents' Reply:**   The Parents state that this paragraph was admitted by Natick and

does not require a reply.

### The May 22, 2013 Team Meeting

142.    Natick scheduled a meeting for May 22, 2013 for C.D.'s annual review (A.R.3413).

**Natick's Response:**  Admitted.

**Parents' Reply:**   The Parents state that this paragraph was admitted by Natick and does not require a reply.

143.    There was no one from Learning Prep in attendance at the meeting (A.R.3306).

**Natick's Response:**  Natick admits that no one from Learning Prep was at the meeting. Natick adds that it had reports from Learning Prep teachers in the areas of history, biology, and language arts/literature, and that it reviewed the information provided. R.566-68; R.571.

**Parents' Reply:**  Admitted.

### The Proposed IEP for 2013-2014 (dated May 22, 2013-May 22, 2014)

144.    Following the meeting, Natick proposed an IEP for the 2013-2014 school year, which was practically identical to the IEP proposed for the 2012-2013 year, indicating that due to a lack of information, it was unable to update C.D.'s current levels of performance. (A.R.2628).

**Natick's Response**:  Natick admits that it proposed an IEP for the 2013-2014 school year.   The IEP for the 2013-2014 and 2012-2013 school years speak for themselves. R.572-591; R.2581- 2602.

**Parents' Reply:**   Admitted.

145.    Ms. McGovern, Natick's Director of Student Services, testified that the IEP proposed for the 2013-2014 school year had few if any changes from the IEP proposed for the 2012-2013 school year based on the lack of information given to the chairperson, Ms. Molinari-Bates, prior to the meeting; she admitted that the Evaluation Team Leader usually makes attempts to obtain information, but since she was not chairing the meeting, she did not know whether Ms. Molinari-Bates had invited Learning Prep School staff or requested information. She testified that the 2013-2014 proposed IEP was appropriate "based upon information Natick had at the time." (A.R.2360; *see generally* A.R.2343-2347).

**Natick's Response:**   Admitted that Ms. McGovern said that "[t]here were very few, if any, changes made to that IEP, based on Ms. Molinari-Bates' lack of sort of meaningful information from providers at Learning Prep at that point" and that the IEP was appropriate. R.2360, *ll*.12-15. Natick denies the statement related to requesting information. The question was: "I'm sorry, did you say you invited Learning Prep to attend that meeting."   Ms. McGovern responded: "I don't recall.  That would be something that Barbara Molinari-Bates - at this point I wasn't chairing – I had chaired one meeting, but I was leaving the chairing of these other meetings to her." R.2360*, ll*.16-22.  She then added "I believe that she had received some feedback from Learning Prep teachers the following year, but I would have to check in the exhibit book."  R.2360, 181*, l*.24 - R.2361, *l*.2.

**Parents' Reply:**  Admitted.

146.    Ms. McGovern testified that the more we know the student, the more we can perfect the transition plan, but admitted that no transition assessment was conducted between 2012 and 2014, and that, in fact, there were no assessments at all conducted between 2012 and 2014. (R.2360; *see generally* R.2343-2347).

**Natick's Response**:  Denied.  Ms. McGovern said that: "We did not conduct a *formal* transition assessment between 2012 and 2014."  R.2392, *ll*.18-22 (emphasis added).

**Parents' Reply**:  Denied.  In response to Ms. McGovern's statement that: "We did not conduct a formal transition assessment between 2012 and 2014." (A.R.2392, *ll*.18-22), the Parents' attorney asked, "Did you conduct any assessments?" to which Ms. McGovern testified, "No."  (A.R.2392, *ll*.20-22)

147.    The Parents rejected the IEP proposed for the 2013-2014 school year for the same reasons they rejected the IEPs for the 2012-2013 school year, including, but not limited to, that the IEP continued to propose placement in the most restrictive program for all of C.D.'s core academic classes, which would have not prepared C.D. for the MCAS and would not have led to a high school diploma, the block schedule, and the lack of an appropriate transition plan. (A.R. 3424).

**Natick's Response**:  Denied.  The Parents' letter speaks for itself.  R.3424.  Natick notes that the letter does not reference any of the reasoning set out in Paragraph 147.   Id.

**Parents' Reply**:  Admitted, except that while the letter does not list the specific reasons for the Parents' rejection, the letter references their reasons for rejecting the 2012 IEP and indicates that the proposed IEP is nearly identical to the IEP rejected the prior year.  (A.R.3424; AR.3428).

### The 10th Grade MCAS

148.    C.D. passed the ELA MCAS in 10th grade and almost passed the MCAS in Math and Science/Technology, missing by only a few points.  (A.R.3901).

**Natick's Response**:  Natick admits that C.D. passed the MCAS in ELA in 10th grade, but did  not pass MCAS in Math and Science/Technology.

61

**Parents' Reply**:   Admitted.

**The April 15, 2014 Team Meeting**

149.     On April 15, 2014, Natick held a team meeting for C.D.'s Annual Review. (A.R.3282).

**Natick's Response**:  Admitted.

**Parents' Reply**:   The Parents state that this paragraph was admitted by Natick and does not require a reply.

150.     Natick informed the Parents that it would be conducting a psychological evaluation, a speech and language assessment, and academic achievement testing as part of C.D.'s 3-year reevaluation.  (A.R.3282).

**Natick's Response**:  Natick admits that it proposed a psychological evaluation, a speech and language assessment, and academic achievement testing as part of C.D.'s 3-year reevaluation. Natick states further that it first proposed this testing on March 12, 2014. R.597.

**Parents' Reply**:   Admitted.

151.     Natick did not propose a transition assessment.  (A.R.3282).

**Natick's Response**:   Natick admits that it did not propose a formal stand-alone transition assessment as part of the three-year reevaluation.

**Parents' Reply**:   Admitted.  The Parents add that Natick did not propose any transition assessment as part of the three-year reevaluation.  (A.R.597).  (*See also* Paragraph 146 *supra*).

**The First Proposed IEP for 2014-2015 (dated April 15, 2014-April 15, 2014)**

152.     Following the meeting, Natick proposed an IEP that was substantially similar

to the prior IEPs, which the Parents rejected for multiple reasons, including, but not limited to, that the IEP continued to propose placement in the most restrictive program for all of C.D.'s core academic classes, which would have not prepared C.D. for the MCAS and would not have led to a high school diploma, the block schedule, and the lack of an appropriate transition plan. (*See* A.R.3282).

**Natick's Response:** Natick admits that it proposed an IEP for the 2014-2015 school year. The IEPs for the 2013-2014 and 2014-2015 school year speak for themselves. R.572-591; R.2551- 2580. The Parents cite no evidence in the record documenting their basis for rejecting the IEP.

**Parents' Reply:** Admitted that the IEPs speak for themselves. The Parents add that by notice dated May 27, 2014, they informed Natick that they rejected the IEP for the same reasons that they had rejected the nearly identical IEPs proposed and rejected in 2013 and 2012, including that a transition assessment had still not been done. (A.R.3423).

**The June 13, 2014 Team Meeting**

153.    A Team meeting was scheduled for June 13, 2014 to review Ms. Cymrot's Psychological Evaluation, Ms. Karian 's Speech and Language Assessment, and Mr. D'Angelo's Academic Achievement Testing.  (A.R.1657).

**Natick's Response**:  Natick admits that it held a Team meeting on June 13, 2014, and that the meeting was held to develop an IEP and determine and determine placement as a result of C.D.'s three-year reevaluation. Natick proposed conducting a Transition Assessment in the upcoming fall when C.D. would be in her junior year.  (A.R.3263).

**Parents' Reply:**  Admitted.

154.    Natick proposed conducting a Transition Assessment in the upcoming fall

when C.D. would be in her junior year. (A.R.3263).

Response: Admitted.

155.    The Father testified that Natick reviewed the evaluations and suddenly informed the Parents that C.D.'s disability category should be "Communication" instead of "Intellectual".   (A.R.1657).

**Natick's Response:**  Natick denies the categorization of "suddenly."  Ms. Cymrot and the other evaluators discussed the results of the evaluation at a Team meeting June 13, 2014, in sixteen pages of transcript. R.991-1007. The Team then moved on to the eligibility flow chart as the process requires. R.1006. Ms. Cymrot explained why she believed that the proper category was "communication disability."   R.1007-1008.

**Parents' Reply:**  Denied.  While Natick indicated that it would move on to the eligibility flow chart as the process requires, there is no evidence that this process ever occurred.  The Parents add that *immediately* following this statement, Natick went on to state "And, basically, I just wanted to state that up until now, the last IEP that was developed was sort of carrying in from the school where it was developed was when she was at [McAullife]. And, at that time, the disability category that has been noted in the IEP is "Intellectual." Based on all the data here, that disability category is not really supported and I will let Ms. Cymrot speak to that." (A.R.1006, *l.*25-A.R.1007, *l.*7).

156.    Ms. Cymrot stated [with regard to C.D.'s psychological evaluation] "the results are really very similar to what had been obtained previously ...In terms of cognitive functioning, C.D.'s scores were in the extremely low to borderline range. (A.R.991).

**Natick's Response:**  Denied.  This quotation is taken out of context.  Ms. Cymrot

stated on R.991: "The results are really very similar to what had been obtained previously. The social, emotional and behavior domains appear to be her strengths as you might read in the report." Then, two pages later in the transcript, on R.993, Ms. Cymrot states: "So anyway, in terms of cognitive functioning, C.D.'s scores were in the extremely low to boarder line range. Her non-verbal reasoning is very consistent with her verbal knowledge and reasoning. And, it is quite similar to the findings for the testing that was done at the – in 2011.

**Parents' Reply**:  Admitted that Ms. Cymrot made these statements.

157.    With regard to C.D.'s disability category, Ms. Cymrot stated, "...basically, I just wanted to state that up until now...the disability category that has been noted in the IEP is "Intellectual." Based on all the data here, that disability category is not really supported ...so, we are looking at noting her disability category as communication." (A.R.1006-1011).

**Natick's Response**:  Denied.  This quote is not from Ms. Cymrot.  It is from a "female speaker." R.1006-1007. The quote references Ms. Cymrot in third person, so it cannot be Ms. Cymrot speaking.  Id.  The quote in paragraph 157 is also not accurate.  The speaker said: "And, basically, I just wanted to state that up until now, the last IEP that was developed was sort of carrying in from the school where it was developed was when she was at Christa McCalla [sic]. And, at that time, the disability category that has been noted in the IEP is 'intellectual.' Based on all the data here, that disability category is not really supported and I will let Ms. Cymrot speak to that."  R.1006-1007.

**Parents' Reply**:  Admitted.

158.    In response to the change in C.D.'s disability category, the Father stated, "This is the first time I heard it ...it is upsetting, it has been intellectual disability for years,

and so to hear the change..." (A.R.1006-1011).

**Natick's Response:**  Natick admits that C.D.'s father made these comments, although it notes again that the quotes are separated by a page in the transcript. R.1008-1009. Natick adds that after the quoted sentence, C.D.'s father added: "But she has also had substantial language processing both receptive and expression over a long period of time."  Id.

**Parents' Reply:**   Admitted.

159.    With regard to the proposed placement, Natick stated, "...based on all the information it probably would seem -be most logical, for C.D.to be in our small group English." (A.R.1011).

**Natick's Response:**  Natick admits that a female speaker made this statement.

**Parents' Reply:**   Admitted.

## The 2nd Proposed IEP for 2014-2015 (dated June 13, 2014 – June 13, 2015)

160.    For the first time since July 2012 when Natick proposed its initial IEP, Natick now proposed a "blended" program for C.D.  (A.R.2529).

**Natick's Response:**  Denied.  Natick proposed replacement classes in June, 2012. R.370.

**Parents' Reply:**   Denied.  Natick did not propose replacement classes in any IEP prior to June 13, 2014. (A.R. 3328-3282).  The IEPs speak for themselves.  (Id.)

160.    Natick now proposed placement in the general education classroom for History, Replacement classes for English and Science, and Math and Reading (as opposed to English) in the ACCESS program.  (A.R. 2529).

**Natick's Response**:  The June 13, 2014, to June 13, 2015 IEP speaks for itself.  R.2529-2550.

**Parents' Reply:**   Admitted.

161.   Although Natick proposed some classes in the general education classroom and some Replacement classes, they were still proposing the ACCESS program for Math, which would not have prepared C.D. for the Math MCAS and receipt of a high school diploma; in addition, a transition assessment had still not been completed. (A.R.2529).

**Natick's Response**:   Natick admits that it proposed social studies in the general education classroom. It proposed math and reading comprehension through the Access program. R.2528. Natick proposed a transition assessment for C.D. R.2528. Natick denies that it would not have prepared C.D. for the Math MCAS or a high school diploma. Natick demonstrated that students in the Access program were routinely placed in replacement classes when their abilities and classroom performance indicated that it was appropriate, and that the replacement classes allowed students to access the general curriculum. R.2191, *ll.*2-8; R.2298, *ll.*20-23; R.2322, *ll.*5-13; R.2396, *ll.* 3-15; R.2439, *ll.*11-21; R.2440, *ll.*13-23.

**Parents' Reply:**  The Parents admit that Natick proposed a transition assessment on June 17, 2014 (A.R.2742-2744).  The Parents deny that Natick would have prepared C.D. for the Math MCAS or a high school diploma (A.R.2954-2957).  The Parents admit that students in the ACCESS program may be moved into the replacement classes and that the replacement classes allowed students to access the general education curriculum.  (A.R.2298, *ll.*20-23, A.R.2322, *ll.*5-13; A.R.2396, *ll.* 3-15; A.R.2439, *ll.*11-21; A.R.2440, *ll.*13-23).

162.   On July 7, 2014, the Parents rejected the IEP and proposed placement for multiple reasons, including that a transition assessment had not yet been conducted, the total hours in the service delivery grid exceeded the hours available in the school's 4-day cycle so there appeared to be no time available for speech/language, the Math goal focused solely on

multiplication, and placement in the ACCESS program for Math would only expose C.D. to functional math and would not prepare her for the MCAS. (A.R.3428).

**Natick's Response:**  The Parents' rejection stands for itself.   R.3420.

**Parents' Reply:**   Admitted.

163.    As a result, the Parents informed Natick that they had decided to exercise their right to obtain independent educational evaluations at their own expense, including, but not limited to, an assessment of C.D.'s activities of daily living (ADLs).   (A.R.3427).

 **Natick's Response:**  Denied. R.3427 contains no notice of obtaining an independent evaluation.

**Parents' Reply:**  Admitted that A.R.3427 does not contain the Parents' notice.

164.    The Father testified that one of the main issues at the team meeting in June 2014 was Natick's change in disability category for C.D. from Intellectual to Communication, which was suddenly announced by Natick without notice and which appeared to have clearly been determined prior to the meeting. (*See* A.R.1610-1690).

**Natick's Response:**  Denied.  The Father did not testify that "one of the main" issues was the disability category. He testified that "One of the things that bothered me was the change in disability category from intellectual to communication.  That's another surprising thing that happened in the June of 2014 meeting. I went to the meeting and it was sprung on me that her disability category was changed.  I didn't know about it before I went to the meeting."  R.1657,  *ll.*8-14.

**Parents' Reply:**   Admitted.

165.    The Father testified that while it is reasonable for teachers to discuss students amongst themselves regarding lesson plans etc., it is not appropriate to change the disability

category – "that's a serious thing." (*See* A.R.1610-1690).

**Natick's Response:**  Admitted that C.D.'s father so  testified.

**Parents' Reply:**  Admitted.

166.     Ms. Cymrot testified on direct exam with regard to the change in category: C.D.
received a full scale IQ score between 66 and 74, which placed her in  the extremely low range
and borderline range for cognitive abilities and met the   criteria for an intellectual disability
based on her cognitive ability, but concluded that C.D.'s disability category should be
communication instead of intellectual, because according to the DESE criteria, the social and
practical domains must also be considered.  (A.R.2139-2140).

**Natick's Response:**    Denied.   Ms. Cymrot provided the testimony referenced in
relation to a question on observations.  She said: "The 95 percent confidence interval places
her score in the extremely low range, with a score between 66 and 74. So that 95 percent of the
times that this test is administered, she would score somewhere within that range.   So it really
flanks the extremely low and borderline range."  R.2139,   *l.*19 - R.2140*, l.*1. She then
continued in response to whether she met the criteria of intellectual ability: "In terms of
cognitive ability, she would have, yes. But the criteria for intellectual impairment, according to
DESE, is more than just cognitive ability.   One has to look at practical domain and overall
adjustment – overall adjustment. And so part of this – yes, the social domain as well as the
practical domain."  R.2140, *ll.*7-13.

**Parents' Reply:**   Admitted that Ms. Cymrot so testified.

167.     During cross-examination, Ms. Cymrot:

      a.     Admitted that she made the determination that C.D.'s disability
               category should be changed prior to the assessment of C.D.'s skills
               in the practical domain, which she knew would be assessed in the
               fall of 2014;

**Natick's Response**:  Denied.  Ms. Cymrot said that she could make the conclusion because the practical domain had been assessed previously.  R 2159, *l*.20.

**Parents' Reply**:  Admitted that Ms. Cymrot so testified.  The Parents add that there is no evidence in the record of this previous assessment.

> b.     Conceded that she did not recall whether the team [including the Parents] used the eligibility flowchart required by DESE at the meeting on June 13, 2014 prior to the change in disability category;

**Natick's Response**:  Denied.  She testified: "I would think so, but I don't recall." R.2162, *l*.11. She continued that "I mean, that's a normal part of a team meeting." R.2162, *ll*.13-14.

**Parents' Reply**:   Admitted that Ms. Cymrot so testified.

> c.     Admitted that she referenced a prior assessment from 2003 where C.D. was not diagnosed with an Intellectual Disability, but ignored the assessments from 2007 and 2008 diagnosing C.D. with an Intellectual Disability;

**Natick's Response**:  Denied.  Ms. Cymrot testified that she did not see a diagnosis of an intellectual disability or mention of an intellectual impairment in the 2008 report. R.2165, *ll*.22-24.

**Parents' Reply**:   Admitted that Ms. Cymrot so testified.

> d.     Indicated that she was not aware that all of Natick's proposed IEPs since 2008 indicated that C.D. had an Intellectual Disability because "I would not have seen or had access to the prior IEPs."

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

   e. Admitted writing an email to Ms. Molinari-Bates on May 15, 2014 stating that she did not need [C.D.'s] file, thereby confirming that she did not review C.D.'s entire record, and conceded that if she had known there were more recent assessments, she might have referenced them in her report;

**Natick's Response:**  Denied.  The email said that she no longer needed the file because she found all the records that she needed from two years ago.  R.2167, *l.*17 – R.2168, *l.*2. She added that "I might have [used] if I had known. But I had seen the three-year repeated reevaluations that Natick had done, and then I was able to, as I said earlier, reference the 4/11 evaluation that was done, and that would have been in the prior three years. So I would have had no reason to think that there were other evaluations. 4/11 was three years prior to 4/14."  R.2170, *l.*22 – R.2171, *l.*5.

  **Parents' Reply:**  Admitted that Ms. Cymrot so testified.

   f. Admitted writing an email to Ms. McGovern, Barbara Molinari-Bates, Mark D'Angelo and Ms. Karian asking the recipients to "edit the report as needed;"

**Natick's Response**:  Denied.  She testified that "I would not have expected her to edit it.  She would have told me what she disagreed with or thought needed further clarification.  And I don't think that the edit would have referred to content, but to any grammatical mistakes or historical inaccuracies, but not the content of what I was saying."  R.2172, *ll.*6-12.

  **Parents' Reply:**  Admitted that Ms. Cymrot so testified.

   g. Had attended the team meeting on May 24, 2012 but "had not reviewed any records at all, other than listening to the report that Dr. Imber presented at that meeting," and actually did not review Dr. Imber's report until the day of the hearing;  and

**Natick's Response:**  Denied.  Natick does not see any such statements in the cross examination of Ms. Cymrot.

  **Parents' Reply:**   Admitted that Ms. Cymrot did not make this statement on cross-

examination.  The Parents add that on direct examination, Natick's attorney asked "Do you believe that – well, you've seen test results from 2012 for [C.D]? Ms. Cymrot responded, "No – well, I just looked today.  I haven't seen them previously." [A.R. 2152, ll. 8-11].

> h.     She did not know whether the change in C.D.'s disability category
>        would affect her eligibility for services after graduation.

 (A.R.293-310).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

**The Observations and the Motion to Compel**

168.     On May 29, 2014, the Parents requested the opportunity for themselves and Dr. Imber and Ms. Flax, to observe the proposed program for C.D. at Natick High School, including both academic and non-academic components of the program.  (A.R. 3126).

**Natick's Response**:  Admitted that the Parents made the request.

**Parents' Reply**:  Admitted.

169.     The Parents specifically requested "observations that are of sufficient duration and extent for the parents and their designees to observe the ACCESS program and meet with Mr. Francoise and the speech-language pathologist.  (A.R. 3126).

**Natick's Response**:  Admitted that the Parents made such a request.

**Parents' Reply**:  Admitted.

170.     Observations were scheduled for Dr. Imber and Ms. Flax to observe the ACCESS program and general education gym class on June 10, 2014, and confirmed by email on June 9, 2014, in which Natick stated, "While we will permit the observers to ask Mr.

Francoise brief factual questions related to their observation, the SLP will not be available."
(*See* A.R.31263143).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and
does not require A reply.

171.    The Parents' attorney forwarded the email from Natick to the Parents, Dr. Imber
and Ms. Flax to inform them of the schedule, the unavailability of the SLP, and the conditions
placed on their observations with regard to their conversations with Mr. Francoise. (*See* A.R.3126-
3143).

**Natick's Response**:  Denied.  There is no evidence in the record that Parents' attorney
forwarded the email.

**Parents' Reply**:  Denied.  The Parents state that both Ms. Flax and Dr. Imber
referenced their receipt of this information from the Parents' attorney in their verified
affidavits. (A.R. 3144, A.R. 3152,)

172.    On June 10, 2014, Dr. Imber and Ms. Flax were accompanied by Ms. McGovern
to observe the ACCESS program and general education gym class; although Dr. Imber and Ms.
Flax did not agree with the conditions placed on their conversations with Mr. Francoise, they
complied with them fully. (See  A.R.3144-3154).

**Natick's Response**:  Denied.  Ms. McGovern was not present during the observation.
R.1795, *ll.*6-8. Natick also denies the characterization that Dr. Imber and Ms. Flax complied
fully with Natick's observation requirements.  R.1284.

**Parents' Reply**:   Denied that Ms. McGovern was not present during the observation.
There is no evidence on the pages in the record Natick cites supporting its response to

Paragraph 172.  The Parents add that there is substantial evidence on the record supporting Ms. McGovern's presence during the observation, not only provided by Dr. Imber and Ms. Flax, but also by Mr. Francoise and Ms. McGovern herself.

In their affidavits, both Dr. Imber and Ms. Flax not only referenced Ms. McGovern's presence at the observation in their verified affidavits, but also the stated the information she provided.  Dr. Imber swore:

> I recall that Ms. Lindsey McGovern, the Assistant Director of Special Education, briefly discussed how the ACCESS program had changed since she began to work in Natick in 2012, and my impression was that she was simply trying to clarify the current program by contrasting it to what it was previously; while I did not ask for this information, I listened to what Ms. McGovern decided to share and felt that the information was helpful in clarifying what the proposed program represented.

(A.R.3170).

Ms. Flax swore:

> Neither Dr. Imber nor I asked for Mr. Francoise to introduce us to his students or provide us with an overview of the program, including the reading program, the math program, and the use of technology within the program; he and Ms. McGovern also provided information about the Achieve program.
>
> Ms. McGovern was present throughout the observation/ consultation, contributed unsolicited information and did not intercede in any way to limit Mr. Francoise's description of the program and the students within the program, without any direct inquiry on my part.

 (A.R.3146).

In addition, Natick referenced Ms. McGovern's presence at the observation in its Opposition to the Parents' Motion to Compel, stating: "On June 10, 2014, Mr. Francoise, the lead teacher of the Program, Ms. Molinari-Bates, the Evaluation Team Leader, and Ms. McGovern, Assistant Director for Student Services all spoke to Ms. Flax and Dr. Imber." (A.R.3159).

Mr. Francoise testified, "I think Ms. McGovern was with them once or -- and Barbara was also."  (A.R.2470, *ll*.7-11).

Ms. McGovern herself testified: "I met with [Ms. Flax] and Jim Franciose and Dr. Imber the previous year, the previous June." (A.R.2363, *l*.23-A.R.2364, *l*.2); and "Suzanne Flax and Dr. Imber and I met with Jim Franciose, and I believe that was in --that was actually in 2014.  It might have been in May or early -- they're saying June." (A.R.2368. *ll*.14-17).

173.    On September 14, 2014, as part of their independent educational evaluations, the Parents requested the opportunity for themselves and their evaluators/consultants, Ms. Coellner, Dr. Imber, Ms. Flax, and Dr. Roffman to observe the proposed program for C.D. at Natick, including both academic classes and lunch period.  (R.3130).

174.    **Natick's Response:**  Natick admits that the Parents requested the opportunity to observe the proposed program and have their evaluators observe the program. Natick adds that observations were scheduled and that the arrangements for asking questions of teachers and service providers were addressed by the BSEA and were the subject of a BSEA order.   R.1399.

**Parents' Reply:**  Admitted.  The Parents add that the BSEA order was in response to the Parents Motion to Compel.  (A.R.732-944; A.R.3112-3173).  The Motion to Compel and the BSEA Order speak for themselves. (Id.)

175.    Between September 15, 2014, and October 24, 2015, Natick's attorney sent multiple emails to the Parents' attorney specifying the conditions that would be placed on the observations; (for example, on October 23, 2014, Natick informed the Parents through their attorney, "these are observations, we are not setting aside a time for your experts to speak with Natick staff. Each visitor will have an escort who will be available to answer basic factual questions about what is being observed...we are not going to allow your experts to speak with

Natick staff at any time prior to the IEP team meeting except for basic questions that might come up during the observation which relate to clarifying what is being observed.)" (A.R.3131).

**Natick's Response:**  Natick admits that it agreed to permit the Parents and their evaluators and consultants to observe the program, but that speaking with staff and asking questions was addressed by, and was the subject of, a BSEA order which permitted written questions.  R.1399.

**Parents' Reply:**  Admitted that the BSEA order addressed the specific relief requested by the Parents in their Motion to Compel and the documents speak for themselves. (A.R.1399; A.R.3112-3173).

176.     On October 24, 2014, at 1:00 PM (during the ongoing observations that day), Natick's attorney contacted the Parents' attorney and indicated that she was just informed that, "both Dr. Imber and Ms. Flax asked for time to talk with staff during their observations today. I do not think I could have been more clear with you about the fact that we were not going to allow this. Why were your people under the impression that they would be allowed to have these conversations? This is extremely concerning to me. They seem to think that they will be allowed to return and again we will not allow this.  Please explain to me why both Dr. Imber and Ms.  Flax made these requests today after I had been explicit with you about the district's position?" (A.R.3140).

**Natick's Response:**  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

177.     The Parents' attorney contacted the Parents' evaluators, including Dr. Imber

and Ms. Flax regarding their observations and was informed that they not only completely

abided by the conditions placed upon them by Natick, but also, they were denied the

opportunity to obtain even basic information. (*See* A.R.3144-3154, A.R.1168, A.R.1173).

> **Natick's Response:**   Denied.   There is no evidence on the pages in the record Plaintiffs
>
> cite supporting paragraph 177.  In fact, Ms. Flax stated in her affidavit in support of
>
> Parents' motion to compel that during the October 24, 2014 observation, she asked
>
> questions of the teacher, Mr. Coleman.  R.3147, ¶27.

> **Parents' Reply:**   Denied.   Both Dr. Imber and Ms. Flax stated in their verified

affidavits that they were advised by the Parents' attorney of the conditions placed upon them

by Natick, that they complied with the conditions, and as a result they were unable to obtain

the information they needed to do their jobs.  (A.R.3144-3154, A.R.3167-3173).  The Parents

add that Natick's representation of Ms. Flax's statement is incomplete and misleading.  More

specifically, Ms. Flax swore:

> When I arrived on October 24, 2014, my administrative escort, school
> psychologist Donna Cymrot, made it very clear that I was not to talk to
> to the Replacement English Teacher, Nick Colman, under any
> circumstances.
>
> l was surprised therefore, when Mr. Coleman actually approached me
> during the class break and appeared to be unaware or concerned that
> he was not supposed to talk to me.
>
> Since Mr. Coleman approached me and initiated a conversation and Ms.
> Cymrot did not intervene, I asked a few very "basic questions, including
> whether I could have a class syllabus and he offered to e-mail it to me; Ms.
> Cymrot allowed Mr. Coleman to explain some of the basic modifications he
> was using in the class, and then Ms. Cymrot stepped in and curtailed any
> further conversation.
>
> After, Ms. Cymrot curtailed my conversation, I attempted to ask her
> some basic questions, but she was unable to answer them.
>
> As a result of my inability to speak with Mr. Coleman, I was unable to

> figure out how he was modifying the curriculum for the students or
> how he might modify the curriculum and services to accommodate
> [C.D.].

(A.R.3147).

178.    Despite Natick's representation that the Parents' "experts had full access to

observe and ask clarifying questions during the observations," the Parents' independent

evaluators and consultants did not have full access to observe and were not even permitted to

ask basic questions during the observations. (*See* A.R.3144-3154).

**Natick's Response**:  Denied.  Ms. Flax swore in her affidavit that she received

information from Natick and asked questions. R.3146-3147. Dr. Imber also swore in his

affidavit that he was able to ask questions and received information from Natick.   R.3151-

3152.

**Parents' Reply**:  Admitted to the extent that both Dr. Imber and Ms. Flax stated that

Mr. Francoise and Ms. McGovern both provided information about the ACCESS program

when they observed on June 10, 2014, which was prior to the receipt of Natick's proposed

IEP dated June 13, 2014 - June 13, 2015, proposing a different "blended" program.  Denied

with regard to the observations conducted in October 2014, following the receipt of Natick's

proposed IEP dated June 13, 2014 - June 13, 2015, proposing a different "blended" program.

The Parents add that both Dr. Imber and Ms. Flax swore in their respective affidavits that

due to the conditions placed upon their observations by Natick, they were unable to obtain

even basic information.   Dr. Imber swore:

> I asked my escort, Ms. McGovern, if I would be given any time to meet with
> her after school, rather than asking my questions during the class time (which
> could be potentially disruptive); she stated that I would <u>not</u> have that
> opportunity.

> I then asked her if I could ask a few questions during the class time, and she stated that she was not permitted to speak with me; I then stated that it was my understanding that I could ask basic questions, to which she responded that I was correct, but then informed me that basic questions meant I could ask questions such as, which class I was observing, and the number of students within the classroom.
>
> Therefore, despite Natick's representation that I could ask basic questions to clarify what was being observed, I not only did not get to ask any clarifying questions, I could not even get one basic question answered."

(A.R.3151-3153).

The Parents add that Natick's representation of Ms. Flax's testimony is incomplete and misleading. (*See* Paragraph 176 *supra*).

179.    On October 30, 2014, Natick's Attorney informed the Parents' attorney that, "*...The reason that the evaluators were not permitted to have substantive conversations with staff during their observation is that Natick had allowed this with your experts in the past and felt as though the conversations turned into interrogations.*" (emphasis added). (*See generally*, A.R.732-944).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

180.    The Parents' Attorney contacted the Parents' evaluators, including Dr. Imber and Ms. Flax regarding their observations and was informed that they behaved completely appropriately and had no idea what Natick was referring to. (*See generally*, A.R.732-944).

**Natick's Response**:  Denied.  Plaintiffs have not cited anything in the record to support paragraph 180.

**Parents' Reply**:  Denied.  The Parents indicated in their Motion to Compel that:

"Parents' Attorney contacted the Parents' evaluators, including Dr. Imber and Ms. Flax regarding their observations and was informed that they not only completely abided by the conditions placed upon them by Natick, but also, were denied the opportunity to obtain even basic information." (A.R.738, A.R.3036). In addition, both Dr. Imber and Ms. Flax addressed their knowledge of the conditions placed on their observations and their compliance with those conditions in their respective affidavits. (A.R.3144-3154, A.R.3167-3173).

181. The Parents' filed their Motion to Compel as a result of these incidents. (*See* A.R.3112).

**Natick's Response**: Natick admits that the Parents filed a Motion to Compel.

**Parents' Reply**: Admitted. The Parents add that the Motion to Compel speaks for itself.

182. Dr. Roffman provided testimony regarding her unanswered questions following her observation of the transition class:

> "I think it was meant to be divided into two 40-minute sections; it was unclear. We were not allowed to ask questions... I wasn't sure how this 80 minutes fit together, and if what benefit it was, and where it stood in terms of being steps towards curricular goals. I wasn't allowed to ask questions, so I wasn't able to discern that." (*See* A.R.1764).

**Natick's Response**: Denied. The quote is not accurate. Dr. Roffman did not testify to the first part of the quote. She testified: "And the period ended without a recap. There was no discussion about what had happened at the actual hands-on placements that I had observed earlier. So I wasn't sure how this 80 minutes fit together, and of what benefit it was, and where it stood in terms of being steps toward curricular goals. I wasn't allowed to ask questions, so I wasn't able to discern that." R.1764, *ll.*2-9.

**Parents' Reply:**   Admitted.

183.    Ms. Flax provided testimony regarding her unanswered questions following her observation of the English Replacement class:

> "I didn't have the chance to speak to Nick Coleman when I observed the [R]eplacement class... part of being a good placement is also the profile of children within the class, and since those questions weren't answered, I had no way to complete my report." (R.A. 1860-1861).

**Natick's Response:**   Denied.  There is no such quote in the record at R.1860-1861.

**Parents' Reply: :**   Admitted to the extent that the quote does not appear in the record at A.R.1860-1861.  The correct cites are: A.R. 1872, *l*.1-3, where Ms. Flax testified, "I didn't have the chance to speak to Nick Coleman when I observed the [R]eplacement class; and A.R.1872, *l*.23-A.R.1873, *l*.7., where Ms. Flax testified, "part of being a good placement is also the profile of children within the class, and since those questions weren't answered, I had no way to complete my report." (Id.)

184.    With regard to his observations of the proposed program, Dr. Imber testified:

> "I was not permitted to ask any questions whatsoever, so I was not able to really find out anything about the curriculum. I didn't see a syllabus...I didn't get to see worksheets... I wasn't really able to determine anything about the kids in the program or what the teacher's objectives were." (A.R.2057).

**Natick's Response:**   Admitted that Dr. Imber so testified.

**Parents' Reply:**   Admitted.

185.    Mr. Francoise testified that when Ms. Flax and Dr. Imber observed the ACCESS program in June 2014, *they did not act in any way inappropriately. [emphasis added].* (A.R.2470).

**Natick's Response:**   Denied.  The quote from Mr. Francoise is "No.  They were fine."

R.2470, *l*.18.

**Parents' Reply:**  Admitted.

186.    The hearing officer refused to allow Mr. Francoise to testify about the

allegations made by Natick against Dr. Imber and Ms. Flax with regard to their

observation of his class:

> Parents' Attorney: "[w]ere you aware that the school district had
> accused them of interrogating you and making you feel..."
>
> Hearing Officer: "This is not relevant, and this is not an issue
> before me...I've already resolved the issue of evaluations and
> access to evaluations."
>
> Parents' Attorney: "This goes to administrative exhaustion and I
> need to have it on the record."
>
> Hearing Officer: "You can get the question on the record, but it's
> not relevant to this proceeding. So I'm not going to have the witness
> answer it." (A.R.2471).

**Natick's Response:**  Admitted that the hearing officer ruled that the question was not

relevant.  Natick adds that the Parents are not citing the full transcript. Please see R.2470-71 for

the full quotes.

**Parents' Reply:**  Admitted.

**The November 14, 2014 Team Meeting**

187.    Natick scheduled a team meeting for November 14, 2014 to review the

Transition Evaluation which was finally conducted in October 2014.  (A.R.3404).

**Natick's Response:**  Natick admits that it conducted a Team meeting to review the

transition evaluation.

**Parents' Reply:**  Admitted.

188.    On November 13, 2014, the Parents sent evaluations conducted by their

Educational Evaluators to Natick in preparation for the team meeting on November 14, 2014. (*See* A.R.3662, A.R.3802,  A.R.3876).

**Natick's Response:**  Natick admits that the Parents provided a neuropsychological evaluation and two incomplete evaluations.

**Parents' Reply:**  Admitted.

189.    Given that the Parents' Motion to Compel was pending at the time of the team meeting, Dr. Imber's report and Ms. Flax's report were submitted to the extent that they could be completed pending the ruling on the Parents' outstanding motion. (*See* A.R.3662, A.R.3802,  A.R.3876).

 **Natick's Response**:  Denied.  There is no evidence on the pages cited for the reasons the reports were incomplete.

**Parents' Reply:**   Admitted that the evidence is not on the pages cited. The Parents add that Natick was advised by email that "since the district has restricted all of the parents' independent evaluators from consulting with service providers/teachers on the day of their observations…the parents' independent evaluators will not be able to complete their evaluation reports prior to the Team Meeting…" (A.R.3141).

190.    Ms. Karian did not attend the meeting.  (A.R.3401).

**Natick's Response**:  Admitted.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and does not require a reply.

191.    Ms. Karian testified that she was unable to attend the meeting in November 2014 when Ms. Flax presented her report because she was attending a conference, did not know whether the Parents were previously informed that she would not be attending, and

admitted that she would have attended the meeting if she had not been at a conference. (*See* A.R.2183-2215).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and does not require a reply.

192.    Ms. Brown testified with regard to the vocational class observed by the Parents and Dr. Roffman; Ms. Brown explained that the students don't stay at the same job; at the end of the year, they choose which job in the rotation they like best, cookie packaging, wiping fitness equipment or setting up library books. (*See* A.R.2215-  2282).

**Natick's Response**:  Admitted that the students rotate through jobs.  Denied in terms of tasks.  Ms. Brown testified:

> So we have students -- again, the rotation is, I mean, I think you saw some students prefer to do the cookie packaging, because they like the roteness and routine of it. And I have other students who refill all of the coolers. And obviously Natick High School is a huge school, so that's actually three students working together to do that, to refill all the drinks in the  coolers.
>
> We have three students working together as a team refilling all of the chips and snack displays. We have other students who help with the -- they have a breakfast snack cart in the morning. So there's an employee working there, and they assist with that, with taking payment, replenishing it, things like that.
> We have another student who does preparation – he'll begin, actually this week, preparing for -- they have a new smoothy bar, so his job is to prepare the ingredients for the smoothy bar. So in the cafeteria itself there are a lot of positions.
> . . .
> And then we have students working in the fitness center, and then we have students working in the library. Some students, their jobs is to set up the displays of books. Some other students, their job is to set up the wall displays. They have a theme of the month, and they have to come up with the theme and then find all of the material.

> Another student sets up all the PowerPoint presentations, which are
> slides that are presented on the flat screen TVs throughout the building.
> And thats his --

R.2276, *l*.8 – R.2277, *l*.20.

**Parents' Reply:**   Admitted that Ms. Brown so testified.

193.    When asked whether Natick could provide C.D. with vocational

opportunities in her areas of interest, Ms. Brown testified that they could find something in

the cafeteria she was interested in since she was interested in cooking and baking. (*See*

A.R.2215- 2282).

**Natick's Response:**  Admitted.  Ms. Brown said specifically, "I mean, I think in the

cafeteria certainly we could find something that -- she was interested in cooking and baking.

We could find something more specific for her, yes."  R.2277, *l*.23 – R.2278, *l*.2.

**Parents' Reply:**   Admitted Ms. Brown so testified.

194.    Dr. Roffman testified that the after-school program proposed by Natick for

the 2014-2015 school year was not reflected in the IEP itself and it was not clear how the

objectives described on the Transition Planning Form could possibly be addressed in two

80-minute periods after school, and that, regardless, it was not appropriate for a student

working on communication skills to be isolated in a 1:1 program. (*See* A.R.1745- 1805).

**Natick's Response:**  Admitted that Dr. Roffman testified that that was her opinion.

**Parents' Reply:**  Admitted.

195.    On cross-examination, Ms. Brown admitted that:

a.    As of now, C.D. would be the only student in the proposed after-
school transition program and conceded that it had never been
implemented before;

**Natick's Response:**  Admitted that the after-school program had not been

implemented before. Denied as to the rest. Ms. Brown said that "If that were to happen, then C.D. would probably be in the community, working on those skills with generalized peers." R.2261, *ll.*10-12.

**Parents' Reply:**   Admitted that Ms. Brown so testified.  The Parents that Ms. Brown also provided the following testimony:

> Q.   So are you saying that you didn't indicate at the January meeting that Carolyn would be the only person?
>
> A.   I mean, as of that point, Carolyn was the only person who had that scheduling need. But it doesn't mean that, in a year, we don't have another IEP meeting where a student has a similar issue and we say, you know, we have a student who is also doing employability skills, and we're going to –
>
> Q.   But as of now she would be the only one?
>
> A.   Right. She would be the only one, correct.

(A.R.2262, *l.* 3-13).

> b.   She was not qualified to testify with regard to the appropriateness of the change in C.D.'s disability category;

**Natick's Response**:   Denied.  She testified that she was not qualified to testify as to whether "adaptive daily living skills apply to making a determination of a student's disability category with regard to whether it's intellectual or communication." R.2259, *l.*18 – R.2260, *l.*2.

**Parents' Reply:**   Admitted Ms. Brown so testified.

> c.   She did not know whether C.D. had passed MCAS or where she stood with regard to the requirements for graduation; and

**Natick's Response:**  Admitted.

**Parents' Reply:**   The Parents state that this paragraph was admitted by Natick and

does not require a reply.

> d.   She did not recall whether there was a transition plan in the IEPs
> proposed by Natick prior to her employment in August 2014.

**Natick's Response:**  Admitted.  R.2215- 2282.

**Parents' Reply:**  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

## The 3rd Proposed IEP for 2014-2015 (dated November 14, 2014-June 13, 2015)

196.   The Parents had questions after the team meeting on November 11, 2014, and

requested an additional meeting to address them; however, Natick responded that another

meeting was not necessary, forcing the Parents to reject the IEP and thereby require a meeting

to have their questions answered; a meeting was then scheduled for January 7, 2015.

(A.R.3400).

**Natick's Response:**  Natick admits that the Parents requested a second Team

meeting   and that Natick did not believe another Team meeting was necessary. There is no

evidence on the cited page concerning the reason the Parents requested the meeting or why

they rejected the IEP.   R.3400.

**Parents' Reply:**  Admitted to the extent that the cited page does not provide

evidence concerning the reason the Parents requested the meeting or why they rejected the

IEP.   The Parents add that the correct cite is: A.R. 3402-3403, which lists twenty (20)

bulleted reasons why the Parents rejected the IEP.  (Id.)

197.   Ms. McGovern admitted in her testimony that she recalled that the Parents

were not able to ask their questions in November because they ran out of time. (A.R.2345-

2425).

**Natick's Response**:  Denied.  Ms. McGovern testified that she felt the Parents always had an opportunity to ask any questions during the meeting. R.2371, *ll.*5-9. She said: "And then in a rejection letter that I received for the IEP we proposed in November, it was alleged that I hadn't given them ample opportunity to answer questions, and I was truthfully very surprised. I do understand that the meetings have to move along at a pace, but we had usually met for an hour and a half to two hours**.**  So I understand there might have been things that they thought afterwards But I was surprised that was brought up." Id.

**Parents' Reply**:  Admitted that Ms. McGovern so testified.  The Parents add that Ms. McGovern also provided the following testimony:

> Q.  Do you recall whether we ran out of time at the meeting in November 2014, which was the meeting to review the transition report?
>
> A.  I guess I do remember that.

(A.R. 2406, *ll*. 7-10).

198.    The Parents rejected the IEP on December 20, 2014, with a lengthy detailed attachment outlining their reasons for rejection, which included: the proposed extended day schedule for C.D. to participate in a "one-to-one" transition program,  which has never before been implemented and which would not provide any peer interaction; the continued proposed placement in ACCESS Math, which would not prepare C.D. for the Math MCAS despite her receipt of an almost passing score at Learning Prep, and Natick's continued insistence on changing C.D.'s disability category.  (A.R.3398).

**Natick's Response**:   Natick admits that the Parents rejected the IEP on December 20, 2014.   The rejection speaks for itself.   R.3398.

**Parents' Reply**:   Admitted.

**The January 30, 2015 Team Meeting**:

199.    A team meeting was held on January 30, 2015. (*See* A.R.3394 -

A.R.3398).

**Natick's Response**:  Admitted.

**Parents' Reply**:   The Parents state that this paragraph was admitted by Natick and

does not require a reply.

200.    Natick noted that it had incorrectly indicated that C.D. would be taking the

Math MCAS (with accommodations) on the "State or District-Wide Assessment" page of

the proposed IEP, and that the form should have indicated that Natick had determined

C.D. would participate in the alternative assessment in Math. (*See*   A.R.3394  -A.R.3398).

**Natick's Response**:  Admitted.

**Parents' Reply**:  The Parents state that this paragraph was admitted by Natick and

does not require a reply.

201.    On January 30, 2015, the Parents received notice from Natick indicating its

refusal to make the changes requested by the Parents, except for correcting the error on the

"State or District-Wide Assessment" page. (*See* A.R.3394 -A.R.3398).

**Natick's Response**:  The N1 speaks for itself.   R.2295-3397.

**Parents' Reply**:  Admitted.

203.    On January 30, 2015, the Parents received the corrected, "State or District-

Wide Assessment" page, which indicated that C.D. would participate in the alternate

assessment for Math (instead of the Math MCAS). (*See* A.R.3394 A.R.3398).

**Natick's Response**:  Admitted.

**Parents' Reply**:   The Parents state that this paragraph was admitted by Natick and

does not require a reply.

## NATICK'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

Natick incorporates herein by reference its denials and the additional information

contained in its responses to Plaintiffs' facts in paragraphs 6, 17-18, 21, 23, 25-26, 28, 29, 31,

33, 34, 35, 37-38, 45, 52, 53, 63, 65, 66, 71-72, 77-80, 84, 87-89, 94, 95-96, 101, 103-104, 108,

112-122, 124-130, 134-35, 138-40, 143, 145-47, 150, 155-58, 162, 164-65, 167, 168, 172-75,

177-78, 182-83, 185-86, 189, 192-93, 195-97, *supra*. Natick adds the following undisputed

material facts which are not otherwise contained in its responses above:

**Prior Placement**

204.    Student was placed by her parents at the Christa McAuliffe Charter Public

School ("McAuliffe") for the sixth through eighth grades.  R.1612, Tr.V.I, p.38*, ll*.11-13.

   **Parents' Response:**  Admitted.

 205.   In C.D.'s placement at McAuliffe, she received services in a general

 education setting, but with the assistance of a one-to-one aide, who acted as a one-to-one

 tutor. R.1696, *ll*.12-19l; R.1716, *ll*.14-22.

   **Parents' Response:**  Denied, except to the extent that Ms. Coellner and Ms. Soden

provided C.D. with supplementary supports and services for C.D. in the general education

setting at McAuliffe.

206.    She attended classes with approximately 16 students in each class and had the

constant support of either Nan Coellner or Marcia Soden.  R.282*, l*.18; R.1695-1696.

   **Parents' Response:**  Admitted to the extent that there were approximately 16-20

students in each class.  (A.R.282*, l*.18; A.R.1718, *l*.20-21).  The Parents deny that either Nan

Coellner nor Marcia Soden provided C.D. with constant support.  At the meeting on July 27,

2012, Ms. Coellner repeatedly stated,

> Just to emphasize, again, that C.D. has been in a regular education
> setting for the past few years.  You said significant support; I'm sort of
> sensitive to that. Certainly, we have been there; but certainly, when
> your representative came to observe her, we are basically in the back
> of the room, she's part of the classroom. And in fact, I realized that she
> only could even recognize who Carolyn was except that she was
> pointed out. She had an opportunity -- The representative had an
> opportunity to speak with her special education teacher, to look at her
> work, and in fact observe her in English, Language Arts, and in
> Science. And basically, she has been functioning in a regular
> education classroom with our support; we are there if she needed us.

(A.R.397, *l*.9-21).

207.     She also required significant and frequent modifications.  R.409, *ll*.16-22**.**

**Parents' Response:**  Denied.  The page cited by Natick does not support Paragraph 207.

**2012-2013**

208.     To provide a comparable IEP to McAuliffe, Natick offered to place C.D. in all

replacement classes. R.2191, *ll*.2-8; R.2298, *ll*.20-23; R.2322, *ll*.5-13; R.2396, *ll* 3-15; R.2439,

*ll*.11-21; R.2440, *ll*.13-23;  R.2771.

**Parents' Response:**  Denied. The pages cited by Natick do not support Paragraph 208.

The Parents add that Natick did not propose an IEP with placement in any replacement classes

until June 13, 2014, and even then Natick did not offer placement in all replacement classes.  The

IEPs speak for themselves.  (A.R.3231-3257, A.R.3260-3281, A.R.3282-3305, A.R.3306-3327,

A.R.3328-3349, A.R.3350-3370).

209.     Natick convened two meetings and reviewed all the information available to it

during the May and July, 2012 meetings, including the results of C.D.'s most recent testing and

verbal reports from C.D.'s service providers.  R.2325, *ll.* 7-9; R.2348-2351.

**Parents' Response:**  Admitted that Natick convened two meetings in May and July

2012.

210.     It was difficult to hold the July, 2012 meeting because it was during the summer when staff are not available.  R.2389, *l.*23 – R.2390, *l.*2; R.2394, *ll.*13-18.

**Parents' Response:** Admitted that Natick so testified.

211.     Although it was difficult for Natick to put together a Team in July, 2012 because it was summer and much of its staff was unavailable (R.2389, *ll.*23-211, *ll.*2; R.2394, *ll.*13-18), all the individuals statutorily-required for the Team meeting were in attendance. R.478, 2770.

**Parents' Response:**  Denied, except to the extent that Ms. McGovern testified, "in the summer it's very difficult to find teaching staff to attend IEP team meetings, per contract, and because they're away and whatnot," (A.R.2389, *ll.*23-A.R.2390, *ll.*2); and also testified, "because it was summer, it's really difficult to find teachers, you know, on fairly short notice who are in town and able to attend team meetings, because it's outside of their contractual work year." (A.R.2394, *ll.*13-18).

212.     The attendance sheet for the July 27, 2012, meeting, shows that both parents, Natick's Director of Student Services, two Assistant Directors of Student Services, including the Team Chair, Lindsey McGovern, who is also a special education teacher, another special education teacher, a general education teacher, the principal of Natick High School, parents' independent evaluator and consultant, and Student's two one-on-one aides ("tutors") attended the meeting, along with the parties' counsel.  R.478, 2770.

**Parents' Response:** The attendance sheet speaks for itself.

213.     No one from the summer program attended because the summer program is only five weeks long.  R.2326, *ll.*13-18.

**Parents' Response:** Admitted to the extent that Ms. Liptak testified that, "The

summer program is only five weeks in duration. I really think the charter school

personnel would have been probably more important at that time than the summer

school people. They had a longer relationship with her. We would have had a snapshot

of information to really contribute.  (A.R.2326, *ll*.13-18).

214.    The transcript from the July, 2012 meeting shows that Natick relied on various

sources of information in developing the IEP, including C.D.'s progress in the summer

program, informal testing, questions during the Team meeting and a staff member's visit.

R.385, *ll*.14-20; R.387, *ll*.3-13; R.397, *ll*.22-24; R.399, *ll*.2-4; R.403-12-25.

**Parents' Response:**  Denied that the transcript from the July, 2012 meeting shows that

Natick relied on various sources of information in developing the IEP. The pages cited by

Natick do not support this assertion.  The Parents add that the pages cited by Natick only

indicate that Natick acknowledged that they have unspecified information from the summer

program (A.R.385., *ll*.14-20); that Natick stated C.D.'s work during the summer program

matched the current performance levels described by McAuliffe in her last IEP (A.R.387, *ll*.3-

13); that Ms. Coellner informed Natick that C.D. performed well and made progress at

McAuliffe (A.R. 397, *ll*.22-24); that Ms. Coellner informed Natick that C.D. was performing

close to grade level (A.R.399, *ll*.2-4); and that while Ms. Dalan did not write a report after her

observation of C.D. at McAuliffe, she informed Natick that she believed the ACCESS program

was appropriate. (A.R.403-12-25).

215.    Lindsey McGovern, the Team Chair who attended the meeting, is also a

special education teacher.  R.2347, *ll*.19-23; R.2344, *ll*.6-10; R.2345, *ll*.2-3.

**Parents' Response:**  Admitted.

216.    In the July, 2014, IEP, the Team adopted the goals, objectives,

accommodations and modifications from the IEP developed by McAuliffe dated April 4, 2013, to April 4, 2013. R.2600-2622.

**Parents' Response:** Denied. The pages cited by Natick do not support Paragraph 216. The Parents add that the last IEP developed by McAuliffe was dated 4/24/2012-4/24/2013. (A.R.3375-A.R.3393).

217.    The Team discussed the option of replacement classes, but believed that the Access program was the most appropriate for C.D.'s needs.  R.403, *l.*21 - 404, *l.*2; R.2600-2622.

**Parents' Response:** Denied to the extent that Natick is implying that the Replacement classes were a "choice" for the Parents. R.403, *l.*21 - 404, *l.*2 does not support Paragraph 217. The Parents add that in the Narrative Description of the IEP cited by Natick (R.2600-2622), Natick wrote, "The option to provide [C.D.'s] special education services through replacement services was discussed by the Team and rejected by the district."  (A.R.2601).

218.    The Access program was for students like C.D. with cognitive, communication and social pragmatic deficits.   R.406.

**Parents' Response:** Denied to the extent that this depicts an incomplete description of the information provided by Ms. McGovern at the meeting on July 27, 2012. Ms. McGovern, said, "The Access program serves kids that do have cognitive, communication, social/pragmatic deficits or disabilities in those areas [C.D.] would, on paper, fit into that category; she has an intellectual disability and also issues with communication and social/pragmatic.  (A.R.406, *l.* 16-20.)

219.    The Access program would have enabled C.D. to have appropriate supports in place.  R.413, *ll.*14-20.

**Parents' Response:**  Denied.  The Parents add that the page cited by Natick does not address the supports that C.D. would have in the ACCESS program. (A.R.413*, ll.*14-20).

230.    The Access program would have provided C.D. with direct special education services in small group English, history, science, math and vocational classes. It would have provided direct special education services in electives in the general education setting and indirect consultation services.  R.2600-2622.

**Parents' Response:**[3]  Denied.  The ACCESS program would not have provided services in small groups. The Service Delivery Grid in the IEP speaks for itself.  (A.R.2617).

231.    The block scheduling allowed reading and writing to be integrated across the curriculum. R.409*, ll.*4-13. Block scheduling would have prevented discrete, isolated instruction in reading and writing and allow information to be presented in a variety of ways.  Id.; R.2212, *l.*20; R.2213, *l.*22 – R.2214, *l.*12.

**Parents' Response:**  Denied, except to the extent that Natick testified that, with respect to the Replacement and general education classes, the longer blocks allows information in each specific course subject to be presented in a variety of ways. (A.R.2212, *ll.*20-24).  There is no evidence on the page cited by Natick or anywhere else in the record supporting Natick's assertion that the block scheduling allowed reading and writing to be integrated across the curriculum. The Parents add that Natick stated that the ACCESS program allows reading and writing to be infused throughout because it is a self-contained program. (A.R.409*, ll.*4-13).

232.    Students in the Access program were routinely placed in replacement classes when their abilities and classroom performance indicated that it was appropriate and the replacement classes allowed students to access the general curriculum. R.2191, *ll.*2-8; R.2298,

---

[3] The Parents have omitted numbers 220-229 in the numerical sequence to maintain consistency with the sequence in Natick's Response.

*ll.*20-23; R.2322, *ll.*5-13; R.2396, *ll.* 3-15; R.2439, *ll.*11-21; R.2440, *ll.*13-23.

**Parents' Response:**  Denied.  The pages cited do not support Paragraph 232. (See Paragraph 161).

233.    Given that C.D. was transitioning from one school to another, Natick held the meeting, but recommended that teachers and staff work with C.D. and then reconvene in October after they had more first-had information about her.  R.2352, *ll.*5-24.

**Parents' Response:**  Denied.   Natick held the meeting in response to the letter from the Parents' attorney requesting a meeting to develop a new IEP.  The purpose of the meeting was to develop a *new* IEP, as explained by Ms. McGovern:

> So the purpose for today's meeting is twofold.  We want to discuss Carolyn's transition to the high school, and also we'd like to develop an IEP that we feel will meet her needs at the high school.  I know that, when the team convened in May, there was discussion around what that kind of program might look like.  There was discussion, also, around proposing a comparable IEP and reconvening early in the fall.  However, since then, I know there's been some communication between attorneys regarding the parents' desire to have an IEP developed for Carolyn as she starts at the high school, to facilitate her transition.  We've also had the pleasure of having Carolyn in summer school with us in an extended school year program, so we have some additional information that we can bring to the table as well.  So the outcome of today's meeting, ideally, will be for us as a team to develop an IEP that we feel will meet Carolyn's needs at Natick High School so she can transition in with that IEP in place at the end of August.

(A.R. 385, *ll.* 3-20).

**2013-2014**

234.    A Team meeting was held on May 22, 2013.   R.2674-2597.

**Parents' Response:** Admitted.

235.    The Access teacher was at the meeting, but C.D.'s father did not have any questions for the teacher.  R.2575.

**Parents' Response**:  Admitted.

236.     The Team Chair had solicited feedback from Learning Prep, but Learning Prep did not provide meaningful information.

**Parents' Response**:  Denied.  The Parents add that Natick does not cite any evidence to support Paragraph 236.

237.     Learning Prep failed to provide sufficient data to update the goals for the 2013-2014 IEP.  R.2584-90; R.2360, *l*.12 – R.2361, *l*.2.

**Parents' Response**:  Admitted to the extent that the goals for the 2013-2014 IEP were not updated.  The Parents add that Natick indicated, "The Team considered [C.D.'s] current performance as reported by LPS.  This IEP dated May 22, 2013-May 22, 2014, was very similar to the IEP that had been previously proposed because the Team felt that [C.D.] continued to present with the same areas of need."  (A.R. 3096).

238.     The Team reviewed C.D.'s current performance as reported by Learning Prep teachers in the areas of history, biology and language arts/literature.

**Parents' Response**:  Denied.  The Parents add that Natick does not cite any evidence to support Paragraph 238.

239.     The Team continued to believe that Access was appropriate.   R.2674-2597.

**Parents' Response**:  Admitted that Natick continued to propose the ACCESS program for all of C.D.'s core academic classes.  (A.R. 2574-2597).

240.     The IEP contained a transition action plan which provided for C.D. to meet with her guidance counselor to explore post-secondary learning opportunities and with the career specialist to explore employment and internship possibilities.  R.2595.

**Parents' Response**: Admitted that the IEP contained a transition action plan.  The

document speaks for itself.

241.     The transition action plan provided that C.D. should explore non-degree post- secondary programs and stated that she would benefit from exploring vocational opportunities and receiving vocational training. It also provided that C.D. would learn to access community services and transportation in the community, managing money and increasing social thinking strategies. R.2595.

**Parents' Response:**  The transition action plan speaks for itself.

**2014-2015 IEPs**

242.     Natick sent Parents an evaluation consent form to perform C.D.'s three-year evaluation on March 12, 2014.  R.2754-57.

 **Parents' Response:**  Admitted.

243.     C.D.'s father rejected the proposed evaluation in full, indicating that before he consented he wanted a description of the tests to be conducted and the location where they would be given.  R.2756.

**Parents' Response:**  Admitted that C.D.'s father rejected the proposed evaluation because he had questions about the tests to be conducted, and the location and dates where testing would take place.  (A.R. 2756).

244.     C.D.'s father did not consent until April 15, 2014.  R.2757.

**Parents' Response:**  Admitted that C.D.'s father provided consent on April 15, 2014.  The Parents add that Natick did not answer the father's questions until April 15, 2014 (A.R. 3409).

245.     The Team met on April 15, 2014, and proposed an IEP. The IEP contained a Transition Planning Action form.  R.2551-2581.

**Parents' Response:**  Admitted.

246.     The Team reconvened on June 13, 2014 to review the results of C.D.'s three-year reevaluation.  R.2529-2550.

**Parents' Response:**  Admitted.

247.     The Team proposed a number of changes from the prior IEPs, including a proposal that C.D. participate in a general education class and some replacement classes. R.2309, *ll.* 22-24; R.2362, *ll.*14-16; R.2364, *ll.*13-19; R.2529-2550.

**Parents' Response:**  Admitted.

248.     The 2014 changes were made based on review of C.D.'s evaluations and information from Learning Prep. R.2412, *ll.*22-24; R.2413, *l.*1; R.2414, *ll.*17-24

**Parents' Response:**  Admitted.

249.     The speech and language pathologist attended both the June, 2014 and January, 2015 meetings, and discussed the findings from her evaluations and what services would be like. Parents had an opportunity to ask questions.  R.2194, *ll.*21 – R.2195, *l.*24; R.2193, *ll.*1-9.

**Parents' Response:**  Admitted that Ms. Karian attended both the June 2014 and January 2015 meetings, and discussed the findings from her evaluations and what services would be like.  Admitted that Ms. Karian testified that the Parents had an opportunity to ask questions.  (A.R.2194, *ll.*21 – A.R.2195, *l.*24; A.R.2193, *ll.*1-9).

250.     The IEP kept C.D. in the Access class for mathematics because that was a significant area of need for her.  R.244, *ll.*14-22.

**Parents' Response:**  Admitted that Natick proposed keeping C.D. in the ACCESS class for mathematics.  The Parents add that the page cited does not address the IEP or the reason Natick proposed the ACCESS class for mathematics.

251.    The IEP proposed placing C.D. in two different English classes to address her significant need in the area of reading comprehension in the Access setting, while permitting her to participate in a replacement English class to accommodate her relative strength in writing and interest in writing. R.2373, *l*.15 - R.2374, *l*.12. The dual English classes ensured C.D. some instruction in English Language Arts for eighty minutes every cycle.   Id.

**Parents' Response:**  Admitted that the IEP proposed placing C.D. in a double English class – one in ACCESS and the other in Replacement and that Ms. McGovern testified as to Natick's reasoning for making this proposal.  (A.R.2373, *l*.15 - R.2374, *l*.12.)

252.    The IEP would have permitted Natick to address C.D. area of weakness intensely, while allowing her to receive content instruction in the less restrictive replacement classes. R.2373, *l*.20 - R.2374, *l*.12.

**Parents' Response:**  Denied.  The IEP speaks for itself.

253.    The IEP would have allowed her to interact with peers in different classes and work in different settings with peers who have reading, writing, and social strengths. R.2333, *l*. 19 - R.2334, *l*.9.

**Parents' Response:**  Denied. The IEP speaks for itself.

**Transition Services**

254.    The 2012-2013 IEP proposed vocational services from the Learning Center Teacher/Student Support Facilitator.   R.2628-2645.

**Parents' Response:**  Admitted that vocational services from the Learning Center Teacher/Student Support Facilitator was indicated on the Service Delivery Grid in the proposed IEP.  The IEP speaks for itself.

255.    There was a Transition Plan for the 2013-2014 and 2014-2015 IEPs

with vocational services.   R.2503-2645.

**Parents' Response:**  The IEPs speak for themselves.

256.    Ms. Brown conducted a transition assessment of C.D. on October 22, 2014.
R.2646-2660.

**Parents' Response:**  Admitted.

257.    She explained that C.D. had an interest in fashion, cooking, baking, and most
of all hairstyling and make-up.   R.2646-2660.

**Parents' Response:**  The Transition Evaluation speaks for itself.

258.    She noted that C.D. required further development to build her knowledge of
the requirements and skills for specific jobs and recommended job shadowing and internships.
She made a number of other recommendations as well.   R.2646-2660.

**Parents' Response:**  The Transition Evaluation speaks for itself.

259.    The Team convened on November 14, 2014 to review the transition
assessment and revise the Transition Planning Form.   R.2503-2528.

**Parents' Response:**  Admitted that a meeting was held on November 14, 2014.

260.    Dr. Roffman testified that Natick's transition assessment was adequate.   R.1775,
*ll*. 4-8.

**Parents' Response:**  Admitted that Dr. Roffman testified that the transition assessment
conducted by Natick in October 2014 was adequate.  (A.R.1775, *ll*. 4-8).

261.    There were numerous schedules offered for the transition services, one of
which was a one-to-one setting after school.  R.1677, *l*.7 – R.1678, *l*.1.

**Parents' Response:**  Admitted that Natick offered a one-to-one transition class after
school.  The Parents add that there would not be an opportunity for electives if C.D. had chosen

to take the transition class during the school day. [A.R.1677, *ll.*7-11].  Ms. McGovern testified

that**:**

> So, when we met -- when we convened to review the transition assessment,
> we found a need for additional services. And we do not want – when I run a
> meeting, I never want scheduling to dictate a service delivery grid. It's not
> good practice, it's not legal, it's not how I practice.  So we felt that rather than
> falsely reduce or alter any service delivery we had proposed in the June
> meeting, we would also propose extended school day, because a huge concern
> that the Parents had that had been voiced was her opportunity to participate in
> electives, and a fear that her special education services would interfere with
> that, which now I feel is a little ironic, because there is a desire to have less
> inclusion.  But at the time a concern that was expressed was, "We don't want
> special education services eliminating her ability to participate meaningfully
> in electives."

(A.R.2372, l.15 – A.R.2373, l.9)

262.    The IEP proposed an extended day for C.D.   R.2503-2528.

**Parents' Response:**  Admitted.

263.    An extended school day would have allowed C.D. to continue to receive

non-academic general education electives during the day as well as all her services on the

service delivery grid.  R.1677, *l.*7 – R.1678,  *l.*1.

**Parents' Response:**  Admitted.

**Disability Category**

264.    The change in the disability category was based upon an evaluation by

Natick's school psychologist, Ms. Cymrot, in May of 2014.  R.2132, *l.*12.

**Parents' Response:**  Admitted.

265.    Ms. Cymrot is a licensed school psychologist who had worked in Natick for

over twenty years.  R.2132, *l.*10 – R.2133*, l.*2.

**Parents' Response:**  Admitted.

266.    Ms. Cymrot noted that C.D. had longstanding deficits in language,

language understanding, reading comprehension, and written language, and that the deficits affected cognitive growth and development.  R.2134,  *ll*.14-22.

**Parents' Response:**  Denied.  There is no evidence on the page in the record Natick cites supporting Paragraph 266.

267.     Ms. Cymrot discussed her opinion that C.D.'s disability should be communication as opposed to intellectual at both the June, 2014 and November, 2014 meetings. R.2143, *l*.22 – R.2145, *l*.4.

**Parents' Response:**  Admitted.

268.     Natick provided Parents with notice of the change in disability category through the N1s and proposed IEPs developed at the June and November, 2014 meetings. R.2527-2548; 2499-2526.

**Parents' Response:** Denied.  The Parents received notice of the change in disability category at the meeting in June. (A.R. 1007, *l*.8-A.R. 1009, *l*.13).  The N1s and IEPs cited were issued after the date of the June meeting.

269.     Service providers testified that a communication disability describes C.D. well and that she needs significant support around language and requires pairing instruction with visuals, repetition, and previewing and reviewing of material.  R.2194,   *ll*.13-20.

**Parents' Response:**  Admitted that Ms. Karian testified:

> Her communication disability really describes her well, and it helps us as educators to provide services that will support her in the best way. We know that she needs a lot of support around language and pairing things with visuals and providing repetitions and really previewing and reviewing material on a consistent basis.

(A.R. 2194, ll.13-20).

270.     The service providers further testified that regardless of the disability category,

the services for C.D. would not have changed because the recommended services are based

upon all areas of deficit and day-to-day functioning, and not upon the named disability

category. R.2143, *ll.*10-21; R.2199, *ll.*3-17.

> **Parents' Response:**  Admitted that Ms. Cymrot testified:
>
>> So that's why I feel that a language disability or communication disability
>> more aptly describes Carolyn. But I want to also say that I think that the
>> specific disability category is not the key component for somebody.
>>
>> Everybody -- for anybody you need to look at how their actual functioning in
>> day-to-day life is. This is just -- testing is just a brief picture of them on a
>> particular day, and it tells really very little about how a person with their
>> personality strengths is able to utilize the abilities and the strengths that they
>> have.
>>
>> So the specific disability category may be important for the IEP
>> development in terms of having to state the disability category, but I
>> think that their day-to-day functioning is what's important in terms of
>> developing a service plan.

(A.R.2143, *ll.*10-21).

The Parents also admit that in response to the Hearing Officer's question: "Does the

disability category impact the way you provide your services?  Ms. Karian stated, "No"

(A.R.2199, *ll.*1-160).

### Learning Prep

271.     At Learning Prep, C.D. has/had no access to ***any*** typical peers because Learning

Prep is a special education school for students with disabilities.  R.2353,   *ll.*13-17.

**Parents' Response:**  Admitted that Learning Prep is a special education school for

students with disabilities.

272.     Learning Prep does not start transition services until the student is in the

eleventh grade.  R.2235, *ll.*21-24.

**Parents' Response:**  Denied.  The Parents add that Ms. Tsang, Transition Coordinator

at Learning Prep testified as follows:

> Q:  Do transitional services at LPS generally begin in the 11th grade?
>
> A:  That is when they are actually called transitional resources, but their transition starts as early as second grade.

(A.R. 2005, *ll.* 12-16).

The father also testified with regard to the transition program at Learning Prep:

> I think the transition program is good. This summer one of the things she'll be doing is working two days a week at a place like Boston College or Newton-Wellesley Hospital. So I think she's making gains in transition.  In fact, the way the Learning Prep -- call them electives, like culinary, horticulture and childcare – is structured is that they follow the Mass. Curriculum transitional assessments, which is something that the state implements for not just kids with learning disabilities, but it's for like people that are returning to society from prison to get them up to speed and to hold a job.

(A.R. 1669, *ll.* 1-13, *See also* A.R. 508-5011).

**Parents' Participation**

273.    The Parents were able to ask whatever questions they had about the program(s) proposed during Team meetings and after Team meetings, they could ask whatever questions they had of the special education teacher, the Director of Special Education, and other staff. R.2195, *ll.*20-24; R.2264, *ll.*5-11; R.2279, *ll.*10-18; R.2280, *ll.*2-6; R.2292, *ll.*11-14; R.2371, *ll.*1-19; R.2394, *l.*23 – R.2395, *l.*8.

**Parents' Response:**  Admitted to the extent that Ms. Karian testified that the Parents asked her a few questions at the IEP meeting in January 2014 (A.R.2195, *ll.*20-24); admitted to the extent that Ms. Brown testified that she did not recall whether the Parents asked questions about the ACHIEVE program at the meeting in January 2014, that the Parents had the ability to ask questions at IEP meetings in November and January 2014 and that they asked questions about the schedule at the meeting (A.R.2264, *ll.*5-11, A.R.2279, *ll.*10-18,

A.R.2280, *ll.*2-6); admitted to the extent that Ms. McGovern testified that she believed the Parents had the opportunity to ask questions, (A.R.2371, *ll.*1-19, A.R.2394, *l.*23 – A.R.2395, *l.*8.).  The Parents add that Ms. McGovern also testified that she remembered that the Team ran out of time at the meeting in November 2014.  (A.R. 2406, ll. 7-10).

The Parents also add that the testimony referenced by Natick at A.R.2292, *ll.*11-14 does not support Paragraph 273.

274.     The Parents and their experts had multiple opportunities to observe Natick's proposed programs. R.2246, *ll.*3-7; R.2256, *ll.*12-17; R.2295, *l.*9; R.2304, *ll.*22-24; R.2368, p.189, *ll.*11-13; R.2369, *ll.*18-21.

**Parents' Response:** Denied, except to the extent that the Parents and their experts were permitted to observe Natick's proposed program in 2014, subject to the conditions and limitations placed upon their observations by Natick.  (A.R.3112-3162).  The pages cited by Natick simply reference the limited observations that occurred and do not support Paragraph 274.

**Testimony/Hearing**

275.     Dr. Imber changed his opinion of what C.D. required over time. R.1676, *ll.*2-6; R.2086, *l.*8 – R.2091, *l.*4.

**Parents' Response:**  Denied, except that Dr. Imber's opinion of C.D.'s needs changed to the extent that C.D. changed during the six-year timeframe that he served as her educational consultant and independent evaluator. The pages cited by Natick do not support Paragraph 275.

276.     In 2011, Dr. Imber advocated for inclusion at the BSEA hearing.  R.2082, *ll.*8–11.

**Parents' Response:** Admitted.

277.     In his 2012 report, Dr. Imber recommended that C.D. "continue to attend

high school in an inclusive environment." He said that "[t]he recommendation is consistent with current best practice in education, consistent with the IDEA's emphasis on least restrictive environment."  R.2077, *l*.8 – R.2078*, l*.4.

**Parents' Response:**  Dr. Imber's report speaks for itself.

278.     At the May and July, 2012 meetings, Dr. Imber stated that inclusion opportunities were important for C.D.  R.2082, *ll*.  12-24.

**Parents' Response:**  Admitted that Dr. Imber so testified.

279.     At the BSEA hearing, Dr. Imber advocated for C.D.'s attending Learning Prep where she had no opportunity to be with general education students. R.2071, *l*.4 – R.2072, *l*.8; R.2086, *l*. 8 – R.2091, *l*.  4.

**Parents' Response:**  Denied.  Natick's representation of Dr. Imber's testimony is out of context and misleading.  The Parents add that Dr. Imber supported C.D.'s continued placement at Learning Prep *at the time of the hearing* based upon the benefits she experienced between 2012 and 2014, and he initially supported the Parents' placement at Learning Prep only because Natick offered no other options than the self-contained ACCESS program for all of C.D.'s core academic classes in 2012, despite her success for the past three years in the general education classroom at McAuliffe. Dr. Imber testified with regard to C.D.'s continued placement at Learning Prep:

> "There is no question in my mind that she is benefitting now and I base that on a lot of observations."

(A.R.2071, *ll*.7-9).

> I think she is making meaningful progress there, and I have every reason to believe she's going to have another successful year, and she will now complete the junior year of high school there.

(A.R.2072, *l*.4 – R.2072, *l*.8).

107

Dr. Imber testified with regard to C.D.'s initial placement at Learning Prep:

> The Natick folks, who did not really truly know [C.D.], talked about the ACCESS program as the only place she was going to be successful, which I don't think any of the people that worked with [C.D.] or the [Parents] thought was appropriate at all. Once that decision was made by the Parents that, "Look, we don't want her to go back to a highly -- the most restrictive program after her success at McAuliffe," well, now the question is, the Parents had asked about other options, and none of the other options they mentioned during the meeting were considered.

(A.R.2087, l.7-A.R.2088, *l*.5).

> Once it was determined by the Parents that ACCESS was in effect going backwards for Carolyn and was not going to be an appropriate program, then they began to consider other options. So at that point, even though it may seem inconsistent to you that I wouldn't say, "Well, have her go to another public school" -- I mean, I don't know if they would have had to have moved or whatever –

(A.R.2089, *ll*.3-11).

> My initial support would have been for an inclusive environment, and had it been discussed, had there been discussion about some other programs on the continuum, like, say, what we talk about the replacement program now, and we had been able to observe it, I think it would have been given due consideration. I think it would have at least been considered as an option.

(A.R.2090, *l*.21-A.R.2091, *l*.4).

280.    C.D.'s father does not have any degrees or licenses in either general or special education, never taught in a public school or private school setting, and did not have any degrees in speech and language pathology.  R.1659, *l*.17 – R.1660, *l*.6.

**Parents' Response:**  Admitted.

281.    Ms. Flax testified that C.D. would have absolutely no friends in the Access program.  R.1913, *ll*.1-16.

**Parents' Response:**  Denied.  Natick's representation of Ms. Flax's testimony is out of context and misleading.  The Parents add that Ms. Flax testified that based on her observation of the ACCESS program and her personal knowledge of C.D., after having worked with her on a weekly basis for over five years prior to the hearing, she did not believe the students in the ACCESS program would be appropriate peers for C.D. with whom she would develop friendships.  Ms. Flax testified:

> Given the level of disability that I observed in the class and the lack of interaction -- that's the big one. None of these kids were interacting with one another. And given [C.D], I know that she would not have friends in that class.
>
> She would probably have no friends, and she would have probably a lot less verbal language.

(A.R.1913, ll.15-16; A.R.1913, *ll.* 6-11).

282.    Ms. Flax testified that C.D. would not benefit from inclusion.  R.1882, *ll.*6-10.

**Parents' Response:**  Denied.  Natick's representation of Ms. Flax's testimony is out of context and misleading.  The Parents add that Ms. Flax's testimony was that C.D. would not benefit from inclusion to the extent that it required her to leave Learning Prep and return to Natick for the following school year, given the benefits she experienced at Learning Prep between 2012 and 2014.  Specifically, Ms. Flax testified, "I feel, during the school day, given the type of environment she is in, she should not be integrated with typically developing peers at this time." (A.R.1882, *ll.*14-17).  Ms. Flax further testified,

> Because she is in an environment where she is developing and growing and flourishing. And one of the reasons the Parents wanted her in a more inclusive environment with typically developing peers was because of her strength in social skills.

(A.R.1883, *ll.*1-12).

283.    Ms. Coellner admitted that she did not conduct any formal evaluations of C.D.,

had not worked with C.D. for over three years, and was a paraprofessional, not C.D.'s special education teacher.  R.1715*, l.*19 – R.1717*, l.*2.

**Parents' Response:** Admitted to the extent that Ms. Coellner did not conduct formal evaluations of C.D. and, at the time of the hearing, she had not worked with C.D. for approximately three years.  (A.R.1715, *l.*19 –A.R.1716, *l.*1).  The Parents add that Ms. Coellner conducted informal curriculum based assessments for 2-3 days per week on a weekly basis for three years at McAuliffe, providing C.D. with both direct and indirect services.  (A.R.1716, *ll.*19-A.R.1717, *l.*2).  With regard to how she measured C.D.'s progress, Ms. Coellner testified:

> I measured it through my experience and my eye and my expertise, that somebody who came in in sixth grade and could barely write a sentence and in eighth grade could write a composition. That's how I measured it… By looking at her work and looking at her self-confidence and her willingness to try things that she wouldn't try.  The fact that in the beginning if the teacher is going to ask her a question, they'd have to cue her first so she wouldn't panic.  By the end, she was raising her hand volunteering.  So those narrative, observational methods, you know.

(A.R.1717, *ll.*15-A.R.1718, l.4).

> With regard to how she measured whether C.D. was actually understanding and retaining the material, Ms. Coellner testified:

> By the feedback that she would give.  They would ask a question and she would answer it correctly.  I would look at -- often they would give -- a "do now," for example, when they walked in would be to write about what we read yesterday, and the fact she would sit down, start it and do it and it would be correct.  By her work products, by her answers.

(A.R.1718, *ll.*10-17).

284.    Ms. McGovern testified that she was surprised that Parents and their experts found Natick's proposed Access program too restrictive for C.D., but then placed her at Learning Prep, a private special education, out-of-district placement.  R.2353, *ll.*1-17.

**Parents' Response:**  Admitted that Ms. McGovern so testified.

285.    She noted that the recommendations of Ms. Flax and Dr. Imber had "really" changed over time.  R.2353, *ll*.13-17.

**Parents' Response**:  Admitted that Ms. McGovern testified this was her opinion.

286.    Ms. McGovern testified that C.D.'s profile had not changed significantly and, in fact, C.D. had made gains in expressive language, warranting a less restrictive setting rather than a more restrictive one.  R.2353, *l*.22 – R.2354*, l*.1.

**Parents' Response**:  Admitted that Ms. McGovern so testified.

287.    Approximately two weeks before the hearing, on or about May 4, 2015, Parents attempted to submit a transition report, a psychoeducational evaluation, and a speech and language evaluation.   R.1584, *l*.23 – R.1585, *l*.6.

**Parents' Response**:  Admitted that the Parents submitted a transition report, a psychoeducational evaluation, and a speech and language evaluation on or about May 4, 2015. (A.R.1584, *l*.23 – A.R.1585, *l*.6.).  The Parents add that they submitted these reports as evidence in accordance with Rule IX of the BSEA rules.

DATED this 26<u>th</u> day of <u>September 2016</u>.

                              Respectfully submitted,

                              C.D., by and through her PARENTS AND
                              NEXT FRIENDS, M.D. and P.D.

                              By their attorney,

                              /s/ Laurie R. Martucci
                              Laurie R. Martucci, Esq.
                              BBO #561946
                              Wagner Law Associates, LLC
                              4 West Street
                              Franklin, MA 02038
                              (508) 528-4007
                              <u>lrm@wagnerlegal.com</u>

## CERTIFICATE OF SERVICE

I hereby certify that the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF"), and paper copies will be sent to those indicated as non-registered participants on September 26, 2016.

/s/ Laurie R. Martucci
Laurie R. Martucci