# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————  )
C.D., by and through her parents and next )
friends, M.D. and P.D.,                    )
                                           )          Civil Action No.
          Plaintiffs,                      )          15-13617-FDS
                                           )
          v.                               )
                                           )
NATICK PUBLIC SCHOOL DISTRICT and          )
BUREAU OF SPECIAL EDUCATION                )
APPEALS,                                   )
                                           )
          Defendants.                      )
———————————————————————  )

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

SAYLOR, J.

This dispute arises out of an administrative decision by the Massachusetts Bureau of Special Education ("BSEA") concerning individualized education programs ("IEPs") proposed by the Natick, Massachusetts Public School District. The BSEA found that the IEPs were adequate to provide C.D., a student with learning disabilities, with a "free appropriate public education," as required under the Individuals with Disabilities Education Act, and denied tuition reimbursement for her placement in a private school. C.D. and her parents have brought suit against the School District and the BSEA seeking to overturn the BSEA's decision.

Plaintiffs have moved for summary judgment. For the reasons stated below, the motion will be denied, but the case will be remanded to the BSEA for further consideration or clarification as to whether two of the proposed IEPs provided for an education in the least restrictive environment possible.

## I.    Background

### A.    Statutory Background

The Individuals with Disabilities Education Act ("IDEA") conditions the provision of federal funds to public schools on compliance with a requirement to provide all disabled children with a "free appropriate public education" ("FAPE").  *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 987 (1st Cir. 1990) (quoting 20 U.S.C. §§ 1400(c), 1414(b)(2)(A), 1416)).[1] "Substantively, the 'free appropriate public education' ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'"  *Id.* (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 203 (1982)).

#### 1.    Individualized Education Programs

The individualized education program ("IEP") is the IDEA's primary means for assuring the provision of a FAPE to disabled children.  IEPs are written statements detailing an individualized education plan for disabled children.  At a minimum, "[e]ach IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *see also Roland M.*, 910 F.2d at 987.

> There is no mechanical checklist by which an inquiring court can determine the proper content of an IEP; IEPs are by their very nature idiosyncratic.  One thing is clear:  the substance of an IEP must be something different than the normal school curriculum and something more than a generic, one-size-fits-all program for children with special needs.

---

[1] On December 10, 2015, Congress enacted the Every Student Succeeds Act ("ESSA").  *See* Pub. L. No. 114-95, 129 Stat. 1802 (2015).  Like the No Child Left Behind Act, which the ESSA replaced, the statute is a reauthorization of the Elementary and Secondary Education Act of 1965.  The ESSA also includes minor amendments to the IDEA that are not relevant to this case.

*Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008) (citations and internal quotation marks omitted).  The specific requirements for IEPs can come "from either federal or state law (at least to the extent that the latter is not incompatible with the former)."  *Id.*

The IDEA contains procedural safeguards that must be followed when creating an IEP. In particular, parental involvement is required in order to ensure adequate protections for the interests of individual children with disabilities.  *See Rowley*, 458 U.S. at 208.  IEPs must be formulated through the participation of a team that includes the student's parents, at least one of the student's regular-education teachers (if any), at least one special-education teacher, a representative of the local education agency, and an individual who can interpret the instructional implications of evaluation results.  *North Reading Sch. Comm. v. BSEA*, 480 F. Supp. 2d 479, 482 n.5 (D. Mass. 2007) (citing 20 U.S.C. § 1414(d)(1)(B)).  At the discretion of the parents or the agency, the team may also include "other individuals who have knowledge or special expertise regarding the child."  20 U.S.C. § 1414(d)(1)(B)(vi).  Parents also have the right to obtain an independent educational evaluation of their child.  *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 58 (1st Cir. 2002).  Furthermore, under Massachusetts law, schools are required to, "upon request by a parent, provide timely access to parents and parent-designated independent evaluators and educational consultants for observations of a child's current program and of any program proposed for the child."  Mass. Gen. Laws ch. 71B, § 3.

IEPs must be reviewed annually and revised when necessary.  *Roland M.*, 910 F.2d at 988.  Children with disabilities must be reevaluated at least once every three years.  34 C.F.R. § 300.303(b)(2).

## 2.    <u>Appropriateness and Adequacy</u>

The IDEA requires an "appropriate" education and an "adequate" IEP; it does not require

perfection.  As the Supreme Court recently articulated, a student receives a FAPE if the IEP is

"reasonably calculated to enable a child to make progress appropriate in light of the child's

circumstances."  *Endrew F. v. Douglas County School Dist. Re-1*, 580 U.S. __ at 11 (2017).

*Endrew F.* elaborated on the Court's prior statement in *Rowley* that a student receives a FAPE if

her IEP is "reasonably calculated to enable [her] to receive educational benefits."  *Rowley*, 458

U.S. at 207.

Prior to *Endrew F.*, the First Circuit articulated the appropriateness requirement in the

following way:

> "[T]he obligation to devise a custom-tailored IEP does not imply that a disabled
> child is entitled to the maximum educational benefit possible."  *Lessard*, 518 F.3d
> at 23, *see also Rowley*, 458 U.S. at 198; *Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*,
> 361 F.3d 80, 83 (1st Cir. 2004).  The Supreme Court has said that an IEP must offer
> only "some educational benefit" to a disabled child.  *Rowley*, 458 U.S. at 200.  Thus,
> the IDEA sets "modest goals:  it emphasizes an appropriate rather than an ideal,
> education; it requires an adequate, rather than an optimal, IEP."  *Lenn v. Portland
> Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir. 1993).  At the same time, the IDEA calls
> for more than a trivial educational benefit, in line with the intent of Congress to
> establish a "federal basic floor of meaningful, beneficial educational opportunity."
> *Town of Burlington v. Dep't of Educ. of Mass.*, 736 F.2d 773, 789 (1st Cir. 1984).
> Hence, to comply with the IDEA, an IEP must be reasonably calculated to confer a
> meaningful educational benefit.

*D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012).

### 3.  Least Restrictive Environment

The IDEA expresses a preference for the education of children with disabilities in the

"least restrictive environment."  *See* 20 U.S.C. § 1412(a)(5).  It requires states to maintain

policies and procedures to ensure that "[t]o the maximum extent appropriate, children with

disabilities . . . are educated with children who are not disabled, and special classes, separate

schooling, or other removal of children with disabilities from the regular education environment

occurs only when the nature or severity of the disability of a child is such that education in

regular classes with the use of supplementary aids and services cannot be achieved

satisfactorily." *Id.* IEPs must, therefore, balance the often competing interests of

"mainstreaming," on the one hand, with substantive educational improvement, on the other.

*Roland M.*, 910 F.2d at 992-93.

### 4.    Transition Plans

In accordance with its purpose to prepare children with disabilities for "further education,

employment, and independent living," 20 U.S.C. § 1400(d)(1)(A), the IDEA requires the

provision of "transition services" beginning at age sixteen. *Id.* § 1414(d)(1)(A)(i)(VIII). The

term "transition services" means "a coordinated set of activities for a child with a disability" that

> (A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
>
> (B) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and
>
> (C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluations.

*Id.* § 1401(34). Thus, at least by age 16, IEPs must include "appropriate measurable

postsecondary goals based upon age appropriate transition assessments related to training,

education, employment, and, where appropriate, independent living skills" and "the transition

services (including courses of study) needed to assist the child in reaching those goals." *Id.* at §

1414(d)(1)(A)(i)(VIII)(aa)-(bb). By statute, Massachusetts has lowered the age at which

transition planning must begin to fourteen. Mass. Gen. Laws ch. 71B, § 2.

The IDEA does not require that there be a separate, stand-alone "transition plan."

*Lessard*, 518 F.3d at 25.  Rather, statements of transition services are to be integrated with the

IEP.  *Id.*

### 5.        Rejection of a FAPE

Where a state fails to provide a FAPE in a timely manner, the parents of a disabled child

have the right to seek reimbursement, where appropriate, for private-school tuition.  *See*

*Burlington v. Department of Educ.*, 471 U.S. 359, 370 (1985).  The Supreme Court has made

clear, however, that parents who unilaterally change their child's placement without the consent

of state or local school officials "do so at their own financial risk," *see Burlington*, 471 U.S. at

374, and are entitled to reimbursement "*only if a federal court concludes both that the public*

*placement violated IDEA and that the private school placement was proper under the Act.*"

*Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (emphasis in original).  A school

district that is "unable to furnish a disabled child with a FAPE through a public school

placement" is "responsible for the reasonable costs incident to [a proper] private placement,"

including tuition reimbursement.  *Five Town*, 513 F.3d at 284-85.

### 6.        Administrative Hearings

Should the parents of a disabled child or a school district wish to contest an IEP, the

IDEA requires the state to convene an impartial hearing.  20 U.S.C. § 1415(f)(1)(A).  In

Massachusetts, those hearings are conducted by the BSEA in accordance with rules that it has

promulgated pursuant to Massachusetts law.  *See* Mass. Gen. Laws ch. 71B, § 3; 603 Mass. Code

Regs. 28.08(5); *see also Roland M.*, 910 F.2d at 988.  Under Massachusetts law, the BSEA has

jurisdiction to hear disputes

> between and among parents, school districts, private schools and state agencies
> concerning:  (i) any matter relating to the identification, evaluation, education
> program or educational placement of a child with a disability or the provision of a
> free and appropriate public education to the child arising under this chapter and

regulations promulgated hereunder or under the Individuals with Disabilities Act, 20 U.S.C. § 1400 *et seq*., and its regulations; or (ii) a student's rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its regulations.

Mass. Gen. Laws. Ch. 71B, § 2A(a).  The BSEA's administrative decision is reviewable in either state or federal court.  *See* 20 U.S.C. § 1415(i)(2)(A), (i)(2)(C)(iii); *see also Roland M.*, 910 F.2d at 987-88.  However, before such an action is brought, the party seeking review must exhaust all administrative procedures under the IDEA.  20 U.S.C. § 1415(l).

### B.   Factual and Procedural Background

#### 1.   The Parties

C.D. is a young woman who has been diagnosed with Borderline Intellectual Functioning.  (A.R. 3876).  She lives with her parents in Natick, Massachusetts.  (A.R. 272). The Natick schools receive federal funds from the United States Department of Education pursuant to the IDEA.  (*Id.* at ¶ 14).

#### 2.   C.D.'s Middle-School Experience at McAuliffe

C.D. attended McAuliffe Regional Charter Public School in Framingham, Massachusetts, for grades six through eight.  (A.R. 3378).  She took all of her classes, with the exception of math, in an inclusive, general-education setting.  (A.R. 3378, 1695).  She received supplementary support in her general-education classes from two retired special-education teachers, Nan Coellner and Marcia Soden, who had been hired by her parents.  (A.R. 271, 1694-1696). Coellner and Soden would stand near C.D. and make sure that she understood what she was supposed to be doing in class.  (A.R. 1696).  It appears that C.D. did very well at McAuliffe, was able to access the general-education curriculum, and that her self-confidence improved significantly while she was there.  (A.R. 1697-98).

3.    <u>The 2012-13 IEP</u>

a.    <u>The May 2012 Meeting</u>

In May 2012, C.D.'s parents contacted Natick by e-mail to request a meeting to discuss C.D.'s re-enrollment in the Natick public school system.  (A.R. 161).  C.D. would be completing the eighth grade at McAuliffe that spring, and planned to enroll at Natick High School for summer services and ninth grade in the fall.  (*Id.*).  In anticipation of the meeting, C.D.'s parents sent Natick her most recent educational evaluation, which had been conducted by Dr. Steve Imber in the winter of 2012; a neuropsychological evaluation conducted by Dr. Erin Gibbons; a speech and language evaluation conducted by Susan Flax, C.D.'s speech therapist; and her course selection list for the high school.  (A.R. 161, 177, 238, 2750).  C.D.'s parents requested that prior to the meeting, they receive copies of the syllabuses for general education classes as well as whatever program Natick thought would be appropriate for C.D.  (A.R. 161).

On May 22, 2012, Gina Dalan, the director of special education, responded to C.D.'s parents, informing them of Natick's usual practices for transferring students from McAuliffe to Natick High School.  (A.R. 268).  It appears that a meeting had already scheduled for May 24, and Dalan informed C.D.'s parents that the meeting would be "more of an information sharing meeting than an IEP meeting."  (*Id.*).  At the meeting, Natick's special-education coordinator would inform the parents about the services offered at the school and what services might be appropriate for C.D., but would not actually propose a new IEP.  (*Id.*).  Dalan also informed the parents that if they did decide at the meeting to enroll C.D. at Natick High School, she would send someone from Natick to McAuliffe to observe C.D. and speak with her teachers to help plan for her transition.  (*Id.*).

At the meeting on May 24, C.D.'s parents brought Soden and Coellner, C.D.'s private

tutors; Flax, her speech therapist; and Dr. Imber, an independent evaluator.  (A.R. 271).  Also present at the meeting were Dalan, the director of special education; Joshua Hanna, a general-education teacher from Natick; Milly Cuiffo, a speech and language therapist; Donna Cymrot, a school psychologist at the high school; Karan Litpak, a Learning Center teacher at the high school; Barbara Molinari-Bates, the evaluation team leader at the high school; and attorneys for both Natick and the parents.  (A.R. 271-72).[2]

The parents informed Natick that C.D. had done well in an inclusive setting at McAuliffe, and that they wanted her to continue in an inclusive, general-education program at the high school.  (A.R. 273).  The parents, Coellner, and Soden explained their arrangement and the support Coellner and Soden that provided to C.D. at McAuliffe.  (A.R. 274-76).  The parents hoped that similar support could be provided at the high school to enable C.D. to continue in an inclusive setting.  (A.R. 276-77).

Natick informed the parents about the different education models available for students with learning disabilities at the high school.  (A.R. 294-95).  At one end of the spectrum, Natick offered inclusive, general-education classes with teaching aides.  (A.R. 294).  It also offered replacement classes—separate classes taught by a special education teacher where all students were on an IEP.  (A.R. 294-95).  Finally, it offered an ACCESS program, a substantially separate program with a significantly modified curriculum in which students would typically not take standardized tests (the Massachusetts Comprehensive Assessment System, or "MCAS") and would not receive high-school diplomas.  (A.R. 295).

The parents asked about the possibility of observing the programs available at the high school.  (A.R. 313).  Molinari-Bates responded that the school district typically permits parents

---

[2] The "Learning Center" appears to be a class or facility during which students with special needs can receive additional support in their coursework.  (A.R. 286).

or their designee to observe a program that had been proposed in an IEP, but because no IEP had yet been proposed—and because C.D. had not yet enrolled at the high school—it was too early to schedule any observation.  (*Id.*).

The attorney for the school district noted that pursuant to the law concerning transfer students, the district was required to provide services comparable to C.D.'s current IEP at McAuliffe.  (A.R. 314).  However, several representatives for Natick stated that based on the information available at the time, the school district had concerns about a general-education placement.  (A.R. 317-28, 321).  Specifically, Molinari-Bates stated that she was concerned that the larger class sizes (approximately 30 students per class at the high school compared to 18 students per class at McAuliffe) would make the general-education environment difficult for C.D.  (A.R. 316-18, 321).  Molinari-Bates stated that the ACCESS program appeared to be appropriate for C.D., but, as the parents had made clear that they were not interested in that program, that replacement classes would likely be the most comparable program to the services provided at McAuliffe.  (A.R. 319).  When the parents inquired about the possibility of having C.D.'s private tutors continue to help her in general-education classes at the high school, Molinari-Bates and the attorney for the school district responded that having private tutors in the classroom would not be possible because Natick employed its own teachers and teaching aides. (A.R. 318).

Finally, the team members briefly discussed possible plans for C.D.'s education after high school.  (A.R. 326-328).  The parents stated their hope that C.D. would receive a high-school diploma, but stated that they did not yet have post-high school plans.  (A.R. 327).  Dalan informed them of the school district's Achieve program, which is a job-coaching program for students aged 18 to 22.  (A.R. 327-28).

### b.        The July 2012 Meeting

The parents submitted C.D.'s completed registration paperwork to Natick on May 29, 2012.  (Pl. SMF ¶ 89; A.R. 360-68).  On May 31, 2012, Dalan, the director of special education, went to observe C.D. at McAuliffe and speak with her special-education teacher.  (A.R. 370). On June 5, 2012, Dalan wrote to the parents informing them that while the ACCESS program appeared to be appropriate for C.D. based on the information available, Natick would be recommending all replacement classes given the parents' objections to the ACCESS program. (*Id.*).  Dalan also informed the parents that due to scheduling difficulties, the parents would not be able to observe classes at the high school prior to the end of the school year.  (*Id.*).  However, she stated that they would be welcome to observe early in the fall, prior to writing a new IEP for C.D.  (*Id.*).  Finally, Dalan informed the parents that she would be leaving the school district on June 22, 2012, and that Tim Luff would be replacing her as the director of special education. (A.R. 371).

The parents, through their attorney, then wrote to Natick on June 13, 2012, requesting an IEP team meeting prior to the start of the 2012-13 school year.  (A.R. 374-75).  They noted their concern about placing C.D. in replacement classes, simply to comply with regulations requiring that a transfer student receive services comparable to their current IEP, only to then propose a new program in the first few weeks of the school year after proposing a new IEP.  (A.R. 374).  In particular, they were concerned that C.D. would start the school year in replacement classes only to be switched into the ACCESS program, which they did not believe was appropriate for her. (*Id.*).  They requested an IEP meeting over the summer so that a new IEP could be proposed prior to the school year.  (A.R. 375).

Natick granted the request for an IEP meeting.  Prior to the meeting, the parents

requested a copy of any report or notes that Dalan had generated as a result of her observations of C.D. at McAuliffe.  (A.R. 378).  The parents wanted the information gathered from those observations to inform the IEP meeting.  (*Id.*).  Dalan responded that her observations were simply intended to help ease C.D.'s transition to the high school, that it was not a formal evaluation, and that she did not create a written report.  (*Id.*).  She further stated that her observations were not intended to change what the IEP team had discussed at their last meeting, and that their recommendation of the ACCESS program for C.D. was based on their discussions at that meeting and Dr. Imber's most recent evaluation of C.D.  (A.R. 377).

An IEP meeting was held on July 27, 2012.  (A.R. 383).  Present at the meeting were the parents; their attorney; C.D.'s tutors, Coellner and Soden; Dr. Imber; Lindsey McGovern, the Assistant Director for Student Services at Natick High School; Tim Luff, the new Director of Student Services at Natick High School; Paul Tagliapietra, the Assistant Director of Student Services at Natick elementary schools; Donna Bresnick, a special education teacher at Natick High School; Kari-Anne Daley, a social studies teacher at Natick High School; Rose Bertucci, Principal of Natick High School; Susan Balboni, the Assistant Director for Student Services at Natick Middle School; and Alisia St. Florian, the attorney for Natick.  (A.R. 384-85. 2601).

The purpose of the meeting was to discuss C.D.'s transition to Natick High School and to develop a new IEP for her.  (A.R. 385).  McGovern began the meeting by asking the parents if they had any concerns that should guide the IEP development.  (A.R. 385).  The parents expressed concern about whether C.D. would be placed with students who had behavioral issues; the kind of support she would receive in non-academic courses; whether she would be able to access the general-education curriculum; and whether the block schedule—with 80-minute classes two or three days per week instead of 45-minute classes five days a week—would be

difficult for C.D. given her memory deficits.  (A.R. 385-86).

Tagliapietra, who appears to have worked with C.D. over the summer during her extended-school-year classes, reported on the kind of work she had been doing over the summer. (A.R. 387-88).  He stated that her level of performance over the summer matched the level of performance that was stated in her previous IEP from McAuliffe.  (A.R. 387).

The team then discussed long-term plans for C.D.  (A.R. 391-92).  The parents expressed some concern about whether C.D. would pass the MCAS—which is required to receive a high school diploma—and asked about what vocational services Natick could provide to help C.D. get a job after high school.  (A.R. 392).  Natick representatives then explained the range of transition services and vocational services available.  (A.R. 392-95).  They also explained that because C.D. was 14 years old, they would begin planning for her transition that year.  (A.R. 392). McGovern recommended that the IEP team reconvene in October to make any necessary revisions to C.D.'s IEP and to begin developing a detailed transition plan for her.  (A.R. 392-93).

C.D.'s tutors then discussed her performance at McAuliffe.  (A.R. 396-400).  They highlighted her areas of strengths and weaknesses, and stated that she did well in her general-education classes with appropriate support—which they described as being not significant.  (*Id.*). Dr. Imber then explained that because of the ways in which tests and formal evaluations are performed, C.D.'s test scores did not adequately reflect her abilities.  He also stated that with appropriate supports and services, she could perform at a level substantially higher than that indicated by her test scores.  (A.R. 400).  Natick representatives expressed some concern about what they perceived as the very large discrepancy between what the parents and the parents' experts said about C.D.'s abilities as compared to her very low test scores.  (A.R. 402).

The team then discussed C.D.'s goals and objectives—which they adopted from her prior

IEP—and the types of services that would be necessary to help her achieve those goals. (A.R. 405). McGovern stated her belief that the ACCESS program would best help C.D. achieve her goals, because it was designed for students with cognitive, communication, and social/pragmatic deficits, and that C.D. "would, on paper, fit into that category" given her intellectual disability and difficulties with communication and social/pragmatic skills. (A.R. 406). Natick representatives then explained the curriculum and structure of the ACCESS program. (A.R. 407-08). The parents again expressed concern about the block schedule, given C.D.'s memory deficits. McGovern explained that the ACCESS program would help address those concerns because, as a separate program with a single teacher, it provides more continuity of instruction across different subject matters. (A.R. 408-09). Several Natick representatives also explained that students in the ACCESS program can transition into replacement or general-education classes as they are able to do so, and that they take general-education electives with appropriate supports and instructional assistants. (A.R. 410-12).

The parents again expressed their belief that, based on her performance at McAuliffe, C.D. should be in general-education classes with support. (A.R. 413). McGovern stated that, based on her IEP from McAuliffe and her test scores, the school district did not believe that general education was appropriate for her and that the ACCESS program would best meet her needs. (A.R. 413-14). Thus, McGovern stated that Natick would propose an IEP that included the ACCESS program, plus electives in general education. (A.R. 416-17). McGovern also stated that they would re-evaluate in October and make any adjustments necessary. (A.R. 416-17, 419).

### c.    **The Proposed IEP**

On July 30, 2012, Natick provided the parents with their proposed IEP for the 2012-13

school year.  (A.R. 2600).  The IEP provided that all of C.D.'s academic classes would be in the

ACCESS program, with electives in the general-education setting.  (*Id.*).  The IEP reflected the

conclusion that the ACCESS program was the least-restrictive environment in which to ensure

FAPE and address C.D.'s needs.  (A.R. 2606).  It also indicated that the recommendation was

based on C.D.'s prior IEP from McAuliffe, as well as input from the Assistant Director of

Student Services, who oversaw the extended school year program in which C.D. participated;

C.D.'s father; her tutors and educational consultant; Natick's Directors of Student Services at the

middle- and high-school levels; and the principal of Natick High School.  (*Id.*).  The IEP also

referred to Natick's long-term plan for C.D., reflecting her parents' hopes that she receive a high-

school diploma and receive appropriate vocational training.  (A.R. 2606).  The IEP did not set

out a specific transition plan, but did state that one would be developed at the next IEP team

meeting in October.  (A.R. 2606, 2621).

On August 9, 2012, the parents rejected the proposed IEP.  (A.R. 2621).  The parents

stated their belief that placement in the ACCESS program would hinder C.D.'s academic and

social development, that the goals set out in the IEP were not aggressive enough, that the

services being proposed were not adequate to help C.D. meet her goals, and that a general-

education setting would be more appropriate for her.  (A.R. 2623-25, 3427).  The parents decided

to enroll C.D. at a private school, Learning Prep, for the 2012-13 school year, and requested that

Natick fund her placement there.  (A.R. 3427).

### 4.    The 2013-14 IEP

On May 22, 2013, Natick convened a team meeting to review C.D.'s IEP and propose a

new IEP for the 2013-14 school year.  (A.R. 3307).  A general-education teacher was present at

the meeting to review the electives available at Natick High School.  (*Id.*).  The ACCESS teacher

was also present to answer questions about that program; however, C.D.'s father, who participated by conference call, did not have any questions or comments for her.  (*Id.*).  At the meeting, the team reviewed reports of C.D.'s performance at Learning Prep in the areas of history, biology, and language arts/literature.  No one from Learning Prep attended the meeting.  (*Id.*).

Based on the information presented at the meeting, Natick again proposed an IEP that provided for all of C.D.'s academic classes to be in the ACCESS program, with general-education electives.  (*Id.*).  The proposed IEP for the 2013-14 school year was very similar to the IEP proposed for the 2012-13 school year.  (A.R. 2360-61).

On June 17, 2013, the parents rejected the 2013-14 IEP for the same reasons as they rejected the prior IEP.  (A.R. 3424).  They decided to re-enroll C.D. at Learning Prep, where they believed she was receiving an appropriate education.  (*Id.*).  They again requested public funding for her placement.  (A.R. 3426).  Natick declined that request, stating that Learning Prep, which is a school exclusively for students with learning and language disabilities, was a more restrictive environment than that provided by Natick's proposed IEP, where C.D. would have at least some opportunities to take classes in a general-education setting.  (A.R. 3425-26).

### 5.    The 2014-15 IEPs

On March 12, 2014, Natick requested the consent of C.D.'s parents to conduct educational assessments, achievement testing, psychological testing, and a speech and language evaluation as part of C.D.'s three-year re-evaluation.  (A.R. 596-97; 2754).  On March 17, the parents rejected the proposed evaluations due to questions about the evaluations that were going to be performed.  (A.R. 2756).  Natick then scheduled a team meeting for April 15, both to discuss C.D.'s re-evaluation and to propose a new IEP in order to replace the prior IEP, which

was set to expire.  (A.R. 604-05; 2362).  Natick proposed an IEP for the 2014-15 school year (the IEP was dated April 15, 2014, through April 15, 2015) with the expectation that C.D.'s three-year reevaluation would be conducted shortly and that the team would reconvene in June in order to revise the IEP in accordance with the information gained from the reevaluation.  (A.R. 2362; 3282).

Employees or representatives of Natick then conducted a psychological evaluation on May 23, 2014 (A.R. 959); a speech and language re-evaluation on May 27, 2014 (A.R. 945); and an achievement evaluation on June 6, 2014 (A.R. 954).  The psychological evaluation found that C.D. had strengths in social, emotional, and behavioral domains, but cognitive functioning in the extremely low/borderline range.  (A.R. 966-67).  The speech and language re-evaluation found that C.D. had strengths in pragmatic language, including things such as eye contact and body language, as well as word memory and comprehension of spoken paragraphs, but significant deficits in sentence formation, understanding vocabulary and semantic relationships, and memory in general.  (A.R. 950).  The achievement evaluation demonstrated that C.D. was below average in reading and written expression and significantly below average in mathematics.  (A.R. 955).

A team meeting was then held on June 13, 2014, to review the evaluations as well as reports of C.D.'s progress as Learning Prep.  (A.R. 983-84).  Present at the meeting were Barbara Molinari-Bates; Lindsey McGovern; Maryann Ouellet, the Chair of the English Department; C.D.'s father; Dr. Imber; and the three individuals who had performed C.D.'s evaluations.  (*Id.*).  The team members reviewed the information provided by Learning Prep, which indicated that C.D. was a hard-working student, but that she had difficulties processing information and maintaining attention, as well as deficits with her memory and expressive and receptive

language.  (A.R. 987).  Each evaluator then summarized their findings.  (A.R. 991-1006).

After reviewing all of that information, Natick stated that C.D.'s disability category, which had been noted as "Intellectual" in her prior IEPs, was not supported by the evidence. (A.R. 1007).  Donna Cymrot, the school psychologist who had administered C.D.'s psychological evaluation, explained that her strengths in social and emotional functioning, as well as her cognitive functioning, suggested that she did not fit within the category of "intellectually disabled" but, rather, had a narrower language or communication disability.  (A.R. 1007-08).  C.D.'s father was surprised by the change, and stated that he needed time to process the information.  (A.R. 1008-09).

Based on the information presented from Learning Prep and the evaluations, the team then discussed a new IEP for C.D.  (A.R. 1009).[3]  First, Natick proposed placing C.D. in replacement classes for English, which it believed would be comparable to the English classes she was taking at Learning Prep, as well as an additional ACCESS reading class.  (A.R. 1011-12, 1015).  It proposed replacement classes for science, which would prepare her to take the science MCAS.  (A.R. 1038).  It also proposed placing her in general-education classes, with appropriate supports, for history/social studies.  (A.R. 1027).  It proposed placing her in the ACCESS program for math, because she required additional support in that area.  (A.R. 1025).  Finally, it proposed a daily academic-services class for additional support as well as speech and language services.  (A.R. 1021, 1046-47).  Representatives for Natick also discussed their plans to conduct a formal transition evaluation in order to plan for C.D.'s transition out of high school, and discussed her areas of interest and possible internship opportunities for her.  (A.R. 1010, 1051-54).

---

[3] Natick had already proposed one IEP for the 2014-2015 school year in April 2014, but the parents had rejected it on the ground that it was nearly identical to the IEPs they had rejected in the past.  (A.R. 3423).

C.D.'s father expressed some concerns about the block schedule at Natick High School, both in terms of the reduced number of classes C.D. would be able to take and the day-long break between classes.  (A.R. 1017, 1021).  He also expressed concern that the reading and writing requirements in a general-education history class might be too demanding for her.  (A.R. 1030).  Representatives for Natick assured him that she would receive any necessary supports and modifications.  (A.R. 1030-32).

Following the meeting, Natick formally proposed a new IEP for the 2024-15 school year.  (A.R. 2529).  On July 7, 2014, the parents rejected that IEP on the grounds that no transitional assessment had yet been done (and that a transitional assessment would change C.D.'s benchmarks and objectives) and because there would not have been time in Natick's proposed schedule for her to receive speech and language services.  (A.R. 3420).  They decided to re-enroll her at Learning Prep for the 2014-15 school year.  (*Id.*).

### 6.      Classroom Observations and the Motion to Compel

On May 29, 2014, the parents requested that their independent evaluators and educational consultants, Dr. Imber and Flax, be allowed to observe the program proposed for C.D.  At that time, the proposed program offered only the ACCESS program for academic classes and general-education classes for electives.  (A.R. 3126).  They also requested that Dr. Imber and Flax be permitted to meet with the ACCESS program teacher and the school's speech-language pathologist.  (*Id.*).

On June 10, 2014, Dr. Imber and Flax met with the ACCESS teacher, observed ACCESS math and science classes, and observed a general-education elective with ACCESS students.  (A.R. 3129).  They were permitted to ask the ACCESS teacher brief factual questions related to their observations.  (*Id.*).  The speech-language pathologist was not available to meet with them

that day.  (*Id.*).  (A.R. 3144-46)

In September 2014, after Natick's proposed IEP had changed to include replacement and general-education classes, the parents requested that they and their evaluators and consultants be allowed to observe those classes.  (A.R. 3130).  They also requested that C.D.'s tutors be allowed to observe the ACCESS program.  (*Id.*).  Observations were scheduled for October 24, 2014, and the parents were told that their consultants would be permitted to observe only, but not to ask questions of the teachers.  (A.R. 3131-3140).  It appears that during the prior observations, the ACCESS teacher felt that their questions had been disruptive and inappropriate.  (A.R. 3146). The parents requested separate time, not during class time, to speak with staff.  (A.R. 3136). Natick declined that request, stating that the observations were to be observations only, not an opportunity to speak in depth with staff.  (A.R. 3137).  However, Natick did provide that each visitor would have an escort who would be able to answer basic factual questions.  (*Id.*).

During the course of the observations on October 24, 2014, the attorney for Natick contacted the parents to inform them that their consultants had asked for time to speak with teachers during the observations, despite their instructions that the consultants were to observe only.  (A.R. 3140).  Flax had asked a few basic questions of the replacement English teacher during a class break.  (A.R. 3147).  However, she later stated that she was unable to evaluate the appropriateness of the class for C.D. due to her inability to ask the teacher more detailed questions.  (A.R. 3148).  Dr. Imber also stated that his inability to ask questions prevented him for properly evaluating the appropriateness of the proposed IEP.  (A.R. 3153, 3755).  Flax and Dr. Imber both stated that it is their usual practice to observe proposed classes as well as interview teachers and other service providers, and that they had never before encountered such significant barriers to speaking directly with teachers.  (A.R. 3147, 3149, 3152).

On November 12, 2014, the parents filed a motion to compel with the BSEA seeking an order compelling Natick to provide them and their consultants with the opportunity to directly communicate with the teachers and service providers who would be working with C.D. under Natick's proposed IEP. (A.R. 3112). The hearing officer concluded that permitting the parents' experts to submit written questions would provide sufficient access to staff, and ordered them to submit any outstanding questions from their observations in writing and ordered Natick to respond in writing. (A.R. 815-16). The parents' experts submitted numerous questions to the teachers of the specific classes that they observed, and received responses. (A.R. 1399-1400).[4]

### 7.     The November 14, 2014 Team Meeting and Updated 2014-15 IEP

Natick conducted a transition evaluation with C.D. in the fall of 2014. (A.R. 1180). The evaluation indicated that C.D. was interested in culinary arts and fashion, including being a hairstylist or make-up artist. (A.R. 3246). However, C.D. appeared unaware of what was required to obtain a job in one of those areas and lacked independent goal-setting and planning skills. (*Id.*).

In order to review the evaluation and discuss an updated IEP, Natick scheduled a team meeting for November 14, 2014. (A.R. 3404). Prior to the meeting, the parents provided Natick with independent evaluations conducted by their consultants. (A.R. 3662-3755, 3802-3833, 3876-3898).[5] Present at the meeting were C.D.'s father; a special-education teacher; a transition

---

[4] By order of the hearing officer, Natick was not required to answer every question that the parents' experts submitted. The hearing officer concluded that some of the questions were more akin to interrogatories than clarifying questions based on their observations, and that Natick was not required to answer such questions. (A.R. 1399-1400).

[5] The independent evaluators recommended that C.D stay at Learning Prep for the remainder of high school. They emphasized the benefits of receiving a "regular" high-school experience rather than being pulled in and out of separate programs. In addition, the independent evaluation of Suzanne Flax concluded that the diagnoses that best described C.D.'s disability were a primary diagnosis of intellectual impairment with a secondary diagnosis of communication impairment. (A.R. 3832). The independent evaluation conducted by Dr. Gibbon stated that C.D.'s evaluation was consistent with diagnosis of mild intellectual disability. (A.R. 3893).

coordinator; a general-education teacher; McGovern, the Assistant Director of Student Services; Luff, the Director of Student Services; Cymrot, the school psychologist; Flax; Dr. Imber; Coellner, C.D.'s tutor; and attorneys for both Natick and the parents.  At the meeting, the parents objected to the reclassification of C.D.'s disability from "learning" to "communication," although the basis of their objection is unclear from the record.  (A.R. 2501).

Natick then proposed a new IEP for C.D., again recommending general education classes for electives and social studies and either replacement classes or the ACCESS program for science, math, English, and reading.  (A.R. 2502, 2517).  The IEP also recommended speech and language therapy as well as transition services.  (A.R. 2517).  In order to provide all of the services recommended, the IEP proposed an extended school day in which C.D.'s transition services and career preparation would take place after regular school hours.  (A.R. 2518).

The parents had additional questions after the November 14, 2014 meeting, and requested a second team meeting to discuss the transition plan and new IEP.  (A.R. 3400).  Natick did not believe that a second meeting was necessary.  (*Id.*).

The parents rejected the proposed IEP on December 20, 2014.  (A.R. 3398).  They provided a lengthy list of reasons for their rejection, including, among other things, the change in C.D.'s disability category from "intellectual" to "communication"; unaddressed concerns about the block schedule; the lack of time in C.D.'s schedule for non-academic electives; concerns about the extended school day; and C.D.'s placement in the ACCESS program for math, which would not prepare her for the MCAS.  (A.R. 3403).  Their notification of rejection also requested a meeting to discuss the refused placement.  (A.R. 3398).

A team meeting was held on January 7, 2015, to discuss the parents' rejection of the 2014-15 IEP.  (A.R. 3395).  At the meeting, representatives for Natick explained that the IEP

was based on an individualized assessment of C.D.'s strengths and weaknesses, not on her

disability category. (*Id.*). Natick rejected the request to change C.D.'s disability category,

stating that the switch to "communication" was based on C.D.'s transition assessment. (*Id.*).

Natick also rejected the parents' request that C.D. participate in the standard administration of

the math MCAS. (A.R. 3396). Instead, Natick proposed that based on data from her teachers at

Learning Prep and the recent assessments showing significant weaknesses in math, she should

take the MCAS Alternate Assessment for math. (*Id.*) Natick also stated, however, that it would

continually review that decision were C.D. to enroll at Natick High School. (*Id.*). In order to

address the parents' concerns about C.D.'s schedule, Natick also agreed to provide them with

draft schedules based on the proposed IEP. (*Id.*).

### 8.     The Appeal to the BSEA

The parents first requested a due-process hearing challenging Natick's proposed IEPs on

May 23, 2014. (A.R. 870). They amended that request on April 1, 2015. (A.R. 869). The

parents alleged that (1) Natick's proposals to place C.D. in the ACCESS program for all

academic subjects in the 2012-13 and 2013-14 IEPs, as well as the initial 2014-15 IEP, violated

C.D.'s rights under the IDEA to be educated in the least restrictive environment in which she

could succeed (Claim I); (2) Natick "predetermined" C.D.'s placement in the ACCESS program,

thereby violating the IDEA's procedural requirement that parents have the opportunity to

participate meaningfully in IEP meetings (Claim II); (3) Natick failed to provide transitional

planning as required (Claim III); (4) Natick failed to provide extended-school-year services in

July 2012 (Claim IV); (5) Natick unnecessarily scheduled annual reviews, IEP team meetings,

and evaluations while C.D. was unilaterally placed in a private school in another district or

violated procedural requirements under IDEA by failing to include persons knowledgeable about

C.D. and the proposed programs at IEP meetings (Claim V); (6) Natick failed to disclose that its attorney would be participating in IEP meetings (Claim VI); and (7) Natick retaliated against the parents and C.D. for requesting a due-process hearing by changing C.D.'s disability category and denying her to opportunity to take the Math MCAS (Claim VII).

A hearing was held before Hearing Officer Catherine Putney-Yaceshyn on May 12, 13, 27, and 28, 2015. (A.R. 1551). In a written order dated July 24, 2015, the Hearing Officer concluded that the IEPs proposed by Natick for the 2012-13, 2013-14, and 2014-15 school years were all reasonably calculated to provide C.D. with a free appropriate public education in the least restrictive environment. (A.R. 1571).[6]

As to the proposed IEP for the 2012-13 school year, the hearing officer concluded that the IEP was less restrictive than C.D.'s placement at McAuliffe because it provided her "the opportunity to independently access academic services in a program specifically designed for students with profiles similar to [hers]," whereas at McAuliffe, she received one-on-one assistance from her tutors. (A.R. 1565). The hearing officer noted that while none of the witnesses testified about the level of restrictiveness of C.D.'s placement at McAuliffe, she "took note of it." (*Id.*). She also concluded that one of the parents' reasons for rejecting the 2012-13 IEP—the father's belief that the goals in the proposed IEP, which were the same goals contained in the McAuliffe IEP, should have changed because the setting was changing from an inclusive, general-education setting to the separate ACCESS program—was not valid because the father did not have any credentials in education. (A.R. 1566). She also discredited the father's contention that the hours of service in the proposed IEP were decreasing from those provided in the prior IEP because "[h]e did not present any credible evidence to support that presumption."

---

[6] Although dated July 24, 2015, the Hearing Officer's final order was actually issued on July 28, 2015, and includes three paragraphs inadvertently omitted from the July 24 version. (A.R. 1549).

(*Id.*).  She also concluded that the parents' assumption that placement in the ACCESS program would result in C.D. being unable to pass the MCAS was not supported by the evidence, as the ACCESS teacher had testified that students in the program are routinely placed in replacement classes when their abilities indicate that that is appropriate.  (*Id.*).

As to the proposed IEP for the 2013-14 school year, the hearing officer concluded that because it was substantially similar to the IEP proposed for the prior year, and because it had been rejected for the same reasons as the prior IEP, she found that it was reasonably calculated to provide C.D. with a free appropriate public education for the same reasons.  (A.R. 1567).

As to the first IEP proposed for the 2014-15 school year, the Hearing Officer concluded that it was created before C.D.'s three-year evaluation could be conducted, and therefore was simply a provisional proposal that was created with the understanding that it would be updated following the three-year evaluation.  (*Id.*).

As to the second IEP proposed for the 2014-15 school year, the hearing officer noted that the parents had rejected the IEP in part because no transition assessment had yet been conducted and that such an assessment would likely change the benchmarks and objectives of the IEP. (A.R. 1568).  However, she concluded that the fact that a transition assessment, once conducted, might change the relevant benchmarks and objectives had "no bearing on the appropriateness of what was proposed by Natick."  (*Id.*).  In addition, the hearing officer did not credit the parents' contention that the services proposed could not actually all be delivered within Natick's schedule, concluding that there was no evidence in the record to support that belief.  (*Id.*).  She also concluded that despite the parents' objections to C.D.'s placement in any ACCESS classes, the proposal for math and reading classes in the ACCESS program was appropriate given C.D.'s well-documented weaknesses in those areas.  (*Id.*).  Finally, she concluded that there was

credible evidence that students in the ACCESS program often move to replacement classes where they are then able to take the MCAS.  (*Id.*).

The third IEP proposed for the 2014-15 school year included the same recommendations for C.D.'s academic classes, but included additional transition services to be provided in a one-on-one setting after school.  (A.R. 1569).  The parents objected to the proposed transition services on the grounds that the one-on-one setting was inappropriate and that C.D. would not receive services tied to her specific interests.  (*Id.*).  The hearing officer concluded that based on the credible testimony of Lindsay McGovern, the delivery of transition services in a one-on-one setting after school was simply one of several scheduling options presented to the parents and was intended to allow C.D. to receive transition services without taking away time in her schedule for non-academic electives in the general education setting.  (*Id.*).  She also concluded that based on the testimony of Katherine Brown, who taught the vocational class for the ACCESS program, C.D. would have been able to receive vocational training related to her interests in cooking and baking.  (A.R. 1559, 1569).  Thus, the hearing officer concluded that Natick's proposed vocational training was appropriate.  (A.R. 1569).  Finally, the hearing officer noted the parents' objection regarding the change in C.D.'s disability classification.  (*Id.*).  She concluded, however, that they had not pointed to any impact that the change would have on the delivery of services, and that Natick staff had credibly testified that the change would in fact have no impact on the way in which services were delivered.  (*Id.*).

The hearing officer next addressed the alleged procedural violations.  She concluded that the credible evidence did not support the parents' contention that they had been unable to receive information and thus to participate meaningfully in the team's decision-making.  (A.R. 1570).  She found that the parents and their consultants were able to ask questions at all of the team

meetings, that they had the opportunity to ask Dalan and her predecessor questions following the team meeting in the summer of 2012, and that McGovern and the ACCESS teacher had, on one occasion, made themselves available to answer questions about the program.  (*Id.*).  She concluded that the parents failed to point to any specific instance in which they were not able to participate in the team process or to have their questions answered.  (*Id.*).

As to the retaliation claim, the hearing officer noted that the record was unclear as to the basis of the claim but that, in any event, the BSEA did not have jurisdiction over claims of discrimination under Section 1983.  (*Id.*)

Finally, the hearing officer concluded that because the IEPs proposed by Natick were all reasonably calculated to provide C.D. with a free appropriate education in the least restrictive environment, the parents were not entitled to reimbursement for their unilateral placement of C.D. at Learning Prep.  (*Id.*).

The hearing officer noted that, in reaching her decision, she did not rely on the testimony of Dr. Imber or Suzanne Flax.  (*Id.*).  She concluded that Flax was not a credible witness based on her statements that C.D. would not benefit from any inclusion classes—a statement not supported by any other witness and inconsistent with Flax's prior recommendations—and her statement that C.D. would not make any friends in the ACCESS program—a statement based entirely on speculation.  (*Id.*).  She concluded that Dr. Imber was not credible because his belief that inclusion was no longer important for C.D. suggested that he changed his recommendations to align with whatever placement she was in at the time.  (A.R. 1570-71).  Finally, the hearing officer did not rely on the most recent reports submitted by Flax, Dr. Imber, and Dr. Roffman (a transition expert) as they were first presented to Natick just prior to the hearing and were not available to the team while preparing the proposed IEPs.  (A.R. 1571).

9.     **The Appeal to This Court and Remand to the BSEA**

On October 21, 2015, plaintiffs filed the complaint in this action seeking review of the BSEA's decision.  They filed for summary judgment on June 27, 2016.  A hearing was held on December 1, 2016, and the Court took the motion under advisement.

On March 22, 2017, while the motion was under advisement, the Supreme Court issued its decision in *Endrew F.*  On March 28, the Court denied plaintiffs' motion for summary judgment and remanded the case to the BSEA in order for the hearing officer to indicate whether the standard she applied was in accordance with the standard announced in *Endrew F.*  The hearing officer responded on April 10, indicating that the standard she applied—the standard articulated in the First Circuit prior to *Endrew F.*—was in accordance with the standard set forth in *Endrew F.* and that her decision in this case was not impacted by *Endrew F.*  Plaintiffs then renewed their motion for summary judgment.

## II.    Legal Standard

Plaintiffs have moved for summary judgment on their challenge to the BSEA's conclusions.  However, "[i]n a case like this, summary judgment is merely the device for deciding the issue, because the procedure is in substance an appeal from an administrative determination, not a summary judgment."  *North Reading*, 480 F. Supp. 2d at 481 n.1 (citations and internal quotation marks omitted).  The burden of proof rests on the party challenging the BSEA hearing officer's decision.  *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992).

Essentially, "judicial review [of administrative decisions on claims brought under the IDEA] falls somewhere between the highly deferential clear-error standard and the non-deferential *de novo* standard."  *Lessard*, 518 F.3d at 24 (citing *Roland M.*, 910 F.2d at 989).  The

28

IDEA provides that courts reviewing agency decisions "(i) shall receive the records of the administrative proceeding; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  The Supreme Court has explained that a district court's review entails both procedural and substantive aspects.  *Rowley*, 458 U.S. at 205 ("When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid.").  Thus, in reviewing the appropriateness of an IEP, a court "must ask two questions: 'First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?'"  *Roland M.*, 910 F.2d at 990 (quoting *Rowley*, 458 U.S. at 206-07).

A reviewing court must ensure that the school district and state education agency adhere scrupulously to the procedural requirements of the statute and relevant regulations and rules.  *See Rowley*, 458 U.S. at 205-06 (noting that the Act "demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.").  However, in reviewing an agency's substantive decisions on FAPEs and IEPs, a reviewing court's "principal function is one of involved oversight."  *Roland M.*, 910 F.2d at 989.  "[C]ourts should be [loath] to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs."  *Id.* at 992; *see also Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004) ("The *Rowley* standard recognizes that courts are ill-

equipped to second-guess reasonable choices that school districts have made among appropriate instructional methods.").  Nonetheless, it is the reviewing court's role to render "an independent ruling as to the IEP's adequacy based on a preponderance of all the evidence, including the hearing officer's duly weighted findings."  *Lenn*, 998 F.2d at 1089.

In short, on matters that implicate educational expertise, heightened deference is due to an agency's administrative findings.  *Mr. I v. Maine Sch. Admin. Dist. No. 55*, 416 F. Supp. 2d 147, 156 (D. Me. 2006).  However, "when the issue is more a matter of law, the educational expertise of the agency is not implicated, and less deference is required."  *Id.* at 157.

As to the evidence, the administrative process is to be accorded "its due weight" such that "judicial review does not become a trial *de novo*, thereby rendering the administrative hearing nugatory."  *Id.* at 996.  The First Circuit has directed district courts reviewing appeals of administrative decisions under the IDEA to

> review[ ] the administrative record, which may be supplemented by additional evidence from the parties, and make[ ] an independent ruling based on the preponderance of the evidence.  That independence is tempered by the requirement that the court give due weight to the hearing officer's findings.  This intermediate level of review reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena.

*Lt. T.B.*, 361 F.3d at 83-84 (citation and internal quotation marks omitted).

Finally, an IEP should not be judged exclusively in hindsight.  "An IEP is a snapshot, not a retrospective.  In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated."  *Roland M.*, 910 F.2d at 992.

## III.  <u>Analysis</u>

### A.    <u>The Impact of *Endrew F.*</u>

30

As noted, the Supreme Court refined its formulation of the standard for determining the appropriateness and adequacy of an IEP during the pendency of this case.  In *Endrew F.*, the court held that a student receives a FAPE if the IEP is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  580 U.S. at 11.  The standard as articulated by the First Circuit prior to *Endrew F.* states that "an IEP must be reasonably calculated to confer a meaningful educational benefit."  *D.B. ex rel. Elizabeth B.*, 675 F.3d at 34.

The Court agrees with the hearing officer that the standard articulated in *Endrew F.* is not materially different from the standard set forth in *Elizabeth B.*, and applied by the hearing officer, at least as it applies to the facts of this case.  Contrary to plaintiffs' contention, *Endrew F.* did not reject all standards that focus on the level of *benefit* provided in favor of a standard based on the level of *instruction*.  Rather, *Endrew F.* explains that the benefit to be provided is "appropriate" educational progress.  That is consistent with a "meaningful educational benefit."  *See Brandywine Heights Area Sch. Dist. v. B.M.*, 2017 WL 1173836, at *10 n.25 (E.D. Pa. March 29, 2017) (concluding that "meaningful educational benefit" standard applied by hearing officer is consistent with *Endrew F.*).

**B.**      **Adequacy of the 2012-13 IEP**

Plaintiffs' first challenge is to the adequacy of the 2012-13 IEP.

**1.**      **Procedural Challenges**

Plaintiffs first contend that Natick violated the procedural requirements of the IDEA by failing to have a team composed of individuals knowledgeable about either C.D. or the classes and programs being proposed for her.  In particular, they allege that there was no one from Natick present at the July 2012 meeting with direct knowledge about C.D., nor was there a teacher from the ACCESS program.  That contention fails for two reasons.

First, plaintiffs' contention is belied, in part, by the administrative record.  The transcript from the July 2012 meeting makes clear that a teacher familiar with C.D. from the extended-school-year program at Natick was in fact present, and did share his observations regarding C.D.'s performance.  (A.R. 387).

Second, while the ACCESS teacher was not present, that absence did not constitute a procedural violation of the IDEA.  The IDEA requires that an IEP team include (1) the student's parents; (2) at least one of the student's regular-education teachers (if the student is or may be placed in regular education classes); (3) at least one special-education teacher, or, where appropriate, at least one of the student's special-education "providers"; (4) a representative of the local educational agency; and (5) "an individual who can interpret the instructional implications of evaluation results." 20 U.S.C. § 1414(d)(1)(B).  In addition, where appropriate, other individuals with knowledge or expertise about the student and/or the student herself may also participate.  *Id.*

There is no statutory requirement that the teacher of the program in which a student is likely to be placed be present at all team meetings.[7]  The IDEA simply requires a special-education teacher, of which there was at least one present at the July 2012 meeting.  (A.R. 384-85).  Furthermore, while the presence of the ACCESS teacher likely would have been beneficial, Natick accommodated the parents' request to hold an IEP meeting before the start of the school year, and can hardly be faulted for failing to pull together an ideal team in the middle of the

_____

[7] The IDEA does require that the IEP include one of the student's regular-education teachers.  While the team did include a regular-education teacher from Natick High School, there was not a regular-education teacher who had taught C.D.  However, the parents have not objected to the team composition on that ground.  In addition, because C.D. had been at McAuliffe—an out-of-district placement—for the past three years, there was not a regular-education teacher at Natick with any direct experience with her.  While the presence of one of C.D.'s teachers from McAuliffe might have been beneficial, it is not clear that Natick can be faulted for not including an out-of-district teacher in its IEP team.  *See Roland M.*, 910 F.2d at 995.  Furthermore, C.D.'s private tutors were present at the meeting and able to comment on her performance in the general-education setting at McAuliffe.  (A.R. 397-403).

summer.

Finally, there is no indication that any potential shortfalls in the team composition compromised C.D.'s right to an appropriate education or seriously hampered the parents' ability to participate in the creation of her IEP. The transcript from the July 2012 meeting suggests that most of the parents' specific questions about the ACCESS program were answered. (*see, e.g.,* A.R. 406-11). After the meeting, and after the proposed IEP had already been developed, the parents requested "study guides for the 9th grade Access program." (A.R. 453). McGovern responded that they "raise[d] good questions about [C.D.'s] program of study" and suggested that they meet with the lead ACCESS teacher at the beginning of the school year to discuss the curriculum. (*Id.*). Natick "cannot be faulted for drafting an IEP that does not answer all of the parents' after-the-fact questions when the parents were given an opportunity to participate in the IEP." *Alloway Tp. Bd. of Educ. v. C.Q.*, 2014 WL 1050754, at *9 (D.N.J. March 14, 2014). With one minor exception, the parents had all of their questions about the ACCESS program— including questions about the other students in the program, the number of students, the schedule, the nature of instruction in the program, and the ability of students in the program to move into replacement or general education classes—answered at the July 2012 meeting. (A.R. 406-11, 417-18).[8]

The parents also contend that Natick predetermined C.D.'s proposed placement in the ACCESS program. "[P]redetermination occurs when an educational agency has made its determination prior to the IEP meeting, including when it presents one placement option at the

---

[8] C.D.'s father did ask whether students in the English/Language Arts ACCESS class read the same books as students in the general-education classes. (A.R. 409). McGovern responded that she did not know, but that C.D. would likely be reading modified texts so that she could access texts at her grade level. (*Id.*). In response to a question from one of C.D.'s tutors about whether they would be reading actual texts or things like recipes, McGovern assured the parents that students in the ACCESS program read texts. (*Id.*).

meeting and is unwilling to consider other alternatives.  In such cases, regardless of the

discussions that may occur at the meeting, the School District's actions would violate the

IDEA's procedural requirement that parents have the opportunity 'to participate in meetings with

respect to the identification, evaluation, and educational placement of the child.'" *H.B. ex rel.*

*P.B. v. Las Virgenes Unified Sch. Dist.*, 239 Fed. Appx. 342, 344 (9th Cir. 2007) (quoting 20

U.S.C. § 1415(b)(1)).  "However, predetermination is not synonymous with preparation."  *Nack*

*ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006).  School districts may

come to IEP meetings with a proposal in mind, but must remain open to input from parents and

their experts.  *See G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 947-48 (1st Cir. 1991)

(finding no predetermination despite the fact that the district came to team meeting with draft

IEP); *K.D. ex rel. C.L. v. Department of Educ., Hawaii*, 665 F.3d 1110, 1123 (9th Cir. 2011)

(finding no predetermination where district had a placement in mind before meeting but

considered alternatives).[9]

Here, there is certainly evidence that Natick considered the ACCESS program to be an

appropriate placement for C.D. prior to the July 2012 IEP meeting.  In a communication prior to

that meeting, Dalan stated that the district's recommendation of the ACCESS program was based

on Dr. Imber's most recent evaluations of C.D. as well as their discussions at the May 2012

meeting.  (A.R. 377).  Dalan also stated that her observations of C.D. at McAuliffe were not

intended to change that recommendation.  (*Id.*).  Furthermore, at the July 2012 meeting,

representatives for Natick expressed reluctance to reconsider their recommendation of the

---

[9] For example, courts have found predetermination where school districts have unofficial policies of refusing certain programs or placements regardless of a child's individual needs, making programming or placement decisions based purely on financial considerations, or prohibiting parents from asking questions during IEP meetings.  *See Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 855-59 (6th Cir. 2004); *W.G. Bd. of Trus. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479 (9th Cir. 1992) (finding predetermination where district decided placement prior to IEP meeting and "assumed a 'take it or leave it' position at the meeting").

ACCESS program, despite statements from the parents' consultants that C.D. was able to perform well in a general-education setting with some additional one-on-one support. (A.R. 402, 413-14). They expressed concern about the discrepancy between their description of her abilities and her low test scores, and stated that, "on paper," the ACCESS program was the most appropriate placement to meet her needs. (*Id.*).

Coming to an IEP meeting with a proposal in mind and then declining to change that proposal after considering the parents' input does not amount to predetermination. Pre-meeting consideration only amounts to predetermination if the district refuses to consider the input, objections, and suggestions of the parents such that they are denied the opportunity to meaningfully participate in the IEP development process. *Nack*, 454 F.3d at 610.

Here, there is no evidence that representatives for Natick were following an unofficial policy in recommending the ACCESS program, that they recommended the ACCESS program based solely or even predominantly on financial considerations, or that they steadfastly refused to consider alternative placements. As the hearing officer noticed, while the district never formally proposed an IEP including replacement classes in 2012, it did initially recommend starting C.D. in replacement classes for the 2012-13 school year and then reconvening in the fall to create a new IEP. (A.R. 370). Furthermore, there is evidence that the recommendation of the ACCESS program did take into account some of the concerns raised by the parents at the July 2012 meeting. For example, representatives for Natick believed that the ACCESS program would help address the parents' concerns about the block schedule at Natick High School. (A.R. 408-09). In addition, they made clear that the proposal was flexible and that they would re-evaluate C.D.'s placement in October 2012, after they had more direct experience with her. (A.R. 419). Because the record shows that representatives for Natick meaningfully considered

the parents' input when proposing C.D.'s placement in the ACCESS program, and remained

open to reconsidering her placement in the future, they did not predetermine C.D.'s placement in

violation of the IDEA.

The parents also contend that Natick denied them the opportunity to participate

meaningfully in the IEP process by not allowing them to observe the ACCESS program.  Under

Massachusetts law, school districts are required, "upon request by a parent, [to] provide timely

access to parents and parent-designated independent evaluators and educational consultants for

observations of a child's current program and of any program proposed for the child."  Mass.

Gen. Laws ch. 71B, § 3.  The administrative record shows that the parents requested the

opportunity to observe classes at Natick at the end of the 2011-12 school year, but that, due to

scheduling complications including standardized testing, special events, and final exams, Natick

was not able to find a time for them to observe.  (A.R. 370).  However, Natick did recommend

holding a team meeting in October 2012 to reevaluate C.D.'s placement, and stated that the

parents would be welcome to observe classes prior to that meeting.  (*Id.*).  While the parents thus

did not have the opportunity to observe classes prior to the July 2012 IEP meeting, Natick cannot

be faulted for failing to find an appropriate time for observations at the end of the school year.

Similarly, because the parents requested an IEP meeting in the summer, Natick cannot be faulted

for their inability to observe classes prior to that meeting.  Natick's offer to have the parents

observe classes in the fall was reasonable and, under the circumstances, would have constituted

"timely access."

### 2.    **Substantive Challenges**

Plaintiffs contend that the hearing officer erred in concluding that the 2012-13 IEP was

reasonably calculated to provide a FAPE in the least restrictive environment.  Their primary

complaint appears to be that the ACCESS program was more restrictive than necessary to provide an adequate education, and that the hearing officer failed to consider evidence in the record showing that C.D. had performed well in the general-education setting at McAuliffe.

The IDEA mandates a preference for educating students with disabilities in general-education settings.  The IDEA's requirement that students with disabilities be educated in the "least restrictive environment" means that "[m]ainstreaming may not be ignored, even to fulfill substantive educational criteria."  *Roland M.*, 910 F.2d at 993.  Rather, the benefits to be gained from mainstreaming must be weighed against the educational improvements that could be attained in a more restrictive (that is, non-mainstream) environment.  *Id.*

The hearing officer concluded that C.D.'s placement in the ACCESS program was "less restrictive than [her] McAuliffe placement," where she was in general-education classes with the assistance of a tutor, "because [the ACCESS placement] did not provide for the assistance of a one to one aide throughout the day.  It provided [C.D.] the opportunity to independently access academic services in a program specifically designed for students with profiles similar to [hers]." (A.R. 1565).

It is likely true that the ACCESS program provides greater individual autonomy to the student than a one-on-one aide, and in that sense is "less restrictive."  But as a general matter, a separate program for students with disabilities is not less restrictive than a placement in mainstream, general-education classes.  While C.D. may well have benefitted academically from a placement in the ACCESS program—a conclusion well within the educational expertise of the agency—such academic benefits "cannot be invoked to release an educational agency from compliance with the [IDEA's] mainstreaming provisions."  *Roland M.*, 910 F.2d at 993 (internal quotation marks omitted).  It is unclear whether the hearing officer adhered to the requirement

that the benefit of mainstreaming be weighed against the benefits of a more restrictive environment.  Under the circumstances, on this issue, remand is appropriate in order to permit the hearing officer to consider, or at a minimum clarify, whether the 2012-13 IEP was reasonably calculated to provide a FAPE in the "least restrictive" environment possible.

Plaintiffs also contend that the 2012-13 IEP was defective because Natick had not yet conducted a transition assessment.  Under Massachusetts law, transition planning is to begin when students are 14 years old, and C.D. was 15 when the 2012-13 IEP was created.  (A.R. 2602).  However, the IDEA does not require a stand-alone transition plan.  *See Sebastian M.*, 744 F. Supp. 3d at 407.  Nor does Massachusetts law require a separate transition assessment.  Under Massachusetts law, transition assessment and planning can consist of informal discussion of the student's postsecondary goals, her skills and strengths that might contribute to that goal as well as the skill and strengths she would need to acquire in order to achieve that goal, and the supports and services necessary to help her make progress towards achieving that goal.  *See* Technical Advisory SPED 2014-4: Transitional Assessment in the Secondary Transition Planning Process ("SPED 2014-4") ("Any assessment that is conducted when a student on an IEP is aged 14-22 can be viewed as a transition assessment, in that it affords information which can be used to discern the student's vision; understand the student's needs, strengths, preference, and interests; and measure progress towards the acquisition of skills.").

C.D.'s post-secondary goals were discussed at both the May and July 2012 meetings, and Natick discussed available services that might help her achieve those goals.  (A.R. 326-28; 391-95).  The parents stated that they hoped she would receive a high-school diploma, but did not yet know of any specific postsecondary goals.  (A.R. 326-27; 391-93).  The proposed IEP stated, under the heading of "Vision Statement," that C.D.'s parents hoped that she would receive a

high-school diploma and vocational training.  (A.R. 2606).  Furthermore, the IEP specified that

in order to help C.D. achieve her goals, she would be provided with vocational services.  (A.R.

2617).  Because transition services were discussed at the team meeting and mentioned in the IEP,

there was no error in the 2012-13 IEP based on transition planning.  *See Sebastian M.*, 744 F.

Supp. 3d at 407 ("Because transition services were mentioned in the IEPs and because transition

services were actually provided to [the student], there is no error here based on transition

planning.").

  C.  **Adequacy of the 2013-14 IEP**

   Plaintiffs contend that the 2013-14 IEP was procedurally improper because Natick failed

to include accurate and up-to-date information regarding C.D.'s then-present levels of

performance.  However, according to the 2013-14 IEP, Natick was unable to update C.D.'s

current performance level because Learning Prep—the school C.D. had attended for the past

year—had not provided sufficient data regarding her performance.  (A.R. 2584).  Plaintiffs fail to

put forth any specific information that Natick should have considered in creating the 2013-14

IEP but did not.

   However, because the 2013-14 IEP was virtually identical to the 2012-13 IEP, it is

subject to the same substantive concerns as the prior IEP regarding whether placement in the

ACCESS program was the least restrictive environment possible.  Accordingly, and for the same

reasons stated above, remand is appropriate to enable the hearing officer to determine whether

the 2013-14 IEP provided for an appropriate education in the least restrictive environment

possible.[10]

---

[10] Plaintiffs also contend that the first IEP proposed for the 2014-15 year was not reasonably calculated to provide a FAPE in the least restrictive environment.  However, for the reasons stated below, any challenge to the substantive adequacy of that IEP is moot because it was replaced prior to the start of the relevant school year.  *See Pohorecki v. Anthony Wayne Local Sch. Dist.*, 637 F. Supp. 2d 547, 555 (N.D. Ohio 2009).  Furthermore, because

### D.     Adequacy of the 2014-15 IEPs

#### 1.     Procedural Challenges

The parents contend that Natick predetermined the change in C.D.'s disability classification from "intellectual" to "communication" prior to the team meeting on June 13, 2014.  At the June 13 meeting, representatives for Natick stated that, based on the results of C.D.'s three-year re-evaluations, they were "looking at noting her disability category as communication" instead of intellectual.  (A.R. 1007).  C.D.'s father was surprised, and stated, "I just think that the parents need a little bit of time to process that and, you know, it certainly can be proposed.  But it probably just needs some discussion."  (A.R. 1008).  Donna Cymrot, the school psychologist, responded, "I respect that it takes a little time to digest a change. . . . [C]ertainly we can discuss it further if you care to."  (*Id.*).

As discussed above, pre-meeting consideration only amounts to predetermination if the district refuses to consider the input, objections, and suggestions of the parents, such that they are denied the opportunity to participate meaningfully in the IEP development process.  *Nack*, 454 F.3d at 610.  It appears from the administrative record as though representatives for Natick were willing to consider the parents' input and further discuss the change in C.D.'s classification with them.  Thus, the record does not support the parents' contention that Natick predetermined the reclassification.  Furthermore, even if there had been some procedural inadequacy regarding the reclassification, there is no evidence that the change in C.D.'s disability classification impeded the parents' ability to participate meaningfully in the IEP development process or changed the

---

plaintiffs do not appear to challenge the adequacy of the second and third IEPs proposed for the 2014-15 years on the grounds that they were not reasonably calculated to provide a FAPE in the least restrictive environment (*see* Pl. Reply at 2) remand on this issue is only necessary as to the 2012-13 and 2013-14 IEPs.

nature of the services provided to C.D.[11]

The parents also contend that Natick denied them the meaningful opportunity to participate in the IEP process by unreasonably restricting their ability, as well as that of their consultants, to observe classes at Natick High School.  Under Massachusetts law, school districts are not only required to provide timely access to parents and their evaluators or consultants for observation, they are also prohibited from imposing any

> conditions or restrictions on such observations except those necessary to ensure the safety of children in a program or the integrity of the program while under observation or to protect children in the program from disclosure by an observer of confidential and personally identifiable information in the event such information is obtained in the course of an observation by a parent or designee.

Mass. Gen. Laws ch. 71B, § 3.  The parents contend that Natick imposed an unreasonable restriction by prohibiting their experts from asking any questions during their observations.

Nothing in either § 3 or the Commonwealth's guidance concerning that section explicitly requires that parents or their experts be given the opportunity to speak with school staff during the course of their observations.  *See* Mass. Gen. Laws ch. 71B, § 3; Technical Assistance Advisory SPED 2009-2: Observation of Education Programs by Parents and Their Designees for Evaluation Purposes ("SPED 2009-2").  Nonetheless, the BSEA has, in the past, concluded that allowing experts the opportunity to ask questions of teachers and other service providers is essential to enable those experts to conduct thorough and meaningful evaluations of proposed IEPs.  *See In Re: Northbridge Public Schools*, BSEA # 09-2533 (Oct. 30, 2008).  However, in order to avoid classroom

---

[11] After discussing the potential change in C.D.'s disability category, a representative for Natick stated "there is no one here that doesn't think that [C.D.] needs to have continued support from a special education IEP." (A.R. 1009).

disruption, school districts do not need to permit experts to ask questions during the observations themselves, but may set aside a separate time for questions afterward.  *See id.*

Here, it appears that Natick did not set aside time for the parents' experts to ask questions related to their observations.  Furthermore, there is evidence in the administrative record that the experts were unable to make a full evaluation of the adequacy of the proposed IEP given their inability to ask follow-up questions.  (A.R. 3148, 3153, 3755).  However, any procedural error was cured when the parents' experts where able to submit clarifying questions in writing.  The parents have not pointed to any evidence in the record that the written questions and answers were inadequate to enable their experts to make a meaningful evaluation of the appropriateness of Natick's proposed IEPs.

### 2.   Substantive Challenges

Plaintiffs next contend that the first two IEPs proposed for the 2014-15 year were not reasonably calculated to provide a FAPE because a transition assessment had not yet been conducted.  As to the first IEP proposed for the 2014-15 year, it was replaced prior to the start of the relevant school year, and thus any challenge to its adequacy is moot.  *See Pohorecki*, 637 F. Supp. 2d at 555 (concluding that IEP that was never implemented and was replaced prior to start of relevant school year "is not ripe for adjudication as to whether it provided [student] with a FAPE").  As to the second IEP proposed for 2014-15, transition planning was discussed at the June 2014 team meeting and mentioned in the IEP.  (A.R. 1085, 2557-58).  That is sufficient to satisfy the requirement for transition planning.  *See Sebastian M.*, 744 F. Supp. 3d at 407.

Plaintiffs also contend that the first proposed IEP for 2014-15 (dated April 15, 2014

through April 15, 2015) was not reasonably calculated to provide C.D. with a FAPE in the least

restrictive environment.  Again, however, that IEP was only intended to be provisional and was

replaced in June 2014, prior to the start of the 2014-15 school year.  Any challenge to its

adequacy is therefore moot.  *See Pohorecki*, 637 F. Supp. 2d at 555.

### E.      The Hearing Officer's Treatment of Witness Testimony

Plaintiffs also contend that the hearing officer erred by giving insufficient weight to the

testimony of their witnesses and giving too much weight to the testimony of Natick's witnesses.

However, "[c]redibility determinations . . . are the province of the factfinder, which in this case

is the Hearing Officer," and should not be "recalibrate[d]" absent compelling evidence.  *Andover*

*Sch. Comm. v. Bureau of Special Educ. Appeals of Div. of Admin. Law Appeals*, 2013 WL

6147139, at *14 (D. Mass. Nov. 21, 2013).  *Accord Sebastian M.*, 685 F.3d at 86 ("The valuation

of expert testimony is precisely the sort of first-instance administrative determination that is

entitled to judicial deference by the district court.").  Here, there is no compelling evidence to

warrant disregarding the hearing officer's credibility determinations.

### 1.      Testimony of C.D.'s Father

Plaintiffs contend that the hearing officer improperly discounted the testimony of C.D.'s

father.  They first contend that the hearing officer erred by discrediting the father's statement that

the 2012-13 IEP was inadequate because it contained the same goals as the McAuliffe IEP, even

though the McAuliffe IEP involved education in an inclusive, general-education setting, while

the Natick IEP did not.  The hearing officer discredited that statement based on the fact that the

father did not have any credentials in education.  (A.R. 1566).  Plaintiffs contend that by

discrediting that statement, "the hearing officer completely disregarded the fundamental

importance Congress placed on parental participation in the educational decision-making process

under the IDEA." (Pl. Am. Mem. at 31-32). However, hearing officers are free to disregard parent testimony when that testimony is "impressionistic and not based upon any expertise." *J.E. v. Boyertown Area Sch. Dist.*, 834 F. Supp. 2d 240, 251 (E.D. Pa. 2011). Disregarding such testimony under appropriate circumstances does not improperly strip parents of their right to participate in the development of IEPs.

Plaintiffs also contend that the hearing officer erred by dismissing the father's statement that the hours of service in the 2012-13 IEP were less than those provided in the prior IEP. The hearing officer concluded the father "did not present any credible evidence to support that presumption." (A.R. 1566). Plaintiffs now point to a chart provided to Natick by the father indicating that the hours of service provided by the proposed IEP would be lower than the hours of service provided by the prior IEP. (*See* A.R. 3432). However, in connection with his testimony regarding the reduced programming, the father also testified that he understood that the IEP proposed by Natick offered different programing, including different types of classes, from the prior IEP at McAuliffe. (A.R. 1666). Given those differences, and even assuming that the hours of service were in fact lower, there is nothing in the record to suggest that the decrease in hours alone would have rendered the IEP inadequate to provide a FAPE.

Finally, plaintiffs contend that the hearing officer erred by disregarding their concern as to whether the ACCESS program would prepare C.D. to take the MCAS. The hearing officer noted the parents' concern, but stated that their belief that the ACCESS program would be inappropriate because it would not prepare C.D. for the MCAS "was an assumption made by Parents and their evaluators that was not supported by the evidence before me." (A.R. 1566). The parents now contend that the hearing officer failed to consider evidence showing that students in the ACCESS program are not prepared for the MCAS. However, there is also

evidence in the record (including testimony at the hearing from Natick teachers) showing that students were able to move from the ACCESS program into replacement classes when their abilities and classroom performance suggested that such a move was appropriate, and that students in the replacement program are generally prepared to take the MCAS.  (*See* A.R. 2298, 2396, 2439-40).  It was within the hearing officer's discretion to credit that testimony over that of the parents.  *See Andover Sch. Comm.*, 2013 WL 6147139, at *14.

### 2.     Testimony of Nan Coellner

Plaintiffs next contend that the hearing officer erred by allegedly omitting all of the testimony of C.D.'s tutor, Nan Coellner.  However, the hearing officer recounted Coellner's testimony in her summary of the evidence, and considered that testimony in her analysis.  (*See* A.R. 1553, 1565, 1569).  The hearing officer ultimately credited the testimony of others rather than that of Coellner's, but did not, as plaintiffs contend, fail to consider any of her testimony.

### 3.     Testimony of Suzanne Flax and Dr. Steve Imber

Plaintiffs further contend that the hearing officer erred by discrediting the testimony of C.D.'s speech therapist, Suzanne Flax, and their independent evaluator, Dr. Steve Imber.  The hearing officer's order stated that she did not rely on the testimony of either Flax or Dr. Imber because she did not find them credible.  (A.R. 1570-71).  As to Flax, the hearing officer reasoned that while she "had appropriate credentials and experience," she made statements during her testimony that "caused her to lose credibility."  (A.R. 1570).  In particular, the hearing officer noted that Flax testified that C.D. "would not benefit at all from any inclusion," a statement not supported by any other witness and contrary to her own prior recommendations for C.D.  (*Id.*).  As to Dr. Imber, the hearing officer stated that while he previously supported an inclusive placement, "he no longer believed that inclusion was as important for [C.D.]," and that, on that

basis, it appeared that he "changed his recommendations to align with which ever placement she was in at the time he was asked to state his opinion." (A.R. 1570-71).

Plaintiffs have failed to produce any evidence suggesting that this Court should now "recalibrate" the hearing officer's credibility determinations, and the Court will therefore defer to those determinations. *See Andover Sch. Comm.*, 2013 WL 6147139, at *14; *Sebastian M.*, 685 F.3d at 86.

### 4. Testimony of Arlyn Roffman

Plaintiffs next contend that the hearing officer improperly disregarded the testimony of Arlyn Roffman, an expert in the field of transition services. Roffman testified at the hearing as to her opinion of the transition services proposed by Natick. Plaintiffs contend that the hearing officer "without explanation summarized [Roffman's testimony] as, 'she opined that the transition plan contained in S-4 was not properly filled out.'" (Pl. Mem. at 37). It is true that the hearing officer stated that "[m]ost of Dr. Roffman's criticisms of the transition services Natick proposed related to her opinion that forms were not filled out correctly." (A.R. 1569). While it may not have constituted the majority of her testimony, Roffman did testify regarding the way in which the transition planning forms were completed. (A.R. 1755-56, 1780). More significantly, however, the hearing officer did not disregard the rest of her testimony. The hearing officer also addressed Roffman's opinions that it was inappropriate for C.D. to receive vocational services in a one-on-one setting as part of an extended school day and that the proposed services were not adequately tailored to C.D.'s interests. (A.R. 1569). The hearing officer concluded that the testimony of two Natick witnesses, McGovern and Cymrot, adequately addressed those concerns and suggested that the transition services proposed were not inadequate on those grounds. (*Id.*). While plaintiffs question Cymrot's credibility as a witness, they have failed to offer any reason

to second-guess the hearing officer's determination that the testimony of McGovern and Cymrot was more credible on these points than that of Roffman.

### 5.   Testimony of Donna Cymrot

Plaintiffs next contend that the hearing officer erred by crediting the testimony of Donna Cymrot, a psychologist at Natick High School, concerning the appropriateness of a "blended program" of instruction that would combine some services in the ACCESS program with others in general-education classes.  The hearing officer credited the testimony of Cymrot, as well as two other Natick witnesses (McGovern and Liptak), in concluding that the father's objection to C.D. being placed in any classes in the ACCESS program did not a support finding that the 2014-15 IEP, which proposed a blended program, was inadequate.  (A.R. 1567-68).  In particular, the hearing officer credited Cymrot's testimony that a blended program would enable C.D. to address areas of weakness, such as math, more intensively in the ACCESS program, while also allowing her to receive instruction in other areas in less-restrictive replacement classes.  (*Id.* at 1568).

Plaintiffs point to a number of statements that Cymrot made on cross-examination that they contend undermine her credibility as a witness.  (Pl. Mem. at 38).  Many of those statements relate to Cymrot's opinion regarding the change in C.D.'s disability classification, and do not appear to be relevant to her testimony concerning the appropriateness of a blended program.  The rest of the statements suggest that Cymrot had not reviewed the entire administrative record.  However, the record shows that Cymrot was well-versed regarding C.D.'s strengths and weaknesses.  (*See* A.R. 1007-09).  There was thus adequate evidence in the record to support the hearing officer's conclusion that Cymrot was a credible witness, and the Court will not now second-guess that determination.

### 6.      Testimony of Karen Liptak

Next, plaintiffs contend that the hearing officer erred in crediting the testimony of Karen Liptak, a special-education teacher at Natick High School.  As with Cymrot, the hearing officer credited Liptak's testimony regarding the appropriateness of a blended program over the father's testimony that placement in any ACCESS classes was inappropriate.  Specifically, the hearing officer credited Liptak's testimony that C.D. would benefit from the opportunity to interact with different peers in the different classes.  (A.R. 1568).

Liptak testified that she had seventeen years of experience as a special-education teacher, that she was familiar with both the ACCESS program and replacement classes at Natick High School, and that she had some familiarity with C.D. from a summer program she attended at Natick at which Liptak was a teacher.  (A.R. 2321-26).  It appears reasonable, based on that experience, to credit Liptak's testimony regarding the benefits of a blended program.  While plaintiffs point out that Liptak only had limited experience with C.D. in the summer of 2012, that is not a sufficient basis on which to overrule the hearing officer's credibility determination.

### 7.      Testimony of Christine Michelson

Finally, plaintiffs contend the hearing officer erred by crediting the testimony of ACCESS teacher Christine Michelson over that of the parents and their witnesses.  Specifically, plaintiffs contend that the hearing officer erred by relying on Michelson's opinion that the IEP 2014-15 IEP was appropriate because Michelson had neither met nor observed C.D and had not reviewed all of the available evaluation reports.  However, while the hearing officer recounted Michelson's testimony in her summary of the evidence, it does not appear that she relied on that testimony in finding that the IEPs proposed for 2014-15 were appropriate.  (*See* A.R. 1560-61, 1567-69).  In her consideration of the appropriateness of those IEPs, the hearing officer

specifically referred to and relied upon the testimony of other Natick witnesses—including McGovern, Cymrot, Litpak, Brown, and Karian—but did not refer to Michelson's testimony. Plaintiffs' contention accordingly appears to be misplaced.

**F.      Hearing Officer's Failure to Consider the Expert Reports of Dr. Imber, Flax, and Roffman**

Plaintiffs contend that the hearing officer erred by failing to consider reports that were prepared by Dr. Imber, Flax, and Roffman and provided to Natick as exhibits five business days prior to the hearing.  The hearing officer stated that she "did not rely upon the most recent reports submitted by Ms. Flax or Dr. Imber, as they were first presented to Natick as exhibits in the hearing and the [IEP] Team did not have the opportunity to review them prior to the hearing."  (A.R. 1571).  She similarly stated that she "did not rely upon the written report of Dr. Roffman as it was not received by Natick prior to the hearing." (*Id.*).

Plaintiffs contend that the hearing officer's failure to rely on those reports was erroneous, because the reports were timely submitted to Natick as exhibits prior to the hearing in accordance with Rule IX of the BSEA rules and 45 C.F.R. § 300.502.  They concede that the reports—which were completed after the development of the third 2014-15 IEP—were not relevant to the hearing officer's determination of the adequacy of that IEP, as they were not available to Natick at the time the IEP was promulgated.  (Pl. Reply at 28).  They contend, however, that the reports should have been considered for other purposes, such as witness credibility, their assessments of the prior IEPs, and their statements concerning their inability to obtain information from Natick.

It is clear from the record that the testimony of Dr.Imber, Flax, and Roffman provided ample information regarding their professional experiences and expertise, their experience with and knowledge of C.D., their assessments of the prior IEPs, and their abilities or inabilities to

obtain information from Natick.  (*See, e.g.,* A.R. 2015-23, 2026-2030, 2034, 2040, 2043-52

(Imber); 1840-43, 1845-46, 1854,  1855-56, 1870-72 (Flax); 1745-47, 1751-57, 1761, 1762-64

(Roffman)).  Plaintiffs have failed to identify any additional evidence contained within the

reports that would have been anything other than cumulative of their testimony at the hearing.

There is, therefore, no basis from which to conclude that hearing officer's failure to consider the

results themselves resulted in any kind of error.

### G.   The Hearing Officer's Determination as to Plaintiffs' Discrimination Claims

In their complaint before the BSEA, plaintiffs alleged that Natick engaged in

discrimination and retaliation in violation of 42 U.S.C. § 1983 and § 504 of the Rehabilitation

Act.  The hearing officer concluded that the record was unclear as to the basis of the allegation

and that the parents had "not met their burden of showing that Natick engaged in discrimination"

and that the BSEA "does not have jurisdiction over claims of discrimination under Section

1983." (A.R. 1570).  Plaintiffs now contend that the hearing officer ignored substantial evidence

in the record suggesting that Natick discriminated C.D. on the basis of her disability.  They

contend that the record was "replete" with evidence of discrimination, citing to evidence

concerning the restrictions placed on plaintiffs' consultants when visiting classes at Natick High

School.

As to the § 1983 claim, the hearing officer was correct to conclude that she lacked

jurisdiction.  While section 1983 claims are sometimes permitted to be brought along with IDEA

claims in a BSEA proceeding, the BSEA does not have the jurisdiction to resolve such claims.

*See In re Rafael v. Norton Public Schools*, BSEA # 1609348, at 8-9 (Aug. 30, 2016).  Section

1983 claims may be brought before the BSEA only for the purpose of developing a relevant

factual record to aid later court adjudication.  *See id.*; *CBDE Pub. Schs. v. Massachusetts Bureau*

*of Special Educ. Appeals*, 2012 WL 4482296, at *8 n.7 (D. Mass. Sept. 27, 2012).  Because

plaintiffs challenge only the hearing officer's determination as to the § 1983 claim, and do not

appear to bring an independent claim, that claim must fail.

As to the § 504 claim, plaintiffs bear the burden of proving four elements:  "(1) that

[C.D.] is disabled; (2) that she sought services from a federally funded activity; (3) that she was

'otherwise qualified' to receive those services; and (4) that she was denied those services 'solely

by reason of her . . . disability."  *Lesley v. Hee Man Chie*, 250 F.3d 47, 53 (1st Cir. 2001)

(quoting 29 U.S.C. § 794(a)).  Plaintiffs appear to contend that Natick discriminated against C.D.

on the basis of her disability by placing restrictions on the ability of her consultants to ask

questions while observing classes.  However, plaintiffs have failed to offer any evidence

suggesting that Natick imposed those restrictions "solely by reason of [C.D.'s] . . . disability."

The record suggests that Natick imposed those restrictions because the consultants had been

disruptive during a prior observation (*see* A.R. 3146), and plaintiffs have not offered any

evidence to suggest that that reason was pretextual.  They have not, for example, offered any

evidence "showing weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the . . . proffered legitimate reasons" provided by Natick."  *D.B. ex rel.*

*Elizabeth B. v. Esposito*, 675 F.3d 26, 42 & n.10 (1st Cir. 2012) (holding that plaintiffs failed to

show that school district's proffered legitimate, non-retaliatory explanations for its actions were

pretextual).

## IV.  <u>Conclusion</u>

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED.  The

matter is hereby REMANDED in part to the Board of Special Education Appeals for further

proceedings, consistent with this opinion, as to whether the 2012-13 and 2013-14 IEPs provided

a free appropriate public education in the least restrictive environment possible.

**So Ordered.**


/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  July 21, 2017                      United States District Judge