```
 1                        UNITED STATES DISTRICT COURT
                           DISTRICT OF MASSACHUSETTS
 2

 3

 4    C.D., by and through her          )
      PARENTS AND NEXT FRIENDS,         )
 5    M.D. and P.D.,                    )  Civil Action
                                        )
 6                    Plaintiffs        )  No. 15-cv-13617-FDS
                                        )
 7    vs.                               )
                                        )
 8    NATICK PUBLIC SCHOOL DISTRICT     )
      and                               )
 9    BUREAU OF SPECIAL EDUCATION       )
      APPEALS,                          )
10                    Defendants

11

12    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

13

                      REDACTED/CORRECTED TRANSCRIPT
14
                             MOTION HEARING
15

16

17

              John Joseph Moakley United States Courthouse
18                          Courtroom No. 2
                           1 Courthouse Way
19                         Boston, MA 02210

20

                           December 1, 2016
21                           11:00 a.m.

22

23                  Valerie A. O'Hara, FCRR, RPR
                         Official Court Reporter
24          John Joseph Moakley United States Courthouse
                     1 Courthouse Way, Room 3204
25                         Boston, MA 02210
                      E-mail: vaohara@gmail.com
```

APPEARANCES:

For The Plaintiffs:

    Martucci Law Associates, by LAURIE P. MARTUCCI, ATTORNEY,
20 Cabot Boulevard, Suite 300, Mansfield, Massachusetts 02048;

For the Defendant Natick Public School District:

    Murphy, Hesse, Toomey, and Lehane,
by DORIS R. MACKENZIE EHRENS, ATTORNEY, and
FELICIA S. VASUDEVAN, ESQ., Suite 410
300 Crown Colony Drive, P.O. Box 9126,
Quincy, Massachusetts 02269-9126.

For the Defendant Bureau of Special Education Appeals:

    Attorney General's Office, by IRAIDA J. ALVAREZ, ATTORNEY,
One Ashburton Place, Boston, Massachusetts 02108.

PROCEEDINGS

THE CLERK:  All rise.  Thank you.  Please be seated.
Court is now in session in the matter of C.D., By And Through
Her Parents and Next Friends, M.D. and P.D., et al, vs. Natick
Public Schools, et al., Civil Action Number 15-13617.

Would the parties please identify themselves for the
record.

MS. MARTUCCI:  Laurie Martucci appearing on behalf of
the plaintiffs.

THE COURT:  Good morning.

MS. VASUDEVAN:  Felicia Vasudevan on behalf of Natick
Public Schools with Doris Ehrens.

MS. EHRENS:  Good morning.

THE COURT:  Good morning.

MS. ALVAREZ:  Iraida Alvarez, Assistant Attorney
General for the Bureau of Special Education Appeals.

THE COURT:  Good morning.  This is the hearing on the
motion for summary judgment.  I've read the materials.  It
would be helpful to me because they cover a lot of ground and
sometimes aren't maybe quite as focused as I might like to take
it from the top.

I'm familiar with the legal framework, but, as a
factual matter, you know, what happened, what specifically
plaintiff said went wrong as a matter of procedure or substance
and what the school district's and BSEA's response is, but let

1    me start with you, Ms. Martucci.

2        MS. MARTUCCI:  Thank you, your Honor.  Good morning.

3    May it please the Court, my name is Laurie Martucci, and I'm

4    appearing on behalf of the plaintiffs, M.D. and P.D., and their

5    daughter, C.D.

6        We're here on a motion for summary judgment appealing

7    the decision of the Bureau of Special Education Appeals, which

8    found that the IEPs developed by the Natick Public School

9    System for the 2012-2013, 2013-2014 and 2014-2015 school years

11:03AM 10  provided C.D. with a free, appropriate public education in the

11   least restrictive environment pursuant to the Individuals with

12   Disability Education Act.

13       This case is about a child with mild disability and

14   communication disorders who returned to the Natick Public

15   School District in the summer of 2012.

16       THE COURT:  Could I get you to move the mic. closer?

17       MS. MARTUCCI:  Oh, I'm sorry, thank you.  To answer

18   your question with regard to exactly what happened in this

19   case, I'll start in 2012 of May, the child in this matter had

11:04AM 20  attended the Christa McAuliffe Charter School in Framingham,

21   Massachusetts for three years in the general ed. classroom with

22   appropriate supports and services after having been placed

23   there by her parents for sixth, seventh and eighth grade.  She

24   had attended Natick Public School through the fifth grade, and

25   then they placed her at the charter school.

1          Toward the end of eighth grade, in May, the charter

2     school ends in eighth grade, so the parents started looking for

3     what they were going to do for the child with the upcoming

4     educational situation, so they contacted Natick and asked if

5     they could come in for a meeting to find out what was available

6     in Natick as part of their decision-making process.

7          Natick held a meeting in May of 2012, at which the

8     parents attended, the parents brought Ms. Nan Coellner,

9     Ms. Marcia Soden, Ms. Suzanne Flax and Dr. Steve Imber, who was

11:05AM 10  the educational consultant.  To go back, Ms. Flax was the

11    child's speech language pathologist, who had seen her every

12    Saturday for many years, since she was 10 years old.

13          Nan Coellner and Marcia Soden, who were two retired

14    special education teachers, who had over 30 years of experience

15    in the Boston Public Schools were hired by the parents to

16    assist in the classroom by providing services as needed, excuse

17    me, to keep her on track, redirect her, that sort of thing in

18    the classroom to make sure that she could access the material.

19          It was as-needed support.  She sat in the classroom in

11:05AM 20  the general ed. environment and participated, accessed the

21    Massachusetts Curriculum Frameworks and succeeded beyond what

22    anybody really expected actually.

23          She actually passed the MCAS in the eighth grade.  I

24    don't remember if I mentioned it, but she has a mild

25    intellectual disability.  Her I.Q. is 70, so it's right on the

1   border of intellectual disability.  She also has some

2   relatively significant communication disorders, which affect

3   her memory, but on the other end of the spectrum, she's an

4   incredibly unique child as far as children go with

5   disabilities.

6           She's the kind of child that any parent would want as

7   far as her work ethic and her ability to do homework, her

8   desire to do homework actually and ability to learn, desire to

9   learn and desire to want to be in a general ed. environment as

11:06AM 10  Congress intended when they enacted the Act to make sure that

11  children with disabilities are included in the general ed.

12  setting to the maximum extent appropriate with supports and

13  services and only removed if those supports and services are

14  not possible to help them to benefit.

15          And, by the way, the benefits, as I'm sure you know,

16  the benefits are not just related to academic benefits, they

17  also include social benefits, emotional benefits, and she

18  achieved benefits in all areas at McAuliffe.

19          She went from a child that barely spoke in fifth grade

11:07AM 20  and could barely write to a child that was writing full

21  paragraphs, that was acting as described in the class, that was

22  going from class to class with the group, not with the group,

23  actually, individually.  She was going by herself with whoever

24  she wanted to between classes.

25          She went to electives and lunch by herself without any

1   support, and she really, she was the -- she was the poster

2   child, I couldn't think of a better word, for inclusion that

3   Congress envisioned because she did exactly what was the

4   purpose of the Act in having the preference for mainstreaming

5   children with disabilities.

6          So the parents went in May, and they had a meeting,

7   and Natick discussed what the options were for programs at

8   Natick.  There was the general ed., then there was something

9   called replacement classes, which are small group classes.  All

11:08AM 10   the children in those classes have IEPs, and they're slightly

11   smaller than the number of children in the general ed. classes,

12   and then there's the ACCESS program, which is the

13   self-contained program.  It's a life skills program.

14          Every school has one, which Natick had at the time, it

15   had only nine students, only one girl with fairly significant

16   intellectual disabilities, autism, some other things, were the

17   disorders, and those were the three programs that were

18   available at Natick, which was described to the parents.

19          The parents presented Natick with information from the

11:08AM 20   people they brought with them, Ms. Soden and Ms. Coellner, who

21   shared the job, I should say.  They were there every day of the

22   week but three days to two days, that sort of thing.  For three

23   years they spent every day with her.  They sat in the back of

24   the classroom mostly.  They helped her as needed.  So they

25   explained everything to the school.

1       I did submit a transcript as part of the record, which

2   when you look, it's clear that Natick was not really open to

3   hearing what was being said, but they said it anyway.  They

4   told her all about how she's succeeded, how well she was doing

5   and what they were looking into.  They had been looking into

6   charter schools, they were looking into all sorts of schools

7   just to figure out what to do at this point because the other

8   school had ended, so they encouraged Natick to go out to

9   McAuliffe.

11:09AM 10       Several times they encouraged them go out and see her

11  because it's really hard to see this child on paper and

12  envision her because she doesn't appear right as she is on

13  paper, as most children don't on just paper, which is why

14  Congress suggests, not suggests, mandates that schools consider

15  a variety of sources, not just paper, not just evaluations,

16  everything that they can get in order to determine exactly who

17  the child is, what their individual needs are, who they are, so

18  that they can make a program that's unique and devised

19  specifically for that child.

11:10AM 20       So the meeting ended and then Ms. Gina Dalan, who was

21  the special ed. director of Natick at the time, went out to

22  McAuliffe and observed C.D. in her class.

23       THE COURT:  McAuliffe was the charter school?

24       MS. MARTUCCI:  Yes, I'm sorry, McAuliffe,

25  Christa McAuliffe Charter School.  She observed the child, and

1    Mr. -- I'm sorry, the father asked for a copy of the notes that

2    Ms. Dalan took, and he was told that there were no notes.  He

3    was concerned about that because he knew that Ms. Dalan would

4    be leaving the district before like I believe in the middle of

5    June, early June, and he wanted to make sure that her successor

6    had information about the observations so that they would know

7    their child because at the time nobody knew that child except

8    for people that -- the parents and the people that came with

9    them to the meetings, so nobody at Natick knew the child at

10   all, and they encouraged get to know her so we can do it as a

11   team, like we're supposed to do.

12        So Ms. Dalan did say that she saw, that it was a short

13   observation, whatever, but she saw the child working by herself

14   doing her work, whatever, in the class, and she saw the special

15   ed. teacher, Ms. Coellner, and Ms. Soden were at the back of

16   the room, but that's really all the information she gave.

17        Shortly after that, the parents received a letter from

18   Ms. Dalan saying that after observing C.D., she recommends

19   that, as was discussed in May, because at the May meeting, the

20   Natick team did say, well, we can start her in the ACCESS

21   program now if you'd like, and, of course, the parents were not

22   happy with that because, first of all, Congress mandates that

23   they look at inclusion as a preliminary issue and only remove

24   the child if she can't be educated in the general ed.

25   environment, so they certainly weren't going to just agree to

1   start her in the ACCESS program, but they were hoping that once

2   Ms. Dalan or whoever saw C.D. at school, they would see what

3   they knew, which is that this child is the epitome, that's the

4   word I was trying to think of, of what Congress envisioned in

5   suggesting that students with disabilities should be

6   mainstreamed to the maximum extent appropriate with

7   non-disabled peers.

8           So, anyway, they got this letter from Ms. Dalan that

9   said, as we had discussed in the May meeting, we are

11:12AM 10  recommending that you put -- that we place C.D. in the

11  self-contained ACCESS program at Natick High School for all of

12  her academic classes, all of core academics, and that's the

13  recommendation.

14          So, in that sense, it would have been a comparable

15  program.  I'm sorry, they were required to do a comparable

16  program pursuant to the regulations because the child was a

17  transfer student, and that's the requirements of the regs. when

18  a child transfers from one school to another, the receiving

19  district needs to either provide a comparable IEP or create a

11:13AM 20  new IEP, or there's some options, but basically it's a

21  comparable IEP until a new IEP can be developed.

22          The parents, based on the fact that it seemed like

23  Natick was not really willing to listen them, they didn't want

24  to put the child in a program that they really seriously

25  believed was completely inappropriate for her, so what they

1    asked for is they asked Natick if Natick would be willing,

2    instead of doing a comparable program under the transfer regs.,

3    if they would be willing to actually create a new IEP for the

4    child so that they could have a more comprehensive meeting,

5    look at all the things, all the aspects of her unique abilities

6    and needs and figure out an actual new IEP during the summer

7    rather than waiting until the fall so that she could have an

8    actual IEP instead of a comparable IEP, and Natick agreed to do

9    that, which was nice, and then they established a meeting.

11:14AM 10    They set a meeting, they established a meeting, scheduled a

11    meeting for July.

12         At that point, Ms. Dalan had left the district, so she

13    was not available to be at the meeting.  The parents attended

14    the meeting in July of 2012.  They again brought Ms. Soden and

15    Ms. Coellner, and I don't think Ms. Flax went to that.

16    Dr. Imber was also there.

17         They brought -- they sent all sorts of records from

18    McAuliffe.  There was a checkoff sheet that was filled out by

19    the guidance counselor at McAuliffe, which in concert with the

11:15AM 20    teachers that worked with C.D., they recommended that C.D.

21    enter into all college prep. classes in the general ed.

22    environment at Natick.  That was their recommendation, and they

23    provided that information to Natick.

24         The parents provided all that, but based on the -- if

25    you look at the transcript, Natick was not willing to listen to

1   anything they said.  They did not follow the rules, which

2   basically say that as a preliminary matter, schools must

3   discuss the general ed. environment first, talk about how the

4   child can access the curriculum in the general ed. environment,

5   and only when there's no way that they believe she can do so

6   with appropriate supplemental support, supplementary aids and

7   services, at that point they can discuss going further along

8   the continuum to the less next restrictive placement on the

9   continuum.

11:15AM 10         However, instead of doing any of that, Natick

11   basically just said we believe the ACCESS program, the most

12   restrictive placement, is the appropriate placement for C.D.,

13   and that's it.

14         The parents asked can we consider general ed., can we

15   consider the replacement classes?  The answer they received was

16   no, basically what we see on papers means ACCESS.  They did not

17   explain why she couldn't succeed in the lesser restrictive

18   environments.  They didn't know her.  There was nobody there

19   who knew her.

11:16AM 20         Interestingly, C.D. had actually attended summer

21   services at Natick a couple weeks before the meeting in early

22   July, so she was known to staff at Natick.  She was known to --

23   I forget her name, but there were two teachers that worked with

24   her in the summer at Natick.  Neither of them were invited, I

25   don't know if they were invited, but neither of them were in

1    attendance at the meeting in July.  There was no one there from

2    the ACCESS program, which Natick ended up proposing, which you

3    would know from reading the transcripts and the submissions.

4        There were no guidance counselors there, even though

5    basically, not basically, if C.D., sorry, if C.D. attended the

6    ACCESS program, her only potential chance to be with

7    nondisabled peers would have been in electives, so it was

8    important for them to get that kind of information from the

9    school, so they went to the meeting.

11:17AM 10    The Natick staff who did not know her at all, never

11    met her, never had anything to do with her said, well, we're

12    not going to listen to you, in effect, and it's our opinion for

13    no reason that they told anybody that C.D. needs to --

14    actually, they did give two reasons.  They said C.D. needs to

15    be in the ACCESS program because of some low test scores she

16    had in a most recent evaluation, not all of her test scores but

17    some of them and also the hearing the parents had in the past

18    in 2011 at the bureau in front of Hearing Officer Crane, so

19    they were basing their decision about her current needs on

11:18AM 20    something that happened in the past.

21        They weren't listening to anything that anybody was

22    telling them about her current needs or current achievements,

23    and also it was misrepresented, I believe, with regard to the

24    hearing in 2011, while it was only a year earlier, the hearing

25    in 2011, the issue at the hearing that was decided was whether

1    or not the IEP proposed by Natick in sixth grade, which was

2    2009, was appropriate for C.D.

3         There was no discussion of her current achievements at

4    McAuliffe were not part of the hearing that they attended in

5    2011 because it was after, it was subsequent to the IEP that

6    was developed, so they couldn't have known under the *Roland*

7    decision, the hearing officer decided that there was no way

8    they could have had the information that was available after

9    they did the IEP, so it was appropriate in his opinion, and

11:19AM 10    that was that hearing.

11        Then she went to McAuliffe, and she blossomed,

12    literally.  She was a different person based on the access to

13    the modeling of peers.  She had friends.  She just blossomed.

14        So, but basically Natick had told the parents that

15    based on those two things, pretty much the scores and the

16    hearing, which had nothing to do with anything current, they

17    had no knowledge of -- their opinion had nothing to do with the

18    current needs of the child, as they are supposed to.

19        They also did not explain to the parents why she

11:19AM 20    couldn't succeed in a less restrictive environment, so

21    following that meeting, the parents rejected the IEP, and they

22    unilaterally struck Learning Prep. School, which is a special

23    education school in Newton where she has been attending now

24    since September of 2012.

25        She's done well there.  It's certainly an appropriate

1    program for her, but it's not a public education, which is what

2    she was entitled to receive, so every year after that -- well,

3    the following year, to take it slower, at the time of her

4    annual review in 2013, Natick had an IEP meeting.  They didn't

5    get any information from Learning Prep. School, they didn't do

6    anything to try to update their knowledge of her current

7    progress, as required.

8           So they provided the parents with an identical IEP to

9    the one they provided that they rejected in 2012.  There were

11:20AM 10  no updates, and their reasoning was because they just didn't

11   get any new information.

12          So they provided the same exact thing, but just to

13   make another point, at this point, C.D. was 15, she had started

14   when she was -- she was 15 at the time, I think she was 16

15   actually at that point, and my point being is that based on

16   federal law, children who are over 16 need to be -- the school

17   districts are required to do transitional assessments, age

18   appropriate traditional assessments to determine the child's

19   needs with regard to employment and vocational needs, et

11:21AM 20  cetera, so that they can provide transitional services to

21   further the goal of making the child an independent employable

22   following high school.

23          So they provided the same exact IEP, and father

24   obviously rejected it for the same reasons he rejected the

25   previous one, and C.D. continued to attend Learning Prep. for

1    tenth grade.  That was ninth grade.  Then the following year,

2    the school again had a meeting, and, again --

3              THE COURT:  Now we're into 2014, right?

4              MS. MARTUCCI:  Right, 2013 to 2014 was the one IEP,

5    then in April, I think it was April of 2014, they had another

6    meeting, and this was actually a very brief meeting.

7    Supposedly it was only done to avoid having the IEP expire, but

8    there's no legal reason for that that they had to do that, but,

9    anyway, they did that, and in order to ostensibly have a

10   meeting just to do that, they didn't provide anything new at

11   all.

12             It was exactly the same again as the previous two

13   IEPs, no transition assessment was proposed or done, there was

14   no transition services that were appropriate, and the same

15   exact proposed placement in the ACCESS program, the

16   self-contained most restrictive program, life skills program at

17   Natick for all of her classes, again, they proposed that, so,

18   the parents rejected that.  Natick also at that time had

19   proposed that they do a three-year re-evaluation for C.D.

20   because the parents rejected that.

21             Natick also at that time had proposed that they do a

22   three-year re-evaluation for C.D. because her time for doing

23   that was coming up, so they proposed a three-year

24   re-evaluation, which would include academic testing and some

25   further testing, but they did not propose transitional

1    assessments, again, even though they were doing a three-year

2    evaluation, so, but, anyway, the parents accepted the request

3    to do the evaluations, Natick performed the evaluations, then

4    in June of that year, the parents, they attended a meeting to

5    discuss the evaluation results, and Natick suddenly proposed an

6    IEP after all this time with a different, they called it a

7    blended program.

8         Basically it was replacement classes for English, it

9    was general ed. for history, and they were still putting her

11:23AM 10  though in the ACCESS program for math and reading, I believe,

11    but the big issue there was she had passed the English MCAS.

12         The goal, the vision for her parents in accordance

13    with the vision of Congress was to have her graduate and get a

14    diploma so she could continue with her life.  In Massachusetts,

15    as you know, you need to pass the MCAS to do that, so that was

16    a very important goal, and she clearly could do it because she

17    did it already in English and recently in science, so they were

18    not willing to have her to be in the ACCESS program where she

19    clearly could not take the MCAS.  That's crystal clear that the

20    children in the ACCESS program do not take the MCAS.

21         There's been a lot of misrepresentations of that in

22    the pleadings.  It's been misinterpreted, I don't know why, but

23    the record is very clear that in order to take the MCAS, a

24    child needs to move out of the ACCESS program into either

25    replacement or general ed.  They do not take it in the ACCESS

1    program.  So that was just not acceptable to the parents

2    because C.D. was preparing for the MCAS at Learning Prep.

3         She was on the track to get a diploma and to pass the

4    MCAS or to take the MCAS, and Natick was asking them to put her

5    back in school in a class with eight or nine children, not

6    prepare for the MCAS and basically learn life skills, have

7    entry points into the curriculum, not actually learn anything

8    substantive under the curriculum frameworks, so that was in

9    June.

11:25AM 10        Oh, and also at that meeting, based on the

11   evaluations, Natick told the parents at the meeting that they

12   were changing C.D.'s disability category after 17 years of

13   being labeled as Intellectual, they were changing it to

14   Communication based on the test is what they said, but the

15   tests actually weren't all that different from her previous

16   tests, so that was kind of suspect, but they insisted on

17   changing her disability category.

18        They did this without going through the flow chart

19   required by the Department of Ed. to determine the eligibility

11:25AM 20   for special ed.  They just came in and said it, so basically it

21   was done without the parents' participation at all.  The

22   parents were shocked by this.  They were dismayed by it

23   basically.  They came to terms to the extent a parent can with

24   their child having an intellectual disability, and now they're

25   being told out of nowhere that they're changing that, so they

1    were taken back by that, to say the least.

2         That was that IEP in June, so the parents, while it

3    was better than the previous IEPs, there was still no

4    transitional assessment done, even though now she was 17, there

5    was no transitional assessment proposed, which is odd,

6    considering they did every other evaluation, and then also that

7    the MCAS would not be -- she would not be prepared for the MCAS

8    in math by being in the self-contained ACCESS program, so they

9    were not willing to accept the IEP for those reasons and some

11:26AM 10   other reasons, which are in the record, so they rejected that

11   IEP, and actually about a month before that meeting, before

12   things changed, the parents had filed for due process to get

13   this resolved, figure out whether or not Natick had, as they

14   allege, failed to provide her with a free, appropriate public

15   education in the least restrictive environment.

16        So the hearing was -- the complaint was filed, the

17   June IEP was rejected, and then something happened.  Oh, in the

18   fall of her next year, 2014, they did finally propose a

19   transition assessment, which was performed for C.D., and a

11:27AM 20   meeting was held in November, I believe, where they proposed

21   for more transition services, but as part of that, they

22   proposed an after school one-to-one transition program, which

23   was not in the parents' eyes, it did not make sense for the

24   child, it was way too restrictive, to use that word.

25        She would have to stay after school, and it certainly

1   wasn't her fault, and she'd have to be alone, so there would be

2   no peer modeling.  It was not an appropriate program.  It had

3   never been done before, actually, so it just did not seem

4   appropriate, and the reason for that, for them proposing that

5   program was because she could not take electives if she took

6   the transition class during the day, so it was a scheduling

7   issue that they really couldn't accommodate her because of

8   their scheduling issue.

9       So the parents rejected that IEP for the reasons I

11:28AM 10   mentioned, and I believe that was November.  The parents had

11   asked -- actually, I should mention, the parents asked if they

12   could, after the November meeting, which ended very abruptly,

13   there was a lot going on at the meeting, and the parents just

14   didn't get to ask all the questions, and they had a lot of

15   questions, so they asked Natick if they could have another

16   meeting to answer their questions.

17       That was not acceptable to Natick, so the parents

18   ended up requesting a meeting through the BSEA, and a meeting

19   was held in January, at which point no changes were made, even

11:28AM 20   though the parents reiterated their concern about MCAS, their

21   concern about the intellectual disability category change and

22   various other concerns, nothing was changed, and that was at

23   that point.

24       Also, to go back, slightly every time -- they had a

25   lot of questions that never got answered in these meetings,

1    but, that's all in the record.

2         In November, I believe it was in November, the parents

3    asked to do observations of C.D.'s proposed program at Natick,

4    so that was eventually worked out, and the parents and their

5    experts saw the program in November.  I should mention that in

6    June, they actually had an observation where Dr. Imber, who's

7    the educational evaluator and consultant to the parents, who

8    has known her, again, since she was in fifth grade and tested

9    her several times, he's also a professor at Rhode Island

11:29AM 10   College.  He's got over 40 years of experience in the field.

11        He observed with Ms. Flax, speech language

12   pathologist, in June, they observed the ACCESS program, they

13   thought everything was fine as far as the observation goes,

14   everybody was pleasant.  They got a lot of information, but it

15   was very clear to them based on their observations that this

16   was a life skills program, which was not appropriate for C.D.

17   There were children with autism and other issues that were

18   stimming, and it just was not --

19        THE COURT:  What is stimming?

11:30AM 20   MS. MARTUCCI:  It's when autistic children rock and

21   make sounds.  It's disruptive.  Also, there was only one or two

22   other girls in the program out of nine.  That's the whole thing

23   that she would get, and they all had fairly significant

24   disabilities, and several of the students in the class actually

25   were nonverbal.

1          One student I think he didn't even speak English.  He

2     came from China.  There was someone else there who was

3     nonverbal.  This child with communications disorders

4     specifically needed to have peer modeling of children that had

5     good communication skills, so the peer situation there was

6     completely inappropriate for her.

7          Anyway, that was in June before they proposed the new

8     IEP anyway, so then in November, the parents had their

9     scheduled observations ready to go, and the last minute before

11:31AM 10     the observations, the parents were informed by Natick through

11     me that they would not be permitted to ask questions at the

12     observations, they could just observe, and that's it.

13          They were, Dr. Imber, Ms. Flax -- oh, and they had

14     hired Dr. Arlyn Roffman at that point, who was a well -- like

15     renowned transition specialist in this state, and she --

16     actually, maybe nationally even, to review the transition

17     program at Natick, so they set up the observations for

18     themselves and Dr. Imber, Dr. Roffman, Ms. Flax and

19     Ms. Coellner to observe the proposed program.

11:31AM 20          Natick was not happy about all these people, and they

21     were trying very hard to limit everything.  We worked together.

22     I believe we were all being reasonable about limiting the

23     number of people and working with the schedule and everything

24     else, but at the last minute, they were told they couldn't even

25     ask basic questions what was going on in the classroom.  They

1       made it very clear, the evaluators with years and years of

2       experience, it's their practice to ask questions so they could

3       understand how the program would be modified for the student

4       that they're looking at it for, and it was very -- it was

5       impossible basically for them to do appropriate evaluations,

6       not to mention they would have no credibility at the hearing.

7       That was already in process of being scheduled, not no

8       credibility but potentially diminished credibility because they

9       were not able to get the questions answered and provide a

11:32AM 10    comprehensive report for the school to review.

11              So, I'm sorry, it's a long story.  So they, oh, I

12      remember now.  I went back and forth with the attorney for

13      Natick to figure out what we can do to have them be able to get

14      the information they need from these observations to see if

15      this was appropriate or not.

16              The parents in good faith were really trying to see

17      what's there, see if they could work with them, whatever, but

18      they were told that -- at that point I was told from the

19      attorney for the school that the reason, and this was the first

11:33AM 20    time we heard of this was in November, the reason the parents

21      were not allowed to ask any questions was because Dr. Imber and

22      Ms. Flax, according to the Natick Public Schools, in quotes

23      interrogated the staff at the previous observation in June and

24      had made everybody feel uncomfortable and all sorts of

25      allegations.

1        In response to that, Ms. Flax and Dr. Imber

2  emphatically deny this, and we ended up filing a motion to

3  compel Natick to permit them to go and ask questions in their

4  observations so that they could get the information they needed

5  in order to be participants in the process as intended by

6  Congress and to determine what's the best program for the child

7  in concert with Natick, so we filed the motion to compel.

8        There were affidavits filed by Dr. Imber and Ms. Flax

9  indicating why they needed the information, indicating that --

10  this is their practice, indicating the questions they did not

11  get answered, they need to get answered.  They were all pretty

12  reasonable questions.  They didn't even get syllabuses.  It was

13  extremely confusing, so they explained that in their

14  affidavits.  They also said under oath that they did not do

15  anything inappropriate in June.

16        The Natick Public Schools responded to the motion

17  opposing it basically.  There were no counteraffidavits filed

18  by anybody from Natick saying that they actually did

19  interrogate or in any way make them feel uncomfortable.  That

20  was in November.

21        Then December came, January came.  The hearing officer

22  that was assigned to the matter at that point did nothing about

23  it, about the motion, the motion was just sitting there, and

24  both Natick and I were asking on every few weeks, you know, how

25  is the motion coming, but it just never happened, and the

1   hearing was actually scheduled for January.  We still hadn't

2   gotten our response to our motion, which we filed in November,

3   so at that point the hearing officer was changed to a different

4   hearing officer, the one that actually heard the decision, and

5   the hearing was rescheduled I believe to May at that point, and

6   then that was January.

7          So January went by, then February went by, and

8   March went by, and in April, they finally ruled on the parents'

9   motion to compel the observations.  At this point, the

11:35AM 10  parents -- it was five months since they even had the

11  questions, so it seriously prejudiced them in terms of them

12  even remembering what they wanted to know at that point, but,

13  regardless, the hearing officer denied the motion and said that

14  the parents could submit brief written questions that will be

15  answered in writing by Natick.

16         The parents really were not happy about this because

17  they, first of all, couldn't even totally remember what the

18  issues were because it was five and a half months ago, but,

19  beside that, they couldn't really get information by just

11:36AM 20  submitting written questions and receiving written answers.

21  They just wanted to have a normal conversation like they do all

22  the time.  These people have major years of experience and they

23  do all this.  They do this in other districts.  It was not

24  unusual.

25         Anyway, they did the written questions because we

1    needed to move it along at this point.  The hearing was

2    scheduled to occur like in two weeks or something like that, so

3    they submitted the questions, then Natick objected to the

4    questions because they thought they were too complex or

5    something, I don't know, but whatever the objection was, the

6    hearing officer held a conference call and decided that

7    actually she was going to change the questions to whatever she

8    thought was appropriate, and Natick could answer yes or no to

9    the questions, which most of the questions were yes or no

11:37AM 10    questions, at least some of them were, so that was kind of a

11    problem, obviously.

12         Anyway, the parents once again went along with it

13    because we wanted to get to the hearing and continue this

14    process, so they submitted the questions, and they got the

15    answers to the questions, which weren't particularly helpful

16    because it was just yes or no questions, new questions that the

17    hearing officer said were okay to ask, and at that point it was

18    like a week before the hearing was scheduled anyway, so the

19    parents and also I should mention had done discovery as part of

11:37AM 20    the process, which also was delayed until April, even though it

21    was submitted in November asking for various documents, but

22    also they asked for redacted IEPs of the children that would

23    have been in the class with C.D. in all these years that the

24    parents had been told that that was their proposal.

25         And upon seeing these IEPs, it was very clear, first

1    of all, that they were not told the correct information because

2    there were kids with very significant disabilities, not just

3    intellectual disabilities, not that they had to have them, but

4    there were kids with behavioral problems, minor behavioral

5    problems but still behavioral problems.

6        By the way, C.D. has never had a behavioral problem in

7    her entire life.  They had kids that said they were nonverbal.

8    None of this was told to the parents ever.  They were told

9    that, you know, it's appropriate basically, that's all they

10   were told.  They were never really given any significant

11   information about the profiles of the students there until they

12   saw the IEPs, which were clearly now it was more inappropriate

13   than it was before.

14       So the hearing was scheduled for May of that year.

15   The parents actually subpoenaed Mr. Francoise, who was the

16   teacher for the ACCESS program when they observed because they

17   wanted to get it on the record they didn't do anything wrong

18   because they didn't do anything wrong, so they subpoenaed

19   Mr. Francoise.  Natick did not have him at the hearing

20   apparently because he wasn't on the witness list.

21       So, anyway, they did that, and the hearing was held.

22   The parents presented evidence from, I'm sorry, the parents

23   presented I believe like five or six witnesses.  It was

24   Dr. Imber, Dr. Roffman, Nan Coellner, Ms. Flax, Erin,

25   Dr. Gibbons, who's a neuropsychologist who had done testing of

C.D.  All of these people were highly, highly, highly, not only highly qualified, exceptionally qualified, experts in their fields, but they knew C.D. for years.  They had worked with her daily some of them for years.  They had read all of her evaluations, they had read all of her IEPs, they were totally knowledgeable as far as they could be about this child.

So they all testified, and Natick had brought up as far as their witnesses go, they had Ms. Liptak, that was her name.  She was the teacher at the summer program who did not attend the meeting, but she testified at the hearing.  They also had Donna Cymrot testify, who was the school psychologist that did the psychological evaluation and determined that C.D. she changed her disability category, however, on cross-examination, Ms. Cymrot admitted not only that she hadn't read the IEPs, that she didn't have access to the IEPs, that she didn't read most of the evaluations, and that, most importantly, she did not test an area of C.D.'s skills, her daily living skills to determine whether or not an intellectual disability is an appropriate category.

It's a requirement to do that in order to make the appropriate determination, and she admitted that she didn't do it because she knew -- I don't know what the reason was, but she admitted that she didn't do it and that she barely knew anything about C.D., and most of the Natick witnesses barely knew anything about C.D.  They had tested her once, some of

1    them, others had not done anything.

2         Mr. Francoise, interestingly, had been replaced, had

3    been the teacher of the ACCESS program for years, like 13

4    years, a new teacher who just graduated from her program,

5    whatever, Ms. Michelson had now become the head teacher of the

6    ACCESS program, and she testified for Natick about the ACCESS

7    program.

8         However, we did have Mr. Francoise there because we

9    subpoenaed him, so he testified, and he testified about the

11:41AM 10   people in the class, the profiles of the students.

11        THE COURT:  He's the lead of the ACCESS program; is

12   that right?

13        MS. MARTUCCI:  He was the head teacher for the ACCESS

14   program for 13 years, and he was replaced by Ms. Michelson a

15   couple months before the hearing, I believe.  So he testified

16   not only that there were children in the ACCESS program that

17   had issues that we were not told about, but also he made it

18   very clear that nothing inappropriate happened at the

19   June observation.  It was very clear, and then so that was his

11:41AM 20   testimony.

21        Natick testified that everybody thought ACCESS was

22   appropriate.  Not only that, they thought that the new program

23   was appropriate.  They were a totally different programs, so

24   it's not clear how they could both be appropriate since nothing

25   had really changed.  They also basically, they just said it was

1   fine, everybody just thought it was fine, but there was no real

2   discussion about why it was fine.  They just said we think it's

3   appropriate then, we think this is appropriate now, that's it.

4        So that was the hearing.  It seemed that it was pretty

5   clear after the hearing that we believe we had met our burden

6   of proof and beyond based on all the facts, evidence I just

7   mentioned and that you have on the record, which is eight

8   volumes, over 4,000 pages.

9        In July of that year, then we received the hearing

11:42AM 10   decision from the hearing officer denying everything.  She

11   basically said that all the IEPs, 2012-2013, 2013-2014,

12   2014-2015 all provided C.D. with a free, appropriate public

13   education in the least restrictive environment.

14        Her reasoning doesn't make a whole lot of sense

15   because if you read the decision, she did not apply the

16   appropriate standard under the *Rowley* decision to look at

17   whether or not the district complied with the procedures under

18   the Act in determining the placement, and it was clear that the

19   district did not.

11:43AM 20        The district never discussed the supplemental supports

21   and services that could be done, they could never looked at a

22   variety of sources, they didn't do a transition assessment,

23   they didn't have knowledgeable staff.  It was everything that

24   they were supposed to do that they didn't do.

25        So the hearing officer didn't mention any of that, she

1    just somehow came up with a whole new theory of how to

2    determine whether or not an IEP is appropriate on her own.  She

3    decided that the reason it's not appropriate is because, in

4    terms of her decision anyway, is because, according to her, and

5    this is sua sponte, nobody brought this up at the hearing, she

6    said that the program at McAuliffe was actually more

7    restrictive than the program that was being proposed by Natick.

8    First of all, that's not the standard.  The standard is clear.

9         Also, it's not even true because she had said that the

11:43AM 10    reason why it was more restrictive is because at the McAuliffe

11    program, C.D. had a one-to-one help constantly throughout the

12    day, and in the ACCESS program, she would be able to

13    independently access whatever they were teaching in that class,

14    so according to her, that's why it was less restrictive.

15         Not only is it the wrong way to determine whether or

16    not an IEP is appropriate at this point, as is found in the

17    *D.B. vs. Esposito* case, the inquiry is not comparing two

18    different programs anyway, it's following the standards of the

19    law in looking at the particular IEP in that point in time it

11:44AM 20    was developed and in deciding whether or not that was

21    appropriate, so that was wrong anyway, but, beside that, she

22    also said Ms. Coellner and Ms. Soden provided constant support.

23    It's totally not in the record.

24         There was no evidence that she received constant

25    support anyway, but in addition to that, suggesting that she

1    could independently access the curriculum, that made it better

2    flies right in the face of the whole purpose of having

3    supplemental support and services in general ed. so that you

4    can access more enriched curriculum.

5         The point is not to put a kid in a more restrictive

6    environment when they can do it themselves, as opposed to

7    putting them in a general ed. where they can do it with a

8    little support, which is what the parents wanted, which is what

9    Congress wanted, but the hearing officer decided that it was

11:45AM 10   actually better for her to access it herself, access the

11   curriculum herself in ACCESS.

12        So that was her rationale for deciding that the IEP

13   for 2012 was appropriate.  Then the hearing officer also

14   decided that the IEP that was proposed next even though there

15   were no changes made was also appropriate.

16        And there was no mention of the fact that there was

17   still no discussion of supplemental supports and services

18   before removing from general ed., there was still no transition

19   assessment, but none of this was mentioned, and the interesting

11:45AM 20   thing is that if you read the decision without having the

21   record, it's like a whole different case because what the

22   hearing officer did is she omitted all the evidence that the

23   parents provided that could prove their case, so it looks like

24   the parents did nothing if you look at the decision on its own.

25        That's not clearly what happened when you look at the

1    record, so she decided that it was fine even though they didn't

2    update the annual, they didn't update the goals, they didn't

3    look at her progress as required under the law annually by the

4    Act.  They didn't do that, and they proposed the same exact

5    thing, and the reason for denying it was because the same

6    reason she denied it before, the 2012 one, which is weird

7    reasoning because IEPs should be looked at on their own for one

8    thing, but if it was in inappropriate in 2012, it was still

9    inappropriate, so that was an odd rationale.  So that was the

11:46AM 10   2013-2014.

11         The hearing officer indicated -- I'll stick with the

12   IEPs first quickly.  For 2014-2015, the hearing officer decided

13   that also provided C.D. with a free, appropriate public

14   education in the least restrictive environment, even though now

15   it was different, but it still worked basically is what she

16   said.

17         She didn't mention again -- actually she did mention

18   there was no transition assessment done, but she said, which is

19   very perplexing, this is not in accordance with the law, she

11:47AM 20   said that although a transition assessment had not been done

21   and the goals and objectives might change once it's done, it

22   had no effect on the validity of the IEP, which contradicts all

23   the case law and everything else that is regarding transition

24   assessments and the importance of having them in order to have

25   an adequate transition plan, as offered for support as heard in

1    the *Dracut* case.

2         So she said all the IEPs were great, then she went on

3    to say that the parents' witnesses were being discounted by

4    her.  She discounted the father's testimony entirely because

5    she said that he did not have credentials in education, and so

6    for that reason she found everything he said was invalid.

7         That is obviously a fallacy because what he said has

8    nothing to do with who he is.  If it's true, it's true, and it

9    was true, everything he said was verifiable on the record,

11:48AM 10   including that she could not take the MCAS, that her services

11   would be messed up by the proposal, et cetera, it was all

12   verified on the record, but, she said, of course, he didn't

13   have educational credentials, she was not going to consider his

14   statements to be valid, which is interesting.

15        And, of course, parents are so important to the

16   process, plus they know the children better than anyone else,

17   so to throw out the testimony and to say that what he said

18   doesn't make any sense and doesn't have any validity because

19   he's not an educator would throw out every parent.  Most

11:48AM 20   parents are not educators.

21        She also said, well, she issued the decision, then two

22   days after issuing the decision, she issued, reissued a

23   decision, which she said was because she had inadvertently left

24   out two paragraphs at the end of the thing that said when you

25   read the issued decision that she decided not to rely at all on

1    Dr. Imber's testimony or Ms. Flax's testimony, and her

2    reasoning was because with Dr. Imber -- well, first with

3    Ms. Flax, she threw out her testimony because she said that

4    Ms. Flax had said that C.D. would not have any peers,

5    appropriate peers, and she did not think that inclusion was

6    appropriate, but she twisted the testimony because the

7    testimony of Ms. Flax was that she should not be learning prep.

8    at this point because she's been there for four years and she's

9    doing well, and they still wanted to put her back in the ACCESS

11:49AM 10    program, so as far as peers go, she's known the child since

11    fifth grade.  It's reasonable for somebody to say, especially

12    when you see who her peers were in ACCESS that she didn't

13    believe it was appropriate.

14         So, regardless, even if it was true, it's not a valid

15    reason in my opinion to throw out the entire testimony of the

16    speech language pathologist who had worked with the child since

17    fifth grade.  Then she also said I'm not going to rely on

18    anything Dr. Imber said, with over 40 years as an

19    educator/professor, et cetera, and knowing C.D. since fifth

11:50AM 20    grade, she was throwing out his testimony because according to

21    her, he changed his testimony based on what the parents wanted.

22         Now, first of all, he didn't do that.  There's no

23    evidence he did that.  The only evidence allegedly that he did

24    that was in Natick's opening statement where they said that

25    they allege that he did that, she never did, and it was never

1    proven at the hearing, but she grabbed onto that and cited for

2    that reason, she was not going to consider him to be a valid,

3    credible witness, so she threw out his testimony.

4          She also said she did not rely on the reports that

5    were submitted by Dr. Imber or Ms. Flax or by Dr. Roffman

6    because they were submitted to the hearing five days before the

7    hearing, which because they could not complete their reports,

8    as I said, because of the whole issue of the observations and

9    the questions being unanswered, but, regardless, they submitted

11:50AM 10    their exhibits, sorry, their reports five days before the

11    hearing, so at least they could be considered for the hearing.

12          The hearing officer said she wasn't going to deal with

13    them at all, count them at all because of that, and she's

14    actually correct.  I agree with that decision in terms of the

15    fact that she couldn't -- they couldn't -- Natick did not have

16    time to redo anything, to look at the reports and adjust the

17    IEP for 2014, the last IEP, but all the other IEPs were in

18    those reports, the expert's opinions about those IEPs, their

19    observation, their test results, everything, so there was

11:51AM 20    plenty of probative evidence in those reports that she decided

21    not to even look at, I guess, so they were thrown out.

22          Based on all that, she came to the conclusion that all

23    of this -- oh, and I should mention also that we had several

24    teachers testify from Learning Prep., including the principal

25    of Learning Prep. explaining their knowledge that they had

1   daily of C.D.'s needs, et cetera, and she didn't even mention

2   that they even testified, I believe.

3          It's appropriate, I understand why under the law, the

4   Burlington test, you would need to prove that the public school

5   failed to provide an appropriate placement before they

6   determined whether or not the private placement, the unilateral

7   placement provides the same, so she didn't have to reach the

8   second part because she had decided the first part was not in

9   the parents' favor, however, they provided valid evidence, they

11:52AM 10   provided good evidence about C.D.'s current needs and how she's

11   doing and what kind of program she needs, everything.  She

12   didn't mention any of that.  That was all out of the decision,

13   and so it was kind of shocking actually to be honest that this

14   was the decision.

15          I'm probably forgetting some things that were in it,

16   but at that point we filed for an appeal because we really

17   don't believe that this is just at all or in accordance with

18   the law or anything else, and I could answer questions because

19   I probably left stuff out.

11:52AM 20          THE COURT:  All right.  Why don't we hear from counsel

21   for Natick, I'm sorry, your name again is?

22          MS. VASUDEVAN:  Sure, it's Felicia Vasudevan.

23          THE COURT:  Vasudevan, okay, go ahead.

24          MS. VASUDEVAN:  Good morning.  So I want to start by

25   saying we disagree with a lot of the factual recounts that

1    Attorney Martucci gave, and so I'll try to go through them.  I

2    was trying to take notes, but as an overview, I think the

3    record is clear that Natick has at all times proposed a free

4    and appropriate public education for the student.  It may not

5    be what the parents' idea of a free and public education is or

6    the parents' expert's ever-changing moving target about what

7    the student's needs are, despite her profile remaining the same

8    throughout this time period, but Natick has proposed a free,

9    appropriate public education in the least restrictive

11:53AM 10    environment.

11        In contrast, the student does not receive an

12    appropriate education in Learning Prep., a private special

13    education school where all of the students have disabilities,

14    and she has no access to no typical peers, which is something

15    that the parents' experts and the parents are saying today is

16    so important.  Parents' argument seemed to be nothing more than

17    I want what I want, and the opinions of the Natick's educators

18    mean nothing.

19        First I want to start with as a student was going

11:54AM 20    through the history when the student was transitioning from

21    McAuliffe to potentially Natick.  As Attorney Martucci said,

22    the standard is that Natick has an obligation because she had

23    an IEP coming in from McAuliffe to provide a comparable

24    placement, and in contrast to what Attorney Martucci said, what

25    Natick offered as a comparable placement at the time was not

1   ACCESS classes but replacement classes, and you can see that on

2   page 380 of the record and 2349 of the record.

3        Ms. Dalan sent a letter to the parents saying that she

4   thought the comparable placement was replacement classes, but

5   from what she saw, she thought that potentially the appropriate

6   program was the ACCESS program.  The parents then sent a letter

7   through Attorney Martucci rejecting the comparable and telling

8   Natick that they should hold a meeting to propose what they

9   think is appropriate.

11:55AM 10        When all this was happening, it was the end of the

11  school year.  Natick had no obligation to convene a team

12  meeting because it was the summer, but in a process of trying

13  to work with the family, they convened a meeting in July, 2012

14  to discuss what they thought was appropriate for the student.

15        And at this meeting, everyone was statutorily required

16  to be at the team meeting.  The IDEA requires a special ed.

17  teacher, a regular ed. teacher, parents and a representative of

18  the LEA.  All of those individuals were present at the meeting.

19        There was a special education teacher from Natick, who

11:55AM 20  could explain the special education programs, including

21  replacement classes and the ACCESS program.  There was a

22  general ed. teacher, and there were many representatives from

23  the Natick Public Schools as well as the parents, so the team

24  was properly composed, and the whole transcript of the July,

25  2012 team meeting is in the record, and in contrast to what

1    Attorney Martucci said, there's a very definite process that's

2    outlined in the Massachusetts regulations about how team

3    meetings have to occur.

4         You don't consider the placement before you consider

5    the appropriate services, the appropriate services, types of

6    curriculum that the student requires, so the first part of the

7    IEP team meeting is about the student's performance levels,

8    what services they require, small group instruction, what type

9    of things that they require, and that's what happened at this

11:56AM 10    July, 2012 team meeting.

11         On page 395 and 396 of the record, testing was

12    discussed, then there were discussions about how she was

13    accessing the instruction in McAuliffe, and then the team

14    thereafter moved on to discussions about placement, and so we

15    were thinking about the first part of the inquiry about what

16    services the student required.  I disagree with the

17    characterization that the student had a mild disability.

18         If you look at the testing results that Natick had at

19    the time and that are still in effect today, no one disagrees

11:57AM 20    that the student's profile has remained constant throughout the

21    time period.  She is borderline cognitively, then if you look

22    at her academic testing, she is anywhere between seven at the

23    time in July, 2012, she's between seven and four years below

24    grade level, and then when the parents say that, you know,

25    there wasn't significant support with this one-to-one aide, but

1    that's their characterization of it.

2           When you look at what the one-to-one aides actually

3    did, it was much more significant than how they're

4    characterizing it.  You know, the one-to-one aides that were

5    there were cueing her as necessary, modifying all the

6    curriculum, you know, creating special work for her, so it was

7    very significant support that she was receiving, and she wasn't

8    receiving the same curriculum as all the other students in

9    McAuliffe, and you can also see that in the IEP and in the

11:58AM 10    current performance levels from McAuliffe.

11           Everything that she was doing was with significant

12    support, so when you look at all of this information, you see

13    that what she really requires is small group instruction based

14    on her disability, her profile, how she accesses curriculum.

15    She requires small group instruction.  She requires significant

16    modification of the curriculum, and, in fact, the parents'

17    experts, Dr. Gibbons, has argued that that's exactly what she

18    requires, and you can see that in her testimony at the hearing

19    and in her reports.

11:58AM 20           So once there's a discussion of the appropriate

21    services she requires, then the next inquiry is what is the

22    appropriate placement in the least restrictive environment, and

23    you can see that in the case law in *Alloway*, the least

24    restrictive placement is only appropriate to the extent the

25    educational environment is appropriate.

1    If the educational environment is not appropriate,

2  then there's no need to consider what the least restrictive

3  environment is, and, similarly, in *Daniel R.R.*, they say that

4  mainstreaming can only be considered in conjunction with what

5  is appropriate for the student, and sometimes students' needs

6  are so severe that they require a separate environment, and

7  based on all of the facts I just told you about the student,

8  that was the case.

9    ACCESS was the least restrictive environment to give

11:59AM  10  her that specialized instruction that she required, while also

11  giving her access to typical peers, so she would be able to

12  have electives with typical peers but have the small group

13  instruction that she required.

14    There's a lot mentioned of the 2011 BSEA decision.

15  The 2011 BSEA decision was not brought up at all in the July,

16  2012 meeting, but I do think it's important that everyone, even

17  the parents' expert acknowledges that her profile has not

18  changed at all.  The 2011 BSEA decision, which the parents

19  never challenged, found that the ACCESS program was appropriate

12:00PM  20  for the student for all of the reasons that I just outlined.

21    And it's also interesting I think when you think about

22  the parents' argument, on the one hand, they're arguing that

23  the student should be in a general ed. class, on the other

24  hand, they're arguing that Learning Prep. is the appropriate

25  program where she has access to no typical peers, and the

1    parents haven't really reconciled that argument.  It doesn't

2    make any sense.

3          So then moving onto the 2013-2014 IEP, I agree that it

4    was largely similar, but if you look, the Natick Public Schools

5    had requested information.  There's evidence on that in the

6    record, had requested information from Learning Prep., but

7    Learning Prep. had not provided any information, and there is

8    case law that says when a parent unilaterally places, for

9    example, in *Roland*, the parent unilaterally placed at Landmark,

12:01PM 10    then Landmark didn't show up for the team meetings, and the

11    Court held that there was no procedural error.

12          Similarly here, Natick can only propose an IEP that's

13    appropriate based on the information that it had, and Learning

14    Prep. hadn't provided it, it had provided some information but

15    not enough information to completely revise the IEP, so the IEP

16    that they proposed was appropriate based on the information

17    that it had, which was similar to the information from

18    2012-2013.

19          Then we move to the 2014-2015 IEPs, and the first IEP

12:01PM 20    was largely similar because the idea was that they were going

21    to be doing the three-year re-evaluations of the student, and

22    the three-year re-evaluation of the student was delayed.  The

23    consent form was sent to the parents, but the parents refused

24    to sign it, so that was the reason for the delay.  They didn't

25    agree to sign it until there was a team meeting held.

1         After the three-year re-evaluation, then seeing the

2    new information that Natick had, they proposed a different

3    program, as Attorney Martucci had said.  It was a blended

4    program with some replacement, some general ed. and some ACCESS

5    classes, and the idea was to keep the student in ACCESS for

6    math because math was a significant need for her and also to

7    keep her in ACCESS for reading comprehension because that was a

8    significant need, but writing was a strength, so she would go

9    into the replacement classes for writing, and so this program

12:02PM 10    would allow her to have English, language, arts in some form

11    every day and address both her strengths and her weaknesses.

12         And so another point that I want to address is that

13    students in the ACCESS program do not take MCAS, but it's

14    throughout the record, and even the July, 2012 meeting and

15    through all the Natick staff who testified that students are

16    commonly moved to replacement classes where they do take MCAS,

17    and that was always the goal, that the team was going to

18    reconvene in October, 2012 and throughout the time the student

19    was there to see if they could always push her to replacement

12:03PM 20    classes, and that was the ultimate goal.

21         And so Attorney Martucci said that it's weird that the

22    2014-2015 IEPs were different, but the reason they were

23    different is because Natick had more data to change the IEPs,

24    and that's exactly what you would expect from the team process.

25    The IEPs changed as more information becomes available to

1     Natick.

2           So moving onto the transition planning, assessments,

3     so there is this requirement under federal law from age 16

4     onward and from state law 14 onward to do transition planning

5     and to do a transition assessment, but I think it's clear from

6     Massachusetts guidance, there's a technical advisory that's

7     cited in our opposition that a transition assessment doesn't

8     have to be a formal stand-alone transition assessment, that any

9     assessment that's conducted when the students are between the

12:04PM 10   age of 14 and 22 that gives information that could influence

11    transition planning is a transition assessment, so to say that

12    there is a procedural error because Natick didn't do a

13    transition assessment is not accurate, but Natick eventually

14    did a transition assessment.

15          Before that it had enough information to do transition

16    planning, so in the July, 2012 IEP that was proposed, there is

17    vocational services that would be provided that are transition

18    services.  The team also said that they would meet in October

19    to do a more in-depth transition planning, and then subsequent

12:04PM 20   IEPs have transition plannings.

21          I do note that it's not required according to the

22    *Sebastian M.* case, it's not even required that there be a

23    standalone transition plan, the question is whether there is

24    transition planning in IEP, and if you look at the record,

25    there are significant -- there's transition planning in all the

1    IEPs that were proposed, and, for the record, Learning Prep.

2    it's in the record, doesn't even start transition planning

3    until the eleventh grade.

4            So the next parents' criticism is that the transition

5    planning was inappropriate for the student because it was in

6    the after school setting, but at the team meeting where they

7    were discussing the provision of services, Natick offered

8    several schedules and discussed several potential options for

9    how to provide the transition services, and it was decided that

10   the after school plan would be the best because it would allow

11   to student to engage in electives during the day and also get

12   the transition planning.

13           And the parents' expert, Dr. Roffman, her biggest

14   critique of Natick's transition planning was that it was

15   inappropriate because it wasn't tied to the student's interest,

16   but Natick described through Ms. Brown, who is the Natick

17   transition person, how would they align the transition planning

18   to the student's interest, so, for example, if the student was

19   interested in fashion and cooking, they would create job

20   shadowing and internships and work with her to create a plan to

21   be able to start careers in either industry.

22           The parents also allege, and Attorney Martucci said

23   here today that the change in disability category was made

24   outside of the team process, and I think that's just completely

25   factually inaccurate if you look at the record.

1        So Ms. Cymrot did an evaluation in May, 2014, and

2   subsequently the discussion of potentially changing the

3   disability category was discussed at two team meetings, May,

4   2014 and November, sorry, June, 2014 and November, 2014, and if

5   you look at the transcripts from those meetings, you can see

6   that Ms. Cymrot discussed in detail her evaluations and how the

7   student had longstanding deficits in language understanding,

8   reading comprehension, written language, and why she was

9   recommending changing the disability category.

12:07PM 10        So it was discussed at a team meeting.  The parents

11   commented on the change in disability category, and then the

12   parents received notice of the change in disability category

13   through the N1 and the proposed IEP.  The parents stated in

14   their opposition that N1 is evidence of the determination being

15   made outside of the team meeting, but that doesn't make any

16   sense.  The N1 is a summary of what happens at the team

17   meeting.

18        Additionally, not only was this determination made

19   through the team meeting, but the parents can't point to any

12:07PM 20   impact of the change in disability category on the service

21   delivery.  As you can see from all the transcripts in the

22   record, the question is what the student needs, not the

23   specific label given to the disability, and all the service

24   providers for Natick at the hearing testified that they

25   wouldn't have changed the services just based on the disability

1    category, the question was what the student needed.

2         So now just moving onto the general procedural

3    violations, the parents argued, Attorney Martucci argues that

4    one of the procedural violations is that the parents didn't get

5    to observe or ask questions, but here today, Attorney Martucci

6    admitted that they got to observe in June, 2014 and November,

7    2014, and not only that, if you look at the record, some of the

8    observations were hours long.

9         The parents were able to ask basic questions.  I think

12:09PM 10   one of the things she said is that they weren't allowed to ask

11   basic questions, but they were allowed to ask basic questions,

12   not detailed questions, and that's because school is going on,

13   the staff have to be working with the students, they can't be

14   available to the experts just at their whim.

15        So if you look at the case law, there's *L.M. vs.*

16   *Capistrano*.  California has a similar law to Massachusetts

17   about allowing parents the chance to observe, and in that case,

18   similar to this case, the school district restricted the

19   parents' experts to 20 minute observations.  Here, we actually

12:09PM 20   gave them more time than 20 minute observations, and the

21   parents allege that this was a procedural violation.

22        The District Court -- sorry, the Ninth Circuit

23   rejected that argument and said that the parents couldn't

24   present any evidence that undermines the credibility findings

25   or any evidence that they would have received through more

1   classroom observation time.

2          Here, the parents had a significant amount of evidence

3   provided to them.  They were able to ask whatever questions

4   they wanted during team meetings.  In fact, in the May, 2013

5   team meeting to develop the 2013-2014 IEP, the Natick staff

6   asked the father if he had any questions, and he said no.  The

7   staff were always available to answer questions.  The parents

8   were able to do observations, so they received enough

9   information to meaningfully participate in the decision-making

12:10PM 10   process.

11          The next sort of procedural error that the parents

12   allege is predetermination of the July, 2012 meeting, and I

13   think if you look at the case law, school districts don't have

14   to come to meetings with a blank mind, all they have to do is

15   come to the meeting with an open mind, they don't have to come

16   to a meeting pretending not to have any idea about what an

17   appropriate placement would be, they have to review the record,

18   they're going to come up with an idea about what they think is

19   going to be appropriate.

12:11PM 20          And along those lines, and the First Circuit case,

21   *G.D. vs. Westmoreland*, the Court concluded that there was no

22   predetermination, even though the school district came to the

23   meeting with a draft IEP, and if you look at the July, 2012

24   meeting, you can see that Natick spent a significant amount of

25   time listening to the parents asking questions.

The fact that they ultimately disagreed based on all the information that they had in front of them doesn't mean that they predetermined the outcome of the meeting.

So then another thing that has been thrown out by the parents was that there was an error in the hearing officer's determination in making the credibility determination, but I think if you look at the case law, credibility determinations are precisely the first instance administrative determination that's given judicial deference, and in this case, the hearing officer had significant reasons for discrediting the testimony of the parents' experts.

So, first, Ms. Flax steadfastly maintained at the hearing that the student would not benefit from any inclusion, a statement that wasn't supported by any other witness and contradicted her prior recommendations.

She also made sweeping generalizations, such as the students in the ACCESS program were nonverbal, which was discredited at the hearing.  She had no idea whether they were nonverbal or not.  She made another sweeping generalization that the student would have no friends in the ACCESS program. Her statement was just pure generalizations, and then with Dr. Imber, Attorney Martucci said here today that there was no evidence that he had changed his opinion over time.

I think if you look -- and the sole evidence for that came from the opening statement of the attorney for Natick.  I

1    think that's factually inaccurate.  If you look at the

2    cross-examination that the attorney for Natick did of

3    Dr. Imber, you can see that she pointed out how his

4    recommendation had changed over time and that the

5    recommendations of Dr. Imber really coincided with wherever the

6    student was placed.

7         In the prior 2011 BSEA hearing, Dr. Imber recommended

8    what the parents wanted, inclusion.  In the July, 2012,

9    Dr. Imber recommended what the parents wanted, inclusion.  As

10   soon as the parents unilaterally placed the child in Learning

11   Prep., then Dr. Imber's recommendation magically changed to

12   Learning Prep., and the father's testimony, the hearing officer

13   properly discounted his opinions about what educational

14   services the student would require.  He has no expertise in

15   education.

16        And then when you look at her crediting of Natick's

17   witnesses, there's significant evidence for why she credited

18   their witnesses.  Ms. Cymrot is a licensed school psychologist

19   who's worked for Natick for over 20 years.  She explained that

12:14PM 20  the reason she didn't test that one area that Attorney Martucci

21   represented in oral argument is that it had previously been

22   tested, so there was no need to duplicate the efforts.

23        She testified extensively about what she thought was

24   appropriate.  Similarly, Ms. Liptak had 17 years of experience

25   as a special education teacher.  She had taught students and

1    was familiar with the ACCESS program and had also worked with

2    the student over the summer and could talk about what the

3    student required.

4           So the last issue I want to talk about is the reports

5    that the hearing officer wouldn't credit, and I think there's

6    case law that's directly on point for that, so if you look at a

7    recent case, May 31st, 2016 decision out of this court,

8    *Jacob Doe vs. Richmond Consolidated*, in that case, it was the

9    same exact issue.  The hearing officer refused to admit reports

12:15PM 10   that had been submitted according to BSEA rules within five

11   days, but the Judge explained that those reports were not

12   relevant, that the school district, they weren't available or

13   considered by the team when the IEPs were created, and,

14   similarly here, the reports that Attorney Martucci is talking

15   about that the hearing officer didn't rely on weren't ever made

16   available to Natick to consider as part of the IEPs that were

17   developed and were considered by the teams at issue in this

18   case.

19          And the last factual thing I just want to say is the

12:16PM 20   characterizations of who would be in the ACCESS program and the

21   replacement classes with the student.  If you look through the

22   testimony, I think it's pretty clear that the characterizations

23   that Attorney Martucci made are not accurate and were debunked,

24   that there weren't large behavioral issues in the ACCESS

25   program.  They're like any public school.  There is occasional

1    behavioral issues, but the students in the ACCESS program were

2    generally well-behaved, and I think that's it unless you have

3    any questions.

4            THE COURT:  No, thank you.  Ms. Alvarez, do you want

5    to weigh in?

6            MS. ALVAREZ:  I don't have anything substantive to

7    what Natick has offered, and we rely on the arguments they made

8    in their brief, and we ask that you affirm the hearing

9    officer's decision.

12:16PM 10            THE COURT:  Okay.  Ms. Martucci, a quick reply.

11            MS. MARTUCCI:  Yes, sir, I'll make it as quick as I

12    can, your Honor.  Thank you.  With regard to the argument made

13    by my Sister counsel about LPS being more restrictive than the

14    ACCESS program, that is totally an inappropriate comparison.

15    As this Court has found --

16            THE COURT:  LPS is Learning Prep.?

17            MS. MARTUCCI:  Learning Prep. School, I'm sorry.  I'm

18    used to saying LPS.  The restrictiveness of Learning Prep.

19    School is not relevant to whether or not the proposed placement

12:17PM 20    at Natick was appropriate, first of all.

21            Second of all, the unilateral law regarding unilateral

22    placements is not exactly the same as far as what the

23    restrictiveness test is because when parents place a child,

24    unilaterally the test is not as strict.  It has to just be

25    appropriate for the child's needs, it does not have to meet the

strict standards that a school district has to meet, but, in

addition to that, LPS is actually not more restrictive than

Natick in many ways, which is that she's being prepared for the

MCAS, she passed the MCAS in tenth grade.  She was accessing

the Mass. Curriculum Framework.

She's with many, many children.  She goes from class

to class by herself.  The children there have much less severe

disabilities than the children in the ACCESS program, and, in

addition, the children -- oh, and the transition program at LPS

does not start in the eleventh grade.  That's very clear from

the record.  They start to transition when the child -- before

C.D. even enrolled, they always are thinking transition at

Learning Prep., but it's very clear that she had classes that

are aligned to the transition program from the time she entered

the school, it's very clear.  It's all in the record, and the

staff from Learning Prep. testified to that.

As far as the parents saying that they always just

wanted what they wanted, that's absolutely not correct, and

it's very clear from the transcripts and the testimony.  They

just wanted their child to have an appropriate education.  They

did not want her to have the Cadillac education, they did not

want her to have whatever they wanted, they just wanted her to

have a free, appropriate public education that met her needs.

They wanted -- that's all they ever asked for, and as

far as their intent to place her at LPS, they looked at many

1    things.  They looked at charter schools, they looked at other

2    schools in the area, technical schools.  At this point, they

3    had to make a decision.  That's the law in this country that

4    when a parent cannot -- when the district does not propose

5    appropriate placement, the parent has to take a chance and do

6    something.  They can't be expected to put the child in an

7    inappropriate placement just to prove that they were right

8    rather than putting the child in an appropriate placement where

9    they haven't been provided with FAPE.  That's their right.

12:20PM 10   They took a chance when they do that, and my clients have

11   definitely taken a chance, but he did what he thought was best

12   for his child in order to do that.

13            As far as the replacement classes being offered by

14   Ms. Dalan, I just want to clarify that.  Ms. Dalan did offer

15   replacement classes in a letter, first of all, not in an IEP

16   meeting, and that was fine because it was based on the

17   regulations for transfer students who get a temporary,

18   comparable IEP.  The parents asked for a new IEP so the child

19   is not moving around, they hope, not starting in a

12:20PM 20   self-contained class.

21            Then when we had the meeting, that's not what

22   happened, but the point is that once we had a meeting to do a

23   new IEP, Ms. Dalan's offer outside the IEP meeting process was

24   off the table.  That was never a real offer.  It was never a

25   real offer, it was only an offer for a culpable IEP until

1    October when based on everything we've seen, now it's likely,

2    it's definitely reasonable for the parents to be concerned that

3    in October the temporary IEP somehow would disappear and they

4    would end up back in ACCESS, so they needed to make a decision

5    for the child.  It was August.  She needed to start school,

6    high school, and they needed to make a decision, and that's why

7    they made a decision.

8         As far as the meeting, the staff at the meeting were

9    very clear that they decided on her placement, proposed

12:21PM 10   placement in ACCESS because of the discussion that happened at

11   the meeting in the past at the hearing in front of Hearing

12   Officer Crane.

13        It was not -- it was very clear why they got, they

14   were saying they know her from years ago, but under *Roland*,

15   they didn't know her.  That's the whole point.  *Roland* is very

16   clear that the information that the IEP is based on is the

17   information that is known by knowledgeable team members at the

18   time the IEP is promulgated.  It's the "known" or "should have

19   been known" standard, and there was nobody at the meeting that

12:22PM 20   knew her.

21        There are people that could know her.  In fact,

22   Ms. Liptak knew her, and as my Sister counsel said, Ms. Liptak

23   really did know her, and she gave credible testimony according

24   to her regarding the child's needs, so you can extrapolate from

25   that if she had been at the meeting, which she should have been

1    in my opinion, she would have provided that information, and

2    perhaps none of this would have happened, and she would have

3    actually recommended that the child get in a more appropriate

4    program at that time.

5         In addition, as far as the regulations for having team

6    members, I don't totally agree with that.  I believe that the

7    regulations do say that if a special education teacher of the

8    child is a requirement of the meeting, well, regardless, under

9    separate regulation, it is very clear that placement decisions

12:22PM 10   must be made by persons knowledgeable about the child.

11        There was nobody knowledgeable about the child except

12   the parents' experts and the parents themselves, and so that's

13   fine, if Natick didn't want to get knowledgeable people there,

14   that's fine, but then the placement decision needs to be made

15   by the people who are knowledgeable, who in this case happen to

16   be the parents.

17        As far as the fact that they discussed things at the

18   meetings, merely having the opportunity to ask questions at

19   meetings and sit there does not equate to have meaningful

12:23PM 20   participation under the case of *Doe vs. Hamilton*, and it's very

21   clear from the transcripts that the parents didn't get answers

22   to their questions.  Natick already made decisions.  They

23   already offered one program.  They did not come with an open

24   mind.

25        I agree with my Sister counsel that you don't have to

1   come with a blank mind, but you do have to come with an open

2   mind, and the transcript is very clear they did not come with

3   an open mind.

4          This is an important point where Natick is arguing

5   that she seemed so low functioning or whatever on paper.  Well,

6   first of all, that's the whole reason that Congress requires to

7   have multiple resources.  Plenty of people in the world do not

8   appear like they should on paper only, but in this case, for

9   this child, it's even more than the average person.  It's

12:24PM 10   really her unique profile is that she does not come across on

11   paper as to who she really is.

12          The parents and their experts implored Natick to go

13   and see her because they weren't making this stuff up.  I mean,

14   they worked with her every day.  She did what they said she

15   did.

16          As far as Natick disagreeing that she had the service,

17   that she had the support she had, first of all, there's no

18   basis for that other than the special ed. director who actually

19   agreed with the parents that she wasn't having constant

12:24PM 20   support, but, in addition to that, the fact that she would need

21   support, that's the whole point of the Act.

22          The whole point is that it's okay to need support

23   because it allows children to be integrated with other typical

24   peers.  That's the whole point, so there's nothing wrong with

25   having a different curriculum or having some modifications or

1    having some support as long as it doesn't mean that they're not

2    doing their own work and not getting any benefit.

3          That's fine, that's a valid argument, but not in this

4    case because in this case, she clearly was getting benefit, and

5    she was not having constant support, and, in addition, it's

6    very important to note that the IDEA envisions -- the placement

7    is based on a child's individual potential.  The child does not

8    have to -- I believe this Court discussed it in the *D.B.* case,

9    the child does not have to do the same things as the other

12:25PM 10   children.  They do not have to meet the same standards as the

11   other children.  That's fine.  That's the whole point, as long

12   as they are making progress in terms of their own individual

13   potential.

14          With regard to the *Daniel RR* case -- first of all, the

15   school district in that case actually did everything that

16   Natick didn't do.  They put Daniel RR, and they tried, they put

17   him in inclusion, and they tried to do everything they could

18   for him, but he had severe behavioral problems, if I'm

19   recalling, and eventually it just didn't work out, and that's

12:25PM 20   fine, that's the law, but they didn't do that in the Natick

21   case, and plus C.D. has never had any behavioral problems at

22   all.

23          The fact that the profile has not changed is

24   interesting because if the profile hasn't changed, then why did

25   they want to change her disabilities profile as a matter, but

1   also if the profile hasn't changed, it begs the question that

2   she was able to be in a better, in a more conclusive

3   environment in 2012.  They didn't need to wait until 2014 when

4   they finally got more information that they were obligated to

5   get under *Roland* all throughout the process to update their

6   knowledge and make an appropriate placement, which they did not

7   do.

8          Oh, and in the *Landmark* case, I believe what happened

9   there was that -- not the *Landmark* case, the *Roland* case, the

12:26PM 10  parents were actually -- they were at fault in some way, they

11  were acting in bad faith, and that prohibited the school from

12  getting the information that the school attempted to get, so

13  that's not relevant to this case at all.

14         The parents in this case signed releases, and they did

15  everything they could to assist.  They brought people, they

16  gave forms, they did everything that they could to get Natick

17  up to speed.  They begged Natick to get up to speed, but

18  nothing ever happened with that.

19         As far as the allegations that the father refused to

12:27PM 20  sign until a team meeting was held.  That's absolutely not true

21  at all.  What happened was he was sent an evaluation consent

22  form.  He simply asked:  When are the evaluations going to be?

23  What are they going to test?  When is she going to have it?  He

24  just had some basic questions, and Natick said that they

25  didn't -- they weren't going to answer those, so at that point

1    he said I want a meeting to answer my questions.

2         He wasn't asking for an IEP meeting, he was just

3    asking for somebody to answer his questions.  As soon as they

4    did, I believe it was April something, I think it was

5    April 15th, the day of the meeting he signed the form, and the

6    reason he didn't sign it in March was because the meeting

7    wasn't held until April.  They could have answered the

8    questions when he first asked, and he would have signed it at

9    that point, I'm sure.

12:28PM 10         As far as students being constantly moved, first of

11   all, that's not exactly accurate.  Not all students are moved

12   anyway, but it is true that students do need to be moved to

13   take the MCAS, and while it may be true that some students

14   move, the testimony didn't say that they're commonly moved,

15   but, regardless, it doesn't mean that they were going to move

16   C.D.

17        An IEP needs to be relevant at the time it's

18   promulgated, not in the future of some potential possibility of

19   being moved, plus given everything that went on in this case,

12:28PM 20   the parents really didn't have a lot of confidence that she

21   would be moved right, and I think they had a right to be

22   concerned about that.

23        With the transition issues, the technical advisory

24   does say it does not have to be a stand-alone form, that's

25   true, but it needs to be integrated without the IEP goals and

1    objectives, and it has to be measurable to lead her to

2    independent living.  That was not there.  They did have TPN

3    forms is what they were called, but they were very vague.  They

4    didn't give anything based on any kind of assessment, and they

5    were pretty useless, and that's what the testimony was at the

6    hearing.

7         It was totally mischaracterized to say that

8    Dr. Roffman said that they were not treated correctly.  That's

9    not what she said at all.  You can look at the transcript of

12:29PM 10   the hearing, obviously, but she also gave much more testimony

11   than that one little thing, but what she was saying is what I

12   just said much better, which is even if it is a stand-alone,

13   it's not clear how it's measurable or how it's integrated to

14   the goals, it's useless.  They don't need to stand alone.

15        In addition, the argument that the technical advisory

16   says that it could be any kind of assessment, it does not have

17   to be a formal assessment.  That's absolutely true, however,

18   it's very clear in this case that there was no assessment done.

19        In fact, Ms. McGovern testified on cross-examination

12:29PM 20   that there was no assessment done, it was not -- no formal, no

21   informal, and no other information available to actually make

22   an appropriate transition service plan.

23        In addition, the fact that they eventually did it is

24   very similar to the *Dracut* case in this Court where they

25   eventually did a transition assessment, but two years prior to

1   that, they didn't do anything, and that caused deprivation of

2   educational benefits, substantive harm to the child in that

3   case and in this case, we allege.

4        As far as her basic interests, first, her interests,

5   Dr. Roffman saying her interests would not be tied to -- would

6   not be available based on what they had available in Natick,

7   the program they saw in Natick was children bagging cookies and

8   children wiping down gym equipment, and basically that was

9   being offered to her, and what was testified to at the hearing

12:30PM 10   was that they would find something for her, they're sure they

11   could find something for her in the cafeteria or whatever to

12   bag cookies, but there was nothing that would be appropriate

13   for her.

14        Since she's been at LPS, she has an internship, a

15   weekly internship.  She works in a store, she takes the bus,

16   takes the T, whatever, she's totally becoming independent.  She

17   passed the driver's ed. written test.

18        Bagging cookies in the cafeteria is not aligned to her

19   interests, it's not even like somebody of her level as far as

12:31PM 20   her interest in cooking, but her career interest isn't in

21   cooking, and that's also clear from the testing.

22        With regard to the notice about the change in

23   disability category, the N1 is a notification form, but the

24   notice of change in disability category is a prior written

25   notice.  That's prior to the change, not after the change,

1    that's why it's called that, and the -- it's required of

2    schools when they unilaterally change a child's placement or

3    identification, disability category, and in this case, there

4    was nothing done prior to the change, and based upon the

5    meeting, yeah, Ms. Cymrot did talk about what her evaluations

6    were, but that's not the process to determine what the category

7    is under which the chart is eligible.

8         There's a flow chart, which Ms. Cymrot admitted she

9    didn't remember doing on her testimony, and also the testing of

12:32PM 10   the child's daily living skills is a necessary component of

11   making a determination that the child has an intellectual

12   disability, and there's no way to make that because it wasn't

13   tested.

14        As far as previous testing, there was no evidence on

15   the record of what she was referring to when she said it was

16   previously tested, so she probably didn't look at it anyway

17   because she said she didn't look at most of the prior

18   evaluations.

19        As far as there being no change in the category, the

12:32PM 20   service delivery, well, that's supposed to be true, but it

21   seems that suddenly it changed, and suddenly everything

22   changed, so that's suspect.

23        With regard to the procedural violations, oh, they're

24   asking basic questions, yes.  They were allowed to ask basic

25   questions or they were told they could ask basic questions, but

1    the affidavits of Dr. Imber and Ms. Flax and Dr. Roffman, their

2    testimony said they were not even allowed to ask questions.

3        Dr. Roffman said she clearly couldn't tell what the

4    kids were doing because she couldn't ask any questions.  The

5    fact that they could ask at team meetings is not a substitute

6    for the service provided unless they were at the team meeting,

7    which they weren't, but that was never said, and, again, asking

8    questions is not a meaningful participation, anyway, the

9    ability to ask questions.

12:33PM 10       As far as the *Westmoreland* analogy, in that case, as

11   she said, the school came in with a draft IEP.  That didn't

12   even happen in this case.  I'm not sure why that's relevant.

13       It's absolutely correct that the administrative

14   determinations of witness credibility are given specifically

15   more deference to pretty much everything in the *Bettencourt*

16   case, however, it was decided that even determinations of

17   witness credibility can be satisfied by the reviewing court if

18   it is unsupported by substantial evidence and arbitrary, and

19   based upon the credibility determinations made by this hearing

12:34PM 20   officer, she totally departed from the established law in this

21   case under *Lessard* and *Sebastian* in this state -- in this

22   country, under *Sebastian* and *Lessard* and -- well, at least

23   those two.

24       Oh, more importantly, actually, under those cases,

25   witnesses who have daily or more contact with a child, usually

1    the school witnesses in most cases, are absolutely considered

2    to have more knowledge and are more credible than somebody, an

3    outside evaluator who comes in and does a one-hour evaluation.

4        In this case, it was reversed as far as the parties'

5    position, but it's the same argument, and, in addition, this

6    hearing officer had a case against the Concord-Carlisle School

7    District a year before our case was heard by her in which she

8    specifically discredited all of the parents' witnesses based on

9    the *Sebastian* and *Lessard* because they didn't have the

12:34PM 10   credibility.

11       So she changed her mind, apparently, and while a

12   hearing officer can totally depart from established precedents,

13   they need to explain why they're doing it, otherwise, it's

14   obviously an arbitrary decision, it must be because if you

15   don't know the reason, what else could it be, how can you know?

16       As far as Ms. Flax saying that she would not benefit

17   from inclusion, that is not true.  That's in the record.  She

18   said she could not benefit at this point.  She didn't see any

19   sense at this point, that she could be returned to the Natick

12:35PM 20   Public School, that's not the law, and that's fine if she was

21   returned under an appropriate IEP, then that's what it is, but

22   she was just saying that this child has been at Learning Prep.

23   for three, four years at that point, and she is succeeding, and

24   she's doing very well, and she doesn't recommend that she go

25   into inclusion, even if it was offered at that point, which was

1    her recommendation, but she was talking about moving her from

2    the school that she was succeeding in and had friends in and

3    everything else for four years which she only went to because

4    Natick felt it was a free and appropriate public education in

5    the first place.  She was only saying it wouldn't make sense

6    for her to go back at that point in her opinion, and that's

7    really logical when you think about it.

8            She also said as far as the nonverbal students, there

9    absolutely were nonverbal students in the class.  It depends on

12:36PM 10  how you define nonverbal, I suppose, but it was definitely told

11   that there was a child in that class who communicates first via

12   an iPad, there was definitely a child in that class that was

13   non-English speaking, and the point is that this child, C.D.,

14   has specific communication deficits and had benefited so much

15   from being with typical peers who could be a good model for her

16   that they were asking to put her back in a self-contained class

17   after being three years in a regular class with regular kids,

18   typical kids.  I mean, that just treats her as a real person.

19           This is her life.  You know, how would that affect a

12:36PM 20  14-year-old child going from three years of successful

21   education in general ed. to a self-contained class with

22   children who definitely have higher disabilities than she did,

23   and as far as behavioral problems not being in the class, first

24   of all, the parents' experts witnessed the behavioral problems.

25           These are not typical behavioral problems.  There was

1    stimming, and there was an autistic boy that was sharpening his

2    pencil for 20 minutes.  Dr. Imber testified to that.  There's

3    no reason to think that he would not be telling accurate

4    testimony under oath.  It happened, and that is not typical.

5    Yeah, there are kids that call out answers or whatever, but

6    there aren't kids that do that in a typical class, and the

7    staff from Learning Prep., the principal from Learning Prep.

8    said the students in her school do not have behavioral problems

9    like that, and if they did, they would have to be transferred

10   out.

11          THE COURT:  Okay.  Let's wrap it up.

12          MS. MARTUCCI:  I'll wrap it, I'm sorry, it's a long

13   case.   Dr. Imber recommended inclusion.  His opinion didn't

14   change over time.  He recommended inclusion, not because that's

15   what the parents wanted, he recommended inclusion because

16   that's what Congress wanted.  That's what he's always

17   recommended.  He only said that at this point the same reason

18   that Ms. Flax testified, she's in the program, she's doing

19   well, it doesn't make sense to move her at this point, although

20   they would have to if an appropriate education was offered.

21          I'm going to quickly look at this.  I just want to

22   mention the hearing officer left out the entire, no mention of

23   our entire motion or anything related to the fact that the

24   parents were not able to get their answers or their questions

25   answered or to observe under the law in Massachusetts, so

1    there's no way anybody who reads the decision would even know

2    that that was even an issue.

3         In the *Jacob Doe* case, I'll quickly say what happened

4    with that.  Oh, that they had no -- that the courts said that

5    there was not a procedural violation because there was no

6    evidence and everything would have changed if they had more

7    time.

8         Well, in this case, there was a ton of evidence, but

9    the hearing officer left it out.   There were affidavits and

12:38PM 10   everything else and testimony that said what they needed to

11   know, which affected their ability to do their report, and as

12   far as the case, recent case in Mass. that said that the

13   five-day rule doesn't allow an IEP report to come in, as I

14   mentioned, earlier presentation, the parents were not asking

15   for that.

16        We agree with that wholly, but only in this case for

17   the most recent IEP, there was other information in there that

18   was totally relevant to this case, tons of it.  I think

19   Dr. Imber's report was 80 pages long, so that's not comparable

12:39PM 20   to the case in this court that was referenced.

21        THE COURT:  Okay.  Why don't we cut it off there, and

22   I'm going to take the issues under advisement.  I guess I'll

23   leave it at that.  Thank you.  Have a good holiday, all, and

24   I'll issue my opinion as soon as I can get it out.

25        THE CLERK:  All rise.

1          THE COURT:  Thank you.

2          (Whereupon, the hearing was adjourned at 12:39 p.m.)

1                    C E R T I F I C A T E

2

3     UNITED STATES DISTRICT COURT )

4     DISTRICT OF MASSACHUSETTS ) ss.

5     CITY OF BOSTON )

6

7           I do hereby certify that the foregoing transcript,

8     Pages 1 through 70 inclusive, was recorded by me

9     stenographically at the time and place aforesaid in Civil

10    Action No. 15-cv-13617-FDS, C.D., by and through her PARENTS

11    AND NEXT FRIENDS, M.D. and P.D., vs. NATICK PUBLIC SCHOOL

12    DISTRICT and BUREAU OF SPECIAL EDUCATION APPEALS,

13    and thereafter by me reduced to typewriting and is a true and

14    accurate record of the proceedings.

15          Dated October 17, 2017.

16

17                 s/s Valerie A. O'Hara

18                _____

19                 VALERIE A. O'HARA

20                 OFFICIAL COURT REPORTER

21

22

23

24

25