# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT MASSACHUSETTS

|  |  |
|---|---|
| _____ ) | Civil Action No. 15-cv-13617-FDS |
| C.D., by and through her PARENTS AND ) | |
| NEXT FRIENDS, M.D. and P.D. ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| NATICK PUBLIC SCHOOL DISTRICT ) | |
| and ) | |
| BUREAU OF SPECIAL EDUCATION ) | |
| APPEALS, ) | |
| Defendants. ) | |
| _____ ) | |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Pursuant to Fed. R. Civ. P.56 and Local Rule 56.1, the Plaintiff's, C.D., and her parents M.D. and P.D. ("Parents"), on behalf of their daughter and themselves, respectfully submit this Memorandum of Law in Support of their Supplemental Motion for Summary Judgment filed on May 25, 2018, seeking reversal of a decision on remand by the Bureau of Special Education Appeals ("BSEA") of the Division of Administrative Law Appeals.

In his July 21, 2017, Memorandum and Order on Plaintiffs' Motion for Summary Judgment, this Court denied the Plaintiff's motion, but remanded the case to the BSEA for further consideration or clarification as to whether two of the proposed IEPs provided for an education in the "least restrictive" environment possible.

The Court noted that, "While C.D. may well have benefitted academically from a placement in the ACCESS program—a conclusion well within the educational expertise of the agency—such academic benefits "cannot be invoked to release an educational agency from compliance with the [IDEA's] mainstreaming provisions" (citing *Roland M. v. Concord School Committee*, 910 F.2d 983, 993 (1st Cir. 1990)).   Rather, the benefits to be gained from mainstreaming must be weighed against the educational improvements that could be attained in a more restrictive (that is, non-mainstream) environment. *Id.*

In its Memorandum and Order, the Court found that it is unclear whether the hearing officer adhered to the requirement that the benefit of mainstreaming be weighed against the benefits of a more restrictive environment and indicated that, given those circumstances, remand on this issue is appropriate to permit the hearing officer to consider, or at a minimum clarify, whether the 2012-2013 and 2013-2014 IEPs were reasonably calculated to provide a free appropriate education (FAPE) in the "least restrictive" environment possible.[1]

## II.      LEGAL STANDARD

The First Circuit has directed district courts reviewing appeals of administrative decisions under the IDEA to:

> review[ ] the administrative record, which may be supplemented by additional evidence from the parties, and make[ ] an independent ruling based on the preponderance of the evidence. That independence is tempered by the requirement that the court give due weight to the hearing officer's findings. This intermediate level of review reflects the concern that courts not substitute their own notions of educational policy for that of the state agency, which has greater expertise in the educational arena.

---

[1] The Court noted that because the 2013-14 IEP was virtually identical to the 2012-13 IEP, it is subject to the same substantive concerns as the prior IEP regarding whether placement in the ACCESS program was the "least restrictive" environment possible, and for the same reasons, remand is appropriate to enable the hearing officer to determine whether the 2013-14 IEP provided for an appropriate education in the "least restrictive" environment possible; therefore the Parents' arguments relative to the 2012-2013 IEP apply equally to the 2013-2014 IEP.

*Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83-84 (1st Cir. 2004) (citation and internal quotation marks omitted).

On matters that implicate educational expertise, heightened deference is due to an agency's administrative findings. *Mr. I v. Maine Sch. Admin. Dist. No. 55*, 416 F. Supp. 2d 147, 156 (D. Me. 2006). However, "when the issue is more a matter of law, the educational expertise of the agency is not implicated, and less deference is required." *Id.* at 157.  Nonetheless, it is the reviewing court's role to render "an independent ruling as to the IEP's adequacy based on a preponderance of all the evidence, including the hearing officer's duly weighted findings." *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1089 (1st Cir. 1993).

Courts are particularly unlikely to defer to administrative rulings that fail to thoroughly address the IDEA's mainstreaming requirement. *See Oberti v. Board of Educ.*, 995 F.2d 1204, 1221 (3rd Cir. 1993) ("[T]he district court did not fail to give 'due weight' to the agency proceedings on this issue since the ALJ did not even consider whether the School District had made efforts to include [the disabled child] in a regular classroom with supplementary aids and services, as is required by IDEA"); *see also Jennifer D. v. N.Y. City Dep't of Educ.*, 550 F. Supp. 2d *420, 432* (S.D.N.Y. 2008) ("[T]he SRO's decision does not enumerate the relevant factors or engage in an analysis of whether the IEP provided for a placement in the least restrictive environment. Because the SRO did not make any findings on this issue, the decision of the SRO is not entitled to deference...."); *see also Warton v. New Fairfield Bd. of Educ.,* 217 F. Supp. 2d 261, 278 (D. Conn. 2002) (overturning an IHO's ruling because "the School Board failed to rebut the presumption of an appropriate mainstream placement").

## III.   LEGAL FRAMEWORK

The IDEA expresses a strong preference for the education of children with disabilities in the "least restrictive environment" (LRE). 20 U.S.C. § 1412(a)(5). It requires states to maintain

policies and procedures to ensure that "[t]o the maximum extent appropriate, children with

disabilities . . . are educated with children who are not disabled, and special classes, separate

schooling, or other removal of children with disabilities from the regular education environment

occurs only when the nature or severity of the disability of a child is such that education in regular

classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*

IEPs must, therefore, balance the often-competing interests of "mainstreaming," on the one hand,

with substantive educational improvement, on the other. *Roland M.* 910 F.2d at 992-93.

## IV.   ARGUMENT

**A.   The hearing officer's Consideration/Clarification on Partial Remand ("Order in Remand") failed to enumerate the required factors or engage in the required analysis to demonstrate that the IEP's proposed by Natick for the 2012-2013 and 2013-2014 school years were reasonably calculated to provide C.D. with a FAPE in the "least restrictive" environment possible.**

Pursuant to the IDEA's LRE mandate:

> Each public agency must ensure that … special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily…Only when the disabled child's education may not be achieved satisfactorily, even with one or more of these supplementary aids and services, may the school board consider placing the child outside of the regular classroom.

34 C.F.R. §§300.114(a)(2)(i) and (ii).

Therefore, as a preliminary matter in every case, school districts must determine whether

the child can be provided with an appropriate education in the regular education classroom with

supplementary aids and services. *See e.g., Department of Educ. v. Katherine D.*, 727 F.2d 809

(9th Cir. 1984). As part of this discussion, the school district must consider the whole range of

supplementary aids and services, including resource rooms and itinerant instruction, for which it

is obligated to provide under the IDEA. *Greer v. Rome City School District,* 950 F.2d 688, 696

(1991).

> Pursuant to the IDEA's LRE mandate:

>> "Each public agency shall ensure that a continuum of alternative placements
>> is available to meet the needs of children with disabilities for special
>> education and related services…The continuum … must … make provision
>> for supplementary services (such as resource room or itinerant instruction) to
>> be provided in conjunction with regular class placement… In determining
>> the educational placement of a child with a disability, including a preschool
>> child with a disability, each public agency must ensure that … a child with a
>> disability is not removed from education in age-appropriate regular
>> classrooms solely because of needed modifications in the general
>> curriculum."

> 34 C.F.R. §§ 300.115(a) and (b)(2); 34 C.F.R. § 300.116(e).

The IDEA "requires states to provide supplementary aids and services and to modify the regular

education program when they mainstream handicapped children…If the state has made no effort

to take such accommodating steps, (the Court's) inquiry ends, for the state is in violation of the

Act's express mandate to supplement and modify regular education." *Daniel R.R. v. State Bd. of

Ed*. 874 F. 2d 1036 (5th Cir. 1989).

> **1.    The hearing officer's Order on Remand failed to demonstrate that
> Natick seriously considered whether C.D. could be provided with an
> appropriate education in the regular education classroom with
> supplementary aids and services and/or necessary modifications prior
> to proposing placement in the substantially separate ACCESS
> program.**

> Pursuant to the IDEA's LRE mandate:

>> In determining the educational placement of a child with a
>> disability, including a preschool child with a disability, each public
>> agency must ensure that … a child with a disability is not removed
>> from education in age-appropriate regular classrooms solely
>> because of needed modifications in the general curriculum.

> 34 C.F.R. §300.116(e).

In her Decision, the hearing officer remarked that while "Father had suggested starting Student in the general education setting with supports and services and assessing her progress in that setting, "Natick was not open to that." (A.R. 1554).[2]  At the meeting on July 27, 2012, when the Parents described the educational model at McAuliffe and C.D.'s success with supplementary supports and services in the general education classroom, Natick responded, "That could not happen here...because it doesn't happen, because public schools have their own staff and their own experts, and they don't allow outside people to come in and teach their students in their classroom. No public school would allow that." (A.R. 317).

The IEPs proposed by Natick for the 2012-2013 school year did not state whether the District considered any accommodations that would have allowed C.D. to continue attending school with non-disabled children. In fact, under the heading "Non-Participation Justification," each of the IEPs stated that: "C.D. requires specialized instruction in small group classes for all core academic content areas and for vocational/post-secondary skill development using modified curriculum and approaches outside of the general education setting in order to make progress." (A.R. 3306, 3308). This type of boilerplate, conclusory language cannot satisfy the requirement that the School District "serious[ly] consider[ed ] ... including the child in a regular class with such supplementary aids and services [as appropriate]." *Oberti,* 995 F. 2d. at 1216; *see also A.S. v. Norwalk Bd. of Educ.,*183 F. Supp. 2d 534, 544 (D. Conn. 2002).  ("[T]he cited testimony is simply too broad and vague to reasonably support the conclusion that the Board in fact considered providing direct assistance from a special education teacher in the regular education classroom, an increased role for the Board's consultants, or the other supplemental services identified by [the student's] experts.").

---

[2] Citations to the Administrative Record are denoted as "A.R." followed by the page number found at the bottom of each record page (e.g., A.R. 1549).

In *Oberti*, the Court noted that this factor weighs particularly heavily against the District, since a school that has failed to give consideration to inclusion of a child in a regular class with supplementary aids and modifications has most likely violated the Act's mainstreaming directive. *Oberti,* 995 F.2d at 1216; *See also Daniel R.R.,* 874 F. 2d at 1048 ("The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad."); *see also P. v. Newington Bd. of Ed*., 546 F.3d 111, 120 (2nd Cir., 2008) (internal quotation marks omitted) ("First, the Court must determine whether "reasonable efforts [were made] to accommodate [N.B.] in a regular classroom."

In *Greer*, the Court found it "significant that neither the transcripts and minutes of the placement committee meetings nor the proposed IEP indicate that school officials considered any options other than the two extremes presented by the parties, that is, the school district's proposal for instruction in a self-contained class and the parents' proposal for instruction in a regular class supplemented only by speech therapy." *Greer v. Rome City School Dist.,* 950 F.2d 688 at 692. Here, the transcript of the IEP meeting from July 27, 2012 clearly demonstrates that Natick failed consider whether C.D. could continue in the general education classroom with supplementary aids and modifications, in violation of the Act's mainstreaming directive. (A.R. 383-433).

In her Order on Remand, as apparent justification for Natick's refusal to even consider whether C.D. could succeed in the general education environment with supplemental supports and services, the hearing officer noted that, "Natick could have provided Student with a continuum of less restrictive options through which she could have moved as she progressed"

(Order on Remand, p.3), evidencing a basic lack of understanding relative to the meaning and purpose of the "continuum" of placements envisioned by Congress.[3]

> **2.  The hearing officer's Order on Remand failed to demonstrate that Natick considered a variety of sources of information from knowledgeable persons to ensure that its placement decision complied with the IDEA's LRE mandate.**

Districts must consider a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior, when interpreting evaluation data and making placement decisions. 34 CFR 104.35(c)(l).

"In determining the educational placement of a child with a disability…each public agency must ensure that - (a) The placement decision - (1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 20 U.S.C. 1412(a)(5); 34 CFR § 300.116; 603 CMR §§ 28.06 (b) and (c).

Prior to the IEP meetings in 2012, the Parents forwarded C.D.'s 8th Grade IEP from McAuliffe (A.R. 163; A.R. 3375) which was written by the McAuliffe IEP team in conjunction with the Parents and their experts, recommending that C.D. continue her education in the general education classroom, her most recent Psychoeducational Evaluation (A.R. 177), and Neuropsychological Evaluation (A.R. 238), and Speech and Language Evaluation (A.R. 222), and a copy of the Natick High School 9th Grade Course Selection List which C.D. and her McAuliffe guidance counselor, Sara Shapiro, had completed, circling and initialing all college prep level courses for C.D. per the recommendations of C.D.'s general education teachers. (A.R.

---

[3] The hearing officer further noted that, "(i)n fact after Student's three-year reevaluation, Natick did propose changes to Student's program that provided her with a general education social studies class…" In doing so, the hearing officer referenced changes made for the 2014-2015 school year, which is not only irrelevant to the school district's determination in 2012, but also references an IEP which this Court specifically excluded from its Memorandum and Order relative to this remand.  (Order on Remand, Footnote 1, p.3).

2750). In addition, Ms. Coellner, Ms. Flax, Ms. Soden and the Parents provided uncontroverted

information regarding C.D.'s success at McAuliffe. (*See* A.R. 383 - 433) The evidence also

included C.D.'s Report Cards and Progress Reports from 6th, 7th and 8th grade, which were

written by her general education teachers, and repeatedly showed C.D.'s ability to access the

general education curriculum and progress with appropriate supplemental supports and services,

as envisioned by the IDEA.  (*See* A.R. 94-151).

At the hearing, Dr. Imber, who has vast experience in conducting both independent

and school evaluations, specifically addressed Natick's focus on low test scores – indicating

that they were not predictive (especially given that C.D. was in general education accessing

the Massachusetts Curriculum Standards for the past three (3) years (and had passed the

MCAS in ELA in 8th grade). (A.R. 396).

Not one of Natick's IEP team members who recommended the self-contained ACCESS

Program were knowledgeable about C.D. (*See generally* A.R. 383 – 433). More specifically, no

Natick team member observed C.D.; no Natick team member consulted with her teachers at

McAuliffe; no Natick team member evaluated her; and no Natick team member provided her

with any direct instruction. On the other hand, the Parents' experts who also participated in the

IEP Team meeting held in Natick on July 27, 2012 had observed C.D. during the course of her

three (3) years at McAuliffe and consulted with her teachers routinely during the time that C.D.

attended school 6th, 7th, and 8th grades. (*Id.*) Two (2) of the Parents' experts had extensive

experience in evaluating C.D.  (*Id.*) Nevertheless, Natick and the hearing officer simply ignored

the placement recommendations made by the parents' experts, her general education teachers

and her guidance counselor at McAuliffe, preferring instead to rely on the recommendations of

persons who had absolutely no knowledge of C.D.'s unique needs and success in the general

education classroom at McAuliffe for the prior three (3) years. (*See Sebastian M. v. King Philip Reg'l Sch. Dist*. 685 F.3d 79, 85 (1st Cir. 2012)).

In her Order on Remand, the hearing officer indicated that, "…the general education program with supports was preferred by the Parents, but deemed inappropriate by Natick because, based on Student's IEP from her prior placement and test scores, Natick did not believe that general education was appropriate for her. (Order on Remand p. 2 citing A.R. 413-414). Notwithstanding the hearing officer's failure to credit Congress with also preferring the general education classroom, the hearing officer fully supported Natick's failure to discuss the range of supplementary aids and services and disregard of the opinions of the only persons knowledgeable about C.D., the evaluation data, and the placement options.

   **3.     The hearing officer's Order on Remand grossly misrepresented the nature and severity of C.D.'s disability and the level of support she needed at McAuliffe to justify Natick's removal of C.D. from the general education environment based upon her prior placement.**

In order for the scales to tip in favor of an integrated environment, the Court need only determine that, "with appropriate support and services," C.D. could "make progress toward [her] IEP goals in the regular education setting." *Warton v. New Fairfield Bd. of Educ*., F. Supp. 2d at 275-276; *see also Daniel R.R.,* 874 F.2d at 1047 ("If the child's individual needs make mainstreaming appropriate, we cannot deny the child access to regular education simply because his educational achievement lags behind that of his classmates....").

Thus, the decision whether to mainstream a child must include an inquiry into whether the student will gain any educational benefit from regular education. *See A.S. v. Norwalk Board of Ed.,*183 F. Supp. 2d at 546 ("[T]he appropriate yardstick is whether [the child], with

appropriate supplemental aids and services, can make progress towards her IEP goals in the regular education setting.")

One way of measuring the benefits of placing a particular child in an integrated class is to look at the progress he or she in fact made in such classes. *See Walczak v. Florida Union Free School Dist.,* 142 F. 3d 119, 130 (C.A.2 (N.Y.) 1998) ("A review of objective evidence [of a student's progress] is easiest, of course, when a disabled child is in a mainstream class."); *see also Roland M.,* 910 F. 2d. at 991 ("[A]ctual educational results are relevant to determining the efficacy of educators' policy choices."); *see also Jennifer D.,* 550 F. Supp. 2d at 432 (noting that the child's behavior "in the period from November 2005 through the development of the January 2006 IEP strongly supports the conclusion that he was capable of being educated in a community school ... if he was afforded special education services").

The "attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." *Walczak,* 142 F. 3d at 130.  (C.A.2 (N.Y.) 1998); *see also Bd. Of Educ. v. Rowley*, 458 U.S. 176, 207 n. 28 (1982) (finding that a disabled student's ability to achieve passing marks and her advancement from grade to grade "was an important factor" in determining whether the student could be appropriately mainstreamed).

Here, the Parents and their experts provided an avalanche of uncontroverted evidence demonstrating that C.D. made more than satisfactory progress both academically and socially during each of the three (3) years that she attended McAuliffe in the general education classroom with non-disabled peers (*see generally* A.R. 383 – 433). Evidence that she made progress is uncontradicted. *Id.* The uncontroverted evidence showed that C.D. succeeded with considerable independence at McAuliffe (*see e.g.*, A.R. 4028); that the support she received in the general

education classroom at McAuliffe served to maximize her learning and participation with nondisabled peers, rather than impede it (*Id.*); that she received occasional (not constant) support (A.R. 1696) in academic classes only (not throughout the day) (A.R. 1696); worked really well on group projects (A.R. 1697); often acted as the scribe, writing on the board on behalf of the group (A.R. 1697); and attended electives, including a keyboarding computer class, art, physical education and lunch on her own, without any support (A.R. 1720).

Nevertheless, as apparent support for Natick's conclusion that C.D.'s prior placement showed that C.D. could not benefit from inclusion even with supplemental aids and services, the hearing officer inexplicably claimed that, "[s]tudent attended general education classes…with the constant support of either Nan Coellner or Marcia Soden," and "although none of the witnesses testified to it," extrapolated that, "…[The ACCESS program] was less restrictive than [C.D's] McAuliffe placement because it did not provide for the assistance of a one to one aide throughout the day. It provided [C.D.] the opportunity to independently access academic services in a program specifically designed for students with profiles similar to [C.D's]" (A.R. 1565).

This finding, if true, would only be one factor relevant to the determination of whether the ACCESS program was the least restrictive environment in which C.D. could succeed; however, it was not only entirely unsupported by the record, it was also completely contrary to it.  In making this finding, the hearing officer not only disregarded substantial uncontroverted evidence on the record provided by the Parents and their experts, but also evidence presented by Natick, including Ms. Dalan's statement in her email to the Parents dated June 19, 2012, in which she observed that C.D.: "was sitting quietly, sometimes taking notes, and other times working to complete given assignments…I did not see her private tutor working with her." (A.R. 377).

**4. The hearing officer's Order on Remand failed to demonstrate that Natick weighed the non-academic benefits of education in the general education setting, including the development of social and communication skills from interaction with nondisabled peers, as factors weighing in favor of inclusion.**

Mainstreaming may not be ignored, even to fulfill substantive educational criteria. "Just as the least restrictive environment guarantee cannot be applied to cure an otherwise inappropriate placement, similarly, a state standard cannot be invoked to release an educational agency from compliance with the mainstreaming provisions." *Town of Burlington v. Dep't of Educ. of Mass.*, 736 F.2d 773, 789 n. 19 (1st Cir. 1984); *see also Roncker v. Walter*, 700 F.2d 1058, 1063 (C.A.6 (Ohio) 1983) ("a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming").

In *Daniel R.R.*, the 5th Circuit reiterated that, "[a]cademic achievement is not the only purpose of mainstreaming. Integrating a handicapped child into a nonhandicapped environment may be beneficial in and of itself…Thus [the Court's] inquiry must extend beyond the educational benefits that the child may receive in regular education." *Daniel R.R. v. State Bd. of Ed.* 874 F. 2d at 1049. *See also*, *Oberti v. Board of Educ.*, 995 F.2d at 1216 ("the Court must consider ... 'those unique benefits the child may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, *i.e*., the development of social and communication skills from interaction with nondisabled peers"); *see also, Daniel R.R. supra* ("a child may be able to absorb only a minimal amount of the regular education program, but may benefit enormously from the language models that his non-handicapped peers provide"); *see also Greer supra* at 697 (language and role modeling from association with nondisabled peers are essential benefits of mainstreaming); *see also Board of Educ. Sacramento City Unified School Dist. v. Holland*, 786 F. Supp. 874, 882 (E.D. Cal. 1992) (benefits obtained by a child with

mental retardation as result of placement in a regular classroom include development of social and communications skills and generally improved self-esteem).

In addition, if a student shows awareness and some positive reaction to being with nondisabled peers, then such interaction weighs in favor of inclusion (assuming the student can receive a meaningful educational benefit and is not unduly disruptive). *Id.* at 883 ("Non-academic benefits in the regular classroom included development of social and communication skills as well as improved self-confidence…Rachel's presence in the regular classroom was not disruptive nor did her presence interfere with the teacher's ability to teach the rest of the class. Rachel followed directions, was well-behaved and not a distraction in class").  C.D. was not only not disruptive, she was a model student.  The evidence of her positive reaction to being with nondisabled peers was overwhelming.

Ms. Coellner testified that C.D. was able to access the general education curriculum at McAuliffe; she has a *mild* intellectual disability and excellent executive functioning skills; is very organized; works really well in groups; has beautiful handwriting and would often be the scribe during group projects. (A.R.1697). Ms. Coellner further testified that, "When I met C.D. in the sixth grade, she had no self-confidence about academics. She was very shy, she didn't think she could do anything, and I saw her self-confidence improve." (A.R.1697, *ll.* 7-11). Ms. Coellner further testified that she observed C.D. over the course of three (3) years; she observed her laughing and joking with other kids in the hallways; she observed her when she was coming back from lunch or going to gym; she knew that kids would call her, and they would meet or go to parties or go bowling. (A.R.1697, 1700, *ll*-24).

C.D.'s success at McAuliffe exemplified the value of providing all students with challenging objectives. *See Endrew F. v. Douglas Cnty. Sch. Dist.,* 137 S.Ct. 988, 1000 (2017).

Ms. Flax testified that in 2007, C.D. presented with a severe language-based learning disability due to her overall cognitive profile; she didn't initiate verbal language and was basically answering questions in one to three words. (A.R. 1848).  Ms. Flax further testified that at McAuliffe, C.D. was in an environment where the bar was set high, she had models she could emulate, and she was growing because of this...she was in an environment where she felt more socially engaged and was more motivated to use her language, and as a result, her attitude changed dramatically; she started talking and wanting to come to sessions..."I know for sure that her language was beginning to progress and she was eager to develop more language." (A.R.1848).  In describing why C.D. benefited from inclusion in the general education classroom at McAuliffe, Ms. Flax stated, "I think with any child who presents with special needs, you want to hold the bar high.  So you want them to have models that they can try to emulate. The thing – the beauty of McAuliffe was, she was in the regular education classroom…and the bar was held high, and she was growing because of this." (A.R. 1848, *ll*.3-9).

Despite the uncontroverted information provided by the Parents and their highly knowledgeable experts at the meetings in July 2012, not only showing that C.D. succeeded academically in the general education classroom at McAuliffe, but also evidencing her extremely positive reaction to be with her non-disabled peers, there is no evidence that Natick or the hearing officer considered this as a factor weighing in favor of inclusion.

> **5. The hearing officer's Order on Remand failed to demonstrate that Natick considered the potential harmful effect of its proposed placement on C.D., including the lack of appropriate peers, and the lack of access to the Massachusetts Curriculum Frameworks in preparation for the MCAS and receipt of a high school diploma, as factors weighing against placement in the ACCESS program.**

In selecting the LRE, consideration must be given to any potential harmful effect on the child. 20 U.S.C. 1412(a)(5); 34 CFR 300.116; 603 CMR 28.06 (b) and (c). Districts must consider factors such as the potential negative effects of the proposed placement as factors weighing in favor of inclusion. At the meeting on July 27, 2012, Ms. Coellner expressed concern that C.D. would be isolated in ACCESS, "Because she is a very normal, regular teenager like all normal, regular teenagers, who has the same interests in fashion and music and television and all that." (A.R. 420) and might lose the skills in ACCESS that she worked very hard to gain at McAuliffe. (A.R. 410-411). Mr. Francoise, the lead ACCESS teacher until October 2014 testified with regard to the peers in the program in 2012-2013: there were eight (8) students - two (2) girls and six (6) boys, one of whom had a one-on-one aide. Most of them used language (*see generally* A.R. 2433 – 2483; A.R. 2460).

While a tailored IEP does not entitle the child to the maximum educational benefit possible, as the Supreme Court has recently articulated, the IEP must be reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances. *See Endrew F.* 137 S. Ct. at 999. Even if it is not reasonable for a child to advance from grade to grade, "every child should have the chance to meet challenging objectives." *Id.* at 1000. The Parents provided uncontroverted information showing that C.D. had the potential to access the general education curriculum, including that she read the same books, was working close to grade level, and had passed the ELA MCAS (A.R. 383 – 433); however, despite the undisputed evidence showing that C.D. clearly had the potential not only to succeed, but also to flourish, in the general education classroom with appropriate supports and services, where the bar was set high and she was presented with challenging goals, Natick not only denied C.D. the opportunity to continue moving forward on the same trajectory as non-disabled children, but also arguably would have reversed it.

16

In describing the ACCESS curriculum, Ms. McGovern stated, "They use entry points to access the general ed. curriculum. The emphasis is on more functional academics but they are teaching the Mass. They're using the Mass. curriculum frameworks; they're using entry points into the Mass. Curriculum." (A.R. 406, *l.*24- A.R.407, *l.*3). Natick indicated that ACCESS students do not take the MCAS and are not on the diploma track. (A.R. 295).

> **6. The hearing officer's Order on Remand failed to demonstrate that Natick measured C.D.'s progress and educational benefit in relation to her own potential, and not in comparison to the abilities of nondisabled students.**

For students with disabilities, progress and educational benefit must be gauged and measured in relation to a student's own intellectual and functional capabilities and not judged in comparison to the abilities of other students -- in particular, the abilities of their nondisabled classmates. *See generally, Daniel R.R., supra*; *Rachel H., supra*; and *Katherine* G. *v. Kentfield Sch. Dist.,* 39 IDELR 63 (N.D. Cal. 2003), *aff'd,* 42 IDELR 29 (9th Cir. 2004).

At the IEP meeting on July 27, 2012, Natick referenced Dr. Imber's report and determined that inclusion would not be successful... "I'll be very upfront here: I can't imagine looking at this report offered by another family and saying to that family 'Let's consider full inclusion.' So knowing the expectation for inclusion classes, I would have significant concerns about her success." (A.R. 317).

When the Parents asked why C.D. could not benefit in the general education classroom or even the less restrictive Replacement classes, Natick responded that, "Well, given C.D.'s level of need, and given some of the other activities that go along with those -- It's not just decoding the text; it's also inferencing, it's instructing meaning from the text, and it's working on a textual analysis at a high-school level, and I think we believe that the most appropriate place for her to truly access the curriculum would be in the ACCESS program." (A.R. 413).

**B.**      **In determining that the IEPs proposed by Natick for the 2012-2013 and 2013-2014 school years were reasonably calculated to provide C.D. with a FAPE in the "least restrictive" environment possible, the hearing officer erroneously applied the IDEA's mandate for transition planning, which not only defies logic, but also constitutes legal error.**

Pursuant to the IDEA, school districts are required to provide transition services, developed through transition planning by the IEP team, based upon "age appropriate transition assessments related to training, education, employment, and where appropriate, independent living skills." 20 USC §§1414(d)(1)(A)(i)(VIII).  In her Order on Remand, the hearing officer explained that the 2012-2013 and 2013-2014 school years were reasonably calculated to provide C.D. with a FAPE in the "least restrictive" environment possible because they "would have provided Student with the opportunity to independently access curriculum at her level, rather than relying on aides, as would have been required in a general education setting."  (Order on Remand p. 3). The hearing officer further reasoned that, "Natick's proposed placement would have satisfied IDEA's purpose of better preparing Student for future independence in education and employment, by instructing and encouraging her to perform more tasks independently while in high school." *Id*. As noted above, the hearing officer's findings with regard to the level of support C.D. needed and/or received was completely unsupported by the record.  Regardless, in reaching her conclusion, the hearing officer apparently confused the IDEA's mandate for mainstreaming with the IDEA's mandate for transition planning, as further exemplified by the hearing officer's finding that, "(t)he record is clear that Natick balanced the benefits to be gained, namely Student being able to independently access curriculum at level and pace appropriate to her profile, against being outside of the general education setting for much of her day in the more restrictive ACCESS classes."  *Id.*

Notwithstanding the complete lack of evidence on the record to support the hearing officer's conclusion, her finding not only defies logic (given that the ACCESS program would not prepare C.D. for the MCAS and receipt of a diploma, and would thereby hinder, not prepare C.D. for further education and employment), but is also contrary to both the LRE mandate (requiring school districts to ensure that students are provided with needed supports and modifications to remain in the general education classroom), and the Supreme Court holding in *Endrew F.* (requiring school districts to provide all students with challenging objectives). The hearing officer's application of the incorrect IDEA mandate to reach her conclusion constitutes clear legal error and should not be afforded any deference by the Court.

## V.    **CONCLUSION**

The hearing officer's Order on Remand neither considered nor clarified whether the 2012-2013 and 2013-2014 IEPs were reasonably calculated to provide C.D. with a FAPE in the "least restrictive" environment possible, pursuant to the Memorandum and Order of this Court, and in accordance with the IDEA. More specifically, the Order on Remand failed to demonstrate that Natick considered whether C.D. could be provided with an appropriate education in the regular education classroom with supplementary aids and services and/or necessary modifications prior to proposing placement in the substantially separate ACCESS program; failed to demonstrate that Natick considered a variety of sources of information from knowledgeable persons to ensure that its placement decision complied with the IDEA's LRE mandate; grossly misrepresented the nature and severity of C.D.'s disability and the level of support she needed at McAuliffe; failed to demonstrate that Natick weighed the non-academic benefits of education in the general education setting; failed to demonstrate that Natick considered the potential harmful effect of its proposed placement on C.D.; failed to demonstrate that Natick measured C.D.'s progress and educational

benefit in relation to her own potential and not in comparison to the abilities of nondisabled

students; and erroneously applied the IDEA's mandate for transition planning, as opposed to the

applicable mandate for mainstreaming, in determining whether the 2012-2013 and 2013-2014

IEPs were reasonably calculated to provide C.D. with a FAPE in the "least restrictive"

environment possible. On the contrary, the Order on Remand, further clarified that the hearing

officer's findings and conclusions were arbitrary, capricious, an abuse of discretion and otherwise

not in accordance with the law, and are therefore, not entitled to discretion by this Court and

should be reversed.

DATED this 25th day of <u>May 2018</u>        Respectfully submitted,

C.D., by and through her PARENTS AND NEXT
FRIENDS, M.D. and P.D.

By their attorney,

/s/ Laurie R. Martucci
Laurie R. Martucci, Esq.
BBO # 561946
Martucci Law Associates
20 Cabot Boulevard, Suite 300
Mansfield, MA 02048
Tel: (508) 964-6664
lrm@martucci-law-associates.com

## CERTIFICATE OF SERVICE

I hereby certify that the above document filed through the ECF system will be sent electronically
to the registered participants as identified on the Notice of Electronic Filing ("NEF"), and paper
copies will be sent to those indicated as non-registered participants on May 25, 2018.

/s/ Laurie R. Martucci
Laurie R. Martucci, Esq.