## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )    Civil Action No. 1:15-cv-13617-FDS

C.D., by and through her PARENTS AND  )
NEXT FRIENDS, M.D. and P.D.         )
                                       )
                Plaintiffs,      )
v.                                   )
                                       )
NATICK PUBLIC SCHOOL DISTRICT    )
and                                    )
BUREAU OF SPECIAL EDUCATION      )
APPEALS,                            )
                Defendants.      )
_____ )

## NATICK PUBLIC SCHOOLS' OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

Plaintiffs, C.D. ("Student" or "C.D."), by and through her Parents and Next Friends,

M.D. and P.D. ("Parents"), (collectively, "Plaintiffs") have appealed from the March 20, 2018,

Board of Special Education Appeals ("BSEA") decision, on remand, which found that the IEPs

that Natick Public School District ("Natick" or "District") proposed for the Student for the 2012-

2013 and 2013-2014 school years were reasonably calculated to provide C.D. with a free

appropriate public education ("FAPE") in the least restrictive environment.  Dkt. 87.  The

decision on remand was comprehensive and provided more than a sufficient basis to support the

BSEA's decision.  As the hearing officer found, the preponderance of the evidence on the record

demonstrates that Natick considered a continuum of alternatives.  The hearing officer reasonably

concluded that the ACCESS program, with opportunities for inclusion for electives and

vocational services, was the least restrictive environment that would provide C.D. a meaningful

educational benefit.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

Natick relies upon the facts set out in this opposition, in Natick Public Schools' Response to Plaintiffs' Amended Statement of Material Facts and Natick Public Schools' Additional Statement of Undisputed Material Facts, which were previously filed.  Natick notes that the Plaintiffs did not state what statements of fact upon which they were relying.

## III.     SUMMARY JUDGMENT STANDARD

In reviewing the decision of an administrative hearing officer in an Individuals with Disabilities Act ("IDEA") case, the district court:

   (i) shall receive the records of the administrative proceedings;
   (ii) shall hear additional evidence at the request of a party; and
   (iii) basing its decision on the preponderance of the evidence, shall grant such
   relief as the court determines is appropriate.

20 USC § 1415(i)(2)(c).  "When the parties choose not to submit additional evidence [as in this case] 'the motion for summary judgment is a procedural device through which the court decides the case on the basis of the administrative record.'"  Linda E. v. Bristol Warren Reg'l Sch. Dist., 758 F. Supp. 2d 75, 87 (D.R.I. 2010) (citations omitted).

This court applies an "intermediate standard of review characterized by independence of judgment" -- a standard which "requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review."  Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990).  *See also* Lessard v. Wilton Lyndeborough Coor. School District ("Lessard I")*,* 518 F.3d 18, 24 (1st Cir. 2008).  The administrative proceedings must be accorded "due weight" (Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206 (1982), and the review must "be thorough yet deferential, recognizing 'the expertise of the administrative agency.'" Roland M., 910 F.2d at 989 (citations omitted).  Because "[j]urists are not trained,

practicing educators . . . the statutory scheme binds trial courts to give 'due weight' to the state agency's decision in order to prevent judges from 'imposing their view of preferable educational methods upon the States.'" Id., *citing* Rowley, 458 U.S. at 207.  The court "is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir.1993) (*citing* Town of Burlington v. Dep't of Educ. for Com. of Mass., 736 F.2d 773 (1st Cir. 1984)), *aff'd sub nom.* Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 105 S. Ct. 1996 (1985).

While a hearing officer's "[l]egal rulings are subject to nondeferential (or *de novo* ) review," Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 111 (D. Mass. 1999), aff'd, 229 F.3d 1133 (1st Cir. 2000), a hearing officer's findings of fact are entitled to deference unless impaired by an error of law or the Court "determines that [they] are unreliable or incorrect in light of the totality of the record." Id. at 112.  The "party challenging the outcome of the administrative decision 'bears the burden of proof.'" Id. at 112.  In this case, the Plaintiffs, as the ones appealing, bear the burden of proof.  They have failed to meet that burden.

## IV. ARGUMENT

### A. The ACCESS Program provided C.D. a free and appropriate public education in the least restrictive environment.

A state must offer all children with disabilities a FAPE to qualify for federal funding under the IDEA.  20 U.S.C. §§1400(c), 1412(a)(1).  A free "appropriate" public education requires an "instructional plan [which is] custom tailored to address the handicapped child's 'unique needs' (20 U.S.C. §1400(c)) in a way 'reasonably calculated to enable the child to receive educational benefits.'" Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir.1993), *citing* Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley,

458 U.S. 176, 207 (1982).  As the First Circuit has pointed out, however,

> [t]he IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and adolescents.  The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal, education; it requires an adequate, rather than an optimal, IEP.  Appropriateness and adequacy are terms of moderation.  It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

Lenn, 998 F.2d at 1086. "The IEP does not have to be the choice of selected experts, the parents' first choice, or even the best choice, but it must provide the child with a free appropriate public education." Gonzalez v. Puerto Rico Department of Education, 969 F.Supp. 801, 807 (D.P.R.1997), *citing* Amann v. Stow School System, 982 F.2d 644, 651 (1st. Cir. 1992).

It is also "common ground that the IDEA manifests a preference for mainstreaming disabled children," C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 285 (1st Cir. 2008).  Accordingly, "[t]o the maximum extent possible," disabled children should be offered a free and appropriate public education in the "least restrictive environment."  20 U.S.C. §§ 1412(a)(4), (5); *see* Five Town, 513 F.3d at 285.  In other words, disabled children should be "educated with children who are not disabled," and special classes or separate schooling should occur only when an appropriate education cannot be provided in "regular classes with the use of supplementary aids and services."  20 U.S.C. § 1412(a)(5)(A).  "The goal, then, is to find the least restrictive educational environment ***that will accommodate the child's legitimate needs***." *See* Five Town, 513 F.3d at 285 (emphasis added).  Indeed, "the correlative requirements of educational benefit and least restrictive environment operate in tandem to create a continuum of educational possibilities. . . .To determine a particular child's place on this continuum, the desirability of mainstreaming must be weighed in concert with the Act's mandate for educational

improvement." <u>Roland M. v. Concord Sch. Comm.</u>, 910 F.2d 983, 993 (1st Cir. 1990).

"Assaying an appropriate educational plan, therefore, requires a balancing of the marginal

benefits to be gained or lost on both sides of the maximum benefit/least restrictive fulcrum.

Neither side is automatically entitled to extra ballast." <u>Id</u>.; <u>Abrahamson v. Hershman</u>, 701 F.2d

223, 230 (1st Cir. 1983) ("placement is not to be made by mechanically choosing the least

restrictive environment; rather, <u>the decision must consider the child's own needs</u>." (emphasis

added)).[1]

      Indeed, "[a]lthough the least restrictive environment must be considered in all special

education programming decisions, Congress recognized that the least restrictive environment—

the default standard curriculum—does not provide meaningful educational benefit to many

children with disabilities." <u>Millay v. Surry Sch. Dep't</u>, No. 1:09-CV-411-JAW, 2010 WL

5288191, at *32 (D. Me. Dec. 8, 2010), <u>aff'd</u>, No. 1:09-CV-00411-JAW, 2011 WL 778401 (D.

Me. Feb. 28, 2011). "[T]he demand for educational benefit does not always jibe with the

mainstream expectation." <u>Id</u>.

      For example, in <u>Cranston Sch. Dist. v. Q.D.</u>, No. C.A. 06-538ML, 2008 WL 4145980, at

*12 (D.R.I. Sept. 8, 2008), the school district argued that the student should attend its proposed

placement in an in-district substantially separate classroom with inclusion electives because it

was the least restrictive environment for the student.  The court held that the proposal was not

appropriate, because "the modest level of mainstreaming available at the School must be

balanced against The Wolf School's provision of services in which the School's IEP was

deficient.  At The Wolf School, Q.D. would be provided speech and language therapy,

counseling, and occupational therapy in an all-day, immersive setting.  He would not be exposed

---

[1] Natick notes that the Parents rely on <u>Greer v. Rome City Sch. Dist.</u>, 950 F.2d 688 (11th Cir. 1991).  The decision
was overturned and remanded by <u>Greer v. Rome City Sch. Dist.</u>, 956 F.2d 1025, 1026 (11th Cir. 1992).

to children with behavior disorders." Id. The court ultimately concluded that "the Hearing Officer correctly found that the benefits offered by The Wolf School would outweigh any loss of mainstreaming opportunities." Id.

Similarly, in Westmoreland Sch. Dist. v. Stephen D., No. CIV. 90-568-S, 1992 WL 613231, at *7 (D.N.H. Apr. 29, 1992), the court concluded that the district's proposal for math in a mainstream class, despite being the least restrictive environment on the continuum, was not appropriate. The court explained that "several witnesses testified that it would be difficult for a mainstream math teacher to implement all of the goals listed in paragraph 7 while teaching twenty to thirty other students. . . . Moreover, even a cursory glance at paragraph 7 reveals that its implementation might have the unintended result of drawing attention to S.D. in a manner that might embarrass him in a large classroom." Id.

In another example, in Devries v. Fairfax Cty. Sch. Bd., 882 F.2d 876, 878 (4th Cir. 1989), a student stated that the school district failed to comply with the mainstreaming requirements in the IDEA. The Fourth Circuit Court of Appeals disagreed, explaining that "[a]lthough we empathize with DeVries' desire to be placed in a public high school with his sister and other nonhandicapped children, we cannot agree that the facts demonstrate that he would receive an 'appropriate public education' at that institution." Id. It noted that "[m]ainstreaming, however, is not appropriate for every handicapped child." Id. The court stated that even with an aide to assist him in comprehending and in communicating with teachers and students, "Michael would simply be monitoring classes with nonhandicapped students at Annandale. Further, his disability would make it difficult for him to bridge the 'disparity in cognitive levels' between him and the other students, he would glean little from the lectures, and his individualized work would be at a much lower level than his classmates. In contrast, the

court found that the South County Vocational Center, located within a public high school, would provide a structured program with the one-to-one instruction that Michael requires, including appropriate instruction in academic subjects, vocational and social skills, community-based work experiences, and access to all the programs and facilities of the public high school." Id. at 879 (quotation omitted); See L.G. v. Fair Lawn Bd. of Educ., 486 F. App'x 967, 973 (3d Cir. 2012) ("the ALJ's findings of fact were sufficient to determine that Fair Lawn reasonably concluded that the completely segregated environment provided for in L.'s IEP was the least restrictive environment in which L. could obtain a 'meaningful educational benefit'" for student who did not have skills for mainstream).

Here, the 2012-2013 and 2013-2014 school year IEPs are very similar given the limited new information from Learning Prep. R. 2422, *ll*.17-22; R. 2584-90. Mainstream classes in Natick could not provide C.D. a meaningful benefit. The ACCESS program was the least restrictive environment that could accommodate C.D.'s diagnosed needs and provide her FAPE. C.D. had scores in the extremely low and borderline range for cognitive ability. R. 1812, *ll*.2-4; R. 1813, *ll*. 1-23; R. 2139, *l*.9 – 2140, *l*.4. She showed significant deficits across language areas, such as receptive and expressive language and in memory, including working memory and recall. R. 2188, *l*.3 – R. 2189, *l*.4. She did best with rote, concrete skills, and struggled with complex, inferential thinking or abstract problem solving. TRI, p.239, *ll*.5-16. She was two to four grade levels below in instructional reading and her scores generally clustered at the fifth grade level in the areas of decoding, single word-reading, and oral reading fluency. R. 254; R. 2629. As an eighth grader, she was at a first grade instructional level in silent reading comprehension. Id. Overall, her reading was in the upper elementary level. Id. Her writing skills were well below average and her mathematics skills were at the 2.7 grade level. R. 254; R.

2630-31.  Consequently, her skills were nowhere near grade level to be able to access a general

education classroom in a high school.

C.D.'s deficits prevented her from taking information in and attending in the general

education setting where a significant amount of information was presented verbally.  R. 2189,

*ll*.14-22.  The goals from her last IEP were not ones that could be addressed in a high school

general education classroom.  R. 2350, *ll*. 2-14; R. 2408, *ll*.6-18.  They involved utilizing long

division, adding and subtracting decimals, rounding, writing paragraphs with at least three

sentences, identifying the main character and main idea from a story, and writing a response to a

comprehension question with at least two responses.  R. 2635-2638.   Indeed, even C.D.'s

parents' own expert, Dr. Gibbons, testified that a general education program was inappropriate

for C.D.  R; 257; R. 1832, *ll*.3-14.  She underscored that "[b]ased on my evaluation of her, I

would have thought all mainstream classes would be inappropriate for her," and in response to a

question on inclusion said, "I mean, I would say not for any academic period of the day."  Id.

Her report stated that

> With these kinds of language issues, [C.D.] can be expected to have difficulty
> managing the oral and written language expectations of a regular high school.
> Her difficulties in quickly accessing information, organizing ideas and
> formulating her language will make it hard for her to participate in classroom
> discussions, convey complex ideas in oral and written form, and keep up with the
> fast-paced social interactions of adolescents.

R.2627-28.  Hence, in contrast to cases, such as Oberti v. Bd. of Educ. Of Borough of Clemton,

995 F. 2d 1204, 1222 (3rd Cir. 1993), the Plaintiffs' expert and school experts did not believe

that any commonly applied methods could be used to educate C.D. in a regular classroom and

that, a regular teacher even with appropriate training would not be able to effectively instruct

C.D.  R. 257.  C.D. would simply be monitoring classes with typical students, her individualized

work would have to be much lower than her classmates, she would struggle to access

information in a typical class and her disability would make it difficult for her to bridge the "disparity in cognitive levels between" her and the other students.  She would stand out socially from her peers.  Indeed, to have C.D. in a mainstream class, would require Natick to alter such a significant percent of the curriculum to tailor it to C.D.'s abilities, that it would be beyond recognition; such an effort, courts will "not require in the name of mainstreaming." *See* <u>Daniel R.R. v. State Bd. of Educ.</u>, 874 F. 2d 1036, 1050 (5th Cir. 1989).

In contrast, the ACCESS program would have provided C.D. a meaningful educational benefit and was the least restrictive environment where she could receive that educational benefit at the time the 2012-2013 and 2013-2014 IEPs were developed and given the information available to the Team.  The ACCESS program would have permitted C.D. to have her academic classes in a substantially separate special education classroom, consistent with Dr. Gibbons' recommendation.  R. 1832, *ll*.9-19.  The ACCESS Program presented grade level curriculum from the Massachusetts Curriculum Frameworks at each student's level, generally modified to a level two to three grade levels below grade level, consistent with C.D.'s testing results.  R. 2190, *ll*.19-22; R. 2292, *ll*.1-22; R. 2293, *l*.22 – R. 2294, *l*.4.  The information would be presented in a way that C.D. could understand and apply the information, often with mini-lessons within each lesson.  R. 2190, *ll*. 19-22; R. 2292, *ll*.1-22.  ACCESS used language-based strategies, consistent with Dr. Gibbons' recommendation.  R. 257; R. 2328, *l*. 2- R. 2329, *l*. 7.  It further employed evidence-based strategies such as graphic organizers, progress monitoring, multi-modal instruction, highlighting, books on tape, hands-on learning activities and regular check-ins.  R. 2292, *ll*. 5-6; R. 2295, *ll*.14-19; R. 2296, *ll*.8-16; R. 2329, *ll*.12-16.

In ACCESS, C.D. would have been in a class with eight other students, two of whom were girls.  R. 2437, *ll*.16-22.  The other students had profiles, including academic skills, similar

to C.D.'s.  R. 2190, *ll*.11-14; R. 2380, *ll*.9-15.  They were hard-working students who wanted to learn, but took longer to learn the material and required the material in smaller, slower increments.  R. 2475, *ll*.7-21.  A speech and language pathologist visited weekly and provided services to the students at least twice a week.  R. 2286, *ll*.14-15.  In this case, Natick High School's ACCESS program was the least restrictive environment in which Natick could provide C.D. FAPE.  The ACCESS Program was what was appropriate to meet C.D.'s educational needs.  R. 2468, *ll*.3-8.

The finding that ACCESS was the setting that would allow C.D. to have a meaningful educational benefit and that C.D. could not receive a meaningful benefit in a general education or replacement class is a finding of fact that is entitled to deference.  Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 111 (D. Mass. 1999), aff'd, 229 F.3d 1133 (1st Cir. 2000); Bd. of Educ. v. Ross, 486 F.3d 267, 278 (7th Cir. 2007) ("Her parents obviously disagree with this, but we cannot undertake an independent assessment of Lindsey's case.  We can only decide whether the hearing officer and the district court came to a rational conclusion, and we find that they did.").  The hearing officer made a rational conclusion that the record supported.  As a result, this court should uphold her findings.

In contrast, to the Plaintiffs' Supplemental Motion for Summary Judgment, the Hearing Officer did not confuse least restrictive environment with transition planning.  A student's independence, especially as they become older and are in high school, is an important factor to consider in determining whether the student has actually received a meaningful educational benefit.  For example, in J.S. v. Springfield Twp. Bd. of Educ., Nos. 05-cv-04891 (DMC), 05-cv-5043 (DMC), 2007 U.S. Dist. LEXIS 44611, at *22-23 (D.N.J. June 19, 2007), the court explained that "[o]ne of the primary intentions of the IDEA was to help handicapped students

achieve independence."  It quoted a Third Circuit decision, underscoring that "emphasis on self sufficiency indicates in some respect the quantum of benefits the legislators anticipated: they must have envisioned that significant learning would transpire in the special education classroom -- enough so that citizens who would otherwise become burdens on the state would be transformed into productive members of society."  Id.  The court upheld the decision that a student's placement in a mainstream class with an aide who did all of his reading was not the least restrictive environment and violated the broader goals of the IDEA to foster independence and social productivity.  Id.  The court described that at the private school, he could read on his own without the assistance of an aide.  Id.

Although the demand for educational benefit required a more restrictive setting for C.D.'s academics, Natick made efforts to include C.D. in school programs with non-disabled peers to the maximum extent appropriate.  Indeed, the Plaintiffs' Supplemental Motion for Summary Judgment ignores all of the inclusion opportunities that C.D. would have in Natick and implies that she would lack access to typical peers.  In reality, Natick High School still would have afforded C.D. access to interaction with non-disabled, general education peers for regular education electives, including vocational classes.  R.1531; R. 2297, ll.8-23; R. 2350, ll.11-18. There was also evidence that ACCESS students had friends from their general education classes and had lunch with those students.  Id.  They participated in the Natick High Connections activities, where general education students came into the ACCESS classroom for socialization opportunities.  R. 2297, ll.8-23; R. 2313, ll.4-10.  The availability of general education electives, replacement classes, and the access to the general education student body meant that Natick High School would have been able to afford C.D. the benefit of the full range of the educational benefit/least restrictive environment continuum.  The evidence at hearing was also clear that

Natick could and would make adjustments to C.D.'s programming along that continuum as and when appropriate.  R. 2349, *l*. 17 – R. 2350, *l*. 18.  Indeed, depending on C.D.'s levels, there was always the possibility, depending on her performance to move to replacement classes and take MCAS.  R. 2396, *ll*. 7-18.  The teacher from the ACCESS program, Mr. Francoise testified that he had students who started in ACCESS who passed MCAS.  R. 2440, *ll*. 13-23.

Parents' argument that a full inclusion program was the least restrictive environment for C.D. for 2012-2013 and 2013-2014 while seeking reimbursement from Natick for their unilateral decision to place her in the far more restrictive setting of a private special education program with no typical, non-disabled peers is logically inconsistent.  In this case, given the information available to the Team when it developed the 2012-2013 and 2013-2014 IEPs, general education classes and replacement classes were not appropriate for C.D. and were not reasonably calculated to provide her FAPE because she required ACCESS to make effective, meaningful educational progress.   The benefits of ACCESS, while permitting C.D. access to some mainstreaming opportunities for electives, outweighs the loss of any additional mainstreaming opportunities and the hearing officer properly concluded that it was the least restrictive environment in which her needs could be met.

B. **Natick considered whether C.D. could participate in a less restrictive environment and concluded that she required the ACCESS program to make effective progress.**

As the hearing officer concluded, Natick did consider and discuss whether a less restrictive environment would allow C.D. to make meaningful progress.  Dkt. 87, p. 3.  The Plaintiffs' characterization of the Team meeting in July 2012 is inaccurate and disregards the conversations that occurred.  Dkt. 91-1, p. 6-7.  Natick explicitly discussed the least restrictive environment question at the July 2012 meeting and balanced the benefits to be gained with mainstreaming.  R. 406, *ll*. 1-7.   Natick considered general education program with supports, but

deemed it inappropriate based on the most recent testing available at the time and the IEP

proposed from C.D.'s current placement.  Dkt. 87; R. 413-414;  R. 2422, ll. 9-14; R.1543-1544.

The second option of replacement classes was also discussed, but Natick explained that it

believed it was appropriate to start with ACCESS classes based on the evaluation results and the

IEP from the Christa McAuliffe Charter School ("McAuliffe"), with the possibility to always

move C.D. to replacement courses when appropriate.  R. 2349, *l.* 17 – R. 2350, *l.* 18.  Students

from the ACCESS program were routinely moved to replacement classes.  R. 2152, *l.* 17- 2153,

*l.* 10;R. 2439, *ll.*11-21; R. 2289, *l.*12 – R. 2290, *l.*13; R. 2324, *ll.*12-21.  Replacement classes,

like ACCESS classes, are all students on IEPs, but the classes go at a faster pace than ACCESS

and use the regular education curriculum.  R. 2192, *ll.*5-19; R. 2322, *ll.*5-13.  The District

intended to meet in October 2012 to monitor C.D.'s progress and see whether any changes

needed to be made to her IEP.  R. 2352, *ll.*8-24; R. 2363, *ll.* 10-19.  The Team discussed how

replacement classes were not appropriate given the faster pace and her instructional level.  R.

413, *ll.* 14-20.  Again, that determination was consistent with the opinion of the Parents' expert,

Dr. Gibbons.  R. 1832, *ll.* 9-23.  It was an individualized determination based on C.D's scores,

current performance level, and the information that the District was hearing.  The 2013-2014 IEP

was largely based on the same information, as there was no new information from Learning

Prep.

Furthermore, although the Parents had individuals who claimed that C.D. could

participate in a general education environment for academic classes, neither the Team, nor the

Hearing Officer, had to credit their opinions, when weighed against other evidence, including the

last proposed IEP from her last school.  34 C.F.R. § 300.502(c); <u>G.D. v. Westmoreland Sch.</u>

<u>Dist.,</u> 930 F.2d 942, 947 (1st Cir. 1991) ("Both federal and New Hampshire standards require

only that an independent educational evaluation "must be considered" in the decision made by a public agency, not that there be substantive discussion of that opinion."). This Honorable Court already determined that there "is no compelling evidence to warrant disregarding the hearing officer's credibility determinations" relative to the Plaintiff's providers. Dkt. 73 at 43. At the Team meeting, a Natick staff member, who was familiar with C.D., Mr. **Tagliapietra** discussed C.D.'s skills. Over the summer, C.D. was focusing on recognition of basic shapes or names, how many angles, vertices and sides, number patterns, fractions, and least and common multiples. R. 388, *ll.* 9-17. She was working on sequencing pictures, labeling parts of a whole, and interpreting negative statements. R. 387, *l.*20 – R. 388, *l.4.* The skills on which she was working, was not high school level work. The Team noted that given the current performance level in the goals in the proposed IEP from her current school, she required a significant level of support to produce work. R. 397, *ll.* 1-8; R. 2626-2642. Mr. Tagliapietra stated that her level of performance over the summer matched the level of performance that was stated in her previous IEP from McAuliffe. R. 387. Thus, in contrast to the Parents' allegations and as stated in this Court's memorandum, there was a staff member with personal knowledge of her. Dkt. 73, p. 32. When Natick asked Ms. Coellner and Ms. Soden for data on her performance, they had no quantitative data, beyond anecdotal information and their impressions. R. 398, *l.* 1 – p. 399, *l.* 22.

Given this information, the Team properly concluded that C.D. could not receive a meaningful educational benefit in a general education setting or replacement classes in Natick, especially with the significant level of assistance she required in much smaller classes of approximately sixteen students at McAuliffe. R.282, *l.*18; R.1695-1696. Given C.D.'s scores and the current performance levels from her charter school, which referenced her need for

"maximum support," the Team decided that she would not be able to access a general education curriculum, even with support. R. 401, *ll.* 1-11; R. 1832, *l.*20 – R. 1833, *l.*6; 2626-2642. Thus, the members of the Team appropriately considered and proposed ACCESS as the least restrictive environment to allow her to make effective progress.

In contrast to the Plaintiffs' allegations in their Supplemental Motion for Summary Judgment, the record demonstrated that at McAuliffe, C.D. had constant support. She was assisted throughout the day by one-to-one aides who acted as tutors to make sure she was on task, cue her as necessary, and go over vocabulary or practice flash cards of science words to prepare for a test during a study or free period. R.1695, *l.*9 – R.1696, *l.*24; R.1701, *ll.*l-8 7. C.D. required frequent modifications. R.409, *ll.*17-21. *See* T.W. v. Unified Sch. Dist. No. 259, Wichita, Kan., 136 F. App'x 122, 131 (10th Cir. 2005) (explaining that the regular education setting was not the least restrictive environment if progress was solely the result of one-to-one instruction). In fact, the quote that the Plaintiffs cite as evidence of her independence is incomplete. Dkt. 91-1, p. 13. The quote is that C.D. was "sitting quietly, sometimes taking notes, and other times working to complete given assignments. ***I saw her special education teacher work with her in her history/social studies class, she appeared to be clarifying directions***. I did not see her private tutor working with her." R. 377 (emphasis added). As a result, when her tutors were not working with her, a special education teacher was assisting her. C.D. was relying on the assistance of her one-to-one aides or teachers throughout the day.

The statement in the IEP that "C.D. requires specialized instruction in small group classes for all core academic content areas and for vocational/post-secondary skill development using modified curriculum and approaches outside of the general education setting in order to make progress," is not a boilerplate statement. It reflects the actual need for C.D. to have classes

outside of the general education setting and her need for a modified curriculum, as Dr. Gibbons,

the Parents' expert testified, and for the reasons outlined herein.  R. 1832, *l.*20 –1833, *l.*6.  It was

based on the Team discussions and determinations.

In developing the 2012-2013 and 2013-2014 IEPs, the Team balanced the ACCESS

program's place on the educational benefit/least restrictive environment continuum with the

services and instruction C.D. required according to her last IEP, most recent testing, and input

from service providers.  Because C.D. was several years below grade level, had goals that could

not be implemented in a general education classroom or the faster paced replacement classes,

and required significant accommodations and strategies, neither a general education classroom,

nor replacement classes were reasonably calculated to enable her to make appropriate progress

and provide her a meaningful educational benefit.  Although more restrictive than full inclusion,

the 2012-2013 and 2013-2014 IEPs calling for placement in the Natick High School ACCESS

Program would have provided C.D. with the educational services she required to make effective

progress while still providing her opportunities for inclusion.   C.D.'s educational needs could

not have been met effectively in a full inclusion classes or replacement classes, even with a 1:1

aide and other supports and services.

An IEP must be "reasonably calculated to enable a child to make progress appropriate in

light of the child's circumstances."  Endrew F. v. Douglas County School District, 580 U.S. ___,

14-15 137 S.Ct. 988, 1001, 137 S.Ct. 988, 1001 (2017).  While some of the benefits of full

inclusion would have been lost in the ACCESS Program,[2] ACCESS was the least restrictive

educational environment that could have accommodated C.D.'s legitimate needs for the 2012-

2013 and 2013-2014 school years.   Five Town, 513 F.3d at 285.  Since ACCESS students at

Natick High School have opportunities to interact with non-disabled general education students

---

[2] C.D. lost all the benefits of mainstreaming when parents unilaterally placed C. D. at Learning Prep.

and to participate in general education electives at Natick High School, the benefits of the

ACCESS Program far outweighed the loss of additional mainstreaming for academic subjects in

the 2012-2013 and 2013-2014 school year.

## CONCLUSION

The 2012-2013 and 2013-2014 IEPs were reasonably calculated to provide C.D. a FAPE

in the least restrictive environment.

Respectfully submitted this 26th day of June, 2018.

NATICK PUBLIC SCHOOLS,
By its Attorney,


/s/ Felicia Vasudevan
Felicia Vasudevan, Esq.
BBO # 687463
Murphy, Hesse, Toomey & Lehane
300 Crown Colony Plaza, P.O. Box 9126
Quincy, MA  02269-9126
Telephone: (617) 479-5000



## CERTIFICATE OF SERVICE

I, Felicia Vasudevan, hereby certify that this document filed through the CM/ECF system will be sent electronically to counsel of record for the Plaintiffs and to counsel of record for Reece Erlichman, Director, Bureau of Special Education Appeals, on this 26thth day of June, 2018.


/s/ Felicia Vasudevan
Felicia Vasudevan


1077887v1