# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| _____ | ) | Civil Action No. 15-cv-136-FDS |
| | ) | |
| C.D., by and through her PARENTS AND | ) | |
| NEXT FRIENDS, M.D. and P.D. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| NATICK PUBLIC SCHOOL DISTRICT | ) | |
| and | ) | |
| BUREAU OF SPECIAL EDUCATION | ) | |
| APPEALS, | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S REPLY TO NATICK PUBLIC SCHOOLS' OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Plaintiffs, C.D. and her Parents, M.D. and P.D. ("Parents"), on behalf of their daughter and themselves, hereby submit this Reply to Natick Public Schools' Opposition to Plaintiff's Supplemental Motion for Summary Judgment.  pursuant to the Memorandum and Order of this Court, and in accordance with the IDEA.  Contrary to the assertion of the Natick Public School District ("Natick or "District"), the hearing officer's Consideration/Clarification on Partial Remand ("Order on Remand"), (Dkt. 87) was far from comprehensive and failed to provide a sufficient basis to support the hearing officer's conclusion that the 2012-2013 and 2013-2014 IEPs were reasonably calculated to provide C.D. with a FAPE in the "least restrictive" environment possible.

To support the hearing officer's determination that the self-contained ACCESS program was the least restrictive environment in which C.D. could receive any educational benefit, the District relies upon cherry-picked information to misrepresent the nature and severity of C.D.'s

disabilities and the type and extent of the supplemental aids and services C.D. requires, which regardless of their veracity, do not excuse the District's failure to adhere to the requirement that the benefits to be gained from mainstreaming must be weighed against the benefits of a more restrictive environment, including *the nonacademic benefits to be gained by C.D.*, as shown by a preponderance of the evidence on the record.

Nor does the alleged extent of C.D. disabilities and the purported level of support she requires excuse the District's failure to consider whether C.D. could be educated in the general education classroom with supplemental aids and services, prior to proposing the self-contained ACCESS program for all of C.D.'s core academic classes, when she returned to the District after completing three (3) successful years in the general education classroom at the McAuliffe Charter School ("McAuliffe"), as shown by an avalanche of uncontradicted evidence on the record.  In addition, the preponderance of the evidence shows that the District failed to consider the potential harm to C.D. of placement in the ACCESS program and based its placement decision on several impermissible factors, including whether C.D. could perform at the same academic level as her nondisabled peers, and whether modifications to the general education curriculum would be needed.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

The facts upon which Plaintiff's rely are set forth in Plaintiffs' Reply to Natick Public Schools' Response to Plaintiffs' Amended Statement of Material Facts and Response to Natick Public Schools' Additional Statement of Undisputed Material Facts, filed on September 26, 2016. [1]

---

[1] The Parents had inadvertently neglected to indicate the statements of fact upon which they relied in their initial Memorandum of Law in Support of Supplemental Motion for Summary Judgment (Dkt. 91); the Parents relied upon the facts set forth in Plaintiffs' Reply to Natick Public Schools' Response to Plaintiffs' Amended Statement of Material Facts and Response to Natick Public Schools' Additional Statement of Undisputed Material Facts, filed on September 26, 2016.

## III.  **ARGUMENT**

### A.  **Natick's conclusion that C.D. would not receive any benefit in the general education environment, was based upon a gross misrepresentation of the nature and severity of her disabilities, derived from cherry-picked information on the record.**

A state must offer all children with disabilities a FAPE to qualify for federal funding under the IDEA. 20 U.S.C. §§1400(c), 1412(a)(1). A free "appropriate" public education requires an "instructional plan [which is] custom tailored to address the handicapped child's 'unique needs' (20 U.S.C. §1400(c)) in a way 'reasonably calculated to enable the child to receive educational benefits.'" *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir.1993), *citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 207 (1982).

School districts are required to provide each special education student with a program in the least restrictive environment, with removal from the regular education environment occurring *only when the nature or severity of the student's disabilities is such that education in regular classes with the use of supplementary aids and services could not be achieved satisfactorily* (20 U.S.C. §1412(a)(5)(A)). [Emphasis added.]  IEPs must, therefore, balance the often-competing interests of "mainstreaming" on the one hand, with substantive educational improvement, on the other.  *Roland M. v. Concord School Committee*, 910 F.2d 983, 993 (1st Cir. 1990). Ultimately, "[t]he goal, then, is to find the least restrictive educational environment that will accommodate the child's legitimate needs," *See C.G. ex. rel. A.S. v. Five Town Cmty. Sch. Dist.,* 513 F.3d 279, 285 (1st Cir. 2008), which are to be broadly construed to include the child's academic, social, health, emotional, communicative, physical and vocational needs. *See e.g., Seattle School Dist., No. 1 v. B.S.* (9th Cir. 1996) 82 F.3d 1493, 1500).

At the IEP meeting on July 27, 2012, Natick focused on C.D.'s test scores as reflected on her most recent Psychoeducational Evaluation conducted by Dr. Steve Imber in July 2012, and

discounted the information regarding C.D.'s performance at McAuliffe provided by Ms. Coellner and Ms. Soden who had worked directly with C.D. on a rotating basis every day for the previous three (3) years. In response to the information provided by Ms. Coellner and Ms. Soden regarding C.D.'s actual performance in the general education classroom at McAuliffe, Natick remarked, "what is a little bit difficult in hearing you describe her performance is that her scores are so low" (A.R. 402), despite Dr. Imber's admonition relative to reliance on standardized tests:

> "...there's a substantial distinction between looking at how she performs on a standardized test...with no assistance, really no support, no graphic organizers, how she does in that situation, then how she does with appropriate supports and services...the picture is going to reflect a very different outcome when she has that support and those services. So...when you asked about comprehension - her numbers on the test scores are going to be substantially lower than what she may do, what she has done, day to day, when she has the appropriate supports and services."

(A.R. 400).

In addition, although Natick chose to rely heavily on Dr. Imber's test results, the Natick team specifically chose to focus on a handful of low test scores, disregarding C.D.'s scores in areas where she performed relatively higher, including that:

> "[C.D.] performed in the average range (approximately one year below grade level) in the letter/word identification subtest...she achieved a standard score of 94, a percentile rank of 36, an age equivalent of 13-1 and a grade equivalent of 7.5...[C.D.] performed at a sixth grade independent level when orally reading passages...her performance on the spelling subtest of the WJ-III test was in the average range...which yielded a grade equivalent of 7.1...[C.D.] performed particularly well on the contextual conventions subtest where she achieved a percentile rank of 37 and 38 and performed at 8.7 grade level."

(A.R. 3378-3379).

By focusing exclusively on C.D.'s low test scores, Natick painted an incomplete and biased picture of C.D.'s legitimate needs and grossly misrepresented the nature and severity of C.D.'s disabilities.

Although Natick sought to diminish the veracity of the information provided by Ms. Soden and Ms. Coellner's because it was not based on standardized measures, the information they provided was far from "anecdotal," as the District contends (Opposition. p. 14). Furthermore, the information they provided was entirely consistent with C.D.'s IEP developed by the McAuliffe team, C.D.'s progress reports completed by her general education teachers, and Dr. Imber's statement that standardized test scores underestimate the actual performance in the classroom with appropriate supports and services.  With regard to how she measured C.D.'s progress, Ms. Coellner testified:

> I measured it through my experience and my eye and my expertise, that somebody who came in in sixth grade and could barely write a sentence and in eighth grade could write a composition. That's how I measured it… By looking at her work and looking at her self-confidence and her willingness to try things that she wouldn't try. The fact that in the beginning if the teacher is going to ask her a question, they'd have to cue her first so she wouldn't panic. By the end, she was raising her hand volunteering. So those narrative, observational methods, you know.

(A.R.1717, *ll*.15-A.R.1718, l.4).

With regard to how she measured whether C.D. was actually understanding and retaining the material, Ms. Coellner testified:

> By the feedback that she would give. They would ask a question and she would answer it correctly. I would look at -- often they would give -- a "do now," for example, when they walked in would be to write about what we read yesterday, and the fact she would sit down, start it and do it and it would be correct. By her work products, by her answers.

(A.R.1718, *ll*.10-17).

In striving for "appropriateness," an IEP must take into account what was, and was not, objectively reasonable at the time the IEP was promulgated. (Roland p. 33).  The court will not consider after-the-fact justifications for a predetermined placement. (*See generally*, *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1050 (5th Cir. 1989))

In its Opposition to Plaintiff's Supplemental Motion for Summary Judgment ("Opposition"), Natick did not reference Dr. Imber's Psychoeducational Evaluation at all, instead

choosing to focus on the Neuropsychological Evaluation conducted by Dr. Erin Gibbons, which was not even completed until August 2012 and therefore, was *not* available or considered by the District on July 27, 2012 in determining that the ACCESS program was the least restrictive placement in which C.D. could receive any educational benefit.

Notwithstanding the District's reliance on an expert's report that was unavailable at the time the District made its determination, Dr. Gibbons herself noted in her report that her results had limited value and that for more complete results Dr. Imber's results should be relied upon, noting that:

> "[C.D.] underwent a Psychoeducational Evaluation by Dr. Steve Imber in February 2012 during which he administered standard tests and observed [C.D.] in her school program.  For complete results the interested reader is directed to Dr. Imber's comprehensive report."

 (A.R. 3853).

In addition, while the District chose to use Dr. Gibbon's report to support the severity of C.D.'s disabilities and needs, Natick neglected to note that according to Dr. Gibbons, "results from the current evaluation are consistent with **Mild** Intellectual Disability and highlight ongoing weaknesses in receptive and expressive language." (A.R. 3895). [Emphasis added].

**B.  Natick's conclusion that C.D. would not receive any benefit in the general education environment, was based upon a gross misrepresentation of the type and extent of supplemental aids and services she needs to receive, derived from cherry-picked information on the record.**

At the IEP Team Meeting on July 27, 2012, the Natick team adopted the goals, objectives, accommodations and modifications from the IEP developed by McAuliffe dated April 4, 2012 to April 4, 2013. (A.R. 2600-2622; A.R. 3375-A.R. 3393).  Although Natick purports to have also based its placement decision on C.D.'s IEP from McAuliffe, as indicated by the hearing officer: "the general education program was preferred by the Parents, but deemed inappropriate by Natick because, based on Student's IEP from her prior placement and test scores, Natick did not believe

the general education program was appropriate for her," (Order on Remand, p. 2 citing A.R. 413-414), the information reflected on C.D.'s IEP was entirely consistent with the information provided by Ms. Coellner and Ms. Soden regarding C.D.'s success at McAuliffe and the academic as well as social benefits she received.  The McAuliffe team noted on her IEP that:

> "[C.D.] successfully participates in inclusion opportunities and is an active member of the school community. [C.D] participates in school events such as McAuliffe Fest and Science Fair…is well-liked by her classmates and teachers...enjoys young adult novels…is able to follow classroom routines and expectations…evidences strong executive functioning abilities through her organization of her materials as well as her attention to instructional activities…participates in school dances and has acquired friends who interact with her in and out of school…[C.D.'s] pragmatic skills are in need of development…she has delays in receptive and expressive language. However, during the 2011-2012 school term her pragmatic language has increased with peers as well as adults."

(A.R. 3377).

In addition, the McAuliffe IEP indicated that C.D. made effective progress in the general education classroom, with the use of supplementary aids and services, including:

> "[S]eat[ing] [C.D.] near an adult or supportive peer in the classroom…provid[ing] C.D. with a written daily schedule…provid[ing] summaries of chapters of novels and/or books on tape for higher level reading demands…provid[ing] graph paper to allow C.D. to line up math problems…and provid[ing] math reference sheets…"

 (A.R. 3381).

With regard to modification of content, the McAuliffe IEP included modifying the math content to "focus on building a deeper understanding of number sense;" modifying the ELA content to focus on "building reading comprehension and purpose of writing;" and modifying the Science and History content to focus on "1-2 'big ideas' per unit of study." With regard to methodology/delivery of instruction, the McAuliffe IEP indicated that C.D.'s instruction should:

> "[C]onnect new information to previous experience and prior knowledge whenever possible; preview new material/vocabulary; repeat, review, recite ongoing information in units of study; provide [C.D.] with opportunities to use multi-modalities while practicing

new concepts…providing C.D. with opportunities to use dialogue and 'turn and talk' strategies for practice of skills and communication with a peer partner in class."

(A.R. 3381-3382)

The McAuliffe team determined that C.D. could reach her IEP goals, be involved and progress in the general education curriculum and participate with non-disabled students with the use of supplemental services, including the availability of support from a special education teacher in the general education classroom. (A.R. 3388). The McAuliffe team further determined that C.D. did not need any supplemental aids or services in extracurricular/non-academic activities. (A.R. 3388).

C.D's goals were based upon the standard Massachusetts Curriculum Frameworks, and included: Mathematics, Writing, Reading Comprehension and Vocabulary, in addition to common goals for students with mild intellectual and/or communication disabilities, including: Communication, Peer Interaction and Study Skills.

It is entirely unclear why these straightforward goals and typical accommodations and modifications could not be implemented in the general education classes or even the replacement classes at Natick High School.  Certainly, there is no evidence to suggest that Natick discussed any of them prior to determining that: (1) C.D.'s goals "could not be implemented in a general education classroom" (Opposition, p.16); [2] (2) that no "commonly applied methods could be used to educate C.D. in a regular classroom" (Opposition, p. 8); and (3) that "C.D.'s educational needs could not have been met effectively in full inclusion classes or replacement classes, even with a 1:1 aide and other supports and services." (Opposition, p. 16).

Despite Natick's unrelenting insistence that C.D. received constant support at McAuliffe, the evidence clearly shows that while McAuliffe provided for support by a special education

---

[2] Which begs the question, if Natick determined, without further discussion, that C.D.'s goals could not be implemented in the general education classroom, why did they recommend that the team accept the goals?

teacher/tutor to be *constantly available* in her general education academic classes, that does not

mean that C.D. received *constant support*.  At the meeting on July 27, 2012, Ms. Coellner stated,

> "Just to emphasize, again, that Carolyn has been in a regular education setting for the past
> few years.  You said significant support; I'm sort of sensitive to that.  Certainly, we have
> been there; but certainly, when your representative came to observe her, we are basically
> in the back of the room, she's part of the classroom. And in fact, I realized that she only
> could even recognize who Carolyn was except that she was pointed out…basically, she
> has been functioning in a regular education classroom with our support; we are there if
> she needed us. She was able to keep up with the class. She was -- She read the same
> books that the class read.  She did basically the same work.  She does require support, but
> I wouldn't call it significant support."

 (A.R.397, *l*.9-A.R.398, *l*.7).

In addition to the evidence showing that the support C.D. received was not constant, the

evidence clearly showed that in contrast to Natick's representation, the type of support C.D.

received is commonly employed in general education classrooms.  Ms. Coellner testified, "the

teacher would be giving a lesson, they would cue her as needed…and [during breaks] they would

go over vocabulary and practice flash cards."  (A.R. 1696, *ll*. 7-8; 1701, *ll*.4-8.)

While Natick attempted to support its finding that C.D. received constant support based on

Ms. Dalan's statement in her email to the Parents dated June 19, 2012, in which she observed that

C.D.: "was sitting quietly, sometimes taking notes, and other times working to complete given

assignments.  I saw her special education teacher work with her in her history/social

studies class, **she appeared to be clarifying directions**. I did not see her private tutor working

with her." (A.R. 377) [emphasis added], Ms. Dalan's statement based on her observation of one

class period on one day, not only failed to show that C.D. received constant support, but also

showed that when she received support, it was basic and limited.  Certainly, "clarifying directions"

does not warrant removal from the general education classroom.

 "In determining the educational placement of a child with a disability, including a

preschool child with a disability, each public agency must ensure that … a child with a disability

is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum." 34 C.F.R. § 300.116(e).   Although Natick argued that "to have C.D. in a mainstream class, would require Natick to alter such a significant percent of the curriculum that to tailor it to C.D.'s abilities, that it would be beyond recognition…" (Natick's Opposition p. 9, citing *Daniel R.R. v. State Bd. of Educ.*, at 1050 (5th Cir. 1989)), there is no evidence on the record to support that conclusion.

> **C.  Regardless of the nature and severity of C.D.'s disabilities and the extent of supplementary aids and support C.D. requires, both Natick and the hearing officer failed to adhere to the requirement that the benefits to be gained from mainstreaming must be weighed against the benefits of a more restrictive environment in concluding that the IEPs proposed for the 2012-2013 and 2013-2014 school years were reasonably calculated to provide C.D. with a free appropriate education in the least restrictive environment.**

As a preliminary matter in every case, school districts must determine whether the child can be provided with an appropriate education in the regular education classroom with supplementary aids and services. *See e.g., Department of Educ. v. Katherine D*., 727 F.2d 809 (9th Cir. 1984). As part of this discussion, the school district must consider the whole range of supplementary aids and services, including resource rooms and itinerant instruction, for which it is obligated to provide under the IDEA.  *Greer v. Rome City School District*, 950 F.2d 688 (11th Cir. 1991); withdrawn on other grounds, 956 F.2d 1025; reinstated per curiam 967 F.2d 470, (11th Cir. 1992).

A state must offer all children with disabilities a FAPE to qualify for federal funding under the IDEA. 20 U.S.C. §§1400(c), 1412(a)(1). A free "appropriate" public education requires an "instructional plan [which is] custom tailored to address the handicapped child's 'unique needs' (20 U.S.C. §1400(c)) in a way 'reasonably calculated to enable the child to receive educational benefits.'" *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086 (1st Cir.1993), *citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley,* 458 U.S.

176, 207 (1982).   However, as the First Circuit has pointed out, "an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential. *Lenn*, 998 F.2d at 1086. "The IEP does not have to be the choice of selected experts, the parents' first choice, or even the best choice, but it must provide the child with a free appropriate public education." *Gonzalez v. Puerto Rico Department of Education*, 969 F. Supp. 801, 807 (D.P.R.1997), *citing Amann v. Stow School System*, 982 F.2d 644, 651 (1st. Cir. 1992).

The IDEA "requires states to provide supplementary aids and services and to modify the regular education program when they mainstream handicapped children…If the state has made no effort to take such accommodating steps, (the Court's) inquiry ends, for the state is in violation of the Act's express mandate to supplement and modify regular education." *Daniel R.R. v. State Bd. of Ed.* at 1048.  "The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad." *Id.*

Despite Natick's ill-conceived argument that it considered "a continuum of alternatives" (Opposition p. 1), both the transcript of the IEP meeting from July 27, 2012 and the IEP Natick proposed three (3) days later, indicate that Natick offered one and only one option: the self-contained ACCESS Program for all four (4) of C.D.'s core academic subjects with undisclosed recommendations for general education electives. No additional filtering of the facts by Natick or the Hearing Officer can blur what was offered by a school-based team of individuals who did not possess the requisite knowledge to made placement decisions.  *See*, *34 CFR § 300.116.  See also, Sebastian v. King Philip Regional School District,* 685 F.3d 79, 85 (1st Cir., 2012) (the hearing officer discounted the testimony of the witnesses who worked with Sebastian for only a few hours in total, did not observe him in his program or review his records, and instead "credited the

testimony of educators who had worked directly with Sebastian at BICO and observed his daily progress there over a number of years.")

Natick's assertion that "the Plaintiff's expert did not believe that any commonly applied methods could be used to educate C.D. in a regular classroom and that, a regular teacher even with appropriate training would not be able to effectively instruct C.D.," (Opposition p. 8), is not only unsupported by the record, but also is a conclusion Natick reached at the IEP meeting on July 27, 2012, without any discussion of the full range of supplemental aids and services available. (A.R. 383-433) *See Greer v. Rome City School Dist.,* 950 F.2d 688 at 692 (the Court found it "significant that neither the transcripts and minutes of the placement committee meetings nor the proposed IEP indicate that school officials considered any options other than the two extremes presented by the parties, that is, the school district's proposal for instruction in a self-contained class and the parents' proposal for instruction in a regular class supplemented only by speech therapy.")

Further, Natick's use of Dr. Gibbons' testimony to support the District's conclusion is taken out-of-context and incomplete.  (Opposition p. 8).  Dr. Gibbons was hired by the Parents to conduct a Neuropsychological Evaluation "to provide updated information on C.D.'s cognitive and academic functioning in order to determine the type of educational program that will meet her needs." (A.R. 240).  Dr. Gibbons was not hired to provide her opinion regarding whether C.D. could receive any educational benefits in the general education environment with appropriate supplementary aids and services. Dr. Gibbons' recommendations in her 2012 Neuropsychological Evaluation report, when taken in context, show that she recommended what she believed would be the *best* placement for C.D.  To that end, she recommended placement for C.D.:

"[I]n a specialized program designed for the needs of students with learning differences. This program should be comprised of students who are also struggling to learn in the

mainstream setting due to learning disabilities, cognitive disorders, attentional problems, or executive function weaknesses. **Under no circumstances should this cooperative, motivated, and well-behaved young woman be placed with students contending with significant emotional and/or behavioral issues."** (A.R. 257) [emphasis added.]

While Dr. Gibbons believed the *best* placement for C.D. to maximize her potential would be in a program outside the mainstream environment, a program similar to Learning Prep School (LPS), she specifically recommended *against* placement in a program, like ACCESS where the students were contending with significant emotional and/or behavioral issues. (*See e.g.,* A.R.1913, ll.15-16; A.R.1913, *ll.* 6-11; A.R. 4182).

Regardless, Natick was not required to provide C.D. with Dr. Gibbon's choice of placement as long as the District's placement provided C.D. with FAPE in the LRE.   In addition, as noted above, Dr. Gibbons' report was not even available for the Natick team to consider at the meeting on July 27, 2012, and Dr. Gibbons was not a member of the IEP team.

It is important to note that neither the Parents, nor their experts in this matter, ever insisted that C.D. should necessarily be placed in all general education classes.  The Parents and their experts were simply expecting the District to consider the full range of supplementary aids and services, as required by the IDEA, before determining that C.D. should be removed from the general education classroom and placed in the most restrictive program at Natick High School for all of her core academic classes. Placement teams must first consider the placement of a student with a disability in the general education classroom and based on the student's abilities and needs, they must take into account the full range of supplementary aids and services that could be provided to facilitate the student's placement in the general education environment. *See, Letter to Cohen*, 25 IDELR 516 (OSEP 1996).  Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services. 34 CFR 300.115 (a).

Assuming that an appropriate program with supplementary aids and services can be designed, that program should be tried. *See, Statum v. Birmingham Pub. Schs. Bd. of Educ.*, 20 IDELR 435 (N.D. Ala. 1993). As the court in *Daniel R.R.*, explained:

> "If we determine that education in the regular classroom cannot be achieved satisfactorily, we next ask whether the child has been mainstreamed to the maximum extent appropriate. The EHA and its regulations do not contemplate an all-or-nothing educational system in which handicapped children attend either regular or special education. Rather, the Act and its regulations require schools to offer a continuum of services. 34 C.F.R. Sec. 300.551…Thus, the school must take intermediate steps where appropriate, such as placing the child in regular education for some academic classes and in special education for others…the appropriate mix will vary from child to child and, it may be hoped, from school year to school year as the child develops. If the school officials have provided the maximum appropriate exposure to non-handicapped students, they have fulfilled their obligation under the EHA.

(*Daniel R.R.* v. *State Bd. of Ed*. at 1050).

"If the state has made no effort to take such accommodating steps, (the Court's) inquiry ends, for the state is in violation of the Act's express mandate to supplement and modify regular education." *Daniel R.R. v. State Bd. of Ed*. at 1036. *See also Girty v. School Dist. of Valley Grove*, 35 IDELR 181 (W.D. Pa. 2001), *aff'd*, 38 IDELR 13 (3d Cir. 2002, *unpublished*) (the court ordered the district to reconsider its position on inclusion for the student and to develop an IEP for him that fully complied with the IDEA's mainstreaming requirement, giving the requisite consideration to the range of available supplementary aids and services. The district failed to give such consideration before recommending a change in the student's placement from full-time general education to part-time life skills support.) Additionally, in *Girty*, as in the instant matter, there was undisputed testimony that the student, (like C.D.) progressed academically and socially in general education and was achieving at a level appropriate for him, was not disruptive and would not likely have a negative effect on his general education peers).

The transcript of the IEP meeting from July 27, 2012 clearly shows that Natick failed to consider any options other than full inclusion in general education classes on the one hand, or

placement in the ACCESS program for all of C.D.'s core academic classes on the other hand. (A.R. 383-433).  Despite assertions by the District and the hearing officer to the contrary, the record is clear that Natick failed to discuss the full range of supplementary aids and services and make reasonable efforts to accommodate C.D. in regular classes.

When the Parents' noted that C.D. has already read the books on the syllabus for English/Language Arts in general education classes at Natick High School and specifically asked, "I don't see any reason why she couldn't be in the general education class with support because she's already reviewed that; she's already worked on things like that significantly and extensively. Why?" (A.R. 413), Natick responded that, "Well, given C.D.'s level of need, and given some of the other activities that go along with those -- It's not just decoding the text; it's also inferencing, it's instructing meaning from the text, and it's working on a textual analysis at a high-school level, and I think we believe that the most appropriate place for her to truly access the curriculum would be in the ACCESS program." (A.R. 413).

When the Parents asked, "instead of doing that, why don't we go the other way? Put her in general education with support and see what she can do. And if it doesn't work, well then we move her down" (A.R. 413), Natick responded, "[p]ersonally, I would not recommend that based on the IEP that I see in front of me, and in consultation with my team." (A.R. 414).  Parent's attorney asked, "And not even in the replacement class?" to which Natick's attorney responded, "[b]ased on what we're seeing on paper, the team is saying the ACCESS program." (A.R. 414).

The District's conclusion that, "C.D. would simply be monitoring classes with typical students, her individualized work would have to be much lower than her classmates, she would struggle to access information in a typical class and her disability would make it difficult for her to bridge the 'disparity in cognitive levels between' her and the other students" (Opposition p. 9, citing *Daniel R.R. v. State Bd. of Educ.* 874 F. 2d 1036, 1050 (5th Cir. 1989)), is not only

unsupported by the evidence on the record, but also violates the requirement that progress and educational benefit must be gauged and measured in relation to a student's own intellectual and functional capabilities and not judged in comparison to the abilities of other students -- in particular, the abilities of their nondisabled classmates. *See generally, Daniel R.R., supra*; *Rachel H., supra*; and *Katherine* G. *v. Kentfield Sch. Dist.,* 39 IDELR 63 (N.D. Cal. 2003), *aff'd,* 42 IDELR 29 (9th Cir. 2004).

In contrast to the instant case, the school district in *Daniel R.R.* took steps to modify Daniel's program.  His teacher made genuine and creative efforts to provide Daniel with educational benefits in the regular classroom.  While the circuit court agreed that Daniel did not benefit in the regular education classroom, despite sufficient efforts by the school district to enable him to do so, the court specifically disagreed with the district court's analysis of the mainstreaming issue, finding it troublesome for two reasons: first, the analysis would impermissibly require handicapped children to learn at approximately the same level as their nonhandicapped classmates and second, the analysis would place too much emphasis on the handicapped student's ability to achieve an academic benefit.  (*Daniel R.R. v. State Bd. of Educ.* at 1046).

As the Supreme Court announced in *Hendrick Hudson District Board of Education v. Rowley*, " [t]he educational opportunities provided by our public-school systems undoubtedly differ from student to student, depending upon a myriad of factors that might affect a particular student's ability to assimilate information presented in the classroom." *Daniel R.R. v. State Bd. of Educ.* at 1046, *citing Rowley*, 458 U.S. 176, 198 (1982). *See also Daniel R.R. v. State Bd. of Educ. supra* ("The Act requires states to tolerate a wide range of educational abilities in their schools and, specifically, in regular education--the EHA's preferred educational environment…we cannot

predicate access to regular education on a child's ability to perform on par with nonhandicapped children).

In contrast to *Daniel R.R.*, substantial evidence on the record shows that C.D. was working close to grade level in many areas (despite some low scores on her standardized tests) (A.R.399, *ll.*2-4); regardless, Natick's justification for removing C.D. from the general education classroom based upon her inability to measure up to the abilities of her nondisabled classmates violates the LRE mandate of the IDEA.

In *Daniel R.R.* the Court found that the court below placed too much emphasis on educational benefits. "Certainly, whether a child will benefit educationally from regular education is relevant and important to our analysis…Thus, the decision whether to mainstream a child must include an inquiry into whether the student will gain any educational benefit from regular education. Our analysis cannot stop here, however, for educational benefits are not mainstreaming's only virtue. Rather, mainstreaming may have benefits in and of itself. For example, the language and behavior models available from nonhandicapped children may be essential or helpful to the handicapped child's development. In other words, although a handicapped child may not be able to absorb all of the regular education curriculum, he may benefit from nonacademic experiences in the regular education environment. As the Sixth Circuit explained " [i]n some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming." *Daniel R.R.* at 1048, citing *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.), cert. denied, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).

A special education placement cannot be justified on the grounds that a child might make greater academic progress away from the regular education environment. *Oberti v. Board of Educ. of Borough of Clementon Sch. Dist.*, 19 IDELR 908 (3d Cir. 1993).

While the overwhelming evidence in this matter is that C.D. received substantial academic benefits in the general education classroom at McAuliffe (*see e.g.,* A.R. 397*, ll.*22-24); both the District and the hearing officer focused solely on academic progress in weighing the benefits of  mainstreaming against the benefits of a more restrictive environment, and failed to consider the nonacademic benefits, such as interaction with nondisabled peers and social development, which are equally critical factors to consider in determining the least restrictive environment for a child.  There is overwhelming evidence in this matter showing that C.D. received substantial nonacademic benefits from inclusion in the general education classroom at McAuliffe for 6th, 7th and 8th grade, and that placement in the self-contained ACCESS program for 9th grade, would have not only failed to provide her with those benefits, and failed to provide her with challenging objectives[3], but also, in light of the peers in the ACCESS program, would also have harmed her (*see e.g.,* A.R. 410-411).

> **D. The Parents' unilateral placement of C.D. at Learning Prep School provided C.D. with an appropriate placement to meet her needs, is not subject to the same least restrictive environment standards applicable to public school districts, and as a practical matter, was less "restrictive" than the self-contained ACCESS program at Natick High School.**

Natick's adoption of the hearing officer's argument that C.D.'s placement at Learning Prep is more restrictive than the ACCESS program, is a "straw man" argument, irrelevant to the determination of whether the IEPs proposed by Natick for the 2012-2013 and 2013-2014 school years proposed placement for C.D. in the least restrictive environment possible, and merely serves to distract the court from the actual issue to be reviewed in this matter. *See*, *Burlington School Committee v. Massachusetts Department*, 471 U.S. 359 (1985).

When a school district denies a child with a disability a FAPE, a private placement is not inappropriate merely because the environment is more restrictive than the public school

---

[3] See *Endrew F. ex. rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988 (2017).

alternative. When a child is denied a FAPE, his parents may turn to an appropriate specialized

private school designed to meet special needs, even if the school is more restrictive. (*C.L. v.*

*Scarsdale Union Free Sch. Dist.*, 2012 WL 983371 (S.D.N.Y. Mar. 22, 2012).

The standard is set forth in *School Committee of the Town of Burlington vs. Department of*

*Education Massachusetts*, 471 US 359 (1985): [A] "Board of Education may be required to pay for

educational services obtained for a child by the child's parents, if the services offered by the Board

of Education were inadequate or inappropriate, the services selected by the parent were appropriate,

and equitable considerations support the parents' claim."  (*Burlington*, 471 U.S. at 370). To meet

their burden of proving the appropriateness of C.D.'s placement at Learning Prep, the Parents need

only show that the services provided were "proper under the Act" (*see Florence County Sch. Dist.*

*Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993) *i.e.*, that the private school offered an

educational program which met the C.D.'s special education needs.  *Id.*

The preponderance of the evidence on the record clearly shows that C.D. received

substantial educational benefits at Learning Prep both academically and socially.  In addition,

although a private school placement for students with disabilities is technically "more restrictive"

than a public school placement, C.D.'s educational experience at Learning Prep was far less

"restrictive" than her experience would have been in the self-contained ACCESS program,

where she would spend her entire day, with the possible exception of lunch and electives, with

eight (8) other students in total (9th – 12th grade), many of whom struggled with significant

emotional and/or behavioral issues. (*See e.g.,* A.R.1913, ll.15-16; A.R.1913, *ll.* 6-11; A.R. 4182;

A.R.1703-1704, *see generally* A.R.1691-1745; *see generally* A.R. 2433-2483).

In her 2014 Neuropsychological Evaluation Report, Dr. Gibbons described the non-

academic benefits C.D. received at Learning Prep:

> Not only is [C.D.]'s current program a good fit for her academically, but she is also
> showing progress in social-emotional development.  By all accounts she has gained

confidence, participates more in classes, and has made friends.  By attending a school like LPS where all of the students struggled to learn in mainstream settings, [C.D.] is part of a social milieu and experiences a sense of acceptance and belonging.  **Furthermore, she is able to have a "typical" high school experience where she transitions between classes, has different teachers, and enjoys social time during breaks."**

(A.R. 3896) [Emphasis added].

## IV.  <u>CONCLUSION</u>

The Parents' have met their burden of proof in this matter and have shown by a preponderance of evidence that the Natick Public School District failed to adhere to the IDEA's LRE mandate in determining that the IEPs proposed by Natick for the 2012-2013 and 2013-2014 school years were reasonably calculated to provide C.D. with a free appropriate education in the least restrictive environment, and that the hearing officer's findings and conclusions were arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, and as such, are not entitled to deference by this Court and should be reversed.

Dated this <u>3</u><sup>rd</sup> day of <u>July, 2018</u>                      Respectfully submitted,

C.D., by and through her PARENTS AND
NEXT FRIENDS, M.D. and P.D.

By their attorney,

/s/ Laurie R. Martucci
Laurie R. Martucci, Esq.
BBO #561946
Martucci Law Associates
20 Cabot Boulevard, Suite 300
Mansfield, MA 02048
Tel: (508) 964-6664
Fax: 1+(508) 964-6665
lrm@martucci-law-associates.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF"), and paper copies will be sent to those indicated as non-registered participants on July 3, 2018.

/s/ Laurie R. Martucci
Laurie R. Martucci